The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WESTERN TOWBOAT COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>VIGOR MARINE, LLC,<br><br>Defendant. | IN ADMIRALTY<br><br>Case No. 2:20-cv-00416-RSM<br><br>MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>**NOTED ON MOTION CALENDAR: MAY 27, 2021**<br><br>File Date: April 29, 2021<br>Trial Date: June 28, 2021 |

**MOTION**

Defendant Vigor Marine, LLC ("Vigor") moves the Court for partial summary judgment on its counterclaim for General Maritime Negligence and the parties' cross claims for breach of contract. *See* Vigor Marine, LLC's Answer to Plaintiff's Complaint for Breach of Maritime Contract and for Declaratory Judgment (Dkt. # 15), at 6; Complaint (Dkt. # 1), at 5. The undisputed facts are that Western Towboat Company ("Western"), knowingly and of its own volition, towed a sinking Drydock into a national marine sanctuary where it sank. This conduct violated federal law, breached standards of prudent seamanship, and breached the express language of the towage contract.

MOTION FOR PARTIAL SUMMARY JUDGMENT - 1
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

There is no genuine dispute of material fact that Western alone caused the sanctuary damage. Absent Western's decisions *after* the Drydock was undisputedly unseaworthy, the Drydock would never have been in the sanctuary at all. Therefore, summary judgment is appropriate—Western is solely liable for any and all damages arising from sinking the Drydock *within* the boundaries of the Monterey Bay National Marine Sanctuary (the "Sanctuary"). For the same reasons, Western cannot establish the elements of its breach of contract claim and summary judgment should be granted in Vigor's favor.

## FACTUAL BACKGROUND

### A.    The tow plan

Vigor hired Western to tow the YFD-70, a decommissioned Drydock (the "Drydock" or "YFD-70") from Seattle, Washington to its buyer Ensenada, Mexico. Declaration of David Boyajian in Support of Motion for Partial Summary Judgment ("Boyajian Dec."), ¶ 1, Ex. 1. This Tow Agreement was a "lump sum" contract, under which Western received a set price regardless of how long the voyage took. *Id*.

Vigor hired Richard Shaw of Bowditch Marine, Inc., a reputable marine surveyor, to determine the suitability of Western's tow vessel (the "OCEAN RANGER") to tow the Drydock on the proposed voyage, and to prepare a report that included maximum sea state and weather conditions for a safe voyage (the "Draft Survey"). *Id*., ¶ 2, Ex. 2. Shaw's Draft Survey provided that "[u]pon receipt of a favorable weather forecast," the tow could proceed "upon headings and at speeds commensurate with enroute winds, seas, swells, and ambient weather conditions in order to minimize stresses on the hull(s) of Drydock YFD 70 and all components and the tow." *Id*.

After Shaw, Vigor, and Vigor's underwriters communicated about Western's proposed voyage limits, Shaw prepared a final "Trip in Tow Suitability Survey" (the "Final Survey"). *Id*., ¶ 3, Ex. 3. The Final Survey indicates that the updated "Towing and Voyage Recommendations were submitted to and reviewed with Western's Port Captain Russel

MOTION FOR PARTIAL SUMMARY JUDGMENT - 2
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

Shrewsbury and submitted to Capt. Steven McGav[ock], Master, Tug OCEAN RANGER."

*Id*. It also required:

> Tug OCEAN RANGER is to proceed upon headings and at speeds commensurate with en route winds, seas, swells, and ambient weather conditions in order to minimize stresses to the hull(s) of Drydock YFD 70 and all components of the tow. The Master of Tug OCEAN RANGER shall **avoid heavy head or beam seas (greater than 8-10 ft.)** to avoid pitching or rolling and ensure that seamanship techniques are employed to minimize the effects of head seas and rolling upon Drydock YFD 70. Special attention should be given to the Tug's horsepower in relation to the weight of the tow(s) to minimize stress on the bow and side shell hatch structure(s).
>
> The Master of the Tug OCEAN RANGER is not to proceed from any safe port or sheltered waters during the voyage without first determining that **reasonable weather conditions (less than Force 6) are predicted along his intended track**, nor is he to proceed at speeds excessive for the prevailing weather or for any regulated waterways the tow may transit.

*Id*. (emphasis added)

Western accepted and incorporated the revised and reduced recommended sea state and wind conditions (although Western inexplicably changed the wind restriction from "less than Force 6" to "20-25 knots", which is slightly higher) in a Tow Plan Amendment, which Western sent back to Vigor. *Id*., ¶ 4, Ex. 4.

**B.    The voyage**

On October 17, 2016, the OCEAN RANGER departed Western's dock at 0900 hrs., picked up the Drydock at Vigor's shipyard at about noon, and made its way west through Puget Sound. *Id*., ¶ 5, Ex. 5. The tug reached the "open ocean" sometime between 1400 hrs. and 1700 hrs. on October 18, 2016, depending who you ask. *See, e.g.*, *id*.

By 1000 hrs. the following morning, the OCEAN RANGER was plowing south through conditions exceeding the tow's wind restrictions. Those conditions continued for at least 16 hours, until subsiding around 0200 hrs. on the morning of October 20, 2016. *Id.* A couple days of fair weather followed. *Id*.

MOTION FOR PARTIAL SUMMARY JUDGMENT - 3
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

1   On Saturday, October 22, 2016, the tow encountered 6-plus hours of significant wave
2   heights that, again, eventually abated. *Id*.

3   Then, from 1400 hrs. on October 23, 2016, through 1400 hrs. on October 24, the tow
4   passed through another 24-hours of conditions exceeding the tow restrictions, including ten
5   straight hours of 35-plus knot winds on the nose and several hours of 10–12 foot seas. *Id*.

6   Twenty-four hours after that storm abated, the OCEAN RANGER's crew noticed the
7   Drydock was listing. *Id*.

8   At 1430 hrs. on October 25, 2016, Captain McGavock called a meeting with his
9   Mates. *Id*., ¶ 6, Ex. 6. They all agreed the Drydock was taking on water. *Id*. They noted the
10  Drydock had taken on a "port bow list" in the OCEAN RANGER's log and altered course to
11  seek refuge and possible assistance in San Francisco Bay. *Id*., ¶ 5, Ex. 5.

12  At 1500 hrs., Western alerted the United States Coast Guard of the OCEAN
13  RANGER's position–just outside the western boundary of the Greater Farallones National
14  Marine Sanctuary–and the Drydock's deteriorating stability. *Id*.

15  Throughout discovery, the parties have disputed *why* the Drydock began taking on
16  water. But it is undisputed that Western knew the Drydock was taking on water and that its
17  stability was deteriorating by mid-afternoon on October 25, 2016. Similarly, what Western
18  did and did not do *after* the Drydock began listing and was in danger of sinking is
19  undisputed.

20  On its altered course towards San Francisco Bay, the OCEAN RANGER entered the
21  Greater Farallones National Marine Sanctuary. *See* Boyajian Dec., ¶ 7, Ex. 7. Over the next
22  few hours, Western concluded the list was getting worse, i.e., the Drydock was taking on
23  more water such that the tow could not safely transit San Francisco's Golden Gate because, if
24  the Drydock "sunk anywhere in that entrance area, it would be a national disaster." *Id*., ¶ 8,
25  Ex. 8, at p. 5.

26  Bob Shrewsbury (one of Western's owners, and an experienced offshore towing

MOTION FOR PARTIAL SUMMARY JUDGMENT - 4
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

master) testified that he personally rerouted the tug and tow toward Monterey Bay. *Id*., ¶ 8, Ex. 8, at p. 6. Captain McGavock later reported to the Coast Guard that at around 1800 hrs. on October 25, 2016, "I made [a] decision to sail away from the termination of West/East bound SF marine traffic lanes. I plotted a SSE course for Pioneer Canyon <u>in case we had to abandon the sinking tow</u>." *Id*., ¶ 9, Ex. 9.

Shortly after 1800 hrs. on October 25, 2016, the OCEAN RANGER crossed the southern boundary of the Greater Farallones National Marine Sanctuary and proceeded into the un-protected open ocean (*i.e.*, not in a federally-protected marine sanctuary). *Id*. ¶ 7, Ex. 7. Captain McGavock stated that, at around this time, "it became apparent the tow would not make it. I contacted [Western Towboat Company] and [the Coast Guard] and [sic] decision was made to head out of the traffic lanes and [Greater Farallones] sanctuary area and into as deep water as possible." *Id*., ¶ 6, Ex. 6. Bob Shrewsbury was "getting more and more concerned talking to the guys and what they could see with the conditions they had there and I told them to head for deeper water." *Id*., ¶ 8, Ex. 8, at p. 9–11. At around 6:28 p.m., Bob Shrewsbury explained his decision to reroute to Monterey Bay in an email to Vigor's Dockmaster Dan Keen, noting "We do not want the Dock to sink where it would have to be a Major Salvage job." *Id*., ¶ 10, Ex. 10. Vigor's Dan Keen agreed. Unfortunately, when Western took the sinking Drydock into the Monterey Bay National Marine Sanctuary that is exactly what Western invited.

Instead of identifying deep water *outside* of federally protected National Marine Sanctuaries, Capt. McGavock plotted a course SSE, directly into the Monterey Bay National Marine Sanctuary. *Id*., ¶ 7, Ex. 7; ¶ 9, Ex. 9. Despite contrary assertions in Western's complaint, Bob Shrewsbury testified that he personally decided to reroute the tow to Monterey, without direction from Vigor. *Id*., ¶ 8, Ex. 8, at p. 10–11. But Bob Shrewsbury also testified that "I wasn't aware of how close he [Captain McGavock] was to the sanctuary, if he was in one," this despite the fact the Sanctuaries' boundaries are clearly marked on the

MOTION FOR PARTIAL SUMMARY JUDGMENT - 5
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

navigational charts. *Id*. Nonetheless, Captain McGavock's boss told him to head towards and into the Sanctuary.

Around 2230 hrs., the OCEAN RANGER crossed into the Monterey Bay National Marine Sanctuary with what Captain McGavock had already concluded was "the sinking tow." *Id*., ¶ 9, Ex. 9.

The National Marine Sanctuaries' boundaries are marked with a thick bright-blue outline on the relevant navigational charts. Large blue font, all capital letters, identify the Sanctuaries by name, note they are "protected area[s]", and refer users to both the chart's notes and the relevant section of the CFR ("15 CFR 922"). *See id.*, ¶ 7, Ex. 7.[1] Printed right on the relevant charts, the referenced chart note states:

> NATIONAL MARINE SANCTUARIES
> National Marine Sanctuaries are protected areas, administered by NOAA which contain abundant and diverse natural resources such as marine mammals, seabirds, fishes and tidalpool invertebrates. These are particularly sensitive to environmental damage such as spills of oil and other hazardous materials, discharges, and groundings. Exercise particular caution and follow applicable Sanctuary regulations when transiting these areas to avoid environmental impacts. A full description of Sanctuary regulations may be found in 15 CFR Part 922 and in the Coast pilot.

Captain McGavock stated that "[a]t 2300 I held a safety meeting to discuss the evolution and process of releasing the tow if circumstances required", i.e. how to cut the tow free when it sunk. *Id*., ¶ 6, Ex. 6.

Three hours later, the OCEAN RANGER was still in the Sanctuary when the Drydock capsized. *Id*. By 0305 hrs., the Drydock slipped below the waves less than one mile on the wrong side of the Sanctuary border. *Id*.; *see also, id.*, ¶ 7, Ex. 7.

---

[1] A scalable, online version of this chart is available on NOAA's website at https://charts.noaa.gov/PDFs/18680.pdf (last visited April 29, 2021).

MOTION FOR PARTIAL SUMMARY JUDGMENT - 6
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

## C. NOAA's penalty

In early November, 2016, NOAA's Scott Kathey informed Vigor that NOAA concluded the Drydock sank 0.92 miles inside the western boundary of the Monterey Bay National Marine Sanctuary. Boyajian Dec., ¶ 12, Ex. 12. A July 2018, Vigor-funded deep-sea survey and ROV dive(s) confirmed the YFD-70 had damaged the submerged lands, surrounding habitat, and possibly unique deep-sea flora and fauna within the Sanctuary. *Id.*, ¶ 13.

On January 19, 2021, NOAA sent letters to Vigor, Western, and Amaya Curiel (the Drydock's purchaser) advising the parties that NOAA considers them liable for damages to the Sanctuary caused by the sinking of YFD-70. Boyajian Dec., ¶ 14, Ex. 14.

## D. Procedural background

Western's complaint (Dkt. # 1) asserts two claims, one for breach of contract based on Vigor's refusal to pay Western's towage fee for the ill-fated voyage, and one seeking declaratory judgment that Western has no liability to the United States for any Sanctuary damage. Vigor answered (Dkt. # 15), and asserted counterclaims for general maritime negligence based, *inter alia*, on Western's decision to steer into the Sanctuary when it knew the Drydock could or would sink. Vigor also asserts claims for breach of contract, attorney fees and costs, and unjust enrichment. Because NOAA's penalty assessment has not issued and related facts remain undetermined, Vigor also filed motions to extend discovery and pretrial deadlines (Dkt # 28) and to stay the case upon completion of discovery, pending NOAA's penalty assessment (Dkt # 31). Western opposed the motions (*see* Dkt. ## 34, 35). Western intimated for the first time that it intended to move for summary judgment (*see* Dkt. # 35, at 6 n.5).

In light of Western's surprising position, and identifying no genuine disputes of material fact regarding how the Drydock ended up inside the Sanctuary, Vigor moves for summary judgment. Further, because Western's admitted actions breached the towage

MOTION FOR PARTIAL SUMMARY JUDGMENT - 7
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

contract, Western cannot establish the elements of a maritime breach of its contract claim as a matter of law. As the Court has not ruled on Vigor's motion to extend deadlines, and as today is the deadline for dispositive motions, Vigor files this Motion for Partial Summary Judgment because there is no genuine issue of material fact: Western breached the towage contract and is solely at fault for violating the Marine Sanctuaries Act.

Vigor's counsel conferred, yesterday, by telephone with Western's counsel about the three issues raised in Vigor's Motion for Partial Summary Judgment. The parties were unable to resolve or narrow any of the issues. Western's counsel indicated that Western intended to file their own motion for summary judgment, but asserted that the Local Rules do not require conferral on dispositive motions, and chose not disclose the grounds for or issues raised by their intended motion(s).

## ARGUMENT

### A.   Summary judgment standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the nonmoving party. *Anderson v Liberty Lobby, Inc.*, 744 U.S. 242, 248–49 (1986). A fact is "material" if it could affect the outcome of the case. *See id*. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact for trial. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). When the nonmoving party has the burden of proof at trial, the moving party need only point out that there is an absence of evidence to support the nonmoving party's case. *Id*. Once the moving party carries its initial burden, the adverse party may not rest upon the allegations or denials of the adverse party's

MOTION FOR PARTIAL SUMMARY JUDGMENT - 8
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

pleading(s), but must provide affidavits or other sources of evidence that set forth specific facts showing there is a genuine issue for trial. *Id.* (citing Fed. R. Civ. P. 56 (e)).

"Summary judgment is not precluded simply because there is a dispute of some facts in a case." *School Dist. No. 1J, Multnomah Co., v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993), *cert. denied*, 512 U.S. 1236 (1994). To avoid summary judgment, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A scintilla of evidence in support of the nonmover's position is insufficient; there must be evidence upon which the jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 250–51. "When the nonmoving party relies on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) (Per Curiam).

**B.    Vigor is entitled to summary judgment on its claim for general maritime negligence**

1.  Western breached its duty of reasonable care when it knowingly towed the sinking Drydock into the Monterey Bay National Marine Sanctuary

A general maritime law negligence claim shares the basic elements of a common law negligence claim: "a duty, a breach of the duty, proximate cause, and damages." *Prince v. Thomas*, 25 F. Supp. 2d 1045, 1047 (N.D. Cal. 1997). A "duty of reasonable care under the circumstances" applies in maritime negligence actions. *Christensen v. Georgia-Pac. Corp.*, 279 F.3d 807, 815 (9th Cir. 2002) (citing *Peters v. Titan Nav. Co.*, 857 F.2d 1342, 1345 (9th Cir. 1988)).

Maritime cases tell us specifically how these standards apply to towboat operations. A tug owner must perform its duties with such reasonable care and maritime skill as prudent navigators usually employ in similar undertakings, and with such consideration as special

MOTION FOR PARTIAL SUMMARY JUDGMENT - 9
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

circumstances may require. *Stevens v. The White City*, 285 U.S. 195, 202, 52 S. Ct. 347, 350 (1935); *Aiple Towing Co., Inc. v. M/V Lynne E. Quinn*, 534 F. Supp. 409, 411 (E.D. La. 1982); *M. P. Howlett Inc. v. Tug Dalzellido*, 324 F. Supp. 912, 917 (S.D.N.Y. 1972). The degree of care required of a tug is measured with reference to the character of the tow and the condition of the seas and weather. *Aiple Towing*, 534 F. Supp. at 411; *See also M. P. Howlett*, 324 F. Supp. at 916–917; *The Wyoming*, 58 F.2d 789 (D. Mass. 1932); *The Mercury*, 2 F.2d 325 (1 Cir. 1924). A tug owner may be directly negligent for breaching its duties to consider the undertaking of the tow and intervene with regard to the decision of its captain when the circumstances require that intervention and there is opportunity to do so. *The Linseed King*, 285 U.S. 502, 510–11, 52 S. Ct. 450, 452 (1932); *Or. by State Highway Com. v. Tug Go-Getter*, 468 F.2d 1270, 1275 (9th Cir. 1972); *Waterman S.S. Corp. v. Gay Cottons*, 414 F.2d 724, 732 (9th Cir. 1969).

Critically, Western's job and responsibilities changed once they knew the YFD-70 was taking on water and losing stability: <u>Once a tower knows its tow is unstable, the tower has a duty to take reasonable measures to avoid the worst consequences</u>. *See generally*, *Houma Well Serv., Inc. v. Tug Capt. O'Brien*, 312 F. Supp. 257 (E.D. La. 1970). The evidence in this case establishes that Western failed on this charge.

In *Houma*, tugs towed barges through shallow water in the Mississippi River. *Id*. at 259. One of the barges appeared to be taking on water and capsized. *Id*. As here, the parties disputed whether the barge was unseaworthy at the outset of the voyage or became unseaworthy as the tower dragged it over mud flats and oyster beds, i.e., there were issues of fact over which party caused the unseaworthy condition. *Id*. As is true here, the *Houma* court determined that question doesn't matter.

Instead, the *Houma* court observed, the tug's crew "not only were aware of the manifestations of unseaworthiness but also were concerned about the barge's safety" "from the time she was taken in tow." *Id*. at 261–62. Because the evidence indicated the tug's

MOTION FOR PARTIAL SUMMARY JUDGMENT - 10
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

captain should have taken prompt action to stop the tow when the crew first observed the unseaworthy condition, or to run the unseaworthy barge to a safe resting place, the *Houma* court ruled the tug "breached the duty it owed and this breach was the proximate cause of the accident," ruling that "[o]ne who elects to ply his trade by running time-honored risks may do so at the peril of liability if the risk materializes." *Id*. at 262.

*Houma* also analyzed the doctrine of mutual fault and concluded it does not apply where the tug, upon seeing the tow's unseaworthy condition, "has the final opportunity, as well as the duty, to avert the damage, sometimes called the last clear chance." *Id*. at 263. In fact, where the tug and the tow both contribute to the end result, if the unseaworthiness of the tow becomes "obvious to the tug in time for the tug to accommodate her own navigation to the emergency, the tug alone was liable." *Id*. (quoting *Chem. Transporter, Inc. v. M. Turecamo, Inc*., 290 F.2d 496, 497 (2d Cir. 1961)) (emphasis added).

This bears repeating: regardless of how or when a tow became unseaworthy, once the tower becomes aware of the tow's imperiled condition the tower alone has the duty minimize the damages the sinking tow causes. Accordingly, *Houma* entered judgment in favor of the barge owners on liability, reserving damages to be resolved in settlement negotiations or further proceedings. *Id*. at 264. This Court should follow *Houma*'s lead.

Western cannot raise a genuine dispute regarding its breach of these standards of care. It is undisputed that Western noticed the Drydock was taking on water and listing after eight days at sea and roughly 13 ½ hours before it sank. *See* Boyajian Dec., ¶ 5, Ex. 5. Bob Shrewsbury testified that he decided to tell Captain McGavock to steer away from San Francisco Bay because he thought sinking the Drydock there would be a "national disaster" necessitating a "major salvage operation" *See* Bob Shrewsbury's deposition and email to Dan Keen, Boyajian Dec., ¶ 8, Ex. 8; ¶ 10, Ex. 10. Captain McGavock told the Coast Guard, under penalty of perjury, that at around 1800 hrs. on October 25, 2016, "I made [a] decision to sail away from the termination of West/East bound SF marine traffic lanes. I plotted a SSE

MOTION FOR PARTIAL SUMMARY JUDGMENT - 11
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

course for Pioneer Canyon <u>in case we had to abandon the sinking tow</u>." *Id*., ¶ 9, Ex. 9. Knowing the tow was in grave peril and might sink, the OCEAN RANGER irrefutably exited the Greater Farallones National Marine Sanctuary around 1800 hrs. on October 25—Captain McGavock noted it in the OCEAN RANGER's logbook. *Id*., ¶ 5, Ex. 5. At that location and across the vessel's track for the next 4 ½ hours, through open ocean not within the boundaries of any protected waters, Western cannot dispute that it could have let the Drydock sink there without exposing itself and Vigor to NOAA's sanctuary restoration damages and related penalties. This bears repeating: had Western simply stopped, stayed put, hove to, or otherwise held position in the deep water *outside* the National Marine Sanctuaries, nobody would be liable to the federal government.

Instead, unquestionably, the OCEAN RANGER plotted a course directly towards and then entered the Monterey Bay National Marine Sanctuary around 2230 hrs., where the Drydock's condition continued to deteriorate for another 4 ½ hours. Bob Shrewsbury testified that he alone made the decision to direct the vessel on this course, and that he did so without appreciating the consequences of sinking the Drydock in the Sanctuary. Captain McGavock steered the vessel to this location having admittedly known since the previous afternoon that he may have to "abandon the sinking tow." Captain McGavock held a meeting about abandoning the tow at 2300 hrs., just after entering the Sanctuary but still more than four hours before the sinking. Boyajian Dec., ¶ 6, Ex. 6. No matter how the Drydock came to be unseaworthy, by 1800 hrs. (if not sooner), Western ***knew*** the Drydock was unseaworthy. At that point, there can be no dispute about the Drydock's unseaworthy condition. Western could see the Drydock, and they reported (through their office) to Vigor that the Drydock was in danger. *Id*. They reported the same to the United States Coast Guard. At that point, Western's job had changed—it was their job to try to minimize further damages, to attempt to save the Drydock, or, failing that, to find a safe place to let it sink.

MOTION FOR PARTIAL SUMMARY JUDGMENT - 12
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

While Western was in unprotected waters, it could have slowed down, stopped, or hove to, to remain there until sunrise. Captain McGavock could have turned South or West, which would have kept the tow outside the Sanctuary. Instead, Captain McGavock proceeded into the Sanctuary and remained there for over four hours, despite the clear chart markings warning about the Sanctuary's risks. Further, Captain McGavock's written post-incident statement to Western's Port Captain stated that McGavock understood that it was important to "head out of the traffic lanes <u>and sanctuary area</u>"[2] when he diverted away from San Francisco, but *hours* before he headed into the Monterey Bay Sanctuary. Boyajian Dec., ¶ 6, Ex. 6.

In light of the foregoing, there is no genuine dispute of material fact that Western breached its duty of reasonable care by failing to give sufficient attention to the special circumstances involved in and risks presented by directing the sinking Drydock to a safer location. *See Aiple Towing Co. v. M/V Lynne E. Quinn*, 543 F. Supp. 409, 411 (E.D. La. Mar. 2, 1982). Western had ample opportunities to avoid sinking the Drydock in a federally-protected Marine Sanctuary—Western spent 4+ hours transiting non-protected open ocean waters en route to the Monterey Bay National Marine Sanctuary *after* it knew the Drydock was likely to sink. Like the tug operators in *Houma*, Western was aware of the Drydock's "manifestations of unseaworthiness" and concerned about its safety when Western elected to run the risk of towing an unseaworthy tow away from the safest and least harmful place to let it sink: deep water outside the Sanctuary.

Like the tugs in *Houma*, the OCEAN RANGER had ample opportunity to "accommodate her own navigation to the emergency" caused by the sinking Drydock. Because Western cannot raise a genuine dispute of material fact that it did not make such a

---

[2] Presumably, the Greater Farallones National Marine Sanctuary, which the OCEAN RANGER was transiting en route to San Francisco Bay.

MOTION FOR PARTIAL SUMMARY JUDGMENT - 13
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

prudent accommodation, Vigor is entitled to judgment as a matter of law that Western alone is liable for any damages that arise from causing the Drydock to sink within the Sanctuary.

      2.      Western is presumptively liable for sanctuary damages and must show by clear and convincing evidence that its negligence could not have proximately caused the sanctuary damage

Under admiralty's Pennsylvania Rule, if a vessel's alleged liability results from a statute or regulatory violation, it is presumed that the ship owner was at fault, and the burden of proving causation shifts to the ship owner. *MacDonald v. Kahikolu, Ltd*., 581 F.3d 970, 973 (9th Cir. 2009). The burden imposed by the Pennsylvania Rule has been often applied in the Ninth Circuit and described as "difficult, if not impossible," to discharge. *Id*. at 974. The presumption is rebutted only where the defendant shows by clear and convincing evidence that the violation <u>could not reasonably have been</u> a proximate cause of the injury. *Id*.

Western violated the National Marine Sanctuaries Act, 16 U.S.C. 1431–1445c-1. The Act makes it unlawful to discharge or deposit from within or into the Sanctuary, any material, or to place or abandon any structure on or in its submerged land, subject to certain exceptions that do not apply here. 15 C.F.R. §§ 922.132(a)(2)(i), 922.132(a)(4). It is also illegal to desert a vessel aground, at anchor, or adrift in the Sanctuary. *Id*., § 922.132(a)(9). Accordingly, Western is presumptively at fault for the sanctuary damage unless it can show by clear and convincing evidence that the violation could not reasonably be held to have been a proximate cause of the damage, which it cannot in light of Western's unilateral decision to take the sinking Drydock into the Sanctuary.

The Pennsylvania Rule also applies where a vessel captain fails to familiarize himself with the obstructions in the area of his voyage and to update his charts in violation of statutory regulations governing mariners. *See Tidewater Marine v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 1003 (E.D. La. 2000) (citing 33 C.F.R. § 164.33. 33 and § 164.30 in ruling that the failure triggered the Pennsylvania Rule, although not finding the fault a superseding cause of the allision for fact-specific reasons).

MOTION FOR PARTIAL SUMMARY JUDGMENT - 14
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

Here, Captain McGavock, Bob Shrewsbury, Russell Shrewsbury and John Cowgill (the OCEAN RANGER's chief mate) admittedly did not familiarize themselves with the hazards presented by the Sanctuary, which are clearly identified (in big bright-blue lines and letters) on the charts and with which they were statutorily mandated to be familiar. *See REXACH v. Sec'y OF THE NAVY*, CIVIL No. 75-408, 1978 U.S. Dist. LEXIS 19588, at *25 (D.P.R. Feb. 14, 1978) (quoting Chapman, Piloting, Seamanship & Small Boat Handling, at p. 417: "It is the duty of a skipper to fix the position of his craft with such degree of precision and at such frequent intervals as is required by the proximity to hazards to safe navigation.").

Western's failure to familiarize itself with the consequences of sinking the Drydock in the Sanctuary, and its disregard for the clear warning printed on the nautical charts, are additional reasons Western bears the burden of showing by clear and convincing evidence that its decision to enter the Sanctuary and remain within it until the Drydock sank could not be a proximate cause of the sanctuary damages. Because it cannot meet this burden, summary judgment is appropriate on Vigor's claim for general maritime negligence.

**C.    Vigor is entitled to summary judgment in its favor on the parties' cross claims for breach of contract**

Summary judgment in Vigor's favor is also appropriate on the parties' cross claims for breach of contract. *See* Complaint (Dkt. # 1), at 5, Answer (Dkt. # 15), at 6. To establish a maritime breach-of-contract claim, a plaintiff must demonstrate "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431, 455 (N.D. Tex. 2019) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004)). Western cannot demonstrate the second element of "adequate performance," so its breach of contact claim fails as a matter of law.

Section 7.B of the towage contract provided that "Should the Tow become disabled, breakaway or be otherwise unfit to continue the voyage . . . Customer [Vigor] shall be

MOTION FOR PARTIAL SUMMARY JUDGMENT - 15
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

notified and the Tug shall either take the tow to the nearest safe port/place or stand by the Tow until other assistance is rendered." Boyajian Dec., ¶ 1, Ex. 1. Western could not have adequately performed the towing contract since it towed the Drydock into the Sanctuary instead of the "nearest safe port/place."

Here, Western knew the Drydock had become "disabled" and "unfit to continue the voyage." But, rather than take the disabled tow to a place where it might safely sink (or safely ride out the night, and be reevaluated in the light of a new day), they towed it into a National Marine Sanctuary. Bob Shrewsbury testified that he alone made the routing decision that led into the Sanctuary, and Captain McGavock reported that he plotted and set the SSE course straight into the Sanctuary. At that time, Shrewsbury and McGavock admittedly believed the Drydock was likely to sink. But the OCEAN RANGER didn't hold the disabled Drydock in position outside the Sanctuary (that would have been a safe place for it to sink). Western instead towed the listing, disabled, sinking Drydock into the Monterey Bay National Marine Sanctuary, in breach of Section 7.B of the tow agreement. Thus, Vigor is entitled to summary judgment in its favor on the cross claims for breach of contract.

## CONCLUSION

Once Western knew the Drydock was unseaworthy, it had a duty to consider the special circumstances and risks presented by the tow's condition and position, including sinking a Drydock in a National Marine Sanctuary, and to adapt its navigation to the particulars of the pending emergency. But Western had no fewer than 3 other licensed towing masters line up behind Bob Shrewsbury's decision to head for Monterey. Not one of them raised the issues presented by the Marine Sanctuaries. Not one of them asked the USCG (during the already-established hourly communications) where they should and shouldn't be if and when the sinking Drydock sunk. Not one of them looked up what the bright-blue lines and letters marking the Sanctuaries on the NOAA charts meant (nor, apparently, did any of them read the chart note explaining the risk(s) posed by the Sanctuary,

MOTION FOR PARTIAL SUMMARY JUDGMENT - 16
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

even though it is printed right on the relevant charts). And not one of them communicated to Vigor the significant risks involved in taking a sinking Drydock into Monterey.

Because Western has admitted that it did not appreciate, understand, consider, or communicate those risks, "the tug alone" is liable to the United States for sanctuary damages. Western cannot show by clear and convincing evidence that its decisions after the Drydock was undisputedly unseaworthy could not be a proximate cause of the damages because there is no genuine dispute of material fact about why the Drydock sank in the Sanctuary as opposed to one mile further west, in non-protected waters (where it had been just a few hours earlier). Moreover, these breaches dictate that Western cannot establish it adequately performed the contract. Thus, Vigor respectfully requests the Court grant partial summary judgment in Vigor's favor that Western is solely liable for damages to the Sanctuary, and that Western's claim for breach of contact fails as a matter of law because Western breached the contract.[3]

Dated this 29th day of April, 2021.

SCHWABE, WILLIAMSON & WYATT, P.C.

By:  /s/ David R. Boyajian
David R. Boyajian, WSBA #50195
Email: dboyajian@schwabe.com
Noah Jarrett, WSBA #31117
Email: njarrett@schwabe.com
Adam P. Murray, WSBA #48553
Email: amurray@schwabe.com
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
*Attorneys for Vigor Marine, LLC*

---

[3] If this Court grants Vigor's motion, only Vigor's counterclaims for fees and costs and unjust enrichment will remain, with damages to be proven at trial or by further motion.

MOTION FOR PARTIAL SUMMARY JUDGMENT - 17
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30733934.5

# CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2021, I served the following MOTION TO STAY PROCEEDINGS on:

Anthony J. Gaspich
Gaspich Law Office PLLC
8094 Barthrop Pl. NE
Bainbridge Island, WA 98110
tony@gaspichwilliams.com

J. Stephen Simms (pro hac vice)
Simms Showers LLP
201 International Circle, Suite 250
Baltimore, MD 21030
jssimms@simmsshowers.com

☒ by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all associated counsel.

/s/ David R. Boyajian
David R. Boyajian

CERTIFICATE OF SERVICE - 1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
360.694.7551

PDX\120355\220045\AMU\30733934.5