The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WESTERN TOWBOAT COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>VIGOR MARINE, LLC,<br><br>Defendant. | IN ADMIRALTY<br><br>Case No. 2:20-cv-00416-RSM<br><br>REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>**NOTED ON MOTION CALENDAR: MAY 21, 2021**<br><br>File Date: May 21, 2021<br>Trial Date: June 28, 2021 |

**REPLY**

Western Towboat Company's ("Western") counsel concedes that Western was on constructive notice of the marine sanctuary boundaries and the consequences of violating the National Marine Sanctuaries Act when the OCEAN RANGER crossed into the Monterey Bay National Marine Sanctuary with a sinking 528-foot steel drydock. *See* Opp'n (Dkt. # 52), at 5, n.19 ("Vigor [had] at a minimum (<u>as did Western </u>and everyone else) constructive (if not actual) knowledge of the marine sanctuary boundaries, and law applying to them.") (emphasis added). Western's brief quotes Bob Shrewsbury's testimony that he directed the tug to Monterey despite the concerns shared by his son and the tug's crew that the drydock

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT - 1
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

would sink. *Id.*, at 16, lines 23–24; 18, lines 7–8, 16–18. Just before Western towed the sinking drydock across the Sanctuary boundary, a USCG helicopter flyover reported a 35–40 degree port list (according to the USCG Incident Report Western never produced to Vigor[1]).

Western acknowledges undisputed facts that support Vigor's motion: Western's opposition brief confirms that Western was worried the drydock was going to sink before the OCEAN RANGER towed the drydock into the Sanctuary. Western also acknowledges that Bob Shrewsbury suggested diverting to Monterey, and Western does not effectively dispute that Western alone set a course into the Sanctuary.

Importantly, Western's opposition brief also admits to constructive, if not actual, knowledge of the Sanctuary boundaries and the legal implications of sinking the drydock there. *See* Opp'n (Dkt. # 52), at 5 n.19. Western violated its duties when it admittedly knew or should have known of the Sanctuary boundaries and applicable law, yet crossed into the Sanctuary when it was already worried the drydock was going to sink. Indeed, Western plotted that course specifically because they thought it might sink.

Western's attempt to switch the parties' roles and responsibilities is unsupported and makes no sense. Western asserts that a few Vigor shipyard employees, via email, in the middle of the night and on land, controlled the tow in the ocean hundreds of miles away. No law, no contract, and no evidence supports this switch of roles. Western, alone, had the

---

[1] Vigor learned about this United States Coast Guard Incident Investigation report, for the first time, when Western attached it to its Motion for Summary Judgment.

That report notes (as cited in Western's brief), "AT 2200T ON 25OCT16, CG 6607 (HELO) IS ONSCENE [sic] AND REPORTS A LISTING OF 35 TO 40 DEGREES FROM THE DRY DOCK BARGE. THE HELO REPORTS THAT A PORTION OF THE PORT SIDE IS PARTIALLY SUBMERGED." *See* Incident Report (Dkt. # 42-23), at 56. The tow crossed into the Sanctuary shortly after 2200 hrs.

For reference purposes only, the steepest street in San Francisco has only a 31.52 degree incline. The steepest in Seattle is East Roy Street (between 25th and 26th), at 26.04 degrees.

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT - 2
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

information, the opportunity, and the legal duty to keep the tow out of the Sanctuary when Western admits it was worried the drydock was going to sink.

Western is therefore solely liable for any and all damages arising from sinking the drydock *within* the boundaries of the Monterey Bay National Marine Sanctuary because: (1) safe navigation is a duty of the tug; (2) Western's opposition brief repeatedly confirms that Western was concerned about the drydock sinking when Western, alone, plotted the course into the Sanctuary; and (3) Western has not identified specific facts showing there is a genuine issue for trial on this question. Summary judgment is appropriate.

1. Safe navigation is a duty of the tug, not the tow.

Much of Western's opposition depends on an implied conclusion that Vigor, a ship repair and marine fabrication company, assumed responsibility to make navigational decisions for the voyage. In effect, Western attempts to hold Vigor liable for failing to exercise prudent seamanship. This proposition is unsupported by evidence, law, or common sense.

The law requires the tug to take responsibility for navigation issues. For example, "A tug's duty of reasonable care includes the duty to take into consideration weather conditions as they may affect the tow." *Transamerica Premier Ins. Co. v. Ober*, 107 F.3d 925, 930 (1st Cir. 1997). Further,

> A breach of the duty of care thus can be found when a tug captain makes a decision that is unsafe in light of the weather conditions and the particular circumstances of the tow that could reasonably have been known. It is negligent, for example, to knowingly brave weather conditions that may imperil a flotilla.

*Id*. (internal citations omitted). A tug is likewise liable for negligent navigation and, after Western noticed the drydock was listing, it had a duty to determine the drydock's exact condition and save it from sinking in the Sanctuary. *See* Thomas J. Schoenbaum, Admiralty & Mar. Law § 12:3 (6th ed. 2019) ("If the unseaworthiness of the tow is apparent or disclosed, the tug has a duty to take reasonable steps to determine the exact condition of the

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT - 3
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

tow and to take action to save the tow."). Thus, "[t]ypically courts hold only the tug liable, given that it is usually in control of the operation, having the duty of reasonable navigation." *Cont'l Ins. Co. v. L&L Marine Transp., Inc.*, 882 F.3d 566, 572 (5th Cir. 2018). And, although unreported, another court has observed that "[t]he master of a tug has a duty to know at all times the tug's position in the water with relation to known hazards through the use of charts, navigational aids, and fixed navigational markers." *River Pars. Co. v. M/V Flag Adrienne*, CIVIL ACTION NO. 01-0007 SECTION "T" (5), 2002 U.S. Dist. LEXIS 12232, at *13 (E.D. La. July 1, 2002). The Sanctuary's boundaries are marked in thick bright blue lines on the relevant charts, with bold blue warnings about the Sanctuary and a citation to the relevant CFRs. *See* Vigor's Motion for Partial Summary Judgment ("Vigor's Motion") (Dkt. # 39), at 6. No authority and no contract imposes similar duties on Vigor.

Western's opposition fails to cite any authority for the proposition that Vigor, through its shipyard employees' efforts to track and assist Western's operation, assumed Western's legal obligations. Thus, Western failed to rebut Vigor's contention that Western alone had the duty to minimize the damages caused by the sinking drydock. *See* Vigor's Motion (Dkt. # 39), at 9–11.

2. Western's opposition brief admits, repeatedly, that Western was worried the drydock was going to sink when Captain McGavock plotted a course directly into the Sanctuary.

    a. Western does not dispute that it was worried the drydock was going to sink before it entered the Sanctuary.

Western's opposition brief acknowledges Russ Shrewsbury's (Bob's son) testimony that, around the time the tug turned away from San Francisco, at 6:00 p.m., "we were worried the dry dock was going to sink …," and "[t]here were concerns about the dry dock sinking regardless of where they went." Opp'n (Dkt. # 52), at 14, line 19–23; 15, lines 1–3. Bob Shrewsbury (Russ's dad), a lifelong mariner, was "scared to death" that it was going to sink. *Id.*, at 17, lines 4–5; *see also* Shrewsbury Depo. (Dkt. # 52-7) at 11–12. Western cites

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT - 4
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

Bob Shrewsbury's testimony that, at 7:00 p.m. on the evening before the sinking, "I'd already decided that I thought we were in trouble." *Id.*, at 18. By 10:30 that night, just as the OCEAN RANGER towed the YFD-70 across the Sanctuary boundary, Bob's "gut and experience" told him "there was a real possibility this thing was going down." *Id*.

Western has not disputed Captain McGavock's sworn statement to the United States Coast Guard that he turned away from San Francisco "<u>in case we had to abandon the sinking tow.</u>" *See* Declaration of David Boyajian in Support of Vigor's Motion ("Boyajian Dec."), Ex. 9 (Dkt. # 40-9), at 3 (emphasis added). Instead, Western's brief admits that "[t]he undisputed facts" include that the crew first noticed the list at 2:30 p.m. (when they noted it in the tug's log) on October 25, 2016, after which "the YFD-70 began to sink rapidly." Opp'n (Dkt. # 52), at 22, lines 1–2. It is undisputed that Western's Bob Shrewsbury directed the OCEAN RANGER to head towards and Captain McGavock towed the limping YFD-70 *into* the Sanctuary *after* Western's decision makers were worried the drydock was going to sink.

      b.     Western does not genuinely dispute that it alone set the course for Monterey.

An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the nonmoving party. *See Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). The undisputed evidence does not support Western's assertions regarding Vigor's responsibility for the location of the sinking.

Western's opposition brief repeats and reinforces Bob Shrewsbury's testimony that he personally rerouted the tug and tow toward Monterey Bay. Western has not undermined Captain McGavock's sworn statement to the United States Coast Guard that he plotted the course into the Sanctuary. *See* Vigor's Motion (Dkt. # 39), at 4–5; *see also* Excerpt of Bob Shrewsbury Depo. (Dkt. # 52-7), at 22–23 (testifying that he told the crew to head for deeper water and towards Monterey while unaware of the OCEAN RANGER's location in relation

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT - 5
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

to the Sanctuary, and that he had not spoken with Vigor about that plan: "<u>I told the tug. I didn't tell them [Vigor].</u>") (emphasis added). Western also quotes Bob Shrewsbury's testimony that "nobody" else was in on the decision to plot the course away from San Francisco and into the Sanctuary. *See* Excerpt of Bob Shrewsbury Depo. (Dkt. # 52-7), at 10, lines 22–23. In its opposition brief, Western admits that, when asked if "Monterey was your suggestion?" Bob Shrewsbury said, "Yes." Opp'n (Dkt. # 52), at 16.

Western argues that the Court should instead hold Vigor liable for that decision for several reasons, none of which raises a genuine dispute of material fact. Western contends Vigor knew the intended voyage would pass through sanctuaries. Opp'n (Dkt. # 52), at 5–6. That is irrelevant because the OCEAN RANGER did not enter the Sanctuary on the intended route, but only after it altered course when Western was already worried the drydock was going to sink. *See* Boyajian Dec., Ex. 9 (Dkt. # 40-9), at 3. Thus, Vigor's pre-voyage expectation that Western would transit the Sanctuary without incident (i.e., while towing an upright drydock) is immaterial to whether Western breached any duties when it deviated course, twice, with a sinking drydock in tow.

Nor do Western's disjointed arguments about Dan Keen's preparations to meet the drydock in Monterey establish that Vigor assumed navigational responsibility for Western's towing operation. Those facts merely show that Vigor reacted appropriately when Western notified Vigor it had rerouted the tow to Monterey. Western's opposition brief actually reinforces the undisputed fact that Western did not turn toward Monterey to meet Vigor, but because Bob Shrewsbury "told Vigor that, that we can't go in there [San Francisco Bay] and I suggested if we were going to go somewhere, to try to find a lee to get some people out there, the only place I thought we could safely go was Monterey Bay." Opp'n (Dkt. # 52), at 16, lines 15–17. Vigor's internal emails, quoted directly in Western's brief, stated: "<u>The tug has decided they want to head to Monterey. They are going to essentially maintain position tonight but keep course to Monterey making little headway. Then in the AM when we have</u>

CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

<u>light, we can get a better view of the situation and determine if it is safe to enter the harbor.</u>" *See* Opp'n (Dkt. # 52), at 11 (emphasis added). Vigor didn't need five-year hindsight to arrive at the "stay offshore until daylight" plan Western conveyed to Vigor before the YFD-70 sank. And Vigor certainly did not assume navigational responsibility for Western's tow by directing *one* employee to fly to Monterey in hope the drydock may safely arrive on the 26th (Vigor's Dan Keen wouldn't be there yet anyway, as he would have to get there from Seattle). Western has not cited any law or evidence that supports a different conclusion.

In light of the foregoing, there is no genuine dispute that Western: (1) had a prudent seaman's duty of safe navigation; and (2) had (at least) constructive knowledge of the Sanctuary boundaries and applicable law. Nor is there any dispute that Western towed the limping YFD-70 in the Sanctuary *after* everyone at Western worried that the drydock was going to sink, *while* Vigor's emails cited in Western's brief show that Vigor expected the OCEAN RANGER to maintain position well offshore until morning.

Western's decision alone proximately caused liability (or potential liability) to the United States for damage to the Monterey Bay National Marine Sanctuary, which would not have arisen if the tug had not driven towards and then into it with the sinking drydock. Accordingly, Vigor requests the Court enter summary judgment that Western is solely liable for any damages to the Monterey Bay National Marine Sanctuary.

Vigor also moved for partial summary judgment on the parties' cross claims for breach of the towage contract, on the grounds that Western's claim for breach of contract must fail as a matter of law because Western did not adequately perform the towage contract. *See* Vigor's Motion (Dkt. # 39), at 15–16. Western's opposition brief does not directly address the breach of contract arguments in Vigor's motion. Thus, if the Court agrees that Western alone caused the Sanctuary damages, partial summary judgment in Vigor's favor on those cross claims is also appropriate.

/ / /

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT - 7
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

3. Western has not identified evidence in the record showing there is a genuine issue of material fact for trial regarding Western's liability for towing the sinking drydock into the Sanctuary.

Western's opposition brief advances a number of additional factual arguments that the record does not support. Vigor declines to address all of them, nor could we in 12 pages, but discusses several to demonstrate the need for skepticism when assessing Western's factual assertions.

Western makes conclusory statements without citation to authority or evidence for support. Most egregiously, Western's opposition brief wrongly avers without citation that "Russ Shrewsbury talked with [Vigor's] Dan [Keen] about the protected nature of Monterey," before quoting six pages of testimony, none of which includes the phrase "the protected nature of Monterey." *See* Opp'n (Dkt. #52), at 12–18. In those six pages, though, Russ Shrewsbury is asked "Did you discuss with Dan concerns that you had about going to Monterey?" *Id.*, at 14, lines 4–6. Russ Shrewsbury answered, "No. I didn't have any." *Id*. Russ Shrewsbury next admits that he was worried the drydock was going to sink (particularly if it sunk in front of tourists at the Monterey Aquarium). *Id.*, at 15. But, Russ Shrewsbury also testifies that he did not express any other concerns at the time. *Id.*, lines 13–15. Western asserts that Bob and Russ Shrewsbury told Vigor that "the listing YFD-70 was in the marine sanctuary." Opp'n (Dkt. # 52), at 5 n.19. Western provides absolutely no citation for this very significant assertion. Even had Western provided any such notification, Vigor's claims would be unaffected. Still, the assertion is false, so Western cannot even support the argument it apparently wishes to rely on.

Contrary to the assertions in Western's brief, Bob Shrewsbury testified (in deposition excerpts submitted by Western) that he had no idea where the tug was in relation to the Sanctuary:

A: I wasn't aware of how close he [Captain McGavock] was to the sanctuary, if he was in one, I just didn't want to – I just thought the best thing would be the farther offshore he could get.

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT - 8
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

| | |
|---|---|
| Q: | … Is it fair to say that at the time, Western Towboat didn't consider the location of marine sanctuaries when they were evaluating casualty risks? |
| A: | Yeah, it wasn't something that was on – it is now. |

****

| | |
|---|---|
| **Q:** | **If tomorrow you were towing a 600-foot dry dock and it started taking on water and it was in a marine sanctuary, what would you say?** |
| **A:** | **I'd say we were stupid. We shouldn't have been there.** |

Bob Shrewsbury Depo. (Dkt. # 52-7), at 25 (emphasis added). Western thus admits it was "stupid" to take the drydock known to be taking on water into a marine sanctuary. Meanwhile, nothing in the record indicates that anyone at Western told Vigor about the "protected nature" of the National Marine Sanctuary (as noted on the navigational charts), or that Vigor knew the position of the tug in relation to the Sanctuary when it crossed into the protected area.

Western also writes, without citing *anything*, that "[n]o one believed that the YFD-70 was imminently going to sink – until, it did – suddenly – early morning, Wednesday, October 26th." Opp'n (Dkt. # 52), at 13 n.31. As described above, the record establishes that Western turned the tug away from San Francisco and toward Monterey at around 7:00 p.m. on October 25, 2016, specifically because Bob Shrewsbury and Captain McGavock were, at that time, worried that the drydock was going to sink.

Additionally, Western leans on expert reports replete with assumptions contrary to documentary evidence and Western's own testimony. Western's reports were clearly written without considering the relevant factual record. For example, Western cites to Captain Fox's report for the proposition that "[w]hen it was realized that the decision to proceed to San Francisco posed risks that were unacceptable <u>Western towboat relayed from Vigor to Captain McGavock to proceed to Monterey Bay</u>." Opp'n (Dkt. # 52), at 19 (emphasis added). Captain Fox's report is dated March 3, 2021 (Dkt. # 42-3, at 3); relevant depositions occurred two

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT - 9
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

weeks later—Captain McGavock then Bob Shrewsbury on March 16 and 17, 2021 (Dkt. # 52-8, at 2 (McGavock); 52-7, at 2 (B. Shrewsbury). Thus, Captain Fox did not have the benefit of Bob Shrewsbury's or Captain McGavock's testimony that Western, not Vigor, directed the tug to Monterey Bay, i.e., into, coming from outside, the Sanctuary. Captain Fox's opinion is consistent with the complaint Western filed, *see* Complaint (Dkt. # 1), at 3–4, but not the evidence actually elicited through discovery in this case.

Similarly, neither did any of Western's other experts have the benefit of *any* Western testimony—their reports are all dated between March 2 and 5, 2021. *See* Dkt. # 42-4, at 2 (Smith); 42-5, at 2 (Kriebel); 42-6, at 3 (Hudson); and 42-16, at 2 (Pickhardt), weeks before *any* Western personnel were deposed.

Third, Western continues to misrepresent what Vigor's Dan Keen said when the parties were assessing whether the YFD-70 would sink. Western's opposition brief asserts that, "Dan Keen was confident that it was unlikely that the YFD-70 would sink," and communicated that confidence to Western when the drydock was actively sinking. Opp'n (Dkt. # 52), at 12. To support this statement, Western cites Keen's deposition testimony, but wrongly urges the Court to believe Keen said the drydock would remain afloat on the night of the sinking. *Id.*, n.30. In fact, Western submitted Keen's actual testimony, which was that "there's a good chance" the drydock could float with two tanks uncompromised, "**[h]owever, again, we're not being specific as far as details here, so …**" (*see* Dkt. # 52-9, at 4), and that, "**when it was an operational drydock**, original design was that you could damage two tanks adjacent and survive **in the definition of a working drydock in a shipyard**," (*id.*, at 7–8) (emphases added). It would be unreasonable to construe Keen's testimony about how the drydock may respond in the sheltered waters of a shipyard as indicating that Keen thought it was unlikely the YFD-70 would sink in the open ocean, having come through eight days of on-and-off storms. More to the point, Western was looking at the sinking drydock before it entered the Sanctuary. Dan Keen was not.

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT - 10
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

Fourth, Western misconstrues the rulings in *Houma Well Serv., Inc. v. Tug Capt. O'Brien*, 312 F. Supp. 257 (E.D. La. 1970). *See* Opp'n (Dkt. # 52), at 21. In Western's mistaken construction, the tower's fault in *Houma* depended on the presence of banks on which to run the tow aground and a lack of communication with the barge owner. *Id*. In actuality, *Houma* first states the rule that after the tow became unstable, "[i]t was then the tower's duty to put into <u>a safe spot</u> …." 312 F. Supp. at 262 (emphasis added). Instead, the *Houma* tower "elect[ed] to ply his trade by running time-honored risks [] at the peril of liability if the risk materialize[d]." *Id*. The *Houma* "safe spot," just happened to include banks. *Id.* In the case at issue, near the Sanctuary, the "safe spot" was ***anywhere but inside the Sanctuary***. And, undisputedly, the OCEAN RANGER and the YFD-70 were in that safe spot when Western knew "there was a real possibility this thing was going down." Opp'n (Dkt. # 52), at 17, line 4–5. The passing reference to the radio in *Houma* merely indicated the tower failed to avail itself of <u>all</u> resources at its disposal (much like Western's failure to consult the chart and heed its sanctuary warnings), and nothing in *Houma* indicates that communicating with the barge owner would excuse the tower's choice to run the risk. Moreover, Bob Shrewsbury's testimony, cited by Western, establishes that Western did not communicate Sanctuary risks to Vigor: Western either did not know it was in a sanctuary, or did not appreciate the associated risks. In either case, Western, not Vigor, is liable for where the drydock sank.

Fifth, Western fails to avoid the Pennsylvania Rule by asserting there is "no nexus" between the injury (here, the damage to the Sanctuary) and the purpose of the legal obligation that was breached. Opp'n (Dkt. # 52), at 23. Western unavailingly cites to a case in which the violation was failure to have an operations manual onboard and the injury was ear damage during a free dive, *MacDonald v. Kahikolu, Ltd.*, 581 F.3d 970, 971 (9th Cir. 2009). The *MacDonald* court observed that the Pennsylvania Rule did not clearly apply to the plaintiff's claims, *id*. at 974, and that the operations in the manual expressly did not apply

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT - 11
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

to free diving, *id*. at 976. Here, the regulations prohibit depositing anything on the Sanctuary floor and Western's violation is exactly that—depositing the drydock on the Sanctuary floor. There could not be a clearer nexus, so Western has not avoided application of the Pennsylvania Rule.

Finally, Western briefly alludes to its mistaken interpretation of the towage contract's indemnity provisions. *See* Opp'n (Dkt. # 52), at 4. To any extent the Court considers those arguments raised in Western's opposition, please see the Vigor's explanation in its Opposition to Western's Motion (Dkt. # 47), at 16–18.

## CONCLUSION

Western's opposition brief reinforces Vigor's motion without raising any genuine dispute of material fact. Western was worried the drydock was going to sink when it towed the YFD-70, listing at 35–40 degrees, into the Sanctuary. Thus, Western alone is responsible for sinking the YFD-70 there instead of outside the Sanctuary even though Western had "constructive knowledge" of the import of the Sanctuary. Accordingly, Vigor respectfully requests the Court enter partial summary judgment in Vigor's favor on Vigor's counterclaim for general maritime negligence and the parties' cross claims for breach of contract.

Dated this 21st day of May, 2021.

SCHWABE, WILLIAMSON & WYATT, P.C.

By: */s/ David R. Boyajian*
David R. Boyajian, WSBA #50195
Email: dboyajian@schwabe.com
Noah Jarrett, WSBA #31117
Email: njarrett@schwabe.com
Adam P. Murray, WSBA #48553
Email: amurray@schwabe.com
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
*Attorneys for Vigor Marine, LLC*

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT - 12
CASE 2:20-CV-00416-RSM

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360.694.7551

PDX\120355\220045\AMU\30877368.6

# CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2021, I served the following REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT on:

Anthony J. Gaspich
Gaspich Law Office PLLC
8094 Barthrop Pl. NE
Bainbridge Island, WA 98110
tony@gaspichwilliams.com

J. Stephen Simms (pro hac vice)
Simms Showers LLP
201 International Circle, Suite 250
Baltimore, MD 21030
jssimms@simmsshowers.com

☒ by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all associated counsel.

*/s/ David R. Boyajian*
David R. Boyajian

CERTIFICATE OF SERVICE - 1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
700 Washington Street, Suite 701
Vancouver, WA 98660
360.694.7551

PDX\120355\220045\AMU\30877368.6