UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WESTERN TOWBOAT COMPANY,

          Plaintiff,

        v.

VIGOR MARINE, LLC,

          Defendant.

No. C20-0416-RSM

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT

## I.     INTRODUCTION

This matter comes before the Court on parties' cross-motions for summary judgment. Plaintiff Western Towboat Company ("Western") moves for summary judgment on all claims, Dkt. #42, and Defendant Vigor Marine, LLC ("Vigor") moves for partial summary judgment on its counterclaim for general maritime negligence and parties' cross-claims for breach of contract. Dkt. #39. The Court finds oral argument unnecessary to resolve the issues. Having considered parties' motions, responses, replies, and the declarations and exhibits attached thereto, the Court GRANTS IN PART AND DENIES IN PART Vigor's motion and DENIES Western's motion as set forth below.

//

## II.   BACKGROUND

### A.  The Drydock

The Drydock YFD-70 ("The Drydock") was a three-section steel structure constructed in 1945.  Its center section ran 368 feet long and 118 feet wide, with two end sections each 80 feet long and 118 feet wide.  With both end sections attached, the total length of the vessel was 528 feet.  The YFD-70 was one of three drydocks in its class, the others being the YFD-69 and the YFD-71.  On April 14, 2016, Vigor sold the Drydock to Amaya Curiel Corporation ("Amaya Curiel").  Dkt. #42-12 at 8.  Amaya Curiel runs a shipyard in Mexico that repairs and scraps vessels. *Id.* at 9.  Vigor contracted Western for towage of the Drydock from Seattle, Washington to Ensenada, Mexico using the tugboat OCEAN RANGER under the command of Captain Stephen McGavock.  Western was aware prior to the voyage that Vigor sold the Drydock to Amaya Curiel for use as scrap.  *See* Dkt. #42-17 at 4.

Before the voyage, Vigor prepared the Drydock for towing with a pre-tow suitability survey report conducted by Captain Richard Shaw, a marine surveyor with Bowditch Marine, Inc. ("the Bowditch Report.").  The Bowditch Report, dated October 18, 2016, recommended that the Drydock be towed in its extended configuration, with bow and stern sections attached.  However, guidance from the U.S. Navy titled "General Information and Operating Manual" recommends towing the family of drydocks YFD-68, YFD-69, YFD-70, and YFD-71 with bow and stern sections detached and docked on the center section for towing.  Dkt. #42-8 at 8 (stating that the dock "has been designed to facilitate towing at sea.  When towed, the end sections are stowed on the center section.").  The Navy's manual clarifies that its contents "are for information and guidance only" as opposed to required operating procedure.  *Id.* at 7.

//

The Bowditch Report concluded that the Drydock was "appropriately prepared and rigged without incident, lashed and secured in apparent good order, and conforms with normal custom and practice for towage of a Marine Industrial Dry Dock Platform from Seattle, Washington for a Coastal Voyage to Ensenada, Mexico via the Puget Sound, the Straits of Juan de Fuca and then proceeding south." Dkt. #42-10 at 21. However, Western's expert witness notes that photographs taken at the time of the survey, but not included in the Bowditch Survey, showed more significant corrosion than the photographs in the survey report. Dkt. #42-6 at 14. Captain Shaw declares that at the time he surveyed the Drydock, Vigor did not inform him that (1) the original Navy design for open ocean tow was that its two end sections would be detached from the center section and loaded onto the center section for tow; (2) Heger Drydock had recommended to Vigor that the YFD-69 be towed disassembled from Portland to Seattle; (3) Vigor's sale contract to Amaya Curiel required carriage to Ensenada in detached form, on a heavy-lift ship; and (4) that Vigor had performed an ultrasonic gauging in 2013 showing significant wastage. Dkt. #42-24 at 2. Vigor also does not dispute that it failed to install a flood alarm on the Drydock, which was a requirement under the U.S. Navy Tow Manual for dead ship tows. *See* Dkt. #42-13 at 6 ("All unmanned tows shall be equipped with flooding alarms. Flooding alarms indicate to the towing ship that there is a problem with the tow, allowing corrective action to be taken before the tow sinks.").

In addition to noting the conditions of the Drydock, the Bowditch Report also set forth recommendations for the tow that were provided to Western's Port Captain, Russell Shrewsbury, and Captain McGavock. Dkt. #40-3 at 7-8. The Bowditch Report specifically required that the OCEAN RANGER "*shall avoid heavy head or beam seas (greater than 8-10 ft.) to avoid pitching or rolling* and ensure that seamanship techniques are employed to

minimize the effects of head seas and rolling upon [the Drydock]." *Id.* at 7 (emphasis added). Furthermore, the Bowditch Report required that the OCEAN RANGER "is not to proceed from any safe port or sheltered waters during the voyage *without first determining that reasonable weather conditions (less than Force 6) are predicted along his intended track*, nor is he to proceed at speeds excessive for the prevailing weather . . . ." *Id.* (emphasis added). Western accepted and incorporated the recommendations in the Bowditch Survey into its Tow Plan, although it revised the wind direction condition from "less than Force 6" to the slightly higher "20-25 knots" in a Tow Plan Amendment. Dkt. #40-4 at 4.

**B. Voyage and Sinking of the Drydock**

On October 4, 2016, Western and Vigor entered into an agreement ("the Towing Agreement") setting forth parties' obligations and agreed-upon rates for the Drydock tow. Dkt. #40-1 (identifying Vigor as "Customer" and Western as "Owner."). The Towing Agreement provided that in the event the tow became "totally lost, the Tug shall be released from performance under this agreement." *Id.* at 5. The Towing Agreement further provided that "Customer [Vigor] shall pay Owner [Western] the lump sum hire identified above, which shall be fully and irrevocably earned upon commencement of services, even if the Tug, Tow and/or cargo is lost and/or the voyage is delayed, frustrated or cancelled, *except to the extent loss, delay, frustration, or cancellation arises from the negligence or willful misconduct of Owner [Western]*." *Id.* at 3 (emphasis added).

After waiting for a storm to clear, the tug and tow left Seattle the morning of October 17, 2016. The ship's log reports that between October 19 and 20, near the border of California and Oregon, the tug encountered southerly winds within the 25 knots range and waves between six and nine feet. Dkt. #42-19 at 5-6. The tug proceeded at a speed between 2 and 4 knots. *Id.*

The tug again faced strong winds of 30 to 40 knots from approximately 8:00 pm on October 23 until 12:00 pm on October 24. *Id.* at 9-10. On October 25, 2016, at 2:30 pm, Western discovered that the Drydock had a port bow list. *Id.* at 11. As the list increased, Western's crew agreed that the dock appeared to be taking on water. Dkt. #42-6 at 8. Western altered course to San Francisco Bay for the next 4.5 hours to seek assistance and minimize the ingress of water. However, by late afternoon, the port listing had continued and was accompanied "by a forward trim sufficient to bring the forward port pontoon deck awash." *Id.*

After communicating with the United States Coast Guard ("USCG"), Western concluded it was unsafe to enter San Francisco Bay in the event the Drydock sank, which would create a major navigational hazard in the San Francisco Bay Area. *See* Dkt. #42-20 at 9 (Email from Western's owner, Bob Shrewsbury, to Vigor's Daniel Keen on October 25 at 6:26 pm stating, "We want to have a look in the daylight to make sure we are safe to transit the San Francisco Bar Crossing. We do not want the Dock to sink where it would have to be a Major Salvage job. If it goes down in 1500 feet of the coast is one thing. But we don't want it on the Bar entrance or Harbor."). Keen replied that he would run calculations through flooding analysis software to determine whether the Drydock would remain afloat. Dkt. #42-20 at 6. He agreed that Western should keep the tow in deep water. *Id.* At 6:49 pm, Western's Russell Shrewsbury informed Keen that the Drydock's forward port corner was awash. Dkt. #42-20 at 6. Approximately three hours later, Keen reported the tank numbers. Keen recalls that, after completing the calculations, he did not believe there was more than a fifty percent chance that the tow would sink. Dkt. #42-14 at 158:17-23.

According to the ship's log, at 7:00 pm on October 25, Western's office "directed vessel to head for Monterey Bay due to tow's conditions." Dkt. #40-5 at 10. At that point, Captain

McGavock had been monitoring the tow for "several hours" and observed a "deteriorating stability" that he determined made it "unsafe to head into San Francisco Bay for repairs." Dkt. #42-23 at 29. At that point, Captain McGavock made the decision to sail away from the termination of San Francisco Bay's marine traffic lanes and "plotted a course for Pioneer Canyon in case we had to abandon the sinking tow." *Id*.

According to Keen, it was Western's idea to proceed to Monterey. Dkt. #42-14 at 160:8-11; *see also id.* at 162:24-25; 163:1 ("Western actually are the ones who recommended Monterey and also recommended a contact for shoreside support."). Emails between Western's Bob Shrewsbury and Vigor's Paul Torrey corroborate Keen's account that Western proposed the idea and decided to proceed into Monterey Bay. *See* Dkt. #42-20 at 5 (Message from Western's Shrewsbury to Keen dated October 25, 2016 at 16:07, stating "We are talking with the Coast Guard in San Francisco to see if they will let us come into San Francisco or not. So if not the next place that may be possible would be to pull into Monterey Bay where we could find a lee from the wind and sea."); *see also* Dkt. #42-20 at 21 (Internal vigor email from Paul Torrey to Robert Eske on October 25 at 8:04 pm, stating "The tug has decided they want to head to Monterey. They are going to essentially maintain position tonight but keep course to Monterey making little headway. Then in the AM when we have light, we can get a better view of the situation and determine if it is safe to enter the harbor."). In the USCG Incident Report, Captain McGavock confirmed that he made the decision to head away from San Francisco Bay and plotted a course for Pioneer Canyon in case he had to abandon the sinking tow. Dkt. #42-23 at 29. Despite Western directing the OCEAN RANGER's course towards the Marine Sanctuary, Bob Shrewsbury testified that he "[w]asn't aware of how close he [Captain McGavock] was to the sanctuary, if he was in one . . . ." Dkt. #40-8 at 12.

Following communications between USCG, Western, and Vigor management, USCG approved the tow to enter Monterey Bay for inspections and/or dewatering. Dkt. #42-20 at 4. The USCG's Captain of the Port Order 16-035 notified Western that should it choose to enter Monterey Bay, Western was required to hire a commercial salvage company; have salvage resources on-scene in Monterey Bay prior to arrival; have the salver conduct an assessment of the tow's hull to identify the source of the flooding; and submit a plan to dewater flooded spaces and means to secure water and weather tight hull before proceeding. *Id.* The tow proceeded with caution towards Monterey Bay. With night approaching, the OCEAN RANGER decided to stay in deeper water and monitor the tow during the night, then proceed into Monterey Bay in daylight. Heavy fog rolled in at 10:30 pm and made it difficult to observe the condition of the Drydock. Dkt. #42-23 at 30. At this point, the tow had developed a 40-degree port list and had approximately 10-12 feet of freeboard left on the port wing wall. Captain McGavock held a safety meeting at 11:00 pm to discuss the process of releasing the tow if required. Dkt. #40-6 at 3. At 12:30 am, Captain McGavock discerned that only 5 feet of freeboard remained. *Id.*

At 2:00 am on October 26, 2016, the fog lifted and Captain McGavock witnessed the port section of the wing wall beginning to submerge. Dkt. #42-23 at 30. At 2:10, the Drydock capsized and the OCEAN RANGER released the tow line. *Id.* At 3:05, the Drydock sank 31 nautical miles southwest of Half Moon Bay, California, approximately .92 nautical miles inside the Monterey Bay Marine Sanctuary. Dkt. #42-19 at 12; Dkt. #42-23 at 3. OCEAN RANGER notified Bob Shrewsbury that the Drydock "fully sank at 0305. Position 37* 21.0N 123* 06.6W in approximately 500 fathoms. Coast Guard San Francisco gave us permition [sic] to leave scene. Headed for Seattle." Dkt. #42-20 at 7 (email dated October 26, 2016, 3:13 am from Captain McGavock to Bob and Russ Shrewsbury). In its incident investigation report on the

Drydock's sinking, USCG concluded that "the initiating event leading up to the casualty occurring was the unknown flooding that occurred onboard the vessel leading it to list and eventually sink while being towed off the coast of California."  Dkt. #42-23 at 3.  USCG likewise determined that it was "unknown if the flooding occurred because of some sort of damage or if material fatigue led to some sort of equipment failure leading to the ingress of seawater into the hull of the vessel."  *Id.*

### C.  NOAA Penalty Assessment

In November 2016, the U.S. National Oceanic and Atmospheric Administration ("NOAA") informed Vigor of its determination that the Drydock sank .92 miles within the Monterey Bay National Marine Sanctuary ("Marine Sanctuary").  Dkt. #40-12 at 3.  Under the National Marine Sanctuaries Act ("NMSA"), it is unlawful for any person to "destroy, cause the loss of, or injure any sanctuary resource managed under law or regulations for that sanctuary."  16 U.S.C. § 1436(1).  Any person who destroys, causes the loss of, or injures any sanctuary resource is liable to the United States for response costs and damages resulting from the destruction, loss, or injury, and any interest on that amount.  16 U.S.C. § 1443(a)(1).  NOAA may also levy a civil penalty for a violation under the NMSA.  16 U.S.C. § 1437.  For purposes of cooperating with NOAA to reduce the potential civil penalty, Vigor and Amaya Curiel hired a research vessel to locate the wreckage of the Drydock.  Dkt. #40-13 at 2.  In a letter dated January 19, 2021, NOAA advised Vigor, Western, and Amaya Curiel of their liability under the NMSA for damages arising from the Drydock's sinking in the Marine Sanctuary and invited them to "work cooperatively" with NOAA to complete an injury assessment, develop restoration actions, and assist with restoring injured sanctuary resources.  *Id.* at 4.

//

On March 16, 2020, Western filed this action against Vigor alleging breach of maritime contract to recover the $187,462.01 Vigor owes Western for its services under the Towing Agreement. Dkt. #1 at 6. In addition to its breach of contract claim, Western seeks a declaratory judgment that Western was not responsible for the sinking of the Drydock in the Marine Sanctuary, thereby exculpating it from liability to the United States in any forthcoming enforcement action under the NMSA. *Id.* at ¶¶ 24-26. Vigor counterclaims for breach of maritime contract based on Western's alleged failure to render reasonable assistance in the event the Drydock became "disabled . . . or otherwise unable to continue the voyage," causing Vigor and its insurers to expend considerable sums in efforts to cooperate with NOAA and creating potential liability to the United States under the NMSA. Dkt. #15 at ¶¶ 36-38. Vigor also counterclaims for general maritime negligence based on Western's failure to exercise reasonable care in towing the sinking drydock into the Marine Sanctuary, and seeks unjust enrichment for expenses Vigor incurred through cooperation with NOAA to minimize the potential civil penalty. *Id.* at ¶¶ 33-35, 40-45.

On April 29, 2021, parties filed cross-motions for summary judgment. Western moves for summary judgment on all its claims against Vigor and all of Vigor's counterclaims against Western. Dkt. #42. Vigor moves for partial summary judgment on its counterclaim for general maritime negligence and parties' cross-claims for breach of contract. Dkt. #39.

### III. DISCUSSION

#### A. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, (1986). Material facts

are those which might affect the outcome of the suit under governing law. *Id.* at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.,* 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers,* 969 F.2d 744, 747 (9th Cir. 1992)).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy,* 365 F.3d 827, 832 (9th Cir. 2004). However, the non-moving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-moving party fails to properly support an assertion of fact or fails to properly address the moving party's assertions of fact, the Court will accept the fact as undisputed. Fed. R. Civ. P. 56(e). As such, the Court relies "on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1278–79 (9th Cir. 1996) (quotation marks and citations omitted). The Court need not "comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).

## B. Unsworn Expert Declarations

As an initial matter, Vigor moves to exclude Western's expert declarations because they are unsworn. Dkt. #47 at 7. Vigor is correct that unsworn expert reports prepared in compliance with Rule 26(a)(2) do not qualify as affidavits or otherwise admissible evidence for purposes of Fed. R. Civ. P. 56 and may be disregarded when ruling on a motion for summary judgment. *Wineland v. Air & Liquid Sys. Corp.*, No. C19-0793RSL, 2021 WL 843166, at *1, n.2 (W.D.

Wash. Mar. 4, 2021). However, at the summary judgment stage, the Ninth Circuit applies a double standard to the admissibility requirement. The movant's evidence in support of a motion for summary judgment must be admissible in both form and content. *Canada v. Blains Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987). The non-movant's evidence offered in opposition to a motion for summary judgment may be admissible so long as the contents are admissible—even if the form is inadmissible. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Courts in this district have considered unsworn reports, even if not in evidentiary form, where the moving party "has not raised a substantive challenge to the authenticity of the reports or the predicted trial testimony" of the experts. *Wineland*, 2021 WL 843166, at *1, n.2.

Given that parties have filed cross-motions for summary judgment, the Court will consider Western's unsworn expert declarations to determine if Western has raised a material dispute of fact to preclude summary judgment on Vigor's motion.

## C. Claims Lacking Subject Matter Jurisdiction

Before proceeding to analyze the merits of parties' summary judgment motions, the Court recognizes two discrete issues raised in the dispositive motions: (1) parties' liability for Western's services rendered under the Towing Agreement; and (2) parties' future liability to the United States under the NMSA for damages to the Marine Sanctuary. These issues are conflated throughout the briefing, with both sides arguing that one party's negligence discharges the other from potential liability to NOAA under the NMSA. Although Vigor and Western are understandably eager to release themselves from potential claims brought by NOAA given the specter of astronomical damages and a civil penalty, this Court must be

mindful of whether it has jurisdiction to grant such relief. For the reasons set forth below, the Court is not persuaded that it maintains subject matter jurisdiction in this private maritime contract dispute to resolve either party's future liability to the United States under the NMSA.

"[F]ederal courts are required sua sponte to examine jurisdictional issues such as standing." *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999). Federal Rule of Civil Procedure 12(h)(3) provides that a court may raise the question of subject matter jurisdiction, at any time during the pendency of the action, even on appeal. *Snell v. Cleveland, Inc.*, 316 F.3d 822, 826 (9th Cir. 2002) (citing *Summers v. Interstate Tractor & Equip. Co.,* 466 F.2d 42, 49–50 (9th Cir. 1972)). Here, Vigor and Western seek to use this private breach of contract action as a vehicle to resolve their future liability to NOAA under the NMSA, notwithstanding the fact that NOAA has not yet issued a penalty assessment and NOAA is not a party to this dispute.[1]

Western seeks a declaratory judgment exculpating it from liability under the NMSA before NOAA has sought recovery of any damages or penalty from the parties. Dkt. #1 at ¶¶ 23-26. Specifically, Western seeks release from its NMSA liability under the Declaratory Judgment Act, requesting that the Court declare that Western "is not liable to Vigor, or through Vigor to the United States, for the sinking of the Drydock and that any and all liability for the sinking . . . lies solely with Vigor." Dkt. #1 at ¶ 25. Westerns further requests that the Court declare "that Western has no liability to the United States concerning the sinking of the Drydock and, in the event the United States should assert a claim or bring an action against Western

---

[1] While Vigor previously moved to stay this case pending NOAA's issuance of its penalty assessment, *see* Dkt. #31, the Court finds that NOAA's completion of its penalty assessment would not resolve all of the jurisdictional issues identified below.

concerning the sinking of the Drydock, that Vigor must fully indemnify and defend Western against such action by the United States." *Id.* at ¶ 26. Likewise, Vigor's counterclaim for maritime negligence seeks to hold Western liable not only for expenditures Vigor already made related to the Drydock's sinking, but for any future claims brought by the United States under the NMSA. *See* Dkt. #14 at ¶ 35 ("Said negligence may have created or may create liability to third parties, including the United States, for which Western should be liable.").

Courts regularly resolve liability between towers and the owners of a tow where damages resulted in injury to a third party. *See, e.g.*, *Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co.*, 372 U.S. 697 (1963) (Considering liability between barge tower and offshore drilling barge owner to third parties' bridge after barge collided with bridge while being towed). Here, however, the Drydock's sinking in a national marine sanctuary triggered liability to the United States under a federal environmental statute with its own liability scheme. *See United States v. M/V Miss Beholden*, 856 F. Supp. 668, 670 (S.D. Fla. 1994) (holding that the NMSA is a strict liability statute). As set forth below, this Court finds several bases under which it lacks subject matter jurisdiction to resolve parties' prospective liabilities to NOAA under the NMSA.

As an initial matter, the fact that NOAA has not yet taken any final action, such as issuing the penalty assessment or bringing an enforcement action, presents issues with ripeness and finality. Ripeness seeks to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effect felt in a concrete way by the challenging parties." *Abbot Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967). In the interest of achieving both

aims, courts consistently reject efforts by parties to obtain preemptive relief from liability under federal environmental statutes before the agency has taken a final action. *See Pac. Resins & Chemicals Inc. v. United States*, 654 F. Supp. 249, 252 (W.D. Wash. 1986) (collecting cases under Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), the Resource Conservation and Recovery Act, and the Clean Water Act.

Here, the Court finds that NOAA has not taken any final action such that parties' claims are ripe for review. Although NOAA's letter dated January 21, 2021 informs Vigor, Western, and Amaya Curiel of their liability under the NMSA, courts have found that similar notice letters that required no action from parties and merely offered the opportunity to voluntarily cooperate in remediation efforts fell short of final agency action. *Pac. Resins*, 654 F. Supp. at 251; *see also D'Imperio v. United States*, 575 F. Supp. 248, 252–53 (D.N.J. 1983) ("[T]he power of the EPA to seek the institution of a liability suit would constitute agency action, but the notice letter is far short of a final decision that the Government undertake such a suit."). For these reasons, the Court finds that any ruling on parties' prospective liabilities under the NMSA, before NOAA has taken any final agency action as to damages or penalties, would amount to "premature adjudication." *Abbot Laboratories*, 387 U.S. at 148–49. Accordingly, Western's declaratory judgment claim and Vigor's maritime negligence claim, to the extent it seeks to absolve Vigor from future liability under the NMSA, lack ripeness and finality.

Relatedly, parties' claims seeking determinations of future liability under the NMSA present standing issues. Pursuant to Article III of the U.S. Constitution, federal courts are courts of limited jurisdiction, hearing only live "cases" and "controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992); U.S. Const. art. III, § 2. To satisfy the case-or-controversy requirement, the plaintiff must establish "(1) [A]n 'injury in fact' that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

Because NOAA has not taken any final action, Western can only assert a speculative injury: that NOAA may seek damages from Western and/or name it as a defendant in a future lawsuit, and that it may face a contribution suit brought by Vigor or other parties. At this time, it remains unclear at what point NOAA will issue any penalty, whether it may bring any enforcement action against parties, and how Vigor's cooperation thus far will be factored into any forthcoming penalty. Indeed, as Western maintained in its briefing opposing Vigor's motion to stay, NOAA has provided no clear timeline on when its penalty assessment will be complete and whether it may seek damages from one or all parties involved in the Drydock's sinking. *See* Dkt. #35 at 4 ("This Court should not stay these proceedings while the parties await some indefinite and unknown duration of time for NOAA's 'penalty assessment' . . . ."). For the same reasons, Vigor's maritime negligence claim, to the extent it seeks to absolve Vigor of future liability under the NMSA, is likewise hypothetical and speculative. *See Pac. Resins*, 654 F. Supp. at 251 (plaintiff lacks standing where "no liability [under CERCLA] has yet been determined and the possibility of future liability is insufficient for standing").

Finally, even if NOAA had completed its penalty assessment such that parties' liability under the NMSA and the final amount of that liability were known, the Court is not persuaded that it has jurisdiction under the Declaratory Judgment Act ("DJA") or maritime negligence law to grant the relief parties request. The DJA, on its own, does not provide an independent basis for jurisdiction over federal environmental laws. *See Pac. Resins*, 654 F. Supp. at 254.

Likewise, although Vigor extensively briefs principles of maritime negligence as a basis for holding Western solely liable for a future NMSA penalty, the issue of negligence is immaterial to liability under the NMSA. *See Deaton v. U.S. Dep't of Commerce*, Case No. 86-1732-CIV-MARCUS, (FL.S.D. Jan 31, 1989) ("Conspicuously absent from the statute's enforcement provision are terms like negligently, recklessly, knowingly, purposefully, or any others which would denote a culpability requirement."). In effect, parties seek resolution of their liabilities under the NMSA, despite the fact that the NMSA is not a cause of action in this lawsuit. Indeed, NOAA is not even a named party. Given that the NMSA delineates its own liability scheme, it is under this scheme that parties' liabilities for damage to the Marine Sanctuary must be evaluated—not the patchwork of maritime law and negligence principles set forth in parties' briefing. *See* 16 U.S.C. § 1443 (setting forth elements of liability and defenses); *see also United States v. Great Lakes Dredge & Dock Co.*, 259 F.3d 1300, 1307 (11th Cir. 2001) (owners and operators of vessels causing injury to Marine Sanctuaries are held strictly, jointly and severally liable to fulfill the remedial purpose of the NMSA).

For these reasons, the Court concludes that parties' claims seeking preemptive relief from liability to the United States under the NMSA lack ripeness, standing, and a basis for jurisdiction. Pursuant to Fed. R. Civ. P. 12(h)(3), the Court dismisses for lack of subject matter jurisdiction (1) Western's claim for declaratory judgment; and (2) Vigor's counterclaim for maritime negligence, to the extent it seeks prospective determinations of liability under the NMSA.

**D. Breach of Maritime Contract**

Both parties move for summary judgment on their claims that the opposing party breached the Towing Agreement. Western claims breach of contract on the basis that Vigor (1)

failed to render a seaworthy tow; and (2) failed to pay for services rendered. Dkt. #1 at ¶¶ 18-19. Vigor, in turn, claims that Western breached the Towing Agreement by failing to render reasonable assistance in the event the Drydock became disabled "or otherwise unable to continue the voyage." Dkt. #15 at ¶ 36.

A contract that relates to a ship, to commerce or navigation on navigable waters, or to maritime employment is a maritime contract. *Brusco Tug & Barge, Inc. v. St. Paul Fire & Marine Ins. Co.*, 897 F. Supp. 2d 1048, 1052 (W.D. Wash. 2012) (citing *Sundance Cruises Corp. v. American Bureau of Shipping,* 7 F.3d 1077, 1080 (2d Cir. 1993)). The Towing Agreement qualifies as a maritime contract given that it relates to ships and navigation on navigable waters. To establish breach of a maritime contract, a plaintiff must demonstrate "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004); *see also F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1360 (S.D. Fla. 2007), *aff'd by* 308 F. App'x 389 (11th Cir. 2009) (identifying essential elements of breach of maritime contract claim).

A court's interpretation of a contract is generally a "mixed question of law and fact." *Miller v. Safeco Title Ins. Co.,* 758 F.2d 364, 367 (9th Cir. 1985). "When the district court's decision is based on analysis of the contractual language and an application of the principles of contract interpretation, that decision is a matter of law." *Id.; see also Breaux v. Halliburton Energy Serv.,* 562 F.3d 358, 364 (5th Cir. 2009) ("Where 'the written instrument is so worded that it can be given a certain definite legal meaning or interpretation, then it is not ambiguous, and this Court will construe the contract as a matter of law.'") (quoting *Foreman v. Exxon Corp.,* 770 F.2d 490, 496 (5th Cir. 1985)).

For the reasons set forth below, the Court finds that material disputes of fact preclude summary judgment on parties' cross-claims for breach of contract.

      i.     Vigor's Motion for Summary Judgment

The Court first addresses Vigor's motion for summary judgment on parties' cross-claims for breach of contract. Vigor argues that Western's breach of contract claim fails as a matter of law because it cannot demonstrate adequate performance. Dkt. #39 at 15. Section 7(B) of the Towing Agreement provides that "[s]hould the Tow become disabled, breakaway or be otherwise unfit to continue the voyage . . . Customer [Vigor] shall be notified and the Tug shall either take the tow to the nearest safe port/place or stand by the Tow until other assistance is rendered." Dkt. #40-1 at 5. Vigor argues that instead of towing the Drydock into the nearest safe port/place, Western towed the Drydock into the Marine Sanctuary and therefore failed to adequately perform its duties.

Western has presented sufficient evidence to raise a material dispute of fact as to whether it violated Section 7(B) of the Towing Agreement. The record demonstrates that the OCEAN RANGER stood by the Tow, pursuant to the terms of the contract, until other assistance could be rendered. Indeed, the factual record indicates that proceeding into a safe port—in this case, Monterey Bay—was deemed too dangerous at the time such that Vigor and Western agreed that staying in deeper water until first light was the appropriate decision. *See* Dkt. #42-20 at 6 (Vigor's Dan Keen agreeing that Western should keep tow in deep water). Vigor argues that Western should have held position *outside* the Sanctuary as "that would have been a safe place for it to sink," yet the plain language of Section 7(b) imposes no such requirements on Western. Indeed, it solely requires that Western either proceed to the nearest safe port or stand by the tow until assistance is rendered. Based on the factual record, the Court

cannot conclude as a matter of law that the OCEAN RANGER breached Section 7(B) of the Tow Agreement by standing by the Drydock through the night instead of proceeding directly into Monterey Bay, or by standing by inside a marine sanctuary as opposed to outside of one. Vigor's motion for summary judgment on Western's breach of contract claim is therefore DENIED.

ii.     Western's Motion for Summary Judgment

Turning to Western's motion for summary judgment, Western contends that it is entitled to judgment as a matter of law on its breach of contract claim given that Western was released from performing its towing duties once the Drydock sank. Pursuant to Section 7(C) of parties' towing agreement, Western is released from performance "[s]hould the tow become totally lost . . . ." Dkt. #40-1 at 5. However, Section 1(A) of the Towing Agreement carves out an exception to Western's release from liability in the event that the tow's loss arises from Western's negligence. *See id.* ("Customer [Vigor] shall pay Owner [Western] the lump sum hire identified above, which shall be fully and irrevocably earned upon commencement of services, even if the Tug, Tow and/or cargo is lost and/or the voyage is delayed, frustrated or cancelled, *except to the extent loss, delay, frustration, or cancellation arises from the negligence or willful misconduct of Owner*.") (emphasis added). Here, Western argues that Vigor waived any defense to breach based on Western's negligence and, even if that defense is preserved, it cannot show that the Drydock's sinking arose from Western's negligence. The Court will examine each argument in turn.

1.     Waiver of Negligence Defense

As an initial matter, Western argues that Vigor waived any defense to breach based on Western's negligence as to the sinking tow. Dkt. #42 at 15. Western cites to the principle of

waiver under maritime and contract law wherein parties may intentionally waive breach of contract claims through conduct that is "inconsistent with" assertion of their contract rights. *Natures Way Marine, LLC v. Everclear of Ohio, Ltd.*, 37 F. Supp. 3d 1232, 1242 (S.D. Ala. 2014), *amended*, No. 1:12-CV-316-CG-M, 2014 WL 5465885 (S.D. Ala. Oct. 28, 2014) (citing *Olsen v. Hunter–Benn & Co.,* 54 F. 530, 531 (S.D. Ala. 1892)).

Neither of these cases support the proposition that Western advances here: that Vigor's communications with Western during the Drydock's sinking somehow amounted to an intentional waiver by Vigor of its negligence defense in the event that the Drydock sank. In *Natures Way*, the defendants' conduct—failing to object to any delay and continuing to pay for shipments and demurrage despite plaintiff's failure to timely complete trips—waived any objection to plaintiff's three late deliveries. *Id.* ("Defendants cannot accept shipments without objection and then belatedly claim breach of contract based on untimeliness."). Here, Vigor did not fulfill its end of the contract, such as paying Western for its the towage services, despite Western's failure to perform. Rather, Vigor merely communicated with Western and coordinated Global Diving to assist with keeping the Drydock afloat. Western offers no support for the proposition that Vigor's efforts to stay apprised of the Drydock's status and to marshal resources to prevent its sinking amounted to an intentional waiver of any negligence defense in the event that the Drydock ultimately sank.

## 2. Causes of Drydock's Sinking

Western maintains that Vigor cannot meet its burden to show that the Drydock's sinking arose from Western's negligence, as required under Section 1(A) of the Towing Agreement. Dkt. #42 at 7. Yet to prevail on summary judgment, the burden lies with Western—not Vigor— to demonstrate that no genuine dispute of fact precludes finding that the Drydock's sinking was

caused by Western's negligence. *See* Fed. R. Civ. P. 56(a); *Anderson,* 477 U.S. at 247. Viewing the record in the light most favorable to Vigor, the Court cannot conclude as a matter of law that the Drydock's sinking was due in no part to Western's negligence.

Western urges the Court to find that the Drydock was unseaworthy from the outset of the voyage based on the corrosion and configuration in which the Drydock was tendered to Western. Seaworthiness is a question of fact typically reserved for trial, and only in rare instances will courts find unseaworthiness as a matter of law. *Morrell v. United States*, 297 F.2d 662,663 (9th. Cir. 1961); *see also Johnson v. Bryant*, 671 F.2d 1276, 1279 (11th Cir. 1982) (finding that "only in a rare case can a vessel be unseaworthy as a matter of law."). This case is not such a rare instance. Western's claims of unseaworthiness rely on evidence that the corrosion of the Drydock was much more substantial than represented in Mr. Law's report, and that the configuration of the Drydock—with both ends attached—was improper for towing on open ocean. Vigor counters that any corrosion was not so substantial that it rendered the Drydock unseaworthy, given the findings in the Bowditch report that reached the opposite conclusion. On the issue of the Drydock's configuration, Vigor points out that the Navy Manual's recommended configuration is merely guidance, not a requirement. *See* Dkt. #42-8 at 7. Additionally, Vigor introduces evidence that the Heger survey for the YFD-69 actually recommended four different towing configurations—two of which were one-piece tow options. *See* Dkt. #48-3 at 5 (Case 1a and 1b providing that end sections remain attached during tow). This evidence raises a material dispute of fact as to whether the Drydock was unseaworthy from the outset of the voyage. While Vigor failed to address the 2013 ultrasonic gauging and the fact that its sale contract to Amaya Curiel required carriage in detached form on a heavy-lift ship, the Court finds these issues probative but not dispositive of unseaworthiness. For that

reason, the question of the Drydock's seaworthiness remains for trial for purposes of credibility determinations and weighing of conflicting evidence.

Furthermore, the USCG incident investigation report states that the Drydock sank due to "unknown flooding." Dkt. #42-23 at 3. The USCG report clarified that it could not determine whether the flooding occurred "because of some sort of damage or if material fatigue led to some sort of equipment failure" that caused the Drydock's hull to flood. *Id.* In response to this ambiguous analysis from USCG, both parties have introduced evidence in support of their theories as to why the Drydock flooded, resulting in its sinking. Western presents evidence of the Drydock's unseaworthiness, including corrosion and the configuration in which it was towed, while Vigor counters with evidence that Western violated the wind restrictions set forth in the tow plan.

The Court finds that Vigor has introduced sufficient evidence to raise a material dispute of fact as to whether the Drydock's sinking was due to Western's negligence. According to Vigor's expert, Admiral Thomas Gilmour, Western's failure to delay the trip due to severe weather and failure to maneuver and alter the OCEAN RANGER's speed once adverse weather conditions began led to the Drydock sinking. Dkt #51 at 7 ("It is clear from the Ocean Ranger logs, that the 8-10 foot seas and/or the 20-25 knot wind conditions were met or exceeded. . . . What is worse is that the tug and tow were generally heading into the seas, which was discouraged by the Towing Recommendations provided by Bowditch . . . .") Furthermore, Admiral Gilmour contends that Western could have avoided the Drydock's sinking had it prepared a proper Tow Plan that incorporated the recommendations on speed and wind restrictions supplied by Bowditch Marine. *Id.* at 7-8 ("A great deal of critical information provided by Bowditch Marine to minimize stresses on Drydock YFD-70 was either not used,

or minimized in developing the Tow Plan and its amendment.").

Vigor also introduces testimony from structural engineer Michael Naylor, which concluded that towing the Drydock in one-piece was not inherently unsafe "provided specific towing restrictions were satisfied" on the voyage, and concluded that towing the dock through heavy storm conditions with winds in excess of 35 knots, resulting in short wave lengths coupled with significant wave heights of approximately 13 feet, was "the most likely cause for the extensive and widespread structural damages that would be required to sink the dock." Dkt. #49 at 26-27. While Western disputes whether Vigor's experts relied on correct information in forming their opinions, *see* Dkt. #55 at 7, this issue is a question of fact, not law, and therefore properly reserved for trial.

In light of the USCG's inconclusive investigation report and Vigor's expert testimony, the Court finds that Vigor has raised a material dispute of fact as to whether the Drydock's sinking arose from Western's negligence. Accordingly, Western's motion for summary judgment is DENIED as to its breach of contract claim.

**E. Maritime Negligence**

Having denied summary judgment on parties' cross-claims for breach of contract, the Court now turns to Vigor's counterclaim for maritime negligence. To the extent Vigor seeks to exculpate itself from liability under the NMSA based on Western's alleged negligence, this Court has already determined that such claims lack subject matter jurisdiction. *See* § III(C), *supra*. However, Vigor also seeks to recover costs it incurred as a result of parties' mutual exposure to liability under the NMSA caused by the Drydock's sinking inside the Marine Sanctuary. *See* Dkt. #15 at ¶ 34. These cooperation costs Vigor incurred as a result of parties' exposure to liability are distinguishable from the speculative and hypothetical costs parties may

occur under the NMSA.[2]  For that reason, the Court finds no basis to dismiss this claim for lack of subject matter jurisdiction at this time.

For the reasons set forth below, the Court finds that summary judgment is warranted on Vigor's counterclaim for maritime negligence.

i.    Claims Barred by Towing Agreement

The Court will first consider Western's arguments that summary judgment dismissal of Vigor's counterclaim is warranted on the basis that Sections 8, 9 and 10 of the Towing Agreement bar Vigor's counterclaim for maritime negligence.

Starting with Section 8, Western argues that this insurance provision requires parties to rely on their respective vessel insurances rather than bring claims based upon negligence or fault. Dkt. #42 at 19.  The interpretation of a maritime contract indemnity clause "is ordinarily governed by federal maritime law rather than state law." *Comeaux v. Coil Tubing Servs.*, No. CIV.A. 02-1790, 2004 WL 2984298, at *2 (E.D. La. Dec. 3, 2004), *aff'd sub nom. Comeaux v. Coil Tubing Servs., LLC*, 172 F. App'x 57 (5th Cir. 2006).  Courts "should read the contract as a whole and may not look beyond written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous." *Id.*  When interpreting a maritime contract of indemnity, the contract "should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within contemplation of the parties, but it should not be read to impose liability for those losses or liabilities *which are neither expressly within its terms nor of such character that it can be reasonably inferred* that parties intended to

_____

[2] Western also argues that it is exculpated from any liability under the NMSA pursuant to the statute's third-party defense, which provides that parties are not liable if destruction or loss was caused solely by an act or omission of a third party.  Dkt. #42 at 21 (citing 16 U.S.C. § 1443(a)(3)(A)).  Because this Court lacks subject matter jurisdiction to resolve parties' prospective liabilities under the NMSA, Western's argument under NMSA's third-party defense is inapposite.

include them within indemnity coverage." *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 333 (5th Cir. 1981) (emphasis added).

Section 8 of the Towing Agreement provides, in part:

A. <u>Intent</u>. It is the intent of the parties that the insurances identified in this section cover all losses, damages, claims, liabilities and suits *incident to the services being provided, and that parties shall look solely to such insurances . . . rather than maintain claims against each other based upon negligence or fault.* To that end, the parties agree to procure and maintain the following insurances, to promptly submit and prosecute all claims against such insurances, *and to look solely to such insurances for recovery*.

C. <u>Further Allocation</u>. . . . [I]n the event a loss, damage, expense, claim, liability and/or suit does not fall within the scope of a required insurance, Owner [Western] and Customer [Vigor] shall be separately responsible for, and shall indemnify and hold harmless each other from and against (including legal fees and costs), . . . *all loss, damages, expenses, claims, liabilities and suits arising out of or relating to property owned by it*, with Owner specifically responsible for the Tug and all personal property on the Tug and with Customer specifically responsible for the Tow, the cargo and all personal property on the Tow.

Dkt. #40-1 at 6-7 (emphases added). Section 8 establishes a knock-for-knock indemnity agreement whereby Vigor would indemnify Western for "all loss, damages, expenses, claims, liabilities and suits" pertaining to the Drydock, and Western would indemnify Vigor for the same pertaining to the OCEAN RANGER. Western's briefing on this issue is notably sparse and relies heavily on the intent provision under Section 8.A that parties will procure insurance such that all claims "incident to the services being provided" will be resolved through insurance. *See* Dkt. #42 at 18-19. While the Court observes that the required insurances under Section 8.B include not only hull and machinery but also protection & indemnity ("P & I") and pollution and environmental liability insurance, *see* Dkt. #40-1 at 6, Western makes no effort to identify which category may apply here. Furthermore, Western fails to meaningfully respond to Vigor's argument that any P & I policy held by Vigor would not cover Western's negligence, such that

claims arising from Western's negligent towing would not be covered under the required insurances.

The Court is not persuaded that Section 8 precludes the claim at issue here: Western's alleged negligence in dropping the Drydock inside a marine sanctuary that exposed Vigor to third-party liability. The Court agrees with Vigor that parties' insurance provisions are not "entirely clear." Dkt. #48 at 19. Nevertheless, the language of Section 8 supports the interpretation of parties' indemnification agreement advanced by Vigor, which is that parties are responsible for claims arising out of or relating to their own property such that Vigor is barred from recouping loss of the Drydock, but not from recouping costs incurred as a result of Western's negligent injury to third parties. Western, in contrast, asserts without support that the insurance provisions confer blanket indemnity for "any liabilities, including those under the Marine Sanctuaries Act, arising from such claims." Dkt. #42 at 19. Western has failed to demonstrate that its expansive interpretation is supported by the text of Section 8.C, which clearly limits parties' respective responsibilities to suits or liabilities arising from their own property. Western also relies on *Dillingham Tug & Barge Corp. v. Collier Carbon & Chem. Corp.*, 707 F.2d 1086 (9th Cir. 1983), for the proposition that "knock-for-knock" provisions must be enforced. However, *Dillingham* does not support Western's position that Section 8 confers blanket protection from all liability arising out of the towing. On the contrary, *Dillingham* determined that parties' insurance provision "would not have paid for loss of use, or injuries to third persons, so it did not shield Dillingham from all liability." *Id.* at 1090. For these reasons, the Court finds that Vigor's counterclaim cannot reasonably be inferred as a claim or suit that parties intended to indemnify under Section 8. *Corbitt,* 654 F.2d at 333.

//

Western also argues that Section 10 of the Towing Agreement bars Vigor's counterclaims and cites to cases where courts upheld exculpatory agreements limiting remedies to exclude consequential damages.[3] Section 10 provides:

> 10. CONSEQUENTIAL DAMAGES. Neither Owner, Customer, nor any Vessel shall be responsible for any special or consequential damages whatsoever, including, without limitation, extra expense, loss of earnings, loss of profits, loss of use and business interruption, whether resulting from negligence, unseaworthiness, breach of this agreement or otherwise, even if the possibility of such damages may have been foreseeable."

Dkt. #40-1 at 7 (emphasis added). Western's arguments are inapposite, given that the expenditures Vigor seeks to recover are not within the scope of consequential damages.

In contract law, consequential damages are defined as "those damages that, although not an invariable result of every breach of this sort, were reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach." 24 Williston on Contracts § 64:16 (4th ed.). In the context of maritime contracts, consequential damages may include "loss of future profits, goodwill, business reputation, and even mental anguish and physical inconvenience." *Tucker Energy Servs., Ltd. v. Hydraquip Corp.*, No. CIV.A. H-05-1265, 2007 WL 2409571, at *2 (S.D. Tex. Aug. 20, 2007) (citing 2 S. SORKIN, GOODS IN TRANSIT, § 11.10[1](a) at 11–89, 90 (1999)). This understanding aligns with the definition of consequential damages set forth in the Towing Agreement: "extra expense, loss of earnings, loss of profits, loss of use and business interruption[.]" Dkt. #40-1

---

[3] On Reply, Western cites *Robins Dry Dock & Repair Co., v. Flint* for the proposition that economic losses caused by a maritime tort to the person or property of another are unrecoverable. *See* Dkt. #55 at 4 (citing 275 U.S. 303 (1927)). The Court need not address this argument, which was raised for the first time on reply. Nevertheless, it observes that Western misstates the key holding of *Robins*, which bars recovery for solely economic loss *absent physical damage* to property in which the plaintiff has a proprietary interest. *See* 7 West's Fed. Forms, Admiralty § 10845 (4th ed.) Here, the absence of physical damage prong is not met, given that the Drydock sank.

at 7. Here, Vigor seeks recovery of costs it incurred as a result of Western's alleged negligence that resulted in the Drydock sinking inside the sanctuary, which exposed both parties to liability under the NMSA. These costs are not within the scope of consequential damages under the Towing Agreement. *See, e.g.*, *Tucker Energy Servs.*, 2007 WL 2409571, at *2 (costs for removal of a wreck are not considered consequential damages under maritime contract). For these reasons, the Towing Agreement's bar on recovery of consequential damages does not bar Vigor's counterclaim.

Finally, Western makes the conclusory argument that the Towing Agreement's force majeure provision under Section 9 bars Vigor's counterclaim. Dkt. #42 at 20. Section 9 states that "[n]either party shall be responsible for delay or failure to perform if the reason for such arises from . . . perils, dangers and accidents of the sea . . . breakdown or latent defects involving hull, machinery, equipment lines, etc. not discoverable by due diligence . . . ." Dkt. #40-1 at 7. Under maritime contracts, "perils of the sea" excusing performance are those that "are peculiar to the sea, and which are *of an extraordinary nature or arise from irresistible force or overwhelming power*, and which cannot be guarded against by the ordinary exertions of human skill and prudence . . . ." *Ferrara v. A. & V. Fishing*, 99 F.3d 449, 454 (1st Cir. 1996) (quoting *R.T. Jones Lumber Co., Inc. v. Roen S.S. Co.*, 270 F.2d 456, 458 (2d Cir. 1959)). Beyond a conclusory citation to the force majeure clause, Western offers no argument as to why Section 9 is invoked here. Western identifies no particular peril of the sea that would excuse performance in this instance, nor does it elaborate on the "breakdown or latent defect" that could not be discovered by due diligence that would give rise to a force majeure defense.

For these reasons, the Court finds that the terms of the Towing Agreement do not bar Vigor's counterclaims for maritime negligence to recover costs it expended as a result of

parties' exposure to liability under the NMSA.

ii.    Merits of Vigor's Maritime Negligence Counterclaim

Having determined that the Towing Agreement does not bar Vigor's claim against Western, the Court proceeds to the merits of Vigor's counterclaim for maritime negligence. Vigor claims that Western breached its duty of reasonable care when it towed the sinking Drydock into the Marine Sanctuary and when it failed to tow the Drydock out before it sank. Dkt. #15 at ¶ 33. On its motion for summary judgment, Vigor seeks to invoke the "last clear chance" doctrine and the Pennsylvania Rule in admiralty law. The Court will address each in turn.

1.    "Last Clear Chance" Doctrine

As established above, the seaworthiness of the Drydock remains a material dispute of fact reserved for trial. However, Vigor argues that under the "last clear chance" doctrine, the question of the Drydock's seaworthiness is irrelevant. Under this doctrine, a vessel committing the later fault is "contractually bound to care for the one guilty of an earlier fault of which the vessel held solely viable had become aware," as "typified by the tug that neglects a leaky tow." Petition of Kinsman Transit Co. (1964, CA2 NY) 338 F2d 708, cert den 380 US 944, 13 L Ed 2d 963, 85 S Ct 1026, infra § 6[b]; *see also* 3 A.L.R. Fed. 203 (1970) ("[A]lthough the towed vessel was or may have been chargeable with some earlier fault which caused her distress, it was found that the towing vessel neglected or improperly handled the towed vessel after becoming aware of her distress."

Vigor argues that Western breached its duty of prudent seamanship at the point when it knew the Drydock was taking on water and losing stability and failed to take prompt action. It is undisputed that the afternoon of October 25, several hours before the Drydock sank, Western

was aware that the Drydock was taking on water.  *See* Dkt. #42-19 at ¶ 4 (port bow list noticed by crew at 2:30 pm); Dkt. #42-6 at 8 (crew agreed dock was taking on water).  To that end, Vigor argues, Vigor was discharged of any fault it had with respect to the tow's unseaworthiness, given that Western had "the final opportunity, as well as the duty, to avert the damages . . . ."  Dkt. #39 at 11 (citing *Houma Well Serv., Inc. v. Tug Capt. O'Brien*, 312 F. Supp. 257 (E.D. La. 1970)).  *Houma* and the body of cases addressing "last clear chance" address instances where the tower failed to take reasonable action to keep the tow afloat or take the sinking tow to a safe resting place prior to sinking.  *See Houma,* 312 F. Supp. at 263.  Courts have found that towers failed to take reasonable action when they neglected to reduce their speed, failed to inspect the tow, and effectively "abandon[ed] [the tow] to sink at the pier, before all reasonable efforts to keep her afloat were exhausted . . . ."  *Henry Du Bois Sons Co. v. Pennsylvania R. Co.*, 47 F.2d 172, 173 (2d Cir. 1931).  In such circumstances, courts held towers solely liable for the sinking where "it was not shown by the tug that no reasonable effort on her part would have kept the barge afloat, and also was not shown that the captain of the barge could have obtained assistance after being moored and abandoned, or failed to do all within his power to prevent the sinking."  *Id.*

Here, a material dispute of fact exists as to whether no reasonable action on the OCEAN RANGER'S part could have kept the Drydock afloat, or whether Captain McGavock failed to do all that was in his power to prevent the sinking.  Western has introduced evidence that, if viewed in the light most favorable to Western, supports the conclusion that the Drydock's sinking was an inevitability regardless of any efforts to keep it afloat.  Western's expert witness, Senior Managing Engineer Dr. Patrick Hudson, contends that in its fully-assembled state, 18-inch openings at the interlocks of the Drydock's center and end sections "provided a potential

pathway for water ingress into the drydock flow" between the end sections and compartments. *Id.* He further concludes that the Drydock was not suitable to be towed in the open ocean in any sea state in the condition and configuration in which it was provided by Vigor to Western for towing. *Id.* at 21. On these bases, Dr. Hudson reasoned that due to Vigor's failure to follow accepted procedures for preparation of the Drydock for open ocean towing, combined with inadequate structural maintenance, the Drydock sank en route to Ensenada.

The Court finds that this evidence of the Drydock's extensive corrosion, as well as its vulnerabilities to water ingress if towed on the open ocean in its fully-assembled state, could be viewed by a reasonable juror as showing that no reasonable action taken by Western could have kept the Drydock afloat after its unseaworthiness was discovered. *Cf. Henry Du Bois Sons Co.*, 47 F.2d at 173. For that reason, a reasonable juror may likewise view Western's efforts to monitor the listing, communicate with the USCG for entry into San Francisco Bay and later Monterey Bay, and to remain in deeper water, as the extent of all reasonable efforts a prudent navigator could have taken at that point in time to keep the Drydock afloat. Accordingly, the Court finds that material disputes of fact preclude any finding that Western was negligent as a matter of law with respect to the Drydock's sinking such that Western is solely liable under the "last clear chance" doctrine.

Alternatively, Vigor urges the Court to extend the "last clear chance" doctrine to the sinking of the Drydock *inside the marine sanctuary*, on the basis that Western had the final opportunity to prevent the tow from sinking in a location that exposed parties to liability under the NMSA and failed to do so. Although Vigor maintains that Western held the duty to "avoid the worst consequences" of the Drydock's sinking, *see* Dkt. #39 at 10, the case law Vigor relies upon does not support this expansive interpretation of the "last clear chance" doctrine. The

cases cited by Vigor considered "last clear chance" in the narrow context of whether the tower took reasonably prudent measures to prevent damage to the tow or tower. *See Houma Well Serv., Inc.*, 312 F. Supp. at 264 ("When the fault of the first vessel appears or should be evident to the second early enough for the second to escape injury *to the first vessel and herself*, she must do so . . . .") (quoting *Chem. Transporter, Inc. v. M. Turecamo, Inc.*, 290 F.2d 496, 498 (2d Cir. 1961)) (internal quotations omitted) (emphasis added). To the extent a tower's "last clear chance" extends to the opportunity to avoid *any* possible harm arising from the tow's sinking, such as environmental penalties, third-party liability, or other injuries beyond direct damages to the tow, Vigor has not adequately justified this expansive application of the doctrine. For these reasons, the Court declines to extend the "last clear chance" doctrine to Western's failure to tow the Drydock out of the Marine Sanctuary such that Western would be solely liable for all damages.

2. Pennsylvania Rule

Next, Vigor argues that Western is presumptively liable under the Pennsylvania Rule in admiralty law. The Pennsylvania Rule shifts the burden of proving causation to the ship owner if the liability results from a statutory or regulatory violation. *MacDonald v. Kahikolu, Ltd*., 581 F.3d 970, 973 (9th Cir. 2009). Vigor argues that Western is presumptively liable on the basis that it violated the NMSA through depositing the Drydock inside the Marine Sanctuary or, alternatively, by violating maritime regulations that require captains to familiarize themselves with hazards in the area of his voyage. Dkt. #39 at 14.

Application of the Pennsylvania Rule based on a violation of the NMSA is improper given parties' unresolved liabilities under that statute. No final determination has been made as to parties' respective liabilities under the NMSA, and this Court lacks jurisdiction to

determine whether liability lies with Western, Vigor, Amaya Curiel, or some combination of those parties. *See* III(C), *supra*. For that reason, the Court declines to apply the Pennsylvania Rule for violation of the NMSA or its implementing regulations under 15 C.F.R. § 922.132.

Vigor also argues that the Pennsylvania Rule applies based on Captain McGavock's violations of maritime navigation safety regulations requiring that he familiarize himself with obstructions and hazards in the area of his voyage. Vigor cites to 33 C.F.R. §§ 164.30 and 164.33, which govern charts and publications. Section 164.30 requires that no person may operate a vessel without marine charts and publications, while Section 164.33 requires that vessels have marine charts of the area to be transited that are currently corrected. 33 C.F.R. § 164.33. However, Vigor has introduced no evidence regarding the charts or publications Captain McGavock had on board the OCEAN RANGER at the time of the Drydock's sinking or whether such materials were up-to-date. It remains unclear whether the OCEAN RANGER's navigational failure was due to a violation of § 164.33 for failure to keep updated charts on board, from human error in reading those charts, or another alternative explanation. For that reason, Vigor has failed to demonstrate as a matter of law that Western committed any regulatory violation related to its navigational charts. For that reason, the Pennsylvania Rule is inapplicable on this basis.

### 3. Elements of Maritime Negligence

Finally, absent application of the "last clear chance" doctrine or the Pennsylvania Rule, the Court considers whether Vigor has introduced sufficient evidence to prevail as a matter of law on its maritime negligence claim. The elements to establish a claim of negligence under maritime law are the same as the elements of negligence under common law. *In re MS Angeln GmbH & Co. KG*, 10 F. Supp. 3d 424, 430 (S.D.N.Y. 2014). Those elements include duty of

care, breach of duty, causation, and damages. *Id.* (citing *Cornfield v. Cornfield*, 156 Fed. Appx. 343, 344 (2d Cir. 2005)). In a maritime tort case, the claimant generally bears the burden of proving the elements of negligence. *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 211 (2d Cir. 2009).

It is undisputed that Western owed a duty of care to Vigor with regard to the tow. In the context of maritime towing, "[t]he owner of a tow is responsible for its seaworthiness, and the owner of the tug for its safe navigation." *Greger Pac. Marine, Inc. v. Oregon Offshore Towing, Inc.*, No. 3:13-CV-00461-SI, 2014 WL 3420770, at *5 (D. Or. July 10, 2014) (quoting *Marina Mgmt. Grp., Inc. v. Basic Towing, Inc.*, 64 F. App'x 532, 534 (6th Cir. 2003)) (unpublished) (citation omitted). However, a tug has a duty to "exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." *Stevens v. The White City*, 285 U.S. 195, 202 (1932).

Vigor has not presented any case law—and the Court is not aware of any—confirming that reasonable care and maritime skill require a captain to ensure that a tow sinks outside, as opposed to inside, the boundaries of a marine sanctuary. However, *Rexach v. Sec'y of the Navy* establishes that prudent seamanship requires the captain to have an accurate understanding of his vessel's location. *See* No. 75-408, 1978 U.S. Dist. LEXIS 19588, at *24 (D.P.R. Feb. 14, 1978) ("The art of piloting reaches its climax in position determination. Underway on a body of water of any size, where the safety of your boat and its crew is at stake, it is not 'where you ought to be', or 'where you think you are', but your knowledge of 'where you are for sure' that counts.") (internal quotations and citations omitted). This positional awareness extends to where the vessel stands in relation to hazards "clearly and adequately charted and warned of on the nautical chart of the area." *Id.* at *4. Here, Western does not dispute that the boundaries of

marine sanctuaries are clearly marked on navigational charts, which vessels are required to have onboard. *See* Dkt. #40-7 (nautical chart denoting sanctuary boundaries in blue); *see also* 33 C.F.R. § 164.33(a)(1)(ii) (Requiring currently corrected marine charts of area to be transited). The Court finds that prudent seamanship required that Western be aware of whether or not it was inside a marine sanctuary while towing the sinking Drydock. *See also Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 995 (E.D. La. 2000) ("Reasonable maritime practice would require, at a minimum, consultation with current charts.").

Turning to breach of duty, whether a tow owner's actions were reasonably prudent is a fact-intensive inquiry typically reserved for trial. Here, however, the record provides no support for Western's position that it exercised prudent seamanship by releasing the tow line while inside the Marine Sanctuary. The record is replete with evidence that Western was well-aware of the hazards posed by San Francisco Bay, where the Drydock's sinking in a major transit area would create an expensive and involved salvage job. *See* Dkt. #42-20 at 9 (Email dated October 25, 2016, 6:26 pm from Bob Shrewsbury to Daniel Keen stating, "We want to have a look in the daylight to make sure we are safe to transit the San Francisco Bar Crossing. We do not want the Dock to sink where it would have to be a Major Salvage job. If it goes down in 1500 feet of the coast is one thing. But we don't want it on the Bar entrance or Harbor.") The record likewise indicates that Captain McGavock was aware of the Greater Farallones National Marine Sanctuary located near San Francisco Bay, and made a decision to head *away* from the Bay and the Farallones sanctuary area when it became apparent the Drydock was sinking. *See* Dkt. #40-6 at 3 ("After several hours it became apparent the tow would not make it. I contacted [Western] and [USCG] and decision was made to *head out of the traffic lanes and sanctuary area and into as deep water as possible*.") Dkt. #40-6 at 3 (emphasis added); *see also* Dkt. #40-8 at 5-6 (Bob

Shrewsbury stating "I told them that we're not going to go into San Francisco. We can't take the chance . . . If it sunk anywhere in that entrance area, it would be national disaster.").

In stark contrast, communications between Western's port employees and the OCEAN RANGER's crew, as well as Western's communications with Vigor, contain no reference to the hazards or potential salvage job they risked by allowing the Drydock to sink inside the Marine Sanctuary. *See* Dkt. #42-20 at 5-17 (email correspondence between Western's Bob Shrewsbury and Vigor's Dan Keen and Paul Torrey in hours leading up to sinking). Crucially, Western's communications contain no mention of the Marine Sanctuary, except for a cursory reference by Russell Shrewsbury to the Drydock sinking in front of tourists at the aquarium. *See* Dkt. #52-10 at 9 ("I remember telling Dan . . . 'I don't want to take this into Monterey if it's going to sink right in front of the aquarium out there.' I remember specifically telling him these people do not want to see a big dry dock out in front of their town."). When asked if he expressly informed Dan Keen "that is a national marine sanctuary that presents these additional risks," Russ Shrewsbury responded, "Not in a direct way, no." *Id.* at 20. Instead, Russ Shrewsbury confirmed that Western's employees "weren't really thinking about it. We were worried about saving the tow." *Id.* at 21. Likewise, despite Western directing the OCEAN RANGER's course towards the Marine Sanctuary, Bob Shrewsbury testified that he "[w]asn't aware of how close he [Captain McGavock] was to the sanctuary, if he was in one . . . ." Dkt. #40-8 at 10-11.

Western has introduced no material fact indicating that the OCEAN RANGER was aware of its location with respect to the Marine Sanctuary at the time it released the tow line. Indeed, the record only indicates Western's intention that the OCEAN RANGER wait in deeper water until daylight, without regard to where the vessel sat in relation to the boundaries of the

Marine Sanctuary. Despite Western's recognition that the Drydock was sinking as the OCEAN RANGER headed away from San Francisco Bay, *see* Dkt. #42-23 at 29; Dkt. #40-6 at 3, the record reflects no understanding by Western that the Drydock was inside a marine sanctuary at the time it sank, nor any awareness as to the practical consequences—whether legal, environmental, or economic—of releasing the tow line in that location. While Western offers theories as to why the Drydock sank in the first instance, it provides no explanation as to why it sank inside the sanctuary. Based on this evidence, the Court finds that no reasonable juror could conclude that Western exercised prudent seamanship with respect to its duty to navigate with cognizance of the vessel's position in relation to navigational hazards. *Rexach*, 1978 U.S. Dist. LEXIS 19588, at *24. For this reason, the Court finds that Western breached its duty of prudent seamanship as a matter of law when it released the tow line for the Drydock inside the Marine Sanctuary.

Turning to causation, given that the Pennsylvania Rule has not been shown to apply here, the burden of proving causation remains on Vigor. Under general maritime law, a party's negligence is only actionable if it is a "legal cause" of the plaintiff's injuries. *Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 998 (E.D. La. 2000) (citing *Donaghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646, 648 (5th Cir. 1992)). "Legal cause is something more than 'but for' causation." *Donaghey,* 974 F.2d at 648 (quoting *Thomas v. Express Boat Co., Inc.,* 759 F.2d 444, 448 (5th Cir. 1985) (citations omitted)). A defendant's negligence must be a "substantial factor" in causing the injury, with "substantial" defined as "more than but for the negligence, the harm would not have resulted." *Chavez v. Noble Drilling Corp.,* 567 F.2d 287, 289 (5th Cir. 1978) (citing *Spinks v. Chevron Oil Co.,* 507 F.2d 216, 222–23 (5th Cir. 1975)). When more than one party is at fault, the comparative negligence standard applies.

*Tidewater Marine, Inc.*, 113 F. Supp. 2d at 998.

Here, the alleged injury is parties' mutual exposure to NMSA liability, which has resulted in damages to Vigor in the form of cooperation costs incurred a result of this liability exposure. Western attempts to challenge causality by arguing that the vessel's unseaworthiness, combined with weather and wave conditions, led to the Drydock's sinking. However, the reason why the Drydock sank in the first instance, which remains a factual issue for trial, is distinguishable from the causation at issue here: why the Drydock sank *inside the sanctuary*. It is undisputed that Western bore the duty of prudent seamanship, which it breached by failing to exercise awareness of the vessel's location in relation to the Marine Sanctuary's boundaries. As a result of that breach, it unknowingly released the tow barely inside the bounds of a marine sanctuary, resulting in parties' mutual exposure to significant liability under NMSA. While Vigor may bear a comparative degree of fault to the extent it supplied an unseaworthy vessel, the Court finds no dispute of fact that Western's failure to exercise awareness of the OCEAN RANGER's location relative to the Marine Sanctuary was a substantial factor in the Drydock's sinking inside the sanctuary, resulting in both parties' exposure to NMSA liability.

Regarding damages, it is undisputed that Vigor has incurred costs as a result of parties' exposure to liability under the NMSA. As a result of this exposure, Vigor has spent money in cooperative research surveys in hopes of reducing the ultimate penalty. These damages flow from Western's breach of its duty of prudent seamanship, which resulted in the Drydock sinking inside the Marine Sanctuary as opposed to outside of it.

Accordingly, Vigor has demonstrated Western's negligence as a matter of law with respect to the Drydock's sinking inside the sanctuary. Summary judgment on Vigor's maritime negligence counterclaim is therefore proper.

# IV.    CONCLUSION

Having considered parties' cross-motions for summary judgment, the responses, replies, and remainder of the record, the Court ORDERS:

(1) Western's claim for declaratory judgment and Vigor's counterclaim for maritime negligence, to the extent it seeks prospective determinations of liability under the NMSA, are DISMISSED for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3);

(2) Summary judgment is DENIED on parties' cross-claims for breach of contract;

(3) Summary judgment is GRANTED on Vigor's counterclaim for maritime negligence.


IT IS SO ORDERED.

DATED this 21st day of June, 2021.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE