UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WESTERN TOWBOAT COMPANY,<br><br>    Plaintiff–Counterclaim Defendant,<br><br>v.<br><br>VIGOR MARINE, LLC,<br><br>    Defendant–Counterclaim Plaintiff. | No. C20-0416-RSM<br><br>ORDER DENYING WESTERN TOWBOAT'S MOTION FOR RECONSIDERATION |

## I. INTRODUCTION

This matter comes before the Court on Plaintiff–Counterclaim Defendant Western Towboat Company ("Western")'s Motion for Reconsideration. Dkt. #80. On June 21, 2021, this Court denied Western's motion for summary judgment and granted in part and denied in part Vigor Marine, LLC ("Vigor")'s motion for summary judgment. Dkt. #77. Western now moves the Court to reconsider its decision granting Vigor's motion for summary judgment on its counterclaim for maritime negligence. The Court has determined that response briefing from Vigor and oral argument is unnecessary to resolve the underlying issues. *See* Local Rules W.D. Wash. LCR 7(h)(3).

## II. BACKGROUND

In its previous Order, this Court found as a matter of law that Western failed to exercise prudent seamanship by releasing the Drydock YFD-70 inside the Monterey Bay National Marine Sanctuary ("Marine Sanctuary") and granted summary judgment on Western's counterclaim for maritime negligence. Dkt. #77. Specifically, the Court concluded that Western failed to exercise prudent seamanship "with respect to its duty to navigate with cognizance of the vessel's position in relation to navigational hazards." *Id.* at 37.

Western requests reconsideration on the basis that (1) the Court failed to consider key evidence demonstrating the OCEAN RANGER's awareness of its location inside the Marine Sanctuary; (2) the Court erred in its application of *Rexach v. Sec'y of the Navy*, No. 75-408, 1978 U.S. Dist. LEXIS 19588, at *24 (D.P.R. Feb. 14, 1978), to the facts at hand; and (3) the Court disregarded facts demonstrating that release of the tow line was necessary to prevent loss of life. The Court will address each argument in turn.

## III. DISCUSSION

### A. Legal Standard

"Motions for reconsideration are disfavored." Local Rules W.D. Wash. LCR 7(h)(1). "The court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence." *Id*.

### B. Captain McGavock's Positional Awareness

Under *Rexach*, prudent seamanship requires a vessel operator to exercise positional awareness with respect to hazards that are "clearly and adequately charted and warned of on the nautical chart of the area." 1978 U.S. Dist. LEXIS 19588, at *4. Western argues that the Court committed manifest error by ignoring deposition testimony from Captain McGavock stating that

he did, indeed, understand he was inside the Marine Sanctuary at the time he released the Drydock's tow line. In response to questioning as to whether he understood what the blue lines on the nautical chart meant, Captain McGavock responded: "That's the Farallons, I believe. The other one is Monterey Bay." Dkt. #52 at 69:23-25. When asked whether he understood at the time those were marine sanctuary boundaries or only now understood that, Captain McGavock responded: "I was very well aware of it at the time." *Id.* at 70:1-6. However, Captain McGavock admitted that he did not understand the navigational hazards presented by those boundary lines. On the contrary, his testimony indicates that he was unaware that national marine sanctuary boundaries denoted an area where sinking the Drydock would risk damaging a nationally significant marine environment and expose parties to potential liability under federal law:

> Q. Marine sanctuaries, what does that mean to you? You knew what the lines were, what did they mean?
>
> A. Certain marine sanctuaries, you're forbidden to transit through with a boat of petroleum, they're all different. Some of them are just marine sanctuaries that prevent commercial fishing, but they're all different.
>
> Q. Okay.
>
> A. Different fishing regulations, different shipping regulations.
>
> Q. What about sinking stuff?
>
> A. Honestly, I don't know.
>
> Q. Do you know now?
>
> A. Obviously I know now, yes.
>
> Q. Okay.
>
> A. But I'm certain on the East Coast, they even sink ships in sanctuaries for artificial reefs, so who knows.
>
> Q: Not in federal sanctuaries, they don't.
>
> A: Oh.

*Id.* at 71:1-22. Captain McGavock's statements also indicate that the crew and owners discussed risks associated with transiting the Greater Farallones National Marine Sanctuary with a sinking drydock. *See id.* at 72:23-25; 73:1-21 ("Did anyone say that being in a marine sanctuary was an important risk that needed to be considered? It was brought up, I believe . . . . That's when I was concerned with the Farallons."). This exchange, however, presents no evidence that Captain McGavock or anyone at Western acknowledged the risks associated with towing the sinking Drydock into the Monterey Bay National Marine Sanctuary after the tow left the Farallones.

In addition to Captain McGavock's deposition statements, Western also introduces new evidence from the deposition of Captain Russ Johnson. *See* Dkt. #47-1. This evidence was not available at the time parties moved for summary judgment. In this deposition, Captain Johnson stated his belief that both Captain McGavock *and* Russell Shrewsbury knew the tow was inside the marine sanctuary, but "just didn't know the consequences of being in the marine sanctuary." Dkt. #74-1 at 93:13-15.

Having reviewed Captain McGavock's and Russ Johnson's deposition transcripts, neither one demonstrates manifest error in the Court's conclusion that Western failed to exercise prudent seamanship "with respect to its duty to navigate with cognizance of the vessel's position *in relation to navigational hazards*." Dkt. #77 at 37 (emphasis added). Both statements raise a material dispute of fact as to the extent Western understood that the OCEAN RANGER had entered a marine sanctuary. However, it remains undisputed that Captain McGavock failed to understand the hazards presented by that sanctuary to a tug towing a sinking drydock. To observe the boundaries of a federal marine sanctuary demarcated on the nautical chart, yet not understand the meaning behind them, cannot be construed as "positional awareness." Indeed, this lack of understanding defeats the very purpose of designating a national marine sanctuary on the chart.

For these reasons, even if Captain McGavock and/or Russ Shrewsbury recognized that the OCEAN RANGER had entered a marine sanctuary, no reasonable juror could find that Western exercised "positional awareness" amounting to prudent seamanship where it had no understanding of the hazards posed by that sanctuary area.

In addition to Captain McGavock's and Captain Johnson's deposition testimonies, Western also argues that the Court overlooked evidence that the U.S. Coast Guard understood that the OCEAN RANGER was inside the Marine Sanctuary. *See* Dkt. #42-19 (vessel logs); Dkt. #42-23 (Coast Guard incident report). Because the Coast Guard was in "constant communication" with the OCEAN RANGER, Western argues, "everyone involved . . . knew that the tug and tow were in the sanctuary" at the time of sinking. Dkt. #80 at 2-3. Again, notwithstanding the Coast Guard's awareness of the OCEAN RANGER's position inside the Marine Sanctuary and the hazards posed by that sanctuary to the sinking tow, this evidence is inapposite to the matter at hand—whether *Western* was aware of these issues. As evidenced by the record, including the deposition transcripts cited by Western in the instant motion, no reasonable juror could conclude that Western understood the environmental, economic, and legal risks it activated when it entered the Marine Sanctuary with a sinking Drydock.

For these reasons, none of the evidence presented by Western in the instant motion demonstrates manifest error by the Court in concluding as a matter of law that Western failed to exercise prudent seamanship.

C. **Application of** *Rexach*

Next, Western argues that the Court committed manifest error in its application of *Rexach* to the case at hand. As an initial matter, Western made no effort to address *Rexach* in its opposition to Vigor's summary judgment motion. *See generally* Dkt. #52. Such arguments are not properly raised for the first time in a Motion for Reconsideration. *See Kona Enterprises, Inc.*, 229 F.3d at

890 ("A Rule 59(e) motion may *not* be used to raise arguments . . . when they could reasonably have been raised earlier in the litigation.") (emphasis in original).

Even if the Court considers Western's untimely argument, Western has failed to demonstrate manifest error. Western points out that the negligence at issue in *Rexach* involved a boat operator who struck a coral reef on account of not understanding where his vessel was, lacked the requisite equipment to determine his location, and took no action to determine his location. *See* 1978 U.S. Dist. LEXIS 19588. Notwithstanding the factual differences between this case and *Rexach*, the Court relied on *Rexach* for the proposition that prudent seamanship requires a vessel operator to exercise positional awareness with respect to navigational hazards in the area he is transiting. *See id.* at *4 ("The art of piloting reaches its climax in position determination. Underway on a body of water of any size, where the safety of your boat and its crew is at stake, it is not 'where you ought to be', or 'where you think you are', but your knowledge of 'where you are for sure' that counts.") (internal quotations and citations omitted). Indeed, this positional awareness is why "[r]easonable maritime practice would require, at a minimum, consultation with current charts." *Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 995 (E.D. La. 2000). The Court declines to draw a distinction between the negligent operator who lacks the requisite charts and the negligent operator who possesses the charts but does not understand the meaning of the chart's notations—in this case, that the boundaries denoted a nationally significant marine environment protected by federal law. In either scenario, the operator does not understand his vessel's position in relation to nearby hazards.

**D. Necessity to Release Tow Line**

Finally, Western's motion argues that Captain McGavock's decision to release the Drydock before proceeding outside the Marine Sanctuary was not negligent, given that release of the tow was required to save the lives of the crew. Dkt. #80 at 2. Because release of the tow was

necessary to respond to a life-threatening emergency, Western argues, its decision does not give rise to penalties under the National Marine Sanctuary Act's implementing regulations. *See* 15 C.F.R. § 922.132(b) (Monterey Bay National Marine Sanctuary regulations stating that its prohibitions "do not apply to an activity necessary to respond to an emergency threatening life, property, or the environment.").

Whether the OCEAN RANGER's release of the tow was necessary to save the lives of the crew is not dispositive of whether the OCEAN RANGER failed to exercise prudent seamanship with respect to its decision to enter the Marine Sanctuary with a sinking drydock. As the Court noted in its order granting summary judgment, the record is replete with Western's acknowledgement of the risks of bringing a sinking tow into San Francisco Bay such that it changed course at that time to avoid a "national disaster" by sinking the tow in a major transit area. *See* Dkt. #40-8 at 5-6 (Bob Shrewsbury stating "I told them that we're not going to go into San Francisco. We can't take the chance . . . If it sunk anywhere in that entrance area, it would be national disaster."); *see also* Dkt. #40-6 at 2 (Captain McGavock stating that "[u]pon monitoring the tow for several hours and witnessing an increase in vessels Port list and trim it was deemed a hazard to navigation to continue for San Francisco Bay."). The record reflects no countervailing awareness by Western of the risks of bringing a sinking tow into the Marine Sanctuary where the Drydock ultimately sank. To that end, to the extent Western presents evidence that sea conditions and the tow's deteriorating state prevented the OCEAN RANGER from proceeding outside the sanctuary's boundaries in the hours before the Drydock sank, this evidence does not contradict the Court's conclusion that Western was negligent in the first instance when it discovered the Drydock's deteriorating state and charted the OCEAN RANGER's course into the Marine Sanctuary without regard to the hazards posed by the sanctuary.

//

ORDER DENYING WESTERN TOWBOAT'S MOTION FOR
RECONSIDERATION - 7

## IV. CONCLUSION

Having reviewed Western's Motion, the exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS that Plaintiff Western's Motion for Reconsideration, Dkt. #80, is DENIED.

DATED this 23rd day of June, 2021.

_____
RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE