```
              UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

WESTERN TOWBOAT COMPANY,        ) CASE NO. C20-00416-RSM
                                )
              Plaintiff,         ) Seattle, Washington
                                )
v.                              ) June 28, 2021
                                ) 9:00 a.m.
VIGOR MARINE, LLC,              )
                                ) BENCH TRIAL
              Defendant.        ) Vol. 1 of 5
                                )
_____

            VERBATIM REPORT OF PROCEEDINGS
       BEFORE THE HONORABLE RICARDO S. MARTINEZ
          CHIEF UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

  For the Plaintiff:      J. STEPHEN SIMMS
                          Simms Showers LLP
                          201 International Circle, Suite 230
                          Baltimore, MD 21030

                          ANTHONY J. GASPICH
                          Gaspich Law Office PLLC
                          8094 NE Barthrop Place
                          Bainbridge Island, WA 98110

  For the Defendant:      CHRISTOPHER H. HOWARD
                          DAVID R. BOYAJIAN
                          Schwabe Williamson & Wyatt
                          1420 Fifth Avenue, Suite 3400
                          Seattle, WA 98101

                          NOAH JARRETT
                          Schwabe Williamson & Wyatt
                          1211 SW Fifth Avenue, Suite 1900
                          Portland, OR 97204

                          ADAM MURRAY
                          Schwabe Williamson & Wyatt
                          700 Washington Street, Suite 701
                          Vancouver, WA 98660
```

## EXAMINATION INDEX

EXAMINATION OF                                                    PAGE

  PAUL TORREY          DIRECT EXAMINATION                          24
                       BY MR. SIMMS

                       CROSS-EXAMINATION                           54
                       BY MR. JARRETT

                       REDIRECT EXAMINATION                        69
                       BY MR. SIMMS

  RICHARD SHAW         DIRECT EXAMINATION                          72
                       BY MR. SIMMS

                       CROSS-EXAMINATION                           91
                       BY MR. BOYAJIAN

                       REDIRECT EXAMINATION                       111
                       BY MR. SIMMS

                       CROSS-EXAMINATION                          114
                       BY MR. BOYAJIAN

                       REDIRECT EXAMINATION                       118
                       BY MR. SIMMS

                       RECROSS-EXAMINATION                        119
                       BY MR. BOYAJIAN

  ROBERT ESKE          DIRECT EXAMINATION                         120
                       BY MR. SIMMS

                       CROSS-EXAMINATION                          134
                       BY MR. JARRETT

  JEFFREY SLESINGER    DIRECT EXAMINATION                         139
                       BY MR. SIMMS

                       CROSS-EXAMINATION                          164
                       BY MR. HOWARD


  DEFENDANT'S OPENING STATEMENT                                    16

## EXHIBIT INDEX

EXHIBITS ADMITTED                                                PAGE

  STIPULATED                                                       12

```
1                          PROCEEDINGS
2      _____

3            THE CLERK:  We're here on the matter of Western

4    Towboat Company versus Vigor Marine, Case No. C20-416, assigned

5    to this court.

6        Counsel, please make your appearances for the record.

7            MR. SIMMS:  Your Honor, Steve Simms for Western

8    Towboat.

9            MR. GASPICH:  Anthony Gaspich for Western Towboat.

10           MR. HOWARD:  Christopher Howard for Vigor Marine.

11           MR. BOYAJIAN:  David Boyajian for Vigor.

12           MR. JARRETT:  Noah Jarrett for Vigor.

13           MR. MURRAY:  Adam Murray for Vigor.

14           THE COURT:  And who else is seated with you?

15           MR. JARRETT:  Dan Keen, Your Honor.  This is our

16   client representative.

17           THE COURT:  Good morning to all of you.  I hope you're

18   all staying cool enough.  At least we're in an air-conditioned

19   courtroom.

20       Today is the 28th of June, and in a couple of days it's

21   going to be July 1st, and I've heard Governor Inslee is going to

22   relax some of the rules regarding the pandemic.  As you see, I

23   have Plexiglass and a high-powered HEPA filter up here.

24   Everyone is wearing masks in the common area.  All judges in

25   this court are fully vaccinated.
```

```
 1         In our last judges' meeting, last Thursday, it was decided
 2    that we would follow the CDC guidelines promulgated around the
 3    United States, and my next general order goes into effect on the
 4    6th, following the July 5th holiday, and it will indicate
 5    exactly what we're going to be doing.  But for your
 6    understanding of how we'll comport ourselves here in the
 7    courtroom -- it feels good to come out here without a mask.
 8    Even with the Plexiglass, it makes it tougher for the court
 9    reporter to get an accurate record.  I didn't know court
10    reporters read lips as much as they do.  So I think, for our
11    purposes in this particular case, if you are fully vaccinated
12    and you feel comfortable, you may remove your masks.
13         Now, let me remind you, some of the studies have shown that
14    the breakthroughs, even for those who are fully vaccinated,
15    breakthroughs occur.  But the odds are on our side, and if you
16    feel comfortable, you are more than welcome, in the courtroom,
17    to take your masks off.
18         For counsel, obviously, when you're speaking from the
19    podium, please take your masks off.  The witnesses are behind
20    the Plexiglass as well, and they will take their masks off so
21    everyone can hear them clearly.
22         If you are not vaccinated or if you have any witnesses that
23    are appearing that are not vaccinated, please -- and we're not
24    testing anybody.  It's going to be on the honor system.  But for
25    everyone's sake, if you don't feel comfortable -- and I don't
```

1    blame anyone for not being comfortable -- please let them know

2    to keep their masks on and try to stay as socially distanced as

3    much as possible from everyone else.

4         A couple of things to go over before we get started.  In

5    our pretrial conference, we talked about having the whole week

6    available for you.  We don't have Friday available.  There is

7    going to be a naturalization ceremony, and I must be there.  So

8    we will not be in session on Friday.  I realize the parties had

9    wanted the entire week, if possible.  I'm sorry we don't have

10   the entire week.

11        We have the next four days for you, so if there is anything

12   you can to do to cut down on witnesses and cut testimony, to not

13   be duplicative, let's do that.  We have a multi-defendant jury

14   trial starting next week, and that's going to be three and a

15   half weeks, so we're not going to finish if we're not done on

16   Thursday.

17        Finally, I had indicated during our pretrial conference

18   that if you have a witness that might be testifying remotely by

19   phone, or even by video, we do have the capability of setting

20   that up.  Our courtrooms are not designed to be video

21   courtrooms.  In fact, it's just the opposite.  That's a battle

22   going on in Congress right now.  But we have the capability, and

23   with the pandemic and Zoom and everything else, we have the

24   ability to do that.

25        However, we are still proceeding full bore on handling

1    civil Zoom jury trials, and so our IT people are stretched, to

2    say the least, as well as the equipment that we have.  We can't

3    just turn on a dime and say, Okay, this afternoon we're going to

4    have a witness appearing remotely.  You need to give us advanced

5    warning so we can make sure IT sets up the equipment for the

6    following day, probably the earliest as possible.  So if you

7    have anyone you intend to present remotely, let us know as soon

8    as you know, and IT will help us out.

9          Finally, I believe the parties requested that the witness

10   be excluded before they testify, and that will be granted.  If

11   anyone is in the courtroom that will be expected to be a

12   witness, they will be excluded until they testify.  After they

13   testify, they may remain in the courtroom.

14         Any questions before we get started about any logistics?

15   Anything from Western?

16             MR. SIMMS:  No, Your Honor.

17             THE COURT:  Anything from Vigor?

18             MR. JARRETT:  Your Honor, Noah Jarrett.

19         There are a number of witnesses, that we expect to be

20   testifying in Western's case, that are seated in the courtroom.

21   I think the position that I recall from Western is that they are

22   client representatives or testifying experts.

23         I mean, I'm curious, with the court's last comment, if that

24   applies to those witnesses.

25             MR. SIMMS:  Your Honor, let me -- so we've got --

1    Captain Shaw is a fact expert --

2            GALLERY SPEAKER:  Under subpoena.

3            MR. SIMMS:  Yeah, you're under subpoena, so you get to

4    go to the hot place.

5            GALLERY SPEAKER:  So the witness area right outside

6    the door?

7            MR. SIMMS:  Yes.

8        Paul Torrey there is going to be our first witness, so we

9    might as well just him stay here.

10       Captain Fox is our retained expert.  Dr. Kriebel is

11   retained expert.  Bob Shrewsbury is a designated expert, and

12   Russ is a designated expert, and our courtroom representative.

13           THE COURT:  Mr. Jarrett?

14           MR. JARRETT:  So their designated experts are experts

15   that don't need to provide a report?  I don't know that the

16   subjects of their testimony was adequately described, Your

17   Honor.  I don't know, for example, what Mr. Shrewsbury -- Bob

18   Shrewsbury is here to testify as an expert about, except for the

19   facts of this incident.

20           THE COURT:  So are you objecting to their being

21   present?

22           MR. JARRETT:  Yes, sir.

23           THE COURT:  Okay.

24           MR. SIMMS:  We designated Captain Shrewsbury as an

25   expert in tug-and-tow handling, and he was designated timely, as

```
 1    required that -- by experts that are not specially retained.

 2              THE COURT:  And the rest?

 3              MR. SIMMS:  And he is also with the same designation,

 4    and, in addition, he is the corporate representative.

 5              THE COURT:  Okay.  So he can remain?

 6              MR. SIMMS:  Yes, sir.

 7              THE COURT:  I'm asking about anybody else, then.

 8              MR. SIMMS:  And then Dr. Kriebel and Captain Fox are

 9    special-retained experts; Captain Fox on tug-and-tow operations,

10    generally; Dr. Kriebel on engineering and wave action.

11              THE COURT:  Anything further, Mr. Jarrett?

12              MR. JARRETT:  Thank you, Your Honor.

13         Well, at some point, the testimony regarding tug handling

14    becomes duplicative and redundant.  They're all experts on tug

15    handling.  That's just to be redundant, Your Honor.  I think

16    their testimony is redundant.

17              THE COURT:  It may well be, but what about their

18    presence in the courtroom, anything further?

19              MR. JARRETT:  No, nothing further, Your Honor.

20              THE COURT:  I'll allow them to remain.  And please,

21    again, be care of the duplicative testimony, because we try and

22    maximize our time.

23              MR. HOWARD:  Christopher Howard.

24         We are working with counsel to streamline some issues, but

25    I do want to clarify and make sure it is okay with the court
```

1  that if one of our witness gets called during plaintiff's case,

2  we would call them back in our case.  We do not have to do them

3  in that order?

4          THE COURT:  That's fine.

5          MR. HOWARD:  Thank you.

6      And I need to bring up the issue of Mr. Challenger, not as

7  an expert, whom you've excluded, but for some of the expenses.

8      I've been working on this with counsel, and we may be able

9  to stipulate to all of the expenses, but for the reasonableness

10 of those expenses, we may need Mr. Challenger as a fact witness.

11 I need to raise that at this time for scheduling later in the

12 week.  Because he was involved in the reasonable process of

13 incurring those expenses, but we may be able to work that out

14 with Mr. Simms.  We're working on that now to shorten the

15 Thursday part.

16     And one thing that would shorten -- I need to make an

17 inquiry similar to the inquiry I made at the pretrial conference

18 in an effort to shorten our cross-examination.

19     We read your order as having established the fault for

20 where it sank, starting at the point where a list was noticed,

21 as establishing that.  So we don't have to establish that again

22 in trial on cross.  We want to make sure that summary judgment

23 isn't being revisited in that regard.  That's established that

24 they are at fault for where it sank.

25         THE COURT:  Correct.

1          MR. HOWARD:  Thank you, Your Honor.

2      On a personal matter, would the court be okay if I wear my

3  polarized glasses because of an eye condition I developed in the

4  last two weeks?

5          THE COURT:  Absolutely.

6          MR. HOWARD:  Thank you, Your Honor.

7          MR. SIMMS:  On that question of negligence at the

8  pretrial, Your Honor also said that the question of comparative

9  negligence is still on the table.

10          THE COURT:  Yes.

11          MR. SIMMS:  Yes.

12          THE COURT:  And I'm assuming if I have to read your

13  trial briefs, I'm assuming that's one of the biggest things

14  we're going to be fighting about here over the next four days or

15  so.

16          MR. SIMMS:  Discussing.

17          THE COURT:  All right.  Counsel, are we ready for

18  short opening statement?

19          MR. SIMMS:  Your Honor, I'm not going to have an

20  opening statement.  You've had plenty, but we would like to do

21  is put some stipulated, agreed things in.

22      Most of the exhibits that you'll see in the pretrial order

23  have been stipulated, so I'd like to enter them, all the ones

24  that say "stipulation," "stipulated" with no objection.

25      And the court still has the pretrial order in front of it

1    to enter as well?

2              THE COURT:  I do, and we will.  Just give me one

3    moment.

4         Madam Clerk, if we give you copies of the exhibit list that

5    indicates that both parties have stipulated, you'll be able to

6    enter those into the record, and can you make sure, at the end

7    of the day, that counsel can check and make sure that our record

8    is correct?

9              THE CLERK:  Yes.

10             MR. SIMMS:  Your Honor, I have -- it is Plaintiff's

11   Exhibits 3, 4.  When we get to 5, 6, 7, 8, plaintiff's experts'

12   reports, the parties have agreed that the expert reports of each

13   side and Dr. Kriebel's rebuttal report may be stipulated

14   authentic and admissible.  So 5, 6, 7, 8 is in; 11, 12,

15   stipulated; 13, 16, 17, 18, 19 stipulated, plaintiff's; 23, 24,

16   25, 26, 27, 32, 33, 34, 35, 36.  For what it's worth, Western

17   won't be introducing 39 and 40, so we don't have to worry about

18   those, but 43, stipulated; 44, 45, 47, 48, 49, 50, 51, 52, 53,

19   54, 55, 56, 57, 58, 60, 65, 68, 69, 70, 71 and 72; 73 is

20   Dr. Kriebel's rebuttal report, which is also filed in the record

21   as ECF 76.  And then 74 is an email that we got by sending a

22   trial subpoena to NOAA, and we've sent that to the Vigor side,

23   and they may or may not be able to stipulate to that.

24             THE COURT:  Mr. Jarrett?

25             MR. JARRETT:  Your Honor, as to that, Exhibit 74, we

 1   have no objection.  I just hadn't decided yet when we first

 2   talked about it this morning.

 3            THE COURT:  Okay.  Thank you.

 4            MR. JARRETT:  Thank you.

 5            MR. SIMMS:  And I will provide the court a copy of

 6   that for the exhibit collection.

 7            THE COURT:  All right.  Thank you.

 8            MR. SIMMS:  And on the defendant's exhibits,

 9   stipulated and entered, moved to the entered -- and all of these

10   have an "A" in front of them.

11            THE COURT:  Yes.

12            MR. SIMMS:  02, 03, 04, 05, 06, 07, 08, 09, 10 --

13   that's A-10.  A-11, A-12, A-13, A-14, A-15, A-16, A-17, A-18;

14   20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33.  35

15   through 38 are the Vigor expert reports, which also the parties

16   agree to have entered; 39, 40 -- all A, still -- A-41, 42, 43,

17   44, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60,

18   61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72 through 79, 80,

19   81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96.

20        And 93 and 94 are the backup to Vigor's costs advanced to

21   NOAA, and Western will agree that those figures are what they

22   are.  So it was 400 and something.

23        But Mr. Jarrett is right, whether or not those were

24   reasonable or necessary or all of that, that's -- that's

25   maybe -- we'll work that out.  Maybe we'll hear from

1    Mr. Challenger.

2         Western would also propose that each expert be accepted as

3    an expert in the field in which the expert is offered, and so we

4    will not have to run through, for each expert, what their

5    qualifications are and all that business.  It's in their

6    reports.

7              THE COURT:  That would help a lot.

8              MR. JARRETT:  Your Honor, we agree with that.  That's

9    fine by Vigor.

10             THE COURT:  Thank you very much.

11             MR. SIMMS:  As far as the witnesses go, what we

12   understand is that Western wants to bring Mr. Keen back -- we're

13   going to call Mr. Keen this morning -- which is fine.

14        Mr. Torrey and Captain Shaw were listed, I think, on the

15   Vigor list.  If it's possible to do all the other witnesses

16   besides Vigor's -- Mr. Keen at the same time, so that we would

17   do the direct, Vigor's side would do the cross and the direct,

18   and we would do the cross.  We'd like the court to have it go

19   that way, for the sake of the witnesses.

20             THE COURT:  Not only for the sake of the witnesses,

21   but I think that will save time as well, whenever we can do

22   that.

23        Mr. Jarrett?

24             MR. JARRETT:  Yes, Your Honor, we don't have any

25   problem with that.  As Mr. Simms stated, we're happy to handle

1    direct and cross with Mr. Torrey and Captain Shaw as he

2    suggests.  One call for each witness.

3          MR. SIMMS:  And for the experts -- and they're

4    different.  Western side will have -- we have our special

5    retained experts, Dr. Kriebel and Captain Fox here.  Dr. Hudson

6    and Mr. Pickhardt will be here tomorrow.

7        What we wanted, since the court has ordered that Western

8    may have them consider and rebut the testimony of the Vigor

9    experts, that we will be putting the Vigor experts on, and then

10   offering our experts to rebut.  And that is kind of a logistical

11   challenge, because we understand that the Vigor experts, who are

12   specially retained, are not to be here until tomorrow or

13   Wednesday, at the earliest.  So we're trying to figure out how

14   to do that.  Don't know whether video would be something you'd

15   want to do, but...

16          MR. JARRETT:  Your Honor, we didn't know about that

17   issue until this morning when we came into the courtroom today.

18       Listed in the pretrial order for Western are Captain Shaw.

19   Dan Keen, and Mike Naylor.  Mike Naylor is an engineer and fact

20   witness and one of our expert witnesses.

21       So I guess we can't very well object to those being called

22   in Western's case.  But Western did not listen Ken Campbell, Tom

23   Gillmour, or Russell Johnson in Western's pretrial order, and we

24   had no plans to have them here.  And they're not fact witnesses

25   at all, so we do object to Western calling those witnesses in

```
 1    Western's case.
 2             MR. SIMMS:  And so the way that it would work, then,
 3    is that the Western experts would be around to listen to those
 4    guys' testimony, and rebut.  I'm just trying to figure out a
 5    good way to streamline that.
 6             THE COURT:  Mr. Jarrett?
 7             MR. JARRETT:  Your Honor, I guess that is an issue for
 8    Western in its case.  But we don't intend to call Ken Campbell,
 9    Tom  Gilmour, or Russell Johnson before plaintiff rests.  So I
10    guess that's where we are, Your Honor.
11             THE COURT:  All right.  We'll deal with that when we
12    have to.
13         All right.  Mr. Gaspich, are we ready?
14             MR. SIMMS:  We are, Your Honor.
15         We'll call Paul Torrey.
16             MR. HOWARD:  Your Honor, plaintiff waived opening, but
17    we did not.
18             THE COURT:  No.  I thought, during the pretrial
19    conference, I thought we talked about this a little bit.  You
20    don't have to make an opening.
21             MR. SIMMS:  I'm not going to.
22             THE COURT:  I read the briefs and I know exactly what
23    the issues are, what we're focusing on and the claims.  So
24    that's fine, you can waive opening, and Vigor can make their
25    opening, and we'll get started.
```

1          MR. HOWARD:  It will be at most ten minutes, Your

2     Honor.

3          THE COURT:  All right.

4                  DEFENDANT'S OPENING STATEMENT

5          MR. HOWARD:  Good morning, Your Honor, and thank you

6     for this air conditioning today.

7          This case -- the evidence will focus this case on the

8     decisions made by Western, and the evidence will show that

9     Western received a tow with recommendations that made that tow

10    suitable for the voyage if the conditions and the recommendation

11    were followed.

12         But time after time, Western made what, at least, one of

13    their employees calls "risk assessments," and chose risk over

14    following the recommendations in the survey and the conditions

15    necessary for a safe tow.

16         Vigor performed its due diligence in delivering the tow,

17    with the recommendations for it to be suitable.  It was

18    seaworthy because it was suitable for the intended voyage.  It

19    gave Western the information it needed to keep the tow safe, and

20    from then on, Western made the decisions, and Western ran the

21    show in their captain's discretion.

22         Now, there are a few facts that I'm going to review.  I

23    wouldn't normally be reviewing, but having read plaintiff's

24    trial brief, I need to point out the evidence is going to

25    correct some things that aren't quite accurate.

1        From Western's trial brief, one might believe that this

2   World War II vintage dry dock had been left corroding and

3   unmaintained and that Vigor had not maintained it, and nothing

4   could be further from the truth.

5        This was a working dry dock.  This dry dock was maintained

6   up until right before they decided that they had one too many

7   dry docks.  It had been maintained with what is called NAVSEA

8   standards.  Those are demanding standards, that will be

9   described to the court, that are necessary to put Navy ships

10  into the dry dock.

11       They have made reference in opposing the summary judgment

12  to the UT scan that was done in 2013.  But let's understand the

13  purpose of that scan.  The evidence will show that scan was made

14  to prioritize repairs.  Dan Keen will explain how they use that

15  to fix the dry dock to keep using the dry dock.  The scan also

16  focused on a portion of the dry dock -- which will be

17  explained -- that wasn't a portion relevant to the tow.

18       There are different parts of the dry dock.  There is the

19  deck.  The deck really doesn't have anything structural to do

20  with what happened in the tow in this case, but it does make a

21  lot of difference when you're bringing a boat in and working on

22  it in the dry dock.  And that scan focused on the deck and the

23  work that needed to be done on the deck.

24       And so it's important, as the evidence comes in, to take a

25  look at, when they talk about the defects and corrosion,

1    distinguish between the deck and the portions of the dry dock

2    that were used for the interior for lifting boats out of the

3    water, as opposed to the rest of the structure, which was

4    important and which was in adequate shape, suitable for this

5    tow.

6         Another point the evidence will refute what plaintiff's say

7    in their trial brief, the evidence will show Vigor had

8    sufficient room to keep this dry dock.  They weren't in a mad

9    rush to get it pushed down to Ensenada.  They could have waited

10   until the spring.

11        Now, the contract, the evidence will show, drafted by

12   Western, their standard form, the contract had Vigor disclaiming

13   seaworthiness.  That's not the standard required under the

14   contract.  The evidence will show under a due diligence standard

15   instead.  And evidence will show Vigor met that due diligence

16   standard, putting in over 996 hours of their own trained,

17   expertise people.

18        Remember, Vigor is in the business of fixing ships.  That's

19   what they do.  They have their own metal workers and welders on

20   staff, and they made it ready and suitable for this voyage,

21   adding additional compartmentalization, was double-sealed.  They

22   hired underwater welders to install cofferdams to seal and

23   reinforce the forward end for the tow.  There were 48 separate

24   compartments that were sealed, double-sealed, ready for the tow

25   to Ensenada.

1          Then they arranged for the inspection by Dr. Shaw, who will

2     be here this morning.  And Captain Shaw determined the

3     suitability for the intended voyage and the conditions under

4     which this could be towed, coastwise, from Seattle to Ensenada.

5          He gave specific wave height and wind restrictions, and

6     Vigor made sure that that information was passed along to

7     Western.

8          The evidence will show that, had those restrictions been

9     followed -- Mike Naylor will testify that, had those

10    restrictions been followed, the tow would have made it safely to

11    Ensenada.

12         The evidence will also show that Captain Shaw had the

13    information that he needed to make the assessment, and he spent

14    the time investigating and reviewing the dry dock, to be able to

15    make an adequate determination.  And we will go over with him

16    today, when he is questioned about the scan and what portions of

17    the dry dock it covers.  I believe you will find that Captain

18    Shaw will testify that it would not change his opinions.  The

19    Navy manual was something he was familiar with and it would not

20    change his opinions.

21         And a very important distinction, because one of the

22    experts for Western talks about comparing this to the 71 -- for

23    shorthand, Your Honor, there are three sister dry docks.  The 69

24    was brought up from Portland to Seattle; the 70, which is the

25    subject of this case; and the 71, which is in San Francisco.

1    And the evidence will show, because Mike Naylor is familiar with

2    the 69 and 71, that it has holes all through it, and it can't be

3    towed anywhere, so any comparison to the 71 is not a valid

4    comparison.  The evidence will show that.

5         The information, with no holes found by Captain Shaw, when

6    he inspected this, gave him the basis for setting the parameters

7    that made it appropriate and suitable for the intended voyage.

8         And in terms of seaworthiness, recall the tow did fine as

9    it was towed through four storms in excess of the conditions.

10   It was by the time it got to that fourth storm that a list was

11   noticed.  There is no indications that this tow wasn't suitable

12   or unseaworthy for the intended voyage that it was given.

13        Had Western followed the survey recommendations and had the

14   survey recommendations been given to the captain, and had they

15   been followed in this case, this case would not have happened.

16        Now, there are two separate inquiries for this court to

17   consider with respect to the comparative-fault evidence that's

18   coming on before you by Western.

19        One is why the vessel sank.  But why the vessel sank is a

20   completely and separate inquiry from where the vessel sank.  Why

21   the vessel sank is quite relevant to a contractual provision in

22   this case that indicates that Western's negligence excuses Vigor

23   from the obligation to pay, and there can be a comparative fault

24   under the contract.

25        But there is simply no evidence in this case that Vigor had

1   anything to do with the routing of the vessel or causing this

2   vessel to sink in the sanctuary.

3       I say that up front because unless something comes up that

4   did not come up during discovery, has not come up through the

5   case to date, you will not hear any evidence from Western that

6   Vigor, in any way, caused where it sank.

7       Now, you will hear that Western chose to leave Cape

8   Flattery, that's the northwest point -- near Point Roberts --

9   the northwest point of Washington.  At the point where they had

10  to make a decision and had they checked the weather at that

11  time, the evidence will show that there was already sea and wind

12  conditions in excess of the parameters set forth by Captain

13  Shaw, but they chose to proceed and to head south.

14      They headed south and kept the throttle up through four

15  storms that exceeded the wave and wind conditions.  And then

16  when they got to San Francisco, Vigor was involved in the -- if

17  you take it into San Francisco, we can go down there and help,

18  you know, pump it out and fix it.  But from that point on, Vigor

19  had no involvement in the decision not to take it into San

20  Francisco and to take it into Monterey, other than being made

21  aware of that.

22      And the reason it didn't go into San Francisco, as the

23  court already knows, is because they thought it might sink.  And

24  from that point on -- Bob Shrewsbury will testify he's the one

25  who made that decision, and there is simply no evidence that

1    Vigor was involved in that decision.  You'll hear no evidence in

2    this case that Vigor attributed to where it sank, Your Honor,

3    and that is a critical issue.

4        Thank you for your patience, and we look forward to trying

5    to get this case squeezed in to four days.

6            THE COURT:  Mr. Howard, one question before you step

7    down.

8        I have not seen a picture of the dry dock.  I don't know

9    what it looks like.  But I did hear and I did read about

10   portions of the structure that could have been removed, and --

11           MR. HOWARD:  Yes.

12           THE COURT:  So I'm trying to figure out what that

13   looks like.

14           MR. HOWARD:  Okay.  May I draw something?

15           THE COURT:  Sure.

16           MR. HOWARD:  Your Honor, the Navy dry dock was made to

17   be able to be taken up to the front, or forward action, during

18   World War II under any conditions.

19       And this is not to scale.  And there is a picture of the

20   outside of the dry dock on page 2 of our trial brief that will

21   show you the outside.

22       But the portions that can be removed are on the outer parts

23   of the dry dock, and those portions can, actually, more than

24   just be removed.  This is, actually, a very versatile dry dock.

25   You can use those two portions to raise the center, and work on

1    the center, or you can use the center to raise the outer two

2    portions, and work on them to maintain the dry dock.

3        So the dry dock was totally flexible, and if it had to be

4    taken under any conditions, that is to say any weather

5    conditions, gale force and beyond, those two could be stacked on

6    the interior piece.

7        Can you see this?

8            THE COURT:  Yes.

9            MR. HOWARD:  And so, yes, this is capable of being

10   taken apart and stacked, if it has to be taken -- well, in World

11   War II, forward to the active area under any conditions, because

12   they did not wait for weather.

13       And, in fact, you will hear testimony, Your Honor, that

14   when Vigor was moving the 69 from Portland to Seattle and they

15   contracted with Heger to do analysis, they had Heger analyze

16   four different ways to transport this, including in one piece or

17   in three pieces.  Heger analyzed all of those options before

18   they decided to try it, pursuant to similar restriction, in one

19   piece.

20       So does that answer your question?

21           THE COURT:  Yes.

22           MR. HOWARD:  Thank you, Your Honor, for asking.

23           THE COURT:  All right.  Western, ready?  Call your

24   first witness.

25           MR. SIMMS:  Okay.

 1                              PAUL TORREY,
                having been first duly sworn, testified as follows:
 2

 3          THE CLERK:  Please state your name for the record, and

 4  spell it for the court reporter.

 5          THE WITNESS:  My name is Paul Torrey; last name is

 6  T-o-r-r-e-y.

 7          THE COURT:  Mr. Torrey, a couple of things to keep in

 8  mind:  Number one, listen carefully to the questions being asked

 9  of you; wait until the question is complete before you start,

10  because if you speak over the question, the court reporter has

11  difficulties and will shut everything down.  All right?

12          THE WITNESS:  Okay.

13          THE COURT:  If you don't understand a question, simply

14  say so, and we'll see if counsel can explain it a little bit

15  better for you.

16          THE WITNESS:  Okay.

17          THE COURT:  You may inquire.

18                          DIRECT EXAMINATION

19  BY MR. SIMMS:

20  Q.   Mr. Torrey, what do you do for a living now?

21  A.   I'm a management employee at a small boat builder here in

22  Seattle.

23  Q.   Before that, what did you do?

24  A.   I was a management employee at Todd Shipyards, who

25  eventually got bought by Vigor.  So I was director of -- in my

1  last job, I was an assistant project manager at Vigor; before

2  that, I was director of facilities and commercial affairs.

3  Q.   So when did Todd Shipyard buy Vigor?

4  A.   I think it was 2011.

5  Q.   And so what was your first job with Vigor?

6  A.   Director of facilities and commercial affairs.

7  Q.   And what was your next job?

8  A.   In August of 2016, I moved to being the assistant project

9  manager for the overhaul of a Navy destroyer.

10 Q.   Okay.  And then after that?

11 A.   Then I left Vigor after that.

12 Q.   Okay.  And when did you leave Vigor?

13 A.   April of 2017.

14 Q.   And I'm going to put up a few exhibits, and I worked with

15 this yesterday, and I think I've just about got it right.  So

16 this should be No. 1 here.

17      Okay.  So can you see that on the screen there?

18 A.   Yes.

19 Q.   Okay.

20      So were you involved, while you worked with Vigor, with the

21 sale of the YFD 70, or the dry dock, to Amaya Curiel?

22 A.   Yes, I was.

23 Q.   Was this a sale for scrap?

24 A.   Yes, it was.

25 Q.   And you heard Mr. Howard refer to NAVSEA qualifications.

1          The YFD stopped being out of NAVSEA qualifications before

2     2015, right?

3     A.    I don't recall the date it went out of certification.

4     Q.    Okay.  Could it have been as early as 2013?

5     A.    No, I don't think.

6     Q.    And the last ship that Vigor used the dry dock for was --

7     was that in 2015?

8     A.    Again, I don't recall.

9     Q.    Okay.

10         So this document here called for the shipment of two dry

11    docks -- the sale of two dry docks to Amaya Curiel, right?

12    A.    Right.

13    Q.    And the price of the YFD 70 was $10,000?

14    A.    I would have to review the document, but I believe that

15    sounds correct.

16    Q.    Okay.

17         And the arrangement was for the YFD 70 and another one

18    called the Emerald Sea to be taken by heavy-lift ship to Amaya

19    Curiel, right?

20    A.    That was the original arrangement, yes.

21    Q.    Why a heavy-lift ship for both?

22    A.    Well, the Emerald Sea was in different condition than the

23    YFD 70.  The Emerald Sea had been split into two different

24    pieces, and it was not in a condition that we thought was

25    towable.

1  Q.    And we're talking about the Emerald Sea.

2           MR. SIMMS:  Some of these emails -- Your Honor, there

3  are a bunch of emails, so...

4  Q.    (By Mr. Simms)  For the Emerald Sea, these are emails that

5  we had admitted, and so you see here this is an email from you

6  to Victor Lopez.  Was he one of the Amaya Curiel people you

7  dealt with?

8  A.    Yes.  He was, I think, the port agent there in Ensenada.

9  Q.    Okay.

10          For the Emerald Sea, was there a proposal to put pumps on

11  the Emerald Sea, even though it was on the heavy-lift ship?

12  A.    I seem to recall that we did put a pump on the Emerald Sea.

13  So there was two shipments, and I believe on one of the

14  shipments, we did put a diesel-powered pump.

15  Q.    And the thoughts about that is Vigor wanted its pump back,

16  right?  It was expensive.

17  A.    It was rental pump, and we did want it back and it did come

18  back.

19  Q.    And there was no pumps put on the 70 for any part of its

20  trip to Mexico, right?

21  A.    I do not believe so, no.

22  Q.    Okay.  So back to our contract.

23          So the original contract with Amaya Curiel was to ship by

24  heavy-lift ship.

25          Why did the arrangement change to a one-piece, over-ocean

1   tow for the 70?

2   A.   When we originally were negotiating with Amaya Curiel, the

3   idea was that we would ship one section of the Emerald Sea on a

4   heavy-lift ship, just one section of that dock by itself down to

5   Ensenada, and then the other section of Emerald Sea, we would

6   load the YFD 70 onto that section of the Emerald Sea.  We called

7   it the wedding-cake approach, where we would stack parts of dry

8   docks on top of other dry docks.

9        So the idea was that we would take the YFD 70 apart, put

10  the end sections on the main body of the YFD 70, and then put

11  YFD 70 on Emerald Sea, and then put Emerald Sea on the

12  heavy-lift ship.

13       We changed our view on that.  We decided that that wasn't

14  going to work because that would require the section of Emerald

15  Sea to be able to operate both here in Seattle, to submerge and

16  receive YFD 70 onto it, and it would have to, on discharge, also

17  have to operate down in Ensenada, to be able to take the YFD 70

18  off of the Emerald Sea.  And we determined that the Emerald Sea

19  would not be able to operate to do that.  There wasn't going to

20  be sufficient power down in Ensenada for it to operate or,

21  perhaps, not a sufficient water depth to sink the dock down in

22  Ensenada.

23  Q.   So was it ever considered to use another heavy-lift ship or

24  the same one twice to get the 70 to Ensenada?

25  A.   That would have been a third voyage with a heavy left ship

1  to take YFD 70 down.  I think we contemplated, but from -- you

2  know, we decided we could tow YFD 70.  It was much more

3  economical to tow it down there rather than to charter a

4  heavy-lift ship again.

5  Q.   How much did Vigor save by having the YFD 70 towed -- that

6  is if it made it -- to Ensenada versus the heavy-lift ship?

7  A.   I don't recall the exact numbers, but it's going to be

8  something on the order of a million dollars.

9  Q.   Okay.  So Vigor got paid $10,000, and it was going to pay a

10 lot more to get the tow to Ensenada, right?

11 A.   Yes.

12 Q.   Because the whole purpose was scrapping this dry dock,

13 right?

14 A.   Yes.

15 Q.   Vigor needed to get rid of the dry dock?

16 A.   Yeah.  I mean, it wasn't -- we didn't need it anymore, and

17 it was taking space in the shipyard, and we needed to --

18 Q.   Vigor had a brand-new dry dock brought in called The

19 Evolution?

20 A.   Is that the right name?  I don't recall the name of the

21 dock that came in.

22      We had the YFD 69 come up from Portland.

23 Q.   And then there was one that got upgraded in China and taken

24 across by heavy-lift ship?

25 A.   That was after my time at Vigor.

1    Q.    Okay.

2          And then was there another one that came in to replace the

3    70?

4    A.    That was 69 that was bought up to replace 70.

5    Q.    Okay.

6          So Vigor saved a million dollars by not using a heavy-lift

7    ship.

8          How about on insurance?  Was the insurance also a

9    consideration in towing the YFD 70 in one piece, the cost of

10   insurance?

11   A.    I don't recall the cost of the insurance being an issue.

12   Q.    Okay.

13         And so when -- take a look at this.  This is Exhibit 23,

14   August 4th email, you to Janice Kowell.  Who is Janice?

15   A.    I don't recall who Janice is.  She might have been with the

16   insurance underwriter.  Melissa and Dawn were handing the direct

17   negotiations with the insurance underwriter.

18   Q.    And you see in Paragraph 1, referring to last year, which

19   is 2015.  "At that time, we determined the cost of keeping the

20   dock repaired was no longer economical."

21         What was the cost of keeping the dock repaired?

22   A.    It varied.  You know, over the time that I was involved in

23   maintaining the dock, we did substantial repairs, and it varied

24   from year to year, depending on, kind of, what the structure --

25   you know, we would do -- as referred to in the opening

1  statement, we would do structural analysis of the dock, look at

2  what areas of the dock needed repair.  Some years we spent

3  hundreds of thousands of dollars in cropping out steel and

4  replacing steel, painting, fixing pumps.

5  Q.   Okay.

6       You see that paragraph also referring to NAVSEA, "Certified

7  by NAVSEA up until 2013"; is that a correct statement?

8  A.   I assume that's correct, if that's what I wrote, yes.

9  Q.   And Heger was involved in certifying for NAVSEA, wasn't it?

10 A.   Yes.  They would come and do our inspection survey as part

11 of the NAVSEA certification process.

12 Q.   Okay.  Was that ultrasound survey part of the NAVSEA

13 certification process?

14 A.   They had periodic ultrasound testing that was required of

15 different sections of the dock at different periods of time.

16 Q.   All right.

17 A.   Some required, I think, every three years, some every five

18 years, some every seven years, something like that.  I don't

19 recall.

20 Q.   And that was for NAVSEA?

21 A.   Yes.

22 Q.   And then in 7, did you recommend Western do this open-ocean

23 tow?

24 A.   I certainly thought that they were qualified to do the tow,

25 yes.

1   Q.   And let's go back, before the sale to Amaya Curiel.

2        There was one proposal to scrap the 70 in China, right?

3   A.   There was a gentleman that came that was trying to

4   negotiate buying the dock and taking it to Korea, I believe, to

5   scrap, but that never really came to fruition.

6   Q.   And that proposal involved the transport on a heavy-lift

7   ship, right?

8   A.   Yeah.  He was a heavy-lift ship broker, and after the

9   discussions with him ended, it came to my mind that probably

10  what he was doing was trying to negotiate a back-haul cargo for

11  a heavy-lift ship that was bringing something over to the West

12  Coast.  I don't know that for sure, but I think that's what he

13  was trying to do.

14  Q.   And that transport would have involved taking the 70 apart

15  into three pieces, right?

16  A.   I don't remember if we got to that part of the discussion.

17  Q.   There was another proposal to move the 70 to Tacoma for

18  disassembly?

19  A.   I recall some conversations around that.  I don't recall

20  how far that got.

21  Q.   Okay.

22       In 2016 -- 2015 there was an engineer named Frank Van Horn,

23  who inspected the 70 and the Emerald Sea for heavy lift?

24  A.   The name sounds familiar.  I don't recall the

25  circumstances.

1    Q.   Before the decision to move the 70 in a one-piece tow, had

2    there ever been a proposal to transport the 70 in one piece

3    anywhere while you were at Vigor?

4    A.   Not that I recall.  Possibly to Tacoma, but not that I

5    recall.

6    Q.   And while you were at Vigor, had the 70 ever been

7    disassembled into less than one piece?

8    A.   I believe while we were still Todd, before the acquisition,

9    there was a point in time in which the end sections would have

10   been taken off for a self-docking.  It would have been probably

11   in the 2008 timeframe.  I'm guessing.  My memory is not totally

12   clear on that.

13   Q.   So the decision to go with a one-piece tow as opposed to

14   heavy lift was sometime in August of 2016, right?

15   A.   Sometime in that summer, yes.

16   Q.   But there was never a written change of the contract with

17   Amaya Curiel to change from a heavy-lift ship to a one-piece

18   tow, was there?

19   A.   No, there was not.

20   Q.   And Vigor never told Amaya Curiel of the decision until you

21   made it for the one-ship tow, right?

22   A.   I don't remember exactly when I might have told Roberto

23   that, whether it was, you know -- I had a phone conversation

24   with him and told him we were changing things, but I don't know

25   that I told him in writing until after the decision had been

1   made.

2   Q.   Did anybody at Vigor, at any time before the sinking, know

3   that the original design of the 70 was that it was to be in

4   three pieces for open-ocean tow?

5   A.   I don't know the answer to that.  I would assume -- I don't

6   know.  If -- it would have to -- one of the dockmasters -- Dan

7   or one of the prior dockmasters might know that.  I don't know

8   that I knew that.

9        I think there was some discussion around that when we

10  brought up 69 from Portland.  And once Heger okayed the tow of

11  69 from Portland, we then proceeded to have them look at doing

12  70 the same way.

13  Q.   Okay.  So when you decided to do 70 the same way -- that is

14  the one-piece tow -- there was no consideration that it would be

15  the first time, apparently in history, that there was an

16  open-ocean tow of this dry dock in one piece for the distance

17  that it was going to be towed?

18  A.   Not that I'm aware of.  There was no discussion about that,

19  that I was involved with.

20  Q.   Okay.

21       So the sequence was that Vigor made the decision to do a

22  one-piece tow.  It was going to save a million dollars.  And

23  then you contract with Western for the one-piece tow.

24       When Vigor contracted with Western for the one-piece tow,

25  had there been any analysis of whether the tow would be suitable

1    for the tow?

2    A.   It was my belief that that's what Heger was looking at.

3    Q.   Okay.  But Heger never looked at the 70 for the purpose of

4    a one-piece tow, did it?

5    A.   I don't know if they physically came out or whether they --

6    I don't know what records they were given to review.

7    Q.   Okay.  Would it surprise you to know they were given no

8    records for the 70 for a one-piece tow, except -- I'll back

9    up -- except one diagram drawn by Dan to show the tow

10   connections on that diagram.  Would it surprise you that's the

11   only thing?

12   A.   Somewhat, yes.

13        I think Heger knew of the condition of the dock.  They had

14   experienced survey -- you know, inspecting the dock, so they

15   weren't absolutely uninformed about the dock.

16   Q.   So the tow contract with Western, this gets signed -- this

17   is the tow contract, and down at the bottom here, there's your

18   signature.  This is October 4th.

19        October 4th, did Vigor have any report from Captain Shaw

20   about suitability for tow?

21   A.   I believe we did.

22   Q.   Okay.  Well, would it surprise you that you didn't?

23   A.   I thought we engaged Captain Shaw to do a pre-tow survey.

24   Q.   Yeah.  And his report was finished the day after the tow

25   departed on the 18th, November 18th.

1   A.    I mean, in my experience working with surveyors, often

2   their reports come after the fact because there is final details

3   that they're putting together.

4   Q.    Okay.  But as of October 4, Vigor had agreed with Western

5   that there was going to be a tow that was going to start on or

6   about October 7.  But look at down here:  "Tow dependent on

7   favorable weather conditions.  In the event that the weather

8   conditions do not allow the tow to commence, either party would

9   reschedule."

10        So as of August, Western was required to commence the tow

11  by November 7, if there were favorable weather conditions,

12  right?

13  A.    Correct.

14  Q.    But at the time, Vigor had no idea of whether the tow would

15  be -- whether you could take the tow -- whether the whole thing

16  together could make the tow.

17  A.    There was some source of that date, that November date.  I

18  don't know what the source is, but I would have to say that

19  there was some -- either we had preliminary conversations with

20  the surveyor or -- that doesn't seem like a date I would have

21  plucked out of thin air.

22  Q.    Okay.

23        So contract's in place October 4th, and then from October

24  4th, on, what was your involvement in -- and let's go up to the

25  departure date of the 17th -- getting the 70 out of Seattle?

1  A.   I was not very involved at that point in time.

2  Q.   And was that Dan Keen, then, who took over?

3  A.   Yes.

4  Q.   What was Dan's job at Vigor?

5  A.   Dan was the dockmaster, or is the dockmaster at Vigor.

6  Q.   So what's that job involve?

7  A.   That involves operating, directing the operations of the

8  dock, planning out the drydocking of vessels, leading the

9  maintenance on the docks.

10  Q.   Okay.

11       And do you have an engineering background?

12  A.   No, I do not.

13  Q.   What is your educational background?

14  A.   I have an undergraduate degree in philosophy and a graduate

15  degree in business administration.

16  Q.   Okay.

17       And so you, basically, turned things over to Dan.  Did both

18  of you report to a guy named Adam Beck?

19  A.   Yes.

20  Q.   What was Bob Ekse's role vis-a-vis what he did.

21  A.   Robert was manager at Vigor.  I think at some point in

22  time, some things were very unclear or informally done.  But he

23  might have become my boss at some point in time there,

24  especially because I -- when I changed over my role in August to

25  become the project manager on the DDG overhaul, and I think at

1  that point Robert might have become my boss, technically.

2  Q.    And did he have any role with what Dan did?

3  A.    I don't recall the reporting arrangements between Dan and

4  Robert at that point in time.

5  Q.    Okay.  We're talking about the cost of insurance.

6        This is the day after you've entered into the contract,

7  August 5th.  You were still working out the insurance.  So did

8  you work to place the insurance for the YFD 70?

9  A.    I would have worked with our insurance team down in

10  Portland, Melissa and Dawn.  They would have reached out

11  directly to the underwriters, and I would have been supplying

12  information and getting information back and forth with them.

13  Q.    Was there any difficulty underwriting for the -- this is

14  48 -- Vigor's A-48.

15        Was there any difficulty getting underwriters to write this

16  coverage?

17  A.    Not that I'm aware of.

18  Q.    So there's lots of underwriters to write the coverage for

19  the 70?

20  A.    No.  I mean, this is not like getting auto insurance, no.

21  Q.    And so this one, the cost, when you say, "Comparable to

22  insure Dockwise shipment," the cost was a little bit more

23  expensive than the Dockwise shipment?

24  A.    That's what I'm reading from this email.  I don't recall

25  the actual numbers.

1  Q.   So cost effectiveness was very important to Vigor in the

2  YFD 70 move to Ensenada, right?

3  A.   Yes.

4  Q.   You wanted to do it as cheaply as possible?

5  A.   Yes.

6  Q.   You wanted to get rid of the 70?  You wanted to scrap it,

7  right?

8  A.   That was -- yeah, it was -- we were getting rid of the

9  dock, yes.

10  Q.   And that was your assignment from Adam Beck, that you were

11  to get rid of the 70 as cheaply as possible, right?

12  A.   Yeah.  I don't know that his words were exactly that, but,

13  yes, to find the most cost-effective way to get rid of the dock,

14  yes.

15  Q.   And you'd been working for two years to get rid of the 70?

16  A.   Yes.

17  Q.   And so this Mexican option came around, and what

18  instructions did you have about saving costs for moving the 70?

19  A.   I don't recall any explicit -- you know, there's always --

20  throughout running the business, there was always an implicit

21  try and do things as economically as possible, you know, in

22  everything we did.

23  Q.   You also got instructions to move it out as quickly as you

24  could, right?

25  A.   You know, I don't recall, completely, on the YFD 70.  With

1   the Emerald Sea, which was in front of this, we'd been working

2   on getting rid of the Emerald Sea for much longer.  And we had,

3   actually, tried to scrap part of it in our yard.  So there would

4   have been a little more, I would say, urgency in terms

5   of getting rid of the Emerald Sea.  But once we found a route or

6   a way to scrap the docks, then it was, okay, let's move forward

7   with this as prudently as possible.

8   Q.    So --

9   A.    There was no point in keeping the dock around.

10  Q.    So the *Ocean Ranger* and the 70 pull out on the 17th, and

11  let's fast-forward to the open ocean, somewhere, going towards

12  Point Reyes.

13        So we've got -- did you, once the 70 departed, receive

14  regular reports of the 70's location and also the weather

15  conditions?

16  A.    I don't believe I did.  I know somebody at Vigor did.  I

17  would have been  preoccupied with other things.  If I did get

18  them, I probably wasn't paying much attention to them.

19  Q.    So here's one example, and there you are.  This is

20  Exhibit 27.  And down here, you see, "Wind southeast 35 to 40

21  knots."

22        You had seen Captain Shaw's towing recommendations,

23  correct?

24  A.    Yes, I believe I did, yes.

25  Q.    And you'd also seen the tow plan that Western wrote?

1    A.    Yes.

2    Q.    And so these wind conditions exceeded that tow plan and the

3    recommendations, right?

4    A.    That's how it appears, yes.

5    Q.    But nobody at Vigor ever pointed this out to Western, that,

6    Hey, you guys are out there exceeding these recommendations;

7    nobody said anything?

8    A.    Not that I'm aware of.

9    Q.    There was never any discussion within Vigor about, Hey,

10   these people are out there exceeding the tow plan and the

11   recommendations?

12   A.    Not that I'm aware of.

13   Q.    But you were part of this team that was monitoring the tow,

14   right?

15   A.    At that point I was deeply involved with the docking of a

16   Navy destroyer, and I really was not paying attention to this

17   tow.

18   Q.    Okay.  Looking at 43, here we've got August 25th.  The

19   second shipment this refers to that.  That is, at the time, the

20   70, right?

21   A.    No.  That's the second shipment of the Emerald Sea -- the

22   second section of the Emerald Sea being shipped.

23   Q.    All right.  So this is Exhibit A-43, and it talks about the

24   dry dock.

25         Okay.  October 25th, going forward to October 25th -- and

1  you remember that the 70 sank early in the morning of the 26th.

2  So this is Tuesday the 25th, and you to Dan Keen, okay?  And Dan

3  writes to you -- this is that morning -- early morning, "This is

4  going to be two long days."  From Dan to you:  "Hey, I haven't

5  seen anything," and then here's the 25th, in the morning, "you

6  have been talking to them."

7  A.    I think that's Dan saying he has been talking to them.

8  Q.    Okay.  He has been -- Dan has been talking to them.  Okay.

9  All right.

10       So at this -- why were you now involved with the tow and

11  what was going on with the tow?

12  A.    Roberto may have contacted me.  I was kind of Roberto's --

13  I remained Roberto's kind of contact at Vigor during this time,

14  so he may have contacted me to ask what was the status of the

15  tow.  And so it looks like I reached out to Dan and said, "Have

16  we been getting updates?"  And Dan gave me the update.

17  Q.    Uh-huh.  Okay.

18       So then a little bit later in the day, at around two

19  o'clock, the call comes in that the tow is listing.

20       What's the first thing you remember about information that

21  the tow was listing?

22  A.    I believe I received a call from Bob Shrewsbury --

23  Q.    That's Bob right there, yeah.

24  A.    -- telling me that the tow had taken on a list, and that

25  they were -- you know, communicating that to me, letting me know

1   there was a possible issue; told me they were in communication

2   with the tug.

3       At that point in time, I then started contacting people

4   within Vigor to try and develop a plan of action of what we

5   should do; to decide, you know, do we take it into San Francisco

6   and then pump out whatever tank is flooding and do repairs and

7   keep going, or what do we do at that point in time?

8   Q.   Okay.  And you'll see at the bottom -- this is a couple

9   hours later -- from Bob to you -- from Bob to Dan and copied to

10  you.  And then your next one, October 25th, Tuesday, 4:21 p.m.

11      Did you call Global Diving about salving the 70?

12  A.   I called Global Diving to ask what resources they might

13  have to assist us in, you know, repairing the dock.

14  Q.   And so did anybody at Vigor believe that the dock was not

15  repairable?

16          MR. JARRETT:  Objection, Your Honor.  There is no

17  foundation for this testimony.

18          THE COURT:  Sustained.

19          MR. SIMMS:  You can answer.  Sustained, so --

20          THE WITNESS:  I can answer the question?

21          THE COURT:  The objection is sustained.

22          MR. SIMMS:  Oh, objection sustained.

23  Q.   (By Mr. Simms)  You were arranging for the -- you made the

24  first call to Global, right?

25  A.   Yes, I did, that's correct.

1   Q.   It wasn't Western that made the call to Global; you made

2   the call?

3   A.   Yes.

4   Q.   And tell us about that call to Western (sic).  What did you

5   tell them, what did they tell you?

6   A.   To Western?

7   Q.   Sorry.  To Global.

8   A.   I think I probably reached out to our contact at Global.

9   We used Global on a number of occasions to do a variety of

10  things at the shipyard related to the dry docks.  I reached out

11  to them and said we potentially have a problem with the dry dock

12  that's being towed.  It's off of San Francisco.  We may need to

13  get a crew out there to pump out tanks or patch a hole or do

14  some kind of repair to keep the dock floating -- not floating,

15  but make it towable, continue to tow.

16       I asked them what resources they might have in the area in

17  San Francisco, and I think I asked them if there was a preferred

18  spot in San Francisco Harbor where we might be able to tow it

19  and do work.

20  Q.   Okay.  So at that point, were you helping Western to get

21  the tow in to --

22  A.   I think we were in conversation, yes, about what to do.  I

23  mean, the dock was listing, what are we going to do?  Is it

24  possible to keep towing it?  Do we have to take it into the

25  harbor to repair it?  What needs to be done?  So, yes, we were

1  in conversation.

2  Q.    And were you talking to Dan about it?

3  A.    I'm sure I looped Dan in.  I'm sure I called Dan

4  immediately and let him know what was going on, yes.

5  Q.    So at that point, did you understand from Dan that the dock

6  would continue to float?

7  A.    I think, at some point in that timeframe, in that

8  afternoon, Dan did some analysis of what we thought was

9  happening to the dock and thought that, given its

10  compartmentalization, it should be fine and continue to float,

11  yes.

12  Q.    And that was internal at Vigor, the analysis?

13  A.    Yes, I believe so.

14  Q.    But you didn't send that to -- in the afternoon, you didn't

15  send that to Western, that analysis?

16  A.    No, I think Dan did send that, at some point, to Western.

17  Q.    Okay.  We'll get to that.

18        So here is San Francisco Bay.

19        Do you know what a marine sanctuary is?

20  A.    I did not at the time.  Maybe I knew of marine sanctuaries

21  at the time, but not of the Pacific marine sanctuaries off the

22  coast of San Francisco.

23  Q.    Okay.  You knew that there were marine sanctuaries there,

24  though, right?

25  A.    No, I don't believe I knew that at the time.

1   Q.   You knew that there were marine sanctuaries at Monterey?

2   A.   I knew there was one off of Hawaii, is probably the best I

3   can recollect.

4   Q.   And so here is 4:35 p.m., Robert Ekse to you and Dan:

5   "Stay in touch with Western, hook Global up with Dan to start a

6   dialogue."  Did you do that?

7   A.   I believe so, yes.

8   Q.   And then you started talking with the Coast Guard.  Tell us

9   about your first conversation with the Coast Guard and how that

10  developed over the...

11  A.   I really don't recall what prompted me to call the Coast

12  Guard.  I don't recall why I called them.  It might have been to

13  request advice on where to take the dock in San Francisco.

14  Q.   Okay.  Okay.  And so this is 7:44 p.m. on Tuesday evening,

15  and here you are, you're talking with the Coast Guard.  Did you

16  talk with the Coast Guard about coming into San Francisco Bay?

17  A.   Yes.

18  Q.   So you were the one that was talking with the Coast Guard,

19  not Western, at that point about coming into the bay, right?

20  A.   I know I was.  I don't know if Western was talking with the

21  Coast Guard at the same time, or the vessel -- the towboat had

22  been in conversation with the Coast Guard or not, but I know I

23  was.

24  Q.   Okay.

25       And so at the bottom here, did you talk with Western to

1    determine if a second tug is needed?

2    A.   I probably had -- I don't recall, but I probably had a

3    discussion with someone at Western about that idea, yes.

4    Q.   Okay.

5    A.   Or I might have spoken with Dan and asked Dan to talk to

6    Western about that.

7    Q.   Okay.

8         And then, "Dan planned on flying out tomorrow morning."

9    Did Dan have plans to fly out to Monterey to meet the tow?

10   A.   I assume he started doing that, but he and I -- I don't

11   know that he and I had an explicit conversation about that.

12   Q.   And look at Vigor's 72.  And here it is, 11:29 p.m. -- and

13   some of these times are a little strange, because this seems to

14   be a little bit about -- whereas, down here, we have 4:07 p.m.

15   Okay?  So it's Bob to you at 4:07 p.m., but whenever this was,

16   you're writing Bob, and then to Dan, "In addition to determining

17   who we will send to assist."

18        Why was it Vigor determining who to send to assist the tow?

19   A.   Well, it was our dry dock, and so to repair the dry dock,

20   we would have to -- have to -- I wouldn't assume that it's

21   Western 's responsibility to repair the dry dock.

22   Q.   Uh-huh.  Okay.  So what you were doing was assisting

23   Western to be able to come in to San Francisco for the repair?

24   A.   The assist there, I think, refers to assisting in terms

25   of -- well, it was probably whatever assistance Western needed

1    to bring the dry dock in and get the dry dock repaired and on

2    its way again.

3    Q.    Okay.

4          And during this process, when you were talking about the

5    Coast Guard, did you receive and view any photos of the dry

6    dock?

7    A.    I seem to recall there being a photo sent to -- I don't

8    know if it was directly to me or to Dan, but some photo that was

9    not particularly clear as to the level of the list.

10   Q.    Okay.  All right.

11   A.    This photo, I believe, is from when the dock is actually

12   sinking on the morning -- I don't think this is a photo from the

13   day before.

14   Q.    Well, during the time where you were talking to the Coast

15   Guard, were you assessing whether -- at least from Vigor's

16   standpoint -- the dock would continue to float?

17   A.    It was my assumption the dock was floating, could float,

18   could be towed into San Francisco Harbor.

19   Q.    And throughout this whole process, until it sank, nobody at

20   Vigor thought the tow was going to sink, right?

21         MR. JARRETT:  Your Honor, objection; lack of

22   foundation.

23         THE COURT:  Sustained.

24   Q.    (By Mr. Simms)  Did anybody at Vigor, during this whole

25   process, express to you that the dock would sink?

1   A.    No.

2   Q.    So now we'll start to talk about Monterey.

3                THE COURT:  Counsel, maybe before we move to Monterey,

4   we'll go ahead and take our morning break at this time for our

5   court reporter.  All right?

6        Mr. Torrey, we're going to take a 15-minute break, and

7   we'll be back with you after the recess.

8                (Court in recess 10:36 a.m. to 10:55 a.m.)

9   Q.    (By Mr. Simms)  I got some dates mixed up.

10       The survey was issued October 18th, the final version, and

11  taking a look at this exhibit, A-3, this is a draft survey.

12       Vigor didn't have a draft survey from the surveyor before

13  October 6th, 2016, correct?

14  A.    That's what it appears, yes.

15  Q.    Now let's go to Monterey.

16       So here's 5:20 p.m., and you're getting calls from the

17  Coast Guard?

18  A.    Uh-huh.

19  Q.    You were in regular communication with the Coast Guard?

20  A.    Yes.

21  Q.    Why were you in regular communication with the Coast Guard

22  about the listing tow?

23  A.    I think at that point in time I was the primary point of

24  contact who had reached out to the Coast Guard, so they had my

25  name.  Since I made the initial outreach to the Coast Guard, you

1    know, they took my name down, and I became the point of contact.

2    Q.    And was the Coast Guard thinking about going to Monterey?

3              MR. JARRETT:  Well, objection, Your Honor.  That calls

4    for speculation as well.

5              THE COURT:  That will be sustained.

6    Q.    (By Mr. Simms)  Did the Coast Guard tell you that they were

7    considering the option of going to Monterey?

8    A.    They suggested that we might want to consider going to

9    Monterey, yes.

10   Q.    Okay.  And then you sent them the tow plan?

11   A.    Yes.

12   Q.    Which had been approved?

13   A.    Yes.

14   Q.    All right.  And did you help set up the radio contact with

15   the *Ocean Ranger*?

16   A.    I don't know whether I forwarded that information on to

17   Western, or whether I asked Dan to do that.  I don't recall

18   exactly, but I assume I had forwarded that information on to

19   somehow to get to the *Ranger*, yes.

20   Q.    And so you're sending a copy of this to Adam Beck, your

21   boss at the time.  He asks, "Is this our responsibility, or the

22   buyer's?"  And you respond, "I would say ours."  What do you

23   mean by that?

24   A.    Contractually, we were obligated, in the sale agreement, to

25   tow the dock -- to transport the dock to Ensenada, and so I

 1    would say making sure the dock was repaired and towed down to

 2    Ensenada was our responsibility.

 3    Q.    You were helping Western to get into a place where they

 4    could repair the dock?

 5    A.    Yes.

 6    Q.    So then we're still -- now, this is about 8:44 p.m., and

 7    there was a question about, "Well, who will do the salving?"

 8    And so this is Exhibit 48 -- Western's Exhibit 48.

 9          So you're on the copy here.

10          Okay.  So it's 9:05 p.m., from you to Dan, Bob, and Russ:

11    "U.S. Coast Guard asking to know what tug company we have on

12    tap."

13          Did you get involved with arranging for the tug company to

14    meet the tow at Monterey?

15    A.    I do not know.

16    Q.    Okay.  Is that something that Dan did?

17    A.    I don't know who reached out to the company, whether that

18    was Western or Dan.

19    Q.    Okay.  So you passed that information along from the Coast

20    Guard, asking about the tug company.

21          This is Exhibit 53 down here.

22          Were you involved with getting the Captain of the Port

23    Order from the Coast Guard?

24    A.    Yes.  That was -- that was the initial contact to the Coast

25    Guard.  They kept me as the point of contact.  So when they gave

1  us the Captain of the Port Order, it came to me.

2  Q.   And the Captain of the Port Order was to permit Western to

3  enter Monterey, right?

4  A.   That is my recollection, yes.

5  Q.   And I'll pull it up here.

6       And did you speak with Specialist Jorge about the Captain

7  of the Port Order, or somebody at the Coast Guard?

8  A.   I spoke to somebody at the Coast Guard.  I don't recall

9  who.

10 Q.   Did they tell you why they believed a Captain of the Port

11 Order was needed?

12 A.   I was under the impression that because there was a damaged

13 vessel entering a port, that there needed to be some kind of a

14 Captain of the Port Order, but I got that impression from them

15 that this was a requirement.  I don't know that if I knew that

16 or developed that independently of the Coast Guard.

17 Q.   Okay.  So here's 43, Captain of the Port Order, and the

18 Coast Guard sent it to you, right?

19 A.   Yes.

20 Q.   Okay.  They didn't send it to Western; they sent it to you?

21 A.   I don't know if they also copied Western on it or not.  I

22 don't know that.

23 Q.   And then 54 -- this is Western's 54.  So there's Specialist

24 Jorge again, and then you, "Send the attached."  It's now 2:45

25 a.m.  Do you remember that evening?  What were you doing?

1   A.   At that point, I was at home, you know, monitoring emails.

2   I don't know if I was taking phone calls at that point in the

3   night, but I was passing emails on to people at that point in

4   the night.

5   Q.   So at 2:45 p.m. -- sorry -- a.m. -- 2:10 a.m., you believe

6   that the tow was still floating, right?

7   A.   Yes.

8   Q.   And nobody had expressed to you that it was going to sink?

9   A.   No.

10  Q.   Everybody's intention expressed to you that they were going

11  to meet the tow in the morning, with Global Diving, to save the

12  tow, right?

13  A.   I don't know that we had -- I don't recall if somebody was

14  lined up to meet the tow.  I believe that the plan was that

15  Western would loiter with the tow, making minimal headway, and

16  then head into Monterey when there was light and we could better

17  assess the situation.

18  Q.   Okay.  And then here's Robert back to you in the morning.

19  Now, by this time, the tow had sunk, but in the morning, at

20  7:16, did you know the tow had sunk?

21  A.   I don't recall what time I learned the tow had sunk.  It

22  was sometime around this point of time.

23  Q.   And the fact that the tow had sunk was a surprise to

24  everybody at Vigor, wasn't it?

25       MR. JARRETT:  Well --

1    Q.    (By Mr. Simms)  Was it a surprise to you?

2              THE COURT:  Sustained; rephrase.

3    Q.    (By Mr. Simms)  Was it a surprise to you to learn this tow

4    had sunk?

5    A.    Yes.

6    Q.    Why?

7    A.    I just didn't think it had been that critical a -- I didn't

8    think it had gotten to that extent of a problem.

9    Q.    And why did you think that?

10   A.    I had no -- no one had provided me any information to think

11   otherwise.  I wasn't there.  I wasn't on site.  I was -- I just

12   didn't have a reason to think it was going to sink.

13   Q.    Because Dan had run the numbers and told you it looks like

14   it should float, right?

15   A.    That was probably one of the considerations, yes.

16             MR. SIMMS:  All right.  Nothing further.

17             MR. JARRETT:  Your Honor, I do have some questions.

18        Mr. Torrey, bear with me.  I'm a little slow and

19   disorganized.

20                            CROSS-EXAMINATION

21   BY MR. JARRETT:

22   Q.    Mr. Torrey, thank you for being here today.  Are you here

23   as a volunteer witness?

24   A.    I guess so.

25   Q.    Did you receive a subpoena from one or both of the parties?

1    A.    From both parties, yes.

2    Q.    From both parties?

3          And you're not a Vigor employee anymore, are you?

4    A.    No, I'm not.

5    Q.    And your testimony in this case doesn't affect your

6    employment with your current employer at all, does it?

7    A.    No, it does not.

8    Q.    All right.  So you have no real reason or -- I mean, I'm

9    just going to -- you don't have any reason to color things

10   Vigor's way or make anything up, do you?

11   A.    No, and I swore that I wouldn't --

12   Q.    Oh, sorry.  I interrupted you.  I apologize.

13   A.    I said swore that I would tell the truth.

14   Q.    There you go.

15         And you're here to provide just truthful testimony.  You're

16   not here to speculate or talk about anything you don't actually

17   know; is that right?

18   A.    Correct.

19   Q.    All right.  Great.

20         Let me get two more questions in.  I don't know if I made

21   note of your background enough.

22         You have a bachelor's degree in?

23   A.    Philosophy.

24   Q.    Philosophy.

25         And you've worked for a number of years in shipyards?

1    A.    Yes.

2    Q.    Are you a naval engineer?

3    A.    No, I'm not.

4    Q.    Do you have any license to operate any kind of vessel?  Do

5    you have any kind of credential?

6    A.    No.

7    Q.    Have you ever towed anything behind a boat, Mr. Torrey?

8    A.    No, I have not.

9    Q.    Have you ever been charged with towing anybody's property

10   in any water anywhere?

11   A.    Not -- I mean, as a manager at Vigor, we moved -- we used a

12   skiff to move what we call sea camels around the yard --

13   Q.    Sure.

14   A.    -- those big fenders; just miscellaneous things we would

15   have moved around the yard at Vigor.

16   Q.    So a fender is a big thing that vessels can bump into

17   instead of crashing into the dock or another vessel?

18   A.    Yes.

19   Q.    Mr. Simms asked you, for some time this morning, regarding

20   direction of the tow.  We'll just start at the end and work

21   backwards.

22        So the direction of the tow.

23        You made some phone calls to the Coast Guard and to Global

24   you told us about, right?

25   A.    Yes.

1   Q.   And you made some decisions about who to involve in the

2   process of trying to repair the tow on its way down to Ensenada;

3   is that right?

4   A.   Yes.

5   Q.   And you made those calls based on one report from Mr. Bob

6   Shrewsbury about the condition of the dry dock; is that right?

7   A.   I don't know if it was just a single discussion with Bob.

8   It was probably multiple phone calls or discussions, you know, a

9   phone call from Bob to me and then maybe a further conversation

10  with Dan, who had talked to Russell.  I don't know.

11  Q.   All right.  You told us about the communications that you

12  had directly with Western that day, haven't you?

13  A.   Yes.

14  Q.   And I didn't hear in your description of those

15  communications what exactly Western told you about the extent of

16  the list on the dry dock at any time.  Do you recall that?

17  A.   I don't recall exactly.  It was something, like, a

18  four-foot list, or something like that, is what I recall.

19  Q.   So four feet out of, sort of, level; is that right?

20  A.   Yeah.

21  Q.   All right.

22       Did anybody from Western ever tell you that the dry dock

23  was listed to 10 degrees at any point?

24  A.   Not that I recall.

25  Q.   Did anybody from Western ever tell you that the dry dock

1    was listed to 20 degrees at any point?

2    A.   Not that I recall.

3    Q.   Did anybody from Western ever tell you the dry dock was

4    listed to 40 degrees at any point, Mr. Torrey?

5    A.   Not that I recall.

6    Q.   If you heard that the dry dock was listed to 40 degrees --

7    that is, tipped over 40 degrees to one side -- what would you

8    have said?

9    A.   That's not good.

10   Q.   Would you have thoughts about whether the dry dock could be

11   righted at that point; that is, set back level and repaired to

12   continued?

13   A.   I would have had concerns, and I would have definitely been

14   talking to others who know more about this than I do.

15   Q.   Would you have been concerned -- if anybody had reported to

16   you that the dry dock was listed to 40 degrees, would you be

17   concerned that the dry dock was going to sink soon?

18   A.   I think that would probably be a strong indication that

19   something's the matter, yes.

20   Q.   And no one ever told you it was listing to 40 degrees when

21   you were helping Western make arrangements in the waters off of

22   California?  Nobody ever told you that, did they?

23   A.   No.

24   Q.   All right.

25        Okay.  So now working backwards.

1     Mr. Simms asked you about reports that Western made to

2  Vigor during the transit down the coast.  Do you recall those

3  questions?

4  A.   Yes.

5  Q.   All right.  And he said, well -- and Western reported

6  weather conditions that exceeded, I think he called them the

7  "recommendations" from Richard Shaw and reported that happened,

8  to you, and you didn't say, Hey, Western, what are you doing?

9  Stop doing that.

10     Do you recall that question?

11 A.   Yes.

12 Q.   Do you consider yourself a person that is qualified to make

13 decisions for the navigation of a towboat in coastwise towing,

14 Mr. Torrey?

15 A.   No, I do not.

16 Q.   So why didn't you tell Western -- when you saw any of these

17 reports about the condition of the tow before it started to list

18 and then eventually sank, why didn't you say to Western, "You

19 guys really need to follow the tow plan, Western"?

20 A.   I don't think I was aware of the weather conditions that

21 the dock encountered going down the coast.  If you recall the

22 email that was shown to me earlier, I reached out to Dan at some

23 point -- I don't remember the exact date.  I think it was the

24 day before -- and said, "Hey, what's the situation with the

25 tow?"

1      Maybe I had been getting emails and just hadn't been paying

2    attention to them, I don't know, but I certainly didn't know the

3    weather conditions that the dock was encountering going down the

4    coast.

5    Q.    All right.  And while doing that, Mr. Torrey, did you

6    consider it your job to direct the Western crew as they towed

7    the dry dock down the coast?

8    A.    No, I did not.

9    Q.    Because, again, you are not a towboat captain, are you?

10   A.    I would say I didn't consider it my job because I was doing

11   other work at that point in time.  I wasn't, at that point in

12   time, focusing on the tow or the transit of the dock.

13   Q.    Okay.  And let's talk about why you were able to focus on

14   other work.

15           MR. JARRETT:  Ms. Ivie, are you able to bring up

16   Exhibit 4 so that Mr. Torrey can see it on the system?

17           MS. IVIE:  I don't know how to switch to that screen.

18   Q.    (By Mr. Jarrett)  Mr. Torrey, can you find the binder says,

19   "Western Exhibits"?

20   A.    Yes.  I have Volume 1 and 2.

21   Q.    I'd like you to look at Western 4, please.

22   A.    Standard towing agreement?

23   Q.    That's it.

24           Did you negotiate that agreement with Western, Mr. Torrey?

25   A.    Yes, I did.

1    Q.   And if you look at the last page of that, there are some

2    signatures.  Is one of them yours?

3    A.   Yes, it is.

4    Q.   So you signed the standard towing agreement on behalf of

5    Vigor, didn't you?

6    A.   Yes, I did.

7    Q.   And Vigor, through you, hired Western to undertake this

8    tow, right?

9    A.   Yes, that's correct.

10   Q.   And when you hired Western, at the time you thought they

11   were a good towing outfit, right?

12   A.   Still do.

13   Q.   Yeah.  Because they have -- well, do they have licensed

14   mariners that drive their towboats?

15   A.   Yes, they do.

16   Q.   Do they have licensed mariners with expertise driving

17   towboats and making those decisions on the water?

18   A.   I believe they do, yes.

19   Q.   And you not a licensed mariner, not on the water, not with

20   your eyes on the tow.  You didn't want to make those decisions.

21   You wanted to entrust the decisions, about driving the tugboat

22   down the coast, to Western, right?

23   A.   I don't know that I thought of it that way at that time.  I

24   just wanted to hire somebody that had experience towing a dock.

25   Q.   Because you weren't going to drive the boat.

1    A.    No.

2    Q.    Is that right?  Sorry.  I asked a bad question.

3    A.    No, I wasn't going to drive to the boat.

4    Q.    Okay.  Great.  Thank you.

5          So now let's talk about a few more things.

6          You negotiated with -- working backwards again.  I

7    committed to working backwards, and it doesn't make any sense,

8    but I committed to it, so here we go.

9          Did you consider yourself the right person to make

10   decisions about whether the dry dock was ready to be towed down

11   to Ensenada?

12   A.    No, I did not.

13   Q.    And why not?  What kind of a background were you looking

14   for someone to make decisions about whether the dry dock could

15   be towed down to Ensenada?

16   A.    There was numerous people on the staff at Vigor who were

17   experienced.  Dan is the dockmaster.  Adam Beck had been a

18   dockmaster in his previous employ.  So they were much more

19   capable than I was.

20   Q.    And in the standard towing agreement, Vigor committed to

21   exercising due diligence to make the dry dock a seaworthy tow;

22   do you recall that?

23   A.    I don't remember that particular clause in the agreement,

24   but I'm sure it's in there.

25   Q.    I'm searching for it, Mr. Torrey.  Bear with me, please.

1    There we go.  That's 3B.

2    Q.    3B, and the clause reads, "Customer" -- that's Vigor,

3    right?

4    A.    Uh-huh, correct.

5    Q.    -- "warrants that it shall use due diligence to tender the

6    tow at the starting port, slash, place and date, slash, time in

7    a seaworthy condition," et cetera.

8         So to do that, you weren't out there welding anything, were

9    you?

10   A.    No, I was not.

11   Q.    Did you direct the welders what to do, the pipefitters what

12   to do, any of that stuff?

13   A.    No.

14   Q.    Who would have done that?

15   A.    That would have been Dan Keen.

16   Q.    And did you perform the inspection to exercise Vigor's due

17   diligence to make the dry dock a seaworthy tow?

18   A.    No, I did not.

19   Q.    Who did that inspection?

20   A.    That would have been Dan Keen.

21   Q.    And did Dan -- as far as you know, was an outside surveyor

22   hired to perform that inspection?

23   A.    Yeah.  We hired Richard Shaw to do that.

24   Q.    Yeah.  Okay.

25        So now working backwards -- and we're to the beginning, so,

 1   to the end.

 2              MR. JARRETT:  Ms. Ivie, can you bring up A-79?  I hope

 3   you can, because I can't.  Thank you, Ms. Ivie.

 4   Q.   (By Mr. Jarrett)  So on the screen in front of you is the

 5   dry dock sale agreement, which is Vigor A-79.  Do you see it?

 6   A.   Yes.

 7   Q.   Did you negotiate that agreement, Mr. Torrey?

 8   A.   Yes, I did.

 9   Q.   And you talked at some length about it, but I just want to

10   make sure I understand a couple of things.

11              MR. JARRETT:  So if you turn to page -- sorry --

12   paragraph 2.1, Ms. Ivie, so it's on page 3, please?

13   Q.   (By Mr. Jarrett)  So you see there, Mr. Torrey, there is

14   discussion about the seller's obligations in the contract?

15   A.   Uh-huh.

16   Q.   And one of the obligations in the contract is to -- at the

17   seller's -- that seller now is Vigor, "at its sole cost and

18   expense, undertake all work to prepare the docks for delivery to

19   buyer, including arranging for carriage of the docks to

20   Ensenada."  Do you see that?

21   A.   Yes.

22   Q.   So that is what you negotiated with Amaya Curiel, right?

23   A.   Yes.

24   Q.   And Amaya Curiel, were they actually going to put the docks

25   to use once they got to Ensenada?

1   A.    No.  There is a clause in this agreement that prohibits

2   them from doing that.

3   Q.    Mr. Torrey, you've been in the courtroom too long.  You

4   already guessed my next question.

5   A.    I specifically wrote that clause.

6   Q.    All right.  So let's talk about that clause.  It's page 5,

7   and the clause is 3.5.

8         Mr. Torrey, is that the clause, 3.5, that you're talking

9   about?

10  A.    Yes, it is.

11  Q.    And what's the point of 3.5, from Vigor's perspective?

12  A.    From Vigor's perspective, we're a commercial shipyard

13  operating in the ship repair business on the West Coast of North

14  America, and providing another shipyard on the West Coast of

15  North America with a NAVSEA certifiable dry dock could

16  potentially allow them to go into competition with us.

17        One of the regular prohibitions, throughout the time I'm

18  trying to get rid of both the Emerald Sea and the YFD 70, was

19  that we were not going to sell the dock to somebody who would

20  compete with us.

21  Q.    You want to eliminate competition --

22  A.    We didn't want to sell the dock to someone who could then

23  put it into service and compete with us.

24  Q.    That phrases it better.  Thank you.

25        Okay.  So let's see if there is anything else in there we

1   need to talk about.

2        Well, let's just point out two more things, Mr. Torrey.

3        Section 5, on page 5 of Exhibit A-79, do you see it there?

4   A.   Yes.

5   Q.   So Vigor limited its warranties that the dry dock would be

6   useful or serviceable on sale to Amaya Curiel, right?

7   A.   I'm just reading through --

8   Q.   Please take your time, sir.

9   A.   Yeah, that seems to me to be a standard disclaimer that you

10  would have in a purchase-and-sale agreement.

11  Q.   Sure.  So the docks are sold as-is, and as-is is underlined

12  there at the end of the paragraph, right?

13  A.   Yes.

14  Q.   And Section 10 of that same exhibit, page 7, this clause

15  provides, essentially, that if the dock is a loss before its

16  delivery, then you, Vigor, would return any payments made by

17  buyer to seller for that dock, right?

18  A.   Yes.

19  Q.   So Vigor's real performance of the contract, as far as

20  Vigor is concerned, is getting the dry dock down to Ensenada for

21  Amaya Curiel to do whatever it wants to do, other than complete

22  with Vigor; is that right?

23  A.   Correct.

24  Q.   Okay.

25       So it came to pass, as you've already described, that you

1    were not -- well, let's approach it this way:

2         At the time you worked for Vigor, was it a for-profit

3    company?

4    A.   Yes.

5    Q.   Was part of your job to do things in the most efficient way

6    possible, the things you were charged with doing?

7    A.   Yes.

8    Q.   Was one of those things to move the YFD out of the Vigor's

9    Seattle yard to somewhere else?  Vigor wanted that done without

10   spending money it didn't have to spend; is that fair to say?

11   A.   Correct.

12   Q.   So was it the best solution you found was to wet tow YFD 70

13   to Ensenada instead of the wedding cake arrangement that you

14   described earlier today?

15   A.   Yes.

16   Q.   And a bunch of factors played into that, right?  You talked

17   about them this morning.

18   A.   Yes.

19   Q.   One of those was, undoubtedly, cost, because Vigor is

20   for-profit corporation and wanted to save costs when it could;

21   is that right?

22   A.   Correct.

23   Q.   So were you ever directed to "get this thing out of here.

24   I don't care what risks we undertake, I don't care what damage

25   we do to the environment, just get this thing off our dock."

1    Did anybody ever tell you anything like that, Mr. Torrey?

2    A.    No.

3    Q.    And because it was suggested this morning that Vigor, sort

4    of, took risks it shouldn't have or didn't evaluate the process

5    sufficiently -- do you remember the gist of the questions that

6    you were asked being one of those things?

7    A.    I'm not sure I know what the gist of the questions were.

8    Q.    Okay.  Good enough.  Maybe I misinterpreted, and that's

9    fine.

10        Anyway, so let's look at Exhibit A-8, please.

11        Is it your thought that Roberto of Amaya Curiel knew the

12   YFD 70 was being wet towed to Ensenada?

13   A.    Yes, he knew that.

14   Q.    Did he ever say, "No, you can't do that.  We insist that it

15   be carried down by heavy-lift ship."

16   A.    No, he did not.

17   Q.    Did he ever tell you, "We're paying to have it towed down

18   by heavy-lift ship, so we insist it be carried that way"?

19   A.    No, he did not.

20   Q.    In fact, Vigor was responsible for sending the YFD 70 to

21   Ensenada, right?

22   A.    Correct.

23   Q.    So Amaya Curiel didn't really express to you any concerns

24   about how Vigor accomplished that task.

25   A.    No.  They were involved somewhat in the discussions of what

1    I called the wedding-cake approach and whether that was even

2    feasible, from their end.  You know, they did have some concerns

3    about how things showed up there.  Not to say they weren't

4    involved in conversations, but I don't think they particularly

5    cared how we got the dock there, no.

6              MR. JARRETT:  Okay.  Permit me to look through my

7    scribbles, Mr. Torry, and then I think I can be done.

8         Thank you, Mr. Torrey.

9              THE COURT:  Any other questions based on that

10   cross-examination?

11             MR. SIMMS:  Yes, Your Honor.

12                       REDIRECT EXAMINATION

13   BY MR. SIMMS:

14   Q.   So looking back at the tow agreement, that customer --

15   that's Vigor -- has informed owner, at the time of the contract,

16   any special circumstances or conditions applicable to tow cargo,

17   which may affect performance.

18        You didn't inform Western of any special circumstances that

19   might affect the tow, did you?

20   A.   Um --

21   Q.   It's No. 4.

22   A.   I thought there was something -- yeah, on the first page,

23   there's the additional conditions.

24   Q.   On the first page, those are the only special circumstances

25   you informed Western of?

1   A.   Well, I assume we also gave them a copy of the pre-tow

2   survey -- I mean, the tow survey before the dock left.

3   Q.   But as of October 4th, the only special circumstances you'd

4   informed Western of is what's on the first page, right?

5   A.   I don't recall the date of the initial survey and whether

6   we -- when we gave Western a copy of that survey.

7   Q.   Okay.  So we had looked at that draft, and that was

8   October 6th, two days later.

9   A.   Okay.

10  Q.   So the draft wasn't around until two days after the

11  contract, right?

12  A.   That would be what appears to be the case, yes.

13  Q.   Who came up with the idea of going with a one-piece tow for

14  the 70?

15  A.   I don't recall.

16  Q.   That wasn't you?

17  A.   No.

18  Q.   And after you got the report of the list, did you stay in

19  contact with Western throughout the evening?

20  A.   I had various contact with Western throughout the evening,

21  but, at some point, I let Dan handle the conversation directly

22  with them.  I don't recall exactly when we handed off.

23  Q.   And did you ever ask whether the list had changed?

24  A.   It was difficult to see the dock from the tug.  It was

25  dark, and I believe it was foggy or cloudy.  So if I recall

1   correctly, they were having a hard time seeing the dock, so I

2   guess I didn't really -- I think we were waiting till morning to

3   see the condition.

4   Q.   Okay.  Thank you.

5           THE COURT:  Mr. Jarrett, nothing further?

6           MR. JARRETT:  Nothing further, Your Honor.  Thank you.

7           THE COURT:  Mr. Torrey, thank you.  You may step down.

8           MR. SIMMS:  We'll call Captain Shaw.

9                        RICHARD SHAW,
          having been first duly sworn, testified as follows:

10

11          THE CLERK:  State your name for the record, and spell

12  your first and last names for the court reporter.

13          THE WITNESS:  Richard Strum Shaw, S-h-a-w.

14          THE COURT:  Good afternoon, Captain.

15       If you're concerned about the mask, you can leave it on.

16  Please speak into the microphone, and listen carefully to the

17  questions being asked.  Do your best to answer that specific

18  question.  Don't speak over counsel.

19       If there are objections, wait for the court to make a

20  ruling, and then we can see whether or not you can answer.  If

21  you don't understand something, please just say so, and we'll

22  get counsel to clarify.  Okay.

23          THE WITNESS:  Okay.

24          THE COURT:  You may inquire.

25

| | |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MR. SIMMS: |
| 3 | Q.   Captain Shaw, we're going to talk about the trip-and-tow |
| 4 | survey that you did. |
| 5 |      Did anyone -- while you were performing the survey or |
| 6 | writing up the final survey, did anyone from Vigor tell you that |
| 7 | the original Navy design for the YFD 70, for open-ocean tow, was |
| 8 | for its two end sections to be detached from the center section |
| 9 | and loaded on the center section for tow?  Did anyone from Vigor |
| 10 | tell you that that was the original design of the 70? |
| 11 | A.   No, not that I can remember.  And we were performing a |
| 12 | coastwise tow, not an open-ocean tow. |
| 13 | Q.   And the coastwise tow you're talking about was for the 69, |
| 14 | so you had two? |
| 15 | A.   No.  It was still a coastal voyage down to Ensenada.  It's |
| 16 | still on the coast. |
| 17 | Q.   Uh-huh.  Okay. |
| 18 |      But no one told you before the -- as a part of your survey, |
| 19 | that the original design for the 70 was for the two end sections |
| 20 | to be loaded on the center for an open-ocean tow? |
| 21 | A.   No. |
| 22 | Q.   Okay. |
| 23 |      And so you're not viewing the coastwise tow to be the same |
| 24 | as an ocean tow? |
| 25 | A.   Correct. |

1   Q.    Okay.  And the reason for that is?

2   A.    Multiple swells and the distance for ports of refuge would

3   be totally different from a coastwise for an open-ocean tow.

4   Q.    So it didn't make any difference to you that the original

5   design for the 70 for open-ocean tow, it was okay?  You

6   considered that a one-piece tow of this dry dock was perfectly

7   okay.

8   A.    It was appropriate for a coastwise tow, very suitable, yes.

9   Q.    Before your survey, did anybody from Heger tell you that --

10  sorry -- anybody from Vigor tell you that Heger dry dock had

11  recommended that the 69 be towed, moved from Portland to Seattle

12  in a disassembled condition; anybody tell you that?

13           MR. BOYAJIAN:  Your Honor.  I object to that.

14       This point was raised on summary judgment, and in Your

15  Honor's order on summary judgment, it said the court found that

16  Heger analyzed four configurations, two of which were a

17  one-piece tow.  Those were labeled Option 1A and 1B.  Both of

18  those concluded suitable for an ocean tow in one piece, subject

19  to a 10.0-foot-wave restriction.  That's in Your Honor's order.

20  Q.    (By Mr. Simms)  And so what we've just heard, Captain, in

21  the objection, is that Heger recommended that the 69 be towed in

22  two pieces.  It recommended one piece, but did you know that

23  before, with the 69, that Heger had recommended tow in two

24  pieces?

25  A.    No.

1   Q.    Okay.  Did you know, as you were surveying, that the

2   original proposal for the move to Ensenada was to move the 70 on

3   a heavy-lift ship?

4   A.    No, I wasn't aware.

5   Q.    And did anybody from Vigor tell you that, as part of that

6   proposal, the proposal was that the 70 be disassembled for

7   loading onto the heavy-lift ship?  Did they ever tell you that?

8   A.    No.

9   Q.    And did anybody from Vigor tell you, in 2013, that in 2013

10  Vigor had performed an ultrasonic gauging of the YFD 70?

11  A.    No.

12  Q.    And they never showed you that gauging?

13  A.    No.

14  Q.    Let's take a look at Exhibit 13.  Have you ever seen this

15  document before today?

16  A.    No.

17  Q.    Okay.  If, in doing your survey in 2016, you had known

18  about this document, would you have asked Vigor to see it?

19  A.    If it was relevant to the condition that we were at -- the

20  dry dock -- three years after the report.

21  A.    Okay.  So here's a report of condition in 2013, and it's

22  2016.  You know that the 70 was kept in saltwater, right?

23  A.    The vessel was in saltwater, yeah.

24  Q.    So you'd expect there to be, if there hadn't been

25  maintenance, some deterioration between what's reported in 2013

1   and the situation in 2016, wouldn't you?

2   A.   I have no idea what their preventative-maintenance program

3   was between 2013 and the 2016.  Whether it's relevant or not, I

4   have no idea.

5   Q.   Okay.  But knowing whether there had been preventative

6   maintenance would be important, right?

7   A.   I have no record of -- I have no knowledge of this being

8   relevant.

9   Q.   Okay.  Well, let's look at -- we'll go down to Tank 1.

10  There are a bunch of tanks here.  Okay.  I'll read you about

11  Tank 1.

12       So here's Tank 1 pontoon section:  "All under deck

13  longitudinal stiffeners visually wasted/missing/holed out

14  forward of Frame 3."

15       If you had seen that about Tank 1, would that have been

16  important information to know?

17  A.   I don't see that written.  Tell me where this is written.

18  You said something about "holed out"?

19  Q.   Uh-huh.  Okay.  Let's see if we can find it.  Oh, here we

20  go.  Okay.

21       Tank 8 -- okay? -- Pontoon Section:  "Outboard most under

22  deck longitudinal & outer deck strake" -- what's a strake?

23  A.   It would be a whole section starting -- well, a strake

24  being closest to the keel, and then we go out A, B, C, D,

25  outboard of keel.

1    Q.    -- "suspect original steel, heavy corrosion/knife edged."

2          If you had seen this, would that have raised questions to

3    ask Vigor about the dock, like, Did you repair that?

4    A.    Yeah, probably, yeah, I would have asked them if there is

5    any conditions with that Tank No. 8.

6    Q.    Uh-huh.  Okay.

7          And I'll just tell you that, throughout this -- you can sit

8    here for a while and look at this -- there are similar reports.

9          Was it important -- if you had this document, would you

10   have conducted your survey differently, starting with asking

11   Vigor whether they had completed the repairs?

12   A.    Yes, I would be concerned with the condition.

13   Q.    Did you make any calculations of the hogging or sagging

14   that the YFD 70 would encounter during -- we'll call it the

15   coastwise tow?

16   A.    Any hogging and sagging would have been directed towards

17   the effects of the swells on the vessel, and my considerations

18   were a limitation of a ten-foot swell.  We wouldn't be concerned

19   with hogging and sagging with that swell.

20   Q.    So your testimony is there would never be any hogging or

21   sagging with a ten-foot swell?

22   A.    Not that we would be concerned with, with dry tanks and a

23   light ballast in the midship aft tanks.

24   Q.    And a ten-foot swell means always waves below -- ten feet

25   and below, right?

1   A.    Yes.

2   Q.    Never any waves above ten feet?

3   A.    You take your considerations and adjust your course and

4   speed if you encounter anything higher than that.

5   Q.    There's some waves that will be higher than that?

6   A.    There could be.

7   Q.    Uh-huh.  Okay.  All right.

8         So but so where did you come up with the ten feet as a

9   place where at or below which there would be no hogging or

10  sagging for the 70?

11  A.    It's a general, customary, maximum height when you don't

12  have a truly barge hull.  When you don't have a true barge hull,

13  you make limitations, and this is the limitation for that type

14  of a hull.

15          THE COURT:  Is there an objection?

16          MR. BOYAJIAN:  There is, Your Honor.

17      Mischaracterizing what Mr. Shaw said.  He did not say that

18  there would not be hogging and sagging; he said there would not

19  be hogging and sagging such that it would concern him.

20      Hogging and sagging forces.  They are always going to

21  exist.  What Mr. Shaw testified previously was that in sea below

22  ten feet, he was not concerned with the forces generated by

23  hogging and sagging.

24          THE COURT:  I understand the objection, and I think

25  Mr. Shaw has answered that question.

1        Mr. Shaw, I understand sagging; what is hogging?

2            THE WITNESS:  Hogging is when you have both your ends

3    down and a little up.  Okay.  Where it sags in the middle.

4    That's the easy one.  That's sagging in the middle.  It's the

5    opposite.  So if you had heavy weight on both ends, it would

6    tend to make the bottom hog.

7            THE COURT:  Next question.

8    Q.   (By Mr. Simms)  Okay.  So you wouldn't be concerned about

9    that for any dock?  There's no difference between the 69, which

10   you reported was in good condition, as opposed to the 70, which

11   you surveyed and reported was in very used condition?

12   A.   Those two were set limits for different reasons.  It

13   probably would have gone a little bit higher in the 69 out of

14   Portland, but she had to deal with the Columbia River Bar.

15   You're never going to send anything over the Columbia River Bar

16   over ten foot.

17   Q.   Let's look back at the survey that you did for the 70.  Let

18   me pull these up.

19       So to start your survey for the 70, you pulled up the

20   survey you'd done for the 69, right?  Just take a look at this.

21   It was a long time ago.  Okay.  Here is August 10th, and then

22   down a little more.

23       Is this the survey you did for the 69?

24   A.   Yes.

25   Q.   And this was for the move, and that move was in May of

1   2015, right?

2   A.    Yes.

3   Q.    Okay.  And you said that your recommendations were for ten

4   feet.  So you say, "Reasonable weather conditions less than

5   Force 6," right?  Okay.  And these are the recommendations you

6   had for the 69, which was in good condition.  Okay?  And here we

7   have, "Master tug shall avoid heavy seas greater than eight

8   feet."

9        So you said eight feet for a tow in good condition, but you

10  said ten feet for a tow in very used condition.  Why?

11  A.    Because of the Columbia River Bar.

12  Q.    Uh-huh.  And the tow -- much shorter, right, between

13  Portland and Seattle?

14  A.    Yes.

15  Q.    And the tow in weather conditions that were much less

16  likely to be rough in May as opposed to October?

17  A.    Yes.

18  Q.    And you said six feet for this, and ten feet for the --

19  A.    No, I did not say six feet.

20  Q.    Well, six -- I'm looking at it.  Oh, eight feet.  Right

21  here.  Eight feet.  Right.  Okay.  All right.  I got it.

22       So this is the 69 survey, and you used this survey as the

23  basis for your 70 survey, right?

24  A.    It's the same title page, the same vessel particulars page.

25  Yeah, the formatting is very similar.

1   Q.    Okay.

2         And so by August 10th, you were still working on a draft

3   survey, correct?

4   A.    Yes.

5   Q.    Okay.

6   A.    You work on your survey from the moment the vessel is

7   leaving.

8   Q.    Okay.

9         And so then did you get -- did you receive, for your 70

10  survey, any -- did you do any calculations yourself about the

11  forces that you would expect the 70 to encounter during the tow?

12  A.    No.

13  Q.    Did anyone do those calculations?

14  A.    I was under the impression that Vigor did.

15  Q.    Okay.  Did Vigor provide you with those calculations?

16  A.    Not that I remember.

17  Q.    Okay.  And so did you rely on anything that Vigor told you

18  to complete your survey?

19  A.    Yeah, quite a bit on projects and the preparations, and

20  then all of the installation of the blanks.  Yeah, there was

21  quite a bit of talk.

22  Q.    Okay.  Let's look at Exhibit 30.

23        Did you ever receive any calculations from Vigor that were

24  based on the Navy Towing Manual?

25  A.    Not that I know of.

1   Q.   Is the Navy Towing Manual an important source to use to

2   determine how to tow a Navy dry dock?

3   A.   I have no idea.

4   Q.   Okay.  You never looked at the Navy --

5   A.   I've heard of the Navy Tow Manual, but it's not used in

6   normal service.

7   Q.   All right.  And we will -- let's look at 14.

8        Was this a dead ship tow?

9   A.   Yes.

10  Q.   Okay.  And it talks about preparing the tow hulls not

11  considered seaworthy for open-ocean tow should be transported as

12  deck cargo.  So you didn't consider this to be an open-ocean

13  tow?

14           MR. BOYAJIAN:  Objection, Your Honor.  We haven't

15  established what section of the Navy Tow Manual he's talking

16  about, but what I'm looking at, it talks about submersibles and

17  LSD style ships.

18           THE COURT:  Could you bring up the rest of it?

19           MR. SIMMS:  Sure.

20  Q.   (By Mr. Simms)  So here's the top.  Preparing the tow,

21  5.71.

22        That doesn't look like, to me, that there is a limitation

23  on semi-submersibles.  "All unmanned tows."  Should.

24        So let's look at this:  "All unmanned tows shall be

25  equipped with flooding alarms."

1          Did you know that Vigor didn't put a flood alarm on the

2    tow?

3    A.    I know that, yes.  I wasn't expecting it -- for them to be

4    using it.

5    Q.    Why was that acceptable?

6    A.    All the through holes were all blanked, and there's so many

7    tanks -- I've never heard of alarms in every tank -- flooding

8    alarms in every tank.  I've done actual dead ship tows, and you

9    put them in the engine rooms or any floodable space, but not an

10   unmanned dry dock.

11   Q.    There wasn't a single flood alarm on this tow.

12   A.    That's right.

13   Q.    Why is that acceptable?

14   A.    That's the normal, customary way.

15   Q.    It is?  Well, according to the Navy, it isn't.

16   A.    Well, I'm sorry.

17   Q.    Yeah.

18         Okay.  And did you know that that was part of the Heger

19   recommendation for the 69; that there be lights showing whether

20   there's listing of the tow?

21   A.    I have no knowledge of that.

22              MR. BOYAJIAN:  Your Honor, objection.  If that's in a

23   Heger document, I'd like to see the document.

24              THE COURT:  The objection will be sustained at this

25   point.

 1          THE COURT:  Counsel, we're straight up at noon.  I

 2   want to give you time for your lunch break, as well as my staff.

 3   If I could have everybody back in here at 10 minutes after 1:00,

 4   and we'll start up then.

 5          (Court in recess 11:59 a.m. to 1:17 p.m.)

 6          THE COURT:  Counsel, welcome back to our afternoon

 7   session.

 8      Counsel, you were still on direct of this witness.

 9          MR. SIMMS:  Yes, Your Honor.

10   Q.  (By Mr. Simms)  So we had been talking about the flood

11   alarms and things in the 69 that I said were in the Heger 69

12   recommendations.  But to do your survey for the 69, you didn't

13   look at anything that Heger did?

14   A.   When you say "what Heger did," in other words, what they

15   reported?

16   Q.   Yeah.  I mean, what they -- did you look at any Heger

17   studies, reports, those sorts of things, to do the survey --

18   your survey for the 69?

19   A.   Yeah.  I recognize the Heger name, but I don't remember

20   seeing anything prior to my survey.

21   Q.   Okay.

22      And here's Vigor 3, and so we had started out -- as we look

23   at your survey, you had the 69 survey, you pulled it up, and

24   then you customized it for the 70 survey, right?

25   A.   I did a YFD 69 survey, and then I did a YFD 70 survey, yes.

1  Q.    Yes.  And you started -- the way that you -- you started to

2  draft the 70 survey, and you pulled up the 69 survey and you

3  used that as a template, right?

4  A.    The same format was used on the YFD 69 to YFD 70.

5  Q.    In other words, you went back to your word processing or

6  your computer system, and you pulled up the 69 survey, right,

7  the first step to do the 70 survey?

8          MR. BOYAJIAN:  Objection; asked and answered.

9          THE COURT:  Counsel, I get the picture of what he did.

10  I'll have you move on.

11          MR. SIMMS:  Okay.  Yes.

12  Q.    (By Mr. Simms)  Take a look at 3.  So is this the draft

13  survey that you produced for the 70?

14  A.    Yes.

15  Q.    Okay.  And that's the date, October 6th.  Is that the date

16  you produced that survey?

17  A.    That's what the survey states.

18  Q.    And then between this draft and the final, were there other

19  draft surveys that you circulated?

20  A.    Not that I know of.

21  Q.    And have you ever seen this?

22  A.    No, not that I remember.

23  Q.    Did Vigor ever give you a copy?

24  A.    Not that I remember.

25  Q.    And if you knew that there was a general information

1   operating manual that the Navy had developed for the 70, would

2   that be an important thing for you to have to do your survey?

3   A.   I would imagine the general information would have been

4   useful.  However, I really wouldn't be interested in the

5   operating manual.  I was not going to be operating the dry dock;

6   we were going to be towing it.

7   Q.   And if this manual had recommendations for towing, would

8   that be important for you to know?

9   A.   It depends on if it's the same configuration.  I have no

10  idea how old the manual is, whether it's really relevant to this

11  structure now as opposed to when they made the general

12  information.  I have no idea.

13  Q.   Okay.  But there's nothing that tells you it's irrelevant,

14  right?

15       We'll flip through it.  We've got plans here.  We've got

16  structure.  We've got -- this is a table of contents; operation

17  of the dock, and, here, it's talking about the dock designed to

18  facilitate towing at sea.

19       "When towed, the end sections are stowed on the center

20  section.  The center section of the dock is provided with

21  collision bulkheads at the end of the section."

22       That's not important information for you to have?

23  A.   I have no idea what was changed, you know, between when

24  this manual was made, and there's 50 years.  The structure could

25  be totally changed.  It may not even be able to make into three

1   pieces.  I had no idea.

2       So if it's not able to be dismantled -- and I guess this is

3   asking it to be dismantled.  I have no idea if it would have

4   been able to be dismantled, with the structures, with the plates

5   going from one section to the next section, or how it was

6   arranged.

7   Q.   So you didn't look into whether the dock could be

8   dismantled?

9   A.   No.  There was no interest to dismantle the dock, as far as

10  I was concerned.

11  Q.   Because Vigor just said, "Give us the survey for a

12  one-piece tow," right?

13  A.   They wanted to tow the dry dock, yes.

14  Q.   In one piece?

15  A.   It was a dry dock to be towed.

16  Q.   528 continuous feet?

17  A.   Yes.

18  Q.   So here's your final survey, and you issued this the day

19  after the tow left, October 18th.  And then I'm looking at

20  page 20.  This is Exhibit 12.

21      So you say that, "Tug *Ocean Ranger* found appropriately

22  prepared and rigged" -- okay? -- "and conforms with normal

23  custom and practice for towing marine industrial dry dock

24  platforms from Seattle, Washington, for the coastal voyage to

25  Ensenada, Mexico, via Puget Sound."

1          What normal practice were you talking about?

2     A.    Normal rigging.

3     Q.    Are you talking about normal tow practice?

4     A.    Yes.

5     Q.    Since what other time had there been a tow of a one-piece

6     dry dock like this from Puget Sound to Ensenada?

7     A.    It's a tow configuration that needs side lights and stern

8     lights, it needs a tow bridal, as is customary for towage.

9     Q.    For a marine industrial dry dock platform, but this is the

10    first one you were ever involved with --

11         MR. BOYAJIAN:  Object.

12    Q.    (By Mr. Simms) -- Puget Sound to Ensenada, right?

13    A.    There was the first dry dock we towed out the Puget Sound

14    to, eventually, Ensenada, yes.

15    Q.    So there was no customary practice for a one-piece tow of

16    this kind of dry dock, was there?

17    A.    As any other customary tow for a coastwise voyage, it

18    followed all those guidelines.

19    Q.    All right.

20         So as the tow went on, you followed it, right?  You

21    followed what was going on, where it was and what the weather

22    was?

23    A.    Yes.

24    Q.    Okay.  So here's October 24th, "Sloppy day north of San

25    Francisco," and by that you meant what?

1    A.    There was some weather kicking up right around the San

2    Francisco area.

3    Q.    Okay.

4          And who is Chris Law?

5    A.    Chris Law, he's an insurance representative for Starr

6    Companies.  I see the name there.  I'd forgotten.

7    Q.    Why were you communicating with Chris Law?

8    A.    I believe they were underwriting the insurance for it.

9    Q.    So by this time, the tow conditions had exceeded your

10   recommendations, right?

11   A.    Yeah.

12   Q.    But all during this voyage, you never said to anybody, Hey,

13   I'm watching this, and the tow conditions have exceeded my

14   recommendations.  We've got a problem.

15         You never said that, did you?

16   A.    No, I didn't have to.  The captain controls his vessel.

17   Q.    Okay.  And let's -- yeah.

18         And so when you gave your recommendations -- and I'm

19   looking at your deposition here, if it's hard to remember.

20         Do you consider your recommendations to be hard

21   restrictions?

22   A.    Yes.

23   Q.    You do?

24         All right.  So let's pull out your deposition transcript.

25   So here's your transcript, and the question is -- this is by

1    Mr. Boyajian.  This is at page 56, line 17.

2              "QUESTION:  When you issue your report, do you find a

3              vessel is suitable to tow subject, you expect the

4              master of the towboat to attempt to follow these

5              instructions?"

6              "Yes."

7              "Do you consider them hard restrictions?"

8    A.   Okay.

9    Q.   And then the next page:  "Do you consider it a hard line

10   the master shall not cross?"  Okay?

11       "No, not necessarily.  It's the captain's judgment call at

12   that point because he is seeing -- he's got his weather report.

13   He's also seeing what the winds are going to do, but he's also

14   seeing the well."  Okay?

15       So your restrictions -- your recommendations are not

16   necessarily a hard line the master shall not cross, right?

17   A.   It's my hard line, and then he uses his own judgment past

18   my hard line.  It's simple.

19   Q.   Uh-huh.  Okay.

20       And then so down here, you got the question, "During the

21   course of the voyage, conditions master adapting," where it says

22   "not to proceed from a safe port."

23       You say -- tell me if you still agree with this:  "That is

24   a recommendation.  The captain makes that determination.  Every

25   day, every time he is evaluating, he's assessing his position.

 1   He takes that under consideration.  It's going to be his

 2   judgment call."

 3        Do you still agree with that?

 4   A.   Yes.

 5   Q.   Okay.  Okay.

 6        And then you say -- you are a towing master, or you're a

 7   captain?

 8   A.   Yes, sir.

 9   Q.   What is your experience in that field?

10   A.   I towed for Northland Towing for a year or so in early --

11   late '70s, early '80s.  I was a master, a captain for Crowley,

12   1988.  I was a mate and captain for Foss.  You know, I've logged

13   over a thousand hours of watch-standing on towboats.

14   Q.   Uh-huh.  And your answers here explain why you don't call,

15   in your reports, hard lines or requirements.  You call them

16   recommendations, right?

17   A.   Yes.

18   Q.   Okay.

19        So why did this tow sink?  What do you think?

20   A.   It came in contact with a submerged or partially submerged

21   object and resulted in incident after that.

22   Q.   Contact with a partially submerged object.  Okay.  All

23   right.

24        And you were checking the weather reports, and the weather

25   within Puget Sound was okay to depart?

1   A.    Yes.

2   Q.    And you don't have any information that weather was a

3   factor of the loss of the tow, do you?

4   A.    I would say the poor visibility added to the inability to

5   see or detect some submerged or partially submerged objects.  I

6   think weather is always a factor.

7   Q.    Uh-huh.  Okay.

8         Back to your deposition.  This is at page 8, line 22.  My

9   question:  "In the capsizing of the dry dock, was weather a

10  factor?"

11        And then you answer:  "Not to my knowledge."

12        Was that a correct answer then?

13  A.    I think it was relating to an actual capsizing.  I never

14  knew that it actually capsized.  I knew that it sunk, but I

15  didn't know it rolled over.

16  Q.    Yeah.  My bad language.  So --

17  A.    Yeah, so -- so.

18  Q.    Okay.  Thank you, Captain.  I will turn you over to the

19  Vigor side.

20                         CROSS-EXAMINATION

21  BY MR. BOYAJIAN:

22  Q.    Captain Shaw, I'm going to start with -- just quickly --

23  this document bearing your signature, Declaration of Captain

24  Richard Shaw, that was filed in support of Western's motion for

25  summary judgment.  I'm going to use it as a reference because it

1  talks about four documents that Mr. Simms talked to you about in

2  his direct questions, and here's our list, so I'll take them one

3  at a time.

4      This declaration, did you review these documents to see if

5  they stood for the propositions that this declaration says they

6  do?  Did you review them before you signed it?

7  A.   I never saw any of these documents.

8  Q.   Okay.  So who wrote this declaration?

9  A.   Mr. Simms presented it to us.

10  Q.   Okay.  And did he also present the characterizations of

11  what these documents say?

12  A.   No.

13  Q.   I'm sorry.  When it says, for example --

14  A.   Oh.

15  Q.   -- the Navy design for the YFD 70 says that it's to be

16  detached from its center section and the ends loaded on the

17  center for tow.

18      Did you review that document and make that

19  characterization, or did Mr. Simms write that characterization?

20  A.   I had nothing to do with this statement --

21  Q.   Okay.

22  A.   -- besides that I wasn't informed.

23  Q.   Okay.

24      Did Mr. Simms send you over a declaration, and you just

25  signed it --

 1   A.    Yeah.

 2   Q.    -- or did you make any changes?

 3   A.    I just signed the one that I received.

 4   Q.    Okay.  Let me walk through these documents with you for a

 5   minute.

 6         We just talked about the Navy design.  Were you aware that

 7   the Navy design to be removed in three pieces.  Are you aware

 8   that that is for what's called "unrestricted ocean towing"?

 9   A.    I'm not really aware.

10   Q.    Do you know what unrestricted ocean towing is?

11   A.    Sure.

12   Q.    Could you tell us what it is?

13   A.    It's going from one coast, completely -- basically,

14   completely across an ocean to another coast.

15   Q.    Okay.

16         So the part that is called "unrestricted," does that mean

17   without weather restrictions?

18   A.    Yeah, probably without weather restrictions.

19   Q.    And is that because if you're going to tow a dry dock from

20   here to, say, Korea, as Mr. Simms talked about earlier this

21   morning, you don't know what you're going to get, and there's

22   no way to hide from weather; there are no safe refuges while

23   crossing the Pacific Ocean?

24   A.    That's correct.

25   Q.    Okay.

1          So when the design parameters for the YFD 70 involve

2    docking the ends on the center, if that was for unrestricted

3    towing --

4              MR. SIMMS:  Objection, Your Honor.  There's no

5    foundation to this unrestricted ocean tow.  I'm looking at the

6    Navy manual here, and it's not in there.

7              MR. BOYAJIAN:  Your Honor, this will be brought out in

8    testimony.  I asked it as a hypothetical.  I said "if that was

9    for unrestricted."

10             THE COURT:  The objection is overruled.

11             MR. BOYAJIAN:  Okay.

12   Q.   (By Mr. Boyajian)  If this was designed for unrestricted

13   tow, would that help you answer the question that Vigor asked

14   you to answer, which was, I think, can this dry dock be towed as

15   presented?  528 feet long, sitting at our dock, can it be towed

16   coastwise, Seattle to Ensenada?

17   A.   Yes.  Once we got all the watertight hatches and all the

18   gear removed and inspected the structural integrity of it, yes,

19   it was -- they wanted a coastwise tow.

20   Q.   Okay.  It sounds to me -- let me make sure I understood

21   what you said.

22         For you, rather than this Navy design from the 1940s, you

23   were more concerned with the present condition as it sat tied to

24   Vigor's dock in August, September, and October of 2016?

25   A.   Yes.

1   Q.    Okay.

2         The Heger analysis, we discussed it earlier.  It applied to

3   the YFD 69.

4         The YFD 69 and the YFD 70, from a structural standpoint,

5   they are identical dry docks; is that correct?

6   A.    Yes, I found them structurally the same.

7   Q.    Okay.

8         So an analysis of the structure of the YFD 69, as opposed

9   to condition, would apply with equal measure to the 69 or the

10  70?

11  A.    Structural, yes.

12  Q.    And the sale contract to Amaya Curiel, is there any terms

13  between the buyer and the seller of the dry dock that would help

14  you conduct your boots-on-the-ground survey and write your

15  survey report?

16  A.    No.  And as a rule, we don't see contracts.

17  Q.    Okay.

18        And then 2013 ultrasonic gauging.  I know that you talked

19  about this a little bit, but is it fair to say that Vigor hired

20  you to assess the condition of the dry dock as it sat in August,

21  September, and October of 2016?

22  A.    Yes.

23  Q.    And so you were far more concerned with actually getting

24  yourself and your assistant, Mike Simonson, into the YFD 70 as

25  it sat at Vigor's dock?

1    A.    Yes.

2    Q.    Okay.

3          Does this declaration, then, amount to -- it says, "Vigor

4    did not inform me of the following."  You said, "I didn't review

5    these documents.  I didn't write these characterizations.  I

6    don't know what they said."

7          For all you cared, this could have said Vigor Marine didn't

8    tell me the YFD was made of kittens?

9    A.    Exactly.

10   Q.    Okay.

11         Let's go, then, and focus on what you did do to survey this

12   dock.

13         Was there ever a document that you wanted to look at that

14   you asked Vigor for that they didn't give you?

15   A.    No, they gave my everything I asked for.

16   Q.    Okay.

17         Was there ever access to any part of the dry dock that you

18   asked for that Vigor didn't get you?

19   A.    There were areas that were not gas free or we were able to

20   enter, and they'd tell me that, and I'd go, "Okay, yeah, I'll do

21   that tomorrow."

22   Q.    Okay.  And then they would provided you access?

23   A.    Then they'd provide me access if I needed to get into a

24   certain area.

25   Q.    Okay.

1        Between you and Mike Simon, did you put about 30 hours of

2   boots inside the dry dock to prepare this survey?

3   A.    Yes, if not more.

4   Q.    Okay.

5        Would you say you performed a complete and thorough survey

6   to the standards of marine warranty surveyors?

7   A.    Yes, sir.

8   Q.    Could you tell us, in your own words, what you do to

9   conduct that survey and generate your report?

10  A.    Full assessment, and going into every compartment, seeing

11  where it stands as far as being able to be towed.  Structurally,

12  we're looking at the diagonals, the verticals of the frames, the

13  longitudinals.  We're looking through hole fittings.  And with

14  the YFD 70, I had a big concern about the removal of equipment

15  and the stability of it, because it was -- they were, basically,

16  stripping anything that was usable off of the dry dock before

17  they got rid of it, and making sure that there were no cableways

18  or anything that could cause access water ingress.

19       So we really concentrated on cableways, watertight hatches,

20  blanks on all through-hole fittings, making sure valves --

21  crossover valves were completely shut between tanks and that the

22  equipment that was being remained onboard was properly secured,

23  and making sure we had side lights, a stern light, and the

24  rigging of the actual tow bridle, reinforcement on decks for the

25  pad eyes, and fairleads for the tow bridle.

1   Q.    Okay.  There's a lot there to unpack.  Let me see if I can

2   summarize a little bit.

3         You said you went into every single compartment?

4   A.    Yes.

5   Q.    You or Mike, who is your assistant?

6   A.    Yes.

7   Q.    Did that include Tank No. 1?

8   A.    Yes.  It was physically tough to get into some of those

9   skinny tanks, but, yes.

10  Q.    Okay.

11        Mr. Simms showed a piece of a 2013 hydrostatic testing

12  survey that showed -- at least the piece he pointed to showed

13  wastage in the pontoon deck section of Tank 11.

14        Can you tell me, is the pontoon section more critical for

15  operation as a dry dock in lifting ships, or more critical to

16  structural integrity for ocean towing?

17  A.    Actually, the pontoon deck where the keel blocks are laid,

18  it's very sensitive to the lifting of the vessels, and quite

19  often it needs doubler plates and plates (inaudible).  It's very

20  much more of an active deck for motion, lifting vessels.

21  Q.    Let me do this for a second.  I'm going to draw a diagram,

22  and help me understand and get it right.  This is a very crude

23  drawing of a dry dock.  That is a dry dock, and it is right side

24  up.  Good for me.

25        Okay.  This is the pontoon deck, right?

 1    A.    Yes.

 2    Q.    And this is where a ship that's sitting in the dry dock,

 3    the ship rests, correct?

 4    A.    Yes, sir.

 5    Q.    Okay.

 6          What Mr. Simms showed you about the ultrasonic gauging in

 7    Hold 1, it referenced the strength of the pontoon deck, not the

 8    shell that is exposed to the forces of the wind, the water, and

 9    the sea while towing, correct?

10    A.    Correct.

11    Q.    And the same thing.  You talked about Tank No. 8.  You or

12    Mike went in Tank No. 8, right?

13    A.    Yes.

14    Q.    And same thing, what he referenced in wastage referred to

15    the pontoon deck.  Same answers across the board?

16    A.    Yes.  And there was no reference, I remember, to any

17    deflection of vertical members, no diagonals.  Throughout the

18    dry dock, the frames, longitudinals, diagonals, were all in

19    their original positions without any -- any stresses known.

20    Q.    And you made that as a first-person, professional

21    observations?

22    A.    Yes.

23    Q.    You put your boots in the tank and you put your eyes on the

24    members?

25    A.    I saw them, I saw them myself.

1  Q.    Is that why the 1940s Navy tow manual is less relevant to

2  you than would be getting in the tank yourself and looking at

3  how it sat?

4  A.    Under those circumstances, yes.

5  Q.    Okay.

6        Portable pumps.  How many compartments were in this dry

7  dock?

8  A.    I'll tell you, about 80 tanks, it seems to me.  It was a

9  lot, they're very skinny, small tanks.

10  Q.    I'll represent -- we'll hear testimony about this later --

11  that it's 48 as it was prepared for tow.  Does that seem about

12  right?

13  A.    Yeah.  We went in about 80 tanks, it seemed.  Vertical

14  ladders.

15  Q.    Which one would you put the pump in?

16  A.    Yeah.

17  Q.    How many pumps would you need to put on this dry dock to be

18  able to pump it dry if it started to take in water?

19  A.    You'd have to have quite a few, and you'd have to have a

20  salvage crew manning those.

21  Q.    So you would need people physically aboard the dry dock to

22  open manhole covers to compartments, check if they had water in

23  them, and then put a pump in it and run it?

24  A.    Yes.

25  Q.    Would you need fuel to run those pumps?

1    A.    Yes, you need fuel.

2    Q.    Okay.  When the dry dock was prepared for towing, it was

3    prepared as a contaminant-free tow, right?

4    A.    Yes.

5    Q.    Okay.  If you put diesel oil and lube oil on the deck of

6    that dry dock, is it still a contaminant-free tow?

7    A.    No.

8    Q.    You concluded that the master of the *Ocean Ranger* shall

9    avoid seas greater than eight to ten feet.  Do you recall that

10   being your recommendation?

11   A.    Yes, sir.

12   Q.    Okay.  When you say "eight to ten feet," is ten the top?

13   A.    Yes, sir.

14   Q.    Okay.  When you talked about the master using discretion,

15   did you mean at that point your job was done and the dry dock

16   was in his hands and you were not in a position to tell him what

17   to do?

18   A.    He was using conditions that were beyond my available

19   information, and if he was onsite and felt that other conditions

20   were such that he was safe to proceed, then we sure can proceed.

21   Q.    Okay.  So what you're saying is that you exercised your

22   professional judgment and created a set of recommendations?

23   A.    Yes, sir.

24   Q.    And that, in your professional opinion as a marine warranty

25   surveyor, having inspected for 40 hours every compartment inside

1    this dry dock, you thought the safe operational upper limit was

2    ten feet?

3    A.    Yes, sir.

4    Q.    And then if Captain McGavock had a different impression,

5    you don't know where he got that idea, but you weren't in a

6    position on that day, where he was out on the ocean, to push

7    back?

8    A.    That's right.

9    Q.    Okay.  Did you find a single hole in the YFD 70?

10   A.    Hole?  No, no holes.

11   Q.    Okay.

12         Mr. Simms and Western Towboat -- I apologize, Mr. Simms.

13         Western Towboat has taken the position there's another dry

14   dock in San Francisco called the YFD 71, slightly different

15   design but same era.  Surveys for that have shown it to be full

16   of holes.  Was the YFD 70 full of holes?

17   A.    No.

18   Q.    Okay.

19         This contract was dependent -- we had it up earlier -- the

20   contract was dependent on a tow under, quote, favorable weather

21   conditions.

22         When you say "eight to ten feet and wind conditions less

23   than the lower end of Beaufort 4-6," is that you defining what

24   favorable weather conditions are?

25   A.    Yeah, that's maximum favor.

1   Q.   Okay.  So that is the upper limit --

2   A.   Upper limits of being favored.

3   Q.   More favorable would be lower?

4   A.   Correct.

5   Q.   Okay.

6        You also instructed in your towing recommendations, quote,

7   not to proceed -- the master of the *Ocean Ranger* is not to

8   proceed from sheltered waters without a forecast of conditions

9   less than 4-6.  Let's talk about 4-6 for a minute.

10       Beaufort scale 4-6 is 22 to 27 knots of wind?

11  A.   Yes.

12  Q.   So when you say "less than 4-6," you mean 21 knots or less?

13  A.   Yeah.  I use round number 25, but, yeah.

14  Q.   Okay.  So 25 knots or less.

15       How far out would you expect, you know, since you've said

16  "not to proceed out of sheltered waters," everyone who has given

17  testimony in this case has agreed that Puget Sound counts as

18  sheltered waters, and that you leave Puget Sound when you turn

19  south at Cape Flattery.  Do you agree?

20  A.   Correct.

21  Q.   Okay.

22       So as Captain McGavock and the *Ocean Ranger* approach Cape

23  Flattery, how far out should they be looking for a forecast of

24  conditions lower than 4-6?

25  A.   They should be looking for 72 hours.

Richard Shaw - Cross by Mr. Boyajian                June 28, 2021

1   Q.   If they had, for example, a forecast as they approached

2   Cape Flattery that said you'll have a gale in less than 24 hours

3   and it will be on your nose, if they go out, have they violated

4   your towing recommendations?

5   A.   Yes.

6   Q.   Do you expect towboat operators to follow your towing

7   recommendations?

8   A.   Yes.

9          MR. BOYAJIAN:   Okay.   Ms. Ivie, if you would, can we

10  have the one weather forecast we discussed earlier?

11  Q.   (By Mr. Boyajian)   At the top it says -- it's very small

12  text, but can you read where it says, "This is the area forecast

13  discussion out of the National Weather Service, Seattle,

14  Washington, for 3:46 a.m., Tuesday, October 18th, 2016."   That

15  was still several hours before the *Ocean Ranger* rounded

16  Flattery.

17         MR. BOYAJIAN:   So we'll go to the bottom part of the

18  page, Ms. Ivie, where it has the marine forecast.

19  Q.   (By Mr. Boyajian)   Okay.   And it says, "We have small-craft

20  advisory continuing but it will come to an end later," and then

21  it says, second paragraph, "A moderate to strong frontal system

22  associated with a low moving front from offshore waters into

23  north Vancouver Island, will move onshore late Wednesday night

24  or Thursday morning.   Expect south to southeast winds to rise 20

25  to 30 over coastal waters Wednesday afternoon, then rise to

1   near-gale force late Wednesday.  Gales are also possible ahead

2   of this incoming front."

3        Okay.  The *Ocean Ranger* leaves the dock on Monday.  The

4   *Ocean Ranger* approaches Cape Flattery sometime around midday on

5   Tuesday.  They've got this, if they were watching the NOAA

6   printouts.  And then it says for Wednesday and Thursday,

7   "Wednesday night into Thursday, 20 rising to 30, 30 rising to

8   near gale or gale."

9        If they had this forecast in their hands as they approached

10  Cape Flattery, and they chose to leave instead of not leave, did

11  they violate your towing recommendations?

12  A.   If that strong frontal system was on their southerly

13  course, yes.

14  Q.   Okay.

15       Was the conclusion of your survey -- to put it in a nice,

16  tight package.  It's is a big document.  It has a lot of work.

17  You didn't just copy and paste the YFD 69 survey and plug it

18  into a new one and change the number to YFD 70, did you?

19  A.   No.  It was impossible.  The equipment and configuration

20  was different.

21  Q.   Okay.  So it's a big survey.  A lot of work goes into it.

22  Let me ask if this is an adequate summary of your conclusion:

23  That the YFD 70 was suitable for a coastwise tow from Seattle to

24  Ensenada, subject to the following restrictions:  Less than

25  ten-foot seas, less than 21 or 25 knots of wind.

1   A.   Yes, sir.

2   Q.   Okay.

3        To the extent they were out -- knowingly out in conditions

4   that exceeded that, they violated your restrictions; is that

5   right?

6   A.   Yes, sir.

7   Q.   And your conclusion, it's not very different.  The legal

8   definition of "seaworthiness" is "suitable for the intended

9   voyage."

10       Is it fair to say that the way you analyzed this, the

11  voyage that was intended was coastwise, Seattle to Ensenada, in

12  conditions lower than ten feet, 25 knots?

13  A.   Yes, sir.

14  Q.   So when you found it suitable, that is the intended voyage,

15  from your perspective.  It is suitable for this voyage?

16  A.   That's correct.

17  Q.   Did you conclude that it was suitable for a voyage in gale

18  force winds for 54 hours or up to 15-foot seas?

19  A.   No, sir.

20  Q.   Okay.

21       You followed along with the tow.  You said you paid some

22  attention to the weather they were encountering as they went?

23  A.   Yes.

24  Q.   Were you in charge of making navigational decisions to

25  respond to those evolving weather conditions?

1   A.   No.

2   Q.   Did Western call you up and say, What do you think we ought

3   to do?

4   A.   No.

5   Q.   If they had, what would you have told them?

6   A.   I'd be concerned.

7   Q.   Okay.

8        There was some questions about the relative restrictions

9   you put on the YFD 69 and the YFD 70.  And it was noted that the

10  trip from Portland to Seattle is shorter than the trip from

11  Seattle to Ensenada.  But you also mentioned something about the

12  YFD 69 having to navigate the Columbia River Bar.

13       I'm not sure that we got an explanation as to why you would

14  lower the wave height restriction for a vessel that had to cross

15  the bar.

16  A.   Because the chance of it, actually, bottoming on the

17  sandbars during any accumulative swells coming in over those

18  bars.  And the short fetch -- you end up getting a shorter fetch

19  on the swells, and it can be very devastating going over that

20  bar.

21  Q.   Okay.

22       So you've said -- and Western's counsel reminded you --

23  that you felt like the YFD 69 was in better condition overall

24  than the YFD 70?

25  A.   Yes.

1    Q.    And yet the restriction was lower.  That is specifically to

2    have addressed the unique sea conditions at the Columbia River

3    Bar?

4    A.    Yes.

5    Q.    Had the YFD 69 tow been Seattle to Ensenada, would you have

6    set a higher than ten-foot-wave height restriction?

7    A.    Probably not.

8    Q.    And your recommendations.  You said the master is still

9    going to exercise his own judgment.

10        Would you hope and expect, after you put 40 hours into

11   walking around in the dry dock and some more time into writing a

12   report, would you hope and expect that the master would see your

13   towing recommendations before he undertook the tow?

14   A.    Yes.

15   Q.    Okay.  Would you be surprised if you learned that a towboat

16   company did not give the master your towing recommendations

17   prior to towing a 528-foot-long, 71-year-old steel dry dock?

18   A.    Yes.

19   Q.    And you mentioned striking a partially submerged object

20   as -- I believe your speculation as to what caused the dry dock

21   to sink.

22   A.    Yes.

23   Q.    How many compartments would this partially submerged dry

24   dock need to breach in order to cause the dry dock to sink?

25   A.    Multiple.  You know, to the bow area, you know, six or

1  eight tanks -- scoring through six or eight tanks.

2  Q.   Okay.  So you'd have to strike one object that broke into

3  six or eight tanks?

4  A.   Yeah.  It scored as it proceeded through the bottom of the

5  hull.

6  Q.   Sure.  So we could think of -- let me come up with a

7  hypothetical.

8       Let's say a partial submerged floating shipping container

9  eight feet wide, 40 feet long.

10  A.   Correct.

11  Q.   It gets up under the dry dock as the dry dock is towed, and

12  as it bounces along, it pokes holes in several tanks.

13  A.   Yes.

14  Q.   How many tanks would you have to flood to sink -- remember,

15  there are 48 individual tanks.  How many tanks would you need to

16  flood to sink the YFD 70?

17  A.   Oh, jeez, it's -- it's quite a few.  I remember talking

18  early on about that compartmentalization, and it seemed like it

19  would be, like, 12 or 14 tanks.

20  Q.   Okay.  So this magic bullet of a container would have to

21  breach 14 individual tanks as it bounced along?

22  A.   Well, yeah, it -- or if enough of them, say, six or eight

23  tanks were holed and then they filled up with water, that could

24  cause quite a bit of a bow down and could cause a hogging

25  situation, and that could rupture the other tanks.

1    Q.    Okay.

2          You concluded that each of the valves, I heard you say,

3    between all of these tanks were sealed and blanked.  What's a

4    blanked?

5    A.    You said between the tanks --

6    Q.    -- between the various tanks --

7    A.    Between the tanks, there were crossover valves, and all of

8    those valves were secured.  The blanks are through-holes from

9    the sides that would either fill -- put water into the ballast

10   tanks or discharge water out of the ballast tanks.

11   Q.    How would water get -- once it's in the dry dock, how would

12   it get between tanks if the valves between the tanks were sealed

13   adequately?

14   A.    Only through access through the bottom.

15   Q.    Okay.  So the only way water could have gotten into tanks

16   was a hole poked in the bottom --

17   A.    Yes.

18   Q.    -- or a structural failure of the walls separating the

19   tanks from one another?

20   A.    Yes.

21   Q.    That would be the other option?

22   A.    Yes.

23   Q.    Okay.  Do you think that if you towed the dry dock for

24   50-plus hours through conditions that exceeded the ones you

25   approved in your tow plan, that it could have caused a

 1    structural failure, allowing water to get between tanks?

 2    A.    Honestly, I'm not sure.  You know, the most likely case is

 3    striking a submerged object.  There's so much debris in the

 4    water these days, it's quite common.

 5              MR. BOYAJIAN:  Okay.  I don't think I have anything

 6    else right now, but I will see after Mr. Simms...

 7                       REDIRECT EXAMINATION

 8    BY MR. SIMMS:

 9    Q.    Back to your towing recommendations.

10          "Nothing in these recommendations" -- this is Exhibit 12 --

11    "to be construed to compromise the judgment of tug master," in

12    these circumstances, and that's the first job of the tug master,

13    to ensure the safety of the tow, the crew, and the tug, right?

14    A.    Yes, sir.

15    Q.    Always, whatever circumstance, wherever the master is?

16    A.    Yes, sir.

17    Q.    So when it comes with your recommendations on the one hand

18    and that question on the other, safety of the tow, crew, and

19    tug, that takes precedence?

20    A.    Yes, the safety of the crew takes precedence.

21    Q.    This ultrasound gauging that we looked at -- this was for

22    the 69 -- that wasn't done for the 70, right?

23    A.    I can't comment on it.  I don't know.

24    Q.    Okay.  All right.

25          But there are things that an ultrasound gauging will tell

1   you about a dry dock that your visual does not tell you, right?

2            MR. BOYAJIAN:  Objection, Your Honor --

3   A.   It could be.

4            THE COURT:  Hang on.

5            MR. BOYAJIAN:  The ultrasonic gauging that we looked

6   at was performed in 2013 on the YFD 70.  Mr. Simms has just

7   characterized that it was done on the YFD 69, and that's not

8   accurate.

9            MR. SIMMS:  Thank you.  That's true.

10  Q.   (By Mr. Simms)  Lets talk about this 2016 -- okay? --

11  setting aside the 2013.  Okay?

12       So you did a visual, and there is a lot of pictures in your

13  report.  There's a lot of photos you didn't include in your

14  report, right?  You took more photos than you included?

15  A.   Of course.

16  Q.   And if you had had an ultrasonic survey of the 70 in 2016,

17  from August until October, would that have told you more about

18  the structure and condition of the 70 than just what you could

19  see, if you had an ultrasonic survey in hand?

20  A.   Yes.

21  Q.   And did Vigor ever offer to do such a survey for you?

22  A.   Never came up.

23  Q.   And we talked about bulkheads and tanks and things like

24  that.  Did the YFD 70 have something called a safety deck?

25  A.   Yes.

1   Q.   And that was the last, basically -- the last part of the 70

2   that would hold it up before it sank, right, the safety deck?

3   A.   Yes.  It's, basically, both sides.

4   Q.   On the sides.  So Mr. Boyajian's drawing that had the sides

5   up here and then the pontoon deck, and so the safety deck is

6   where on his drawing?

7   A.   Both sides.

8   Q.   Both sides.  Okay.

9        So did you, particularly in your survey, look to see

10  whether the safety deck had structural integrity?

11  A.   Yes.

12  Q.   All right.

13       And before the tow left, you had a conversation with Russ

14  Shrewsbury, right, right before it left?

15  A.   Probably, yes.

16  Q.   And you talked with him about the weather.  There had been

17  a big storm come through.  Remember, it was, like, the 15th,

18  16th --

19  A.   No, I don't remember a specific conversation with Russ that

20  talks about a big storm coming through.

21  Q.   Okay.  And so you and Russ were talking about the weather,

22  whether it was about a storm or not, and you told him, "Don't

23  worry, Russ.  This thing was made for World War II.  You won't

24  have any problem with the tow.  It won't sink.  Just go ahead."

25  That's what you told him, right?

1    A.    No.  I don't remember anything like that.

2    Q.    Okay.  All right.  If Russ has a different recollection,

3    you don't remember any conversation with Russ?

4    A.    I remember talking to Russ, but I sure don't remember a

5    conversation like that.

6    Q.    Uh-huh.  Okay.  All right.  But could have happened?

7    A.    I don't remember that conversation.

8    Q.    All right.

9              MR. SIMMS:  Okay.  Thanks.

10                         CROSS-EXAMINATION

11   BY MR. BOYAJIAN:

12   Q.    Just a couple quick ones.

13         Do you normally call up towboat companies and tell them,

14   You don't need to pay attention to the tow recommendations I put

15   in my report?

16   A.    I never said that.

17   Q.    Do you ever call up towboat companies and tell them, Hey, I

18   wrote one thing for the customer, but the truth of the matter is

19   you can go out in just about any conditions you want?

20   A.    No.

21   Q.    Let's go back to the drawing for a minute.

22         Oh, God, I'm embarrassed by my art, but please bear with

23   me.

24         Are the safety decks up here?  The document camera doesn't

25   want to turn on.  That's okay.  We'll do it this way, unless

1  someone can figure it out.

2       This is our dry dock, like this.  My thumbs are up here.

3  These are the safety decks, right?

4  A.    Yes.

5  Q.    And these this little compartments up here and here are the

6  safety decks, right?  I mean, bearing with my art skills, that's

7  where they are?

8  A.    Yes.

9  Q.    And they are airtight, reserve buoyancy compartments meant

10 to keep it afloat when you submerge it during use as a dry dock;

11 is that correct?

12 A.    Yes.

13 Q.    We talked about hogging and sagging earlier.  I'm going to

14 make another drawing here, which is just embarrassing, but

15 please forgive.

16      This is a dry dock sitting with a swell right in the

17 middle.  This is what you talked about before with hogging,

18 right, something pushing up on the middle --

19 A.    Yes.

20 Q.    -- so the dry dock bends this way?

21 A.    Yes, something pushing on the middle, or heavy weights on

22 both ends.

23 Q.    Or heavy weights on both ends, sure.

24      And sagging is the opposite; when you have the dry dock and

25 you have the swell under the bow and the stern such that the

1    middle bends down, right?

2    A.    Yes.

3    Q.    Okay.

4         When you start bending a dry dock, hogging and sagging it,

5    where are the greatest forces applied on the structure of the

6    dry dock?  Are they applied the strongest -- and the top is

7    bending.  Is it up at the top and down at the bottom?

8    A.    Yeah.  The heaviest one would be on the bottom.

9    Q.    Okay.  Okay.

10             MR. BOYAJIAN:  Thanks.

11             MR. SIMMS:  Could we mark those?  Because I think they

12   might come up later.

13             MR. BOYAJIAN:  By all means.

14             THE COURT:  Do you want to have that marked as an

15   exhibit, counsel?  Just give it to our clerk.

16             THE CLERK:  We're marking this drawing, correct?  This

17   is what we're marking as an exhibit?

18             MR. SIMMS:  Yeah.

19             MR. JARRETT:  Sure.

20             MR. SIMMS:  Yeah.  Yeah, we'll probably use it again.

21             THE COURT:  Captain Shaw, before you step down, both

22   counsel touched on a question the court had about the 2013

23   ultrasonic gauging.  And I know you testified you didn't see a

24   2013 one, but can you tell me, just a little bit, what does an

25   ultrasonic gauge reveal that you can't see with the naked eye?

1          THE WITNESS:  The actual thickness of the steel in

2     question.  In other words, if I put the gauge up on this, it

3     will tell me the thickness of this Plexiglass.  However, if

4     someone took a grinder or sand papered off and you measure it,

5     it's going from .25, now it's going to say .18.  So it will be a

6     measurement of wastage within that sheet of steel.

7          So where they put that gun on here, gun on here, here,

8     here, on a piece of plate steel, whether it's a strake on the

9     bottom, or any other diagonals or horizontals.

10          THE COURT:  You can see damage to that steel from the

11     outside because you can visually take look at it?

12          THE WITNESS:  Right.

13          THE COURT:  You can't see it from the inside unless

14     you climb into these tanks?

15          THE WITNESS:  Yes, you have to climb into the tanks.

16          THE COURT:  And some are small --

17          THE WITNESS:  Very small.

18          THE COURT:  -- and difficult to get into?

19          THE WITNESS:  Yes.

20          THE COURT:  Is a ultrasonic gauging something that you

21     would typically do before deciding whether a vessel is

22     seaworthy?  A dry dock, specifically.

23          THE WITNESS:  Not necessarily.  Yeah, not necessarily.

24     You go by the past history of it, the preventive maintenance

25     that's going on, and then make judgment calls from them, too.

1            THE COURT:  Any questions, Mr. Simms, based on the

2    court's questions?

3                      REDIRECT EXAMINATION

4    BY MR. SIMMS:

5    Q.    So you knew that Vigor was going to scrap this dry dock,

6    right?

7    A.    Yes.

8    Q.    And you knew that it had -- the last NAVSEA qualification

9    was 2013, right?

10   A.    I'm not sure if I -- I don't know if I knew that.  I knew

11   it had been in operation very soon -- it had been in operation

12   not too much before I did the survey.  In other words, it seemed

13   to me it was only out of service for, like, six months or a

14   year.

15   Q.    It had been out of service for about a year, right?

16   A.    Yeah, I think it was about year it was out of service.

17   Q.    Okay.  And there had been no maintenance done during that

18   year, right?

19   A.    There was maintenance done that I saw being done on the

20   vessel.

21   Q.    To prepare it for tow?

22   A.    Yes.

23            MR. SIMMS:  Okay.

24            THE COURT:  Mr. Boyajian, any questions based on the

25   court's questions?

1          MR. BOYAJIAN:  Yeah, just one.

2

3                    RECROSS-EXAMINATION

4  BY MR. BOYAJIAN:

5  Q.   Did you suggest or ask for ultrasonic testing evaluation to

6  be done on the YFD 70 to help you make your conclusion?

7  A.   No.

8  Q.   If you had asked for one, do you think Vigor would have

9  been done one?

10 A.   Yes.  All indications were Vigor was being proactive with

11 all recommendations.

12          MR. BOYAJIAN:  Thank you.

13          THE COURT:  Captain, thank you.  You may step down.

14          THE WITNESS:  I've got one question, sir.  I received

15 two subpoenas.

16          THE COURT:  Yes.

17          THE WITNESS:  Okay.  Am I cleared on both of those

18 subpoenas?

19          THE COURT:  No reason to bring him back, from the

20 plaintiffs, from the defense?

21          MR. SIMMS:  No.

22          THE COURT:  You're free to go.

23      You may call your next witness.

24          MR. SIMMS:  Robert Ekse.

25          THE COURT:  Good afternoon.  If I could have you make

 1   your way to the middle of the courtroom, and come up in front of

 2   my clerk, and raise your hand to be sworn prior to testifying.

 3                           ROBERT ESKE,
              having been first duly sworn, testified as follows:
 4

 5            THE CLERK:  Please state your name for the record, and

 6   spell your last name for the court reporter.

 7            THE WITNESS:  Robert Ekse, E-k-s-e.

 8            THE COURT:  Mr. Ekse, please listen carefully to the

 9   questions of counsel, and answer the question as best you can.

10   Don't speak over counsel, and hopefully counsel won't speak over

11   your answers as well.  If you don't understand something, just

12   say so.  I'll try to get them to elaborate and maybe make it

13   clearer for you.  Okay?

14            THE WITNESS:  Thank you.

15            THE COURT:  You may inquire.

16                         DIRECT EXAMINATION

17   BY MR. SIMMS:

18   Q.   Mr. Ekse, what do you do for a living?

19   A.   I am the president of Elliott Bay Design Group, a naval

20   architecture firm here in Seattle.

21   Q.   Are you a naval architect?

22   A.   No, I'm not.

23   Q.   What's your background?

24   A.   Marine management, operations, maintenance.

25   Q.   Did you work for Vigor?

1   A.   I did.

2   Q.   What did you do for Vigor?

3   A.   I was a project manager, operations manager, and general

4   manager.

5   Q.   How long did you work for Vigor?

6   A.   If I remember right, about seven -- seven years.

7   Q.   From when to when?

8   A.   I'm going to be guessing here.  I've got to go back.

9        I started Portland in 2011 -- is that right, 2011?  And

10  then up to Seattle three years after that, and then was there

11  for about four years.

12  Q.   When you were in Portland, were you involved with the move

13  of the YFD 69 to Seattle, or were you already up here?

14  A.   No, I think I was here in Seattle.

15  Q.   So you were involved with receiving the YFD 69?

16  A.   It came to the yard that I was at.

17  Q.   Okay.  And the 69 was to replace the 70, right?

18  A.   You'll have to -- I'll have to rely on you for the numbers.

19  I don't -- I don't recall the specifics.

20       But, yes, it replaced a dry dock -- the sister dry dock, if

21  you will.  It was, basically, the same size, shape.

22  Q.   And so we're here talking about 70.  This is the one that

23  sank.

24  A.   Gotcha.  Understood.

25  Q.   So the 69 came from Portland to replace the 70.

1        And so at the Seattle facility, how did your

2   responsibilities relate to operation of dry docks, if they did?

3   A.    Yeah.  As the general manager, Dan Keen, the dockmaster,

4   worked for me.  For a short period of time, there was changes of

5   management as the operation grew.  But my capacity for

6   operations was limited to the ship repair end of things.  We had

7   both fabrication and ship repair, and I was a general manager

8   over the ship repair, which utilized the dry docks.  And I

9   helped to ensure, facilitate, oversee the coordination of people

10  that were operating the dock and repairing the vessels on the

11  dock, et cetera.

12  Q.    In 2016, did Dan Keen report to you?

13  A.    I don't recall.

14  Q.    Okay.

15  A.    There was a -- if I can elaborate?

16        There was just a period of time where we had a few

17  different managers coming in and out, and the organization was

18  changing.  That's when I went from an operations manager to a

19  general manager, during that timeframe.

20  Q.    In 2016, did Paul Torrey report to you?

21  A.    No.  Paul never reported to me.  He reported to Adam Beck.

22  Q.    Were you at all involved in the decision to switch from

23  using a heavy-lift ship to transport the 70, the old dock, to

24  Mexico, to switch from that to a one-piece tow to take it to

25  Mexico?  Were you at all involved in that decision?

1    A.    Involved to the point where I was informed of what was

2    going on.  That whole project was outside of my direct

3    influence, but because it had to do with the yard, Paul kept me

4    and others informed of what was going on.

5    Q.    Did you have any responsibility for the financial operation

6    of the yard?

7    A.    Yes.

8    Q.    And so did you come to learn that Vigor could save a lot of

9    money by towing the 70 to Mexico instead of using a heavy-lift

10   ship?

11         MR. JARRETT:  Objection, Your Honor.  The question is

12   incomplete.  Versus -- save a lot of money versus what?

13   Q.    (By Mr. Simms)  So you've got the heavy-lift ship tow --

14         THE COURT:  Hang on, counsel.  Hang on.  Let me have

15   you rephrase your question, and maybe ask for more specifics.

16   All right?

17   Q.    (By Mr. Simms)  So you had responsibility for the financial

18   operations of the yard.  And so the original proposal -- let me

19   even back up.

20         So did you know that Vigor had sold the 70 to the Mexican

21   scrapping company for $10,000?  Did you know that?

22   A.    I was aware that they had sold it.  I was not aware of how

23   much.

24   Q.    Did you know that the original proposal was to transport

25   that dock on a heavy-lift ship from Seattle to Ensenada?

1   A.    I know that there were several methods that were being

2   considered for transport and bids getting arranged for.

3         But was I responsible for financials in the yard?  The

4   answer is yes, but not over the dock move.  That was done

5   separately and outside of my budget.

6   Q.    Whose budget was it in?

7   A.    Adam Beck's.

8   Q.    And were you ever involved in a discussion about the cost

9   of moving on a heavy-lift ship versus moving in a one-piece tow?

10  A.    Only from an ancillary standpoint.  I wasn't involved in

11  those negotiations or those discussions, but, again, Paul

12  brought me into the conversation from a operations perspective.

13  They were looking at different methods, and if there was going

14  to be a heavy-lift ship in the yard or near the yard, then he

15  felt I should probably know that, and if it was going to be a

16  tow, it would be a different operation.

17  Q.    Okay.  And as part of the ancillary discussions, was there

18  any discussion of the relative cost of each approach?

19  A.    There's always evaluations of cost.  I don't remember

20  anything specific, related to the comparison of the two, that

21  comes to minds, but I do remember hearing of the different bids

22  they were getting on various options.

23  Q.    Okay.  And what was the most expensive and what was the

24  least expensive?

25  A.    I don't remember.

1  Q.   So we'll go -- fast-forward.

2       The tow has left Seattle on the 16th, the 17th, and now

3  we're at the afternoon of the 25th, and you've just gotten --

4  this is -- look at Exhibit 67 that I have up.

5       Paul is reporting to you that the 70 has taken on about

6  three feet of water.  Okay.  That's at 4:21.  At 4:35 you

7  respond.

8       First, how was it in your -- or if it was -- responsibility

9  to set up a response to what Paul had reported?

10 A.   It really wasn't.  What this was a coming together of the

11 team.  Dan worked for me, and Dan was, obviously, going to play

12 a role in this, to assist the condition that had just manifested

13 itself.  So if we were going to help at all, Dan was going to be

14 a part of that, and he worked for me.

15      Paul, he had been part of that from the beginning, so his

16 involvement is obvious.

17 Q.   Okay.

18      So Paul had the job of getting in touch with Western and

19 with Global, the salver, right?

20 A.   I would imagine.

21 Q.   Did you give him those jobs, or did he say, Okay, I'll do

22 this; how did that come about?

23 A.   This instruction that I'm giving him on the email, is that

24 what you're referring to?

25 Q.   Yes.

1   A.   Let me read it.

2        It's going back a ways, but as I read this, what it seems

3   like is that Paul is already in touch with Global, and I'm

4   asking him to connect Global with Dan, since he's going to be

5   involved.

6   Q.   Okay.  And then Dan planned on flying out.  Did you tell

7   Dan, Okay, you're going to fly from Seattle to San Francisco and

8   see what's going on in the morning; is that --

9   A.   That was kind of the impression that we had, was that Dan

10  would go and meet the tow.

11  Q.   And that's because you believed that the tow would be above

12  the water.

13  A.   Of course.  I think the reason that we were sending Dan to

14  San Francisco is because that's where we assumed the tug would

15  bring the dry dock to.  But that wasn't being driven by Dan or

16  Paul.  That was being driven by the tow company.

17  Q.   Right.  And so they were going to visit -- because at the

18  time -- let's go from the email, up until the next day when you

19  learned that the 70 had sank.  Okay?

20       From this time, for the first time you heard from Paul

21  Torrey, to that time you heard that the 70 had sank, were you

22  part of any discussion to the effect that the 70 is going to

23  sink?

24  A.   No.

25  Q.   And why not?  Did everybody believe it would float?

1      MR. JARRETT:  Objection, Your Honor.  That calls for

2  speculation and assumes a fact that is certainly not in

3  evidence.

4      THE COURT:  The objection will be sustained.

5  Q.   (By Mr. Simms)  So from the time you heard about the --

6  from Paul, the 70 taking on water, to the time that you had

7  heard it sank, you weren't part of any discussion where somebody

8  said to you, It will sink?

9  A.   No.

10  Q.   The assumption -- your assumption was that, in the morning,

11  Dan having flown to San Francisco, or wherever, would be meeting

12  the tow above water with Global Diving, right?

13  A.   Yes.

14  Q.   And so Paul's job, that you gave him, was to help

15  coordinate with Western so that that salving operation could

16  happen the next morning, right?

17  A.   It was more about equipment, and Dan knows the dry dock, so

18  they're going to have information.  Am I telling you what you've

19  just said?  He was helping Global understand what was going to

20  be at stake, what compartments might need to get looked into,

21  what they might need for equipment, those kinds of things.

22  Q.   Dan's job was to get the equipment on site so that it could

23  meet the tow, and the tow could get pumped out, right?

24  A.   It wasn't his job.  And I take exception to that only

25  because we were in a position of helping.  But the reason Dan

Robert Ekse - Direct by Mr. Simms                    June 28, 2021

1    was there is because he's the resident expert on the dry dock.

2         But in this type of situation, Dan, it wasn't his

3    responsibility, and it wasn't why he was going down there.

4    Q.    Okay.  What was --

5    A.    Just a point of clarification.

6    Q.    -- your understanding of why he was going down there?

7    A.    I'm sorry?

8    Q.    What was your understanding of why Dan was going to go to

9    San Francisco, Monterey?

10   A.    He was the most knowledgeable about the dry dock in the

11   communication loop, and we were going to do what we could to

12   help.

13   Q.    Okay.

14   A.    If there was anything to do.

15   Q.    Okay.

16        And so at the top here, Exhibit 67, it's 11:10 p.m.  Is

17   Melissa the insurance or the claims manager at Vigor at the

18   time?

19   A.    Yeah.  Melissa was risk management.  I'm not exactly sure I

20   remember her title, but she interfaced with those groups.

21   Q.    Okay.  And then, "If you need help with the details of this

22   brief," what were the details of the brief at that time?

23   A.    Well, what it looks like to me is that I'm contacting

24   Melissa, as a Vigor employee, to contact our underwriters to

25   make sure that they understand that there's been an event.  It's

1  just standard practice when there is an event.

2      I didn't have any details of any contractual position that

3  we may or may not have had, but I'm telling her that if she

4  needs help with the details, then I can bring the people to the

5  table, because they're close to my office.  Paul was there; Dan

6  is there; Adam; whoever.

7  Q.   Okay.  And at this time, the tow is still viable.  That was

8  your information?

9  A.   Correct.

10 Q.   And were you getting that information from Dan?

11 A.   I don't remember.  It would be speculation.

12 Q.   Okay.  Where did the information come from?

13 A.   That the tow was viable?

14 Q.   Yes.

15 A.   I don't know specifically what I was referring to here,

16 but, if I remember correctly, Paul was giving us day-to-day,

17 hour-to-hour updates on what was happening with the tow.

18 Q.   Okay.  And then go to Exhibit 54.

19     So here, now it's getting late or early.  Okay.  So here's

20 Paul, down here.  He's working with the Coast Guard, and then he

21 forwards to you a Captain of the Port Order, and this is pretty

22 earlier.  Were you still up at 2:10 in the morning?

23 A.   I don't know.

24 Q.   Okay.  All right.  But you did get this?  He forwards the

25 Captain of the Port Order to you.  And then at 7:16 a.m., you

1  write Paul, "I didn't see anything in the requirements we aren't

2  already doing."  What requirements are those?

3  A.   I'm sure they would be in the document that was attached to

4  the email.

5  Q.   Oh.  Good point.  Okay.

6       So the Captain of the Port Order, 43 -- here it is.  This

7  is the Captain of the Port Order.

8       And so as far as you knew, Vigor was conducting all these

9  requirements; that is, hire commercial salvage company, have

10 salvage resources on scene, have the salvage conduct an

11 assessment, submit a plan.  Vigor was doing all of that?

12 A.   I don't -- I don't think that's accurate.

13 Q.   Okay.

14 A.   I mean, what you're -- I don't want to put words in your

15 mouth, but what you just said is Vigor was doing this.

16      What I'm referring to is are these things being done,

17 rather than is Vigor doing it.  This was all --

18 Q.   Well, yeah, back to Exhibit 54.  "We aren't already doing."

19 If Vigor wasn't, who was doing them?

20           MR. JARRETT:  Objection, Your Honor.  The witness

21 wasn't done with his answer when counsel interrupted him with

22 the next question.

23           THE COURT:  Were you finished with your response?

24           THE WITNESS:  I guess I'm a little confused by the

25 question, and maybe that's what's dragging my question out.  Can

Robert Ekse - Direct by Mr. Simms                    June 28, 2021

1    you rephrase?

2            THE COURT:  Let me have counsel clarify.

3            THE WITNESS:  Thank you.

4    Q.   (By Mr. Simms)  So here is Exhibit 54.  Paul has sent you

5    the Captain of the Port Order.  Now, this is the morning after

6    the sinking, but by this -- but at 7:16 a.m., you hadn't gotten

7    a word about the sinking.  Okay.

8        So did you know at 7:16 in the morning of the 26th that the

9    tow had sank?

10   A.   I don't know where this is in the timeline.  I'm sorry.

11   Q.   Okay.

12       So you get the Captain of the Port Order.  You say,

13   "Thanks, Paul.  I don't see anything in the requirements that we

14   aren't already doing."  By "we," that's Vigor, right?

15   A.   No, I don't think so.

16   Q.   Okay.  Well --

17   A.   You got to -- this Captain of the Port was not sent to me.

18   It was sent to a lot of people, including the tug company that

19   it was addressed to.

20   Q.   Okay.  Well, let's --

21   A.   So I think the important thing is that --

22            THE COURT:  Counsel.

23   A.   We --

24            THE COURT:  Mr. Eske, hang on.

25            MR. SIMMS:  Before we pass --

1          THE COURT:  Mr. Simms, hang on.  We can't speak over

2     each other because that drives the court reporter crazy, and

3     then I don't hear what's going on anyway.  So it's not coming

4     into the person you need it to come into:  Me.

5          So wait until the witness is finished with his response.

6     If you think it's nonresponsive, you can say so, but let's try

7     not to speak over each other.

8          MR. SIMMS:  Yes, sir.

9     A.   I think it's the collective "we."

10    Q.   (By Mr. Simms)  Okay.  So let's look down at the bottom.

11    This is a message that Paul is forwarding you.  Nobody from

12    Western in that one.

13         This is the Coast Guard forwarding the Captain of the Port

14    Order.  It's sending it to Paul and only Paul.  There's lots of

15    copies to Coast Guard people.  Paul sends it to you and Dan and

16    Adam, and here is Bob Shrewsbury and Russ.  It's 2:45.  Okay.

17    But then you respond back to Paul -- let me put it this way:  In

18    the Captain of the Port Order, what was Vigor doing to respond

19    to the Captain of the Port Order?

20    A.   Vigor, specifically?

21    Q.   Yes.

22    A.   I was preparing Dan to go down and help.

23    Q.   Okay.

24         Did Vigor hire a commercial salvage company?

25    A.   I don't know who hired Global, if that's who you're

Robert Ekse - Direct by Mr. Simms                   June 28, 2021

1    referring to.

2    Q.    Okay.  All right.

3          Did Vigor -- was it planning to have salvage resources on

4    scene in Monterey Bay?

5    A.    We were -- Vigor, specifically?  I can't answer that.  I

6    don't know who hired them.  And you're getting very specific in

7    your questioning, and I feel like I'm getting roped into saying

8    something.

9          Vigor was not directly involved by themselves in any of

10   this.  The Captain of the Port Order was sent to the tug, and

11   then it was forwarded to an ancillary conversation within Vigor.

12   And I can't tell you that because I said "we," that meant that

13   we were doing anything -- everything that was outlined in that

14   letter by ourselves.  That was a collective "we," and the

15   Captain of the Port letter was specifically addressing the tug

16   company.

17   Q.    Yes, but let's be exact here.  Okay?

18         Back to our Exhibit 54.

19         The Coast Guard didn't send the Captain of the Port Order

20   to the tug company, did it?

21   A.    That's who it's addressed to.

22   Q.    But it's sent to Paul Torrey of Vigor.

23   A.    Was it not sent in another email?

24   Q.    No.

25   A.    Well, they sent it to the wrong person, then, didn't they?

1   I don't mean to be --

2   Q.   -- in speaking with the Coast Guard, not Western, about the

3   Captain of the Port Order, right?

4   A.   I think the Coast Guard is being very specific about who

5   it's to.

6   Q.   Okay.  Well, it says what it says.

7        Okay.  So after the sinking, did you participate in the

8   cooperation with NOAA to locate the sunken tow, and then to pay

9   money in connection with that, to assist?

10  A.   I don't -- no.  No, not to my knowledge.  There was

11  discussion with NOAA, whether it was directly with Seattle or it

12  went through Melissa, I don't recall, but there was conversation

13  about where it was on map, last reported by Western when it

14  sank, but only speculation, that I recall, of where it actually

15  ended up.

16  Q.   So after the sinking, you went on to other things.  You

17  weren't any more involved in the situation?

18  A.   Correct, yeah.

19        MR. SIMMS:  Okay.  All right.  I'll turn you over to

20  Vigor.

21        THE COURT:  Mr. Jarrett, I don't know how long you

22  have.  Is this a good time to take our break?

23        MR. JARRETT:  I'll be brief, Your Honor.

24        THE COURT:  Okay.

25                        CROSS-EXAMINATION

1  BY MR. JARRETT:

2  Q.   Mr. Ekse, do you retain any financial stake in Vigor

3  Industrial or any of its component affiliates?

4  A.   No.

5  Q.   Do you have any financial incentive during your testimony

6  here today?

7  A.   No.

8  Q.   Are you here testifying under subpoena?

9  A.   Yes.

10  Q.   Okay.

11      So this is Exhibit 43, on your screen in front of you

12  again.  Can you tell me to whom that exhibit is addressed?

13  A.   The vessel master of the tug *Ocean Ranger*.

14  Q.   And it's care of Agent Paul Torrey?

15  A.   Yes.

16  Q.   All right.  So the Coast Guard sends the Captain of the

17  Port Order to Paul Torrey, because they've been dealing with

18  Paul Torrey, and then Paul Torrey then distributes to others,

19  almost immediately, including Western Tugboat Company; is that

20  your read of the documents you've seen here today?

21  A.   I didn't see the communication with from Paul to Western

22  Towboat in the limited slides that we had, but that's what I

23  would understand, yes.

24  Q.   We're looking for the email.  If we can find it, Mr. Ekse,

25  I will show it to you.

1    Okay.  So let's move on to a different topic, then.

2    Remind me, please, your position at Vigor before you left.

3 What was your last job?

4 A.   I was the general manager of ship repair.

5 Q.   And Ms. Ivie, who is on the ball -- she's on the ball but

6 she didn't find the exhibit that I wanted.

7    But, anyway, so that was your position right before you

8 left, you were general manager?

9 A.   Yes.

10 Q.   And so in that position, did you have, sort of, knowledge

11 of where the various moving pieces of Vigor were at the various

12 shipyards?

13 A.   Yes.

14 Q.   And those moving pieces included the dry docks; am I right?

15 A.   Yes.

16 Q.   You, sort of, knew how the various dry docks were being

17 used at Vigor's various shipyards?

18 A.   That is correct.

19 Q.   All right.

20    Was it suggested that YFD 70 had to be discarded because it

21 was in the way?  Is that your recollection?

22 A.   In the way?  I would say that YFD 70 was no longer

23 financially viable to operate, submerge, and lift vessels,

24 and --

25 Q.   Okay?

 1  A.    -- therefore, it was in the way and needed to be gotten rid

 2  of.

 3  Q.    All right.  Mr. Ekse, I hesitate to do this, but --

 4        MR. JARRETT:  Ms. Ivie, can you bring up Mr. Ekse's

 5  deposition for me, please?  So we're looking at page 16.  Scroll

 6  down to line 20.

 7  Q.    (By Mr. Jarrett)  So, Mr. Eske, you were asked the

 8  question, "So was the YFD 70 in the way at the yard?"  And this

 9  refers to the Seattle yard.

10        And your answer was:  "In a way, no.  The YFD 70 was tied

11  up in an area of the yard that wasn't -- that hadn't been used

12  in a long time."

13        Do you see that?

14  A.    Absolutely.  Do I understand the context of your question?

15  No.

16  Q.    Oh, I didn't mean to be confusing, but I can understand --

17  A.    Yeah, that's okay.

18  Q.    So is that testimony from page 16 of your deposition still

19  accurate?

20  A.    That's correct.

21        The context of this is that the dry dock didn't have to go

22  anywhere.  It was not in the way.  It was no longer being used,

23  but there wasn't any kind of urgency to remove it.  There wasn't

24  anything driving that event --

25  Q.    That's -- oh, I'm sorry to interrupt.

1   A.    That was -- that's the answer.

2   Q.    All right.  I now understand.

3         I asked you, Mr. Ekse, if Paul Torrey forwarded the Captain

4   of the Port Order on to the others that needed to see it.  This

5   is Plaintiff's Exhibit 54, and there you see Paul Torrey's email

6   to Dan Keen, others at Vigor and Bob Shrewsbury and Russell

7   Shrewsbury.  Do you see that?

8   A.    I do.  That's exactly what I would have expected.

9   Q.    You expected Paul Torrey to get the Captain of the Port

10  Order from the Coast Guard and say, This needs to go to others

11  who are helping deal with the situation, so he sent it on to

12  Western Towboat Company?

13  A.    Yes.

14        MR. JARRETT:  That's it for me, Your Honor.  Thank

15  you.  Thank you, Mr. Eske.

16        THE COURT:  Mr. Simms?

17        MR. SIMMS:  No questions, Your Honor.

18        THE COURT:  All right.  You are excused.

19        We'll go ahead and take our break at this point in time.

20            (Court in recess 2:50 p.m. to 3:13 p.m.)

21                        JEFFREY SLESINGER,
            having been first duly sworn, testified as follows:
22

23        THE CLERK:  Please state your name for the record, and

24  spell your last name for our court reporter.

25        THE WITNESS:  My name is Jeffrey Slesinger, and that's

 1    spelled S-l-e-s-i-n-g-e-r.

 2              THE COURT:  Good morning.  Please speak into the

 3    microphone, and listen carefully to the questions being asked.

 4    Do your best to answer that specific question.  Don't speak over

 5    counsel.  If there are objections, wait for the court to make a

 6    ruling, and then you can see whether or not to answer.  If you

 7    don't understand something, please just say so, and we'll get

 8    counsel to clarify.  Okay?

 9              THE WITNESS:  Yes, Your Honor.  Thank you.

10              THE COURT:  You may inquire.

11                        DIRECT EXAMINATION

12    BY MR. SIMMS:

13    Q.    Mr. Slesinger, what do you do for a living?

14    A.    Well, right now I have my own business, Delphi Maritime.

15    My background is as a tugboat captain, and in that business, I

16    do training and audits of safety management systems, surveys.

17    I'm also an author, and I will do some consulting related to the

18    tug and barge industry.

19    Q.    Do you hold any professional licenses?

20    A.    Yeah.  I'm a master of 1,600 tons, oceans; also a master of

21    towing for tugs, oceans.

22    Q.    And did you work at one time -- did you work for Western

23    Towboat Company?

24    A.    Yes.  I worked for Western Towboat Company from 1986 to

25    2019.

1   Q.   What did you do for Western when you worked for Western

2   Towboat Company?

3   A.   I started out as a full-time captain in all of their

4   operations, harbor work, towing to Alaska.  In 1998, I became a

5   director of safety and training, and continued in that position

6   until I retired in 2019.  I also continued filling in as a

7   relief captain on tug trips.

8   Q.   All right.

9        And so as part of your work with Western Towboat Company,

10  did you have any involvement with the Western Towboat tow of the

11  YFD 70?

12  A.   Yes.  I wrote the tow plan for that tow.

13  Q.   Okay.  And we have put the tow plan up.  There we go.  I'll

14  scroll down so you can look at it.

15       What is a tow plan?

16  A.   A tow plan is a guidance document for our masters on a

17  specific tow that they're going to embark on.

18  Q.   Is a tow plan the same as a voyage plan that's referred to

19  in the Code of Federal Regulations?

20  A.   No.  A tow plan is a guidance document that has an overall

21  guidance for the particular tow that's going to be undertaken.

22       A voyage plan is more of a working document.  That process

23  is on board the tug and will be revised as that tug continues on

24  its voyage.

25       So they are two different things.

Jeffrey Slesinger - Direct by Mr. Simms          June 28, 2021

1    Q.   Was a voyage plan required for the YFD 70 tow?

2    A.   Well, that CFR requires a voyage plan for the type of tow

3    that the *Ocean Ranger* embarked on.

4    Q.   And are voyage plans always written out in detail?

5    A.   No.  Some are written out; some are simply acknowledged

6    that they have gone through the process.  Different companies

7    will use different techniques.  Some will have a formal form;

8    some will have notes that they make on a pad that's passed back

9    and forth between watches.  They have different mechanisms for

10   the communicating of criteria and the information that's

11   contained in a voyage plan.

12   Q.   For this tow, what did Western do, if anything, to

13   communicate that information?

14   A.   I'm sorry.  Are you speaking of communicating that

15   information --

16   Q.   For a voyage plan.

17   A.   Well, that would have been under Captain McGavock's

18   purview, and how he handled that, I'm not quite sure.

19   Q.   So back to your tow plan here.

20        What was the function, if any, of this tow plan that you

21   wrote?

22   A.   Well, the function of it was to give some practical

23   guidance to our masters and to give recommendations about how to

24   proceed with that tow.  Also, if there was any input from third

25   parties and their recommendations about certain conditions that

Jeffrey Slesinger - Direct by Mr. Simms          June 28, 2021

1   they should be aware of.  That was also incorporated in there.

2   Q.    Did you get recommendations from third parties to

3   incorporate in the tow plan?

4   A.    Yeah, certainly if there's recommendations that a surveyor

5   makes or the Coast Guard or some regulatory body, we want to

6   incorporate that in there.

7   Q.    Did you get recommendations from Richard Shaw of Bowditch

8   about information to include in the tow plan?

9   A.    Yes.  Indirectly, I will say.  It wasn't communicated

10  directly from Mr. Shaw, but I did receive his survey, and I saw

11  that he had certain sea and weather conditions that he

12  recommended, and I incorporated that into the tow plan.

13  Q.    The survey you received, was that his final survey?

14  A.    Well, to be honest, I'm not sure.  I don't believe so,

15  because I went on vacation and was out of the office from

16  October 15th to the 29th, and I'm not really sure if that was

17  the final version I received before I left.

18  Q.    Okay.  So when did you leave?

19  A.    October 15th, we got on an airplane, which means that

20  probably October 14th, I was not in the office.

21  Q.    Okay.

22        So back to -- so did -- you talked about third parties, so

23  there is that survey.

24        Now, in the survey, do you remember a section that was

25  titled "recommendations"?

Jeffrey Slesinger - Direct by Mr. Simms          June 28, 2021

1   A.    Yes, I do recall that.

2   Q.    In your experience, is recommendations from a surveyor

3   orders for what a tug master must follow?

4   A.    I've always interpreted that word literally, which means

5   they are recommendations that should be followed as closely and

6   as best as possible.

7         Anybody in the maritime industry who is, at any time, at

8   sea, knows there are no absolutes, and that's why we make

9   recommendations to masters, to follow as best they can these

10  recommendations, you know, even on the changing circumstances

11  they may encounter.

12  Q.    Is following a survey recommendations, then, a matter of

13  the discretion of the master?

14  A.    I wouldn't say it's a matter of discretion of the master.

15  I would say it's a master's discretion to adhere to those

16  recommendations as best he can under the circumstances he

17  encounters.

18  Q.    And so were there any other third parties whose input was

19  reflected in your tow plan?

20  A.    Not that I was aware of at that particular time.

21  Q.    Did Western -- now, this is the tow plan, and I'm going to

22  the bottom, and then we have Exhibit 32, which is tow plan

23  amendments.  And did you add the tow plan amendments after you

24  wrote the tow plan?

25  A.    Yes.  I wrote the tow plan, initially, from a template that

Jeffrey Slesinger - Direct by Mr. Simms          June 28, 2021

1    I had used before, and I had submitted it, and then we got this

2    feedback and these additional recommendations, and I

3    incorporated those into a revised tow plan.

4    Q.    Is that the feedback you received from Richard Shaw?

5    A.    Yes, that report -- that draft survey he had done.

6    Q.    Okay.

7          Did the Coast Guard approve the tow plan?

8    A.    I don't have any direct knowledge of that.  I believe I did

9    hear that they did approve it.  I created this tow plan, and

10   then I distributed it electronically to Bob and Russell, and

11   they may have distributed it to other parties, which, one, I

12   think, was the Coast Guard, but I can't speak to that directly.

13   Q.    And so going down here, your tow-plan weather, "Once the

14   tow is cleared for sea by attending surveyor, the tow will

15   depart Puget Sound upon a receipt of favorable weather forecast

16   of seas 15 or less."

17         Now, down here, "The tug master will ensure that weather

18   data is continuously monitored and recorded for the tow's local

19   and projected track."  What did you mean by that?

20   A.    Well, simply that the tug master would use reliable

21   resources to continually monitor the weather to what kind of

22   conditions were forecast and make adjustments that he saw fit.

23   Q.    What are reliable resources?

24   A.    Well, there's multiple ones out there.  There's, of course,

25   the NOAA weather forecast, there's weather facsimile charts,

1   there's -- WindyTY is another one.  There's several software

2   programs.  These days, actually, any mariner who has any kind of

3   connection can look at the various models, European models, U.S.

4   models, forecast models that have the data that weather

5   forecasters use.

6   Q.   Were those resources available for the master of the

7   ocean -- of the tug?

8   A.   I believe you asked me if they were available for the *Ocean*

9   *Ranger* master?

10  Q.   Yes.

11  A.   Yes, they were.

12  Q.   So if I put myself on the bridge of the *Ocean Ranger*, I had

13  all these resources available to me at the time?

14  A.   That's correct.

15  Q.   And was Captain McGavock trained to use those resources?

16  A.   Well, yes, certainly.  He is a Cal Maritime graduate.  They

17  have meteorology, tug courses.  He has extensive experience with

18  weather systems up in Alaska and also on the West Coast.  He is

19  not a meteorologist, but he is certainly trained in how to

20  interpret those data points and decisions in the field.

21  Q.   And so how about "continuously monitored and recorded for

22  the tow's local and projected track"?  What kind of recording is

23  this recommendation that you're making in the tow plan?

24  A.   Well, the way we would do it is the -- whoever was on watch

25  would listen to the latest forecast, or whatever information.

Jeffrey Slesinger - Direct by Mr. Simms                  June 28, 2021

1  If it was certainly a verbal forecast, they would write it down

2  so that it was -- on a legal pad so it was accessible to the

3  next watch.  If there was other data that came in, facsimile

4  charts, they would archive that electronically so it was

5  accessible again to the next watch.  So that was the method of

6  recording.

7  Q.   And for "projected track," how far out in the projected

8  track was this?  If it's suggesting anything, are they supposed

9  to record?

10 A.   Well, I'm sure they would be looking at both a longer-range

11 forecast and a more immediate-range forecast, and any in

12 between.  The only issue there is that the longer-range

13 forecasts are much less accurate, so you would weigh more heavy

14 the forecast you get for 24 or 48 hours.

15 Q.   So the tow plan continues on, and the tug maintains daily

16 contact with the office.

17      Now, down at the bottom here, this is -- this is attached

18 with your tow plain.  It's a drawing from Heger Dry Dock.  Why

19 was this attached to the tow plan?

20 A.   Well, sometimes people who are -- other third parties that

21 are reviewing tow plans like to see what the towing connection

22 is, you know, what our towing equipment is on the tug, as well

23 as where the attachment points are on the object being towed.

24 So this was a convenient way to illustrate that.

25 Q.   So Heger tried to -- did you know who they were?

1  A.    Not at the time that I wrote this.

2  Q.    And let's look at the upper-left-hand corner here.

3  "General notes:  This tow plan is developed for open-ocean

4  towing from Seattle, Washington."

5  A.    Yes, I do see that.

6  Q.    And was this an open-ocean tow?

7  A.    I would say it was an open-ocean tow, yes.

8  Q.    We heard from Captain Shaw.  I'll tell you that he makes a

9  distinction between a coastal tow.  He says this is a coastal

10  tow, not an open-ocean tow.  Is he right about that?

11  A.    Well, I think we're using two different terms.  I believe

12  he might have been referring more to the voyage, which is along

13  the coast, and my reference here to ocean towing is the exposure

14  to the sea and wind conditions, which are more typical of being

15  in the ocean.

16  Q.    And could you expand on that a little bit?  For example, is

17  it safer or less turbulent to be sailing this route down the

18  coast than in the open ocean?  Are there different conditions

19  that would be expected?

20  A.    Well, no.  You would expect open-ocean conditions, or

21  certainly the potential to be exposed to open-ocean conditions

22  on that route from here to Ensenada.

23  Q.    And how about this No. 2?  This is part of the tow plan.

24      Heger Dry Dock is not conducting an engineering evaluation

25  of the dock's capabilities to be towed shown in the

1    configuration.

2         Was it the responsibility of anybody, then -- Heger's not

3    doing it -- to conduct engineering evaluation of the dock's

4    capability of become towed?

5    A.    Well, I believe that burden would have fallen on the

6    surveyor on behalf of the dry dock owner.

7    Q.    Okay.  Was that Vigor's responsibility to conduct an

8    engineering evaluation?

9              MR. HOWARD:  Objection; foundation.

10   A.    Well, I certainly would assume it would be.

11             THE COURT:  Hang on.  Hang on.

12             THE WITNESS:  Sorry.

13             THE COURT:  Is there an objection?

14             MR. HOWARD:  I object to the foundation.  Lack of

15   foundation and asking for a legal conclusion.

16             THE COURT:  It does.  Let me have you lay more

17   foundation.

18             MR. SIMMS:  Okay.

19   Q.    (By Mr. Simms)  Did Vigor, as the entity hiring Western for

20   the tow, in your experience, have any responsibility to do an

21   engineering evaluation of the dock's capability to be towed?

22             MR. HOWARD:  Same objection.  I don't think he's

23   established a foundation to judge Vigor's obligation to do an

24   engineer --

25             THE CLERK:  Counsel --

1    MR. HOWARD:  I was going too fast anyway.

2                        (Off the record.)

3    THE COURT:  Thank you.

4    MR. HOWARD:  And I'll ask Mr. Simms to start the

5    question over again.

6    MR. SIMMS:  I'll ask a different one.

7    So we're looking at the general notes here, No. 2.

8  Q.    (By Mr. Simms)  Did Western have the responsibility of

9  conducting an engineering evaluation of the dock's capability to

10  be towed in the shown configuration?  That's my question.

11  A.    No, I don't believe so.  I believe that Vigor was under the

12  obligation to present us with a vessel object that was seen

13  ready to tow, and that would been part of their due diligence in

14  determining that.

15  Q.    What do you base that comment on?

16  A.    I'm sorry.  Are you talking about the engineering study?

17  Q.    What you just said about -- that Western wasn't responsible

18  to provide an engineering evaluation, but Vigor was.  What is

19  the basis of that?

20    MR. HOWARD:  Objection; mischaracterizes and

21  foundation with respect to Vigor's responsibilities.

22    THE COURT:  Overruled.

23  I guess, Mr. Slesinger, what he is asking is, why did you

24  answer that question the way you just did?

25    THE WITNESS:  Because in my experience, the

1   responsibility for warranting that the vessel being towed is up

2   to that vessel owner; in other words, the dry dock's owner.  We

3   don't, as a rule, go around and inspect all the barges and other

4   vessels that we tow.  The expectation is that the owner of that

5   vessel will present us with something that's seaworthy and has

6   the ability to withstand the conditions of the intended voyage.

7   Q.   (By Mr. Simms)  And the word we'll hear a lot here is "due

8   diligence."

9          In your experience, is there a difference between the

10  exercise of due diligence to tender a tow and the presentation

11  of a seaworthy tow?

12          MR. HOWARD:  Objection, Your Honor.  That's a legal

13  conclusion.

14          THE COURT:  Overruled.

15  Do you understand what he's asking?

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.  You may answer.

18  A.   Could you repeat the question?

19  Q.   (By Mr. Simms)  Sure.

20          In your experience, is there a difference between

21  undertaking due diligence to present a tow and presenting a

22  seaworthy tow?  Is there a difference?

23  A.   Well, due diligence is the process you go through to be

24  able to say that it's seaworthy.  And depending on the age and

25  the condition of that object being towed, it requires different

1   levels of what we'll call an investigative or a forensic

2   determination about its ability to withstand the conditions you

3   expect.

4   Q.   So the YFD 70 was built in 1947 or so, so it was -- it was

5   old.  It was 60, 70 years old by the time it was towed.  What

6   does that say to you about the due diligence required to present

7   the tow?

8   A.   Well, the due diligence would be -- first of all, it's old,

9   like, 70 years old.  It's being towed in an configuration that's

10  unusual; not necessarily recommended.  We would need to go and

11  do some kind of a structural engineering analysis of what kind

12  of bending moments and torsional forces that tow could

13  withstand, and we'd need to establish the condition of the

14  structural integrity of it, which, honestly, you can do some of

15  that visually, but that requires, in many cases, an ultrasonic,

16  nondestructive testing to measure plank thicknesses, and gather

17  all that data and give it to an engineer who knows what they're

18  doing, and see what their determination is.

19  Q.   And this drawing from Heger, does this show a new tow

20  arrangement for the YFD 70, something that hadn't been used

21  before on the YFD 70?

22  A.   No.  And to be honest, because the responsibility for this

23  was on Vigor, I did not exert a lot of energy and really try to

24  decipher and -- and do their job.

25       So by that diagram, no, I was not aware that, originally,

1  they were designed to be towed in one piece and the two ends put

2  on top.

3  Q.   And so here is the amendments, and so let's look at your

4  amendments here.

5       And reporting twice daily.  Okay.  And then, "Western

6  Towboat will be using Rich Courtney, a maritime weather service,

7  or WX weather information and course guidance."  What did you

8  mean by that?

9  A.   Well, I put that in there because we have used him as one

10 but not the only resource for weather forecasting and

11 conditions.  He's been a great resource for our captains in some

12 of our other jobs, and I put him in there just to list him as

13 one of the many resources that we would use or could use during

14 our voyage.

15 Q.   When you wrote this tow plan and amendment, was it an

16 amendment of the tow contract that Western had with Vigor?

17 A.   No.  I had nothing to do with that contract.  I didn't even

18 look at it.  I had no knowledge of that contract.  This was

19 strictly a tow plan with recommendations for guidance to our

20 captain.

21 Q.   And so now Rich Courtney, did you mean in this that Western

22 Towboat would be -- that you were advising that Western Towboat

23 keep constant contact with Rich Courtney about whether

24 information and course guidance?

25 A.   No.  I only put that in there to list him as a resource,

1    one additional resource for our captain to use, meaning for

2    weather information, if he felt that was appropriate.

3    Q.    Was that in addition to the resources that you talked about

4    that you had put in your plan right here, about the weather?

5          Let me blow it up.  See that paragraph on weather?

6    A.    Yes, yes, he was in addition to that.

7    Q.    So did you intend to recommend that Western use Rich

8    Courtney at all?  Was it discretionary?

9    A.    The value of Rich Courtney for us, in the past, has been

10   when there's been conflicting or contradictory weather

11   forecasting from these other sources, and Rich Courtney could,

12   at times, provide some insight as to which may or may not have

13   been more accurate.  That's been his primary role that we had

14   used in the past and we would use on this particular voyage.

15         In other words, if these other resources -- the four or

16   five other weather resources, if there were some contradiction

17   between them, there was some difference, then he could provide

18   insight as to why that was occurring and, perhaps, which he

19   thought was more accurate.

20   Q.    Did Western have -- and I think you've talked about it --

21   but go into the history that Western had with Rich Courtney.

22   Tell us about the history and relationship of Western and Rich

23   Courtney, how long Western had been working with him, what

24   typical work with Rich Courtney was, that sort of thing.

25   A.    Well, Rich Courtney was originally, I believe, out of

Jeffrey Slesinger - Direct by Mr. Simms          June 28, 2021

1    Kodiak, with the weather service.  And our master -- we have a

2    regularly scheduled run between Seattle and Whittier, where we

3    cross the Gulf of Alaska, and weather systems up there can be

4    very unpredictable and very severe, so we started calling him

5    when he was working for the weather service -- or our captains

6    did -- to ask him questions about what these forecasts meant,

7    how accurate they were, that sort of thing.

8         Once he retired from that and started his own business, we

9    continued that relationship where we would also consult with

10   him.  He had the same access to information he did when he was

11   at the weather service.  And so that's been a longstanding

12   relationship that both the company and the Pacific captains have

13   had with him, on a personal level, in discussing and, I would

14   say, reading a little bit between the lines of what the

15   published forecasts are.

16   Q.   Have you had experience towing up and down the Pacific

17   coast?

18   A.   Yeah, I've had some experience going up and down the

19   Pacific coast.

20   Q.   In your experience, what, if any, differences in weather

21   variability is there between the Gulf of Alaska and the West

22   Coast?

23   A.   Well, not a whole lot.  You can run into very severe

24   weather on either of those routes.

25   Q.   Okay.

1   A.    The one difference I will say is that, on the Pacific

2   coast, once you're out there, you have very little choice of

3   refuge; whereas crossing the Gulf of Alaska, you are able to

4   wait on different sides of the Gulf there for weather systems to

5   go through.

6   Q.    And so what happened, I'll tell you, with Rich Courtney, is

7   that there was contact with Rich Courtney in the weekend before

8   with Ann Kelly, from Western, whom you know, and Bob Shrewsbury,

9   whom you know, and that was it, and then the tow left.

10        Was that a violation of the tow plan?

11  A.    I don't believe so.

12  Q.    Why?

13  A.    Because he's listed as one of the resources, not the sole

14  resource, and not one that was mandatory to use.  If, at the

15  time that they left, they had any questions or needed some

16  interpretation, I'm sure they would have called him.  But it

17  sounded like the forecasts were all consistent and within the

18  parameters that were discussed in here, and so they left.

19  Q.    Whose idea was it to include this reference to Rich

20  Courtney in the amendment?

21  A.    Well, it was my idea.  Like I say, I was thinking of the

22  different resources that we have used in the past, and I thought

23  it would be a good idea to use that, and also just to emphasize

24  to the captain that, certainly if he felt it was necessary or

25  warranted, to call Rich Courtney; that we had the company's

Jeffrey Slesinger - Direct by Mr. Simms          June 28, 2021

1  backing on that.

2  Q.   So down here in tow conditions, you just talked about the

3  limited options once you get out past Cape Flattery of refuge.

4  So these were the refuges:  Columbia River Bar, worst case, and

5  San Francisco.

6       It was relative, availability of refuges, right, once the

7  tug-tow turned?

8  A.   There were limited refuges, yes.

9  Q.   Taking the tug and tow across the Columbia Bar would be an

10  undertaking; is that safe to say?

11  A.   Yeah.  That was -- the percentage of that being, A, having

12  the conditions to do that and, B, it happening were very, very

13  low.  Realistically, it was more likely that San Francisco would

14  be the first real opportunity as a port of refuge.

15  Q.   And so here you write, "Ideally tow conditions no more than

16  eight- to ten-foot seas and 20 to 25 knots of wind."  What did

17  you mean by "ideally"?

18  A.   I think it's important to remember I wrote this for a

19  captain.  I didn't write it for a courtroom or lawyers.  And as

20  captains, we all understand that there are just no guarantees

21  when you go out there, there are no absolutes.  So the word

22  "ideally" was put in there just to communicate, "Please try and

23  manage that tow as best you can, to stay within these limits,

24  and ideally that will happen," and it was a recommendation.

25  Q.   And so where did the eight- to ten-foot seas figure come

1    from?

2    A.    Well, that came from the amended dry dock survey.

3    Q.    Okay.

4          And in your understanding, did that mean average wave

5    height or absolute wave height?

6    A.    It was ambiguous.  I mean, it was never delineated as far

7    as we talking about swells, sea states.  It was a general

8    recommendation the surveyor made, and that's the general

9    recommendation that went in there.

10   Q.    So it could have meant average wave heights?

11   A.    Again, my memory on this may be incorrect.  But I believe,

12   even in the forecasts for wave heights, I want to say it's the

13   top two-thirds height, and there may be ones that are higher

14   than that.  But, again, I may not be correct on that.

15   Q.    And 20 to 25 knots of wind.  Was that from the Bowditch

16   survey also?

17   A.    That was my interpretation of it.  I know it was 4-6, and

18   I -- my numbers are not precise on what a Beaufort 4-6 wind

19   scale is.

20   Q.    Why is wind conditions something to take into consideration

21   when you have a tow?

22   A.    Well, the primary consideration would be your ability to

23   make headway, or if it was a very, very strong wind, the way it

24   might offset the tow from the course that you were steering.

25   Q.    All right.  And then down here, "any change in the draft,

1   immediately report it to Western."

2       And so that's where we get to your return from Hawaii to --

3   I'm sure before this, you learned about the sinking of the tow.

4   And when you learned about the sinking of the tow, did you

5   make -- did you not plot a -- did you create this?

6   A.   Yes, I created that chart.

7   Q.   Okay.  This is Exhibit A-12.

8   A.   Yes.  There was some question as to where exactly the dry

9   dock had sunk, and so I reviewed the logs and I, to the best of

10  my ability, plotted the positions that were in the logs.

11      I will say that the lines that connect the positions are

12  not representative of the course that the *Ocean Ranger* was

13  trying to steer.  They are representative of a course-made-good,

14  if you will, idea.

15  Q.   Tell us the difference between those two things.  What's a

16  course made good?

17  A.   Well, many times, especially if you have a difficult tow,

18  you may be steering in one direction, but the swell, wind, and

19  even current conditions can, basically, make you crab so that,

20  on a chart, it looks like you 're sailing directly from one

21  point to another but, actually, you may be pointed in a much

22  different direction, sometimes as much as 10, 15, 20 degrees off

23  from the course that you made good.

24  Q.   Okay.  So "made good" means actual course?

25  A.   Over the ground.

1  Q.  Over the ground.

2      And the tugs have, for lack of a better word, an auto-pilot

3  system?

4  A.  Yes, that's correct.

5  Q.  And the master would lay in a course on the auto-pilot

6  system, and then the system would attempt to keep to that

7  course, right?  Is that the way it worked on Western's *Ocean*

8  *Ranger*?

9  A.  The auto pilot on Western's tugs will try to maintain the

10  compass heading that you put in there.  It will not make

11  adjustments for course over ground.  It will just try and steer

12  in the specific direction that you programmed into it.

13  Q.  Because the course made good depends on wave and wind and

14  swell conditions, right?

15  A.  Yeah.  There are many factors.  It depends on wind, wave,

16  and swell.  It also depends on the aspects of that tow related

17  to the current sea state and trying to minimize any stress on

18  it.  There's really multiple factors that can contribute to a

19  course made good being different than a course steered.

20  Q.  So back to your chart here.

21      Now that you've looked at this, including before, does this

22  show, accurately, that the *Ocean Ranger* had a straight line of

23  travel, from 1400 on the 25th to 1800 on the 25th?  Did the

24  *Ocean Ranger* actually travel a straight line on a course made

25  good?

Jeffrey Slesinger - Direct by Mr. Simms          June 28, 2021

1  A.   No.  Again, that line was really just connecting those

2  known positions.  It's not representative of the actual track

3  line of the *Ocean Ranger*.

4  Q.   And how about here?  That doesn't show the exact travel

5  from 1800 to 2230, does it?

6  A.   No.  Again, it's not representative of the track line that

7  the *Ocean Ranger* actually traveled.

8  Q.   Okay.

9       And so to be representative of the track line, how do I do

10 this?  If I wanted to plot what the track line was of the *Ocean*

11 *Ranger*, what would I do?  What would I need?

12 A.   Well, you'd need to go back and look at the chart program

13 they used, which was Rose Point.  There's usually a log file in

14 there that you can reference, which will have the vessel's

15 headings and speed at various time points.

16 Q.   And what if I, instead or in addition to it, went through

17 and looked at the tug logs and the position the tug was logging,

18 can I get a more representative showing of the track?

19 A.   Well, you could get -- in the conditions that were in that

20 log, and the weather conditions in that towing condition, you

21 could -- you could make an educated guess about the different

22 headings that were going on between those two points, or those

23 various waypoints.

24      That's the reason I drew those lines in there, was because

25 I really -- other than the fact that I knew they were not

Jeffrey Slesinger - Direct by Mr. Simms                    June 28, 2021

1  steering directly on those lines, to try and recreate, you know,

2  a little zigzag line of which way they were going, which way

3  they were pointing, really wasn't impossible.

4  Q.   Okay.  So between 1800 and 2230 -- okay? -- does this chart

5  that you drew on show that absolutely the tug was outside of the

6  marine sanctuary between 1800 and 2230?

7  A.   Well, that particular line and the direction they're going

8  would indicate that they were outside of the marine sanctuary.

9  Well, once they exited out -- their course made good exited out

10  of the sanctuary.

11  Q.   Okay.  But are there waypoints between -- let me go back to

12  the log here.

13      So here's the 25th.  Here's 1800.  So 37, 36 north, 123,

14  14.2 west, and that's where that is, right?

15  A.   Yes, to the best of my plotting abilities.

16  Q.   Okay.

17      And then we've got 1900, 2000 -- ten o'clock -- no, eight

18  o'clock.  And then 2230, but you've got 2230 here, so -- at any

19  rate, there's some parts that you didn't plot from the...

20  A.   I certainly did not plot things that did not have a

21  specific latitude and longitude.

22  Q.   Uh-huh.  Okay.  All right.  Okay.

23      So then we go to the 25th, and then the 26th.  This is 26th

24  log.  This is Exhibit 33.  And there's a number of other places.

25  And then so we end up at 0305 here, 37°21.  Okay.  All right.

Jeffrey Slesinger - Direct by Mr. Simms          June 28, 2021

1        So let me just go back to this.

2        Now, this chart is a NOAA chart, right?

3   A.    Yes, that's correct.

4   Q.    And describe the plotting -- was there a plotting program

5   on the *Ocean Ranger*?

6   A.    Well, they had the Rose Point electronic navigation system.

7   Q.    Okay.  So what does that look like?  If Judge Martinez is

8   sitting -- if that was the wheelhouse of the tug, what would it

9   look like for him?  If he was looking out the front windows of

10   the tug, where would that plotting program be vis-à-vis where

11   he's sitting?

12   A.    Well, the actual screen for that plotting program would be

13   behind him, and what he'd be looking at is, essentially, a video

14   representation of this chart with a little icon of the *Ocean

15   Ranger*, and, depending on how they had it set up, it would be,

16   like, a little track line that would have visually illustrated

17   the course that that tug had taken.

18   Q.    Okay.  So what he'd see, using -- if the bench was there

19   and this was -- that was the tug wheelhouse, he would see

20   something like this.

21        Would he see, on the plotting program, these blue lines?

22   A.    Yes, he would see those.

23   Q.    And those are showing up.  It would look pretty much like

24   this, right, on the plotting program?

25   A.    Yeah.  Perhaps a better way to explain it is that this is a

1    hard copy chart, a picture of that.  The Rose Point uses what's

2    called a vector chart, which is, basically, a digital

3    representation of that exact chart.

4    Q.    Okay.

5          And the blue lines, what does that represent?

6    A.    Those are the boundaries of the marine sanctuaries, areas

7    that are designated as marine sanctuaries.

8    Q.    And so if the master or the mates navigating the tug were

9    using the Rose Point system, they would be able to see exactly

10   where they were vis-à-vis the marine sanctuary, right?

11   A.    Yes, that's correct.

12   Q.    Because it's graphically presented right there?

13   A.    Yes.

14   Q.    And in your experience, is the plotting system, Rose Point,

15   accurate?

16   A.    It's accurate most of the times.  There's some areas

17   where it -- I mean, it's subject to GPS errors, so there are

18   times when, if that signal is lost, it cannot be accurate.

19   Q.    Okay.

20         And was Captain McGavock and the mates, Jacobson and

21   Cowgill and Jesse -- my brain isn't working -- trained on the

22   use of this navigation system?

23   A.    Yes.  All of Western Towboat's captains and mates and

24   second mates are familiar with it and how to use it.

25         When we first brought it in, we brought in the Rose Point,

1  I guess you could say, representative to kind of train our guys

2  in one of our winter seminars.

3  Q.   And how long before the sinking had Western brought in the

4  Rose Point system?

5  A.   I couldn't say exactly, but I want to say -- if that was

6  2016, it could be ten years.  We used another system previous to

7  that, and we, kind of, transferred over.  But we've been using

8  electronic charting system for quite some time.

9          MR. SIMMS:  All right.  I'm going to stop here and

10  turn you over to the Vigor folks.

11                    CROSS-EXAMINATION

12  BY MR. HOWARD:

13  Q.   Mr. Slesinger, my name is Christopher Howard.  I don't

14  believe we've met, even virtually.

15          First, you mentioned two roles you had with Western -- can

16  you hear me?

17  A.   Yes.

18  Q.   You mentioned that you had two roles with Western, but you

19  had a third, also, at the time, in 2016.  You were also their

20  port captain, correct?

21  A.   As was -- probably others have described, Western Towboat

22  was never a very top-heavy company.  We all wore different hats:

23  tug captain, port captain, safety director, in my case.

24  Q.   What does the port captain do?

25  A.   Port captain, I would say, is more engaged in some of the

Jeffrey Slesinger - Cross by Mr. Howard                June 28, 2021

1   operational logistics of the various towing jobs that we have.

2   Q.    So as port captain, did you have any specific involvement

3   in that capacity with this tow, with Vigor?

4   A.    I would say the writing of the tow plan came under that

5   title.

6   Q.    Now, the original tow plan that you prepared, which is

7   Exhibit A-3 -- if we can put that up.  You've already seen

8   this -- you prepared that from a fairly standard form, correct?

9   A.    It's a form that we had used -- I had used in the past.

10  Q.    And the 15-foot seas, that was your number, correct?  That

11  didn't come from Vigor or Captain Shaw or any external source;

12  is that right?

13  A.    That's correct.  That's a number we had used internally for

14  previous tow plans.

15  Q.    Now, when you write a tow plan, you write a tow plan to

16  give your captains the greatest discretion in how they can

17  exercise their judgment to get the job done, right?

18  A.    To get the job done within the parameters of the tow plan,

19  yes.

20  Q.    Well, I don't want this to become circular.

21        Are you trying to bind your captains' hands from exercising

22  their discretion when they're executing the tow plan and getting

23  the tow towed?

24  A.    No.  We're trying to give them -- we want to give them the

25  discretion to make those decisions in the field, as best they

Jeffrey Slesinger - Cross by Mr. Howard                June 28, 2021

1    can with their judgment, to carry out the intent and the

2    parameters of the recommendations of the tow plan.

3    Q.    And there was a word you used a lot in your deposition that

4    we haven't heard today, but I'd like to let you explain it, and

5    that's -- was it risk assessment or risk evaluation or risk

6    judgment that you expect your captains to make when they're out

7    on the sea?

8    A.    I believe what you're referring to is that I was trying to

9    explain that captains are making risk-based decisions all the

10   time, where they are constantly evaluating a lot of variables

11   and a lot of risk factors that are present for that particular

12   voyage and at that time.

13   Q.    And during that time during the voyage, it's your captains

14   you expected to make the decision, not the customer, not the

15   owner of the tow, correct?

16   A.    We expect our captains to take this lead on making those

17   decisions, and if they feel it's necessary or would be helpful

18   to consult with our officer or customers, then they certainly

19   have the discretion to do so.

20   Q.    Now, you said, in response to Mr. Simms' questions, you did

21   not have anything to do with the actual contract between Western

22   and Vigor; is that correct?

23   A.    That's correct.

24   Q.    That's outside your area?

25   A.    That's correct.

1    Q.   So, specifically, Vigor's obligations under the contract

2    was not something you were involved in negotiating, correct?

3    A.   I was not involved in negotiating it, no.

4    Q.   And if the contract disclaims the warranty of

5    seaworthiness, that's not something you're aware of?

6    A.   I would probably have to go look up that term to figure

7    that out, so, no, I'm not aware of that.

8    Q.   If the contract requires due diligence on the part of

9    Vigor, as opposed to an obligation to deliver a seaworthy

10   vessel, that's outside of your area of what you were doing for

11   Western, correct?

12   A.   Yes.  I had nothing to do with the contract or the

13   contractual language.

14   Q.   Now, at some point, did you have contact with Captain Shaw?

15   A.   Not directly.

16   Q.   Did you know Captain Shaw?

17   A.   Yes.  I've known him from other professional encounters

18   we've had.

19   Q.   And did you have a chance to discuss Captain Shaw's

20   testimony with Mr. Simms before testifying today?

21   A.   I -- no, I -- well, I really can't remember.  I don't

22   believe so.  Nothing that comes to mind.

23   Q.   In terms of your prior working with Captain Shaw, did you

24   respect him as a surveyor for this type of work?

25   A.   Yes, he seemed like a decent surveyor.

1  Q.   And one thing to be clear about:  What is this type of

2  survey?  This type of survey is a specific niche in the field,

3  correct, for suitability?

4  A.   I believe it comes under several names, but one is a

5  warranty survey or a trip-and-tow survey.

6  Q.   Now, you're currently doing surveys; is that correct?

7  A.   That's correct.

8  Q.   But you specifically won't touch warranty or trip-and-tow

9  surveys, will you?

10  A.   That's correct.

11  Q.   So that's not something that's part of your current

12  practice as a surveyor?

13  A.   That's correct, except that I would like to point out that

14  the surveys that I do are condition surveys of vessels.  It's

15  not that I can't do a trip-and-tow survey, but I choose not to

16  because of the liability, not because I don't have the skill set

17  to do that or aware of the types of things you would need to

18  look at.

19  Q.   Now, when you received -- let's go to Exhibit A-4, and

20  scroll down to paragraph 6.

21       When you received the draft report from Captain Shaw, did

22  you read it?

23            MR. SIMMS:  I'm not sure -- objection.  Is this the

24  draft report?

25            MR. HOWARD:  The draft has "draft" written all over

1   it.

2          MR. HOWARD:  This is the final.  We'll come back to

3   the final.

4   Q.   (By Mr. Howard)  Did you read it?

5   A.   Yes, I read it.

6   Q.   Did you have the option of calling Captain Shaw if you had

7   any question about what he meant?

8   A.   I certainly had that option.

9   Q.   Did you call Captain Shaw to ask him what did he mean by

10  eight to ten feet?

11  A.   No.

12  Q.   And so did you take his eight to ten feet and incorporate

13  it into your amendment?

14  A.   I took his recommendation and incorporated it into my

15  amendment, yes.

16  Q.   And did you have an understanding, from the draft survey

17  that you reviewed, that he was recommending the ship shall

18  avoid -- that's mandatory language -- seas in excess of eight to

19  ten feet?

20  A.   I believe I took that in the context of what it was listed

21  under, as recommendations.

22          MR. SIMMS:  Before we go, what I'm reading is "shall

23  avoid heavy seas greater than 15 feet" in this document.

24          MR. HOWARD:  In which document?

25          MR. SIMMS:  The one that's on the screen.

1          MR. HOWARD:  Okay.  I'm looking at the final document.

2     Okay.

3          MR. SIMMS:  But this is -- I think you need to

4     establish what he had in front of him, and I think what we've

5     heard is that he has had that draft in front of him that says 15

6     feet.

7          THE COURT:  Counsel, hang on a second.  How much more

8     do you have of this witness?

9          MR. HOWARD:  I have at least 20 minutes, Your Honor.

10         THE COURT:  And, Mr. Simms, I assume you'll have more

11    questions for him?

12         MR. SIMMS:  I might.  I'll try to keep it short.

13         THE COURT:  Counsel, we're, actually, past our closing

14    time of when we were going to shut down.

15        Mr. Slesinger, I realize that you're retired, but we will

16    have to bring you back tomorrow to finish up this testimony.

17         THE WITNESS:  Okay, Your Honor.

18         THE COURT:  Counsel, we'll see you tomorrow morning at

19    nine o'clock.

20              (Proceedings adjourned at 4:21 p.m.)

21

22

23

24

25

C E R T I F I C A T E


          I, Nancy L. Bauer, CCR, RPR, Court Reporter for
the United States District Court in the Western District of
Washington at Seattle, do hereby certify that I was present in
court during the foregoing matter and reported said proceedings
stenographically.

          I further certify that thereafter, I have caused
said stenographic notes to be transcribed under my direction and
that the foregoing pages are a true and accurate transcription
to the best of my ability.



          Dated this 2nd day of August 2021.


                              /S/  Nancy L. Bauer

                              Nancy L. Bauer, CCR, RPR
                              Official Court Reporter