UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE.

_____

WESTERN TOWBOAT COMPANY,          ) CASE NO. C20-00416-RSM
                                  )
                Plaintiff,        ) Seattle, Washington
                                  )
v.                                ) June 29, 2021
                                  ) 9:00 a.m.
VIGOR MARINE, LLC,                )
                                  ) BENCH TRIAL
                Defendant.        ) Vol. 2 of 5
                                  )

_____

                VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE RICARDO S. MARTINEZ
             CHIEF UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

  For the Plaintiff:      J. STEPHEN SIMMS
                          Simms Showers, LLP
                          201 International Circle, Suite 230
                          Baltimore, MD 21030

                          ANTHONY J. GASPICH
                          Gaspich Law Office PLLC
                          8094 NE Barthrop Place
                          Bainbridge Island, WA 98110

  For the Defendant:      CHRISTOPHER H. HOWARD
                          DAVID R. BOYAJIAN
                          Schwabe Williamson & Wyatt
                          1420 Fifth Avenue, Suite 3400
                          Seattle, WA 98101

                          NOAH JARRETT
                          Schwabe Williamson & Wyatt
                          1211 SW Fifth Avenue, Suite 1900
                          Portland, OR 97204

                          ADAM MURRAY
                          Schwabe Williamson & Wyatt
                          700 Washington Street, Suite 701
                          Vancouver, WA 98660

EXAMINATION INDEX

| EXAMINATION OF | | PAGE |
|---|---|---|
| JEFFREY SLESINGER | CROSS-EXAMINATION continued BY MR. HOWARD | 177 |
| | REDIRECT EXAMINATION BY MR. SIMMS | 186 |
| STEPHEN MCGAVOCK | DIRECT EXAMINATION BY MR. GASPICH | 188 |
| | CROSS-EXAMINATION BY MR. BOYAJIAN | 261 |
| | REDIRECT EXAMINATION BY MR. GASPICH | 318 |
| | REDIRECT EXAMINATION BY MR. GASPICH | 322 |
| DANIEL KEEN | DIRECT EXAMINATION BY MR. SIMMS | 323 |
| | DIRECT EXAMINATION BY MR. BOYAJIAN | 345 |

EXHIBIT INDEX

| EXHIBITS ADMITTED | PAGE |
|---|---|
| N/A | |

1                       PROCEEDINGS

2        _____

3              THE COURT:  Good morning.  Please be seated.

4              MR. HOWARD:  Before I continue, Mr. Jarrett has a

5     procedural question, if that's okay.

6              THE COURT:  Yes, Mr. Jarrett?

7              MR. JARRETT:  Thank you, Your Honor.

8         As you recall, we have, sort of, a joint order in limine

9     that Mr. Simms submitted with our stipulation providing that the

10    parties would give each other 24-hours notice of witnesses that

11    they intended to call in the next day's case.

12             THE COURT:  Yes.

13             MR. JARRETT:  We have issues with the way that counsel

14    for Western is -- is not complying with that order, in my view,

15    Your Honor.

16        Mr. Simms identified eight or nine witnesses for

17    yesterday's testimony.  We got through three and a half.  So I

18    asked yesterday to identify the witnesses that would be in the

19    rest of the -- in plaintiff's case today, and Mr. Simms replied,

20    well, it's pretty much everybody else on their witness list and

21    Vigor's retained experts.

22        So in my judgment, Your Honor, that is not an adequate list

23    of witnesses, because it's not possible, and it's every possible

24    witness, it's not possible to get through all of them.

25        So I'd ask that Western comply with the order that

 1   Mr. Simms submitted with our stipulation.  If he'd tell us which
 2   witnesses are actually going to be called in plaintiff's case.
 3          THE COURT:  Thank you.
 4      Mr. Simms, any problem with being able to do that?
 5   Actually, counsel, before you respond, let me say this to all
 6   parties:
 7          As I told you, we have four days this week, unfortunately,
 8   and then it looks like we're going to be stuck doing criminal
 9   trials for a bit, and by that, I mean well over a month.
10          So given how slow we moved yesterday -- this is a bench
11   trial.  We don't have a jury to worry about.  I've been doing
12   this for a long, long time.  You can give me information pretty
13   quickly.
14          I need to get to the crux of why we're here.  We've only
15   got certain, distinct, legal claims left in this particular
16   case, after the court's ruling, and that's what I need you to
17   do; give me the information to help me make the call on what
18   claims are left.
19          Maybe you're correct when you said "pretty much everybody
20   else on there," because, basically, if we think about yesterday,
21   today, and then giving the defense some time to put their case
22   on, you need to think about being finished here in a day or so.
23          So any problem with being able to let them know,
24   realistically, who your next witnesses will be?
25              MR. SIMMS:  Your Honor, we did yesterday.  I talked to

 1    Mr. Howard about exactly who we're going to do call today -- who

 2    we think we're going to call.

 3        But we're trying to move it as fast as possible.  That's

 4    why we stipulated to all the things that we did, to start off

 5    with.

 6        And, of course, what happens if we get to the end of the

 7    day and I say, Oh, we've got some extra time; I haven't named a

 8    witness, then that's a problem, too.

 9        I don't want anybody to be surprised.

10        I told Mr. Howard yesterday exactly who we're going to have

11    today.  We're going to finish Mr. Slesinger.  We're going to

12    have Captain McGavock.  We're going to have mates Kyle Jacobson

13    and John Cowgill.  Then we will put on Dan Keen, who is right

14    here, and then after that we'll have Dr. Hudson, the engineering

15    expert.

16              THE COURT:  All right.  Again, it takes cooperation

17    from both sides to make a trial go smoothly, and I expect that

18    from experienced counsel as well.  So let's try to make the best

19    use of our time that we possibly can.

20              MR. SIMMS:  That's what we're trying to do, Your

21    Honor.

22              THE COURT:  All right.

23              MR. JARRETT:  Thank you, Your Honor.

24              THE COURT:  Mr. Howard, you were still on examination

25    of Mr. Slesinger.

1    MR. HOWARD:  I believe I'll be able to shorten it,

2    with the benefit of last night.

3                    CROSS-EXAMINATION continued

4    BY MR. HOWARD:

5    Q.    Good morning, Mr. Slesinger.

6    A.    Good morning.

7    Q.    I'm going to start by asking, for background, to put up

8    Exhibit A-6, which is your amended tow plan.  Do you recall

9    that?  It should be up in front of you in a moment.

10   A.    Yes.

11   Q.    Okay.  You prepared this, right?

12   A.    Yes.

13   Q.    At the time you prepared this, is it your testimony you had

14   not yet received the amended -- the final survey?

15   A.    Yeah.  I don't believe I -- I believe I had received a

16   draft survey, but not the final one that was issued.

17   Q.    But you have tow conditions for eight- to ten-foot seas and

18   20 to 25 knots of wind in this plan; is that correct?

19   A.    That is correct.

20   Q.    If you had not received the final survey, do you know where

21   you got this from?

22   A.    I got it from a draft survey.

23   Q.    So you got a revised draft survey?

24   A.    That's correct.

25   Q.    Okay.  Thank you.

1      Did you send that revised draft survey on to the captain?

2   A.   No, I did not.  Any communication with the captain happened

3   after I had gone on vacation.

4   Q.   Would the survey be important for the captain to receive?

5   A.   You're speaking of the warranty survey.

6   Q.   The warranty survey from Captain Shaw, was that something

7   that would be useful for the captain to receive?

8   A.   Yes, it would be.  Usually the surveyor presents that to

9   the captain in person, has been my experience.

10  Q.   It was not your job to get it to the captain?

11  A.   Every time we've used a warranty surveyor, that surveyor

12  has gone down to the vessel and met in person with the captain

13  to discuss his recommendations.

14  Q.   So you don't bother forwarding the survey that you receive

15  to the captain?

16  A.   No.  It's transferred directly from a surveyor to the

17  captain.  At least that's the way it had been in the past.

18  Q.   Now, if we could put up A-4 for a moment.

19       In A-4, the language in paragraph 6, you agree, says,

20  "shall avoid heavy head or beam seas greater than eight to ten

21  feet"; is that correct?

22  A.   That's what that document says, yes.

23       MR. SIMMS:  Objection.  This is not the draft.  This

24  is the final.

25       MR. HOWARD:  And I, actually, have a follow-up

1  question that should address his objection.

2          THE COURT:  All right.

3  Q.   (By Mr. Howard)  Is that the same language in the revised

4  draft from which you took eight to ten feet?

5  A.   I took the eight to ten feet, but I don't believe I took

6  that verbatim.

7  Q.   You used the word "ideally"?

8  A.   I did.

9  Q.   What does "ideally" mean to you?

10  A.   Well, in the context of this statement here, if you read it

11  strictly, that sea state that's describe is only applicable to

12  head and beam seas, which leaves the question, does that mean

13  that a 30-foot quartering sea or following sea is appropriate?

14  That wasn't addressed.

15          So my interpretation, as a mariner, was that eight to ten

16  feet was a general recommendation, and that, ideally -- that is,

17  we would do the best to our ability -- stay within those bounds.

18  Q.   So do you read this as permissive, that, in the captain's

19  discretion, he could make a choice to exceed that wave height?

20  A.   I read this as recommendations to the captain to, as best

21  to his ability, follow that recommendation.

22  Q.   I'm going to change subjects, briefly.

23          By the way, did you speak to the captain about the

24  surveyor's report at all?  Speak, not send.  Did you speak to

25  him?

1    A.    I had no conversations with Captain McGavock.

2    Q.    Coast Guard approval, what does that mean to you?

3    A.    That means that somewhere in the Coast Guard hierarchy,

4    someone has reviewed that and approved that tow plan.

5    Q.    And by approving it, they're not giving you a blank check

6    to go out and do anything, are they?

7    A.    I really can't speak to what the Coast Guard's intent is

8    when they stamp something "approved."

9    Q.    Okay.  So would it be accurate, then, you, as port captain,

10   getting it approved just means you're allowed to go?

11   A.    It means that whatever was in that tow plan that they

12   looked at and reviewed, they agreed with, and that was

13   sufficient enough for them to release that tow.

14   Q.    And it's your understanding that they are releasing it for

15   the intended voyage as described in the tow plan, correct?

16   A.    Yes, they're releasing it for that intended voyage.

17   Q.    Do you know if the Coast Guard gets the survey?

18   A.    I do not have any knowledge of that one way or the other.

19   Q.    I'd like to change topics to weather.

20         Now, you mentioned yesterday that by putting the Rich

21   Courtney statement in your document, Exhibit A-6, you were

22   giving the captain permission to call Rich Courtney.  Is that an

23   accurate paraphrase?

24   A.    Yes, I put it in there as listing another resource.

25   Q.    But your captains already have, basically, blank-check

1  approval to call Rich Courtney, don't they?

2  A.   Certainly, they do.  But in this particular case, this was

3  a tow that we don't regularly do, and I just put it in there for

4  emphasis.

5  Q.   Do you recall you may have been adding this because a third

6  party wanted special weather planning for this trip?

7  A.   No third party contacted me and asked for special weather

8  permitting.

9  Q.   And the language you put into your tow plan was, in the

10  weather routing section, "will be using"; is that correct?

11  A.   That's what it says.

12  Q.   That sounds pretty affirmative, not as available, but will

13  be using.  That was your expectation, that Western would be

14  using him for this trip for weather planning, correct?

15  A.   My intention of that statement was that we would be using

16  him in a capacity, if we felt it was necessary.

17  Q.   Do you know if the captain ever called Rich Courtney during

18  this tow?

19  A.   I do not.

20  Q.   Do you know if anyone called Rich Courtney regarding this

21  tow?

22  A.   I believe our office contacted him prior to the departure

23  of the tow.

24  Q.   Approximately five days in advance of the tow?

25  A.   If that's what the record shows, yes.  I don't have that

1    information in front of me.

2    Q.   So when you indicate in your plan you will be using him, a

3    call a few days in advance is sufficient to be using him for the

4    purposes of the tow plan?

5    A.   The call to him is in the context of one of many weather

6    resources.  And as I explained before, if it's warranted to talk

7    to him about some inconsistencies in a forecast, then, yes, we

8    would call him.  It doesn't say that we must call him.  It just

9    says that we will use him, as necessary, in the capacity we've

10   used him in the past.

11   Q.   And you would agree that weather was pretty important for

12   this trip?

13   A.   Certainly weather was a factor.

14   Q.   And, in fact, coming up on a particular decision point, you

15   had -- first, background:  You were in Hawaii for all these

16   decision points, correct?

17   A.   That's correct.

18   Q.   You were probably very lucky to be in Hawaii at that time.

19        So you had no personal knowledge of what actually happened

20   from October 14th until after it sank -- after the dry dock

21   sank, correct?

22   A.   I only have knowledge of that from the investigation that I

23   did subsequent to the incident.

24   Q.   When you generated the map?

25   A.   That was part of that process, yes.

1  Q.    I'll come back to that.

2        But would you agree that the -- put on the survey, A-4,

3  paragraph 7, please -- that the survey -- now, this is the final

4  survey -- and I'll ask if you saw this in the draft -- calls for

5  weather to be checked before leaving any safe port.  Was that in

6  the draft that you saw?

7  A.    Yes, I believe that was in the draft.

8  Q.    And that's a reasonable thing, isn't it?

9  A.    Yes.

10 Q.    And would you agree that the key point in the tug's

11 departure is rounding Cape Flattery?

12 A.    That's one of the key points.

13 Q.    That's when it's leaving the safe waters of the Greater

14 Puget Sound area?

15 A.    That's when you're committed to a ocean tow.

16 Q.    Right.

17       And at that point, would you expect the captain to get

18 weather forecasts in advance before turning south of Cape

19 Flattery?

20 A.    Yes, and I believe he used multiple weather resources to

21 get that.

22 Q.    And if you had weather forecast in 72 hours that exceeded

23 the parameters of the recommendations, you would expect the

24 captain to turn around, right?

25 A.    I would expect him to consult with us, and we would discuss

1  it.

2      I had no indication in my investigations that there was

3  such a forecast at that time.

4  Q.   I understand.  Well, they did hit such a storm within 24

5  hours, right?

6  A.   Yes, they did.

7  Q.   And if there was a forecast storm within 24 hours, you

8  would expect the captain to turn around rather than head south,

9  correct?

10  A.   If he had such a forecast, yes.

11  Q.   Now, moving on to -- you did some investigation, I think

12  you discussed yesterday.

13        MR. HOWARD:  Your Honor, may I approach enough to put

14  this on the easel?

15        THE COURT:  You may.

16        MR. HOWARD:  Can you put up Exhibit A-12?

17  Q.   (By Mr. Howard)  Do you recognize A-12 that's on the screen

18  in front of you?

19  A.   Yes, I do.

20  Q.   Did you prepare this?

21  A.   Yes, I did.

22  Q.   And you prepared this from the log made by the tow; is that

23  correct?

24  A.   I prepared this from the log sheets.

25  Q.   And the log sheets, those are important-to-be-accurate

1    documents kept on the tow, correct?

2    A.    Yes, they're an important document.

3    Q.    And it's important that they be accurate, so they put the

4    accurate information in at the time.  That's how you train your

5    people?

6    A.    Yes.

7    Q.    And, in fact, there was some discussion yesterday about

8    autopilot.  The captain and the mates, they're monitoring the

9    autopilot, right?  I mean, you don't just let autopilot run the

10   tug without monitoring it, right?

11   A.    Yes, that's correct.  They are making inputs in the

12   autopilot.

13   Q.    We're going to be using this blowup, an illustrative

14   version of Exhibit A-12.  Can you just tell me if it appears to

15   be an accurate blowup of the document you prepared?

16   A.    Yes, it does appear to be accurate.

17   Q.    And the datapoints, you personally placed those datapoints

18   based upon the datapoints from the log, correct?

19   A.    I plotted those latitudes and longitudes based on the ones

20   that were in the log.

21   Q.    And to the best of your ability, those were done

22   accurately?

23   A.    Those positions, yes, those are accurate.

24             MR. HOWARD:  Thank you.  I have no other questions.

25             THE COURT:  Mr. Simms, anything further for

1    Mr. Slesinger?

2                       REDIRECT EXAMINATION

3    BY MR. SIMMS:

4    Q.    In your testimony that was led by Mr. Howard, you talked

5    about some sort of risk analysis or assessment.  What did you

6    mean by that?

7    A.    What I meant by that is that captains are always faced with

8    balancing risks, and those are risks to people, risks to

9    property, risks to environment, and we are taught and we teach

10   our people to do it in that priority.  Always keep in mind --

11   make sure your people are safe, make sure your property or your

12   equipment is safe, and if those are taken care of, then, yes,

13   manage those environmental risks.

14        And so any decision that captain is making, he's always

15   looking at those three risk factors and any of the variables

16   that are related to making that decision.

17        So that's why -- that's the context for the captain when

18   they're out at sea making decisions about how to steer, where to

19   go, routing, that sort of thing.

20   Q.    There was a main part of your tow plan, and then there was

21   the addendum.  Was the addendum ever submitted to the Coast

22   Guard?

23   A.    I don't know.  I did not have any direct contact with the

24   Coast Guard.  I'm not sure if Western Towboat sent that to them

25   or not.  I don't have any knowledge of that.

1   Q.   How long after the first part of your plan did you do your

2   addendum?

3   A.   Well, my recollection is that when I received the changed

4   draft language from the surveys, that I put that in there, but I

5   don't recall an exact date.

6   Q.   But did you do the addendum sometime after you finished the

7   plan, the first part?

8   A.   Yeah.  I made the initial plan, then I got the draft survey

9   back with its change, and then I amended the plan.

10          MR. SIMMS:  Okay.  Thanks.

11          MR. HOWARD:  Nothing further, Your Honor.

12          THE COURT:  Thank you.  Mr. Slesinger, thank you.  You

13   may step down.  You're free to go.

14          THE WITNESS:  Thank you.

15          THE COURT:  Counsel, you may call your next witness.

16          MR. SIMMS:  We'll call Captain McGavock.

17          THE COURT:  Captain, good morning.  If I could have

18   you make your way through the courtroom, and come before our

19   clerk to be sworn prior to taking the witness stand.

20                         STEPHEN McGAVOCK,
          having been first duly sworn, testified as follows:

21

22          THE CLERK:  Please state your full name for the

23   record, and spell it for the court reporter.

24          THE WITNESS:  Stephen McGavock; S-t-e-p-h-e-n,

25   M-c-g-a-v-o-c-k.

1        THE COURT:  Captain, the microphone before you does

2   amplify a little bit.  Don't get too close because it blows up.

3   Listen to the question, and answer the question that's asked.

4   If you don't understand something, just say so, and we'll try to

5   get them to clarify.

6        You may inquire.

7        MR. GASPICH:  Thank you, Your Honor.

8                    DIRECT EXAMINATION

9   BY MR. GASPICH:

10  Q.    Could you tell us how old are you?

11  A.    I am 45.

12  Q.    Do you have any family?

13  A.    Yes, I have two daughters.

14  Q.    Did you attend college?

15  A.    Yes.  I received an associate's degree from Chemeketa

16  Community College and then I -- in manufacturing engineering,

17  and then I proceeded on to California Maritime Academy in 2000,

18  and graduated from there in 2003 with a degree in marine

19  transportation and an Unlimited 3rd Mate license.

20  Q.    And in case the court is not familiar with California

21  Maritime Academy, could you explain what is that school?

22  A.    It's a four-year academy in San Francisco -- in Vallejo,

23  the Bay Area, and it's part of the CSU system.  And you go

24  there.  It's fairly -- it's quasi-regimented you have to wear a

25  uniform and such.

1    And they have an engineering section and a

2  marine-transportation section and a business section, and they

3  prepare you for a career in the maritime industry, or various

4  elbow industries off of that.  So I chose -- I always wanted to

5  work on ships, so I chose the marine transportation.

6  Q.   When did you first get interested in working at sea?

7  A.   My uncle was a captain on the Columbia River, in Astoria,

8  and I would go out on his boat when I was younger and help him

9  handle lines and stuff, and I always liked being on the water,

10  so it was just, kind of, a no-brainer for me.

11  Q.   When you graduate Cal Maritime, do you obtain a Coast Guard

12  license?

13  A.   Yes.  You receive an Unlimited 3rd Mate license, if you're

14  in the marine transportation program.

15  Q.   And when you say "unlimited," what does that mean?

16  A.   It means you can serve as a third mate on a vessel of

17  unlimited tonnage, any U.S. flag vessel, and --

18  Q.   Ships, essentially?

19  A.   Yeah, ships.

20  Q.   Okay.

21    And, currently, what licenses do you hold?

22  A.   I currently hold a 1,600-ton Oceans Masters license, with a

23  Master of Towing endorsement.

24  Q.   Okay.  And do you still have your Unlimited 3rd Mate

25  license?

1    A.    I have a Unlimited 2nd Mate license.

2    Q.    So you've upgraded the initial third mate ships license to

3    a second mates license?

4    A.    I have.

5    Q.    Have you worked continuously in the maritime industry at

6    sea since you graduated in 2003?

7    A.    Yes, I have.

8    Q.    All right.

9          Could you tell the court just a brief summary of your work

10   experience at sea?

11   A.    Yes.  I interned when I was at the academy on cutter

12   suction dredges, or, essentially, small ships that dredge ship

13   channels.  That was over on the East Coast, and I did that for

14   three months.  And then after I graduated, I worked for Crowley

15   Marine Services for five years.  And then I resigned from there

16   and went to Western Towboat in 2008, I believe.

17   Q.    And have you continued to work at Western Towboat

18   continuously since 2008?

19   A.    Yes.

20   Q.    All right.

21         And what is your current position with Western Towboat?

22   A.    I currently sail as master.  My main run is on our newest

23   Titan boat, the *Bering Titan*, and that run is primarily a

24   Whittier -- we go from Seattle to Whittier, sometimes to Kodiak,

25   and we're towing a 420-foot rail barge.

1    Q.    Okay.

2          And how long have you worked as a full-time master for

3    Western Towboat?

4    A.    Full-time master since 2014.

5    Q.    Okay.

6          And did you work as master aboard Western boats between

7    2008 and 2015?

8    A.    I worked as a chief mate.

9    Q.    Okay.

10         You said you tow rail barges.  What is your experience in

11   the towing industry?

12   A.    Well, I started out towing -- oh, with Crowley, I started

13   out towing, kind of, odd jobs overseas, construction equipment,

14   and those were large barges as well.  We were doing construction

15   projects in Russia, South Korea, and I did that for two years.

16         And then I transferred over to the petroleum side and towed

17   oil barges for about a year and a half.

18         And then I ended up on articulated tugging barges, which

19   are, essentially, small tankers.  And then that's when I left

20   Crowley, after serving on those for about a year.

21   Q.    Okay.  So apart from towing barges, which some may say is

22   somewhat predictable in how they tow -- this case involved a dry

23   dock -- do you have any experience towing structures that are

24   non-barges?

25   A.    Yeah.  I did several tows as a mate for the caissons they

1    use for the -- I believe it's the 520 floating bridge across

2    Lake Washington.  We towed them out of Grays Harbor, and towed

3    them up the coasts and down the straits and here to Seattle, and

4    then we handed them off to another outfit, and they towed those

5    through the locks.  So, essentially, yeah, it's a large block of

6    concrete.

7         As well, worked on several rig moves in Cook Inlet, where

8    we used three tugs to tow these oil drilling rigs.

9    Q.   Do specialized structures, like you mentioned concrete

10   blocks and you mentioned the drill rigs, do they handle

11   differently than barges?

12   A.   Yes.

13   Q.   Could you tell the court what are some of the extra

14   considerations?  As someone in charge of a navigation watch when

15   a tug is towing those sort of specialty structures, what are

16   some of the things you have to deal with?

17   A.   Your speed is going to be greatly affected, just because

18   the block coefficient, which means the underwater section of

19   that vessel, it's not very hydrodynamic, and that means it's not

20   going to tow very well behind you.  As well, currents greatly

21   affect you.  It 's not a easy tow.

22   Q.   Sometimes if you want to head a certain course, do you have

23   to steer courses that are widely different than the course to

24   make it?

25   A.   Absolutely, yes.

1    Q.    Okay.

2          Were you the master aboard the *Ocean Ranger* for towing the

3    YFD 70?

4    A.    Yes.

5    Q.    Were you provided any special documents, or any documents,

6    I should say, in connection with that tow?

7    A.    I was provided with the tow plan, the amended tow plan.

8    Q.    Okay.  Any other documents you were provided?

9    A.    No.

10   Q.    Did you see a survey?

11   A.    No.

12   Q.    Did you see a ship survey from Captain Richard Shaw about a

13   survey?

14   A.    I did not see that survey.

15   Q.    Okay.

16         Could you tell the court what is the tow plan, or the

17   amended tow plan?

18   A.    An amended tow plan is, basically, a guideline that you

19   follow in regards to getting this tow from Point A to Point B.

20   It just, you know, suggests safe speed; weather parameters,

21   ideally; and, you know, wind, currents.  Basically, you're

22   looking at all the factors to get this tow safely from Point A

23   to Point B and things to take into consideration.

24   Q.    All right.

25         As a master of a tug, do you normally get tow plans for any

1  job?

2  A.   No, sir.

3  Q.   Okay.  And why did you get one for the YFD 70, for that

4  tow?

5  A.   It was a specialty tow.  Usually, like the tow-rig moves,

6  we would have a tow plan.  So, basically, something that is out

7  of the ordinary, we'll get a tow plan for, with a tow master,

8  sometimes, as the rig moves.

9  Q.   You mentioned there are a number of things in the tow

10  plans, such as weather and seas, and things like that.  Are

11  these -- when they're provided to you by Western for a job, are

12  these requirements you have to abide by, or are these merely

13  recommendations to you as master?

14  A.   It's a recommendation, and, ideally -- ideally -- you'll,

15  you know, stay beneath those guidelines, although it is, you

16  know, Mother Nature, and you can predict all you want but

17  sometimes you might, in turn, get, you know, a little snootier

18  weather than what was called for, briefly.

19  Q.   I put in front of you Exhibit 32.  Is this the amended tow

20  plan provided by Western?

21  A.   Yes, it is.

22  Q.   All right.

23       So under the section that says "Tow conditions," it says,

24  "Ideally, no more than eight- to ten-foot seas and 20 to 25

25  knots of wind."  Did you see that before you departed Seattle?

1    A.    Yes, I did.

2    Q.    And you mentioned the word earlier "ideally," and I see

3    that in the amended tow plan.

4    A.    Uh-huh.

5    Q.    When you read this sentence, what did it mean to you?

6    A.    It means using my best judgment, that I will proceed within

7    those parameters.  If -- occasionally, sometimes you'll have a

8    random set of waves that might come through from a very distant

9    storm, and it might go over 10 feet for a half-hour, maybe, or

10   even 15 minutes, it will bump up to 12 feet, and then back down.

11        So, to me, that means, like, you know, that's where ideally

12   comes in, where you have a slight exception for that

13   circumstance.

14   Q.    Okay.

15        Now, before you departed Seattle on this voyage, Captain

16   McGavock, did you have occasion to speak with anyone about the

17   tow?

18   A.    Yes.  I spoke with Bob Shrewsbury, Russell Shrewsbury, and,

19   briefly, with Richard Shaw.

20   Q.    Richard Shaw.  Now, who is Richard Shaw?

21   A.    He is the marine surveyor for Bowditch.

22   Q.    And when you saw Captain Shaw, where was that?

23   A.    It was when we were picking the tow up.

24   Q.    And where was that?

25   A.    In front of Vigor.

1  Q.   At Vigor.  So Captain Shaw was at Vigor when you made up to

2  the tow?

3  A.   Yeah.

4  Q.   All right.  And do you know why he was there?

5  A.   Just to see us off, I believe.

6  Q.   Okay.

7       And tell the court about your conversation with Captain

8  Shaw.

9  A.   I just, basically, said it was good to go.

10 Q.   Okay.

11      Did Captain Shaw, in your conversation, have any discussion

12 with you about the weather or sea conditions during the trip

13 from Seattle to Ensenada?

14 A.   No.

15 Q.   Did Captain Shaw say to you that, "I see there may be a

16 discrepancy between my recommendations and my survey and

17 Western's recommendations and their tow plan, with respect to

18 the weather conditions, and that causes me some concern"?

19 A.   No.

20 Q.   Did Captain Shaw ever mention to you any restrictions

21 regarding the seas or the weather when you met with him at Vigor

22 when picking up the tow?

23 A.   No.  I just saw the tow plan.

24 Q.   Did Captain Shaw ever tell you in that conversation that he

25 believed that there should be a hard line of ten-foot seas that

1    you should not surpass?

2    A.    No.

3    Q.    Did Captain Shaw ever have any discussion with you about

4    whether he placed limitations on the tow?

5    A.    No.

6    Q.    So, Captain, you said earlier that -- or words to the

7    effect -- in talking about the weather, the tow conditions,

8    about the "ideally, no more than ten feet," and I was getting

9    the impression that you need to exercise your judgment --

10   A.    Uh-huh.

11   Q.    -- in certain instances; was that correct?

12   A.    Yes.

13   Q.    All right.  So why, as master of a tug, do you have to

14   exercise judgment with respect to these weather and sea

15   conditions?

16   A.    Well, ideally, you want to get to your destination intact

17   with your tow, your crew, your vessel, no environmental damage,

18   and so you're going to use your best judgment and your past

19   experience to work off of that.

20        And at that point, I'd had a lot of experience with judging

21   the weather.  I'd sailed probably a hundred trips up and down

22   the West Coast.  I live on the Oregon Coast.  I watch the

23   weather.  I surf on the Oregon Coast.  And so I'm pretty in tune

24   with what's going on there.  And so in my best judgment, and in

25   talking with the owners, we decided to proceed.

1    Q.    Are you trained in weather?

2    A.    Yes.  I received a -- meteorology at the academy.

3    Q.    So you took courses in meteorology at Cal Maritime?

4    A.    Yes.

5    Q.    And as part of the job as master of a tug, are you required

6    to gather weather data and interpret weather data?

7    A.    Absolutely.

8    Q.    And the responsibility for the safety of your crew and the

9    safety of your tow and tug, whose responsibility is that?

10   A.    That's mine.

11   Q.    All right.

12         So when you go out on a voyage like this, or a trip, is it

13   your practice to collect weather information?

14   A.    Yes.  I use various tools.  I use NOAA, I use WindyTY,

15   Stormsurf.  There's several.  I use the weather charts that are

16   provided by NOAA, the weather maps.  So there's a lot of

17   different tools that you can turn to.

18   Q.    Okay.

19   A.    And so I just, kind of, take a variety of all those, and

20   then, kind of, make an average out of it, and -- because the

21   NOAA text forecasts, they generally overforecast, because

22   they're casting a broad net out, and they're going to give you

23   the worst possible conditions for that nav area, or for that

24   selected unit that they're covering; whereas, the weather models

25   give you a more precise idea of what's happening out there.

1    Q.    So when you said the NOAA information can tend to

2    overforecast, are you saying that, because it covers a broad

3    area of ocean, that may apply to some parts but may not apply to

4    other parts?

5    A.    Yes.

6    Q.    All right.

7          And you said that some of the other weather forecasting

8    information can be more accurate.  What are examples that you

9    use that you found to be more accurate?

10   A.    Oh, such as the weather model WindyTY.  You can pinpoint a

11   forecast for an exact area, and it will give you the swell

12   direction, swell height, barometric pressure; basically, any

13   information that you could ask for, it provides.

14   Q.    So has it been your general practice, in your 20-plus years

15   going to sea, to gather information from these sources, and then

16   make a determination on your own as far as what the weather will

17   be in the area that you're going to be proceeding?

18   A.    Yes, absolutely.  I was always taught to use every tool

19   presented to you and use your best judgment, after going through

20   all that information, to make the most prudent choice.

21   Q.    And did you follow your customary practice during the tow

22   of the YFD 70?

23   A.    Yes, I did.  I was watching, in person, the storm that we

24   were waiting for, where I live in Oregon.  And I remember

25   talking to the owners on the phone and saying, "Yeah, it's

1  pretty snooty down here."  Obviously, we're waiting for this

2  large system to pass, and that's why we waited -- I believe it

3  was ten days, or something like that.  And I routinely -- I just

4  look at the weather every day on the Internet, just out of

5  habit, even when I'm not working.

6  Q.   Okay.  So the storm you just referred to, was that

7  something that was occurring before you started the tow?

8  A.   Yes, that's the one that we waited for.

9  Q.   All right.  So were you part of the decision-making to

10  wait?

11  A.   Yeah.

12  Q.   So this tow was delayed because you felt that there were

13  weather conditions that were not sufficient?

14  A.   Absolutely.

15  Q.   Now, in the tow plan there's reference to a fellow named

16  Rich Courtney.  Do you know who Rich Courtney is?

17  A.   Yes.  I use him often.

18  Q.   And did the tow plan provide a provision for using

19  Mr. Courtney?

20  A.   Yes, it did.  And I believe Bob Shrewsbury had talked with

21  Rich prior to this voyage.

22  Q.   On the monitor in front of you is Exhibit 32, which we were

23  just talking about.  Does that show the reference to

24  Mr. Courtney?

25  A.   Yes.

1   Q.    Are you familiar with Mr. Courtney?

2   A.    I've never met him in person.  I've talked to him on the

3   phone for hours and hours.  He's very knowledgeable in Alaska,

4   but he has admitted to me before -- I had asked him a question.

5   I was northbound from Cedros Island, Mexico, with a very heavy

6   salt barge, and it was in December, and there was an approaching

7   system from the northwest, and I was concerned if I was going to

8   make it to Cape Flattery in time before it was forecasted

9   significant seas.  And Mr. Courtney said, "Honestly, Cap, I

10  don't have much expertise on the West Coast, so your guess might

11  be as good as mine."  And so he, flat, told me that, and I,

12  obviously, took him by his word, and we made it in the just fine

13  with all our salt.  So it was a good trip.

14  Q.    So in the past, you said you've used Mr. Courtney for

15  weather planning services.  Where have you used him?

16  A.    Just in Alaska.  I know, when I worked for Crowley, that we

17  used him for a job in Sakhalin Island, Russia.

18  Q.    And would you have any hesitation, if you had a question

19  about --

20  A.    Never, no.

21  Q.    -- routing --

22  A.    No.  I've called him many times in the middle of the night

23  when I've been worried about a situation out in Western Alaska,

24  in the Gulf of Alaska, and he's always been right there to, kind

25  of, ease your mind a little bit and say, Hey, you're good for

1    the next twelve hours, and whatnot.

2    Q.    Okay.  And you didn't call Mr. Courtney on this particular

3    tow?

4    A.    I did not, no.

5    Q.    Is that because of what he told you?

6    A.    What he told me before, and I just -- yeah, I felt

7    confident in the information that was presented to me and the

8    choice that I made.

9    Q.    Okay.

10   Let me ask you about the tug, what you do on board the tug.

11   Do you stand a navigation watch?

12   A.    Yes, I stand watch from 0700 to 1100, in the a.m., and then

13   from 1900 to 2300, in the evening, and I also take care of

14   various other things, you know, on my off-watch.

15   Q.    Just in case the court is not familiar with standing a

16   watch on a tugboat, what are you doing when you're standing

17   navigation watch?

18   A.    Well, first, you're looking out the window, and second,

19   checking your position.  You're looking at the radar, plotting

20   contacts on the radar, answering traffic, calling traffic,

21   calling people on the radio that you might have a crossing

22   situation with, getting weather; all kinds of different things.

23   Q.    Okay.  Let me focus on the last part.  You said "getting

24   weather."  What do you do to monitor weather when you're on

25   watch?

1   A.   When I'm on watch, I will download the latest forecast, and

2   then if I have Internet service, I'll look at the weather models

3   that I stated earlier.  And so that's usually, like, the first

4   thing I do after I've settled into the watch; make sure we're in

5   good water, no traffic, everything all looks -- at our weather

6   to make sure.

7   Q.   Who were the two other watchstanders on the *Ocean Ranger*?

8   A.   Kyle Jacobson was the second mate, and John Cowgill was the

9   chief mate.

10  Q.   Which watches did Kyle and John stand?

11  A.   Kyle stood 2300 to 0300, and then John stood 03 to 07.

12  Q.   All right.  So, basically, every eight hours, you come back

13  on watch?

14  A.   Correct.

15  Q.   All right.

16       And we mentioned earlier NOAA weather forecasts.  What time

17  do those come in?

18  A.   Those come out at 04 and 1600 Pacific Standard Time.

19  Q.   And whose watch would those have come in on?

20  A.   Those would have come in on Mr. Cowgill's watch.

21  Q.   So the other data, you mentioned these other sources that

22  you look at when you're on watch and -- well, actually, let me

23  ask you first:  Did Mr. Cowgill listen to the weather -- the

24  NOAA weather forecast on his watch?

25  A.   Yes.

1  Q.   All right.

2       And all these various weather information that you're

3  obtaining on the vessel, are they recorded in any way?

4  A.   I don't believe they're recorded.  We print them out when

5  we download the text forecast for the weather models, the NOAA

6  weather maps, and keep them for the time they're relevant for,

7  say, 48 hours, and then we'll just toss them in the wastepaper

8  basket after they're, obviously, not useful anymore.

9  Q.   Are they written down?  Do you have scratch pads or --

10 A.   Yeah, scratch pads, and, especially, listen to the VHF for

11 the forecast, or just try to figure out where we're going to be

12 down or trackline when this forecast is supposed to be valid.

13 So, yeah, there is a lot of scratch paper involved.

14 Q.   Okay.

15      And is the weather information, when it's -- you print out

16 the maps and you write it down, is that passed down from watch

17 to watch?  In other words --

18 A.   Yes.  We'll leave it on the chart table and say, Hey, have

19 a look at this, what do you think?

20 Q.   So do you have active discussions with your mates about

21 weather?

22 A.   Absolutely.  I like to get everyone's opinion.  Sometimes I

23 might miss something, or, you know, maybe someone -- like, John,

24 he was a Bering Sea fisherman for quite a while, and he has a

25 lot of weather experience, and so, Hey what do you think about

1  this forecast?  I like to ask my mates' opinion on various

2  things.

3  Q.    But as far as making decisions about course tracks and

4  whether you're going to go or not go, these types of decisions,

5  who makes those decisions?

6  A.    That's my decision.

7  Q.    With respect to the forecast, what are the periods of time

8  that you get forecasts for?

9  A.    You get 24, 48, 72, and 96.

10  Q.    Okay.  So there's an important issue in this case as to the

11  accuracy of forecasts.  So could you tell the court, based on

12  your 20-plus years of experience at sea, how accurate are these

13  forecasts?

14  A.    Usually the 24 to 48 is fairly accurate.  Beyond that, I

15  don't put a lot of faith into it.  It's more of a -- I don't --

16  there's not a percentage that -- how do I say this? -- I just

17  don't have a lot of faith beyond 48 hours.

18  Q.    Having found that beyond 48 hours, a forecast sometimes can

19  be on and sometimes can be off?

20  A.    Yes.

21  Q.    Okay.

22        This was a voyage along the Pacific Coast, from the most

23  northern spot to all the way to the south, going to Ensenada,

24  Mexico.

25        If you have bad weather, are there places you can duck into

1   along the coast to get out of the weather?

2   A.    Yeah.  There's the -- well, Grays Harbor would be the

3   first; Columbia River, Tillamook Bay, Yaquina Bay, Brookings,

4   Coos Bay.  But all those would -- I wouldn't put a lot of

5   faith -- I mean, the only one I think that would be able to

6   handle, with the best, perfect conditions to pull into would be

7   the Columbia River, and that's if -- if the weather is already

8   deteriorating to that point, then it's kind of a no-go.  You

9   don't want to cross the bar if it's already kind of snooty.

10  Q.    I think you were anticipating my next question, so let me

11  just ask it to be clear.

12        First of all, are you saying, in general, that there are

13  ports along -- between, say, Cape Flattery in Washington, down

14  to San Francisco, where a tug can go into with a tow, in

15  general?

16  A.    Yes.

17  Q.    Okay.

18        Now let's talk about this case, the YFD 70.

19        Are any of those ports realistic as -- I'll call it a port

20  of refuge, in case of a storm?

21  A.    Not in my opinion.

22  Q.    Now, you seemed to indicated there was some equivocalness

23  to the Columbia River.  Did I sense that correctly?

24  A.    Yes.

25  Q.    Okay.  So what did you mean by that with respect to the

1   YFD 70?  Why was that --

2   A.   I've done many bar crossings, both as a mate and as a

3   captain with various tows, towing oil barges, freight barges,

4   gravel barges, and the bar, it's very tricky.  I grew up fishing

5   down there.  My mother is from Astoria.  There's a lot of

6   currents.  The swell can be multiplied times two, even three on

7   a big ebb, and there's several large bends in the channel going

8   in there, so you probably have to require a pilot, probably two

9   assists with that.  And even then you're going to have -- it's

10  just -- it wouldn't be a good idea.  You'd probably have to get

11  clearance from captain of the port.  I think it would be a bad

12  decision.

13  Q.   So to sum up, the Columbia River Bar was not a realistic

14  port of refuge from the weather for the YFD 70?

15  A.   In my opinion, no.

16  Q.   Okay.

17       So is what you're saying, Captain, that if you're going to

18  depart on a voyage from Cape Flattery, at the northern part of

19  Washington, going down south along the coast, would the first

20  realistic port of refuge be San Francisco?

21  A.   Yes.

22  Q.   All right.  And does the Port of San Francisco pose risks?

23  A.   Yes.  It's also a tricky area.  I've had many crossings

24  down there as well.  I surfed underneath the Golden Gate Bridge

25  numerous times and gotten sucked through the -- almost out to

1   sea there.  It has lots of current.  You have fog.  It's kind of

2   a narrow fairway getting in there, so if you have an unwieldy

3   barge, you might be taking out nav aids as you're going in,

4   which you don't want to do.

5   Q.    When you say "nav aids," what are those?

6   A.    Challenge markers.

7   Q.    Buoys?

8   A.    Buoys, yes.

9   Q.    So during the approach to the San Francisco Bay, the

10  current can push an unwieldy tow around and threaten a buoy or

11  maybe even other vessels?

12  A.    Absolutely.

13  Q.    That is in the best of circumstances?

14  A.    That is in the best of circumstances.

15  Q.    Assuming that you have an option for San Francisco as a

16  port of refuge in bad weather, to depart from Cape Flattery, do

17  you need a stretch of weather that you feel like you can get

18  from Cape Flattery all the way to San Francisco?

19  A.    Yes, about five days, maybe six, depending on your speed.

20  Q.    Okay.  And I think you were anticipating my next question:

21  Again, with the YFD 70, based on the speeds you're going to

22  make, how long a period was it that you needed to get decent

23  weather for?

24  A.    That would be about six to seven days.

25  Q.    Now, what day did you depart Seattle?

1  A.    Oh, the 17th of October 2016.

2  Q.    And that was after the initial delay for weather, correct?

3  A.    Yes.

4  Q.    All right.

5        So what is the distance between Seattle and getting out to

6  the ocean?

7  A.    Oh, I believe it's 128 miles, roughly.

8  Q.    Okay.  And --

9  A.    A normal tow would be about 12 hours.

10 Q.    Are the waters of Puget Sound and into the Strait of Juan

11 de Fuca, are those relatively protected waters?

12 A.    Yes.

13 Q.    Those would not be considered open ocean?

14 A.    No.

15 Q.    When you get out past Flattery into the Pacific, is that

16 considered open ocean?

17 A.    Yes.

18 Q.    If you're going on a tow along the coast, is that

19 considered open ocean?

20 A.    Absolutely.

21 Q.    So if you have this boundary at Cape Flattery, between

22 relatively protected waters and the open ocean, is that a place

23 where you have to make a decision about whether you will take a

24 tow out or not?

25 A.    Yes.  And I have done that on numerous occasions, where

1   we've just jogged or went at anchor in Port Angeles and waited

2   for that weather to abate.

3   Q.   Can you tell the court about some of those decisions?  What

4   were the considerations that you incurred, prior to the YFD 70,

5   where you decided not to go?

6   A.   As opposed to -- I'm sorry?  What?

7   Q.   What were some of the considerations, in prior times, where

8   you got to Cape Flattery and decided not to go?

9   A.   Oh, I'd look at the weather buoys.  I'd look at the

10  forecast; maybe call a local NOAA forecaster.  There's a lot of

11  different tools you can use.  Maybe call an inbound ship that

12  just came in off the ocean, or an inbound tug, an inbound

13  fishing vessel.  There are a lot of ways to figure out what's

14  going on out there.

15       And, generally, if the forecast starts to improve and you

16  see the buoys start to come down, then you're like, okay.  As

17  long as you have this window to get -- let's say I was going

18  from Flattery to Portland, and that's about a -- or to Astoria,

19  it's about a 24-hour voyage, I want to make sure I have that

20  window, and so I wait for the buoys to come down, till they're

21  within my parameters.  I give myself at least 12 hours to get --

22  so I'd want 30, 36 hours to get down there.  So I'm looking

23  at -- a lot of different variables go into that decision.

24  Q.   And did you make a similar decision when towing the YFD 70

25  when you got to Flattery, about whether to go or not go?

1    A.    Yes.

2    Q.    And what did you decide?

3    A.    With all the information that I gathered, I decided to go.

4    It was within the parameters.  I knew that there was going to be

5    a little bit of a blow off of northern Oregon, but it was

6    flowing off the beach, so there's not much of a fetch to

7    generate a sea state.

8         So I knew the barge is going to be more affected,

9    obviously, by the sea state than the wind.  So, you know, it was

10   going to go five knots, predictably, above the tow-plan

11   parameters, ideally.  And I -- with my past experiences and my

12   judgment, I decided that it would be okay, and it was.

13   Q.    Okay.  You had a lot of information in that answer, so let

14   me see if I can unpack it a little bit.

15        First of all, definitionally.  You mentioned "fetch."  What

16   is fetch?

17   A.    Fetch is the distance over water that certain wind

18   direction will go, and that's, actually, what generates waves,

19   and then waves will generate swell, and then swell generates

20   ground swell, and so on.

21   Q.    So why was fetch relevant to your decision to go past Cape

22   Flattery?

23   A.    I believe we were approximately 18 to 20 miles off the

24   beach, and that's not a whole lot of fetch with that amount of

25   wind.  If it was blowing 80 off the beach, then it would be a

1    different story.  But 20 miles with 25, even 30 knots of wind

2    isn't going to generate more than, I would guess -- unless there

3    is opposing currents -- seven-, eight-foot seas.

4    Q.    Okay.  So your first point that you considered was whether

5    there was going to be a likelihood of generating significant

6    seas from the system that was coming through; is that right?

7    A.    Correct.

8    Q.    Okay.

9          And you mentioned seas and swells.  Okay.  We haven't

10   talked about that in the case so far.  Explain to the court the

11   difference between seas and swells?

12   A.    Seas are wind generated, local.  So, like, seas would be,

13   like, out here in Elliott Bay, if it was blowing out of the

14   north 30 knots, you'd have, maybe, four-foot wind-chopped seas

15   out in the bay.

16         A swell, that's been generated by the wind thousands of

17   miles away, perhaps, and it has a longer period between the

18   waves.

19   Q.    What's the significance of that difference between winds

20   and waves with respect to a tow, and particularly a tow like the

21   YFD 70?

22   A.    It depends on which direction it's coming from.  It's going

23   to be, in my opinion, less affected by the seas than the swell.

24   Seas might slow you down a little more if you're heading

25   directly into the wind or waves.  There's a lot of variables.

1    The distance apart the swell is; if the seas and the swell are

2    from the same direction or opposing.  It's a pretty dynamic

3    environment, so...

4    Q.    Okay.

5          And in the amended tow plan that you were given, it said,

6    "Ideally, no more than eight- to ten-foot seas."  During that

7    initial low-pressure system that came through -- that was going

8    to come through shortly after you left -- "shortly," meaning

9    within a day or so -- was it forecasted to have seas in excess

10   of ten feet?

11   A.    No.

12   Q.    And, in fact, when you went through that storm, did you

13   have seas that were less than ten feet?

14   A.    Yes.

15   Q.    All right.  Now let's talk about the winds.

16         The recommendations said, "Ideally, no more than 20 to 25

17   knots of wind."

18   A.    Uh-huh.

19   Q.    Did you receive a forecast from NOAA that indicated that

20   there may be 20- to 30-knot winds?

21   A.    I believe so.

22   Q.    Okay.  So I'm looking at the numbers.  That forecast, winds

23   possibly up to 30 knots, and you said ideally, no more than 25

24   knots.  Were you aware of that when you made your decision?

25   A.    Yes.

1  Q.   Okay.  Please tell the court why you felt it was safe to

2  proceed.

3  A.   Like I said earlier, I knew the wind was going to be

4  blowing off the beach, so there would be less of a sea state

5  involved, and five knots blowing on your beam isn't going to

6  make much of a difference at those lower wind speeds.

7  Q.   When you say "five knots," what do you mean?

8  A.   The tow plan said no more than 20 to 25, and NOAA had said,

9  you know, up to 30 possibly, and that's possibly, it's not 100

10  percent.  And like I said, with my past experiences, I, in my

11  best judgment, went out, and it was a nonissue.  The barge did

12  fine -- or I'm sorry -- the dry dock.  And -- yeah.

13  Q.   So in your professional judgment as a licensed captain

14  aboard towboats, with more than 20 years experience, that

15  because the forecast provided for seas that were going to be

16  less than the recommendations in the tow plan, and the winds

17  were only going to be five miles per hour higher than the 25

18  recommended limit, that it would be safe to proceed?

19  A.   Yes.  If it was five feet over the wave height, then I'd

20  say absolutely not, you know, if it's 15 foot.  That will affect

21  the tow a lot more drastically than five knots of wind.

22  Q.   And is that because -- I think you mentioned earlier that

23  the seas are really the more important -- seas and swells are

24  more important than the wind?

25  A.   The sea state, yes.

1  Q.   Okay.

2       Now, did you actually encounter weather when you left

3  Flattery?

4  A.   No, not for the first 36 to 48 hours, I believe.

5  Q.   And that was my bad question.  Let me say it again.

6       Did this storm or this low-pressure system that was

7  forecast, did you actually encounter that?

8  A.   Yeah.  It wasn't a storm by any means.  I would just call

9  it a local weather system that passed through quickly.

10 Q.   All right.  And did you get winds as forecast, 20 to 30?

11 A.   There might have been a gust to 30.  I'd have to look at

12 the logbook.

13      MR. HOWARD:  Can you pull up the logbook, Exhibit 33?

14 Q.   (By Mr. Howard)  Is this the page of when you came through

15 the area around the Columbia River?

16 A.   Yes.

17 Q.   Okay.

18      And was that the low-pressure system you encountered?

19 A.   Yeah, I wouldn't call it a low pressure -- yeah, just the

20 system.

21 Q.   Okay.

22      So what were the winds that you recorded in your log?

23 A.   It looks like southeast 25 to 30, and then looks like the

24 sea state of seven to nine feet.

25 Q.   Okay.  So there's one entry at 1400 at southeast to 30 to

1    35; am I reading that correctly?  1400?

2    A.    Oh, okay.  Yes.  That would have been on Kyle's watch.

3    Q.    Okay.

4          One thing about the logs:  How are these numbers recorded?

5    Do you have machines on the tug that tell you what the wind and

6    seas are?

7    A.    We have an anemometer, which measures wind velocity.

8    Q.    And does that give you an accurate presentation?

9    A.    I -- you don't really -- I don't trust them.  It's more of

10   a visual, going off the -- you know, the Beaufort scale.  You

11   compare a picture to what's outside your windows, and then that

12   gives you a reference of, Okay, well, this sea state is showing

13   Beaufort winds from 28 knots.

14   Q.    So these numbers in here are a seaman's estimates based

15   on --

16   A.    We look at the anemometer.  It's not going to be very

17   accurate if you're doing six knots directly into the wind.  You

18   can add the six knots.  They're just not the most accurate

19   thing, because we're always moving.  Even if the boat's, you

20   know, pitching and rolling, that's going to affect the

21   anemometer.  It is just a deal that spins on top of a stanchion

22   on top of the super structure.

23   Q.    Okay.  And what was the highest seas in coming through this

24   system?

25   A.    It looks like nine feet.

1    Q.    Okay.  And that was within the parameters of the tow plan?

2    A.    Yes.

3    Q.    All right.

4          Did you have any problems with the tow when coming through

5    this system?

6    A.    No, it handled fine.

7    Q.    All right.

8          The events that we're here about took place approximately

9    five days later, so I'm just going to ask you, in general:  Did

10   you have, over the next five days, until you got to the city of

11   San Francisco, did you experience any problems with the tow?

12   A.    No, sir.

13   Q.    Now, do you normally check the tow when you're towing?

14   A.    As far as, like, physically go on it?

15   Q.    Well, do you -- in other words, the tug is here and the tow

16   is back there.  Do you ever look back at it?

17   A.    Oh, absolutely.

18   Q.    Okay.

19   A.    The first thing you do when you come on watch is look out

20   the back window.  You spend a lot of time just staring aft.

21   Q.    Tell the court -- explain to the court what is your normal

22   routine -- and specifically what was your routine during this

23   voyage with the YFD 70 -- that you and the crew did for checking

24   the tow.

25   A.    I would come up on my watch -- actually, before watch.  I'd

1  make a round.  I would look out the back deck, make sure -- look
2  at the tow from that position, and then go up and look at it
3  from the aft controls, which is the next deck up off the main
4  deck, where you have a good view of the tow wire and your tow.
5  And then go into the wheelhouse, ask the watch how's the tow
6  been behaving, has the weather been deteriorating, has it been
7  the same, what's the traffic?  But, yeah, obviously, the tow is
8  the first thing you're going --
9  Q.   What types of things are you looking for when you're
10 looking back and checking the tow?
11 A.   Just checking to see how it's tracking.  You're making sure
12 it hasn't developed a list, the nav lights are functioning, your
13 cargo is still secure.
14 Q.   So one of the things that's important to you is to see if
15 tow develops any damaged such that it could be listing, taking
16 on water?
17 A.   Yeah, that's, primarily, the first thing that you're going
18 to check --
19 Q.   Okay.  So in the --
20 A.   -- that and the strain on the tow wire.
21 Q.   Okay.
22      So in the five days or so between leaving Flattery and
23 going through this initial storm, and then going all the way
24 down to San Francisco, did you ever notice a list or any other
25 problem with that tow, the YFD 70?

1  A.    No.

2  Q.    All right.

3        Now, you raised the point earlier, when I was asking about

4  checking the tow, can you go on board and check the tow?

5  A.    Generally not on an open-ocean tow, unless it's flat calm.

6  Q.    Why is that?

7  A.    Just, if you go alongside, there's two large moving things,

8  and the seas will, obviously, bash them together and damage one

9  or the other, and it's not -- just not safe.

10 Q.    Okay.

11       So if there was something going on on the tow, like, say,

12 for instance, a tow, you had a structure failure that was

13 letting water in, would you be able to determine that?

14 A.    Not in the open ocean, no.

15 Q.    So now let's jump ahead.

16       You, at some point, noticed, or your crew noticed, a

17 problem with the tug; is that correct?  With the tow.

18 A.    With the tow, yes.

19 Q.    Okay.  And when was that?

20 A.    I believe it was around 1400 or so.  I got up from a nap

21 after lunch there and went up to the wheelhouse to check the tow

22 and see how things were going, and I can't remember if it was

23 Kyle or John that said, "Hey, it looks like we might be

24 developing a list to port."  So I looked at it and looked at it

25 and looked at it again, and I was, like, "Oh, yeah, actually, it

1  looks like you're right."

2       And so from then, on, someone was always looking at it, and

3  slowly it got a little more, and so on.

4  Q.   Okay.

5       And pulling up the logbook, Exhibit 33, for October 25th.

6  Does that refresh your recollection, the date of when this

7  problem developed?

8  A.   Yes.

9  Q.   All right.

10      And you mentioned -- there is an entry there, "1430,

11 noticed tow has port bow list, altered course for San Francisco

12 Bay."

13      So was 1430 the time it was noticed, or was it prior to

14 that time?

15 A.   No, that was the time it was noticed.

16 Q.   Okay.

17      And you said that the mates had discovered it.  So did that

18 occur during their watch?

19 A.   Yes.

20 Q.   All right.

21      And where were you at the time that they first noticed a

22 possible issue?

23 A.   I believe -- they didn't -- I got up -- like I said, I got

24 up -- took about an hour nap after lunch, and I got up, and, oh,

25 that must have been about 1400, and they notified me that, you

1  know, it looks like it's got a slight port list, and all three

2  of us sat there and looked at it for a while and all concurred

3  that, yes, it's definitely listing.

4  Q.    Okay.

5        You said that you stand the 7:00 to 11:00 watch.

6  A.    Uh-huh.

7  Q.    So you would have been on the watch the morning of the 25th

8  between 0700 and 1100, correct?

9  A.    Uh-huh.

10  Q.    And were you checking the tow during your watch?

11  A.    Yes.

12  Q.    During your watch, when you left at around eleven o'clock

13  in the morning, did you notice any problems with the tow?

14  A.    I did not.

15  Q.    All right.  So the mates come and advise you that they

16  think there is an issue.  Okay?  When you came up to the

17  wheelhouse, what did you see?

18  A.    I saw -- it was a little hard to tell because the seas and

19  the swells were coming -- if this is the dry dock, the seas and

20  swells were coming and hitting the starboard aft quarter, or

21  stern, and so it was kind of pushing the dry dock like that, and

22  so it was kind of doing this.  So you really have to watch it

23  for a while to see if it is truly a list or if it's just the

24  motion that it's making within the conditions of the sea.

25        So like I said, we watched it for a half hour, at least,

1   until we noticed that it, indeed, did have a slight port list.

2   Q.   And when you say a "slight port list," were you able to

3   determine -- I realize it's a dynamic environment, it's moving

4   all the time, but were you able to make any determination about

5   how much list it had?

6   A.   My best guess would be less than a foot, maybe.

7   Q.   Okay.  All right.

8        So when you confirmed, in your mind, that you thought it

9   had a slight list, what did you do?

10  A.   I notified Western Towboat.

11  Q.   All right.  And how did you do that?

12  A.   Sat phone.

13  Q.   Sat phone?

14  A.   Uh-huh.

15  Q.   Okay.

16       And did you have one discussion or multiple discussions

17  with --

18  A.   We had multiple discussions.

19  Q.   Okay.

20       And in general -- not the specific conversation, but, in

21  general, what did you talk about and what was decided?

22  A.   Well, I continued to monitor it over the next several --

23  well, the whole time period until it sank.  But throughout that

24  time, I was talking with the owners about, you know, is it

25  changing, is it getting worse, do we need to come up with a

1  plan?  And so I was calling them probably every half hour.  We

2  determined, indeed, it was getting worse.  And it was coming

3  down by the bow as well, and that's when we figured we've got an

4  issue here.  It wasn't just the list.  It was coming down by the

5  head.

6  Q.    And did you make any changes to your tow plan?

7  A.    Yes.  The owners talked to Vigor and notified Coast Guard

8  Sector San Francisco, and we started to develop a plan to go

9  into San Francisco Bay.  And I believe they were going to

10  de-water it and throw a soft patch or a weld over it, if they

11  found where the water ingress was coming from.

12  Q.    You said "a soft patch."  What is that?

13  A.    It's just a temporary weld, or sometimes it's composite,

14  that they'll put over a damaged area or a hole or a thru

15  fitting.

16  Q.    Okay.

17        So in these conversations with Western, the owners of the

18  tug, did anyone ever tell you who was going to do that, the

19  patch?

20  A.    I believe Vigor was going to fly down or drive down.

21  Q.    All right.

22        So you altered course for San Francisco.  When did that

23  occur?  And the log is in front of you if you need to look at

24  that.

25  A.    Let's see.  That was at 1430.

1    Q.    All right.

2          Now, did you go to San Francisco?

3    A.    No.  Over the next several hours, it got drastically worse,

4    and then it kind of stabilize for a bit.  And I spoke with the

5    owners, and I said, "I don't feel comfortable towing this into

6    the bay," given my past experience and knowledge of the area and

7    with the tow in this condition, and so we decided not to go into

8    San Francisco Bay from there.

9    Q.    Who made that decision?

10   A.    Well, I, ultimately, made it myself, as the master, and the

11   owners backed my decision.

12   Q.    So in a situation where the tug owner, Western, and,

13   apparently, the dry dock owner, Vigor, wanted you to go to San

14   Francisco, were you authorized to override that and --

15   A.    Yeah.

16   Q.    Okay.  Why is that?

17   A.    As a master, you're, ultimately, responsible for the vessel

18   and the safety of the crew and everything.

19   Q.    Okay.

20         And what were some of your considerations in deciding not

21   to go into San Francisco?

22   A.    Like I stated earlier, there's lots of traffic, and it's

23   one of the busiest -- second -- third busiest port on the West

24   Coast.  It's a bar, so it's going to amplify the swell, if there

25   is any, which, at that point, we don't want any further damage

1   to occur to the dry dock.

2       It's a narrow fairway going in there, as I said earlier.

3   So with a tow, you have to get the tow up closer to you, and if

4   it's not in a good, towable condition, with a good rake and the

5   bow up out of the water -- in this case, the bow was already

6   down in the water a little bit with the list -- that tow is just

7   going to be going like this, back and forth.  So it just

8   wouldn't be a good idea.

9   Q.   So it was dangerous?

10  A.   Yes.

11  Q.   And you didn't want --

12  A.   I figured a worst-case scenario, if it does sink in the

13  middle of a major, major navigational thoroughfare, then it's

14  going to be a bad deal.

15  Q.   That's great point, Captain.

16      Sinking -- it eventually sank, but at this time did you

17  have a belief it was going to sink?

18  A.   I did not.  I started preparing for the worst-case

19  scenario, just to be prudent, think ahead.  But from what I was

20  told, it had three sections, and at this point I figured it was

21  just the forward section that was damaged.

22  Q.   Okay.  So let's talk about that.  That's important.

23      So you said the dry dock had three sections.  What did you

24  understand?

25  A.   I understood that there was a forward section, a midship

1  section, which was the largest, and then a stern section.

2  Q.    And why was that relevant to your belief that it was not

3  going to sink, despite the fact it was taking on water?

4  A.    Well, at this point, just with the center deduction, with

5  the aspect of the tow being down by the head with the port list,

6  I assumed it was the forward section that had water in it, and

7  that's one of the smaller sections.

8        Hopefully, the midship section and the stern section are

9  still structurally intact and have enough reserve buoyancy.  So

10 that forward section could be completely flooded, but all that

11 air, reserved buoyancy in the after sections are going to keep

12 the dry dock afloat.

13 Q.    Did you get any information from your many discussions with

14 the owners where they indicated to you or that Vigor had

15 indicated to them that the dry dock would stay afloat, despite

16 taking on water?

17 A.    Yeah.  We all, you know, thought that, yeah, it's going

18 to -- it's going to float, even if that forward section

19 completely floods, and that's what I deducted from the

20 conversation with the owners and just through what I was seeing

21 firsthand.

22 Q.    Okay.

23       You said you were monitoring the dry dock during this time.

24 Did you get any other information about the condition of the dry

25 dock from other sources?

1    A.    Yes.  After Coast Guard Sector San Francisco was notified,

2    they sent a helo out to just kind of check over the scene, you

3    know, in case things turned for the worst.  And I asked them to

4    hover over the dry dock and see if they could see any apparent

5    damage or anything was obvious to them.  I asked them if they

6    could tell if the stern section was still out of the water.

7          So they were very helpful.  They gave me a lot of relevant

8    information that I couldn't deduct from my perspective.

9    Q.    Okay.  So this is actually information, you talking by

10   radio to the helo --

11   A.    Yeah.  I believe we were on 22 Alpha on the VHF radio.

12   Q.    Okay.  Was any of the information that you were provided by

13   the Coast Guard overflight of the dry dock, did that raise any

14   concerns, in your mind, that the dry dock may sink?

15   A.    At that point, no.  I had felt fairly confident that it was

16   going to be -- it was going to be okay.

17   Q.    Now, you said you made a decision to not go into San

18   Francisco.  What did you decide to do next?

19          THE COURT:  Counsel, hang on.  Maybe before we go into

20   that, it would be a good time for our break.

21          Captain, we're about to take our mid-morning break for

22   about 15, 20 minutes, but I have a couple of questions.

23          When you take a tow like this, something that's a bit out

24   of the norm --

25          THE WITNESS:  Right.

1          THE COURT:  -- is it your practice, at all, to ever go

2     on board and take a look at the object -- the dry dock, in this

3     case -- that you'll be towing?

4          THE WITNESS:  At times, yes, there have been

5     circumstances where I've walked around with the marine surveyor;

6     other times, no.  In some of the rig moves, you never go walk

7     around with the surveyor.  It all depends just on the

8     circumstances.

9          THE COURT:  In this particular case, you had the

10    survey done by Captain Shaw?

11         THE WITNESS:  Yes.

12         THE COURT:  Did anything in that survey give you

13    pause, hesitation, concerns?

14         THE WITNESS:  Absolutely not.  I was just concerned

15    about the age.

16         THE COURT:  Once you are underway, I understand it's

17    next to impossible, for safety reasons, for you to ever go on

18    board.  When you see it start listing, and you watch it for a

19    while, is there a certain point that it gets to when you

20    realize, uh-oh, we have a real problem here?

21         THE WITNESS:  Yes.

22         THE COURT:  And what is that point?

23         THE WITNESS:  That gets back to the point of how much

24    reserve buoyancy you have, and you're going to have to look at

25    the blueprints and whatnot of the vessel, and you have to figure

1    out which compartments are compromised.

2        But, you know, once -- if something is halfway submerged

3    for its size, then it's becoming a problem.  At this point, it

4    was not.

5              THE COURT:  All right.  We'll come back and start up

6    there.

7              MR. GASPICH:  Your Honor, just a point of

8    clarification.  I think the witness testified -- you asked him

9    about Shaw's survey.  He testified earlier he did not see Shaw's

10   survey.

11             THE COURT:  Thank you.

12        All right.  We'll be at recess for 15 minutes.

13             (Court in recess 10:31 a.m. to 10:50 a.m.)

14             THE COURT:  Counsel, you may proceed.

15             MR. GASPICH:  Thank you, Your Honor.

16   Q.  (By Mr. Gaspich)  Captain McGavock, I want to follow up on

17   some of the questions the judge asked you just before we broke.

18        To clarify, you did not see Captain Shaw's Bowditch survey

19   report; is that correct?

20   A.  No.

21   Q.  Okay.

22        Your sole contact with Captain Shaw was in that meeting

23   when you picked up the dry dock at Vigor?

24   A.  Yes.  When everyone was there, yes.

25   Q.  Okay.

1       And the court also asked you about an inspection, or

2   whether you inspected the barge.  Did you yourself inspect the

3   barge?

4   A.   I did not physically go on the barge.  I drove, kind of, up

5   and down on the tug so I could visually, you know, get close to

6   it and see and just inspect for, you know, any obvious big dents

7   or cracks or anything like that.  But I did not physically get

8   up on the barge -- or dry dock.

9   Q.   There was testimony in the case about how the barge --

10  excuse me, the dry dock, pardon -- the dry dock, that all the

11  pipes that were used for sinking this -- when it actually

12  operates as a dry dock -- that interconnect at the spaces, that

13  all of those were closed off and blank, and they were trying to

14  seal various parts to segregate it out.  You have no personal

15  knowledge of whether any of that was done?

16  A.   I'm taking a professional's word that it's been done.

17  Q.   Right.  And you don't know if it was done correctly?

18  A.   I don't.

19  Q.   And is it part of your job, as a tug master taking on a

20  tow, to go inspect that type of work on a tow?

21  A.   Not all the time, no.

22  Q.   Now, prior to the break, we talked about going to San

23  Francisco, and you testified that you made a decision that you

24  did not want to go there.  So let's talk about where you decided

25  to go.

1     Where did you decide to go when you made the decision not

2  to go to San Francisco?

3  A.    In talking with the owners, the next plan of attack was to

4  possibly go to Monterey Bay, and have someone come out -- bring

5  some equipment out on a crew boat, or smaller vessel, to get

6  access to the dry dock and inspect it and see if they could, you

7  know, do some work on it out there.

8  Q.    There's a chart on the easel right there.  Could you just

9  step down and point out where Monterey Bay is?

10  A.    It's kind of the half coin here, and it's, basically, from

11  Santa Cruz down to Monterey proper and Carmel.

12         MR. BOYAJIAN:  We can't see that, and I notice the

13  judge and the judge's clerk also can't.  Would it be okay to

14  pull that out and put it by the jury box?

15         THE COURT:  Sure.  Absolutely.  Anywhere you can see

16  it better.

17         MR. GASPICH:  For the rest of my examination, Your

18  Honor, I'm going to pull up a chart and do it electronically.

19         THE COURT:  I think that will work better if you pull

20  it up on the screen.

21         MR. GASPICH:  Yeah, I think so.  It was just

22  convenient at the time.

23  Q.    (By Mr. Gaspich)  So you said that there was discussions

24  about trying to do repairs in Monterey Bay.  Did you think that

25  was a good idea, a bad idea?  Did you have any thoughts about

1  it?

2  A.   I wanted more time to assess the situation, and

3  approximately at this time a fog bank rolled in, which obscured

4  our visibility to the tow.  And so at that point, it was hard to

5  determine, you know, whether it was getting worse.  It had just

6  evened out as far as the list and the trim.

7       So we discussed, and I felt it was most comfortable, A,

8  since I could not visually see the barge, and B, just thinking

9  worst-case scenario, we'll try and, you know, head out until

10 daylight and the fog breaks, and I'll try and get out to deeper

11 water, and then reassess the situation, in daylight hours and

12 hopefully with no fog, the next morning.

13 Q.   Okay.  So you said "deeper water."  Did you have a specific

14 destination that you wanted to go to?

15 A.   I was trying to get to Pioneer Canyon.

16 Q.   Okay.  Hold up.  We're going to pull up Exhibit A-90, which

17 is a NOAA chart.  Does this show the area around San Francisco

18 Bay?

19 A.   Yes.

20 Q.   Okay.

21      Can you point out, on the screen for the court, where

22 Pioneer Canyon is?  There should be a highlighter function.  I

23 think you can use your finger on the screen.

24 A.   Is that showing up?

25           THE CLERK:  Counsel, I've changed it to red.

1    A.    Now I got it.

2    Q.    (By Mr. Gaspich)  Could you circle it again?

3    A.    Yeah.

4    Q.    Okay.  Great.

5          And Pioneer Canyon, I notice to the right of that area is a

6    blue line.  What does that blue line signify?

7    A.    That's the Monterey Bay Sanctuary.

8    Q.    And is the area you were heading, Pioneer Canyon, is that

9    inside or outside --

10   A.    Outside.

11   Q.    That's outside the marine sanctuary?

12   A.    Yes.

13   Q.    Okay.

14         Now, what time did you make the decision not to continue

15   proceeding into San Francisco Bay but to proceed out to deeper

16   water in Pioneer Canyon?

17   A.    I believe it was around 1900 or so.  It was after dinner.

18   Q.    Okay.  And if we could pull up the logs.  Do you have an

19   entry that reflects that decision?

20   A.    Yes.

21   Q.    What does it say?

22   A.    "Western Towboat office directed vessel to head to Monterey

23   Bay due to its condition.  Coast Guard Sector San Francisco

24   notified."

25   Q.    But your testimony is you didn't head to Monterey Bay.  You

1  headed out to Pioneer Canyon; is that correct?

2  A.   That's correct.

3  Q.   All right.

4  A.   I guess I didn't make a log entry for my last decision to

5  head for Pioneer Canyon.

6  Q.   Okay.

7       And I asked you earlier -- you had an entry at 1400

8  regarding discussions with owners.

9  A.   Uh-huh.

10 Q.   With this entry at 1900, did all of this happen at 1900, or

11 was this a series of events that were going on throughout the

12 day?

13 A.   It was, kind of, a series of events.  I mean, it didn't

14 specifically happen right at 1900.

15 Q.   When did you make your course change to head out to Pioneer

16 Canyon?

17 A.   I believe it was 2000 -- 2100.  I was having trouble

18 turning it at this point.  And as I said before, I couldn't see

19 it, and the Coast Guard helicopter had to go back to base

20 because their visibility was restricted.  They said, "It's not

21 safe for us to be out here anymore," and so I lost my ace in the

22 hole there.

23      So I was trying to turn the tow, and the courses don't

24 actually reflect what's going on there.  So I was trying to turn

25 and head in a southwest direction, but at that point it was

1  getting unwieldy.  It was hard for me to get it to do what I

2  intended it to do.

3  Q.    Okay.  Let's talk about that.

4        So what was making it difficult for you now to handle this

5  dry dock?

6  A.    Well, at this point, I couldn't see it.  I dropped back

7  twice, which means I -- it was dark and foggy, and when you drop

8  back, it means you real your tow wire in to a shorter length.

9  Q.    So you're closing the distance between the dry dock and the

10  tug?

11  A.    Exactly.

12        And I got up to -- oh, it was about 800 feet behind me,

13  just so I could say I saw it, but it seemed to be getting worse,

14  but it was very hard to tell.

15  Q.    What was your visibility?

16  A.    I'd say -- well, the viz was probably a quarter mile,

17  maybe, if that.

18  Q.    Okay.  So what time was this?

19  A.    At this point, after the second time I reeled it in, I

20  didn't really feel it was the safest thing to be reeling in if

21  it, in fact -- I couldn't see it -- was sinking.  I was, you

22  know -- so it was a large hindrance there to see what exactly --

23  I just had the radar to observe.

24  Q.    Let's take a step back, because these are important events.

25        First of all, when you were called up to the wheelhouse at

1  1430 in the afternoon, did you remain in the wheelhouse for the

2  rest of that day?

3  A.    Yes.

4  Q.    Okay.  So past midnight?

5  A.    Yes.  Just about -- yeah, after -- after midnight,

6  midnight-thirty.

7  Q.    So you have personal knowledge of everything that went on

8  during that time?

9  A.    Yes.

10 Q.    Okay.

11       Now, what time was sunset?

12 A.    It was right around 1900, 1830, but it might have been a

13 little earlier with the reduced visibility.

14 Q.    So with the reduced visibility after 1900 or so, you had

15 issue with this pea-soup fog you talked about, and also it was

16 getting dark?

17 A.    Yes.

18 Q.    And did that make it difficult to see the barge?

19 A.    Very difficult.

20 Q.    And you mentioned that you tried to shorten the tow wire --

21 A.    Uh-huh --

22 Q.    -- to get a look at the dry dock.  I wasn't clear.  Did you

23 ever get a look at it, or not?

24 A.    I was able to see the port and starboard running lights,

25 but I didn't get a good aspect as to the silhouette of the dry

1    dock.

2    Q.    What was the timeframe when you shortened your wire to drop

3    back?

4    A.    Oh, it was probably 20 minutes, maybe.

5    Q.    No, just within this timeframe between 1430, when you first

6    came up, and --

7    A.    It was probably, oh, around 2100 or so, maybe.

8    Q.    And besides seeing the running lights, were you able to

9    tell the condition of the dry dock, in any way, with respect to

10   the list?

11   A.    Not really, no.

12   Q.    Okay.

13         Was there any information you gathered -- you said that you

14   earlier had Coast Guard helicopters flying over that provided

15   some information --

16   A.    Uh-huh.

17   Q.    -- and I take it, at this point, after it became dark and

18   the fog came in, you no longer had the benefit of that?

19   A.    That's correct.

20   Q.    So after 1900, through the rest of the night, until the

21   events surrounding the vessel capsizing and sinking -- we'll do

22   that -- but did you ever get a good look at the dry dock to be

23   able to determine what its condition was?

24   A.    No.

25   Q.    Okay.  All right.

1          Now, I want to go back to your decision to head for deep

2     water in Pioneer Canyon.

3          Now, at the time that you made that decision, where was the

4     tug?

5     A.    We were off the western inbound/outbound traffic lanes off

6     of San Francisco Bay.

7     Q.    Okay.

8          And I don't see the traffic lanes represented on this

9     exhibit.  Are there multiple traffic lanes to San Francisco?

10    A.    Yes.  There's northern, western, and southern.

11    Q.    All right.

12         And without having the advantage of having those on here,

13    are you able to indicate, just in general, where you were at the

14    time that you were turning to go to deep water?

15    A.    Yeah.  Right there, approximately.

16    Q.    Okay.  All right.  And we have a line and a circle --

17    A.    I didn't mean to do the line there.

18    Q.    That's fine.

19         So are you indicating in the area of the circle?

20    A.    In the area of the circle, correct.

21              THE COURT:  Counsel?

22              MR. BOYAJIAN:  If I may?  We have an exhibit that

23    shows the plot entries from the *Ocean Ranger*.  Jeff Slesinger

24    testified they were accurate and made off the logs.

25         If we're going to talk about the position of the vessel,

1   can we please use the chart that shows the scale?

2          MR. GASPICH:  Your Honor, we would like to show that

3   Jeff Slesinger's drawings were not accurate, so I'd like to use

4   this, if possible.

5          THE COURT:  Your witness.

6   Q.    (By Mr. Gaspich)  So did you lay a course for Pioneer

7   Canyon?

8   A.    After, oh, about 2000 or so, I just said -- taking into

9   account, you know, the worse thing that could happen, I felt it,

10  you know, safe.  And like I said before, the restricted

11  visibility, darkness, et cetera, I just thought it would be safe

12  to get outside, get out of the Farallones, get out past Monterey

13  Bay, and head for deep water.  I took the tailhold off the tow

14  winch wire.

15  Q.    Let me just stop you.  I want to just focus on the one

16  question.

17         Did you lay a course from the position outside the central

18  traffic lanes, out toward Pioneer Canyon?

19  A.    Yes.

20  Q.    Okay.  And how did you do that?

21  A.    Used RBO off of our Rose Point program.

22  Q.    Okay.  So a lot of letters, a lot of names.  Can you

23  explain to the court what that means?

24  A.    It's, basically, a line that's a point in the compass rose,

25  a direct line, and it's a line that you could just put down that

1  you intend to follow to make it from Point A to Point B.

2  Q.    Okay.  And what does that line signify?

3  A.    It signified the route -- the course that I would like to

4  take to get from where we were at that time to, worst-case

5  scenario, if this thing decides to go down.

6  Q.    Okay.  Navigation lesson for the court.

7        Is the course you steer necessarily the course made good?

8  A.    No.

9  Q.    Why is that?

10  A.    Different effects; winds, currents.  Like I said, if you

11  have an unwieldy tow, you could be steering in this direction

12  but the tow is trying to take you a different direction;

13  therefore, your course over ground is a completely different

14  direction.

15  Q.    In the context of a vessel -- in this case, a dry dock

16  that's taking on water -- what types of things might affect it

17  that would take it in a different direction from the direction

18  you want to tow it?

19  A.    So in this case, from my last visual on the dry dock, it

20  was listing and down by the bow a little bit, and so that is

21  going to affect how I am able to steer it, because it's trying

22  to pull the tugboat one direction.

23        So you're unable -- if I wanted to intend down this track

24  line, it's pulling my heading off to a different direction.  So

25  I might be steering, say, 162 to make good a course of 220.  So

1   I'm trying to go this way, but steering -- it's a
2   dynamic-position-type deal where the barge will overrule what
3   you're trying to steer.
4   Q.    And with this listing dry dock, that appears to you to be
5   taking on water, were you experiencing that affect when you were
6   trying to tow from the traffic lanes out to Pioneer Canyon?
7   A.    Yes.
8   Q.    And how would you describe that effect?  Was it
9   significant?  Minor?
10  A.    It was very significant.
11  Q.    Okay.  Was it difficult to tow the dry dock on your course
12  set out for Pioneer Canyon?
13  A.    Yes.
14  Q.    Okay.
15        Now, let's talk about counsel's point and the Jeff
16  Slesinger exercise.
17  A.    Uh-huh.
18  Q.    In normal course of your practice as a professional
19  mariner, do you record positions of the tug, during a voyage, in
20  the logbook?
21  A.    Yes.
22  Q.    Okay.  Was that done during this voyage?
23  A.    Yes.
24  Q.    Have you gone back, in preparation for your testimony
25  today, and plotted the positions in the logbook on a chart?

1    A.    Yes, I have.

2    Q.    Okay.

3          And do the lines in Mr. Slesinger's plot there reflect the

4    course or a course made good of the tug at this time?

5    A.    Not exactly, no.

6    Q.    Did Mr. Slesinger leave out some positions?

7    A.    I believe so.

8    Q.    Okay.

9          When you did it and you plotted it -- and let's

10   specifically talk about the position when you made the turn at

11   the traffic lanes out to Pioneer Canyon -- what course did you

12   make good?

13   A.    187.

14   Q.    Okay.  187.  And what is that course?

15   A.    That is just west of due south.  So due south is 180, so

16   it's 7 degrees --

17   Q.    So you're, essentially, going south; a little bit off, but,

18   essentially, going south?

19   A.    Uh-huh.

20   Q.    And when we say, again, "course made good," was that the

21   actual track that the tug and the tow was taking?

22   A.    Yes, over the earth.

23   Q.    You mentioned -- this is going to be important

24   geographically.  You mentioned the Farralones and Monterey Bay.

25   Were you talking about the sanctuary?

1   A.   Yes.

2   Q.   All right.

3        Could you point out on this Exhibit A-90 in front of you --

4   first of all, where is the Farralones Sanctuary?

5   A.   The Farallones is -- I believe it's 26 miles off of San

6   Francisco, Ocean Beach there.

7   Q.   Could you point it out?  Is that signified on this

8   Exhibit A- --

9   A.   Yes.  It's this area here.

10  Q.   And is that signified by the blue line?

11  A.   Yes.

12  Q.   And then you said the Monterey Bay Sanctuary.  Where is

13  that?

14  A.   That conjoins beneath that, on the southwest corner.  It

15  goes down like that.

16  Q.   All right.

17       Now, when you made your turn, were you at the traffic

18  lanes -- outside the traffic lanes of San Francisco Bay, were

19  you in the Monterey Bay Sanctuary?

20  A.   At that point, no, I was in the Farallones.

21  Q.   And the course you set, did that -- that you were trying to

22  make good to Pioneer Canyon, was that course outside the

23  Monterey Bay Marine Sanctuary?

24  A.   Yes.

25  Q.   And based on your plot of your positions yesterday, and not

1  only that, but also your things that you were seeing on tug at

2  the time, were you successful in staying outside the sanctuary?

3  A.    To the best of my knowledge and what was presented to me,

4  yes.

5  Q.    Okay.

6        So were you able to determine whether you were outside the

7  sanctuary when you were in the wheelhouse of the tug that

8  evening?

9  A.    Yes.

10 Q.    Okay.  Tell court how you were able to determine that.

11 A.    Via charts and the Rose Point electronic charting system.

12 Q.    I think we need to get a little bit deeper into how that

13 works exactly.

14       Can you explain to the court what exactly, as a mariner,

15 are you seeing in that chart -- that chart plotter?

16       MR. BOYAJIAN:  Your Honor, if I may make an objection

17 right here.

18       This testimony is apparently based on something called the

19 Rose Point system, chart plotting that they had aboard.

20       We had discovery requests that asked for all information

21 and data related to the vessel at all times.  None of this was

22 ever produced, none of it was ever raised at any of the

23 depositions of Captain McGavock or either of the mates.

24       Two days ago, Mr. Simms sent us an email saying, lo and

25 behold, Western Towboat had discovered a black box containing

1  data from a chart plotting system.  He asked if we would allow

2  that to be admitted at trial.  We said we would object, and he

3  withdrew, the idea of introducing any of that information.

4        Now we are hearing for the very first time, on the second

5  day of trial, that, as of yesterday, they created a new plot

6  based on information available in that system that suddenly says

7  that they were outside the Monterey Bay Marine Sanctuary.

8        This is the very first time any of this has been raised,

9  and it's based on information that they withheld from us

10 throughout the course of discovery.

11        So I would object to any line of questioning having to do

12 with anything been gleaned from this chart plotting.

13              THE COURT:  Mr. Gaspich?

14              MR. GASPICH:  Your Honor, the witness's testimony is

15 based on his recollection, first, of what he was doing in the

16 wheelhouse that evening.  He is merely saying how he knew.

17        Secondly, it's based on his personal plot, manual,

18 old-style mariner stuff, not any electronic system.  The witness

19 has not looked at any electronic system to refresh his

20 recollection.  He took positions from the logbook, which have

21 been produced in discovery and are available to both sides.

22        He went and confirmed his recollection, and that's what the

23 basis of his testimony is.  It has nothing to do with this Rose

24 Point system.

25              THE COURT:  So are you indicating you're not going to

1   be using any of the records that Mr. Simms produced lately?

2           MR. GASPICH:  Not only are we indicating we're not

3   using them, we've informed counsel, with greatest apologies for

4   the lack of production, that we do not intend to use them.

5           MR. BOYAJIAN:  Your Honor, if I may?

6       Captain McGavock is one of several deponents for Western

7   Towboat that, during their depositions, indicated that these

8   plots were correct.  At no point did counsel ever produce a new

9   set of plots to us.  This is the first time we've ever heard of

10  a new set of plots.

11          THE COURT:  I understand, and this is perfect

12  cross-examination for this witness, or any other witness.  So

13  long as counsel does not use any of the records that were

14  produced at the very last minute, I'm going to let you go ahead

15  and put this testimony on.  As I've said, it may be very ripe

16  for cross-examination, especially how he may have testified

17  during his deposition as well.

18          MR. GASPICH:  Agreed, Your Honor.

19          THE COURT:  All right.

20          MR. GASPICH:  I think those are good questions to be

21  asked, and I suspect we'll get to them.

22  Q.  (By Mr. Gaspich)  So, Captain, with respect to this chart

23  plotter, the Rose Point system, can you explain to the court

24  what does that show?  How does that work?

25  A.   It uses a GPS, a global positioning system, and it shows

1  your own position -- your own ship position on the electronic
2  nautical chart.  It shows your course, your speed, your course
3  over ground.
4  Q.   Okay.  Let me just stop you there because I -- we don't
5  need to get into Rose Point all that much.
6       Do you have a screen in your wheelhouse?
7  A.   Yes.
8  Q.   And does it look like the screen we're looking at right
9  now, the monitor?
10  A.   It's a little different.
11  Q.   Okay.  But is it, basically, showing a NOAA nautical chart?
12  A.   Yes.
13  Q.   And on that chart, does it show the position of your vessel
14  and tow?
15  A.   Yes.
16  Q.   And do you consult this when you are on watch in the
17  wheelhouse?
18  A.   Yes.
19  Q.   Why do you consult it?
20  A.   To maintain our position.
21  Q.   Okay.
22       And does it give you real-time information -- I mean,
23  subject to the limitations of satellites or what have you, but
24  does it give you real-time information about where you are at
25  any one point?

1   A.   Yes.

2   Q.   Okay.

3        Based on your recollection -- well, first of all, where is

4   this screen in the wheelhouse?

5   A.   On that vessel, it would be above the chart table.  The

6   chart table is, if you're looking out the forward -- of the

7   wheelhouse windows, the chart table is behind you, and the

8   electronic chart display is above the chart table.

9   Q.   So it's behind you?

10  A.   Uh-huh.

11  Q.   Do you ever turn around to look at it?

12  A.   Yes.

13  Q.   And how often do you do that?

14  A.   Depends on the plotter, but --

15  Q.   Well, let me start over.

16  A.   I talked over you.  I apologize.

17       What is your general practice, during your navigation

18  watch, for checking your chart plotter?

19  A.   Often.

20  Q.   Okay.  And in the context of this night, with the YFD 40

21  (sic), how often were you checking it?

22  A.   We were checking it more than often.

23  Q.   And why were you checking it more than often?

24  A.   To make sure that we were clear of sanctuaries.

25  Q.   And based solely on your recollection -- strike the

1  question.

2      Have you ever reviewed this chart plotter or any data from

3  it since you left the boat?

4  A.    No.

5  Q.    So based solely on your recollection of that night, were --

6  and from the time that you were up there, you made the course

7  change around -- whatever the time was you said earlier -- 1930,

8  2000, whatever -- up through the time you left after midnight,

9  did you ever bring your tow into the marine sanctuary?

10 A.    Not that I'm aware of.

11 Q.    Okay.

12     Did you, at my request, go back and take the positions out

13 of your logbook for that evening?

14 A.    Yes --

15 Q.    -- and plot them on a chart?

16 A.    Yes, I did.

17 Q.    And you did that.  Did that indicate to you, based on your

18 plots, whether you were inside or outside the marine sanctuary?

19 A.    Indeed, I was outside.

20 Q.    Did you leave the wheelhouse?

21 A.    I left the wheelhouse, oh, approximately midnight-thirty,

22 midnight-45, and I just -- it was still foggy out, and I told

23 the second mate, Kyle, "I'm just going to put my feet up for a

24 minute in my rack, and get me up if" -- you know, "I'll be back

25 up here in a little bit.  I just need to meditate for a minute

1  and think about some stuff."  I'd been on my feet all day.  So I

2  went down -- and I told him, you know, "If the fog lifts, wake

3  me up immediately.  If the radar aspect of the dry dock

4  changes" -- I had the radar zoomed way down to where you could

5  get a good radar image of the dry dock -- I said, "If that

6  disappears, hit the general alarm."

7       But at this point, with the information I was given about

8  how it was constructed, I thought it still had enough reserve

9  buoyancy, and I just -- I assumed it was going to be a long

10  night.  And so I gave those instructions to Kyle and went down

11  for a little bit.

12  Q.   Okay.  And I just want to clarify the time.  You said it,

13  kind of, in a funny way.

14       You're saying somewhere around 12:30 or 12:45 at night is

15  when you left the wheelhouse?

16  A.   Yes.

17  Q.   All right.

18       So, Captain, would you have left the wheelhouse if you

19  thought there was any reasonable risk that the dry dock was

20  going to sink?

21  A.   Never.

22  Q.   And did you -- at the time that you left the wheelhouse,

23  did you believe that it was going to sink?

24  A.   No.

25  Q.   Did you recognize there was a risk that it was going to

1    sink?

2    A.    I recognized, as any prudent mariner would.  You're going

3    to prepare for the worst, and in this case that's what I did.

4    Q.    What did you do to prepare for that risk?

5    A.    I held a safety meeting with the whole crew and discussed

6    what each crew member's task would be, in case we did have the

7    worst-case scenario.

8          I took -- there's a -- on a tow wire, the end of it goes

9    through the cheek -- it's the side of the tow winch -- and

10   there's a clamp on there that they use when they're putting the

11   wire on, and I had the crew take that off, just so if I did have

12   to dump the wire, there wouldn't be any hesitation; set up a

13   torch; grinding wheels; had guys get their suits out; basically,

14   everything to prepare for the worst.

15         But I just assumed, like I said before, it was going to be

16   a long night.  I've had many of those.  I've spent many nights

17   just standing in the wheelhouse, watching the tow and the

18   weather.

19   Q.    So let's just talk a little bit about these precautions.

20         When you tow, you have a wire that comes onto a winch; is

21   that correct?

22   A.    Yes.

23   Q.    And the winch is something that's probably, like, six- or

24   seven-feet diameter on the outsides of the phalanges to it?

25   A.    Yeah, they vary in size.  They're approximately six-foot

1  wide.

2  Q.    So it rotates in and rotates out the wire --

3  A.    Correct.  It looks like a big sewing bob or a fishing reel.

4  Q.    Okay.  That's a good analogy.

5        What was the device that connects the wire to it?  What do

6  you call that?

7  A.    That's the tailhold.

8  Q.    The tailhold.  And is that located toward the outside of

9  the winch?

10 A.    Yes, it's on the outside.

11 Q.    Okay.

12       So you loosened that, and why did you do that?

13 A.    I just loosened that in preparation, in case I did have to

14 release the tow.  If, indeed, it did sink, I did not want to be

15 drug down with the tow, especially if we were in deeper water

16 than the amount of tow wire is out, it will take us down.

17 Q.    Let's talk about that for a second.

18       When you say the tow could take you down, what do you mean?

19 What could happen?

20 A.    If you're towing any vessel, and especially if it's larger

21 than your tow, and it sinks and you're attached to it, it's

22 going to be like a big sinker, an anchor.  It would be like

23 tying a bowling ball to your foot and jumping in the water.

24 It's a very serious condition.

25 Q.    Okay.

1    So what other precautions did you take that evening to

2  avoid that outcome, should that dry dock sink?

3  A.    Like I said before, I had a safety meeting.  I got -- had

4  one of the crew members get a wire -- or not wire -- a cutting

5  wheel out that is used to cut through metal, a blow torch that

6  we use to cut through tow wire.

7  Q.    Let me stop you there.  Why would you have those out?

8  A.    In case -- oh, and I also -- sorry -- I also took the hand

9  brake -- there's two brakes on a towing drum.  There's an air

10  brake, usually, and then there is a manual hand brake, and I

11  loosened the hand brake, and it was just on the air brake.  But

12  the reason I had these other implements out is in case I let the

13  air brake out, and for some reason it didn't go, and here we

14  are, stuck, were going to have the cut the wire.

15  Q.    You mentioned there are two brakes, the hand brake and the

16  air brake.  The hand brake, is that manual?  You have to tighten

17  it down?

18  A.    Correct.

19  Q.    Okay.  So you loosen that.

20    And the air brake, how does that work?

21  A.    The air brake is just a pneumatic deal.  It's just a lever.

22  You push it forward, the tow brake goes on; you pull it aft, it

23  lifts the brake band off the drum.

24  Q.    So if you push the lever forward, then that wire is going

25  to freewheel out?

1    A.    On this particular boat, if I remember, if you pull it aft,

2    towards the stern, that's going to release the brake, and then

3    it will freewheel.

4    Q.    Okay.  And did you make any other preparations in case of a

5    sinking?

6    A.    Not that I can think of at this time.

7    Q.    Okay.  All right.

8          So you wound up going to bed.  Did you give instructions

9    to -- who was on watch with you at that time?

10   A.    Mr. Jacobson.

11   Q.    Okay.  And was that his regular watch?

12   A.    Yes.

13   Q.    All right.

14         Did you give him any instructions has to where you were

15   taking the tug?

16   A.    Yes.  During the safety briefing earlier, I instructed the

17   crew what the plan was.  We're going to, you know, head out for

18   deeper water, outside, and assess the situation in the daylight

19   when the fog lifts.  So we'll just carry on as before, and,

20   yeah, get through the night, and gave everyone their specific

21   duties.

22   Q.    You mentioned an alternate repair location, Monterey Bay.

23   When were you going to Monterey Bay?

24   A.    There was no -- nothing was set.  It was just talked about.

25   Q.    Okay.

1      And when would be the earliest that you would set course

2 for Monterey Bay, if at all?

3 A.    Well, it's kind of speculative.  It really just depends on

4 what shape the tow was in.  If it was still looking like it had

5 plenty of flotation left and we came up with another plan, then

6 we would, assumingly, proceed into there for repairs.

7 Q.    My question now is dealing with timing.

8      Would you have headed out that evening if you felt

9 appropriate, or was it going to be a wait longer to do that?

10 Assuming you could do that, of course.

11 A.    Would have waited.

12 Q.    So you went to bed.  Did you get any sleep?

13 A.    Not really, no.  I just read a book, I think.

14 Q.    What happened next?

15 A.    About 0212, Kyle came down and -- the wheelhouse, I'm just

16 on the next deck.  I mean, he can darned near throw a pencil at

17 me and hit me in the head in my rack there.  But Kyle yelled

18 down that the fog had cleared and he could see the tow, so I

19 immediately ran up and told him to just keep on heading the

20 direction he was heading, and I went aft and sat there and

21 watched it for, oh, a good five or ten minutes.  And about seven

22 or eight minutes into it, it just rapidly -- it kept going down

23 by the head, and then it just rapidly turned over, and I think

24 at that point we were only doing about 1.2 knots.

25 Q.    Okay.  Let's take a step back.

1          So the second mate came and woke you up.  Was he excited?

2    A.    He was pretty excited because we hadn't been able to see it

3    for quite a few hours, and from what he could see, it looked

4    like the aspect of the tow had changed.

5    Q.    Okay.  And did he tell you what he saw, or did he just call

6    you?

7    A.    He just called me and said, "Hey, come see it.  It looks

8    like it's changed."  So I just ran back to the aft controls and

9    watched it.

10   Q.    So when you got back out of your room and you went back to

11   the aft controls, what did you see?

12   A.    I saw that the condition of the tow had worsened.  It had,

13   oh, a 30-degree port list, and the bow was completely submerged

14   at that point, and that explains why I was having trouble

15   steering it.

16   Q.    And when you saw that 30-degree port list -- and that's an

17   estimate, I take it?

18   A.    Roughly.

19   Q.    And the port bow was now submerged.  Are you talking about

20   the deck?

21   A.    The deck, yeah, the deck.

22   Q.    And what went through your mind?

23   A.    At that point, it's -- this thing, it's past the -- you

24   know, very hard for -- I could still tow on it.  I'm not going

25   to get very far.  The harder I pull on it, the worse that

1  condition is going to get.  It's like dragging a diver through

2  the water.  It's just going to want to go deeper.

3        And at that point, I watched it a little longer, and then,

4  like I said, it rapidly capsized, and then it went down by the

5  head, went down by the bow, and at that point it was halfway

6  under water, and I said, "It's going down.  This is the time."

7  Q.    Okay.

8        So you saw that it was a 30-degree list, and it got

9  markedly more pronounced --

10 A.    Uh-huh.

11 Q.    -- and deck was now dipping -- the portside deck was now

12 dipping into the water.  Were you concerned about the dry dock

13 capsizing or sinking when you first came up and saw it?

14 A.    When I first came up and looked at it, I wasn't concerned

15 about it capsizing quite yet.

16 Q.    Why?

17 A.    Because I still thought it had reserve buoyancy in it.  I

18 still thought that the midship and the stern sections weren't

19 compromised.

20 Q.    And why did you think that?

21 A.    Just from the information that was passed along to me.

22 Q.    Okay.

23        And how long before it capsized?

24 A.    It capsized within less than a minute.  It was very quick.

25 Q.    And so when it capsized, what went through your mind?

1  A.    I just immediately started thinking about the safety of the

2  crew and the boat, and that's when -- in our discussion earlier

3  at the safety meeting, I said, "If anyone sees it capsize and

4  start to go down, hit the general alarm," you know, "I don't

5  care who it is.  That's when things are going to get serious."

6       And so Kyle hit the general alarm, and everyone came up to

7  the wheelhouse and we watched it for a bit longer.  I put the

8  brake in neutral to that point, where it's really easy to -- if

9  it wants to go, it's going to go.  And then it started going

10  down even more, and that's when I completely dumped the wire.

11  Q.    Were you concerned -- when it started going down more and

12  capsized, were you worried about saving your tug at that point?

13  A.    I was very worried, yes.

14  Q.    Were you worried about seeing your kids again?

15  A.    Yes.

16  Q.    Did the wire release?

17  A.    Yes.  It came off pretty quickly.

18  Q.    Okay.

19       The dry dock had capsized.  Did it sink at that point?

20  A.    It remained buoyant.  It submerged, oh, about

21  three-quarters of the way, and it went kind of straight down,

22  and then it bobbed back up for just about 10 or 15 seconds, and

23  then it just went straight down.

24       This was over -- it remained in that position, about

25  halfway, just floating for about a half-hour, and then it just

1    quickly went straight down.

2    Q.    Okay.

3          I'm going to show you the logbook now.  You have an entry

4    at 0210, "Dry dock capsized, began sinking, severed tow" -- we

5    have lots of red lines there.  Can you read that?  Can we clear

6    that?  Thank you.

7          "Separate tow, standing by dry dock to ensure sinking.

8    Coast Guard notified."  What did you mean, "standing by"?

9    A.    I stood by, just several hundred yards off -- or less than

10   -- a hundred yards off the dry dock, and just sat alongside it

11   and maintained -- drifted with its position.  And over this

12   time, it was still slowly sinking, and then after that initial

13   28 minutes -- the last two minutes is when it just really went

14   down quick.

15   Q.    And you have a time of 305 saying, "dry dock fully sunk."

16   So it was still floating and could be seen between 0210 and 0300

17   o'clock?

18   A.    Yes.

19   Q.    Fifty-five minutes?

20   A.    Yes.

21   Q.    And you said in your last answer that it was drifting.

22   A.    Uh-huh.

23   Q.    Can you explain to the court what do you mean by that?

24   A.    When something is drifting, it's going with the wind or

25   current or whatever the prevailing forces are, and in this

1  point, I'm assuming it was the current, and it took it to the

2  east, towards shore.

3  Q.   Okay.  And that would be towards the marine sanctuary?

4  A.   Yes.

5  Q.   Were you instructed by anyone to remain on scene?

6  A.   Yes.  The Coast Guard said to remain on scene until it was

7  completely submerged or sunk, as it might have posed a hazard to

8  navigation.  And they wanted me to make sure that there was no

9  visible sheen or pollution in the water.

10       So we waited there for, oh, another half-hour, and there

11  were no visible pollutants.  One of our nav lights popped up,

12  and we grabbed that.  And I notified the Coast Guard again and

13  said, "No visible sheen, no pollution," and they cleared us to

14  depart the scene.

15  Q.   When you say one of your nav lights popped up, what do you

16  mean?

17  A.   We put portable navigation lights on this tow:  A white

18  stern light, a red port running light, and a starboard green

19  line light.  They're held on magnetically.  For some reason, one

20  of them popped off and floated up, and they're fairly expensive,

21  so I went ahead and grabbed it.

22  Q.   Captain, had you ever experienced, in your 20-plus years at

23  sea, anything like this before?

24  A.   Absolutely not.

25  Q.   Was this traumatic for you?

1   A.   Yes.

2          MR. GASPICH:  No further questions at this time, Your

3   Honor.

4                        CROSS-EXAMINATION

5   BY MR. BOYAJIAN:

6   Q.   Well, Captain McGavock, I have a bit of an outline, but

7   before we get to it, I want to address some things that we just

8   recently raised.

9          First, 20-plus years at sea.  You said you graduated when

10  from...

11  A.   2003.

12  Q.   Okay.  And this was 2016, so you had 13 years at sea,

13  right, at the time?

14  A.   At the time, correct.

15  Q.   Okay.

16         And you became a captain when?  2013?

17  A.   Full-time captain, 2014, I believe.

18  Q.   Okay.  So two or three years of experience as a captain at

19  this point, not 20-plus, right?

20  A.   That's correct.

21  Q.   Okay.

22         The other thing I want to do is I want to start by going

23  right to your deposition transcript, please, at page 85.

24         You were just telling Mr. Gaspich and the court that you

25  were steering a course south-southwest once you left the traffic

 1  lanes, right?

 2  A.    Yes.

 3  Q.    Okay.  Do you remember when we took your deposition, we

 4  talked --

 5  A.    I do, yeah.  At that point, I hadn't --

 6  Q.    Hold on.  I haven't asked a question.  I would like to get

 7  to your deposition.

 8  A.    Yeah.  Go ahead.

 9         THE COURT:  Captain, it would be easier on our court

10  reporter if you wait until the question is complete, so if you

11  could give it that extra second pause, and then answer.

12         THE WITNESS:  Okay.  Yes.

13         THE COURT:  All right.

14  Q.    (By Mr. Boyajian)  I don't mean to get up here and just

15  start right in with your transcript, but this is the first time

16  we're ever heard about some of these things, and want to scroll

17  to the relevant page.

18      Page 85, okay?  I'm going to start at line 11.  Do remember

19  we talked about this?  This is the transcript, and I'm going to

20  read it, and then I'll ask you how, now, we're hearing something

21  different for the very first time.

22  A.    Uh-huh.

23  Q.    Okay.

24      I asked, as a question -- okay.  It says -- and we're

25  talking about your statement, your sworn statement to the United

1  States Coast Guard on the 2692 report.

2  A.    Uh-huh.

3  Q.    Do you remember where we are in the deposition at this

4  point?

5  A.    Yes.

6  Q.    Okay.

7        It says -- and I'm reading from your sworn statement to the

8  United States Coast Guard -- "I plotted a south-southeast course

9  for Pioneer Canyon."  It doesn't say anything about a repair

10  facility in Monterey Bay.  Why does it -- and you say I couldn't

11  tell you what I was thinking.  At the time I wrote it up, it was

12  traumatic, and I can't tell you where my head was.  Okay.  Had

13  you been setting a course for Pioneer Canyon?  Obviously, what I

14  said there, trying to remember to get to deep water.  Okay.

15  Pioneer Canyon is deep.  I agree on that one.  Is Pioneer Canyon

16  inside or outside -- and I'm sure I say the Monterey Bay

17  National Marine Sanctuary.  Apparently both.  Yeah, it is a

18  little bit of both.  Which part were you pointed out if we look

19  at this chart?  Well, apparently, it shows me pointing toward

20  the Monterey Bay side.  The sanctuary side?  Yes.  Is there

21  something here on this statement to the Coast Guard that says "I

22  was headed in a different direction because I was unable to

23  steer or I was on a different course?"  No.  Okay.  When it

24  says, "I plotted a course," to me, when I read that, it tells me

25  that you were able to plot a course and that that's the course

1  you wanted to steer.  Is there something that I'm not

2  understanding that would tell me or the United States Coast

3  Guard that you were having difficulty steering or setting a

4  course?  Plotting a course on the charts and being able to

5  maintain that course is a different thing.  Fair.  Okay.  It

6  says, I plotted a south-southeast course.  What course were you

7  headed?  At that time, I was heading south-southeast --

8          THE COURT:  Hang on.

9          MR. GASPICH:  I object.  I mean, if counsel wants to

10  put this in the record, he can do that.  I don't know if there

11  is a question --

12          MR. BOYAJIAN:  I'm about to --

13          THE COURT:  Counsel, hang on.  Let him finish his

14  objection.

15     Mr. Gaspich?

16          MR. GASPICH:  Yeah.  Is counsel trying to put this

17  into the record, or is there a question for the witness?

18          MR. BOYAJIAN:  Yeah, there is, and I had actually

19  reached my final line here, where he said --

20          THE COURT:  Mr. Boyajian, wait one minute.

21     Reading it, putting it into the record, but it's not

22  evidence coming from the witness stand.

23     If you want the court to consider this portion of the

24  deposition, then you can designate certain portions of it and

25  say, "It contradicts his testimony from the stand," and the

1   court can take that into consideration in deciding credibility.

2        If you want to question him about a specification answer,

3   then I need you to point to the page, to the line, to the

4   question asked, and his response.

5            MR. BOYAJIAN:  Okay.

6            MR. GASPICH:  Thank you, Your Honor.

7            MR. BOYAJIAN:  Thank you, Your Honor.  I had,

8   actually, reached that point before Mr. Gaspich stood up.  And

9   it's here.  It says --

10  Q.   (By Mr. Boyajian)  Your answer, Captain McGavock -- 87, 3

11  and 4 -- "At that time, I was heading south-southeast toward

12  Monterey."

13       If you look right below it -- I'm sorry.  That will do.

14       So we just went through two pages of your deposition

15  transcript, where you say, "I was plotting the course

16  south-southeast from Monterey Bay.  I was plotted for the piece

17  of Pioneer Canyon that extends into the Monterey Bay Marine

18  Sanctuary, and I was able to steer that course."

19       That's what we've just read over the last couple pages.

20  A.   I don't see that there.  Sorry.

21  Q.   Well, we just read it into the record, and it will be

22  there.

23       My question for you is:  Why, if we've covered for several

24  pages, where you said, "I was heading south-southeast for the

25  part of Pioneer Canyon that is inside the Monterey Bay

1  Sanctuary," why is today, for the very first time, are we

2  hearing a very different answer that you were plotting a

3  south-southwest course?

4  A.    When I gave my deposition, I'd just returned off a 28-day

5  hitch, a 28-day voyage, and it was a longer-than-normal voyage,

6  and I was running on fumes, to say -- I hadn't been able to

7  review all of the pertinent facts to the situation.

8       I remember, now going over it, I'm refreshed, and looking

9  at the 2692, I notice I messed up.  I put south-southeast

10 instead of south-southwest.  Like I said before, it was a

11 traumatic experience when I wrote that.  I messed up.

12 Q.    Okay.  And we'll talk about traumatic in a minute, but when

13 I took your deposition, you weren't in a traumatic experience.

14 You had had over four years to refresh your recollections and

15 over four years to take your old logbook and create a new

16 plotted course.

17      Had you bothered to do that at any time until Mr. Gaspich

18 asked you?

19 A.    No, not -- up until the deposition, I hadn't reviewed

20 anything.

21 Q.    When did Mr. Gaspich ask you to create a new plot and a new

22 chart?

23 A.    This was several days ago.

24 Q.    Okay.  And when did you give it to Mr. Gaspich?

25 A.    Yesterday.

1  Q.    Okay.

2         MR. BOYAJIAN:  Mr. Gaspich, you are subject to

3  ongoing discovery requirements.  Those were never produced to

4  us.  We never got to see them.  This is the first we've heard

5  about them.

6  Q.    (By Mr. Boyajian)  okay.  Let me turn to one more piece of

7  this deposition transcript before we turn around and go back

8  to -- before we turn around and go back to my outline.

9         Page 61, please.

10         MR. GASPICH:  Your Honor, I object.  The normal

11  process is asking a question and, as you pointed out, getting an

12  answer and using that to raise up an opposing point, allegedly,

13  by the witness.

14         Counsel is not doing that.  He is simply, again, reading

15  the transcript.  I would object to that, unless the court, to

16  speed it along, just wouldn't let him ask about things in his

17  transcript.  I think we're going to be here all day.

18         THE COURT:  Mr. Gaspich, he hasn't asked a question

19  yet.  I'm assuming he's going to point out a question and

20  whether or not it contradicts the testimony of this witness

21  today.

22  Q.    (By Mr. Boyajian)  Captain McGavock, in your previous you

23  answer, you had just said -- and your testimony earlier -- that

24  it was a scary experience when you were letting this tow wire

25  go.  Do you recall saying that?

1    A.    Yes.

2    Q.    Okay.  When I asked you in your deposition, here at line

3    61 -- sorry -- page 61, line 18, "Was it scary or were you

4    clear?"  "We were clear at this point."  Your answer was, "We

5    were clear at that point.  It was more surreal."

6          So are you saying that when I took your deposition, you

7    thought it was not scary but surreal, but you have since

8    reevaluated that position, too, and now --

9    A.    As I stated before --

10          MR. GASPICH:  Objection, Your Honor.  That doesn't

11    contradicted testimony.  This is after that point.  I think it's

12    an improper question.

13          THE COURT:  Overruled.  Let him answer.  The court can

14    evaluate whether or not it's a contradiction.

15          THE WITNESS:  May I proceed?

16          THE COURT:  You may.

17    A.    I believe what I was trying to say is, the scary part was

18    still being attached to that tow, and not knowing if it's going

19    to take us down.  That was the kind of life-or-death part.  I

20    mean, my hands were shaking.  It was scary.

21          The surreal part is after that, and it's like watching -- I

22    mean, it's something you see on TV, like -- and that's -- I must

23    have used the wrong words.

24    Q.    (By Mr. Boyajian)  Okay.  And I want to touch on one final,

25    last thing that was in the end of your prior testimony.

1     By my math, you said you came up at 0205 hours, and then

2  you said seven or eight minutes later you went to look at the

3  dry dock and you noticed it had listed to 30 degrees.  Is that

4  accurate to what you just said?

5  A.   It's fairly accurate --

6  Q.   Okay.

7  A.   -- as much as I can remember.

8  Q.   We're going to look at the document later, but you probably

9  recall you told the U.S. Coast Guard, in your sworn statement on

10  your 2692, that you observed a 40-degree list at 1030 hours, so

11  four hours -- roughly, four hours prior.

12     Are you testifying now that the dry dock had somehow gained

13  10 degrees of buoyancy between 10:30 at night and 2:12 in the

14  morning?

15  A.   No.  I'm mistaken there.

16  Q.   Okay.  So your sworn statement to the United States Coast

17  Guard was mistaken both in what direction you were plotting and

18  as to as degree of list you observed at 10:30 at night?

19  A.   Technically, I guess, yes.

20  Q.   Okay.

21     And are you aware that the United States Coast Guard

22  helicopter flyover -- and we'll look at this document later --

23  but are you aware that, at ten o'clock at night, they reported a

24  35- to 40-degree observed list?

25  A.   Okay.

1    Q.    Were you aware of that?

2    A.    Yes.

3    Q.    Okay.

4          But is your testimony still that four hours and 12 minutes

5    later, at 2:12 a.m., you observed a 30-degree list?

6    A.    Incorrect.

7    Q.    Which was incorrect?

8    A.    My estimation that when I went aft to look at it, it was --

9    it didn't gain 30 degrees.  I was wrong there.

10   Q.    Okay.  Okay.

11         With those few things that were fresh and top of mind out

12   of the way, I'd like to go to the top of my outline, and we'll

13   just start at the start.

14         THE COURT:  Counsel, maybe it's a good time to take

15   our break.  I've got an important meeting.  We're trying to get

16   more judges, so it's very important to me.

17         If we could start up at our regular time.  If I can have

18   you back at ten minutes after, and we'll do our best to get

19   started at 1:15.

20         MR. SIMMS:  Since we're talking about order of

21   witnesses, I wanted to be straight up about this.  As soon as

22   we're finished with Captain McGavock, we will skip to Dan Keen,

23   and then we will have Dr. Hudson.

24         THE COURT:  All right.  Thank you.

25         We'll stand at recess.

1          (Court in recess 11:54 a.m. to 1:20 p.m.)

2          THE COURT:  Counsel, before we get started, I've got

3     concerns about the testimony that's coming in from this witness,

4     and, perhaps, other proposed witnesses, regarding all this

5     testimony about the location of the *Ocean Ranger* in relation to

6     the marine sanctuary.

7          There's been extensive questioning today on Captain

8     McGavock's path in relation to the marine sanctuary, both

9     looking at that chart and the other exhibit, I believe 92, that

10    was pulled up by counsel as well.

11         Based on the record that the court had, before the summary

12    judgment, the court determined that Western failed to exercise

13    prudent seamanship with respect to its duty to navigate with

14    cognizance of the vessel's position in relation to the

15    navigational hazards, here, the marine sanctuary that we've been

16    talking about.

17         The court reconsidered that issue on Western's motion that

18    identified deposition testimony from this witness, and it

19    determined that its original conclusion was not erroneous.

20         In light of that ruling, all that remained for trial, and

21    all that remains for trial, are three things:  Each of the

22    parties' cross-claims for breach of contract and whether Vigor

23    bears any comparative fault as to the dry dock's sinking inside

24    the sanctuary.  That's it.  The rest of this is not relevant at

25    this point in time.

1          Given that the court has already determined Western's

2     negligence, the testimony on the path the *Ocean Ranger* took in

3     or around the marine sanctuary is not relevant to any of the

4     remaining issues, unless I'm definitely missing something from

5     either side.

6          And one more thing.  The court wants to make sure -- remind

7     the parties that the proposed pretrial order in this case still

8     discusses resolution of the parties' potential liability under

9     the National Marine Sanctuaries Act.

10          To the extent the parties intend or have any intention to

11     present witnesses regarding these claims, the court made clear,

12     again on summary judgment, that all claims seeking any kind of

13     preemptive relief from liability to the United States, under

14     MNSA, were dismissed for lack of subject matter jurisdiction.

15     And the court is, therefore, making no determination and will

16     not make any determination as to the parties' respective

17     liability to the United States in this matter, should it come to

18     pass.

19          I'm sure that they will take a hard look at it, and they

20     will make a determination as to either party or both bear any

21     responsibility in this particular case.  And as I said, I have

22     nothing to do with that, and the relevance of some of the

23     testimony or potential testimony, proposed testimony, escapes

24     me.  So I don't know, Mr. Boyajian, if you or Mr. Jarrett want

25     to respond to the court's concerns.

1      MR. BOYAJIAN:  Not at all, Your Honor.  You've just

2   shaved four pages and, likely, a half an hour of time that I

3   intended to spend today.

4      I know we went through it this morning, but if you're

5   saying you found that testimony this morning irrelevant and you

6   don't need to hear any more questioning along those lines, I'm

7   happy to discard all of that.

8           THE COURT:  From the plaintiff's side, Mr. Gaspich or

9   Mr. Simms, am I missing something there, counsel, given the

10  rulings that have been made?

11          MR. SIMMS:  We understand the rulings, Your Honor,

12  yes.

13          THE COURT:  All right.  Okay.

14      Mr. Boyajian, you're on cross-examination.

15          MR. BOYAJIAN:  I appreciate that.

16  Q.   (By Mr. Boyajian)  Captain McGavock, are you sure you met

17  Captain Shaw?

18  A.   I am not 100 percent that I did, not face to face, but on

19  the back deck of the tug.

20  Q.   I'm sorry.  I'm confused about that.  Not face to face but

21  standing in the same place?

22  A.   I believe he was on the bow of the dry dock, and I was on

23  the stern of the tug --

24  Q.   Okay.

25  A.   -- as we were making out.

1    Q.   Okay.

2         Captain Shaw testified here yesterday, and I don't mean to

3    (inaudible) but maybe to help refresh you -- he said he wasn't

4    there when the dry dock left, and Mr. Keen will testify later

5    that Captain Shaw was unavailable that day and not present.

6         Are you sure you met Captain Shaw on the day the dry dock

7    left?

8    A.   I could be mistaken.  I...

9    Q.   Okay.

10        Let's get to the YFD 70.  When did you first learn that you

11   were going to tow this dry dock?

12   A.   Oh, I believe it was mid-September.

13   Q.   Okay.

14        And what had you been told about when this tow would leave?

15   A.   I was told -- it was towards the end of September is when

16   we were hoping to leave, and then there were several delays due

17   to Ensenada not being able to accept it, and then, of course,

18   the weather delay.

19   Q.   Okay.

20        At your deposition I asked you the same question, page 11,

21   line 3 is the question, line 5 is the answer.

22        I said, "What were you told about when the tow was going to

23   leave?"

24        And your answer was, "That it's weather-dependent over the

25   next several weeks."

1    A.    And I didn't have all the information at that time.

2    Q.    Okay.

3          Were you ever told that Vigor was in a rush to get this dry

4    dock out of their yard?

5    A.    I can't remember, honestly.

6    Q.    Okay.

7          I want to talk about the documents that you got to see

8    before you undertook this tow.

9          What documents did you have related to this tow?

10   A.    Just the tow plan.

11   Q.    And the amendment?

12   A.    And the amendment.

13   Q.    Okay.  Those two, in your mind, constitute the tow plan,

14   together, right?

15   A.    Well, the amended section is the one that pertains to the

16   voyage.

17   Q.    Okay.  Great.

18         Did you follow the amendment with respect to the conditions

19   outlined?

20   A.    As closely as possible.

21   Q.    Okay.

22         The tow plan says that "weather data will be continuously

23   monitored and recorded for the local and intended track," and

24   you spoke about that for some time with Mr. Gaspich this

25   morning, didn't you?

1    A.    Yes, sir.

2    Q.    Okay.

3          And I think I heard you say two things before that; that

4    some stuff was written down on scratch paper that was later

5    discarded.

6    A.    Uh-huh.

7    Q.    And some stuff was downloaded.

8    A.    Downloaded off of the NOAA website.

9    Q.    Right.  Okay.

10         Was that information, then -- did someone go affirmatively

11   into the ship's computer and delete those downloads?

12   A.    I honestly could not answer that question.  Not that I'm

13   aware of, no.

14   Q.    Not that you're aware of?

15   A.    No.

16   Q.    But you don't know where those downloads went?

17   A.    No, sir.

18   Q.    Okay.

19         So the local conditions are saved in the log and preserved.

20   Where the ship is in that moment is preserved, but anything

21   related to forecasts predicting what the conditions the ship

22   would encounter in the future, all of that is gone, as far as

23   you know?

24   A.    Yes.

25   Q.    Okay.

1        What sources of weather data were you collecting?

2   A.    Like I said before, I use a bunch of different information.

3   I look at several different websites, WindyTY, Stormsurf, Wave

4   Underground, the NOAA weather pictures and maps, and then NOAA

5   texts.

6   Q.    Okay.

7        You don't have records of anything that any of the apps you

8   mentioned, at the start, say?

9   A.    Well, the apps are just, you know, live-streamed.  You look

10  them up on your phone or on the ship's computer, if you have

11  Internet service.

12  Q.    Right.  But you don't have any records of what those said

13  then now, do you?

14  A.    No.

15  Q.    Bowditch Marine, Captain Shaw; you knew he had done a

16  survey, right?

17  A.    Yes.

18  Q.    You never saw it?

19  A.    I did not see the survey.

20  Q.    Did you ever ask to see it?

21  A.    I did not.

22  Q.    Okay.

23        Had you ever towed a 528-foot steel dry dock in the open

24  ocean?

25  A.    No.

1  Q.   Had you ever towed a 71-year-old World War II era dry dock

2  in the ocean?

3  A.   No.

4  Q.   Why didn't you care what the surveyor thought or found in

5  his survey?

6  A.   I'm taking his years of experience and professional opinion

7  and thoroughness into account; that when he tells me or tells

8  the owners and the port captain and whomever else is involved

9  that it's good to go, that it's seaworthy, and it's, you know,

10  an acceptable tow.

11  Q.   Okay.

12       Did you see where it said that it was an acceptable tow?

13  A.   The information I got -- and this is a long time ago, I

14  can't, honestly, remember what was said, but, in effect, it was

15  good to go and it was seaworthy.

16  Q.   Okay.  Have you seen the survey report since?

17  A.   No, sir.

18  Q.   Well, you and I looked at it at great length when I took

19  your deposition.

20       Have you seen it other than during the deposition?

21  A.   No.

22  Q.   Okay.

23       Do you recall from the deposition that it's 10, 20, 30

24  pages long, full of photographs and --

25  A.   I don't.

1   Q.    -- findings?

2         Okay.  If you had known that at the time, would you have

3   wanted to see it and get more information than it's just good to

4   go?

5   A.    I would have definitely taken it into account, yes.

6   Q.    Did you know at the time that it contained weather

7   restrictions?

8   A.    Yes.  It was in the tow plan.

9   Q.    Okay -- no, no, no, I'm sorry.

10        Did you know at the time that Captain Shaw's survey

11  contained weather instructions?

12  A.    Yes.  Well, I'm assuming the tow plan goes off Captain

13  Shaw's recommendations.

14  Q.    Okay.

15        Did you assume they were exactly word-for-word copies of

16  Captain Shaw's recommendations?

17  A.    There is some leeway there, I would assume.

18  Q.    Okay.

19        So if you felt the two weren't identical, you wouldn't

20  wanted to have seen the words that Captain Shaw used, having

21  physically surveyed and concluded that it was suitable to tow?

22  A.    If it was presented to me, of course, I would take that

23  into account, yes.

24  Q.    Okay.  But I'm asking, you didn't -- you could have asked

25  for it, right?

1   A.   Yes, I imagine I could have.

2   Q.   And -- but you didn't?

3   A.   No.

4   Q.   Which -- okay.

5        So the weather restrictions in the survey.  Let's talk

6   about them.  They're fairly specific.

7        You knew, on the one hand, that there was an eight- to

8   ten-foot sea restriction, correct?

9   A.   Correct.

10  Q.   Do you recall we discussed in your deposition another

11  restriction about wind conditions?

12  A.   I do recall, yes.

13  Q.   Okay.

14       And you said earlier today that you were less concerned

15  with wind restrictions than you were with wave height

16  restrictions.

17  A.   That's correct.

18  Q.   Did you ask Captain Shaw whether that was a reasonable

19  assumption?

20  A.   No.

21  Q.   Okay.

22       You never towed a 528-foot dry dock.  Would you have been

23  curious to know whether Captain Shaw thought there was a

24  reason -- an important reason to impose a wind restriction?

25  A.   I would be open to his input, although I don't know how

1  many barges Captain Shaw has towed in his life, but I've towed a

2  lot, and...

3  Q.   What I'm trying to understand is, is there a reason that

4  you wanted less information about this tow rather than more?

5  A.   I didn't say that.

6  Q.   Well, you knew there was a survey.  You knew it contained

7  pertinent weather restrictions.  You knew it existed, and you

8  didn't ask for it.  So that tells me that there was information

9  you knew was available that you chose not to access.  So I'm

10  asking:  Why?

11  A.   I assumed that Vigor would have given me that survey if

12  they deemed it pertinent.

13  Q.   Okay.

14       Were you aware that Captain Shaw gave that survey to your

15  port captain, Jeff Slesinger?

16  A.   I was not.

17  Q.   Did you know where Jeff Slesinger got the wind and

18  wave-height restrictions that were in the tow plan?

19  A.   From Captain Shaw.

20  Q.   Okay.  So you knew that Captain Shaw had communicated

21  something to Jeff Slesinger and had asked Jeff Slesinger, "What

22  did Captain Shaw gave us?"

23  A.   Yes.  And I believe that's how the tow plan was drafted,

24  within Captain Shaw's recommendations.

25  Q.   My question was a different one.

1       Did you ask Jeff Slesinger, as the port captain at Western

2   Towboat, "What did Richard Shaw give us?  I'd like to see it for

3   this tow"?

4   A.    Jeff was out of town when I commenced the tow, and,

5   therefore, I did not speak with him.

6   Q.    Okay.

7       Did you ask anybody else at Western, "Could I see a copy of

8   Captain Shaw's tow-suitability survey?"

9   A.    I cannot recollect, but I believe I did not.

10  Q.    Okay.

11      If you had said that, you assume someone would have given

12  you a copy?

13  A.    I assume so, yes.

14  Q.    So then you would have seen it, and you wouldn't have to...

15  A.    Yeah.

16  Q.    Understood.

17      Okay.  I would like to go, please, to Exhibit A-04.

18      Okay.  Here, at the bottom, paragraph 6, you see the eight-

19  to ten-foot-sea restriction.  The one I want to talk about is

20  actually paragraph 7, please.  I want to take this part a little

21  bit because there is critical terms here.

22      I believe we were talking earlier about safe ports and

23  sheltered waters.  Sheltered waters included Puget Sound, right?

24  A.    Absolutely.

25  Q.    And the turn to Flattery is when you would be proceeding

1  from sheltered waters?

2  A.    Yes.

3  Q.    And then without first determining that reasonable weather

4  conditions less than 4-6.  Do you know what 4-6 on the Beaufort

5  scale is?

6  A.    I believe it's 23 to 27 knots, or 23 to 29.  I can't

7  recollect, but it's somewhere within there.

8  Q.    You were at 22 to 27 knots, and do you know if there's an

9  associated sea state?

10 A.    Approximately six to eight feet.

11 Q.    You're making it tighter than you have to it.  It is

12 somewhere from eight to thirteen feet, depending on which scale

13 you use.

14     So when -- "The master of the tug *Ocean Ranger*" -- that's

15 you -- "is not to proceed from any safe port or sheltered

16 waters" -- meaning don't turn south at Cape Flattery and

17 leave -- "without first determining that reasonable weather

18 conditions less than 22 knots and less than eight-foot seas are

19 predicted along the intended track," what is that saying to you?

20 A.    It's saying don't go if it's predicted to be in the tow

21 plan stated eight to ten feet and up to 25 knots, and the

22 forecast that I was looking at was within those parameters for

23 the first leg of the voyage.

24 Q.    Okay.  Which forecast?  You mentioned several.

25 A.    The WindyTY forecast, and the NOAA forecast.  As I stated

1   earlier, I believe the text forecast had said possible gusts to

2   30 out of the southeast, and as I stated earlier, that wouldn't

3   affect the sea state as much, because there is less fetch.  But

4   five knots of wind, if it was apparent, it might happen.  I

5   don't believe five knots of wind would really affect the

6   integrity of the tow.

7   Q.   Where in this sentence are you seeing "exercise your

8   discretion"?  I see "is not to proceed."  That's a directive.

9   Do you see it differently, or is there a confusion?

10  A.   I do not see that.

11  Q.   Okay.

12       And we agreed less than 4-6 is less than 22 knots less than

13  eight feet of wind -- eight-foot seas, not ten, right?

14  A.   Yes.

15  Q.   So you needed a forecast to be able to turn south at

16  Flattery that was 21 knots or less and eight-foot seas or less.

17  For how long?  How far into the future?

18  A.   Well, the voyage to San Francisco would take at least six

19  days, and that's in five to six days in favorable conditions,

20  and that's a pretty tough ask --

21  Q.   Okay.

22  A.   -- at that time of year.

23  Q.   Fair.  It's a tough ask at that time of year.  So it might

24  not have been possible to get a weather window that met the

25  restrictions in the second half of October; is that what you're

1  saying?

2  A.    I didn't say that, no.

3  Q.    Please help me understand what you were saying.

4  A.    I'm just saying things in the fall or early fall, they're

5  more variable, and that's a large weather window to look at.

6  And in my judgment, as I said earlier, I thought NOAA was

7  overforecasting, and they did overforecast it.  And I don't

8  think that that system had anything to do with the integrity of

9  the tow.

10        After we went through that first small system, there was no

11  change in the aspect of the tow.  It didn't lose speed.  It

12  towed straight, which is telling me that it was still an

13  integral system that was not compromised.

14  Q.    Okay.

15        Were you able to get aboard the dry dock, climb up into the

16  wing walls and examine the internal structure of the dry dock to

17  be able to say that it had withstood this first storm?

18  A.    As I said earlier, we could not go alongside out in the

19  open ocean.

20        From my past experiences, when you do have a barge that has

21  been compromised and it is ingressing water, it immediately

22  develops a list or a trim difference, a different aspect.  It

23  will tow off to one side, or it will veer, seesaw back and

24  forth.  And from my past experiences, it was towing straight

25  behind us.  I did not lose speed; therefore, I believe that it

1  successfully -- that system did not affect us.

2  Q.    Okay.  I asked a different question, though, not whether it

3  was ingressing water.

4        Were you able to get inside the dry dock --

5  A.    No.

6  Q.    Okay.  Let me ask you this another way.

7        If you had a forecast that said you're going to have 30

8  knots on your nose within 24 hours of leaving Puget Sound and

9  turning left, should you have left?

10 A.    I would not have left with that forecast.

11 Q.    Okay.

12       MR. BOYAJIAN:  Ms. Ivie, can we please go to A-06?

13 Q.    (By Mr. Boyajian)  Okay.  These you did have aboard the

14 *Ocean Ranger*?

15 A.    Yes.

16 Q.    And these are the versions of the tow restrictions you saw?

17 They don't match what we just looked at, though, right?

18 A.    They do not.

19 Q.    Okay.

20       Western wrote this tow plan, right?

21 A.    That's correct.

22 Q.    It says, "We'll use Rich Courtney."  Did you tell anyone at

23 Western, Hey, I've talked to Rich Courtney, and he tells me I'm

24 not a valuable asset for West Coast towing?

25 A.    Can you repeat the question?

1   Q.   Well, you said earlier that you had a conversation with

2   Rich Courtney in which he told you, "Your guess is as good as

3   mine," when it comes to towing on the West Coast.

4        Did you tell anyone at Western, Hey, we said we were going

5   to use Rich, but Rich isn't really a good resource for West

6   Coast towing?

7   A.   Maybe in passing over a beer or something.  But we used him

8   before departure, so...

9   Q.   Okay.  Well, we'll get to that.

10       You didn't call him?  You didn't use him?

11  A.   I did not call him.

12  Q.   Okay.

13       Did anyone tell you, I talked to Rich this morning and

14  here's what Rich said?

15  A.   No.

16  Q.   So you don't actually know that anyone at Western used him?

17  A.   I don't know.

18  Q.   Okay.

19       What does it mean to you, though, this sentence for Rich

20  Courtney?

21  A.   It means that Western Towboat will be using maritime

22  weather services for weather information and course guidance.

23  Q.   Okay.

24       When you and I spoke at your deposition -- well, I asked

25  if -- are you a professional meteorologist?

1    A.    No.

2    Q.    And I asked you what Rich provided, and rather than make

3    you say it again, do you recall saying, "He's a more experienced

4    set of eyes, able to help me read between the lines on

5    forecasts"?

6    A.    In Alaska.

7    Q.    Okay.  Well, when I asked you -- page 30, line 4:

8              "QUESTION:  What does Rich Courtney provide as far as

9              weather information?

10             "ANSWER:  He would look at a system or systems and

11             read between the lines and give you the best guess as

12             to what conditions may be in a certain area."

13   Where in there does it limit it to Alaska?

14   A.    That is just how I was thinking at the time.  I had stated

15   earlier I'd just gotten off a trip closing the Gulf of Alaska,

16   and I just used him, and it was fresh in my mind.

17   Q.    Okay.

18         What about the second piece here, course guidance?  What

19   does Rich Courtney provide by way of course guidance?

20   A.    In the instance of the Gulf of Alaska, if we have a system

21   that is blowing, say, out of the east, we'll hug the shoreline

22   to get, like I stated earlier, a lead, less of a fetch, to

23   develop a heavier sea state.  He might say to go in deeper water

24   to get less sea state.

25         But that is his area of expertise.  He's the professional

1    for that area.

2    Q.    Okay.

3          This contract, this tow plan doesn't relate to towing in

4    Alaska, does it?

5    A.    No.

6    Q.    So it says Western Towboat will use him for course

7    guidance.  When I asked you at your deposition what "course

8    guidance" meant, line 23 on page 30, you said, "He'll tell you

9    his thoughts about a certain track line."

10         Is that what you could have expected from him if you called

11   him for this trip?

12   A.    As before, I stated he wouldn't have had much input to say

13   about that track line.  And concerning that track line, to get

14   from Flattery to Mexico, there's not much variance you can go.

15   You have to go south.

16   Q.    Sure.  There's some room to the west, isn't there?

17   A.    Yeah, but you're just going to add days to a time-sensitive

18   voyage.  You don't want to be out there longer than you have to.

19   And then if you change course with the dry dock and you're

20   putting the seas directly on the head or on the beam, that's not

21   what we want -- correct? -- according to the...

22   Q.    Sure.  Did Rich Courtney give you advice that suggested

23   that you should put waves on the head or the beam?

24   A.    No, but if he was to look at a low-pressure system

25   approaching and said, "I recommend that you head on a course of

1  2-8-0 to let this system pass beneath you," but then you'd be

2  exposing yourself more, and you'd be exposing the barge,

3  presumably, to more rocking, more rolling.

4  Q.    So you're talking about if there was a particular system

5  that --

6  A.    This is hypothetical?

7  Q.    Right.

8      And he gave you a set of hypothetical course guidances,

9  that there might be a reason you would question him.  But you

10  didn't have any course guidance from him in this case, right?

11  A.    No, because, once again, his expertise is in Alaska.

12  Q.    Okay.  But you told me in the deposition, and you just

13  agreed, he was a more experienced set of eyes, a professional

14  meteorologist.  You were getting weather information from apps

15  on your phone but didn't think it was worth calling a

16  professional meteorologist?

17  A.    I have used him before off the coast, as I stated earlier,

18  and he honestly said, "You have as much information as I have

19  there, and your guess is as good as mine."

20  Q.    Okay.

21      The apps on your phone, do they provide course guidance as

22  well?

23  A.    There is some out there.

24  Q.    Were you using the apps on your phone for course guidance?

25  A.    For course guidance?

1    Q.    Uh-huh.

2    A.    Well, you take the weather that you're expecting, that's

3    forecast, and, perhaps, yeah, course guidance just means, okay,

4    I want to avoid this area, so, yes, I'll alter course to

5    starboard several degrees.

6          So in theory, when you look at the weather, when you read

7    the weather, you are using it for course guidance.

8    Q.    Right, to generate your own guidance.  Rich Courtney would

9    have provided, as you put it, a second, more experienced set of

10   eyes.  So instead of you -- just you coming up with the course,

11   you would have had another professional looking at it.

12         So are you saying that you used the apps and you generated

13   your own course guidance, so you didn't need a second set of

14   eyes on it?

15   A.    I didn't say that, but I see where you're going.

16   Q.    Okay.  Well, then, help me understand, if that's not what

17   you're trying to say.

18   A.    Yeah, I just -- as I stated before, he wouldn't have been

19   much input, I believe.

20   Q.    Okay.  So what you're saying is --

21   A.    In my past experiences, it did not help.

22   Q.    Okay.

23         The recommendations we looked at before this, Captain

24   Shaw's recommendations, when I asked you at your deposition, you

25   said, "They're clear, they're, quote, pretty black and white."

1  Do you remember saying that?

2  A.   Not off the top of my head right now, but sounds right.

3  Q.   What about a few minutes ago when we were talking about

4  them, you said -- I don't see wiggle room here.  They say don't

5  leave if you have an adverse forecast.

6  A.   Yes, black and white, yes.

7  Q.   What about what we're looking at here for tow conditions?

8  Is this black and white?  Is this clear?  Does it provide you

9  certain guidance as to whether you should have left around Cape

10  Flattery or not?

11  A.   Yes, it's fairly clear.

12  Q.   Okay.

13     Where?  Where is it clear about whether you can leave at

14  Cape Flattery or not?

15  A.   Well, it says, "Ideally, no more than eight- to ten-foot

16  seas and 20 to 25 knots of wind."

17  Q.   Right.  And you said at least one of the sources of weather

18  information you had said your were going to have conditions

19  exceeding 20 to 25 knots of wind, but this piece of the tow plan

20  said that you could exercise judgment.

21     When we looked at Captain Shaw's recommendation, you said

22  it's black and white, there's no room to exercise judgment, you

23  either go or you don't go, you either have a forecast or you

24  don't.  So if this is -- how is this as clear?

25  A.   I didn't see Captain Shaw's tow plan.

1    Q.    I understand, but we just looked at it now.

2    A.    Yes.

3    Q.    Western had it.

4    A.    I can't use that information to make a judgment call if

5    it's not presented to me at the time.

6    Q.    Right.  But I just asked you if this was as clear, and you

7    said it was, and I'm asking you to tell me -- explain to me how

8    it is as clear.  How would it have helped you make that call,

9    black and white --

10   A.    Captain Shaw's?

11   Q.    No.  This one here that we're looking at.

12   A.    This one here, ideally, and it's also predicted.  And as I

13   stated earlier, NOAA casts a wide net on their forecasts, and

14   they tend to overpredict.

15        If I went by every NOAA forecast, if I took it at 100

16   percent, we would never get anywhere.  Commerce would never get

17   anywhere.  It's -- I might be overexaggerating, but you see what

18   I'm saying.

19   Q.    I do.

20        Do you remember that, in your deposition, when we talked

21   about this one, you said Bowditch was black and white.  And then

22   when we talked about this one, do you recall saying, quote, It's

23   kind of vague, unquote.  "It depends on the person's opinion of

24   ideal."

25                MR. GASPICH:  Your Honor, could we have counsel cite

1   to where he's citing from?

2          MR. BOYAJIAN:  I'd be happy to.  I asked if he

3   remembered.  If he says he doesn't recall, I would provide the

4   cite.

5          MR. GASPICH:  What page?

6          MR. BOYAJIAN:  Page 33, line 8.

7          MR. GASPICH:  Thank you.

8   Q.   (By Mr. Boyajian)  Answer:  "It's kind of vague."  Page 33,

9   line 13:  "It depends upon a person's opinion of ideal."

10         Check again.  Captain Shaw's restrictions, the ones that

11  you didn't see but that Western had -- someone at Western had,

12  certainly Jeff Slesinger.  Hopefully, he passed them to somebody

13  else before he went on vacation.

14         If you're getting ready to leave Puget Sound, and you have

15  a forecast exceeding eight foot or 22 -- 22 miles an hour -- 22

16  knots --

17  A.   Ten.  Ten.  Exceeding.  I believe you said "eight foot."

18  Q.   I did.  Captain Shaw's survey said 4-6.

19  A.   I'm sorry.  Right.

20  Q.   And we agreed that was eight feet, 22 knots or less.

21  A.   Yes.

22  Q.   According to that, if you had a forecast over eight feet or

23  22 knots, should you have left?  Captain Shaw's survey.

24  A.   According to that, yeah, if it was -- it was less than

25  that, but, yeah.

1  Q.    Okay.  Maybe my question wasn't clear.

2        If the forecast you had showed conditions exceeded eight

3  feet or exceeding 22 knots, should you have left?

4  A.    Not with -- with -- if you're saying if I had that set of

5  tow plans.

6  Q.    Okay.

7        And now if we're looking at this one, Western's version,

8  the one that's vague, if you had a forecast that said exceeding

9  ten feet and 25 knots in the first 24 or 48 hours, should you

10 leave?

11 A.    If it was exceeding ten foot, no, I wouldn't leave, because

12 seas are more adverse to a vessel than wind is.

13 Q.    Okay.  Okay.  Seas.  You were about to probably say

14 something about the wind part of my question, then.

15       Okay.  The wind part of my question was:  What if you had a

16 forecast that said you were going to be in winds exceeding 25

17 knots in the first 24 to 48 hours of your trip, should you

18 leave?

19 A.    Well, it depends on how much it was exceeding.  If it said

20 it was going to blow 35 knots or if it said it was going to blow

21 sustain 30 for 48 hours, I would not have left.

22 Q.    Okay.  So if it said 35 knots, you wouldn't go?

23 A.    If it said 35 -- gusts to 35 out of the -- in our face, I

24 would not have left.

25 Q.    Okay.  Great.

1       Again, though, where did you get the opinion that the wind
2   part was flexible, that you could exceed it?  Is it this word
3   "ideally"?
4   A.    Yeah --
5   Q.    Okay.
6   A.    -- and just in past experiences.
7   Q.    Okay.  So Captain Shaw's version, hard stop at 21 knots,
8   eight feet.  Western's version, ten feet, maybe winds over 25.
9   Does that summarize what you're saying about these two
10  documents?
11  A.    Yes.
12  Q.    Okay.
13      We talked about, I think, San Francisco -- right? -- and
14  you said that, in terms of how far ahead you're looking, you
15  need, five, six, seven days to get there, for a window?
16  A.    Yeah.  You look at the speed you're expected to make, and
17  if we didn't average what we thought we were going to make, that
18  will extend the period of your voyage.
19  Q.    Okay.  Do you remember what your forecast said as you were
20  approaching Cape Flattery?
21  A.    As I was approaching Cape Flattery?
22  Q.    Sure, or as you were crossing Puget Sound and then
23  approaching Cape Flattery, getting ready to turn south from
24  sheltered waters of Puget Sound to the open ocean.
25  A.    I don't remember offhand.  I remember that it was not that

1  severe, and it said it was going to be a quick system.

2  Q.    Okay.

3        Page 44, line 14 in your deposition.  I asked you same

4  question:  "What were these preforecasts telling you?"  You

5  said, "I believe it was five to seven feet and southeast less

6  than 20."  Is that about what you remember?

7  A.    That sounds about right.

8  Q.    Okay.  That was pretty specific.

9        If you had a forecast that said, "Captain McGavock, within

10 24 hours, you'll be in a full-blown gale" -- how much wind is a

11 gale?

12 A.    Thirty-five knots and above.  Above 35 knots.

13 Q.    Okay.  So over 35.  If you had a forecast that said you're

14 going to have a gale within a day, within 24 hours.  If you had

15 that forecast, would you have gone?

16 A.    A gale, not just a gust?

17 Q.    A gale.

18 A.    A full-blown gale, like a sustained gale?

19 Q.    The word "gale"?

20 A.    Well, "gale" can be used -- a gale tends, in my aspect, it

21 means sustained winds up over 35.  If it's less than that, it's

22 just possible gusts to 35, just a quick puff.

23 Q.    My hypothetical was this:  If you had a forecast that said

24 you're going to have gale force winds in less than 24 hours

25 after you make your southerly turn, would you have gone?

1   A.    No.

2        MR. BOYAJIAN:  Could we pull up A-92, please?

3   Q.    (By Mr. Boyajian)  Let's look at when this NOAA forecast is

4   for.

5        Sunday, October 16th, 9:54 a.m., out of Seattle.  These are

6   the forecasts you would have been looking at when you said,

7   "NOAA weather texts"?

8   A.    Correct.

9   Q.    Let's go down to the marine section.

10        So, again, this is Sunday before you leave.  Do you see

11   here, starting at the -- you have gale force winds at the

12   entrance -- on Saturday, though, you're not out there yet -- and

13   it says, "Easing this evening over the inland waters with

14   small-craft advisory," and it says, "Winds easing all waters on

15   Tuesday with a ridge of high pressure moving over the area.

16   Next front arrives on Wednesday for more small-craft advisory

17   winds."

18        Do you know what small-craft advisory winds are in the

19   Pacific Northwest?

20   A.    It's less than a gale.

21   Q.    Sure, but do you know what they are?

22   A.    Not off the top of my head.

23   Q.    Okay.  It's 21 to 33 knots.  Gale is 34 to 47.  Small-craft

24   advisory can also be issued in the Pacific Northwest -- you'll

25   hear testimony from our weather expert -- for ten-foot seas.

1     So either 21 knots or over, or ten-foot seas.  Captain

2  Shaw's upper limit on winds was 21 knots, right?

3  A.    Yes.

4  Q.    Less than 22?

5  A.    Uh-huh.

6  Q.    Okay.  So small-craft advisory is higher than Captain

7  Shaw's restriction?

8  A.    Yes.

9  Q.    Okay.

10     Could we go to the next forecast, please?

11     This is Sunday, and this is before you crew up and tie up.

12  A.    Yes.

13  Q.    You're still checking forecasts, though, in advance of your

14  trip, aren't you?

15  A.    Absolutely.

16  Q.    Okay.  So you would have seen that one on Sunday?

17  A.    Yes.

18  Q.    Monday, October 17, 3:33 p.m., marine section, second

19  paragraph:  "A weak ridge will build over the Pacific Northwest

20  on Tuesday."

21     You were leaving today, Monday.  You'd get to Cape Flattery

22  sometime on Tuesday?

23  A.    What day is Monday?

24  Q.    The 17th of October.

25  A.    Okay.  Yeah.

1    Q.    And in your deposition, page 44, we discussed what time you

2    were going to round Flattery.  You said 1700 hours.  Do you

3    think that's still accurate, based on your logs?

4    A.    I can't remember at this time.  I'd have to see the logs.

5    Q.    Okay.  Do you have a reason to think that the time you gave

6    me in your deposition is wrong?

7    A.    It could be.

8    Q.    In any event, you were going to get, sometime on Tuesday

9    afternoon, out around Flattery onto the open ocean?

10   A.    Possibly, yeah.

11   Q.    Okay.

12         Second paragraph:  "A weak ridge will build over the

13   Pacific Northwest Tuesday, and winds will ease, then turn

14   offshore, and rise to gale force over the coastal waters ahead

15   of the next front."  Do you see that?

16   A.    Yes.

17   Q.    You were tracking NOAA forecasts on the day you tied up and

18   crossed Puget Sound, right?

19   A.    Yes.

20   Q.    Okay.  So you would have seen this forecast?

21   A.    I would have, yes.

22   Q.    Okay.

23         The apps were telling you something different, but we don't

24   have any of those anymore, right?

25   A.    No.

1    Q.    Okay.  We just have this one, and it says gale force?

2    A.    Yes.

3    Q.    Okay.  If you'll go the next forecast, please.

4          This is Tuesday, real early in the morning -- so this is

5    before you get to Flattery, no matter what time on Tuesday you

6    got there.

7          The marine section again, please.  This is as you're

8    approaching.  "Small-craft advisory for hazardous seas continues

9    across the coastal waters."

10         We talk about the two bases for a small-craft advisory in

11   the Pacific Northwest greater than 21 knots or greater than

12   ten-foot seas.  This one is specifically saying it's based on

13   hazardous seas.

14         Did you have this forecast?

15   A.    Yes, I must have looked -- I'm sure I looked at this one.

16   Q.    Okay.  And then it says, "A moderate-to-strong frontal

17   system associated with a low-moving front offshore into

18   Vancouver Island and will move onshore Wednesday night and

19   Thursday morning.  Expect south to southeast winds," not behind

20   you, not a tailwind.

21   A.    That's behind my intended route.

22   Q.    This is saying the front will move there.  This is not

23   saying where the winds will be, is it?  Is it telling you where

24   these wind will be?  It's saying over the coastal --

25   A.    From the offshore waters into northern Vancouver Island, so

1   that's saying that front is passing above me, north of me into

2   Vancouver Island, into Canada.

3   Q.    Right.  Where's it telling you the winds are?  Does it say?

4   It says expect them over the coastal waters Wednesday night.

5   And what is it saying they'll do?  "Rise from 20 to 30 over the

6   coastal waters, then rise to near gale force later Wednesday

7   night.  Gales also possible."

8         So this one is saying small craft advisories for seas in

9   excess of ten feet, and then 30 knots wind could be full gale

10  overnight on Wednesday, right?

11  A.    As I said before, if it's blowing further offshore, you

12  might expect that, but the closer to shore, you're not going to

13  get that --

14  Q.    I understand.

15  A.    -- with that wind.

16  Q.    This is the forecast you would have read.

17  A.    I look at it, and I take that information and other

18  variables, and I'll take that into account.  I don't look at it

19  and say 100 percent, put all my eggs into that basket just on

20  the NOAA forecast and say I'll go all-stop and put the anchor

21  down.

22  Q.    Okay.

23        In your deposition, page 46, line 18, it says, "That's

24  exceeding wave parameters, sea state within parameters.  If I

25  had that exact forecast, then I would say, well, probably not a

1    go, but that's not what I had."  That is what you had.

2    A.   As I said before, when I gave my deposition, I didn't have

3    all the information, and I was extremely tired.  I'd never given

4    a deposition before.  I wasn't even quite sure what I was

5    looking at.

6    Q.   You had an opportunity to review your deposition and make

7    corrections of mistakes of fact.  Did you take that opportunity

8    with your counsel?

9    A.   Please repeat.

10   Q.   Your counsel requested a copy of your deposition transcript

11   to review and make changes and corrections, correct facts.  Did

12   you make changes and corrections to fix any of these things that

13   you stated incorrectly in your deposition?

14   A.   No.

15   Q.   Okay.

16        I also asked you, before I started showing these -- and the

17   transcript today will reflect that -- if you had a forecast that

18   said gale force within 24 hours, would you have gone, and you

19   said no.  So we don't have to go back to your transcript.

20        I'm asking you, you had this forecast, you said you did,

21   and you told us, a few minutes ago, if you did have a forecast

22   that looked like this, you wouldn't go.

23        Why'd you go?

24   A.   As I said earlier, that's over a wide, vast area, and

25   taking into account all the different parameters, the wind

1  direction, the swell direction, the heading, all those different

2  things, yeah, perhaps if you were 60 miles out, which this

3  forecast is for, you might experience that.  If you're closer to

4  the shore, you're probably not going to experience it if it's

5  southeast, which it was.

6  Q.   Where does it say 60 miles out?  Where does it tell you

7  that?

8  A.   It's either 10 to 60 -- is it 10?  I can't see the whole

9  thing.

10  Q.   Okay.

11      So what you're saying is you read between the lines and

12  decided that it was okay to go --

13  A.   I don't know how many miles this forecast that I'm looking

14  at right now is for.

15  Q.   Well, you said that you were qualified to interpret

16  forecasts and decide whether you could go.  You're looking at it

17  right now, and you're saying you can't tell me --

18  A.   I don't know how many miles out this forecast is for.

19  Q.   This is the Sector Seattle marine forecast.

20  A.   There is a forecast for onshore to 10 miles, and then

21  there's a forecast from 10 to 60.  I'm not sure which one this

22  is for.

23  Q.   Okay.  So what you're saying is -- you told us before, if

24  you had this forecast, you wouldn't go.  Now you're saying, Now

25  that I'm looking at it, I can't tell where it says the bad

1  weather will be.

2  A.   I didn't know exactly which forecast I was looking at a few

3  minutes ago, and then it occurred to me.

4  Q.   Okay.  Can we get the last of the forecasts, please?

5  A.   I can't see what mileage...

6  Q.   Okay.  This is Wednesday, crack of dawn.  You were out.

7  You've turned south?

8  A.   I still don't know how many miles out that forecast is for.

9  Q.   I understand.  This is -- I asked you if these are the

10  forecasts you would have seen, and you said yes.

11  A.   I'm sorry.  I misinterpreted the question without getting

12  all of the --

13  Q.   Is there some piece of this page that you would like to

14  see that would --

15  A.   I would like to see how far out this forecast is for; like,

16  how many miles offshore.

17  Q.   Well, it just says what it says, and you said it would be

18  the one you had.

19  A.   I'm sorry.  I misinterpreted that question.  I was assuming

20  this was out to 60 miles, because our track would be over 10

21  miles offshore.

22  Q.   Okay.  But you had forecasts in your hand that said gale

23  force winds and seas over 10 feet, didn't you?

24  A.   I can't recollect.

25  Q.   But you just did recollect.  You just told us all that you

1    would have seen these, that you would have looked at them.

2    A.    Yes, I would have looked at them.

3    Q.    Okay.  So did you have these forecasts?

4    A.    I'm sorry?

5    Q.    So you had seen these forecasts when you made your decision

6    to go?

7    A.    I'm sure I would have looked at them, yes.

8    Q.    Okay.

9          Can we go to the marine section?  This one is after you've

10   turned south.  You're on the ocean, but you haven't hit a storm

11   yet.  You haven't hit any conditions yet.

12         "A warm front will bring gale force winds to the coastal

13   waters this afternoon.  The trailing cold front will arrive on

14   Thursday with gales continuing over the coastal waters.  Gale

15   force winds are likely at the east entrance to the strait," et

16   cetera."

17         So you have another one, right after you get out onto the

18   ocean at 3:40 in the morning, telling you gales are coming.  Why

19   didn't you turn around?

20   A.    I -- I don't know what -- what day is this for?

21   Q.    We can go back to the top.  It's 3:44 a.m., the first

22   morning you're on the water -- on the open ocean.

23   A.    Okay.

24   Q.    Is there something in here that's telling us the gale that

25   they say three, four times, isn't going to be where you were

1  going to be?

2  A.    Yeah.  They're going to be behind me.

3  Q.    Where does it say that?

4  A.    "Likely at the east entrance to the Straits of Juan de

5  Fuca."  I would already be south of there.

6  Q.    Okay.  That's one of the three places they mention gale.

7  Let's start at the top.

8      "Gale force winds to coastal waters."  Were you going to be

9  on the coast of Washington?

10  A.    Yes.

11  Q.    Okay.  So where is it saying it's not going to be where you

12  are?

13      "The trailing cold front will arrive on Thursday with more

14  gales continuing over the coastal waters."  Where does it say

15  it's not going to be where you are?

16  A.    Yeah, you read it correctly, I guess.  That's also just one

17  of the pieces of the puzzle.

18  Q.    Okay.

19      But you said if you had a forecast that said "gale," you

20  wouldn't go.  We just looked at four forecasts, starting the day

21  before you left, the day you were on Puget Sound, the day you

22  turned south, and the next morning when you were on the ocean.

23  Each one of them said "gale."

24  A.    Those are NOAA forecasts.  They overforecast.

25  Q.    Okay.

1          But you didn't say, when I asked you if you had a forecast

2     that said "gale," not if it was the NOAA forecast, and you just

3     said, "I wouldn't go."

4     A.    You're mincing words, but...

5     Q.    I don't mean to mince words.  I'm trying to be precise.  So

6     help me understand if there is a distinction.

7          You're saying if the apps told you something different --

8     and we don't have those anymore -- but if this one said "gale,"

9     you'd ignore it?

10    A.    No, no.  I'd take it into consideration.

11    Q.    But not not go, so ignore it.  You said, "If I had a gale

12    forecasted, I wouldn't go."

13    A.    Uh-huh.

14    Q.    This says gale --

15    A.    And at that point, I also talked to the owners, and they

16    were talking with other weather forecasters.  It just wasn't my

17    total opinion there.  I was checking with other --

18    Q.    Okay.  So you were talking to the owners.  The owners had

19    access to these forecasts, too?

20    A.    Yes.

21    Q.    Okay.

22          So who was in on that decision?  Was it you, Bob Shrewsbury

23    and Russ Shrewsbury because Jeff was on vacation in Hawaii?

24    A.    Yes.

25    Q.    Okay.

1        So all three of you had access to these, and all three of

2   you knew what was in the tow plan, and somebody back at the

3   office had seen the towing recommendations in the survey that

4   were more clear -- right? -- that were more black and white;

5   said don't go unless you have less than 21 knots, less than

6   eight feet, and the three of you collectively made the decision

7   to ignore these four forecasts.

8   A.    I don't know.

9   Q.    Okay.

10       MR. BOYAJIAN:  Can we please go to the logbooks for a

11  minute?

12  Q.    (By Mr. Boyajian)  Okay.  Tuesday the 18th, this is you

13  crossing Puget Sound, correct?

14       Sorry.  Can you go back to the 17th?  I apologize.

15       This is the day you make up your tow?

16  A.    Yes.

17  Q.    We looked at the first forecast on the 16th, Sunday.  It

18  said potential gale force on Wednesday and Thursday, right?

19  A.    Yes.

20  Q.    Okay.  Then on Monday, we look at another forecast and it

21  says potential gale force on Wednesday night into Thursday,

22  right?

23  A.    Yes.

24  Q.    Okay.  This is when you make up your tow, on Monday.

25  Starting about noon, you're crossing Puget Sound, right?

1  A.   Yes.

2  Q.   Okay.

3         MR. BOYAJIAN:  Let's go now to Tuesday, please,

4  Ms. Ivie.

5  Q.   (By Mr. Boyajian)  On Tuesday, we saw another forecast that

6  said predicted gale Wednesday night into Thursday, right?

7  A.   Yes.

8  Q.   Okay.  And we are crossing Puget Sound.

9         And then at your deposition, you told me 1700 hours is when

10 you leave Puget Sound for Cape Flattery -- around Cape Flattery,

11 rather.  Is that still the hour you want to pick, or do you want

12 to pick a different hour?

13 A.   About 2000, it looks like.

14 Q.   So 8:00 p.m.?

15 A.   Yes.

16 Q.   Okay.

17        So it isn't until 8:00 p.m.  You've got three days' worth

18 of forecast saying you're going to hit a gale within the first

19 day when you get out there, but you still make this turn at

20 8:00 p.m., right?

21 A.   Yes.

22 Q.   The next day, Wednesday morning, 3:44 a.m., another says

23 you're going to hit a gale later tonight and into Thursday

24 morning, but you kept going south, right?

25 A.   Yes.

1    Q.    At 12:15 -- you said you got on the ocean around 8:00

2    p.m. -- so 20 hours later, you are in conditions exceeding the

3    tow restrictions, right?

4    A.    Not Western Towboat's.  The one that I had on board that I

5    was looking at.

6    Q.    Sure, that said 20 to 25, right, and this says 25 to 30?

7    Those conditions --

8    A.    Oh, yes, the wind, yeah.

9    Q.    Okay.

10          Next log entry, 1400, 2:00 p.m., you log gale force winds.

11   Thirty-five knots is gale force, right?

12   A.    That was Kyle, not me.

13   Q.    Okay.  You being the *Ocean Ranger*, you're the master of the

14   *Ocean Ranger*.  The logbooks, they are the official record of

15   what the tug does and encounters, right?

16   A.    Correct.

17   Q.    And they're your logbooks in the end, right?  These are

18   your signatures, "Captain's signature, Stephen McGavock"?

19   A.    Absolutely, yes.

20   Q.    Okay.  So if someone else makes the entry, when you sign

21   the book it becomes your entry, your responsibility as the

22   official record of what your towboat did and what it

23   encountered.

24   A.    Yeah, but Mr. Jacobson's -- when he looks at the

25   anemometer, which usually is not correct -- if he's looking at

1   the Beaufort scale, his judgment, his opinion of the wind is

2   going to be different than mine.

3   Q.   Okay.

4        When you sign these logbooks as the captain, you create the

5   official record for the tugboat *Ocean Ranger*, correct?

6   A.   That's correct, yes.

7   Q.   So according to you, Captain Stephen McGavock, at two

8   o'clock in the afternoon, exactly when it's forecasted, your

9   tugboat is in a gale?

10  A.   Apparently.  I was not in the wheelhouse at that time.  I

11  was not on watch, so I can't -- I can't answer for Mr. Jacobson.

12  Q.   Fair.

13       You signed the logbooks.  They're your official logbooks

14  for the *Ocean Ranger* --

15  A.   Yes, but I did not physically visually see that.

16  Q.   This is --

17  A.   I understand what you're saying.  I signed that, yes.

18  Q.   Okay.

19  A.   Did it happen for sure?  Did he really experience a gale?

20  That's up for debate.

21  Q.   Fair.

22       Let's say he didn't.  Let's say it only got to 33, and he

23  wrote 35.  So it was one knot less than a gale.  These

24  conditions, starting at 12:15 and going to, at least, 8:00 p.m.,

25  that whole stretch -- eight hours -- are conditions exceeding

1  the tow restrictions, whether we use Captain Shaw's or we use

2  Western's, right?

3  A.   With the wind parameters, yes.

4  Q.   With the wind parameters, yes.

5       And, again, you didn't ask Captain Shaw, "Is it okay for me

6  to push the wind parameters as long as I don't push the sea

7  state parameters?"

8  A.   No, I did not.

9  Q.   Okay.  Let's just do this quickly.

10      Let's say we take Captain Shaw's restriction, because you

11 said that one was black and white.  Right?  His restriction is

12 21 knots or less.  I want you to help me count out how many

13 hours the *Ocean Ranger* spent in conditions exceeding the

14 restrictions.

15      We said his were seas greater than eight feet, winds

16 greater than 21 knots.  If we start at 10:00 a.m. -- right? --

17 and 22 is greater than 21, barely, but it is, isn't it?

18 A.   Uh-huh.

19 Q.   So we've got two, four, six, eight, ten -- at least 12

20 hours here on the first day you're out on the ocean, where

21 you've towed the dry dock through conditions exceeding the

22 restrictions, right?

23 A.   Yes.

24 Q.   Okay.  Can we go to the next page, please?

25      This day was pretty good.

1          Going to the next page, 21, please.

2          Another day.  Great weather on the 21st, Friday.

3          Going to the next, please.

4          So we already said 10 or 12 hours, right?  Here we go.

5     We've got -- now we have a 10- to 13-foot, 10- to 12-foot swell.

6     So we've got at least two, four, six -- at least eight more

7     hours in conditions exceeding the tow restrictions, right?

8     A.   Yes.  And that was not on the forecast.

9     Q.   Okay.

10    A.   And it was beyond the range of what I could have seen when

11    I'd left Flattery.

12    Q.   You told us earlier that, when you were leaving, what you

13    needed was five, six, seven days of good-forecasted weather to

14    feel comfortable about a window.

15    A.   Yeah, but you can only -- I generally trust up to maybe

16    three days, depending on the area, time of year, et cetera.  And

17    this goes, kind of, beyond that scope.  You know what I'm

18    saying?

19         And in this circumstance -- if I can explain -- you notice

20    that there is hardly any winds.  There's airs, which means no

21    wind.  And when it was recorded 10- to 13-foot -- it's

22    south-southeast 10 knots, and there was recorded 10- to 13-foot,

23    I'm assuming, long period of swell, if there's no wind.  That

24    can come out of nowhere.  That can -- you can't predict some of

25    those.

1  Q.    And that may be true.  I'm walking through how many hours

2  do your logbooks show the *Ocean Ranger* was in conditions

3  exceeded the tow restrictions.

4  A.    Sure, I see your point.

5  Q.    We'll come back to predicted in a minute --

6  A.    Uh-huh --

7  Q.    -- because you raise a point I want to touch on.

8         MR. BOYAJIAN:  Can we go to the next page, please,

9  Ms. Ivie?

10  Q.    (By Mr. Boyajian)  Okay.  Here we go again.

11        If we're using Richard Shaw's numbers -- right? -- we said

12  that maximum for 4-6 is eight, but let's stay with the maximum

13  on swells, ten feet.  You're within ten feet, but, again, we've

14  got two, hour, six, eight hours in excess of the wind

15  restriction, right?

16  A.    Uh-huh.

17  Q.    Okay.  Next page, please.

18        Okay.  We've got another two, four, six, eight, ten,

19  twelve, another fourteen.  You see --

20  A.    Yeah.  Can I explain something?

21  Q.    No.  I didn't ask a question right now.

22  A.    Okay.

23  Q.    Because I want to stay on my train of thought here.

24        Let's see.  We've got 24, 26, 36.  We've got at least --

25  according to the exercise we just did -- at least 44 hours

1  between when you rounded Cape Flattery and when you first notice

2  a list and you're towing the *Ocean Ranger* and the YFD 70 through

3  conditions exceeding the plan.  Do you disagree with my math on

4  that?

5  A.    I wasn't keeping track.  But 44 hours?  Okay.

6  Q.    Well, we said 12 the first day, eight another time, eight

7  another time, and then 14 right here.  That's 44.

8  A.    Okay.

9  Q.    Let me ask you another question.

10         You just said -- and I'll raise one more thing.  I was

11  thought I was going to end here.

12         You said you knew you needed five, six, seven days of good

13  weather to get from Cape Flattery to San Francisco, but you only

14  trust a three-day forecast.  Are you rolling the dice on the

15  next three or four days?

16  A.    Absolutely not.

17  Q.    Okay.  So what -- what, then, are you doing?

18  A.    I'm taking -- the longer range out it gets, I'm taking less

19  stock in what it's saying, what the models are predicting.  I

20  mean, obviously, it's a dart board sometimes.  The forecasters

21  will admit, even, it could be a guess.  It's weather.  It

22  changes.

23         And, yeah, a 24 to 48, at this point, this far along, I

24  don't think the best forecaster in the world could have

25  predicted what the weather was there.  And at that point, I

1  mean, am going to turn around?  No, because I'm closer to the

2  port of refuge that's in the tow plan.

3      So, I mean, I can't foresee this.  This is beyond than what

4  I, as a captain and my meteorological knowledge, can predict,

5  and beyond even what the best weather predictor could predict.

6  Q.   So what are you doing, then, beyond the first three days?

7  A.   You're continuing to check the whether every day.  But I'm

8  just saying, when I leave -- when I leave, I'm looking out --

9  okay? -- four days.  You know, the first couple of days -- all

10 right? -- those are fairly, you know, trustworthy.  But out to

11 as far as the forecast extends, as far out as it goes, it's

12 beginning to look, you know, less trustworthy.

13 Q.   Okay.

14      So you say you trust 24 to 48 hours, but when you had a

15 gale force four days in a row that said gale force, you didn't

16 trust those?

17 A.   As I said earlier, that is forecast -- the worst forecast

18 possible for that nav area.  And in this case, with this

19 predominant wind direction, part of that is going to be less

20 than what's predicted for the furthest offshore point.

21 Q.   Okay.  But it didn't prove to be, right, because your

22 logbooks show --

23 A.   For a short period of time, yes --

24 Q.   So you got what you forecasted?  You ignored it --

25 A.   -- sustained.

1    Q.   Hold on.  Let me finish my question, please.

2         What was forecasted was a gale sometime on Wednesday

3    afternoon into Thursday morning.  Your logbooks show you got a

4    gale sometime between Wednesday night and Thursday morning,

5    right?

6    A.   Yes.

7    Q.   Okay.  We'll go back to those forecasts for a minute, and

8    let's start with the first one again.

9         I'm okay for now.  I'm sure that your counsel has some

10   redirect.

11             MR. GASPICH:  Could you leave that exhibit up, that

12   Iowa State weather, whatever you call it?

13             MR. BOYAJIAN:  They're in your exhibits.  You have

14   them.

15             MR. JARRETT:  It's our 92.

16                      REDIRECT EXAMINATION

17   BY MR. GASPICH:

18   Q.   Do you remember the Iowa State documents counsel was just

19   going through with you?

20   A.   The Iowa State?

21   Q.   Yes.  That's that exhibit with the so-called NOAA records.

22   A.   Oh.

23   Q.   Have you ever seen that before?

24   A.   I don't recollect seeing them, no.

25   Q.   When you get NOAA information on your vessel, does it look

1  like that?

2  A.   Well, like I said, I couldn't tell how far offshore that

3  forecast was for.

4  Q.   Yeah.  Could you take a moment -- I don't think you got a

5  chance.  Can you explain to the court what you mean by that?

6  A.   Well, as I stated earlier, for the NOAA text zone forecast,

7  there's a spot for zero to 10 nautical miles offshore, and then

8  there's another separate forecast, a separate zone for 10 to 60

9  nautical miles offshore, and then there is a wider swath that's

10  for that larger nav area that's way offshore.

11  Q.   When it said "coastal," those records, you don't know if it

12  applies to the inshore or the offshore portion?

13  A.   That's correct.  I didn't see the...

14  Q.   You were asked a number of questions about this particular

15  document, Exhibit A-4.  This is the Captain Shaw survey report,

16  and you had never seen this before, correct?

17  A.   That's correct.

18  Q.   All right.

19       So if you had seen this and you saw that these were

20  entitled "trip and tow recommendations" and that there is a

21  section under which he was asking you about that said "towing

22  recommendations," what is your interpretation of the word

23  "recommendation"?

24  A.   Exactly what it says, recommendation.

25  Q.   And what is your interpretation?

1    A.    It's not black and white; it's up for interpretation.

2    Q.    So this is Captain Shaw's opinion that he's recommending.

3    He's not requiring you; is that --

4    A.    That's correct.

5          MR. GASPICH:  That's all the questions I have.  Thank

6    you.

7          THE COURT:  Captain, before you step down, I have a

8    couple of questions.

9    I'm trying to figure out in my mind -- I understand about

10   the different NOAA forecasts and the zones, as you've explained,

11   and, of course, that makes a ton of sense.

12         THE WITNESS:  Uh-huh.

13         THE COURT:  Mr. Boyajian was asking you a series of

14   questions about you trust the weather forecast for 24 to 48 a

15   lot more than you would 72 and whatever.  That makes ultimate

16   sense as well.

17         THE WITNESS:  Yes.

18         THE COURT:  But once you're out there and something

19   unexpected comes up at the 72-hour mark, what options do you

20   have at that point in time?  What word do you use when things

21   get...

22         THE WITNESS:  Nautical or snooty?

23         THE COURT:  Snooty.

24         THE WITNESS:  In this case, we don't have a lot of

25   options up and down the West Coast, because there is few

1    deep-water ports.  Especially in Washington, there is only, and

2    that's using the term "deep water" loosely.  Also, there's the

3    Columbia River, and then Coos Bay.

4         So in this circumstance -- in a lot of circumstances you

5    don't really have an option.  So if you get weather that is

6    above what is shown in the forecast, then you might be stuck.

7              THE COURT:  And what does that mean?  Does that mean

8    you stop?  You --

9              THE WITNESS:  You slow down.  You slow down and adjust

10   your vessel -- in this case, a vessel in tow -- into the most

11   comfortable, efficient configuration to make less stress on your

12   tow wire, your tow, your tugboat.

13             THE COURT:  Okay.  And then the other question I had

14   is, Mr. Boyajian also asked you several questions about

15   small-craft advisory and gale force, and I think he mentioned 21

16   to 33 knots for small-craft advisory.  Do you agree that that's

17   correct?

18             THE WITNESS:  I believe so.  I'd have to double-check,

19   honestly.

20             THE COURT:  And then gale force winds would be 33 to

21   whatever --

22             THE WITNESS:  It's 33 to 55, and then above that is

23   storm force.  I'd have to have a chart in front of me.

24             THE COURT:  Any other questions based on the court's

25   questions?

1          MR. GASPICH:  Yes, sir.

2                    REDIRECT EXAMINATION

3     BY MR. GASPICH:

4     Q.   In view of the change in circumstances that you encounter

5     when proceeding down the Pacific coast between Flattery and San

6     Francisco, Mr. Boyajian showed you a couple of instances where

7     you had weather that was greater than what you may have expected

8     or hoped for.  And did you, in fact, make the types of changes

9     to course and to speed during those times?

10    A.   Absolutely, and the logbook will reflect that.

11              MR. GASPICH:  Okay.  Thank you.

12              THE COURT:  Mr. Boyajian, any questions based on the

13    court's questions?

14              MR. BOYAJIAN:  Nothing further, Your Honor.  Thank

15    you.

16              THE COURT:  You may step down.

17         Counsel, let's go ahead and take our afternoon break at

18    this time.  We'll come back with your next witness.

19                   (Court in recess 2:36 p.m. to 2:52 p.m.)

20              MR. SIMMS:  We call Dan Keen.

21              THE COURT:  Step up, and raise your right hand to be

22    sworn.

23                        DANIEL KEEN,
            having been first duly sworn, testified as follows:

24

25              THE CLERK:  State your name for the record, and spell

1   it for the court reporter.

2          THE WITNESS:  Daniel Keen, K-e-e-n.

3          THE COURT:  Mr. Keen, you've been sitting in the

4   courtroom.  You've heard my instructions to everybody else,

5   especially speaking over -- and I know people want to get the

6   information out, but when they talk over each other, it makes

7   for an imperfect record and an angry court reporter.

8          THE WITNESS:  All right.

9          THE COURT:  You may inquire.

10                      DIRECT EXAMINATION

11  BY MR. SIMMS:

12  Q.   Mr. Keen, how long have you worked for Vigor?

13  A.   This past May made eight years at Vigor.

14  Q.   So by my quick math, you've worked with them since 2013?

15  A.   That's correct.

16  Q.   All right.

17       And in 2013, what was your job with Vigor?

18  A.   In 2013, my job was dockmaster.

19  Q.   You had some responsibility for the YFD 69?

20  A.   The 69, yes, with preparations and configurations

21  installing in the Seattle shipyard.

22  Q.   Yes.  So you had responsibility for the 69 for the

23  transport from Portland to Seattle?

24  A.   Yes.  I assisted with the tow preparation.

25  Q.   Okay.

1          And you also had responsibility for the 70?

2     A.    Yes, and I assisted with the 70.

3     Q.    And you were part of the decision to have the 70 towed in

4     one piece from Seattle to Ensenada, correct?

5     A.    Yes.  I was on a bigger team, yes.

6     Q.    Who in the bigger team made the decision to tow the 70 in

7     one piece from Seattle to Ensenada?

8     A.    Ultimately, the decision was up to Paul Torrey and Adam

9     Beck to enter into contract with Western.

10    Q.    And you participated in that decision?

11    A.    From a supportive role, yes.

12    Q.    Okay.

13          Before that decision was made to tow in one piece, nobody

14    did any engineering calculations to confirm that a one-piece tow

15    could be done safely to Ensenada, did they?

16    A.    There were no specific calculations performed on the YFD

17    70, as you've described.

18    Q.    Okay.

19          And you hold a master's license?

20    A.    No, I do not.

21    Q.    You have served on a ship, though?

22    A.    Correct.  I previously held a merchant mariners credential

23    and license.

24    Q.    And reading charts is part of a mariners credential, right?

25    A.    Correct.

1  Q.   And you knew the route that the YFD 70 was to take from

2  Seattle to Ensenada because you saw the tow plan with the route,

3  right?

4  A.   Well -- I'm sorry.  Are you talking Western's tow plan?

5  Q.   Yes, submitted to the Coast Guard.

6  A.   Yes, I saw Western's tow plan.

7  Q.   You saw that.  You were in correspondence to and from the

8  Coast Guard that said they approved the tow plan, right?

9  A.   Correct.  I was in correspondence because of a request from

10 Russ Shrewsbury to assist with details of configuration for the

11 Coast Guard.  They had questions, and I helped Russ answer those

12 questions.

13 Q.   Okay.

14      So as part of your submission of the tow plan, you saw the

15 route, and you knew it would go through marine sanctuaries,

16 right?

17 A.   No.  I was unaware of marine sanctuaries locations.

18 Q.   Okay.  So you were a merchant mariner, and you read charts,

19 right?

20 A.   That's correct, sir.

21 Q.   And so you saw the chart for this route, right?

22 A.   To be honest, I do not recall, actually, picture in my

23 mind, the voyage plan, but it's a good chance it came across my

24 desk, yes.

25 Q.   Okay.

1    And when you looked at the chart, you couldn't tell whether

2    there were marine sanctuaries that the tow would go through?

3    A.    Well, sir, typically, if I received something from Western

4    on a voyage plan, it would have been a large, drawn-out view

5    where I -- I don't know if the detail was there.  Further to

6    that, I had no bearing or technical warrant of the voyage, you

7    know, route.

8    Q.    All right.

9    As a merchant mariner, part of it is to be aware of your

10   surroundings, isn't it?

11   A.    That's correct, sir.

12   Q.    And so it's correct that you, at some point, knew what a

13   marine sanctuary was, didn't you?

14   A.    No, sir.  I -- I was not very familiar with West Coast

15   marine sanctuaries.  I grew up on the East Coast.

16   Q.    Okay.

17   So we're going to talk about the tow going in -- or the

18   proposal to go into San Francisco, and you were part of that

19   discussion about the tow going into San Francisco to meet

20   Global, right?

21   A.    That's correct.

22   Q.    And so at the time you had no idea that that route would

23   pass through a marine sanctuary; are you telling me that?

24   A.    That's correct, I had no idea.

25   Q.    No idea, even though you are a licensed merchant mariner?

1    A.    That's correct, sir.

2    Q.    Okay.

3          So the YFD 69, there was a --

4    A.    I answered that incorrectly.  I apologize.

5          At that time I do not think I actually was licensed.  At

6    the time of the tow, my license had expired.  I was no longer a

7    licensed mariner at the time.  I just wanted to be clear.

8    Q.    All right.

9          So the YFD 69 was moved from Portland to Seattle in 2015,

10   right?

11   A.    The 69, yes.

12   Q.    And as part of that move, Vigor had Heger Dry Dock do a

13   number of studies, right?

14   A.    No.  Actually, the study was done prior to commencing or

15   even engaging contractually to do that tow.  That was a Vigor

16   market study to determine whether or not the dock could be moved

17   to Seattle at all, or we studied other docks in the Portland

18   location.

19   Q.    So we're going to focus on the 69 move to Portland.

20         Okay.  As part of that study, Heger made some

21   recommendations, right?

22   A.    They made case scenarios, yes.

23   Q.    So different scenarios?

24   A.    Yes.

25   Q.    And one of the scenarios was a one-piece tow, right?

1    A.    Yes.

2    Q.    And they -- yes.

3          And they did studies of the forces that would -- that the

4    69 would encounter for a one-piece tow, correct?

5    A.    Correct.

6    Q.    Okay.  That was never done for the 70 before the one-piece

7    70 tow, right?

8    A.    The 70 and the 69 are structurally identical docks, sir.

9    Q.    No, that's not my question.

10          The study for the one-piece tow for the 69, there was never

11   an engineering study done for the 70, right, for a one-piece

12   tow?

13   A.    The results of the 69 can be transferred over to the 70.

14   Q.    Can they?  So the 70 and the 69 were in exactly the same

15   shape, weren't they?  That's what you're saying?

16   A.    No, that's not what I said.

17   Q.    Okay.

18          The 69, says Captain Shaw, is in very used condition --

19   sorry -- the 70, and the 69 was in poor condition, right -- or

20   good condition?

21          MR. BOYAJIAN:  Your Honor, if I may?  Objection.

22   Mr. Keen hasn't been combative or belligerent, and Mr. Simms is

23   treating him as though he has been.  He's giving

24   straightforward, honest answers, and I think he deserves to be

25   treated with a level of greater respect.

1      MR. SIMMS:  I really take exception to that.

2      THE COURT:  All right.  Hang on.

3      I want all of you to behave as professionally as possible,

4  all of you.  That's just the mandate from the court.

5      But, secondly, your question is bouncing back and forth,

6  and what I think it's doing, Mr. Simms, is confusing the

7  witness.  It's certainly confusing me.

8      If I could have you take a moment and take a look at the

9  question that you want to ask, and make sure that you get it the

10  way you want to ask it.

11      I'm reading them as they come up in real-time, and they're

12  confusing even reading them.  So take a deep breath.  He's not

13  being combative.  Ask him the question that you want to ask.

14      MR. SIMMS:  All right.

15  Q.   (By Mr. Simms)  The 69 and the 70 were not in the same

16  shape, right?

17  A.   Condition?  No.

18  Q.   Not in the same condition.  Okay.

19      Well, let's talk about the Heger Dry Dock reports.

20      Was there a List-O-Light system on the 70?

21  A.   Yes, but that was for our dry dock operation, yes.

22  Q.   Okay.

23      And Heger had -- had -- so -- let me back up.

24      What is a List-O-Light system?

25  A.   List-O-Light system, if I'm correct, sir, is a light bar;

1  five lights across; stern light being white, and then two to one

2  side red, two to the other side green.

3      As the dock -- as it sits there with a ship in it when they

4  perform maintenance, if the dock were to gain a list or a

5  correction there, one of the colored lights would show up.  Two

6  lights would show up if the list was larger than a preset number

7  in the system.

8  Q.   So a List-O-Light system would indicate the dock is

9  listing?

10  A.   Correct.  This is, again, in ship repair, you know, tied to

11  the pier -- fixed-to-the-pier situation, yes.

12  Q.   But the List-O-Light system on the 70 was not operating

13  during the 70 tow, was it?

14  A.   No, sir.  It needs power.  It needs shore power to operate.

15  Q.   Okay.  And so there was no list indication on the 70 when

16  it was towed in one piece?

17  A.   No, sir.

18  Q.   And there were no flood alarms on the 70 when it was towed

19  in one piece?

20  A.   No flood alarms, sir.

21  Q.   And the cost of a flood alarm is about $3,000?

22  A.   I could not comment on that.  It's all dependent on how big

23  you build the system.  You can build systems that are analog and

24  can be simple.  You can build systems that are digital that

25  transfers signals to ships.  You have to be specific on the type

1    of system before I can engage in price.

2    Q.    So in the process of preparing this 70 for the one-piece

3    tow to Ensenada, you did some calculations based on Table G-4 of

4    the *Navy Towing Manual*, didn't you?

5    A.    That's correct.  Please confirm that it was Table G-4, but,

6    yes, I do do calculations out of the *U.S. Navy Towing Manual*.

7    Q.    Is this a table you use for your calculations, Table G-4?

8    A.    Yes, this is part of the table -- or the table I use to

9    support the calculations.

10   Q.    So the *Navy Towing Manual* is a reliable source to use for

11   determining standards for tow, correct?

12   A.    It's a source for standards of towing when towing U.S. Navy

13   assets.

14   Q.    And you use this table for what purpose?

15   A.    To calculate tow resistance, to verify the size of the tug

16   and load of the tug was satisfactory for the tow.

17   Q.    Okay.  Why was it important, if it was important, to

18   calculate tow resistance?

19   A.    Tow resistance helps size the jewelry or tow rig and wire

20   components there in between, and also, again, the size of the

21   tug.  You verify that you can make the speed that you desire for

22   your voyage.

23   Q.    All right.

24         And when you made your calculations, did you provide those

25   to Richard Shaw?

1   A.    Yes, Richard Shaw and Chris Law of Starr Insurance Company.

2   Q.    Chris Law of the insurance company?

3   A.    Yeah.

4   Q.    And Exhibit 30, are these the calculations that you did?

5   A.    I believe those are Chris Law's calculations, sir.

6   Q.    Uh-huh.  Okay.

7         So back to our tow manual here.  Okay.  So you see this 68

8   to 71 at the bottom, three piece.  And the total length of the

9   fully assembled 70 was 520 -- how long was it?

10  A.    528, sir.

11  Q.    528?

12  A.    Yes.

13  Q.    All right.  But this -- this down here has 474.

14  A.    Correct.

15  Q.    Okay.  So you never made calculations for a 528-foot tow,

16  did you?

17  A.    I did, sir.

18  Q.    Okay.  Using this table?

19  A.    Yes.  You can adjust the size of the surface area, which I

20  found that by using the GHS model of actual surface area.  So

21  instead of using a tabulated value, I found the actual, as-is

22  condition, and that to update the calculation.

23  Q.    Okay.  And that's what you provided to Richard Shaw?

24  A.    And Chris Law.  The initial request for validation came

25  from Chris Law's insurance.

1   Q.   Okay.

2        So on Chris -- and this is not entered as an exhibit -- but

3   on Chris Law's calculation, what shows you that whole 526 feet

4   was used?  Did he use it in his calculation?

5        You've seen these before, right?

6   A.   I have.  Unfortunately, I haven't studied his counts for

7   some time.  His counts were incorrect, and so I have a rebuttal

8   calculation to them that was part of the communication in

9   correcting the actual cross-sectional area, wind area, surface

10  area, et cetera.

11  Q.   All right.

12       Here's Exhibit 10.  At Vigor, did you have a copy of this

13  manual?

14  A.   Yes, I do.

15  Q.   Okay.  And you never provided the copy to Richard Shaw, did

16  you?

17  A.   That, I don't know.

18  Q.   You never told Richard Shaw that the original

19  configuration -- the original plans for the 70 were for a

20  three-piece tow?

21  A.   I cannot place the date or time, but I do believe Richard

22  Shaw and I had a conversation of -- that this was the ultimate

23  coup de grâce design of the dock; however, that was for a

24  for-deployed asset for the U.S. Navy, where it could be deployed

25  anytime, anywhere.  As with some of these docks were configured

1  with gun turrets, et cetera, for wartime efforts.  That's why

2  they were able to build up a stack and service itself in foreign

3  deployment scenarios.  So that's the intent of the three-piece

4  design.

5  Q.    There is no email or document that records that memory of

6  yours?

7  A.    No.

8  Q.    Okay.

9        And if that conversation happened, when did it happen?

10 A.    It was likely on the deck plate with the 69 tow.

11 Q.    It was about the 69?

12 A.    On the deck plate while we were working the 69 tow.

13 Q.    Okay.  All right.

14       So for the 70 -- and let's go forward to the days that it

15 was -- actually, it had departed Seattle, and then it goes on to

16 where it sank.

17       Okay.  What is the first report you got that the --let's go

18 to the 25th.  Did you get a report that the 70 was listing?

19 A.    I received a call from Bob Shrewsbury.

20 Q.    And you got some photos, right?  He sent you some photos?

21 A.    I got one photo sometime after the conversation.

22 Q.    Okay.  But you don't have those anymore?

23 A.    The photo?  I do not.  I submitted it back -- sorry --

24 after the time of the incident, when we had immediate data

25 collection or whatever.

1    Q.    Things disappear.

2    A.    Sure.  Yeah.  I didn't look back past then.  I, you know,

3    turned all my stuff in.

4    Q.    Okay.

5          So you got a photo, at least at the time, that had you look

6    at the dock.  And what did that -- when you looked at that

7    photo, could you tell whether it was going to sink?

8    A.    I could not determine that from one photo.

9    Q.    Okay.

10         And, in fact, you planned, throughout the evening --

11   afternoon and evening -- to come to San Francisco to meet the

12   tow in the morning, didn't you?

13   A.    That's correct.

14   Q.    And you talked to Greger, the local tow company --

15   A.    Yes.

16   Q.    -- to meet you there?

17   A.    Yes.

18   Q.    And you talked to Global Diving?

19   A.    I talked to both.  I believe Greger was in contact -- or

20   Russ Shrewsbury called me and told me, and he gave me a name,

21   and I made a contact from there.

22   Q.    And you told Russ you'd be going down to meet the tow?

23   A.    That's correct.

24   Q.    And you were out at the Seattle Athletic Club with your

25   wife for dinner, sitting in front of your laptop?

1   A.    No.

2   Q.    No?  That wasn't it?

3   A.    No.  I was at dinner, but it wasn't at that location.

4   Q.    Okay.  All right.

5         So let's look at this email that hasn't gotten much

6   discussion yet but will.  Let's go down to the bottom here.

7         So we're in the evening, and here is -- okay.  Emails; Bob;

8   talking about San Francisco.  Here is you:  "Just talked to

9   Russ."  Okay.  6:37 p.m.  What did you talk to Russ about?  And

10  this is Exhibit 34.

11  A.    I cannot remember what that conversation was about, sir.

12  Q.    Okay.  But did it have something to do with tank numbers?

13  What did you mean by "approx tank numbers"?

14  A.    It was the development of what's above on your screen, sir.

15  If you scroll up, it was --

16  Q.    Okay.  We'll go up.

17        So Bob reports back, 6:49, port forward is awash, but

18  you've gotten some update.  Okay.  All right.

19        So 9:43, this is three hours later.  Okay.

20        So you talked about the GHS program.  What is the GHS

21  program?

22  A.    It's a ship-stability software built by Creative Systems in

23  Port Townsend.

24  Q.    Okay.

25  A.    They use it to create a hull form of a vessel, and also the

1   tanks inside the vessel; assign weights and manipulate load

2   editing for general stability evaluation.

3   Q.   Okay.

4        For the tow of the 70, there had to be new tow connecting

5   points installed, right?

6   A.   Yes.  New tow pad eyes were installed on the deck, yes.

7   Q.   Because the existing ones were for a tow of a three-piece

8   tow as opposed to a one-piece, right?

9   A.   No, that's not correct.  They were reinstalled because the

10  existing ones -- the original ones had been removed for

11  ship-repair/production reasons.  They were on the pontoon deck,

12  in the way.  They to be removed, in history.

13  Q.   The ones installed did not match the ones that were

14  original to the dock, right?

15  A.   They were appropriate in size for the tow.

16  Q.   For the one-piece tow?

17  A.   Yes.

18  Q.   Okay.  And you designed that installation, right?  You did?

19  A.   I designed the arrangement, but not the size or attachment

20  of the pad eye.

21  Q.   And you sent a drawing to Heger to transfer it to a plan,

22  right?

23  A.   That's correct.

24  Q.   But you didn't ask them to do any engineering study of a

25  one-piece tow for the 70?

1    A.    No.

2    Q.    So we're back to the GHS program.  But you had the GHS

3    program here loaded with all of the data for the 70, right?

4    A.    That's correct.

5    Q.    And have you read Russ Johnson's expert deposition?

6    A.    Not in full, sir.  Not enough to comment on it.

7    Q.    So was that the proper thing to do, for Western to call you

8    and say, Hey, Dan, you have all the data about this, what do you

9    think is happening?  Was that the right thing for them to do?

10   A.    Well, that would be a great first step in trying to

11   understand what was going on, yes.

12   Q.    Okay.  Because you could run the program and you could

13   project a number of scenarios, right?

14   A.    Over some time, yes.  It's not instantaneous.  It takes

15   effort to create this, yes.

16   Q.    Okay.

17         What's the safety deck on the 70?  What does it do?

18   A.    A safety deck is a deck one level down from the top deck.

19   It is designed for the dry dock operation itself, when you're

20   dry-docking vessels.  It is a reserve air bubble, if you will,

21   for when you dry dock vessels.  So you submerge down to get a

22   vessel over top of the blocking system, and that safety deck

23   reserves buoyancy on the sides, and also houses machinery

24   equipment safely and dryly.

25   Q.    If the safety deck maintains integrity, even if everything

1    else has not, the dock will float, right?

2    A.    In a ship-repair situation.

3    Q.    In a ship-repair situation.  How about during a tow?

4    A.    Well, sir --

5    Q.    Is there a difference?

6    A.    Ship repair, working operation of a dry dock in a harbor, a

7    safe harbor, I do not -- I couldn't comment on how this vessel

8    would react to a sea state submerged down to the safety deck.

9    Q.    So if we went back to the original *Navy Tow Manual* for

10   this, that would be a good place to look to as a reference for

11   what the safety deck does, as far as buoyancy?

12   A.    I'm not sure I understood your question.

13   Q.    So here's your diagram.  You're working at 9:30 or so, and

14   by this time, 9:43 -- or have you talked -- how much

15   conversation had you had Bob or Russ by this time?

16   A.    At this time, it was a few phone calls.  I'd seen, likely,

17   some text messages; emails were shared.  There is a big

18   communication loop between Vigor and Western, and as you earlier

19   found out, you know, the Coast Guard group.  Everyone was

20   talking to everyone a little bit, so...

21   Q.    You were here for Paul Torrey's testimony?

22   A.    Correct.

23   Q.    Is there anything that jumps out -- that you disagree

24   with -- that he was wrong about?

25   A.    No, sir.

1    Q.    So he was remembering things right?

2    A.    As far as I remember them, yes.

3    Q.    Okay.

4          So 9:43 p.m., you're running calculations.  Why did you run

5    it this way so that the diagram looks as it does here?

6    A.    Well, sir, if you look at it closely -- it's hard to tell,

7    it's a bit blurred on the screen -- but the pink or the magenta

8    in color is representing a flooded compartment.  Those are port

9    compartments.  From one photograph I saw, and what has been

10   discussed, there was a slight port list.  So I was attempting to

11   recreate the condition that I saw in the photo.

12   Q.    Okay.  That you saw in the photo a few hours before?

13   A.    Correct.

14   Q.    All right.

15         So your assumption was that there had been no change from

16   what you had seen in the photo?

17   A.    No extreme change, no, sir.

18   Q.    Okay.  And the basis of that assumption was what?

19   A.    I was not there to see any change, and -- I mean, the

20   change in the photo, and then below you see in the email, "port

21   was awash," I believe is what I said right there --

22   Q.    Okay.  Yeah, right before --

23   A.    -- if you scroll down right before there.

24         So there's only two data points I'm working on and trying

25   to understand how we got there.  There are many possibilities,

1    configurations of flooding the tanks, you know, many different

2    locations we could be looking at here.  So it was some time to

3    just to try to think what could possibly be happening.

4    Q.    And this was the only scenario you ran, right?

5    A.    This is the only scenario I ran and forwarded on, yes.

6    Q.    Okay.  Did you run others?

7    A.    Well, the entire time, I -- flooding and unflooding and

8    attempting to create something.  So it's not like -- I don't

9    have a magic wand.  I can't just say, Oh, that's it.  It's an

10   iterative process.

11   Q.    Yeah, and so you ran, what you would say, 50, 60 scenarios,

12   a hundred?

13   A.    No.  It might have been in the neighborhood of 25 different

14   scenarios.

15   Q.    And every one you ran told you that the dock would remain

16   afloat, right?

17   A.    I don't think I characterized that as the way I saw it.

18   Every one I ran, I could not duplicate the way the failure was

19   being seen.

20   Q.    You could not duplicate the way, I'm sorry?

21   A.    The way the failure was being seen.  You know, the dock had

22   a list, the forward port corner was awash, and I was having

23   trouble with a simple failure to create that -- to duplicate

24   that.

25   Q.    Uh-huh.  Okay.  All right.

1        So you had all the data.  You're running things.  Nothing

2   told you that it would sink.  And then here, worst case is a

3   worst case, all tanks, one side flooded.  It is possible for

4   it -- I think you meant "to" -- stop here until it calms down.

5   Is that what you intended to type?

6   A.    Yeah.

7   Q.    Tell me what you intended to type here.

8   A.    It is impossible to stop here.  That's what I was trying to

9   say.  That's the word missing.  I just had the two snapshots,

10  the photograph, and then the port awash in the email below.

11  Q.    So this would yield a deep draft of 48 feet.  Okay.  We got

12  that.  Then a number of hours later, it sank.

13        So what happened between -- on your end between 9:43 and

14  early the 26th?  What did you do after you sat down with this

15  program?  Let me back up.

16        After you send this, you're still running scenarios, right?

17  A.    No.  I was packing a bag to fly to San Francisco and get

18  some sleep.

19  Q.    Okay.  And so when did you go to bed that night?

20  A.    That's hard to tell.  I cannot remember.

21  Q.    Okay.  And but there were more discussions back and forth

22  about what to do, getting Greger, getting Global in place?

23  A.    There was work on that, yes.  I do not remember the exact

24  times of the calls.  I remember specifically having a desire to

25  get into bed if I was going to wake up in the morning and

1    literally drive to SeaTac and find a flight.

2    Q.    When was your flight?

3    A.    It was not booked yet.

4    Q.    So you were supposed to get there as early as you could,

5    find a flight, and get down there?

6    A.    Yep.

7    Q.    So you went to bed with the understanding that Global was

8    going to meet you there and Greger was going to meet you there

9    down in San Francisco, and you were going to meet the tow

10   sometime that morning, right?

11   A.    There was no timeline established.  To be clear, no one was

12   under PO or contract with Global or Greger.  These are all

13   conversations on how to best fit and get boots on the ground,

14   locally, so to help close these plans up.  So I don't want the

15   court to think we had a plan in place, because we were still

16   trying to figure out information at the time.

17   Q.    Uh-huh.  Okay.

18        Now, since this, have you ever gone back with your GHS test

19   program and, knowing what happened, done an analysis of what

20   happened?

21   A.    No, sir, I have not.

22   Q.    All right.

23        So we know that the dock sank, but you never went back in

24   the program to say what must have compromised?

25   A.    It's hard to do without all the data points.  There's been

1  some information that's come out, from the testimony I've heard

2  so far, the degrees of list for a certain amount of time that I

3  was not aware of.  So I had no new information to generate on.

4  The only follow-on information I did receive was a photograph of

5  it sank or capsized.  It's sort of hard to tell.  The team did

6  they best they could to send a photo, but...

7  Q.   Uh-huh.  Okay.

8       Even with that degree of list, you had the program right

9  there.  You can't tell us today whether that -- with that

10 degree, applying the program, that that was why it sank.  There

11 was some factor that caused that.

12 A.   Well, sir, a list in itself does not cause a vessel to

13 sink.  It's the loading on the vessel that creates the list

14 which causes the sinking.

15 Q.   So you can use the program to see what tanks were

16 compromised, right, as a result of a load?

17 A.   The program wouldn't tell me what tanks are compromised.

18 From the seat here, right now today, I would still be guessing

19 as to which tanks were compromised.

20 Q.   Uh-huh.  Okay.

21      And you don't know what caused the list?

22 A.   There was a weight added or a loss of buoyancy.  Those are

23 the two options to cause list to the dry dock.

24 Q.   Okay.  All right.

25      But you really don't know what happened, do you?

1    A.   I was not out on the tug.  No, sir.

2    Q.   All right.  And today you don't know what happened, right?

3    A.   Today, yeah, I do not know.  I have suspicions, but, you

4    know, that's all I have.

5              MR. SIMMS:  All right.  Thank you.

6         And, Your Honor, when we started, you might remember, that

7    Vigor said they would be bringing Mr. Keen back for their

8    direct.

9              THE COURT:  Correct.

10             MR. BOYAJIAN:  Your Honor, there were too many topics

11   covered in Mr. Simms' direct question, that there's no way that

12   I can address what's been raised now without simply taking Mr.

13   Keen's direct now.  Would that be appropriate?

14             THE COURT:  That would be fine.

15             MR. JARRETT:  Sorry, Dan.  No warning.

16             THE WITNESS:  Yeah.

17                       DIRECT EXAMINATION

18   BY MR. BOYAJIAN:

19   Q.   Mr. Keen, a minute ago, we were talking about resistance

20   calculations that you did based on the *Navy Tow Manual*.

21        Can you explain what those resistance calculations were

22   for?

23   A.   Yes.  The resistance calculations were for determining the

24   acceptable sizing of the towing and the acceptable sizing of the

25   tug.

1   Q.   They don't have anything to do with analyzing the strength

2   of the dry dock itself, do they?

3   A.   They do not.

4   Q.   Or the structural integrity of the dry dock itself?

5   A.   They do not.

6   Q.   Okay.  They simply have to do with the strength of towboat

7   that would be required to pull an object of that size through

8   the water?

9   A.   The strength of the towboat and the appropriate sizing of

10  the tow chain wire, jewelry included.

11  Q.   Okay.

12       You touched briefly on an analysis that was performed by

13  Heger Dry Docks.  Who are Heger Dry Docks?

14  A.   Heger Dry Dock Engineers, they are an engineering firm from

15  Massachusetts that inspect, perform engineering calculations for

16  modifications to design new dry docks, and also issue

17  certifications of use at a commercial level and also for U.S.

18  Coast Guard 8634 standard inspections.

19  Q.   You know Mike Naylor of Heger Dry Dock, right?

20  A.   I do.

21  Q.   We've retained him as an expert.  I'm sure he can give a

22  more detailed explanation of what they do.  But as you

23  understand it, Heger just works on dry docks, right?

24  A.   That's correct.

25  Q.   You mentioned that the analysis done on the structural

1    suitability for towing the YFD 69 would apply to the YFD 70.

2    Why would it?

3    A.    The docks are identical, sister docks.  They share the same

4    structural drawings.  You'll find that the YFD 69 and YFD 70 are

5    listed on the same -- on the same -- in the title block of

6    several drawings.

7    Q.    So a structural analysis done on the structure of the YFD

8    69, and its suitable for towing in one piece on the ocean, would

9    answer the same questions that you'd have asked Heger about the

10   YFD 70?

11   A.    That's correct.

12   Q.    What would be the only difference between the two docks?

13   A.    Condition.

14   Q.    And who answers questions about different conditions?

15   A.    That would be a case for a tow and marine warranty

16   surveyor.

17   Q.    Okay.  Did you hire a marine warranty surveyor to inspect

18   the YFD 69?

19   A.    Yes, we did.

20   Q.    Who was it?

21   A.    It was Bowditch, Richard Shaw.

22   Q.    Okay.  Who did you hire to inspect the condition of the YFD

23   70?

24   A.    Bowditch, Richard Shaw.

25   Q.    Was part of the consideration for that that he could assess

1  the relative condition between the two docks?

2  A.   Yes, it was.

3  Q.   *Navy Tow Manual*.  The original design, we're heard a lot

4  about that.  I know the court has questions about it because

5  they've put it in the orders.

6      Why was the original tow configuration for the YFD 69, 70,

7  and 71 a three-piece tow with the end sections stacked into the

8  center section?

9  A.   The original design of the tow -- or the dock itself --

10 sorry -- for tow in three sections was for deployment so the

11 dock could be towed in unrestricted conditions, or almost any

12 conditions, across the ocean to forward operating location --

13 you know, a foreign country -- and perform maintenance on naval

14 vessels during battle time.  This is all during World War II era

15 mentality.

16     With that, the dock also, as a forward operating location,

17 could work on itself.  The end sections, as they come off, can

18 lift the middle center section to allow for underwater

19 maintenance on the middle, and the end sections docked in the

20 middle could repair the middle section.

21     So this is a multifunctional use for the Navy, to allow for

22 deployment maintenance of their vessels, and also a foreign

23 deployment for maintenance of their own asset, the dock itself.

24 Q.   Okay.  I think we're clear on how the dock could be used to

25 service itself in a faraway location, away from shipyards where

1   other docks could service it.

2       Let's talk about -- you said something about an restricted

3   ocean towing in wartime for forward deployment.  Could you

4   explain what you mean by "unrestricted towing during wartime"?

5   A.   This is with the intent of if they needed to go, they can

6   go no matter the weather or heave-to or not have a wave-height

7   restriction such as we had for this YFD 70 tow, they would be

8   more flexible to leave when they desired.

9   Q.   So the Navy needs a dry dock is in Okinawa.  The YDF is

10  sitting in Hawaii.  They need it as fast as they can.  They

11  can't wait for a weather window.  They're not going to get a

12  warranty survey to set weather restrictions.  They can stack the

13  ends on it, hook up a tow wire, and go?

14  A.   Yes.

15  Q.   Okay.  And when they get there, they know the dry dock --

16  if it's there for years and years -- that it can service itself?

17  A.   That's correct.

18  Q.   The ends can lift the center so you can work on the center;

19  and the center can lift the ends so you can work on the ends?

20  A.   Yes.

21  Q.   Okay.

22      We've also heard a fair amount in the last couple of

23  days -- you've been here about -- a 2013 ultrasonic gauging

24  survey.

25      Can you tell us what the purpose of that survey was and

1    what it looked at?

2    A.    The purpose of that survey was coming out of the NAVSEA

3    certification program of the dock; to evaluate the dock and

4    condition for lifting vessels, and if -- where appropriate, to

5    make repairs to do so, to continue to lift vessels, to be

6    functional as a dry dock.

7    Q.    Okay.  So the purpose was to assess its future suitability

8    for use as a commercial dry dock?

9    A.    That's correct.

10   Q.    A commercial asset to lift vessels to work on them in the

11   shipyard?

12   A.    That's correct.

13   Q.    Was it an assessment for the structural suitability for

14   ocean towing?

15   A.    It was not.

16   Q.    Had you done repairs and maintenance work between 2013 and

17   2016 on the YFD 70 such that the ultrasonic gauging was

18   outdated?

19   A.    Yes, we had.  We placed steel in several locations.

20   Q.    Okay.

21         Was it, in your opinion, to the question that you had asked

22   Captain Shaw?

23   A.    I'm sorry.  Please repeat.

24   Q.    Well, you had said before that Captain Shaw was hired to

25   assess the current condition of the YFD 70 and the suitability

1   for its tow.

2       Was a 2013 ultrasonic gauging that was three years old and

3   you had said was prior to ongoing maintenance and repairs, was

4   that a document that you saw as particularly helpful for Richard

5   Shaw to answer the question for which you hired him?

6   A.    No.  The current situation -- the current condition was

7   more important to Richard Shaw.

8   Q.    Speaking of Richard Shaw, Captain McGavock said he met him

9   on the deck of the tow -- on the dock the day -- or the towboat

10  the day it left.  Was Captain Shaw at Vigor the day it left?

11  A.    No, he was not.

12  Q.    Where was Captain Shaw?

13  A.    I don't know.

14  Q.    How do you remember that Captain Shaw wasn't there?

15  A.    I recorded the drafts of the tow on it, as it departed, for

16  him and sent it to him via email.

17  Q.    Why did he need the departure drafts?

18  A.    Because he was not there to take them himself.

19  Q.    And what does he need them for?

20  A.    Matter of record.

21  Q.    Oh, we were talking about where you put the pad eyes.

22      Have you ever heard any indication from anybody or any

23  suggestion that pad eyes failed during towing?

24  A.    I have not.

25  Q.    If pad eyes fail, does the tow sink?

1    A.    No.

2    Q.    What happens if pad eyes fail?

3    A.    The tow would go astray, I would assume.

4    Q.    Okay.  Let's talk about getting this thing ready to tow.

5          YFD 70, it's a big shoe box with the ends taken off, right?

6    A.    Oh, yes, yes, as far as the shape.

7    Q.    In effect, when you're towing it, it's just a big barge.

8    A.    Yes, in large part.

9    Q.    Let's talk about what you did for maintenance for this dry

10   dock while it was a dry dock, before it became a barge for ocean

11   tow.  Let's talk about maintenance before 2016.

12         What was -- well, I'll ask you.  You were the dockmaster.

13   That's what your business card says.

14         What was Vigor's inspection and repair regime with respect

15   to the YFD 70?

16   A.    Inspection and repair cycle, if you will, inspect to find

17   things broken or needing to be repaired, and then fix them;

18   everything from steel to mechanical to electrical, all three

19   classes of design -- or of a vessel.

20   Q.    Okay.

21         And what sort of -- you said "inspections."  What kinds of

22   inspections were those?

23   A.    Visual and operational style.  You get down into the tank.

24   You have the UT gauging from 2013.  You have mechanical

25   operation.  You get down to a tank and operate a valve right

1   while you're adjacent to it, to make sure it is, indeed,

2   operating properly, without any movement or squeaking, and

3   verify there is no water leaking by once it's closed.

4   Q.   I believe we heard Paul Torrey say the other day -- correct

5   me if it was Bob Eske -- that Vigor sometimes spent tens of

6   thousands and sometimes spent hundreds of thousands of dollars

7   per year on ongoing maintenance and repairs to keep this as a

8   serviceable, functional asset in your yard.

9   A.   That's correct.

10  Q.   And NAVSEA certification, what is NAVSEA certification?

11  A.   NAVSEA certification is an inspection and maintenance

12  program to allow the dry dock facility to lift and dry dock U.S.

13  naval assets, combatant vessels.

14  Q.   We've heard that, in 2013, Vigor allowed the NAVSEA

15  certification for the YFD 70 to lapse.  Why?

16  A.   We were out of market.  There were no more vessels of the

17  appropriate size to dock in that dry dock.  The FFG's no longer

18  in Everett and -- sorry, I might say this incorrectly -- the

19  Navy moves vessels around the region, and the only vessels that

20  come up for availability from there were DDGs, and it's not

21  appropriate for the -- the YFD 70 was not the right dry dock for

22  DDGs, to perform maintenance.

23  Q.   Okay.

24       I forgot to mention:  You are a trained naval architect,

25  right, or engineer?

1    A.    Yeah.  A naval architect, yes.

2    Q.    Okay.  As part of that trade, you use a lot of acronyms the

3    rest of us don't, especially dealing with Navy ships.  Let me

4    see if I can get that in lay terms.

5          NAVSEA certification allows you to lift Navy ships.  The

6    Navy ships that were in the market to lift, that you were going

7    to make money servicing, had gotten too big for the YFD 70.

8    A.    Yes.

9    Q.    And so you let that certification lapse.

10   A.    That's correct.

11   Q.    Okay.

12         Did you still keep up maintenance and repairs, ongoing, of

13   the dry dock?

14   A.    Yes.

15   Q.    Why?

16   A.    Because we were lifting commercial vessels.

17   Q.    Okay.

18         And until when you were using the YFD 70 to lift commercial

19   vessels?

20   A.    Until the late winter of 2015.  I believe that was the last

21   vessel.

22   Q.    Okay.  Late winter --

23   A.    Early in the year, first quarter.

24   Q.    Okay.  First quarter of the year in 2015, what kind of

25   ships was this still lifting?

1    A.    This was -- a Crowley alert class tug was the last vessel.

2    Q.    Okay.

3          At the end of that, the decision was made to take the YFD

4    70 out of service.  What was it about the YFD 70 that made it

5    worth taking it out of service?

6    A.    On that last vessel, we had a major mechanical failure, and

7    it was cost prohibitive to repair, considering we had a surplus

8    of dry dock in Portland.

9    Q.    Okay.

10         So you had extra dry docks than what you needed to run a

11   commercial shipyard?

12   A.    That's correct.

13   Q.    And you had one that you said it had mechanical failure?

14   A.    Yes.  The YFD 70 had a major mechanical failure on the

15   undocking of the last vessel.

16   Q.    Okay.  When you say "major mechanical failure," what broke?

17   A.    The pump and, I believe, two reach rods, along with the

18   valve it was leaking by.

19   Q.    Okay.  These are pieces of equipment that allow the dry

20   dock to submerge and then be pumped dry and refloated?

21   A.    That's correct.

22   Q.    So these are pieces of equipment that are critical for use

23   as a commercial dry dock lifting ships, but are not related at

24   all to structural integrity for ocean towing?

25   A.    That's correct.

1  Q.    Okay.

2        If you couldn't use the pumps, could you have removed the

3  ends and stacked them onto the center section of the YFD 70?

4  A.    Are you referring to the dock's pumps?

5  Q.    Correct, the dock pumps.

6  A.    The dock's pumps were not operational, it would have been

7  extremely difficult to dock the ends of the dry dock on the

8  center section.

9  Q.    Could you have done it in your yard at Vigor with all the

10 assets that you have around?

11 A.    Yes, we could have done it with the industrial support we

12 have.

13 Q.    Okay.

14       Could they have unstacked it at the Mexican shipyard on the

15 other end of this voyage?

16 A.    Likely not.

17 Q.    Why not?

18 A.    There was concerns over depth of the water in Mexico,

19 getting power, and then also the use of pumps to safely operate

20 the system to unstack.

21 Q.    You said there were concerns.  That's passive.  Who had

22 these concerns?

23 A.    The company we sold to.

24 Q.    Amaya Curiel?

25 A.    Yes.

1    Q.   So the Mexican shipyard had concerns that if you sent it to

2    them -- towed it to them stacked, they might not be able to

3    unstack it?

4    A.   That's correct.  If it was stacked, they could not work on

5    it as they needed to.

6    Q.   Okay.

7         There's been some talk in this case -- you've been here --

8    about whether or not Vigor exercised due diligence to prepare

9    the YFD 70 for an ocean tow.

10        Bearing in mind due diligence is a legal term -- and I

11   don't expect you to understand the ins and outs -- what did you

12   do?  As the dockmaster in charge of getting this dock ready to

13   be towed, what's the work you did?

14   A.   We prepared the tow brake, reinstalled pad eyes, and

15   installed the tow rig.

16        We went into every tank, and where there was a shell flood

17   valve, we installed a steel blank, which is a hard piece of

18   steel bolted onto the bow to create double physical protection.

19        There were at least two valves, as I mentioned before, that

20   were allowing water to cross-flood compartments -- there was a

21   failure -- so we removed those valves and installed steel blanks

22   so water could not cross through compartments.

23        The leading edge of the tow, of the tow itself, the forward

24   end of the dock, there were four flood valves there oriented on

25   that face -- so on the face of the tow -- to eliminate

1   hydrostatic pressure from the tug.  So as the vessel moves

2   through the water, we didn't want the water hitting the valve or

3   disc of the valve, so we install cofferdams, blanks, on the

4   external of the hull to reduce or eliminate the hydrostatic

5   pressure on the valve itself.  And then also on the inside of

6   the vessel -- sorry.  Way too fast.

7       So on the external of the hull beams, we installed the four

8   steel -- or four cofferdams over top of those flood valves to

9   eliminate the hydrostatic loading while towing; therefore, the

10  valve itself would not see any -- any pressures.

11      In addition, those valves also did receive the blind

12  flanges or steel blanks on the inside of the tank, creating,

13  ultimately, triple protection for those sea chests.

14      The dock itself -- since we've talked about the center

15  section -- in the three-piece-tow arrangement, the center

16  section has small tanks, when, in a dry dock configuration, are

17  open to flood with the adjacent tanks.  In this case, we went in

18  and actually sealed those small tanks, creating even more

19  compartmentalize.  So, in basic terms, a dry dock configuration

20  is eight tanks long.  We made it ten tanks long.  So we

21  increased compartment survivability.

22      There was general cleaning debris.  We removed all the

23  environmental greases, et cetera.  The safety deck had spares in

24  storage.  We pulled all that out, all the stuff there.  Closed

25  the doors on the safety deck, the seal.

1          All deck hatches were resealed and put down with gaskets

2     and silicone to improve the seal.

3     Q.    Let me see if I'm keeping up with you.

4          It sounds like you ensured that every compartment within

5     the dry dock was separate and sealed off from every other

6     compartment within the dry dock by either sealing the blank,

7     sealing a valve and blanking it, or removing it entirely and

8     putting a plate of steel where it used to be.

9     A.    That's correct.

10    Q.    Okay.

11         You created additional compartments that used to be able to

12    flood separately, but you sealed them off with steel-welded

13    plates --

14    A.    That's correct.

15    Q.    -- to create more watertight compartmentalization within

16    the dock.

17         Any valves that opened to the outside of the ocean

18    received, at least, double seals.

19    A.    Yes.  A steel blank put on the inside, so you had the valve

20    itself, and the steel blank created a double seal, and the lead

21    of the tow, there were three -- triple protection.  You had a

22    cofferdam, the valve, and then a blank itself.

23    Q.    Okay.  So the ones on the leading edge that would meet the

24    waves and the hydrostatic forces of towing it into the ocean,

25    you sealed it, you blanked it on the inside, and then you hired

1    outside contractors to get in the water and underwater weld on

2    steel cofferdams to block off those valves?

3    A.    That's correct.

4    Q.    Okay.

5          Is there anything else -- oh, and then you cleaned out the

6    garbage, and you removed any contaminants so that this would be

7    a completely contaminant-free tow.

8    A.    That's correct.

9    Q.    Was it certified by the Coast Guard as a contaminant-free

10   tow?

11   A.    No, I don't believe so.

12   Q.    Okay.  But it was?

13   A.    It was.

14   Q.    No petroleum products?

15   A.    No petroleum products.

16   Q.    No hydraulic fluids?

17   A.    No hydraulic fluids.

18         And, importantly, removed all gear that could shift or move

19   during tow and cause damage or breach the hull.  So if there was

20   anything on safety deck or -- for example, I mentioned that we

21   removed the valve to blank.  That valve was removed so it

22   wouldn't hole the dock during tow.

23   Q.    So you took everything off it so that if you -- like in the

24   backseat of my car with my kids, if I go around a corner fast,

25   all the junk flies to one side.  You took everything out of it

1   so that couldn't happen?

2   A.   That's correct.

3   Q.   Okay.

4        Then you hired Rich Shaw, same surveyor who did the YFD 69,

5   to get inside the YFD 70.

6        Did you provide him with access to every single tank and

7   compartment in that dry dock?

8   A.   Yes, we did.

9   Q.   Okay.  Did you provide him with every single document he

10  ever asked Vigor for?

11  A.   Yes, I did.

12  Q.   Okay.  Let me back up.

13       All that work you described before, that's Vigor's folks

14  and Global Diving's folks who welded the cofferdams.  How many

15  hours -- how many person hours were put into prepping this dock

16  for tow?

17  A.   An estimate would be around a thousand hours of work.

18  Q.   Okay.  How many people in the crew that were working on it?

19  A.   Approximately eight people.

20  Q.   And for how long?

21  A.   Well over a month, maybe two.

22  Q.   Okay.

23       Then you hired Richard Shaw to confirm all the work you

24  did, right?

25  A.   That's correct.

1   Q.   Because you wanted a second set of eyes to confirm what

2   Vigor had done.

3   A.   Well, that, and also to take any recommendations of work to

4   be done from Richard Shaw.  So if he were to bring something up

5   that he felt needed to be done, we would have done it.

6   Q.   Okay.

7        You didn't want to be, Hey, Vigor made all these decisions

8   on our own.  You wanted another expert to come in and put eyes

9   on it.

10  A.   That's correct, yeah.  He was hired as the expert for that,

11  yes.

12  Q.   Okay.  You were here when he testified.  He said, between

13  him and his assistant, Mike Simonson, about 30 hours crawling

14  around into every compartment, right?

15  A.   That's correct.

16  Q.   Okay.

17       Did they note any deficiencies with the dock that they said

18  Vigor had to correct?

19  A.   They did not come back with anything for me to correct.

20  Q.   Okay.  Did that make you feel, like you'd done your job

21  right?

22  A.   It was nice to know we did something right.

23  Q.   Okay.

24       Oh, we've heard about pumps.

25       Okay.  How much compartments were in the YFD 70 after you

1  created additional compartmentalization prior to towing?

2  A.    Approximately 48, including the safety deck --

3  Q.    Okay.

4  A.    -- spaces.

5  Q.    Where were the pumps?  Which one would you put the pump in?

6  A.    That's hard to tell.  You'd need to know where it was

7  coming in, so you've have to have more than one pump, for ease

8  of use.

9  Q.    Okay.  How many pumps do you think it would have taken to

10  set it up in a reasonable way that you might be able to get the

11  pumps to access each and every one of the compartments that may

12  take on water?

13  A.    You know, I'm not a salver, but my opinion would be about

14  16.

15  Q.    Okay.  And 16 spread around evenly around the dock?

16  A.    All the pontoon deck, yeah, secured to the pontoon deck.

17  Q.    Okay.  And that would be with a big, long hose that,

18  presumably, some human being would be on the dock to get the

19  hose into the flooding compartment?

20  A.    That's correct.  Someone would have to be there on the dock

21  to start and engage the pumps, including opening the tank.

22  Q.    Okay.  Let's talk about that.

23       Say the *Ocean Ranger* had managed to put, let's say, two

24  people onto the dry dock.  And there had been pumps, there had

25  been 16 pumps.  What would these people that get on the dry

1   dock -- in a dynamic sea on a sinking dry dock, what would they

2   have had to do to find the water and pump it out?

3   A.   In the condition we were set up in, they would have had to

4   open a tank lid at a guess or an estimate of what tanks and more

5   of a hunt-and-peck evolution.  So if a tank went down,

6   approximately -- approximately 24 bolts around -- one-inch bolts

7   would all have to be opened up and lifted off the lid to inspect

8   to see if there is water in the tank, with the configuration of

9   those.

10       It's about a two-hour -- well, an hour evolution.

11  Q.   It's an hour to open one tank?

12  A.   Yeah.

13  Q.   Just to look in to see if there is water in there?

14  A.   Yep.

15  Q.   Okay.

16       There's no water in it.  Now you've got an open hole in the

17  deck.  What do you have to do to seal it back up?

18  A.   You'd have to re-prep the hole, and gasket back down, lid

19  back down, attempt to get alignment.  These things can be

20  tricky.  And then drive all the bolts back in, hoping you don't

21  cross anything on the way back in, and then you go find the next

22  tank to open.

23  Q.   Okay.  So an hour to get the top off.  How long to get the

24  top back on?

25  A.   Probably about the same.

1    Q.    Okay.  So two hours to check one tank.  How many tanks?

2    A.    In the pontoon, there were 32.  I believe my math is right

3    there.

4    Q.    Okay.

5          Remember this thing, the earliest anyone noticed a list was

6    maybe noon.  The crew agreed it was listing around 2:30 in the

7    afternoon, and by 2:00 a.m. the next morning, it was sunk; 12

8    hours.  You just said it would take 65 hours just to check just

9    the compartments on the pontoon deck?

10   A.    That would work.  That's what it about takes.

11   Q.    Okay.  That's just to check them.

12         Okay.  Let's talk about the pumps, 16 pumps.  How do you

13   run pumps?

14   A.    In this case, it likely would have been a diesel pump.

15   Q.    So you would have had to have some supply of diesel fuel

16   aboard the YFD 70?

17   A.    That's correct.

18   Q.    Didn't we just talk about the fact that you had declared it

19   as free of contaminants?

20   A.    Yes.

21   Q.    Okay.  So if you put fuel on it, is it still free of

22   petroleum and contaminants?

23   A.    No.

24   Q.    Then you need lube oil, too, right?

25   A.    In the machines, yes.

1  Q.   Okay.  So fuel, lube oil, 16 pumps, and two people would

2  take two hours to check one tank, and there were 36 tanks?

3  A.   Thirty-two --

4  Q.   Thirty-two.

5  A.   -- on the safety deck -- the pontoon deck.

6  Q.   Sorry.

7      So was the short answer to my question, why weren't there

8  pumps, because it was wasn't feasible?

9  A.   Yes.  It was not feasible.

10 Q.   Okay.

11      Once you had prepared your dock -- right? -- all the stuff

12 we talked about; did all that work, a thousand hours.  Richard

13 Shaw surveys it, finds it suitable subject to certain weather

14 restrictions.  You think about pumps but you decide it doesn't

15 make sense.  Richard Shaw -- you were here -- said the same

16 thing.

17      Once you prepared the dock, what else was left for you to

18 do -- you at Vigor to do?

19 A.   Help it leave the pier.

20 Q.   Okay.

21      Once Western towed it off your pier, what was left for you

22 to do with respect to this tow to Ensenada?

23 A.   There was nothing left.

24 Q.   Okay.

25      What else would you or could you do?  If you could provide

1  valuable information, you'd have done it, right?

2  A.    That's correct.

3  Q.    You're the dockmaster.  That's what your business card

4  says, right?

5  A.    Yes.

6  Q.    You knew more about this dock -- Paul Torrey said -- than

7  anyone.

8  A.    At times, yes.

9  Q.    So if you could have answered a question for Western about

10  the dock, you'd have done that?

11  A.    That's correct.

12  Q.    Other than that, there was nothing you could do once they

13  pulled it off your pier, correct?

14  A.    That's correct.

15  Q.    What did you expect Western to do?

16  A.    To tow the dock safely to Ensenada under the conditions

17  deemed by the tow plan and the warranty surveyors in the

18  suitability survey.

19  Q.    So Richard Shaw's recommendations?

20  A.    Yes.

21  Q.    Less than 4-6 winds, less than eight or ten feet?

22  A.    Yes, that's what I read, I believe.

23  Q.    When the dry dock left Vigor's pier, in your head it was

24  setting out for a voyage that was Seattle to Ensenada,

25  coastwise, in conditions under 21 knots of wind and under

1    ten-foot seas?

2    A.    Yes.

3    Q.    At least that's what you expected Western would do.

4    A.    That's what I expected to be done, yes.

5    Q.    Because they had it in writing that that was the

6    recommendation for how to safely tow this to Ensenada?

7    A.    That's correct.

8    Q.    And they told you they were going to call Rich Courtney.

9    Did you expect them to call Rich Courtney?

10   A.    Yes, I did.

11   Q.    Okay.

12         Did they ever tell you, We might not call Rich Courtney?

13   A.    No, they did not.

14   Q.    Did they ever tell you, We might not follow Rich Shaw's

15   recommendations?

16   A.    No, they did not.

17   Q.    Okay.

18         So you were responsible for getting it ready, and they were

19   responsible for everything that had to do with towing.  If they

20   needed some input, you'd be happy to answer a question, if you

21   could?

22   A.    That's correct.

23   Q.    But they had to give you information to give them good

24   answers, right?

25   A.    Yes.

1  Q.   Okay.  Well, let's talk about that, information that came

2  from Western to you.

3       Earlier in your testimony with Western's counsel, it was

4  suggested you were in on the decision to go to Monterey.  Did

5  you decide to go to Monterey?

6  A.   No, I did not.

7  Q.   Who made that decision?

8  A.   The Shrewsburys.

9  Q.   Okay.  Were you consulted for input on that decision?

10 A.   I was -- I was called -- I believe I had a phone call with

11 Russ, and, you know, one of the conversations or comments from

12 him was, you know, we should probably go there, to Monterey,

13 rather than San Francisco.  It was just part of the round-robin

14 calling.

15 Q.   Did they tell you Monterey Bay is in a federally protected

16 National Marine Sanctuary?

17 A.   No, they did not.

18 Q.   Did they tell you, without using the words, "National

19 Marine Sanctuary," "If we sink a dry dock in there, it can come

20 with huge penalties"?

21 A.   No, they did not.

22 Q.   If they told you -- let's say -- let's go back all the way

23 to 2:30 in the afternoon, when the logs say, Wow, Captain

24 McGavock and two mates took 30 minutes of looking at it to find

25 a list -- barely a list, right?

1          At that point, if they had said to you, Hey, Dan, it's

2    taking on some water.  Is it safe to go into a federally

3    protected marine sanctuary where, if it sinks, we could expose

4    ourselves to millions of dollars in damages?

5    A.    I would have said, Don't go there.

6    Q.    Okay.

7          Let's talk about the condition of the dry dock.

8          October 25th, you got an update early in the day that the

9    dock had taken on some water and had a slight list, right?

10   A.    Yes.

11   Q.    What did you know?  What were you told?

12   A.    I was called by Bob Shrewsbury, and he said there might be

13   a problem and that there was a slight list.  I did receive a

14   photograph.  I believe it was a photograph taken through a pair

15   of binoculars.

16   Q.    Okay.  So you got one photograph.  Do you think it was

17   taken with a cell phone, with the lens pushed up to a set of

18   binoculars?

19   A.    That's what it appeared to be, yes.

20   Q.    What did it tell you?  What did that photograph tell you?

21   A.    It was hard to say.  It appeared the dock may have had a

22   list, and the sea state was obscuring the forward end of the

23   tow.  So I didn't have a clean look at both port and starboard

24   side.

25   Q.    And with that, you got the narrative from Bob Shrewsbury

1  that there might be a problem, it might be taking on some

2  water --

3  A.   That's correct.

4  Q.   -- on the port side, bow down?

5  A.   From what I understood, it was just a port list.

6  Q.   Okay.

7       We saw an email earlier that had a GHS model that you ran,

8  one of several that you ran, and it said, "Port forward now

9  awash."

10  A.   Yes.

11  Q.   That was an update, right?

12  A.   Yes.

13  Q.   So that told you that the condition of the dry dock had

14  gotten worse, right?

15  A.   That's correct.

16  Q.   Okay.

17       Did you ever receive another update after that telling you

18  the condition of the dry dock had gotten worse?

19  A.   No, not until it was gone.

20  Q.   Okay.  You got one that said it sank, which, you're right,

21  is worse.

22       But between "port forward now awash" that we saw at around

23  6:30 p.m., while you were at dinner, and the next morning, at

24  2:00 or 3:00 a.m., when you got an email that said it sank, no

25  updates?

1    A.    None that I recall.

2    Q.    Okay.

3          So you ran a model.  You generated that model, and you came

4    up with what's said there, and you explained that, you know,

5    this is worst case, all tanks flooded on one side.

6    A.    That's correct.

7    Q.    Is that because you thought there was some localized damage

8    on the port side, and you were trying to see what would happen

9    if that got real bad?

10   A.    Yes, that was an attempt to create a port list with the bow

11   down, but then also working with the running theory that was

12   going in the group, that what if they had something.  So it was

13   just an attempt to go -- to look at what a possible worst case

14   could be.

15   Q.    Okay.

16         You heard earlier that -- Captain McGavock talked about the

17   dry dock progressing, getting worse and worse all afternoon, too

18   scary to bring it over the San Francisco Bar, et cetera, et

19   cetera.

20         Did you receive updates that told you those things from

21   Western Towboat?

22   A.    I did not receive any updates to help me build a model --

23   Q.    Okay.

24   A.    -- to understand where we were at.

25   Q.    Okay.

1        Did you ever hear an update that -- we heard about a United

2   States Coast Guard helicopter flyover at 10:00 p.m.  They

3   reported -- while the dry dock was still outside the marine

4   sanctuary -- they reported a 35- to 40-degree list?

5   A.    I did not.

6   Q.    Okay.

7        We also talked about Captain McGavock's sworn statement to

8   the United States Coast Guard that, at 10:30 p.m., he observed a

9   40-degree list.  Did you hear about a 40-degree list?

10  A.    I was not aware of that.

11  Q.    If anyone had ever said to you, Dan, this dry dock has a

12  35- to 40-degree list, what would you have said?

13  A.    I would have said that the tow was compromised and it is

14  likely unsafe.

15  Q.    Okay.

16       If they had told you at 10:00 p.m., It's got a 40-degree

17  list, we don't see it getting better, what would you have told

18  them?

19  A.    I would have told them to prepare for the thing to sink and

20  get yourself to -- the tug and themselves be safe.

21  Q.    So information flowed from Western to you at Vigor because

22  you were the person who knew the most about the dry dock, you

23  were the person who prepared the dry dock for tow, two critical

24  pieces of missing information.  You never heard about a marine

25  sanctuary or the potential risks of a marine sanctuary?

1   A.   No.

2   Q.   And you testified that if you had, even early on in the

3   afternoon when you only noticed a barely -- a barely perceivable

4   list, you would have said, Don't go in there?

5   A.   That's correct.

6   Q.   Okay.

7        And number two is, you got, "Dan, the thing is barely

8   listing."  A few hours later, you get, "Port forward corner is

9   now awash."  Never another update?

10  A.   That's correct.

11  Q.   But if you had been told what Captain McGavock swears to

12  the Coast Guard he observed at 10:00 p.m., a 40-degree list, you

13  would have said, "Cut the tow wire and get home safe to your

14  families"?

15  A.   Yes.

16           MR. BOYAJIAN:  That's all I have right now.  Thanks.

17           MR. SIMMS:  Your Honor, before cross, we had a little

18  bit of an inaudible there.  Lots of discussion, of course, about

19  which witnesses are going to be called and in what order.

20       We intended to have Dr. Hudson today.  He has a brand-new

21  baby, and he must be home tomorrow, and that's San Diego.  And

22  so what we'd like to know is, if it's possible to have him

23  appear by Zoom?

24           THE COURT:  Zoom wouldn't work because we can't do the

25  hybrid like that, but we might be able to get him on the phone

1   and maybe get a video set up if we could do it maybe later in

2   the day.  Our IT people would come up, and they would put

3   cameras here, and we could get him in a situation where he could

4   be on video.  We can check to see.  I can't make any promises.

5             MR. SIMMS:  Okay.  Or he can come back in person

6   Thursday.  So if either of those are possible, we'll make that

7   happen.

8             THE COURT:  And maybe we'll just take him out of order

9   on Thursday.  It's a bench trial.  We can get started with

10  everybody else.  That makes a lot more sense.

11            MR. SIMMS:  All right.  We'll talk about that.

12            THE COURT:  All right.  We're almost to the point

13  where we've going to shut down for the day, but let me ask some

14  questions that may impact your redirect.

15       Mr. Keen, if I'm understanding this correctly, the three

16  pieces of the dry dock -- the front piece, the back piece, and

17  the middle piece, you know, fore, aft, middle -- those two end

18  pieces could be removed from the dry dock itself and stacked on

19  top of the middle one.

20            THE WITNESS:  That's correct, yeah.

21            THE COURT:  So are they small enough, compared to the

22  middle, that all -- both ends can be on top of it within that

23  middle piece?

24            THE WITNESS:  Yes, they can.  They, actually,

25  physically bolt onto the middle via -- so ends are like this,

1  and the middle is a reverse "T."  So they bolt on, and you

2  submerge them.  You have to make electrical connections and

3  actually operate them, submerge them away, and then they float

4  away, and you rotate them.  And then the middle section operates

5  as an independent dock.  It submerges down, and with them

6  rotate, you bring them into the middle section and actually dry

7  dock the end sections, if you will, into the middle.

8         THE COURT:  I'm also assuming that those end pieces,

9  whether they're in the front or the back, have their own

10 independent tanks for buoyancy.

11        THE WITNESS:  Yes, yes.

12        THE COURT:  When you put the pad eyes on the front

13 section, does it change the mechanical -- how do I say this? --

14 I'm just thinking if it was designed by the -- or the Navy

15 manual says tow it from the middle section with the other end

16 pieces stacked on top, put the pad eyes there for towing.  When

17 you change that, does it, in any way, affect how the way that

18 tow could work?

19        THE WITNESS:  To clarify, sir, the pad eyes are

20 actually installed on the center section in -- nearby -- or

21 adjacent and in alignment to existing structure for towing, and

22 the tow system had extension wires, cables that then transfer,

23 lay on top of the deck of the forward end of the tow and exit

24 the forward end to the chain bridle arrangement.  So we were

25 still pulling, structurally and strength-wise, from the center

1    section, where it was appropriate, and then the lead angle or

2    the attachment angle was through the forward end of the tow to

3    achieve appropriate add to the tow from the dock.

4            THE COURT:  When you learned that there was a port

5    list and then you started running your GHS models, Exhibit 34,

6    those scenarios, the one that we saw and you were questioned

7    about indicated worst case, all tanks flooded on port side, this

8    is the way it's going to be listing, and I think I even saw a

9    minus-45-feet draft.  I mean, you're concerned still about

10   towing it at that point in time.  That's what's causing it to

11   pull to the port side, because it's now in the water, when it's

12   supposed to be on top on top of the water.

13       The bow down, if I understood your testimony correctly, you

14   couldn't really duplicate that on the modeling system.

15           THE WITNESS:  No, I couldn't.  I think there -- there

16   was, obviously, an answer out there, but there are so many

17   different combinations of a tank flooded versus how much water

18   is in it versus how much water is in the next tank.

19       So through my -- I was having difficulty and could not, in

20   my iterations, duplicate the picture and the descriptions of bow

21   awash.

22       It's one of those things where more data is better or helps

23   get to that.  You know, the progression over time would have

24   helped me some.  And also, not that they could have, but in a

25   magic world, but if they had said, Well, Tank 6 has three feet

1  of water, that would have been an instant datapoint to help

2  close to gap.

3       Sort of in the world of math, indeterminable equations and

4  whatnot, so as soon as you get one datapoint, you can start

5  closing the gap and another datapoint further, so...

6            THE COURT:  Obviously, something was causing the port

7  side bow to go down.

8            THE WITNESS:  Correct.

9            THE COURT:  Am I understanding correctly that you

10 believed -- and I believe the evidence has probably shown --

11 that the dry dock was still under tow at that point in time?

12 They were towing it.

13           THE WITNESS:  Yes.

14           THE COURT:  Would it make more sense to stop towing?

15           THE WITNESS:  Yes, it may have, sir, depending -- if

16 the -- if the --

17           THE COURT:  In other words, I'm pulling this large

18 shoe box -- as Mr. Boyajian said -- behind me.  I see it listing

19 to the port side.  I see the front of it dipping down into the

20 water.  Not only is it causing this minus-45-foot draft problem,

21 but maybe if I stopped, it might come back?

22           THE WITNESS:  It might, or if water was filling,

23 because when a vessel pushes through the water, it creates a bow

24 wake -- right? -- so water raises up.  If that force or

25 hydraulic force was what was filling the tank in some sort, too,

1   it might have stopped that as well, and we might not have seen

2   progression.

3          THE COURT:  When you made the assumption that,

4   worst-case scenario, and you were still planning for it -- I

5   think you were asked this -- you did not consider that it might

6   actually sink?

7          THE WITNESS:  At that time, no, sir, but anything can

8   sink, so that's, sort of, why I was trying to find a worst-case

9   scenario.

10          THE COURT:  And when you ran that scenario with every

11   tank on the port side flooding, you didn't do that because you

12   believed there might be some structural problem with that side?

13          THE WITNESS:  No.  It was an effort to duplicate the

14   scenario.  And what I was finding was that not one tank was

15   damaged.  Any one of the tanks on the port side, I would not see

16   the condition they saw.  There's two tanks on the port side, I

17   would not see the condition they saw.  So the numbers started

18   growing, and that's where I account to that.

19          THE COURT:  Thank you.

20          THE WITNESS:  Yep.

21          THE COURT:  Counsel, we'll start up in the morning.

22   We'll be at recess.

23               (Proceedings adjourned at 4:16 p.m.)

24

25

# C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 2nd day of August 2021.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter