UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE.

_____

WESTERN TOWBOAT COMPANY,          ) CASE NO. C20-00416-RSM
                                  )
                Plaintiff,        ) Seattle, Washington
                                  )
v.                                ) June 30, 2021
                                  ) 9:00 a.m.
VIGOR MARINE, LLC,                )
                                  ) BENCH TRIAL
                Defendant.        ) Vol. 3 of 5
                                  )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

  For the Plaintiff:      J. STEPHEN SIMMS
                          Simms Showers LLP
                          201 International Circle, Suite 230
                          Baltimore, MD 21030

                          ANTHONY J. GASPICH
                          Gaspich Law Office PLLC
                          8094 NE Barthrop Place
                          Bainbridge Island, WA 98110

  For the Defendant:      CHRISTOPHER H. HOWARD
                          DAVID R. BOYAJIAN
                          Schwabe Williamson & Wyatt
                          1420 Fifth Avenue, Suite 3400
                          Seattle, WA 98101

                          NOAH JARRETT
                          Schwabe Williamson & Wyatt
                          1211 SW Fifth Avenue, Suite 1900
                          Portland, OR 97204

                          ADAM MURRAY
                          Schwabe Williamson & Wyatt
                          700 Washington Street, Suite 701
                          Vancouver, WA 98660

EXAMINATION INDEX

PAGE

DANIEL KEEN       REDIRECT/CROSS-EXAMINATION       384
                  BY MR. SIMMS

                  REDIRECT EXAMINATION             416
                  BY MR. BOYAJIAN

                  REDIRECT/RECROSS EXAMINATION     436
                  BY MR. SIMMS

KYLE JACOBSON     DIRECT EXAMINATION               439
                  BY MR. GASPICH

                  CROSS-EXAMINATION                463
                  BY MR. JARRETT

JOHN COWGILL      DIRECT EXAMINATION               468
                  BY MR. GASPICH

                  CROSS-EXAMINATION                479
                  BY MR. JARRETT

                  REDIRECT EXAMINATION             493
                  BY MR. GASPICH

                  RECROSS-EXAMINATION              495
                  BY MR. JARRETT

FRED PICKHARDT    DIRECT EXAMINATION               497
                  BY MR. SIMMS

                  CROSS-EXAMINATION                511
                  BY MR. BOYAJIAN

                  REDIRECT EXAMINATION             530
                  BY MR. SIMMS

                  RECROSS-EXAMINATION              533
                  BY MR. BOYAJIAN

BOB SHREWSBURY    DIRECT EXAMINATION               536
                  BY MR. SIMMS

                  CROSS-EXAMINATION                560
                  BY MR. HOWARD

                  REDIRECT EXAMINATION             581
                  BY MR. SIMMS

EXHIBIT INDEX

| EXHIBITS ADMITTED | PAGE |
|---|---|
| 10 | 497 |
| 14 | 395 |
| 15 | 497 |
| 62 | 396 |
| 63 | 396 |

1          PROCEEDINGS
2     _____

3          THE COURT:  All right, counsel.  Welcome back.  We're

4     back in session, and I believe you were starting your

5     examination of Mr. Keen.

6          MR. SIMMS:  Yes, sir.

7                         DANIEL KEEN,
               having been previously sworn, testified as follows:
8

9                    REDIRECT/CROSS-EXAMINATION

10    BY MR. SIMMS:

11    Q.   Mr. Keen, between the time that you left the stand last

12    night and now, did you discuss your testimony with anyone?

13    A.   Discussed as in -- well, I asked my team if I was presented

14    as a competent person, yes.

15    Q.   Did you have any other discussions with the team about your

16    testimony?

17    A.   Not in detail, no.

18    Q.   Did you have any discussion at all, in any form, other than

19    you did really well with your testimony yesterday?

20    A.   No; just did really well.

21    Q.   Nothing else?

22    A.   Nothing else.

23    Q.   This is the -- right to the GHS program here.

24         So let's put exactly where you were when you were looking

25    at this and reporting it back to Western.  Okay?

1    You were at home?  You were out to dinner?  You were --

2    what were you doing?  Where were you?  Let me show you --

3    A.   I believe this is the email from 9:30-something p.m.,

4    correct?

5    Q.   Yes, it's 9:30.

6    A.   Or 9:43 p.m.  I was home when I sent this email.

7    Q.   Okay.

8         And that evening, before you arrived home, were you out --

9    A.   Yes, I was out to dinner with my wife.  I was also working

10   on the cases, working through it.  Like I explained yesterday,

11   it's quite the in-depth, trial-and-error process, getting

12   through all the situations.

13   Q.   Okay.

14        So you said that at first -- when you first got the call,

15   the report was about a three-foot list, right?

16   A.   I do not recall a number being evaluated.  My recollections

17   or first understanding is there was a list, and then pictures

18   shared with me, it looked -- appeared to be a list, but I didn't

19   really have a rough number -- you know, number established.

20   Q.   The pictures shared with you.  So there was the first

21   report, and then when you saw the pictures, you could tell the

22   list had become worse, right?

23        MR. BOYAJIAN:  Objection; mischaracterizes.  I believe

24   Mr. Keen said he saw a picture.

25        THE COURT:  Well, objection to the form of question.

1    Maybe you can just rephrase that.

2    Q.    (By Mr. Simms)  From the time that you got the first report

3    of the list --

4    A.    Okay.

5    Q.    -- to the time that you saw the photo -- right?

6    A.    Okay.

7    Q.    Okay.

8          -- something told you that the list had increased between

9    those times, right?

10   A.    Not necessarily, no.

11   Q.    Okay.

12         So when you saw the photo, were you under the impression

13   that the list had not increased?

14   A.    No.  I saw the photos; under the impression that the photo

15   was the condition discussed.

16   Q.    Okay.  There were running lights on the 70, weren't there?

17   A.    Yes.

18   Q.    And batteries powered those?

19   A.    Batteries solar-charged.

20   Q.    And those batteries could have run the -- what do we call

21   it? -- they would have run the List-O-Light system, couldn't

22   they?

23   A.    I don't know that for sure, sir.

24   Q.    It's not something that you looked into?

25   A.    I'm not an electrical designer, so the first step there in

1  evaluating which power source is required for the List-O-Light

2  system, if it's AC or DC voltage there, amperes drawn and

3  determined if you had the appropriate length of battery, but

4  that's as far as I would know.  I wouldn't be able to evaluate

5  from there.

6  Q.   Did anybody determine that the solar battery would be

7  sufficient to operate the running lights?

8  A.   The solar battery in the system, I believe, was an enclosed

9  box that you purchase off the shelf and is by the manufacturer,

10  designed to run its own system.

11  Q.   Okay.  All right.

12       So that's -- and how many of them were there on the 70

13  running the running lights?

14  A.   I believe we established yesterday there was three of them:

15  A port, starboard, and stern light.

16  Q.   So there were three independent batteries?

17  A.   Correct.

18  Q.   And what's the cost of the battery, solar-operate?

19  A.   Sir, I'm not sure.  I believe Western supplied the

20  batteries.

21  Q.   Western supplied the batteries?

22  A.   I believe so.  The magnet lights -- or -- you know, the

23  running light.  It's a battery -- it's a box.  The thing is

24  about the size of these books here -- for the court -- and,

25  typically, a light on top and a little solar cell, and the

1   batteries are inside the box.

2   Q.    So back to our GHS.

3         So here it is.  The data that you were running through the

4   GHS system, when was the last time that you had loaded data into

5   the GHS system about the 70?

6   A.    Last time, as in when, sir?

7   Q.    So taking the time that you're looking at this, the last

8   time before the time you opened your laptop on the 25th and

9   looked at this.  When had you last loaded any data about the 70?

10  A.    Just so I understand, to be clear.  You're asking me when

11  is the last previous time I operated the GHS program from this

12  instance here?

13  Q.    Okay.  Well, let's try that.

14  A.    It was creating the surface area calculation for Chris

15  Law's tow distance counts -- Chris Law's calculations.

16  Q.    And the purpose of looking at surface area calculations was

17  to decide what power was needed to pull the tow?

18  A.    Yes, as we established that as part of it yesterday.

19  Q.    What other part did those calculations play?

20  A.    Well, surface area fell into the calculations we used in

21  the tow manual to determine tow resistance, which size of the

22  tug and the size of the towing equipment, of the jewelry

23  associated connecting the tow to the tug.

24  Q.    So that calculation determined the power of the tug needed

25  and the towing configuration needed to tow, right?

1   A.    Not the configuration; validates the size of the equipment

2   in the configuration.

3   Q.    Okay.  Gotcha.

4        So you worked with the program to determine that with Chris

5   Law, the insurance person.  Before that, when was the last time

6   you used the GHS program for the 70?

7   A.    I do not recall; however, I used it quite extensively at

8   the time.  So we'd have to look back at logs to understand what

9   I -- actually, there are no logs for the system.  I apologize.

10  Q.    But the GHS program that you were looking at the night of

11  the 25th did not have the extra tanks that you had added in the

12  70, right?

13  A.    All the floodable volume was accounted for in that model,

14  yes.

15       As you see there, it does not -- the pontoon section, as we

16  described, had 32 tanks at that point.  The additional four

17  tanks from the 28 listed here are derivatives of Tank 5, Tank 6,

18  Tank 11, and Tank 12.  And we separate out a portion of the

19  existing tank here to create additional compartmentalize.

20       So, in fact, what I demonstrated with this model is the

21  assumption that we'd lost that compartmentalization as well,

22  helping to find a worst-case scenario.

23  Q.    But this model did not have a separate entry for the new

24  tanks, right?

25  A.    It did not have a separate entry, but then again, as I

1  stated, the model still is defined appropriately for the amount

2  of value or buoyant lift or loss of volume capable.

3       So by adding the tanks and definition to this list in the

4  line up here, as you see, there would be nothing -- no

5  additional volume added to the bottle.

6  Q.   Okay.  Let's go to Exhibit 10.

7       This is a document that Vigor kept in its files, right?

8  A.   Yes, yes.

9  Q.   And it's a document that you would refer to from time to

10 time about the 70, right?

11 A.   For operation of the dry dock, yes.

12 Q.   And the same for the 69?

13 A.   Yes.

14 Q.   It's a document you used in the ordinary course of your

15 business to operate the 70?

16 A.   To some extent.  A lot of the information in this document

17 is irrelevant for this day and age.  It was written in the '40s.

18 There are some components on the dock that don't exist anymore.

19 Both the 69 and 70, they were obsoleted by the Navy, removed.

20 But the key things, like the mechanicals and some general

21 arrangements, what remains.

22 Q.   Okay.  All right.

23       MR. SIMMS:  So I'd like to have this entered as

24 Exhibit 10 as a document made and kept in the ordinary course of

25 business at Vigor and relied on, at least, for some things.

1    THE COURT:  This is not stipulated?

2    MR. SIMMS:  It is not.

3    THE COURT:  Any objection?

4    MR. JARRETT:  Well, this is different than the

5 Exhibit 10 that's in the Western trial exhibits.  It's --

6    MR. SIMMS:  It's the USN dry dock operating manual.  I

7 got Exhibit 10.  This is Exhibit 10 on what we printed out and

8 sent to the court.  It's the U.S. Navy Floating Dry Docks

9 Manual.  We marked it Exhibit 10.

10    MR. JARRETT:  Your Honor, my only problem is, I don't

11 have the full document that we're being asked to stipulate to at

12 this time.

13    So we have Exhibit 10 that Western submitted as a trial

14 exhibit, and I think I understood Mr. Simms to say this is a

15 different thing than that.  But I don't -- I don't -- so I guess

16 my problem is, I don't know what's going on here, Your Honor, I

17 guess is the problem.

18    MR. SIMMS:  This was the one we put in, the whole 217

19 pages.

20    THE COURT:  All right.  I just want to make sure that

21 we're talking about the same thing, and that's the only concern

22 I've got.

23    So let me just defer a ruling.  We don't have to admit it

24 right at this second, I don't believe.  Maybe during the break,

25 you can make sure it is the same, or else that they have an

1    opportunity to take a look at the manual.

2          MR. SIMMS:  Yes, Your Honor.

3          THE COURT:  All right.

4    Q.   (By Mr. Simms)  So we talked about the 2013 ultrasound

5    survey done for the 70.

6    A.   Yes.

7    Q.   And that survey was done for the purposes of NAVSEA

8    certification of the 70, correct?

9    A.   That is not what I said yesterday, sir.

10   Q.   Okay.  It was not done for NAVSEA certification?

11   A.   That is not what I said yesterday.

12   Q.   What did you say yesterday?

13   A.   It was done when we exited NAVSEA certification and

14   evaluation of the dry dock for use in lifting commercial

15   vessels.

16   Q.   So was there an evaluation of the 70 done at that point?

17   A.   Please be more specific.  Evaluation?

18   Q.   I'm sorry?

19   A.   Please be more specific with your valuation.  "Valuation"

20   or "evaluation"?

21   Q.   Oh.  Evaluation of the 70.  Gotcha.

22   A.   Okay.

23   Q.   And what were you evaluating with that?

24   A.   We were looking at the -- you know, the structural

25   capability of lifting the dry dock, you know -- lifting the dry

1   dock, sorry -- lifting commercial vessels with the dry dock.

2   Q.   Okay.  And what was the result of that evaluation?

3   A.   The result was we continue with commercial work; however,

4   one of the largest vessels that dock used to lift up was a polar

5   icebreaker, large vessels.  So we decided to no longer lift

6   polar icebreakers with the dry dock.

7   Q.   Okay.

8        And after that, Vigor never repaired the 70 so that it

9   could lift polar icebreakers?

10  A.   Not to lift polar icebreakers, no.  Repairs were ongoing,

11  continuously, on the dock, though.

12  Q.   Okay.  And let's talk about those repairs.

13       So if I were Richard Shaw, going through all the tanks and

14  all the things that you said that he did, three years later, in

15  2016, I'd be able to see those repairs, right?

16  A.   Yes.

17  Q.   I'd be able to see them because there would be big plates

18  cut out and welded in over holes.

19  A.   Well, sir, you don't always repair only holes.  You repair

20  areas that have -- you know, some wastage, et cetera, but there

21  was newer steel, yes, on the dock.

22  Q.   I'd be able to tell the difference between this newer steel

23  and what was replaced, right?

24  A.   Generally speaking, yes.

25  Q.   Okay.  And that would be obvious in the photograph that

1  Shaw took, right?

2  A.    At times.  I say that because even new steel starts to turn

3  brown and rust, so it blends in.

4  Q.    All right.

5        So if we went to the Vigor records to see exactly what

6  repairs are done, would the Vigor records show that?

7  A.    Not necessarily, no.

8  Q.    Why?

9  A.    Vigor does not maintain records on its own equipment in the

10  traditional sense as it would for a ship-repair project, where

11  everything is itemized out for a customer project.  You know, we

12  have staff on site at times.  It is a mere effect of just

13  bringing the staff to the location of the repair, and executing.

14  Q.    Okay.  So that's why we never got records showing repairs,

15  yes?

16  A.    Yes.

17  Q.    So you use this table from the towing manual, G-4, to make

18  the calculations that you made and to correct Chris Law's,

19  right?

20  A.    Correct.

21  Q.    Okay.

22        The towing manual is a source that you regularly use in

23  your business, isn't it?

24  A.    "Occasionally" would be a more proper word.

25  Q.    But this is a document that's kept -- you have it on your

1   shelf in your office, I expect.

2   A.    No.  We use it when referenced to, lately, by customers.

3           MR. SIMMS:  I'd like to enter Exhibit 14.

4           MR. JARRETT:  May we see the cover again, please,

5   counsel, of the document you have up on the screen.

6           MR. SIMMS:  Sure.  Is this another mismatch between

7   what you all have?

8           MR. JARRETT:  I'm looking to see if there is a Bates

9   number on this page, please.  The bottom right-hand corner would

10  be helpful.

11          MR. SIMMS:  This was one we got right off the

12  Internet.

13          MR. JARRETT:  Did we object -- oh, I see.  Your Honor,

14  I think we reserved objections to Exhibit 14.

15      I understand what we're doing now, and we don't have those

16  objections.  We'd waive that objection to 14.

17          THE COURT:  Thank you.  Exhibit 14 is admitted.

18                  (Exhibit 14 admitted.)

19  Q.    (By Mr. Simms)  And so you were involved with the 69 tow,

20  right, from Portland to Seattle?

21  A.    Sorry.  Can you please speak up?

22  Q.    Sure.

23      You were involved in the Portland to Seattle tow of the 69,

24  right?

25  A.    That's correct.

1   Q.   Okay.

2        And you received the tow-suitability survey from Richard

3   Shaw?

4   A.   Yes.

5   Q.   Okay.  And that's it right there.  Okay.

6        MR. SIMMS:  Move to have that admitted.

7        MR. BOYAJIAN:  Objection, Your Honor.  This is not a

8   tow-suitability survey.  This is a towing recommendation sheet,

9   which is one small part of the overall tow-suitability survey.

10       MR. SIMMS:  And I'm going to -- thank you.  I'm going

11  to move to admit 62 and 63, the Shaw complete suitability and

12  recommendations.

13       MR. BOYAJIAN:  We have no objection on either of these

14  two.

15       THE COURT:  Thank you.  62 and 63 are admitted.

16            (Exhibits 62 and 63 admitted.)

17  Q.   (By Mr. Simms)  So we talked about Heger, and Heger is the

18  dry dock architect that you use almost exclusively, right?

19  A.   They're dry dock engineers, yes.

20  Q.   And you are a naval architect by background.

21  A.   Correct.

22  Q.   SUNY Maritime Naval Architecture?

23  A.   Yes.

24  Q.   And what year is your degree?

25  A.   2009, sir.

1  Q.   Okay.  And that's what gives you the qualifications to do

2  the calculations you did, right?

3  A.   That's a part of it, sir.  Experience would be another

4  part.

5  Q.   But you found Heger to be a very reliable source of

6  engineering information --

7  A.   Yes.

8  Q.   -- that you rely on?

9  A.   Yes.

10  Q.   Another name for this type of dock, the 69, the 70, the 71,

11  is a Rennie dock, right?

12  A.   No.

13  Q.   It's not?

14  A.   It is not.

15  Q.   It's not a pontoon dock?

16  A.   It is not a Rennie-designed dock, sir.

17  Q.   Okay.  What's the difference between this and a Rennie

18  dock?

19  A.   This is a Harris-designed dock.

20  Q.   Okay.  Is there a difference between a Harris design and a

21  Rennie design?

22  A.   Yes, there is, sir.

23      A Harris design has, as we've discussed, the three

24  sections:  Two smaller end sections and a larger mid-body.

25  Rennie-designed dock, sir, is a series of

1  nearly-identical-length pontoons that float freely, independent

2  up on themselves.  And then a single wing-wall section, side

3  wall, installed on those pontoons to make the system rigid.

4  Q.    Okay.  All right.  Well, let's take a look here.

5       Have you ever looked at the Heger Dry Dock website?

6  A.    Yes.

7  Q.    Okay.

8       And then they've got a library here, down here, Heger

9  Publications.

10      Before we go past this, have you ever used the American

11 Bureau of Shipping Rules in any work that you've done with the

12 70?

13 A.    With the 70?  No.

14 Q.    Excuse me?

15 A.    With the 70, no.

16 Q.    And how about the DNV, the Det Norske Veritas?  Do you ever

17 use those rules for classifications of floating docks?

18 A.    I have used DNV for other things in 2017.

19 Q.    Okay.  And do those two guides provide reliable formulas

20 for determining the longitudinal strength of dry docks?

21 A.    I didn't use them in that sense, so I couldn't comment.  I

22 don't know.

23 Q.    And so we'll go down to Heger Publications.  Have you ever

24 seen their *Dockmaster's Manual*?

25 A.    Yes, I have.

1   Q.   And what I did was to pull down this.  Okay.

2        So this is the Dockmaster's training manual, and it comes

3   from Heger, so it's reliable, isn't it?

4   A.   Yes.

5   Q.   And here, this is -- the 70 is pontoon dock, right?

6   A.   By the drawings and descriptions there, I don't necessarily

7   agree with that.

8   Q.   Uh-huh.  Okay.

9        So Heger says here that there are three types of floating

10  dry docks:  "Sectional, box, or one-piece."  If the 70 was any

11  of these, what would it be?

12  A.   It's hard to say what Heger would consider it to be.  In my

13  opinion, it would be a box or a one-piece.

14  Q.   But there were three pieces for that dock, right?

15  A.   That's correct, with the intention, though, that the pieces

16  weren't designed to be removed, in that sense, yes.  I mean,

17  they were for as we described, but it wasn't a normal course of

18  activity.

19  Q.   Okay.

20       So here, down, they're describing the pontoon sections can

21  usually be self-docked.

22  A.   Uh-huh.

23  Q.   That was the 70 pontoon sections could be self-docked

24  A.   Yes.

25  Q.   How about this.  Here's what Heger says:  "Ocean tow is

1    usually not possible unless the dock is cut in shorter sections

2    due to the lower longitudinal strength."

3             MR. BOYAJIAN:  Your Honor, objection, if I may?

4        Mr. Keen has said that the YFD 70 is not a Rennie-type

5    dock.  These are instructions for towing Rennie-type docks, as

6    Mr. Simms has highlighted at the top of the page.

7        I'm not sure where we're going with this line of

8    questioning about a completely different type of dock.

9             THE COURT:  The objection is overruled.  It says,

10   "Pontoon or Rennie dock."  The witness can explain his

11   understanding of what this section means.

12   Q.   (By Mr. Simms)  So Rennie, and the other type is what?

13   A.   Harris.

14   Q.   Harris.

15   A.   Harris design.

16   Q.   Well, let's see if the *Dockmaster's Manual* has anything

17   about a Harris dock.

18       Okay.  I'm searching it, and either I'm wrong or Adobe is

19   wrong, but there's nothing in here about Harris design.

20   A.   This manual was developed for the operation of dry docks in

21   a commercial facility, or a facility.  It was not directed for

22   towing the docks.

23   Q.   Well, here it's talking about towing, so --

24   A.   It is.

25   Q.   So let's go down a little bit more in this document.

1      And this is a document that you've used and relied on,

2  right?

3  A.   Yes.

4  Q.   Okay.

5       So longitudinal strength.  Lloyd's rule for longitudinal

6  bending; it has a number of things in here.  Okay.

7       And then down here -- and I'm going to -- this is page --

8  this is page 1-20, and it's in bright red.  It says, right below

9  this, "For docks that will be towed in open water, a separate

10  analysis of stresses induced by waves must be conducted."

11  "Must."  "Must."  But you didn't do that for the 70, did you?

12  A.   We did that with a structurally same dock, the 69.  To

13  understand -- to go into it further there, Vigor evaluated 69

14  for those four cases, and also evaluated Dry Dock No. 3, which

15  is a proper Rennie-style dock in Portland, and that dock was not

16  suitable to be towed because it was a Rennie-style dock.  So,

17  therefore, that's why the business decisions were to move the

18  YFD 69 to Seattle instead.

19  Q.   The one you were just talking about, that was the Emerald

20  Sea, right?

21  A.   No, no, that's not what I was talking about.

22  Q.   Okay.  Which is the one that is the Rennie-type dock?

23  A.   Portland Dry Dock No. 3.

24  Q.   Okay.  It's not the 69.  That's a different one?

25  A.   That's correct.

1    Q.    So here, "For docks that will be towed in open water, a

2    separate analysis of stresses."  It doesn't seem to be limiting

3    what sort of dock we're talking about.  You just said for the

4    Rennie-type dock, you did analysis, but there was no analysis

5    done for the 70, right?  No separate analysis for stresses?

6    A.    No separate analysis was done for the 70 due to the fact

7    the 69 was the same dock structurally.

8    Q.    Okay.

9          So, "By limiting longitudinal directions to values lower

10   than maximums set by the designer, you will never overstress the

11   dock."

12         There were no consideration of longitudinal deflections,

13   right?

14   A.    Sir, that statement is relevant to the operation of a dry

15   dock when you're floating the tanks or deballasting the tanks,

16   not for lifting a ship.

17   Q.    Okay.

18         Now, the 70 was sold to Amaya Curiel for $10,000, right?

19   A.    Okay.

20   Q.    There was a value done on the 69, wasn't there?

21   A.    There likely would have been.  I'm not aware of it.

22   Q.    Okay.  All right.

23         And I want to talk about the 71.  The 71 was a sister

24   dock -- is a sister dock, right?

25   A.    Yes.

1  Q.   It's kept down in San Francisco?

2  A.   You're telling me that.  I'm not very familiar with it at

3  all.

4  Q.   Okay.  We'll ask Heger about the 71.

5       And I'll go down here, and this is the value of the 71,

6  which they called the Eureka.  This is the 2018, two years after

7  the tow.  But the valuation, "Our opinion is the present

8  condition of the Eureka, the 71, has a negative value."

9       At the time of the 70 sale -- and let's just do the math.

10 Okay.  $10,000 -- how much did Vigor commit to spend to get the

11 70 towed to Ensenada?

12 A.   I don't know that number, sir.

13 Q.   Okay.  Way more than $10,000, right?

14 A.   Okay.

15 Q.   So at the time of the tow, the 70 had a negative value,

16 right?

17 A.   Okay.  You're telling me.  Sure.

18 Q.   Yeah, and I can do that.  Yeah.  Okay.

19       Now, down here, 2015, it says South Port Atlantic valued a

20 sister dock for the Eureka for $750,000.  Right?

21       Before the 69 was moved to Seattle, there was a valuation

22 done of the 69 for $750,000, wasn't there?

23 A.   I guess so.  I'm not aware of that valuation.

24 Q.   Yeah.  That was a part of insuring -- the 69 was insured,

25 right, before it got moved up to Seattle?

1    A.    I sure hope it was.

2    Q.    Right, because Vigor had put a lot of work in, at its own

3    shipyard, for the 69, to prepare it for the tow, right?

4    A.    Yes, we performed a dry docking on the 69 before the tow.

5    Q.    You had a Heger survey recommending different types of tow,

6    including a one-piece.  You paid for that.  How much was that?

7    A.    I do not know.  I did not commission that report.

8    Q.    Okay.  But Heger doesn't do things for free like that,

9    right?

10   A.    Not usually, no.

11   Q.    And then you had two separate Heger surveys for the

12   one-piece tow, analyzing longitudinal stresses and other

13   stresses that the tow would experience on the trip between

14   Portland and Seattle, right?

15   A.    I'm sorry.  Did you say two other surveys --

16   Q.    Yeah.

17   A.    -- or two other reports?

18   Q.    Yes.

19         Let's take a look.  This is Vigor's exhibit, and we've

20   entered it.  This is 95.

21         And so after the initial Vigor report -- the initial Heger

22   report, Vigor had two others done.  Okay?  This was done right

23   before the tow, May 2013, "Analysis of the Ability of the Dry

24   Dock to Resist Ocean-Wave Bending."  Did you ask for that to be

25   done?

1   A.   No, I did not commission this.  This was in 2013.

2   Q.   Who did?

3   A.   I'm not sure.  Can you scroll down to the date again,

4   please?

5   Q.   Sure.

6   A.   So I started Vigor in May of 2013, so this was likely

7   commissioned before my time.

8   Q.   Okay.  All right.

9        Here's another one.  Okay.  All right.

10       Well, for the 70, and during all this time, from the

11  time -- and let's talk about, for a second, the --

12       MR. SIMMS:  Before I forget this, though, I'd like to

13  move to admit as an exhibit for rebuttal, the *Dockmaster's*

14  *Manual*, which Mr. Keen says he uses and relies on.

15       THE CLERK:  Is there a number?

16       MR. SIMMS:  That would be Western 75.

17       THE COURT:  This is the Heger one?

18       MR. SIMMS:  This is the Heger one, yes.

19       THE COURT:  Mr. Boyajian?

20       MR. BOYAJIAN:  We don't have a copy, and, second,

21  we're not clear what rebuttal as to...

22       MR. SIMMS:  Okay.  Copy's on the web, and I will email

23  to everybody.  And what it is in rebuttal to was the idea that

24  it was reliable, based on Heger's calculations of the 69, to do

25  a tow, open ocean, to Ensenada.

1      THE COURT:  Did we clear up the issue about the Rennie

2  versus the Harris?

3      MR. SIMMS:  We --

4      THE COURT:  Does this mention the 70?

5      MR. SIMMS:  It does not -- well, let's see.  That's a

6  good question.

7      MR. BOYAJIAN:  Your Honor, I suppose if Mr. Simms is

8  saying that it rebuts something in the Heger conclusion in the

9  analysis of the YFD 69, I think that generalized information

10  available on Heger website would not contradict or rebut two

11  direct studies for which Heger was paid to conduct specific

12  analyses as to the YFD 69 and, by extension, due to the fact

13  they are structurally identical, the YFD 70.

14      This is just a generalized available piece of information

15  on the website.

16      MR. SIMMS:  That Mr. Keen says he has looked at.  This

17  is a training manual.

18  Q.   (By Mr. Simms)  You use this for your own training, right?

19  A.   For calculations of lifting vessels, yes.

20      MR. BOYAJIAN:  I suppose my question is, Your Honor,

21  what does it rebut?  This doesn't rebut or contradict Heger's

22  direct analysis and conclusions about the particular dry dock.

23      THE COURT:  Aside from that, counsel, my concern is,

24  unless you tie it specifically to the dry dock at issue here,

25  I'm not going to go hunting through this and looking it --

1   you've already inundated me with a ton of paper here, and I want

2   to be able to get to what is critical to this particular case.

3        So unless you can show me where it refers to the type of

4   dry docks we're discussing here, either the 69 or 70, I don't

5   see how it's relevant.

6        MR. SIMMS:  We'll hear a little later from the Heger

7   Dry Dock man himself, Mike Naylor, so we'll save this for him.

8        THE COURT:  Thank you.

9   Q.   (By Mr. Simms)  So let's -- we'll go back to the, I guess,

10  genesis, is the right word, of how the one-piece tow came about.

11       And you had -- you've known Russ Shrewsbury for a long

12  time, right?

13  A.   Since 2013.

14  Q.   As a matter of fact, to this day, Western continues to be

15  the first tug company that Vigor calls when it needs something

16  moved, right?

17  A.   For harbor assist, yes.

18  Q.   Okay.  For harbor assist, the first company that -- you're

19  still doing business -- that is, Vigor is still doing business

20  with Western?

21  A.   Correct, for harbor-assist work.

22  Q.   And other work like this is pretty rare for Vigor, right?

23  A.   We do an amount of it.  It's not as frequent as harbor

24  assist, yes.

25  Q.   And so you've known Russ -- how long have you known Russ

1 Shrewsbury?

2 A.   Since 2013, sir.

3 Q.   Do you consider him to be a friend?

4 A.   Yes, a friend and a colleague.

5 Q.   Yes.  Okay.

6     And so was it in August of 2016 that you first started

7 talking with Russ about moving this dock?

8 A.   I do not recall exactly when we started talking about that.

9 Q.   Okay.

10     Did the conversation go something like this:  Hey, Russ,

11 could you guys move this dock?

12 A.   I believe the conversation was of the sort of asked Russ

13 and Bob to come down to the yard and see if we can discuss

14 moving the docks.

15 Q.   And so you discussed moving the dock, yes --

16 A.   Yes.

17 Q.   -- with them, and you asked them to give you a quote?

18 A.   Uh-huh, and also if they thought it was feasible.

19 Q.   Uh-huh.  Okay.

20     And you said, We want to tow this as-is to Ensenada?

21 A.   Yes.

22 Q.   And what else did they say to you during that get-together?

23 A.   I do not recall the conversation well enough to quote that,

24 so I apologize.

25 Q.   Okay.  And then they gave you a quote for a one-piece tow

1    to Ensenada?

2    A.    Yes, and I was pricing and quoting the contracts to Paul

3    Torrey, who manages that portion.

4    Q.    And Western's was the only bid that came in for this?

5    A.    I do not recall if Paul asked for any other bids.

6    Q.    Okay.  All right.

7          So then you get the bid and all that stuff, and then you

8    start working on the 70 to make it fit for the tow, right?  Or

9    your due diligence.

10   A.    We started preparing the dock for the tow.

11   Q.    All right.  And so you've testified -- and one of the big

12   points here is due diligence -- about what Vigor did.

13         Is there anything that you haven't described already that

14   Vigor did to be duly diligent to prepare the 70 for a one-piece

15   tow to Mexico?

16   A.    Not that I'm aware of, sir.  I believe that I named

17   everything we did; however, it was some time ago, so smaller

18   items might have fallen -- you know, skipped my memory.

19   Q.    But there are no records that show exactly what you did,

20   are there?

21   A.    Not in depth, no.

22   Q.    Not in depth?

23   A.    No.  Sorry.

24   Q.    What records are there?

25   A.    Whatever email or discussions -- would discuss with Rich

1    Shaw.  That's it.  It was more of a deck-plate-driven job.

2    Q.    Ten thousand man hours, is that what you said?

3    A.    No, no.

4    Q.    A thousand man hours?

5    A.    Approximately a thousand hours.

6    Q.    So there were a thousand person hours that went into this

7    due diligence, but no records to confirm that?

8    A.    Correct, sir.

9    Q.    So you go through this and -- tell me what a naval

10   architect does.

11   A.    It depends on the job assignment, sir.  It's more along the

12   lines of what does a civil engineer do.  It depends on what job

13   they have.

14        Some cases, I've been a stability engineer for ABS.  Other

15   cases, I was a naval architect for U.S. Navy at MSC and I

16   evaluated dry dockings; built small foundations or arrangements.

17   So it's a variety of things onboard vessels.

18   Q.    Uh-huh.  Okay.  All right.

19        And you were performing as a naval architect with Vigor,

20   right, for the 70?

21   A.    For the tow-resistance calculations, yes.

22   Q.    Okay.  But that was it?

23   A.    That was it.

24   Q.    Okay.  So I want you to put your naval architecture hat on.

25        For however it happened, for the 70 to have sank, there had

1    to be some catastrophic failure, right?

2    A.    Yes.  For it to sink, there would have had to be extreme

3    loss of buoyancy or additional load implied on the vessel.

4    Q.    Okay.  And that was so catastrophic that it caused the

5    safety deck to be breached, right?

6    A.    I couldn't render a guess of when the safety deck or how

7    the safety deck was breached, sir.

8    Q.    Okay.  But you know that, for this dock, if the safety deck

9    is not breached, it floats, right?

10   A.    What I know as a dockmaster -- and I have not evaluated as

11   a naval architect beyond this -- but, yes, in a harbor scenario,

12   calm waters, if the safety deck was not breached and the dock

13   was fully submerged, as in the main ballast tanks were flooded,

14   the safety deck would not go underwater, yes.

15   Q.    So when you're talking with Bob and Russ Shrewsbury that

16   night, everybody is trying to figure out whether the -- what's

17   going on.  You never said to them, "Bob and Russ, I can run all

18   the calculations.  I can't figure out what's going on but, let

19   me tell you, if the safety deck is breached, you're going down";

20   never told them that?

21   A.    No, I did not tell them that, that I recall.

22   Q.    Okay.  But you knew that at the time?

23   A.    Yeah.  I mean, if every compartment in that dock was

24   flooded, there would be no more buoyancy.  Yes, I knew that.  I

25   think anyone would know that.

1  Q.   Well, that was the -- the last defense.  That last defense

2  holds, it floats.  If that last defense doesn't hold, it sinks.

3  Right?

4  A.   Sir, there are a lot of variables in that.  The safety deck

5  has its own compartments, and so I would have to assume that all

6  those compartments were flooded as well, or, you know, water was

7  transferring to another side, or how that -- so I do not -- I

8  struggle answering that directly.

9  Q.   Okay.

10      So you're communicating with Bob and Russ throughout the

11  evening.  You're getting your dinner messed up.  Russ was out at

12  dinner, too.  He'll testify to that.

13  A.   Okay.

14  Q.   Everybody is talking.  You get home, and you never ask

15  them, Has it gotten worse?

16  A.   I do not recall asking that question.

17  Q.   You never said, Well, hey, you guys, you know, I sent you

18  this at 9:53 -- and we're talking now it's eleven o'clock and

19  you're on the phone with Ron Greger and you're talking with Paul

20  about Global, but you never went back to Western and said, What

21  are you seeing now?

22  A.   The original communication that came across with the

23  picture, it was described as a hard-to-get scenario -- it was

24  hard to see -- well, not hard to see -- sorry.  Communication

25  was a little bit difficult, so I was relying on Western to

1  continue to feed information to me.  There was a lot of things

2  going on between, like I said, coordinating with Global and

3  whomever else I was trying to coordinate with, and get a night's

4  sleep before flying to wherever.

5  Q.    So Chris Law, he is the -- he's some part of the insurance

6  for the 70, right?

7  A.    Yes.

8  Q.    Okay.  And we talked about some calculations he did that

9  turned out to be wrong.

10       Did he also do some other calculations that related to wave

11  and wind?

12  A.    I do not recall.

13  Q.    Okay.

14       So we have Rich Shaw's draft survey, and then you and Rich

15  Shaw discussed -- emailed with Chris Law about the draft survey?

16  A.    Yes, there were email communications there.

17  Q.    Okay.  And so Chris Law has the draft survey, and he makes

18  the recommendation that the wave height and wind be -- wave

19  height be decreased in the draft report, and wind restriction be

20  increased, right?

21  A.    He made recommendations for changes, yes.

22  Q.    And it was those recommendations that Rich Shaw carried

23  into his final survey report, right?

24  A.    You have to line the two documents up for me to verify,

25  but, yes, that sounds correct.

1          MR. BOYAJIAN:  Objection, Your Honor, to this.

2   Captain Shaw was here.  Captain Shaw said that he did a

3   tremendous amount of work before coming up with his own

4   conclusions that he put in his report.  He did not say that he

5   got numbers from somebody at an insurance company, and now

6   Western is trying to use Dan Keen, who is neither Captain Shaw

7   nor Mr. Law, to try and create a connection between one man's

8   thinking and another.

9          MR. SIMMS:  Okay.  Well, we, obviously, don't --

10          THE COURT:  Hang on.

11          MR. SIMMS:  -- don't agree with what Captain Shaw was

12   remembering, but Mr. Keen was remembering something else.  He

13   was part of these conversations, shooting these things back and

14   forth --

15          THE COURT:  The objection will be overruled.  It's the

16   witness's testimony that matters, not counsel's comments and

17   statements.

18   Q.   (By Mr. Simms)  So at the time -- and before the tow left,

19   the only thing by way of survey was Rich Shaw's draft survey,

20   right?  Is that right?

21   A.   Yeah, sorry.  I'd have to look at dates and time stamps to

22   verify what document was out at the time.

23   Q.   Okay.

24      Rich Shaw didn't issue his final survey until the day after

25   the tow left, right?

1  A.    Yes.  Rich Shaw and Bowditch would issue a final on

2  departure.

3  Q.    Okay.

4        So in your experience as dockmaster, it's customary that

5  the surveyor will -- before the tow departs, the trip-and-tow

6  surveyor -- it's customary that the surveyor will get with the

7  captain, go over the survey, and have the captain initial the

8  survey, right?

9  A.    I don't have enough experience there to comment to that.  I

10 really don't.

11 Q.    Well, you asked Rich Shaw to go down to meet the tow and

12 tug before they left, did you?

13 A.    Rick Shaw makes it a point to inspect the tug before it

14 left.  So that's what he does.  I didn't direct him for that.

15 Q.    With that, he did inspect the tug.

16       But my question is, you asked Rick Shaw to go down to meet

17 the tug and tow before they departed, right?

18 A.    I don't recall.

19 Q.    You said, Are you going down there?

20 A.    If I said that, Are you going down there to see it leave,

21 and that may be when he asked me to take the drafts to the

22 vessel on departure, because he couldn't attend.

23 Q.    Okay.  So you took the draft on departure?

24 A.    Yes.

25 Q.    Okay.  That's the draft of the --

A.   Of the tow.

          MR. SIMMS:  All right.  Let me see if my folks have any questions.

     All right.  We'll turn you back over to the Vigor side.

          THE WITNESS:  Thank you, sir.

          MR. SIMMS:  You're welcome.  Thank you.

          THE COURT:  Any other questions, Mr. Boyajian?

          MR. BOYAJIAN:  Yes, Your Honor, certainly more than ten minutes.  I say that because maybe Your Honor wants to take our break before I get started.

          THE COURT:  No.  Let's get started.  We take our break at 10:30.

                    REDIRECT EXAMINATION

BY MR. BOYAJIAN:

Q.   Mr. Keen, I'm going to start with some questions that came out of Mr. Simms' line of questioning, and then we'll go back to some that I had ready for you this morning.

     The List-O-Light system, remind us what that is and where it gets used.

A.   Yes.  The List-O-Light system was light bar installed on the end of the dry dock; shone to shore -- lights towards shore for use during a dry dock operation or when the dock was in operation as a dry dock.  It was an early warning indication system if there was a wake change on board the dry dock, causing the dock to list.

1          When a dock is in a lifted condition with a vessel on

2    board, or a -- what do you call it? -- burden condition, it can

3    be sensitive to weight change.  And you have what is called a

4    low freeboard at that point so that it would have less than a

5    foot -- or it's measured in inches -- of distance of pontoon

6    deck above waterline.

7          If the dock were to list too much to one side, the water

8    would progress onto the pontoon deck, resulting in a loss of

9    buoyancy.  The pontoon deck of the whole hull has a water plane

10   -- right? -- so that's when you take a slice of the vessel along

11   the waterline, and that water plane represents resistance --

12   buoyant -- sorry.  Excuse me.

13         You take that plane, and by a matter of height in the Z

14   direction, you can define weight -- weight per -- it values a

15   weight per inch.  Anyway, the weight it takes to submerge the

16   dock.

17         And once the pontoon deck tilts into the water and water

18   comes across the pontoon deck, that water plane shrinks, and it

19   takes less weight to cause a change or add to the change to the

20   dry dock.

21         So anyhow, to summarize it, the List-O-Light is an early

22   warning system for events like that so that shoreside personnel

23   could notify a dockmaster in the event that a light was alarmed.

24   Q.   So the List-O-Light, then, is a tool used when you're

25   lifting ships to help make sure that you don't tip over and drop

1    the ships that you're lifting?

2    A.    Correct, or, more importantly, all the personnel working on

3    the ships.  And it is for the duration of the availability while

4    the ship's lifted.  That's the real intent.

5    Q.    Okay.  This isn't a tool used for towing?

6    A.    No.

7    Q.    Heger, we keep talking about Heger's analysis for the YFD

8    69.  They approved a one-piece tow of the YFD 69 subject to a

9    ten-foot-wave-height restriction, right?

10   A.    Through the report, yes.

11   Q.    So that was their conclusion.  The structure of the YFD is

12   suitable for one-piece ocean towing subject to a

13   ten-foot-wave-height restriction?

14   A.    Yes.  I would have to make sure I read the paragraph

15   correctly, but, yes, that's what I believe it says.

16   Q.    And the YFD 69 and the YFD 70, from structural standpoint,

17   are identical, correct?

18   A.    That's correct.

19   Q.    The difference is condition?

20   A.    Correct.

21   Q.    And Richard Shaw was hired as a warranty surveyor to

22   compare and tell you the present condition of the 69 and the 70

23   prior to their ocean tows, right?

24   A.    That's correct.

25   Q.    And what did he conclude?

1    A.    He determined that the 70 was acceptable to tow with also

2    the preparations we'd done to the vessel.

3    Q.    And subject to the exact same ten-foot-wave-height

4    restriction that Heger had concluded?

5    A.    Yes.

6    Q.    So Richard Shaw and Heger, coming from different angles,

7    looking at the same dock, both settled on ten-foot-wave-height

8    restrictions?

9    A.    Yes.

10   Q.    The YFD 70 was sold for $10,000.  You were here the other

11   day when Mr. Torrey testified about why the YFD 70 was sold, but

12   can you remind us?  Was Vigor trying to make a profit off it, or

13   was Vigor trying get it out of the commercial market?

14   A.    Vigor was trying to get it out of the commercial market.

15   We did not want it to be sold and then resold to an interested

16   party to then compete with us in the market.  So, quite frankly,

17   we would have paid for it to be removed.

18   Q.    Rather than it go to a competitor --

19   A.    Correct.

20   Q.    -- who would try and undercut you and bid for the same

21   jobs?

22   A.    Yes.

23   Q.    So the value to Vigor was not making a couple hundred bucks

24   on selling a dry dock; it was getting it out of the competitive

25   market?

1    A.    That's correct.

2    Q.    I'm sorry to put you on the spot for this.

3          Does Vigor hire Western for ocean towing anymore?

4    A.    We do not.

5    Q.    Why does Vigor still hire Western for moves within the

6    yard?

7    A.    It's something they've done well at, and they have the

8    equipment in the Puget Sound that no one else has.

9    Q.    Okay.

10          I want to talk about tracking hours, how you track person

11    hours within the yard.

12          For commercial projects, tell us how you track hours.

13    A.    For commercial projects, we set up a number tracking

14    system.  For simplicity, we'll call items "tasks."  These items

15    all have individual numbers associated to them, project numbers

16    or task numbers, and personnel will -- they will charge their

17    time to those individual tasks numbers as they complete the

18    work.

19    Q.    Okay.  Do you do it a different way when you're working on

20    your own equipment?

21    A.    We do.  There is a general overhead number that, most of

22    the time, it gets charged to by individual tasks.

23    Q.    And so when Vigor's own shipyard personnel -- who is expert

24    in welding, pipefitting, et cetera -- when they're assigned to

25    work on a Vigor asset, they don't track hour-by-hour,

1    bolt-by-bolt what they do because you're not preparing and

2    sending a bill to someone.

3    A.    That's correct.

4    Q.    The safety deck, I want to be clear about this.

5          You said that the safety deck, were it not breached, in

6    calm water in the yard, would keep the dock from sinking,

7    correct?

8    A.    The safety deck, yes, in calm waters.

9    Q.    Was the YFD 70 in calm waters when it sank?

10   A.    Not that I'm aware of.  It did not appear to be.

11   Q.    Is there a situation in which the safety deck could be

12   breached but many other compartments within the dock are not

13   breached, such that the dock wouldn't sink?

14   A.    The safety deck itself being elevated, if there was a

15   structural issue there and no issues below, would take on water

16   in swells above 30, 40 feet above waterline.  I would have to

17   look at individual case scenarios to figure out the rest of the

18   details.

19   Q.    What about this:  The dry dock -- kind of looks like this,

20   like a field goalpost -- tips all the way over.  One safety deck

21   is underwater and breached, but this side still has a lot of

22   compartments that have air in it.  It could, theoretically,

23   float, right?

24   A.    That's correct.

25   Q.    So it's not just simply the safety will say that -- and if

1  the safety deck floods, if one floods, the dock is gone.  It is

2  far more complicated, the analysis, than that?

3  A.    That's correct.  These docks were designed to do lots of

4  weird things.  In some cases, they come through the Panama Canal

5  on one side.  They would flood everything on one side,

6  including, I believe, the safety deck, with weights, and it

7  would sit upright on its side going go through the Canal.  So

8  they are versatile.

9  Q.    Because the Canal is not wide enough to let a 120-wide dry

10 dock go through?

11 A.    Correct.

12 Q.    And you're aware that this has been done for dry docks to

13 get through the Canal?

14 A.    I've seen photos, yes.

15 Q.    Okay.

16       Who was in charge of the tow once it left your dock?

17 A.    Western Towboat.

18 Q.    Okay.

19       But you were happy to answer questions for them, to the

20 extent you could, right?

21 A.    Yes.

22 Q.    As a dockmaster with a lot of knowledge about how this dry

23 dock worked.

24 A.    That's correct.

25 Q.    You can only answer questions if you have relevant,

1   adequate information, right?

2   A.   Yes.  Good data in equals good data out.

3   Q.   You couldn't see the dry dock from dinner with your wife,

4   could you?

5   A.   I could not.

6   Q.   Couldn't see the dry dock from your house when you were

7   home packing to get on an airplane, could you?

8   A.   I could not.

9   Q.   Who could see the dry dock?

10  A.   Western Towboat.

11  Q.   And they gave you what updates?

12  A.   Updates from the initial call from Bob.  I assumed the

13  photograph that was sent to me was relative to the initial phone

14  call of -- of -- reporting a list, and then the follow-on

15  port-bow-is-awash email.

16  Q.   So just those two?

17  A.   That I recall, yes.

18  Q.   Okay.

19       Ultrasonic gauging, how is that done?  Because it sounds

20  like -- it's a quick name, and as my partner, Mr. Jarrett,

21  pointed out this morning, you say it quick enough it almost

22  sounds like an oil change.  What is it?

23  A.   Ultrasonic gauging or thickness gauge testing, UT gauging,

24  all synonymous names, are -- it's a piece of equipment tethered

25  on with a probe, and you put the probe on a steel -- or in this

1   case, the steel, and it reports back the thickness of the steel

2   on the screen.

3          And the process of doing that is establishing where you're

4   going to go with it.  Most times, in dry docks, it is what we

5   call belts.  So the length of the dry dock, sir, you take

6   sections of it, sampling sections of approximately 10 to 15

7   sections down the length, and you do the full circumference of

8   it.

9          So on a long dry dock, you turn it by its side, you do

10  around the entire perimeter and the members in that area.  And

11  you take them several feet apart -- a couple feet apart.  So you

12  take a shot, you record your shot, you move to the next one;

13  take your shot, record the shot.  And you do everything you can,

14  standing.  When you can't reach it from standing, you have a --

15  you would have to fully scaffold or bring in rope technicians to

16  suspend themselves in the large, tall tanks.

17         A full-on inclusive process of the dock would take over a

18  month of sampling, and, likely, another month of report writing.

19  Q.   Does Vigor have the equipment and personnel to do a

20  complete ultrasonic testing of a dock the size of the YFD 70?

21  Does it have that capability, using its own equipment and staff?

22  A.   No.  We're not staffed to do a job that big and be able to

23  maintain our -- we're, actually, not staffed to do a job that

24  big.

25  Q.   Okay.

1   A.   It's a large crew.

2   Q.   So to do the whole dock, you're saying it would take two

3   months.  But you could certainly do a smaller section, right?

4   A.   We could, yes.  Vigor has capability of in-house -- doing

5   smaller sections if called out to.

6   Q.   So Richard Shaw went, personally, into each and every tank

7   and looked at every section of the dock.  If he said, "Mr. Keen,

8   I have concerns about this area, would you perform an ultrasonic

9   gauging in Tank 12," would Vigor have done that?

10  A.   Yes, we would have and could have.

11  Q.   Okay.

12       What about if Western had said -- because you said Bob and

13  Russ took a walk along the dock -- if they said, "We have

14  concerns about this area here near the waterline, Dan, we'd love

15  if you'd do you an ultrasonic gauging to put those concerns to

16  rest," would Vigor have done that ultrasonic testing?

17  A.   Yes, we would have.

18  Q.   Okay.

19       Was there any indication or request that you got from

20  Captain Shaw or his assistant, Mike Simonson, that requested

21  that Vigor do an ultrasonic testing of any specific part of the

22  YFD 70?

23  A.   No, there was not, no request.

24  Q.   Did you do an ultrasonic testing of the entire YFD 69

25  pre-tow?

1   A.    No, we did not.

2   Q.    Okay.

3         Heger analyzed the YFD 69 for open-ocean tow in one piece.

4   Did they say, "Before we can do this, when you need to do a

5   complete ultrasonic testing, or we can't evaluate whether this

6   can be towed at sea"?

7   A.    They did not.

8   Q.    How do you take -- physically take -- I know we talked

9   about what the pieces look like when you take the YFD apart.

10  How do you physically take the YFD 70 apart?

11  A.    It's quite an extensive process.

12        THE WITNESS:  I've been using my hands a lot, sir.

13  Would you like me to draw?  Would that help?

14        THE COURT:  You can explain it.

15        THE WITNESS:  Okay.  I just want to make sure you

16  understand.

17  A.    So, for lack of a better description, this would be the end

18  sections -- right? -- and as we described yesterday, this is the

19  center body.

20        To perform a separation of the dock itself, there are --

21  each end section is connected -- bolted by over 200 bolts,

22  one-inch-plus diameter bolts, approximately 100 on each side of

23  the dock, in the wing wall.

24        So at that meeting surface, to perform this, you'd have to

25  ballast the dock into a situation where there was a positive

1  up-force at that faulty connection.  Then you loosen your bolts,

2  and then operate this -- this -- the end sections' equipment --

3  ballasting equipment, to ballast it down, in a way, and then

4  perform -- in a seamanship-like manner, perform a separation,

5  float it away, and store the dock -- this section at a location.

6  And then you'd have to repeat the process on the other end.

7      To put the sections inside, you would then have to operate

8  the center as a dock on itself.  All equipment operating,

9  actually, very crucial.  There's quite a bit of redundancy in

10  the system, but once you've separated the ends, you've lost some

11  redundancy or the pumping capability.  Those sections weren't

12  attached to the center as far as pumping, but they also help

13  create an up-force.

14      So then the dock would submerge, and you bring the two end

15  sections in, and then lift up the whole thing.

16      One of the critical things with the separating -- I kind of

17  glossed over it -- is control of this section.  You have to

18  install electrical umbilicals for control cables and supply

19  power to these end sections so you could actually operate it

20  from the control house, because, in the normal configuration,

21  all that is truncated and omitted, and it's just direct

22  hardwired.  So you disconnect that electrically and then install

23  long umbilicals to be able to operate this end section of the

24  dock, to allow it to be flexible so you're not ripping things

25  apart when you're moving it.

1    Q.    How long does that process take?

2    A.    The preparation and execution of that, I would estimate,

3    at, at least, a month to do.

4    Q.    Okay.

5    A.    And not to mention the bolts -- many of the bolts are in a

6    very, very tight space on the outboard side.  Inboard, along the

7    pontoon wall, they're right there at your hands.

8          On the outboard, it is an 18-inch-wide gap, and you're down

9    working your hand in a pocket.  It's almost -- probably better

10   you would have to flush them off, which is take a torch and

11   actually burn them away and replace the bolts later, if

12   that's -- you're intending to put it back together.

13   Q.    So a tremendous amount of work to do it?

14   A.    Correct.

15   Q.    It would make sense that if you could get professionals to

16   tell you it was safe to tow on the open ocean in one piece, that

17   might be a preferable option, from a commercial standpoint?

18   A.    Yes, most definitely.

19   Q.    Heger Dry Dock, are they the nation's number one,

20   preeminent dry dock engineer outfit?

21   A.    They are.

22   Q.    Okay.  And their conclusion was it was safe to tow it in

23   one piece if you stay out of waves over ten feet?

24   A.    Yes.

25   Q.    And a warranty surveyor, who also looked at it, safe to tow

1  it in one piece from Seattle to Ensenada if you stay out of

2  waves over ten feet?

3  A.    Yes.

4  Q.    Okay.

5      If you put the ends on the middle and lift it for an ocean

6  tow, isn't that just more weight on fewer buoyant tanks?

7  A.    Correct.  You're carrying cargo, if you will, at that

8  point, and you're more susceptible to damage.  So a loss of one

9  tank of buoyancy would be a much more extreme resulted condition

10  with the two pieces on board than it would have been as a

11  one-piece tow.

12  Q.    So it is a tradeoff.  There are pluses and minuses, from a

13  safety standpoint, for towing in a one-piece configuration or a

14  stacked configuration?

15  A.    For deemed stability compartmentalization, yes.

16  Q.    You told us yesterday you could have, with the assets

17  available in the Vigor's commercial shipyard, you could have

18  done this work.  At the Mexican shipyard, could they have

19  unstacked it?

20  A.    Likely not.  They did not have the appropriate -- or they

21  expressed concern of the appropriate deep water; would have had

22  to take the dock and the three pieces out to deeper water, and

23  then perform this exercise away from -- away from service and

24  support and needed power generation, experts at operating it.

25  They were not experts or operators of a dry dock, so they would

1    have had to figure out how to do that as well.

2    Q.    Okay.  Sounds like part of what you're saying is at their

3    dock.

4         At your dock, you had enough water depth, equipment, and

5    power to do --

6    A.    Correct.

7    Q.    -- this operation, and expertise to do this operation.

8         At their dock, they had none of those.  So they would have

9    had to do this at a remote location, out in the middle of the

10   harbor, putting generators and pumps on a barge, and all of this

11   would be done in a floating, dynamic situation in the middle of

12   the Ensenada harbor.

13   A.    Yes, that's how I understand it, yes.

14   Q.    And only if they could hire someone with your expertise to

15   coordinate this ballet.

16   A.    Yes.  I would have likely had to go down to execute it.

17   Q.    So they didn't want it in the stacked configuration, then.

18   A.    No.

19        MR. BOYAJIAN:  Ms. Ivie, can I have 34, Western's?

20   This email from Dan Keen, down at the bottom, please.

21   Q.    (By Mr. Boyajian)  We keep talking about this.  What did

22   you tell Western could happen.  Okay.  Let's take this apart.

23        First part:  This is worst case, all tanks flooded one

24   side.

25        Were you saying that this is the worst conceivable thing

1    that could happen to the dry dock, or, you, Western, have told

2    me it's listing slightly to port.  This is a model if everything

3    on the port side floods?

4    A.    The latter.  This is a worst case if all tanks on one side

5    of the dry dock were flooded.

6    Q.    Okay.

7          And then do you say, "It's definitely going to stop here"?

8    A.    No.  I'm saying, "It is possible for it to stop here if" --

9    or "here" -- I have some words missing there -- "calms down,"

10   the intent of that is, "here, if the weather calms down."

11   Q.    So what you meant is, It's sinking, I don't have a lot of

12   information from you, Western.  I have been unable to recreate

13   you told me what you have -- I'm putting together testimony

14   you've given -- but if I flood everything on the port side, it

15   might stop here if the weather suddenly improves.

16   A.    Yes, that's what I'm trying to say.

17   Q.    Okay.  You didn't tell them this thing isn't going to sink?

18   A.    Not here, no, no.

19   Q.    This GHS model -- actually, can we scroll down, please, to

20   the next page?

21         What angle is that in your model?

22   A.    You know, to be exact -- if I could read the header there,

23   it would tell us.  If you can zoom in -- if the scan is proper.

24   It may be hard to read.

25   Q.    Okay.  Let me ask you a different question.

1       In preparing for trial, we were working with you, thinking

2   about creating some demonstrative exhibits, and we took Captain

3   McGavock's sworn statement, to the United States Coast Guard,

4   that he observed a 40-degree list at 10:30 at night.  And I said

5   to you -- well, frankly, I said, "Dan, could you show me what a

6   40-degree list looks like?"  And you plugged it into GHS.  What

7   happened?

8   A.   Just to correct, it wasn't GHS I plugged it in to.

9   Q.   Oh, I'm sorry.  What model and program did you use?

10  A.   Using HECSALV, which is a competitor to GHS.  Years later,

11  Vigor upgraded to a different software.  Sorry.

12  Q.   Sorry.

13  A.   I'm slowing down.  I apologize.

14  Q.   I asked you to plug in 40 degrees into the modeling

15  software that Vigor uses for dry docks now.  What did the

16  modeling program tell you?

17  A.   At 40 degrees, I could not recreate a stable floating

18  condition.

19  Q.   You're an engineer.  Let me see if I can put it into plain

20  language.

21       The program kept spitting out that the dry dock was sunk?

22  A.   That's correct.  And it kept showing me that the dry dock

23  was capsizing itself at 40 degrees.

24  Q.   Do you remember, what was the absolute most angle that you

25  could get your program to say the dry dock might still float?

1    A.    Approximately 30 degrees.

2              MR. SIMMS:  Your Honor, we've got to object.  They're

3    now offering him as an expert.  This is not what he was offered

4    for.  He was offered as a fact witness.  What he's referring to

5    is calculations he did after the fact with a completely

6    different program; never cross-examined him on this; never

7    disclosed before.  So the court shouldn't allow the expert

8    testimony.

9              THE COURT:  Response?

10             MR. BOYAJIAN:  No response, Your Honor.

11             THE COURT:  All right.  Objection sustained.

12        Counsel, let's take our break.

13             MR. BOYAJIAN:  I have one more.

14             THE COURT:  Oh, that's even better.

15   Q.   (By Mr. Boyajian)  Had Western Towboat told you, Dan Keen,

16   it's 10:30 at night.  We're about to go into the marine

17   sanctuary.  Captain McGavock is visually observing a 40-degree

18   list, and the Coast Guard observed the same from a helicopter a

19   half an hour ago.  What would you have told Western?

20   A.    That it will sink.  You better get yourself and crew

21   members safe.

22             MR. BOYAJIAN:  Okay.  Thanks very much.

23             THE COURT:  Mr. Keen, I have one question.

24             THE WITNESS:  Yes, sir?

25             THE COURT:  You explained about the -- let me ask it

1   this way:

2       From your perspective, with your expertise, your

3   experience, your knowledge as a naval architect, what is your

4   understanding of the reason for the ten-foot-wave-height

5   restriction for towing this dry dock?

6           THE WITNESS:  My understanding is to reduce

7   longitudinal bending moment for strength of the dry dock.

8           THE COURT:  Can you explain that a little better?

9           THE WITNESS:  As a dry dock -- or sorry -- as vessel

10  goes through a wave set, and you go into hogging and sagging

11  conditions because of the waves induced on the vessel, then, in

12  extreme conditions, large wave sets are -- the higher the waves.

13  The more the vessel could sag or hog in that.  So that strength

14  there is why, I understand, the wave conditions were set to what

15  they were.

16      I'm sorry.  Did that -- I might have gone backwards there

17  with you a little bit.

18          THE COURT:  No, no.  It makes sense.

19      So it doesn't have anything to do with, potentially, water

20  getting on top of the pontoon deck and adding more weight?

21          THE WITNESS:  No.  The pontoon deck, sir -- or the

22  vessel itself was trimmed by the stern, and the pontoon is a

23  flat, clear surface, so the water would have run off the back if

24  we had got green water on deck.  And with the tank lids all

25  secured, water would not have entered the -- you know, through

1    that as well.  So...

2           THE COURT:  And just out of sheer curiosity, and I

3    understand it's probably not relevant at all to the

4    determination the court has to make, but you indicated,

5    previously, that you had suspicions as to what may have

6    happened.  What do you suspect happened?

7           THE WITNESS:  Sir, I -- initially, with the small list

8    that we were seeing, my first thought was we hit something -- or

9    something has hit it -- sorry.  So that's why I was performing a

10   hunt-and-peck for -- a single tank damaged, would I see the same

11   conditions that they were seeing?  That's how I started my

12   evaluation, trying to find -- and as I continued to evaluate, I

13   could not make that happen without crossing physical boundaries.

14       So one of the unique things about the end section, it being

15   separate, it's not physically connected to the main section.  So

16   if you were to flood the entirety of an end section, it's not

17   possible for that water to transfer in at the levels we're

18   working with.  I mean, if you flood the entire end section,

19   we're not putting wings underwater or anything of that sort.

20       So as my round-robin of case evaluations were going, and

21   unsuccessfully matching what I'm seeing, I started being

22   concerned that it must have been broken apart from the heavy

23   weather they were seeing, so it induced longitudinal bending

24   from the heavy weather they had seen just days prior.

25           THE COURT:  Mr. Simms, any questions from the

1   plaintiff based on the court's questions?

2          MR. SIMMS:  Yes, to follow-on to the court's

3   questions, starting back with what the court wrote.

4                  REDIRECT/RECROSS EXAMINATION

5   BY MR. SIMMS:

6   Q.    Have you seen the opinion that the court issued last

7   Monday?

8   A.    No.

9   Q.    Okay.

10          There's a statement in here:  "Keen recalls, after

11   completing the calculations, he did not believe there was more

12   than a 50 percent chance that the tow would sink."  Is that

13   correct?

14   A.    From the datapoint that I was seeing, I did not -- I was

15   not thinking that it was going to sink.  But from the data --

16   you know, the initial datapoint, which was a photograph, sir,

17   and that we have a slight list, as you saw there, that there was

18   some time of quite a bit of evaluation going on.

19   Q.    And the court asked about the ten-foot restriction, and

20   that was the same for the 69 and for the 70, right?

21   A.    I believe, yes, we've already discussed --

22   Q.    And so but the 69 was in much better shape than the 70?

23   A.    That is not really quality terms, but, yes, it was in good

24   condition, the 69 was.

25   Q.    But you were confident enough that the 69 was in such good

1  condition that you never ran an ultrasound on the 69, right?

2          MR. BOYAJIAN:  Your Honor, objection, if I may?

3          THE COURT:  Yes.

4          MR. BOYAJIAN:  You asked whether Mr. Simms had any

5  questions that came out of the questions the court had just

6  asked.

7          THE COURT:  Right, and that's going far afield.

8  Objection sustained.  Anything else?

9  Q.    (By Mr. Simms)  And so you never raised any question that

10  the ten-foot restriction was the same for the 69 and 70?

11          MR. BOYAJIAN:  Your Honor, I believe you just

12  sustained my objection, and he's asking the same question.

13          THE COURT:  Any other questions, Mr. Simms?

14          MR. SIMMS:  Okay.

15  Q.    (By Mr. Simms)  How much does it cost to do an ultrasound

16  survey?

17          MR. BOYAJIAN:  Your Honor, again --

18          THE COURT:  And, again, Mr. Simms, I didn't mean to

19  open it up all over again.

20          MR. SIMMS:  All right.  Okay.  So it would just

21  following be up on Your Honor's questions?

22          THE COURT:  Yes.

23          MR. SIMMS:  No more questions.

24          THE COURT:  Anything further, Mr. Boyajian?

25          MR. BOYAJIAN:  No, Your Honor.

1          THE COURT:  Mr. Keen, you'll be sad to know you may

2    step down.

3          Counsel, we'll go ahead and take our recess.

4               (Court in recess 10:37 a.m. to 10:59 a.m.)

5          THE COURT:  Counsel, you may call your next witness.

6          MR. SIMMS:  We will call Kyle Jacobson.

7          MR. GASPICH:  Your Honor, Mr. Jacobson will be wearing

8    his mask until you direct him otherwise.

9          THE COURT:  Yes.  Please step forward and raise your

10   right hand to be sworn.

11                        KYLE JACOBSON,
         having been first duly sworn, testified as follows:
12

13         THE COURT:  The directive by the governor is that

14   people can remove their masks in indoor setting.  If you're not

15   comfortable doing that, you can keep it on.

16         THE WITNESS:  I'm not vaccinated.

17         THE COURT:  Then I will ask you to keep your mask on,

18   but get closer to the microphone, and pay attention to the

19   questions that are being asked.  Try to answer only that exact

20   question.  If you don't understand something, say so, and we'll

21   try to get them to clarify it.

22         THE CLERK:  Please state your full name for the

23   record, and spell it for the court reporter.

24         THE WITNESS:  Kyle Jacobson, K-y-l-e, J-a-c-o-b-s-o-n.

25         THE COURT:  You may inquire.

1          MR. GASPICH:  Thank you, Your Honor.

2                  DIRECT EXAMINATION

3    BY MR. GASPICH:

4    Q.    Mr. Jacobson, were you the second mate aboard the tug *Ocean*

5    *Ranger* during the trip in which you towed the dry dock the YFD

6    70?

7    A.    Yes.

8    Q.    All right.  Do you hold a maritime license?

9    A.    Yes.

10   Q.    And what license do you hold?

11   A.    I hold a 1,600-ton Master, with a Master of Towing

12   endorsement.

13   Q.    How long have you worked in the maritime industry?

14   A.    Sixteen years.

15   Q.    And with whom are you currently employed?

16   A.    TradeWinds Towing.

17   Q.    You no longer work for Western?

18   A.    No.

19   Q.    In very brief fashion, give us an idea of your experience.

20   A.    I started towing in 2004, and then 2006, I was employed by

21   Western Towboat, and I left in 2018, and then worked for two

22   other companies after that.

23   Q.    In what capacities have you sailed aboard tugboats?

24   A.    OS deckhand, AB deckhand, and mate; typically, chief mate,

25   the senior mate.

1  Q.    During that trip with the YFD 70, what watch were you

2  assigned?

3  A.    I was on the 11:00 to 2:00.

4  Q.    Was it a four-hour watch?

5  A.    Yes.

6  Q.    So it would be 11:00 to 3:00?

7  A.    Yeah.  Yeah.  Sorry.

8  Q.    And also 11:00 a.m. to 3:00 p.m., and then again from 11:00

9  to 3:00 a.m.; is that right?

10 A.    Yes.

11 Q.    In general, what was your responsibilities as second mate

12 on the *Ocean Ranger*?

13 A.    Responsibilities as a second mate is to stand a

14 navigational watch and perform safety drills and inspections

15 when needed for regulatory, and to manage the crew that's on

16 watch with me.

17 Q.    All right.

18       When you're standing watch, your navigation watch in the

19 wheelhouse on the *Ocean Ranger*, do you monitor the weather?

20 A.    Yes.

21 Q.    And how do you do that?

22 A.    Monitoring the weather would be making my log entries,

23 observing the current weather that we have, and then also

24 reading the forecasts that we receive.

25 Q.    All right.  And do you receive those forecasts, or are they

1    received during a different watch?

2    A.    They're typically received during the chief mate's watch.

3    Q.    And on this particular trip, who was the chief mate?

4    A.    John Cowgill.

5    Q.    In order for you to read weather information that

6    Mr. Cowgill obtained on a different watch he would have, what

7    would he do?

8    A.    Can you please repeat the question?

9    Q.    Sure.

10         If Mr. Cowgill is the person who received the weather

11    information, and he worked a different watch, how did you read

12    it?  In other words, did he save it, did he record it somewhere,

13    did he leave it out on the counter for you to read?

14    A.    Yes.  Typically, our forecasts would either be on the chart

15    table, or we would have the local forecasts on the computer.

16    Q.    Okay.

17         And what were the sources of weather that you used during

18    your watch?

19    A.    NOAA forecasts, along with the weather pictures that we

20    would download.

21    Q.    Now, were you -- I'm going to skip ahead and put you during

22    the voyage from Seattle to Ensenada.

23         Were you on watch when the tug rounded Cape Flattery?

24    A.    No.

25    Q.    Where in relation to Flattery did your watch fall?

1   A.    I don't remember specifically, but I think I was before we

2   rounded Flattery.

3   Q.    During the trip, did you -- you know at the end of the trip

4   that this resulted in the sinking of the dry dock, but prior to

5   that time, did you have any problems towing the dry dock?

6   A.    You mean prior to the capsizing?

7   Q.    Prior to the time where -- putting aside that incident,

8   where you started having problems that led to the capsizing and

9   eventual sinking, but, prior to that time, was there any

10  problems, during your watches, that you observed, with towing

11  the dry dock?

12  A.    Other than being a really slow tow, no.  It was towing just

13  like anything else that I've towed in my career.

14  Q.    Okay.

15        So in your 16 years in the towboat industry, have you

16  experienced tows that have had issues?

17  A.    Yes, and -- but typically it would be because it's slowing

18  you down too much or something, but nothing out of the ordinary,

19  I guess you'd say.

20  Q.    Okay.

21        So if you have a problem with a tow, what are the types of

22  things you might see?

23  A.    You can lengthen your tow.  You can shorten your tow.

24  There's all -- you can put surge gear, in which is extra chain.

25  So there's different ways that we can try to make the tow work

1  better, but a lot of the times, at the end of the day, you've

2  got to just go with the way it's going.

3  Q.   Okay.  And that wasn't my question, but it will probably do

4  because I didn't ask it properly.

5  A.   Oh, sorry.

6  Q.   So let me try again.

7       Some of the problems you might see with a tow that you're

8  towing, either a barge or anything else, could you encounter a

9  list with the tow?

10 A.   I've never seen that in my career, but, yes, you can

11 encounter that, I guess.

12 Q.   Okay.

13      And have you ever experienced, in your career, where the

14 tow may not track directly behind you but now swing off to the

15 side?

16 A.   Yes.

17 Q.   Or go back and forth?

18 A.   Yes.

19 Q.   All right.

20      And with respect to the 70, did you ever see that -- prior

21 to the events that we're going to be talking about in a moment

22 that led to the capsizing -- but prior to that time, did you

23 ever notice any problem with listing?

24 A.   No.

25 Q.   Did you ever notice any problems with the tow not tracking

1    properly behind the tug?

2    A.    No.  I remember it tracking quite well, actually.

3    Q.    Okay.

4          And when did you first notice that change?

5    A.    I don't remember the exact dates, but it was probably about

6    12 hours before the capsize was when I noticed the list.

7    Q.    Okay.

8          Now, what do you do during your watch to check the

9    condition of the tow?

10   A.    It's visual inspection, so you're constantly looking behind

11   you at the tow while you're on watch.

12   Q.    And you said part of your -- one of your watches falls from

13   11:00 p.m. to 3:00 in the morning.  So when it's dark, can you

14   see the tow?

15   A.    You can see the navigation lights, and you can put a

16   spotlight on it, too, to do a visual check.

17   Q.    Do you use the radar to check on the tow?

18   A.    Yes.

19   Q.    And what will the radar show you?

20   A.    The radar shows you -- do you need me to, basically, dumb

21   it down for someone that doesn't know what a radar is?

22            MR. GASPICH:  Well, I'm not sure how to answer that

23   respectfully, Your Honor.

24            THE COURT:  I know how a radar works.

25            THE WITNESS:  Okay.

1        MR. GASPICH:  Thank you, Your Honor.

2   A.    It's, basically, painting a picture, where you can just see

3   either land or different objects around you.  So, yes, you're

4   seeing the echo on the screen.

5   Q.    (By Mr. Gaspich)  And if you turn the range down

6   sufficiently, would you be able to see the outline of the dry

7   dock on radar?

8   A.    Yes.

9   Q.    Okay.  And did you do that for this voyage when checking

10  it?

11  A.    Yes.

12  Q.    Okay.

13        Now, let's move ahead to the event you talked about; that

14  there was a list approximately 12 hours before the sinking.

15        So were you on watch?

16  A.    Which time again?

17  Q.    We're going to talk about the event, the capsizing and

18  sinking.

19  A.    Okay.

20  Q.    You said earlier that you first noticed something about 12

21  hours before.  What did you notice?

22  A.    It was hard to tell because there was a northwest swell on

23  the quarter of it, so it was pitching in a way that it was kind

24  of hard to tell if it was taking a list.  But John and I

25  monitored it and confirmed, after watching it for, I believe it

1    was an hour and a half, maybe two hours, that it was definitely

2    taking a list.

3    Q.    And John is who?

4    A.    The chief mate.

5    Q.    All right.

6          And who was on watch when this was first noticed?

7    A.    We were doing watch-change, so I believe I was coming off

8    and he was going on watch.

9    Q.    All right.  And so the watch-change would have happened

10   somewhere prior to 1500, or 3:00 p.m.?

11   A.    Yes.

12   Q.    Who first noticed it?  Was it you or Mr. Cowgill?

13   A.    John was the first that mentioned it, because he said he

14   looked out the back when he was making his coffee.

15   Q.    And then what did you do when he first brought it up?

16   A.    We both looked at it and monitored it, and then determined

17   that, yes, it was taking a list.

18   Q.    Okay.

19         Now, you mentioned something about a northwest swell, so I

20   want to have you explain to the court what you were talking

21   about.

22         So what direction -- or if you don't remember

23   specifically -- what general direction were you towing at that

24   time?

25   A.    We were towing in a south-southeast direction, or it was

1    more southerly.  So it was -- the northwest swell, the swell

2    coming out of the northwest, was pushing the stern quarter of

3    the tow.

4    Q.    So if I could use my hands to point south, or down, as a

5    compass here, you're heading this way, and the swell was coming

6    from this way, this direction?

7    A.    Yes.

8    Q.    Actually, I have to turn around for you.  So like that.

9          Okay.  And why did the swell make it difficult to discern

10   whether you had a list?

11   A.    Because, typically, a tow that doesn't have much draft,

12   which, I believe, it was only drawing three, maybe four feet,

13   pitches and rolls quite excessively.  So it was making it pitch

14   in a way that it was hard to determine if it was taking a list.

15   If it was on a flat surface, you'd notice the list right away.

16   Q.    How long did you look at it before you came to the

17   conclusion that the dry dock was developing a list?

18   A.    I believe it was, like, an hour, an hour and a half.

19   Q.    Okay.  And then what did you do?

20   A.    Notified the master.

21   Q.    All right.  And what happen then?

22   A.    I was off watch at that time, so I -- I can't recall what

23   happened at that time.

24   Q.    Okay.

25         Do you know any decisions about changing the course of the

1   tow?  Instead of heading for Ensenada, do you know if they

2   headed somewhere else?

3   A.    When I came back up -- I believe I was on my off-watch for

4   dinner -- I heard that we were heading to San Francisco, and

5   then I went back to bed after that.

6   Q.    Okay.

7         And when would be the next time that you were on watch?

8   Would that have been 11:00 p.m.?

9   A.    Yes.

10  Q.    All right.

11        Did you participate in any of the conversations that the

12  captain may have had with Western Towboat or with anyone else

13  about what to do with the dry dock?

14  A.    No.

15  Q.    Were you involved in any of that decision-making?

16  A.    No.

17  Q.    All right.

18        So your watch was 11:00 p.m.  There's been testimony in the

19  case about a meeting or a safety meeting around that time.  Do

20  you recall that?

21  A.    Yes.

22  Q.    Okay.

23        So tell the court what happened at that time.

24  A.    So I was coming up to start my watch, and Stephen, the

25  captain, had everyone in the wheelhouse, and, basically, laid

1    out what we were going to do in case it decided to sink.

2    Because we were trying to manage our hours; to make sure that

3    people don't go over their hours, and then also so that you're

4    not up all day long.  So people were trying to get their rest

5    periods, but we wanted everyone to be on the same page before

6    people laid down.

7    Q.   And what other things were discussed at the meeting?

8    A.   We set the tow winch up; said it was ready to release.  We

9    closed all the hatches -- made sure that the boat was ready in

10   case it did go down -- so that it was watertight.  And we were

11   told to monitor the radar and to monitor the tow, and if it does

12   go down, to hit the general alarm and wake everybody up so we

13   could respond.

14   Q.   When Captain McGavock held this safety meeting at eleven

15   o'clock with the crew, did he mention to you about the condition

16   of the tow?

17            MR. JARRETT:  Your Honor, objection; relevance.

18            THE COURT:  Overruled.  You may answer.

19   A.   Can you please repeat the question?

20   Q.   (By Mr. Gaspich)  Sure.

21       When you had this safety meeting about the preparations,

22   for the possibility that the tow could sink, did Captain

23   McGavock also give any information about the condition of the

24   tow, about the degree of list, or whatever the condition was?

25   A.   No.

1    Q.    All right.

2          Did you start your watch after the meeting?

3    A.    Yes.

4    Q.    And when you started your watch -- actually, strike the

5    question.  Let me start over.

6          Did Captain McGavock stand the navigation watch immediately

7    preceding yours?

8    A.    Yes.

9    Q.    So he would have been up there from 1900 till 2300, so 7:00

10   to 11:00; is that right?

11   A.    Yeah.

12   Q.    And when you took over the navigation watch, did Captain

13   McGavock stay in the wheelhouse?

14   A.    He stayed up long enough to do the watch-change, and then

15   he went to bed.  So I believe it was, like, ten minutes after

16   11:00 or so that he was out of the wheelhouse.

17   Q.    Okay.

18         Did Captain McGavock wind up staying up there for an hour

19   or more?

20   A.    No.

21   Q.    Did Captain McGavock, when he did the watch-change with

22   you, and you took over, did he discuss with you the condition of

23   the tow?

24   A.    He could not discuss the condition of the tow because the

25   visibility, at the time, you could not see the condition of the

1    tow.

2    Q.    And why is that?

3    A.    Because you can't see it.  When we did the watch-change,

4    the fog was so great that we couldn't even see the bow of the

5    tug, let alone the tow, the dry dock.  So I was told to monitor

6    it with radar and to wake him up when visibility becomes clear

7    enough that we could see it.

8    Q.    Okay.

9          Did Captain McGavock ever say to you, You have to be

10   careful because the condition of the tow is so listed over, I'm

11   really concerned about it?

12   A.    No.

13   Q.    Did Captain McGavock ever tell you that the tow had a

14   30-degree list?

15   A.    No.

16   Q.    Did Captain McGavock ever give you any information that

17   suggested that the dry dock was dramatically different from

18   earlier in the day when you saw it?

19   A.    No.

20   Q.    If the condition of the dry dock, with respect to its list,

21   had changed dramatically, would that have been information you

22   wanted to know?

23   A.    Yes.

24   Q.    Would you have expected Captain McGavock to tell you if it

25   had changed in that way?

A.    Yes.

          MR. JARRETT:  Objection, Your Honor; foundation.

          THE COURT:  The objection is sustained.  Ask another question.

Q.    (By Mr. Gaspich)  During the watch, from when you came on at 2300, did you have problems towing the dry dock?

A.    Could you please repeat your question?

Q.    Sure.

          Did you notice any problems -- when you came up for your 11:00 p.m. watch and you were up there, did you notice any problems towing the dry dock?

A.    Yes.  We could not make the speed that we were making first duly in the trip.  We were going slower, and it was becoming more difficult to steer.

Q.    When you say it was more difficult to steer, what do you mean?

          MR. JARRETT:  Your Honor, I have to object again on relevance, based on the court's comments yesterday, Your Honor.

          THE COURT:  I guess I'm not sure where we're going with this, counsel.

          MR. GASPICH:  Your Honor, there is a claim for negligence against Western Towboat and its handling of this trip, on numerous grounds, and this is leading up to their actions leading up to the capsizing of this, so it's relevant to those issues, how they acted -- the crew acted.

1           MR. JARRETT:  Your Honor, I understood from the court

2    yesterday that this issue of negligence has been decided

3    already, and reconsidered on reconsideration and decided again.

4    That's the basis for my objection.

5           MR. GASPICH:  There's a claim remaining in the case,

6    notwithstanding the court's earlier ruling, about that Western

7    Towboat did not exercise proper seamanship in handling of the

8    tow, on a number of grounds.  So we've been talking about

9    weather, we've been talking about decision-making.  This all

10   goes to that, Your Honor.

11          THE COURT:  All right.  If I could have you get to the

12   crux of the matter, I guess.  So objection overruled.

13          MR. GASPICH:  Yes, yes, Your Honor.

14   Q.   (By Mr. Gaspich)  You said that the tug had some issues,

15   you sensed with -- I forget exactly what it was.  I'm sorry.  I

16   got distracted with the discussion.

17        Can you tell us what problems you were experiencing with

18   the tow?

19   A.   We were experiencing problems holding our course due to

20   what we found out later was the extreme list.  So we could not

21   control our direction, and we could not control our speed.  It

22   was -- it was hard to maintain that.

23   Q.   Okay.

24        And you said earlier that you couldn't see the tow.  How

25   could you tell that?

1   A.    At the time, it was with radar.

2   Q.    Now, at some point during your watch, were you able to see

3   tow?

4   A.    Yes, right before it capsized.

5   Q.    All right.

6         And what happened?  Did the fog lift?

7   A.    The fog was still there, but it lifted enough that we could

8   see the tow.  And I put the spotlight on it, looked with the

9   binoculars, and confirmed it had an extreme list, and woke up

10  Stephen, and he came up, and that's when it capsized.

11  Q.    When you said it had "an extreme list," can you provide us

12  with a little better description of what you saw?

13  A.    Probably a 40-degree list, maybe more.

14  Q.    There's talk about the deck.  You have two sides and a main

15  deck of it.  Was any parts of the deck of the dry dock, at that

16  time, around two o'clock, when you first were able to see it,

17  was any part of the deck below the water?

18  A.    The port wing wall was listed over, and half of the main

19  deck was underwater.

20  Q.    Now, prior to that time at two o'clock, when you first

21  noticed that extreme condition, did you have any concerns about

22  the dry dock capsizing?

23  A.    Could you please repeat?

24  Q.    Sure.

25        So prior to the time at 2:00 a.m., where you saw it was

1  severely listed over, but prior to that, did you have any

2  concerns about it capsizing?

3  A.   I had concerns about the tow through my whole watch because

4  I couldn't confirm any -- because I couldn't confirm its

5  condition.

6  Q.   Did you -- prior to that time, did you have any -- did you

7  know for certain that it would capsize?

8  A.   No.

9  Q.   When you saw the dry dock turned over or listed over in the

10 severe condition, what did you do?

11 A.   I woke up Stephen.  I called the master.

12 Q.   Okay.  And then what happened?

13 A.   We had the spotlight on it.  We were watching it.  Stephen

14 was looking at it with the binoculars, and he told me that it's

15 starting to capsize and to sound the general alarm to get the

16 crew up.

17 Q.   And was the tow let go at that time?

18 A.   Just shortly after, yes.

19 Q.   All right.  What happened then?

20 A.   We released the tow.  It was upside down after the capsize,

21 and we stood by until it was fully sunk.

22 Q.   And did you -- after it was released, do you recall how

23 long a period you stood by?

24 A.   I believe it was maybe just under an hour, like 50 minutes

25 or so.

1    Q.    Okay.

2          Now, Mr. Jacobson, did you take photos of the tow when you

3    were on board the vessel?

4    A.    Yes.

5    Q.    All right.  We're going to pull up some photos for you and

6    have you identify them.

7          So you took photos of the dry dock during the trip, right?

8    A.    Yes.

9    Q.    And did you take photos at various times?

10   A.    Yes.

11         MR. GASPICH:  Your Honor, we'll show the witness

12   Exhibit 44.

13   Q.    (By Mr. Gaspich)  And what I'd like to do is I'd like to go

14   through the photos and have you identify them.

15   A.    Okay.

16   Q.    The first photo, where was this taken?

17   A.    This was shortly after we got underway in Elliott Bay.

18   Q.    And this photo here, is that at sea?

19         You took this photo also?

20   A.    Yes.

21   Q.    And what does this photo show?

22   A.    This is when we confirmed that it was taking on a list.

23   Q.    All right.  So this would have been in that period

24   approximately 12 hours before it sank?

25   A.    Yes.

1  Q.    All right.  And does this accurately depict what you

2  initially saw?

3  A.    Yes.

4  Q.    And in the picture, if you could describe for us -- it

5  looks like the port bow -- the port bow, that would be on the

6  right side of the dry dock, the way we're looking at it here?

7  A.    So the port bow on, yeah, the right side of the picture.

8  Q.    You have a device there.  If you could put a dot there

9  where the port bow is.

10 A.    It's about -- yeah.

11 Q.    And in this photo, because it's a still, it appears that

12 the port bow is down into the water.  So can you explain that?

13 Was the port bow submerged at the time, or why does it appear to

14 show that?

15         MR. JARRETT:  Objection, Your Honor.  Counsel's read

16 of what the photo show is not the witness's reading of it,

17 necessarily.  So it's a leading question.

18 Q.    (By Mr. Gaspich)  Could you explain why the photo looks the

19 way it does?

20 A.    The photo looks the way it does because we are out in the

21 ocean, and it's between the swells.  You also have the northwest

22 swell, which is coming from this direction, and it's pushing the

23 stern quarter there.

24 Q.    Okay.  Thank you.

25         This photo here, when was this taken?  What does it show?

1   A.   The same time, and it's just a different portion of the

2   swell.  So you can still see the main deck right there.

3   Q.   Uh-huh.  Okay.

4        And the next picture, what does that show?

5   A.   Pretty much the same thing.  These were all taken

6   consecutively, within, probably, a couple seconds of each other.

7   Q.   Okay.  This is No. 5 of 20.  What does this photo show?

8   A.   This portion right here is the starboard wing wall, and

9   then this is the main deck, and then the port wing wall is

10  underwater down here.

11  Q.   So this is after it capsized?

12  A.   This is as it's capsizing.

13  Q.   As it's capsizing?

14  A.   Yeah.

15  Q.   All right.

16       And there is a light around the darkness.  Where was the

17  light from?

18  A.   Oh, the light?  This was the spotlight from the tug that

19  was shining on it, because it was so dark that you couldn't even

20  see it without the light on.

21  Q.   This is 6 of 20.  When was this taken and what does this

22  show?

23  A.   I don't believe I took this one.  I haven't seen this one.

24  Q.   Okay.  Next photo, this picture, 7 of 20.

25  A.   Yeah, I don't believe I took this one, either.

1    Q.    Okay.  Number 8 of 20, it looks like it might be a copy.

2    I'm not sure.

3    A.    Yeah.  These are a lot better quality than the ones I took,

4    so these are not ones that I took.

5    Q.    Okay.  Did you take this photo?

6    A.    No.

7    Q.    Just to come back to that photo.  On these that you didn't

8    take, can you tell us when, during this process, between that

9    12-hour period when they were taken, what they show?

10   A.    Looking at that compared to the pictures that I was taking,

11   it was probably from one of my other crew members that were

12   taking pictures at the same time as me.

13   Q.    Right.  But can you tell whether they were taken --

14   obviously, it is not dark, so it is not after sunset --

15   A.    Yeah.

16   Q.    -- but you tell when it was taken?

17   A.    I can't tell you what time of day it was.

18   Q.    And this photo?  This is No. 11 of 20.

19   A.    That's right before it capsized.  So the very top of the

20   port wing wall is where that red light is, and then the portion

21   of the dry dock, right there, is underwater.

22   Q.    And does this photo accurately reflect what you saw when

23   the fog lifted around 2:00 a.m.?

24   A.    Yes.

25   Q.    Okay.  Next photo.

1      And for the record, that was 11 of 20.

2      Photo 12 of 20, what does that show?

3  A.   That would be the underside of the dry dock after it

4  capsized.

5  Q.   And what does 13 show?

6  A.   I believe this was after it capsized, when it was starting

7  to sink.  I can't tell which side that is.

8  Q.   Okay.  And the next photo?

9  A.   Same as the last.  This is the underside right here, and I

10  don't know if this is the port or the starboard wing wall.

11  Q.   Okay.  So one of the wing walls, at that time, had

12  completely submerged --

13  A.   Yes.

14  Q.   -- from the surface?

15  A.   Yes.

16  Q.   And then 15, is that your picture, or someone else's?

17  A.   That looks like one of the ones I took.

18  Q.   And 17, anything new in this one?

19  A.   No.

20  Q.   Eighteen, what is this picture?

21  A.   That was one of the pictures I took.  It was hard to get a

22  good picture, but that's, basically, when the fog broke and we

23  could see the list that it took on.

24  Q.   Okay.  So I see two white dots.  What do those signify, if

25  you know?

1  A.    That's the light reflecting on dry dock.  Are you talking

2  about here?

3  Q.    Yes, that and on the other side.

4  A.    Yeah.  That's the light reflecting on paint on the dry

5  dock.

6  Q.    And 19?

7  A.    That was as it was sinking.

8  Q.    And 20?

9  A.    As it was sinking.  You can see, right here -- so when it

10  sunk, it pitched up and then rolled down, and that right there

11  is where a hole burst in the deck, and water was pouring out.

12        MR. GASPICH:  Your Honor, I'm done with my examination

13  with one exception, and just a point of clarity.

14        Your Honor said yesterday that, given the prior rulings of

15  the court, that the court was not willing to hear testimony

16  about the location of the tug and the knowledge of the mates'.

17  The ruling had to do with their knowledge, the situation.

18        This witness has testimony.  I would make a proffer that he

19  would testify similar to the captain; that from the point that

20  he was on watch, he was monitoring the vessel's position using

21  the navigational equipment, and that they were outside of the --

22  he was aware of the boundaries to the marine sanctuary --

23  Monterey Bay Marine Sanctuary, and that the tug and tow were

24  outside of it.  But I would make a proffer of that testimony,

25  but understand that Your Honor is not willing to receive it; is

1   that correct?

2          THE COURT:  Yes, that's correct.  I've it noted for

3   the record.

4       Let me ask Mr. Jacobson something here.

5       If you could go back to one of the pictures of the dry dock

6   in daylight?

7       I just made the assumption -- and I'm not sure why I made

8   that assumption -- that when it capsized -- did you say it

9   capsized?

10         THE WITNESS:  Yes.

11         THE COURT:  When it capsized, the port side went down

12  first, and it rolled?

13         THE WITNESS:  It rolled, and then it stayed upside

14  down for about 50 minutes, and when it sank, it pitched up

15  vertically, and then went down.

16         THE COURT:  Thank you.

17         THE WITNESS:  Yes.

18         MR. GASPICH:  Your Honor, actually, you reminded me of

19  a further question.  If I might?

20         THE COURT:  All right.

21  Q.   (By Mr. Gaspich)  That sequence about when it capsized, and

22  then you said it came up on end.

23  A.   Uh-huh.

24  Q.   Okay.  Was it under the water when it came up?

25  A.   About three-quarters of it was underwater when it was in

1  the process of sinking, and then it pitched up, about half of

2  it, and then it went down.

3  Q.   And did you see any other things happening with the dry

4  dock around that time, or did hear any noises, see any --

5  A.   Oh, yeah, yeah.  When it pitched up vertically, you could

6  hear metal-crashing noises, so I'm assuming probably bulkheads,

7  internal bulkheads breaking, and all the air escaping out of it.

8  Q.   And did you actually see anything related to air, or was it

9  something you heard?

10  A.   It was something you heard.

11  Q.   And was it loud?

12  A.   Yes.

13          MR. GASPICH:  Thank you.

14          THE COURT:  Mr. Jarrett, cross-examination?

15          MR. JARRETT:  Yes, please.  It will probably take me

16  longer to get to the podium than it will to ask questions.

17          THE COURT:  I may hold you to that, Mr. Jarrett.

18          MR. JARRETT:  Please do.

19                    CROSS-EXAMINATION

20  BY MR. JARRETT:

21  Q.   Mr. Jacobson, when you are standing watch, and you're

22  making notes in the log, and you're measuring the weather

23  conditions and the sea conditions to note in the log, it's

24  important to be accurate with those, isn't it?

25  A.   Yes.

1    Q.    And do your best to get the wind speed, for example, as

2    accurately as you can, right?

3    A.    Yes.

4    Q.    And measuring the wind speed and the sea state is a skill

5    that you have built, I guess, as a mariner, right?

6    A.    Yes.

7    Q.    You wouldn't want, for example, a lawyer off the street to

8    go and try and measure the sea state of anything that you cared

9    about floating, would you?

10   A.    Yes.

11   Q.    I said that question terribly, Mr. Jacobson.  So apparently

12   you wouldn't want this lawyer asking you questions, either.

13   A.    No.

14   Q.    But my point is that you just want -- as a mariner, you

15   know the importance of measuring the wind and the sea as

16   accurately as possible, and you've developed the skill to do

17   that by standing watch in the wheelhouse of Western's and over

18   operator's vessels, right?

19   A.    Yes.

20   Q.    So, also, when you are standing watch and you notice some

21   difficulty in maneuvering a tugboat due to the tow behind it,

22   you note that in the log, don't you, if you have trouble moving?

23   A.    That could be something that should be put in the log, yes.

24          MR. JARRETT:  Can you put page 10 up, please,

25   Ms. Ivie?  I need to go to the 25th, please, so the page

1  previous.  10/26, so I need 10/25.  Sorry.

2  Q.    (By Mr. Jarrett)  So on the screen in front of you,

3  Mr. Jacobson, is the page of the vessel's log from October 25,

4  isn't it?

5  A.    Yes.

6  Q.    And as far as time goes, which of those entries correspond

7  to your watch?

8  A.    If you see up in the top portion, here and here, those are

9  the times I was on watch, and here.

10  Q.    Okay.

11        And I think you said at some point during that watch, you

12  noticed -- just to paraphrase -- you noticed some difficulty

13  maneuvering the tug because of the tow.  Did I paraphrase that

14  correctly?

15  A.    Yes.

16  Q.    Is that difficulty noticed in any of the log remarks that

17  correspond to your watch?

18  A.    To my watch?  No.

19  Q.    All right.  So two more things.

20        Mr. Jacobson, you noticed some -- eventually -- you and

21  Mr. Cowgill noted some change in the tugs -- sorry.  You noticed

22  a change in the list of the dry dock.  We talked about that at

23  some length just a minute ago, right?

24  A.    Yes.  I noticed a difference from, again, the beginning,

25  when we noticed the list, until we got visual confirmation

1  before the capsize, yes.

2  Q.   All right.

3       Did the people on the tugboat communicate that to the

4  Western home office?

5  A.   I don't know.

6  Q.   Did anyone ever tell you that anyone at Vigor had said this

7  dry dock cannot sink?

8  A.   I saw an email from Vigor that, basically, stated this

9  is -- with all the port tanks flooded, and it will not sink with

10  all the port tanks flooded, is, basically, what it said, from my

11  recollection.

12  Q.   All right.  So you saw that after the dry dock sank, during

13  the course of this litigation, I assume; is that right?

14  A.   I believe -- yes, yes.

15  Q.   Okay.

16       So did anyone tell you -- at the time of the dry dock

17  sinking, or during the voyage before it sank, did anyone tell

18  you, "Vigor says this thing can't ever sink."  Do you remember

19  anyone saying that?

20  A.   No, I don't remember anyone ever saying that.

21  Q.   Or words to that effect.  To make up for my poor grammar:

22  Did anyone ever say that Vigor said this thing cannot sink?

23  A.   I do not recollect.

24           MR. JARRETT:  Okay.  That's all the questions I have

25  for you.  Thank you, sir.

 1          MR. GASPICH:  Nothing further, Your Honor.

 2          THE COURT:  Mr. Jacobson, thank you.  You may step

 3     down.

 4          THE COURT:  Counsel, let's go ahead and break now, and

 5     we'll start up at one o'clock.  That will give you an hour and

 6     ten, hour and fifteen minutes.

 7       We'll be in recess.

 8             (Court in recess 11:46 a.m. to 1:02 p.m.)

 9          THE COURT:  Counsel, you may call your next witness.

10          MR. GASPICH:  Thank you, Your Honor.  We call John

11     Cowgill.

12          THE COURT:  Mr. Cowgill, if I can have you make your

13     way up before the clerk, and raise your hand to be sworn.

14                        JOHN COWGILL,
          having been first duly sworn, testified as follows:
15

16          THE CLERK:  Please state your full name for the

17     record, and spell it for the court reporter.

18          THE WITNESS:  John Cowgill.  That's C-o-w-g-i-l-l.

19          THE COURT:  Mr. Cowgill, I think you're about right

20     for the microphone in terms of distance.  Keep your voice up so

21     everyone can hear you.  If you don't understand a question asked

22     by counsel, say so, and we'll get them to rephrase it.  Please

23     don't speak over the question.  Wait until he's done before you

24     answer.

25       You may inquire.

1                        DIRECT EXAMINATION

2    BY MR. GASPICH:

3    Q.    Mr. Cowgill, were you employed as the chief mate of the

4    *Ocean Ranger* during the tow of the YFD 70?

5    A.    Yes.

6    Q.    Do you hold a maritime license?

7    A.    Yes, 1600-ton oceans.

8    Q.    How long have you worked at sea?

9    A.    At sea, 45, 50 years.

10   Q.    Fifty years?

11   A.    You were asking how long have I worked at Western Towboat?

12   Q.    No.  How long have you worked at sea.

13   A.    Yeah, exactly.

14   Q.    A long time?

15   A.    Right.

16   Q.    Okay.

17         Have you always worked in the towboat industry?

18   A.    No, just for the last 20 years.

19   Q.    Prior to that, where did you work?

20   A.    Commercial fisherman in Alaska.

21   Q.    You're used to some weather.

22   A.    Yes.

23   Q.    Just to be clear, when did you first start with Western

24   Towboat?

25   A.    2002 April.

1    Q.    And what positions have you worked aboard their tugboats?

2    A.    All the way from the deckhand through the second mate,

3    first mate; did some skippering.

4    Q.    As chief mate on the *Ocean Ranger*, what were your

5    responsibilities?

6    A.    I had the watch before the skipper.  My responsibility was

7    kind of the day-to-day of the boat, kind of second in command,

8    unless we have an uppity engineer, then we'd have to allow that

9    he was second in command, to keep him happy.  But other than

10   that, kind of dealing with the crew, you know?  And in my

11   experience, I did a lot of mending of the lines and stuff,

12   making sure the deck was always prepared for whatever job we

13   had.

14   Q.    And you said navigation watch right before the skipper.

15   Was that the 3:00 to 7:00 watch?

16   A.    It was 3:00 to 7:00 in the morning, 3:00 to 7:00 in the

17   afternoon.

18   Q.    As chief mate, did you have any particular responsibility

19   for weather?

20   A.    Yes.  I'd usually listen to the weather at four o'clock,

21   write it down on a Post-it note or a legal pad, and leave it for

22   the skipper peruse.

23   Q.    And when you say you listened to the weather, what weather?

24   A.    NOAA.

25   Q.    And how did you listen to it?

1    A.    Usually over the VHF.

2    Q.    Did you receive written reports, or do you have to listen

3    to it by the radio?

4    A.    We did get those.  Again, I'd usually listen to the morning

5    weather reports or the weather reports over the NOAA VHF.  We

6    were getting reports from the office, and I think the skipper

7    was pulling them off the computer as well.  Lots of weather

8    reports.

9    Q.    When you're standing watch, is it part of your

10   responsibilities to keep track of the weather?

11   A.    Yes.

12   Q.    Okay.

13         As chief mate on the *Ocean Ranger* during that particular

14   tow, did you have any responsibility for making decisions about

15   navigation?  And I don't mean just specifically on your watch,

16   but, otherwise; where the boat was going, what courses to steer,

17   that sort of thing?

18   A.    No, I was -- no.

19   Q.    Okay.  Going back to the weather for a moment, did you --

20   besides using -- I think you said notepads --

21   A.    Post-it, notepads.  Yeah, we'd write it down so we could

22   remember it for later that day.

23   Q.    Did you also record weather observations in the vessel's

24   logbook?

25   A.    We did.

1   Q.   Let me show you Exhibit 33, the deck log for the *Ocean*

2   *Ranger*.

3   A.   Okay.

4   Q.   Okay.  I'm picking out October 25th, 2016.

5        Did you write in the logbook?

6   A.   Yes.

7   Q.   Okay.  And so the entries that appear during the times of

8   your watch, those would be your entries?

9   A.   3:00 to 7:00, yes.

10  Q.   All right.  I'll just ask you about the weather.

11       So the weather observations would be listed under the

12  columns "wind," "sea," and "weather"?

13  A.   Yes.

14  Q.   So under the "wind," I see there are numbers there.  Let's

15  take the entry for 12:15.  That would have been one of your

16  entries?

17  A.   No.

18  Q.   Oh, I'm sorry.  Yeah, that was on me.  I apologize.

19       How about the 1600 entry?

20  A.   Yes.

21  Q.   So there you have "SE 25."  What does that mean?

22  A.   Southeast 25 knots, coming out of the southeast.

23  Q.   And I notice in some of the entries, I see, like, a 25 and

24  a plus sign, and on other pages, there is usually two numbers

25  with a dash.

1       So how do you -- when you write down estimates of wind, how

2   do you arrive at that?

3   A.    I just observe the sea state, and usually that tells me a

4   lot.  There's variations due to the height of the boat.  You

5   know, I started in little, 20-foot fishing vessels, and

6   everything looked huge.  And, you know, moving onto this boat,

7   everything looks smaller.  I guess if I was on an aircraft

8   carrier, it would look smaller yet.

9       I notice differences between people right before me and

10  after me.  It's just how they perceive it.

11      But I would be looking out at sea states, the size of the

12  waves, you know, whether there is whitecaps, you know, how bad

13  it is, you know, stuff like that.

14  Q.    So you've been at this game for 50 years, you said.  I take

15  it that you're fairly experienced when looking at the sea

16  conditions to try to determine weather?

17  A.    Yes.

18  Q.    But is what you're saying, notwithstanding the experience,

19  there's a lot of factors that affect the accuracy of your

20  observations.

21  A.    Oh, yeah.

22  Q.    And was it your point, also, that one person may look at

23  the same sea conditions and come up with a slight -- a

24  completely different set of views as to what the speed is?

25  A.    Oh, yeah.

1    Q.    And has that been typical through your career?

2    A.    Yeah.  I mean, one guy will look at it, and he's scared or

3    if he's wanting to go home or whatever.  It impacts what they

4    write.  It definitely does.  After 50 years, I think it affects

5    you less, because, just through the course of the years, it's

6    been driven into your head.

7    Q.    So you when wrote -- we took the one entry at 1600,

8    southeast 25, would you say that that's your best estimate?  It

9    may, actually, be different from that?

10   A.    Oh, yeah, yeah, that's my best estimate.  And we do it --

11   almost everyone is doing it in five miles-an-hour increments,

12   too, so...

13   Q.    Okay.  At some point there was a problem with the tow on

14   the *Ocean Ranger* of the YFD 70.  When was that?

15   A.    What's that?

16   Q.    When did you first notice or were you first apprised of a

17   problem with the tow of the dry dock?

18   A.    I was not quite on watch.  I think I was going on watch,

19   and I went up to the wheelhouse, just to go up there, and I

20   looked back at it, and just started studied it for about 15

21   minutes, and just thought it was a little bit down by the head,

22   you know.  It wasn't -- it was a little bit hard to -- and the

23   reason I had to spend 15 minutes on it is because we had, kind

24   of, opposing seas, you know, and it was hard to really get an

25   idea.  But that's when I first noticed it.

1  Q.   And can you remember the time and the date?

2  A.   Remember -- no, not without looking at this log.

3  Q.   Okay.  Could you look at the page in front of you for

4  October 25th?

5  A.   27th, did you say, or 25?

6  Q.   You have October 25th in front of you?

7  A.   Yes.

8  Q.   And does that refresh your recollection of approximately

9  when you first noticed it?

10  A.   Yes.

11  Q.   What time?

12  A.   That would be 1430.

13  Q.   Okay.  So this says, "notice tow has port bow list, altered

14  course for San Francisco."  Do you know if that's the time when

15  you first noticed it, or the time you altered course?

16  A.   That would have been the time that we altered course.  We

17  probably noticed it a little bit before that.

18  Q.   All right.

19       And what happened after you confirmed, in your own mind,

20  that there was a list?

21  A.   Well, what happened to me is, I went down to the galley and

22  I met the skipper down there, and I mentioned it to him, and he

23  said, "Yeah, I noticed the same thing," looking out the back of

24  his stateroom, I believe.  I'm not sure.  But he -- he agreed

25  there was something going on, and then we went up and studied

1   it, just watched it more, and that's when we come to the

2   conclusion that we had an issue.

3   Q.   Okay.  So the log indicates that you left Cape Flattery

4   around the 18th, and this is on the 25th, this is almost a week

5   later.

6        During that time, until you noticed the list, did you

7   observe any problems with the tow regarding its handling, or any

8   problem whatsoever?

9   A.   No.

10  Q.   Did it track fairly true behind you, as you were towing it?

11  A.   I think so, yeah.  It would have been something I would

12  have noticed.  I mean, a bad tracking -- anything that tow that

13  doesn't track well, yeah, is remarkable to us because, yeah, it

14  affects our speed and everything else.

15  Q.   And did you notice any list prior to this time?

16  A.   No.

17  Q.   Were you ever able to determine why the YFD 70 was listing?

18  A.   Not definitively, no.  I mean, we were on a tow wire

19  three-tenths of a mile away from it.  We could just look at it

20  and speculate, I guess.

21  Q.   Okay.

22       Now, you were on watch from 3:00 to 7:00 that night.  After

23  discovering the list, where did you head?

24  A.   San Francisco.

25  Q.   Were you involved with any of the discussions or decisions

1  to change course to San Francisco?

2  A.    No.

3  Q.    All right.

4       Did you observe the tow during your watch, during the 3:00

5  to 7:00 watch on the 25th?

6  A.    Yes.

7  Q.    And what did you see about its condition?

8  A.    It was just -- it noticeably had a list.  I mean, we had an

9  issue.  It was just, I guess -- it was a little worse than when

10 we initially saw it, you know, somewhat worse, and we just knew

11 that we had an issue.

12 Q.    During that your four-hour watch, did you ever see the list

13 progress to a point where the deck -- it's been called the

14 pontoon deck -- but the horizontal portion of it, did you ever

15 see that below the surface of the water?

16 A.    I don't recall that.

17 Q.    Okay.

18       Now, there's been discussion about a safety meeting at 2300

19 that evening; do you recall that?

20 A.    Yeah.

21 Q.    How did that come about?

22 A.    It was a timely discussion of what we might do, you know,

23 that we need to -- you know, whatever we might need to do.  Let

24 the tow slip, you know, whatever, you know, just kind of get on

25 alert, everyone get on the same page as to whatever emergency,

1    you know, procedures might be.

2    Q.    Okay.

3          You got off watch at seven o'clock, and now this was 11:00.

4    Were you up or sleeping during that period?

5    A.    I was probably down.  I was probably sleeping.

6    Q.    And when you came up to the meeting, did the captain talk

7    about what to do in case the dry dock sank?

8    A.    Yeah.

9    Q.    All right.

10         Did Captain McGavock indicate during that meeting to the

11   crew that he thought it was going to sink?

12   A.    No, I don't recall that at all.

13   Q.    Did Captain McGavock indicate to the crew that he was aware

14   that the dry dock had a severe list?

15   A.    Not severe.  I mean, just, you know, what we were watching,

16   on my watch, the previous watch, so...

17   Q.    You were up at eleven o'clock, obviously, it was dark, but

18   did you actually take a look out the window to look at the tow

19   during this meeting?

20   A.    Yeah.  I couldn't see a lot, but I could tell that it was

21   there still, you know, the boat was behind us with the nav

22   lights and everything.

23   Q.    But you couldn't really see the tow?

24   A.    No.

25   Q.    Okay.

1       If the tow at that time, at eleven o'clock on the 25th, had

2   a 30-or 40-degree list, would you expect Captain McGavock to

3   have told you that?

4   A.    Yeah.

5   Q.    And what happened after the meeting?  What happen after the

6   meeting concluded?

7   A.    I probably went back to bed.  What was that, eleven o'clock

8   you said?  So my next watch would be three o'clock, so it is

9   always a good idea for me to get sleep because of those odd

10  hours.  So I would have been trying to rest up for whatever the

11  next day was going to bring.

12  Q.    What is the next thing that happened with respect to the

13  dry dock, that you were aware of?

14  A.    The next thing, I think I was awoken when they were going

15  to release the tow.  Is that the day you're talking about?

16      Yeah, they woke me up.  It was the general alarm.  I went

17  up -- the second mate was in the wheelhouse and the captain was

18  at the second steering station.  I went back, and he released.

19  I got there just as the wire went back over the end.

20  Q.    When Captain McGavock was releasing the tow, did you look

21  at the dry dock?

22  A.    Yeah.  I don't really -- I was more impressed with the wire

23  going over.  There were sparks flying and stuff like that.  And

24  Steve had his hands on his head.  I think, as the skipper, he

25  just realized, you know, the responsibility.  It was really hard

1   on him.

2        Yeah, I think that's the only thing I remember is the wire

3   going over and slapping the sides of the rails, kind of like a

4   snake going...

5   Q.   Do you remember whether the dry dock had capsized at that

6   point?

7   A.   I don't.  I don't recall that.  I just -- it was kind of a

8   blur.  I was just waking up, really.

9        MR. GASPICH:  Okay.  No further questions at this

10  time, Your Honor.

11        THE COURT:  Cross-examination?

12        MR. JARRETT:  Yes, please.

13                 CROSS-EXAMINATION

14  BY MR. JARRETT:

15  Q.   Mr. Cowgill, I just have a couple of questions for you,

16  sir.

17        So, Mr. Cowgill, was this tow the type of thing you were

18  used to working on as a mariner for Western Towboat?

19  A.   No.

20  Q.   Did you ever see anything like this being towed behind a

21  Western boat?

22  A.   No.

23  Q.   And what do you usually tow for Western?  What's your usual

24  tow?

25  A.   Back then I was still on freight run, and that's a tow

1   that's kind of a milk run up through Southeast Alaska, dropping

2   off freight.

3   Q.    And what do you tow when you drop off freight?

4   A.    It's called a deck barge, and it just has containerized

5   freight on it.

6   Q.    Sure.  And when you tow a deck barge with containerized

7   freight, do you get special instructions -- you, meaning the

8   towboat -- do you get special instructions from the Western

9   office, or anybody else, about how to do it?

10  A.    Well, we certainly listen to either offices, AML, the barge

11  operator -- or the barge runner, or our officer.  We do that so

12  often, we kind of know what we're doing.

13  Q.    Yeah.  And I apologize for interrupting you, sir.  It was a

14  silly question.

15       What I'm getting at is, when you tow those freight barges,

16  do you, on the towboat, have a tow plan?

17  A.    I think we have a standardized -- standard operating

18  procedure, I guess, but I don't think they make up a tow plan

19  for each individual -- you know, we do it every two weeks.

20  Q.    Sure.

21  A.    It's routine.

22  Q.    All right.

23       And when you do that, you know more -- you, personally,

24  Mr. Cowgill, know better about how the tow is going to react in

25  weather and sea conditions, do you?

1   A.    Say that again.

2   Q.    Sure.

3         When you are familiar with the freight barge that you

4   usually tow, you have a pretty good idea about how it's going to

5   react in weather and sea conditions?

6   A.    Yes.

7   Q.    And with the YFD 70, did you think you had any idea about

8   how the YFD 70 would act in the sea and in the various weather

9   that you might encounter?

10  A.    I had a trust that Vigor made it seaworthy for us to tow,

11  and I felt good about that, and we towed it.

12  Q.    Sure.  Okay.

13        Because you were watching pretty close at the beginning --

14  well, at least until it listed, you were paying more attention

15  to it than you would one of the freight barges that you tow,

16  more typically.

17  A.    Definitely.

18  Q.    All right.

19        Did you ever see the tow contract between Vigor and

20  Western?

21  A.    Contract?  No.

22  Q.    Did you ever see the recommendations from the tow surveyor

23  that Vigor hired?

24  A.    I did look through it.

25  Q.    When did you see the surveyor's recommendations?

1    A.    Say again?

2    Q.    When did you see the surveyor's recommendations?

3    A.    I think sometime before Flattery.  They were up on the

4    chart table, and I looked -- you know, I looked through them.

5    Q.    All right.

6          MR. JARRETT:  Can you pull those up for me, MaryAnn?

7    Ms. Ivie.  That'd be A-4.

8    Q.    (By Mr. Jarrett)  So you saw the trip-and-tow

9    recommendations?

10   A.    Uh-huh.

11   Q.    You did see this document that's on the screen now, A-4,

12   Mr. Cowgill?

13   A.    Uh-huh.

14   Q.    Is that a "yes," sir?

15   A.    Yeah.  I mean, it's six years, so I can't -- I know I

16   looked through -- I looked through one back then, yes.  Yes, I'd

17   say yes.

18   Q.    Okay.

19         MR. JARRETT:  Ms. Ivie, would you put up the tow plan,

20   please, which is A-2?

21   Q.    (By Mr. Jarrett)  Now, as I understood it, the tow plan was

22   on the vessel.

23   A.    Yeah, that's -- that's what I'm looking at, yeah.

24   Q.    So now that I showed you two documents, Mr. Cowgill --

25   A.    I'm sorry.

1  Q.   No.  You're okay.  And, again, it was six years ago.  I'm

2  not beating up on you.  I'm just trying to get clear here.

3  A.   Yeah.

4  Q.   So was the document that you saw on the vessel A-2, which

5  is on the screen now, or the recommendations that were on the

6  screen a minute ago?

7  A.   This is what I remember, yeah --

8  Q.   This being --

9  A.   -- and I remember because it's got a boat on -- that was a

10  familiar thing they did.  They put the boat that was -- it kind

11  of helps an old guy like me remember.  So, there you go.  That's

12  our boat.

13  Q.   So just in case you forget, here's what we're doing, we're

14  driving a tugboat?

15  A.   Right, exactly.  Thank you.

16  Q.   So you saw on the boat A-2, not A-4?

17  A.   Right.

18  Q.   Okay.  And I thank you for clarifying.

19       So A-2 included some weather and sea guidance, didn't it?

20  A.   Uh-huh.

21       MR. JARRETT:  Can you page through the document,

22  MaryAnn, until I can find the right page?  It's the weather

23  section.

24  Q.   (By Mr. Jarrett)  Here we are.  We're looking at the page

25  marked "Western Transport 166," and you see the section right

1  there in the middle called "weather," Mr. Cowgill?

2  A.    Yes.

3  Q.    And now that you see it blown up, is that what you remember

4  being the weather and sea guidance from Western Towboat for the

5  tow of the YFD 70 to Ensenada?

6  A.    Yeah.  I probably read through this.  I mean, don't

7  remember specifically, but, yeah.

8  Q.    Okay.  And this weather section of the tow plan says that

9  you can only depart after you get favorable seas -- pardon me --

10 favorable weather forecast of seas of 15 feet or less.  And it

11 also says that the tug master will ensure the weather data is

12 continuously monitored and recorded for the tug boat's local and

13 projected track, using a variety of sources.  Do you see that,

14 Mr. Cowgill?

15 A.    Uh-huh.

16 Q.    Okay.

17       So just so I'm clear, you never did see the recommendations

18 from Vigor's surveyor about how that surveyor thought the tow

19 ought to be towed down to Ensenada, did you?

20 A.    I don't -- can't remember that, no.

21 Q.    Okay.  And remind me of your position on the *Ocean Ranger*.

22 A.    I am the chief mate.

23 Q.    So you're the second in command; is that right?

24 A.    Yes.

25 Q.    So the second in command of the vessel didn't get a copy of

1   the recommendations from the trip-and-tow surveyor; is that

2   right?

3   A.    Yeah.

4   Q.    All right.  And I think that Mr. Gaspich asked you these

5   questions, but I need to get them for my own notes, Mr. Cowgill.

6         When you are on watch, part of your job is to note the

7   weather and the seas that the vessel is encountering

8   periodically; is that right?

9   A.    Yes.

10  Q.    And how do you go about estimating the weather and the seas

11  that the vessel is encountering?

12  A.    Look out at the seas, I guess, and -- you know, the height,

13  et cetera.

14  Q.    All right.  So that's the seas.  You have to figure out how

15  to estimate the height of the seas from the wheelhouse.  And

16  I -- well, after 50 years, you can probably do it in your sleep,

17  but do you look at a reference point and, from that, try to

18  gauge the height of the seas?

19  A.    Yeah.  It's actually looking at the waves, and then, you

20  know, the amount of water on top of them, basically, how far

21  that's being blown down the back side of the wave.  I mean,

22  there's just -- yeah, I guess it's like you just said:  50

23  years, I just kind of glance out there and I've got a pretty

24  good idea what that wind speed is.  If you know what the tide is

25  doing, that will make it worse, better, et cetera.

1    Q.    And you've probably have had occasion to train others in

2    how to do it over 50 years.  You've talked to people who haven't

3    done it for quite as long as you have about how to estimate sea

4    heights, right?

5    A.    Yeah.

6    Q.    So there's probably a right way to do it, and there's

7    probably any number of wrong ways to do it; is that correct?

8    A.    Well, I don't know if it's like that, if it's wrong.  It's

9    their perception.  It's just different.  People look at it

10   differently, and I don't know if it's a wrong way.  It's just

11   it's experience, I guess.

12   Q.    You bet.

13         And how many other watchstanders were on *Ocean Ranger* for

14   this voyage?

15   A.    Two.

16   Q.    All right.  Who are they?

17   A.    Watchstanders would be Steve McGavock and Kyle Jacobson.

18   Q.    And Captain McGavock and Kyle Jacobson, are they reasonable

19   guys?

20   A.    Yeah.

21   Q.    Do they know how to do their job?

22   A.    Yeah.

23   Q.    Do they know how to -- by your observation, do they

24   accurately estimate and then record the weather the vessel

25   encounters?

1    A.   I never really -- I think a lot of that is kind of a

2    personal signature, you know, the way they -- I don't really

3    check to see if they're accurate or not.  I mean, I don't know

4    how -- I guess they -- they just sent a satellite up five years

5    ago that can actually tell you the height of a wave from

6    wherever up in space.  That's amazing to me.  And that's

7    accurate, I'm sure, because otherwise they wouldn't have done

8    it, you know.  But I think Kevin and Kyle -- Not Kevin, but

9    Steve McGavock and Kyle both would -- yeah, they were fine at

10   their jobs, yes.

11   Q.   Okay.

12        So you don't look at their logs, their log sheet entries

13   and say, Well, that's him, so I can discount it, I can disregard

14   it because he doesn't know what he's doing?  You don't say that

15   about either one of those guys?

16   A.   I wouldn't be sailing with them if I was doing that.

17   Q.   That was my next question, sir, so that's great.

18        Okay.  So part of the tow plan required the crew of the

19   *Ocean Ranger* to monitor and record weather forecasts on the

20   vessel's projected tracks.

21   A.   Uh-huh.

22   Q.   And you can look at that page if you want to refamiliarize

23   yourself with it.  And I think you described for Ms. Gaspich, in

24   general, how you did that.

25        In litigation like this, sir, we have discovery requests,

1   and we work a lot with counsel for Western Towboat to exchange

2   the documents that we think are discoverable.  And we asked for

3   documents regarding weather forecasts, weather observations from

4   the vessel, and we didn't get any of the scratch papers or any

5   of the notepads that you described to Mr. Gaspich.

6          So that brings me to wonder, what happened to them?  What

7   happens to those scratch pads that you use to pass along the

8   forecast that you listen to?  What happens after you write them

9   down and leave them for the next watch?

10  A.   Usually they'll just sit there for a day or two, and then

11  be discarded.

12  Q.   Sure.  And so the weather forecasts that were on the

13  scratch pads on the -- on the -- what table were those kept on?

14  A.   The chart table.

15  Q.   The chart table.  The scratch papers that are kept on the

16  chart table are thrown away after a period of time.  So in this

17  case --

18  A.   Remember, this is just one way we were getting our weather.

19  I think I explained that.  They're getting weather from the

20  office, and then he was pulling weather off the computer as

21  well.

22         So this was just my old-fashioned way of, you know -- what

23  we, basically, do on a freight run.  I was used to doing it that

24  way, so that's what I did.

25  Q.   It's probably easy to get used to doing things after a few

1    years on water, huh?

2         So you kept the scratch pads on the chart table until

3    somebody threw them away.  And my only question is:  Do you know

4    if those scraps of paper were thrown away after the YFD 70 sank?

5    A.    Not after.

6    Q.    They weren't, huh?

7    A.    No, I mean some were thrown away before.

8    Q.    Sure.

9    A.    And then the ones that were on the computer, the ones that

10   Steve McGavock was -- you know, I don't know what happened to

11   those.  Steve probably had those someplace else I don't know.

12   But those ones you're talking about, yeah, they were just part

13   of the -- you know, kind of a triad of weather, the reports that

14   we got.

15   Q.    Right.  And the information regarding the triad of whether

16   reports that you got, all of that is gone, right?

17   A.    You'd have to talk to Steve.

18   Q.    Okay.

19         So now let's talk about -- let's talk about October 23 and

20   24.

21         MR. JARRETT:  Ms. Ivie, can you bring up those pages

22   on the log sheet to help Mr. Cowgill remember those days?

23   Q.    (By Mr. Jarrett)  Mr. Cowgill, just to try and get you to

24   where we are in the chronology here, this was midway during the

25   voyage, before the list developed that you described for

1    Mr. Gaspich, and you encountered some weather on October 23 and

2    24, didn't you?

3    A.    Uh-huh.

4    Q.    And when you were deposed by my partner, Dave Boyajian, one

5    of the guys with the beard sitting over at counsel table with

6    me -- boy, I stick out, don't I? -- you described the weather

7    that you encountered starting on October 23 and going into the

8    24th.  Do you remember that?

9    A.    Okay.

10   Q.    Do you remember how you described the weather to

11   Mr. Boyajian?

12   A.    No, not exactly.  Sorry.

13   Q.    Okay.  Because you used a particularly descriptive term.

14   A.    Oh, I didn't say the f-word, did I?

15   Q.    No.  No, Mr. Cowgill, that wasn't the response I was

16   looking for, but, no, you did not.

17         What you said was -- and I'll just remind you.  This is at

18   page 47 of your deposition transcript, and I can show you the

19   page, Mr. Cowgill, or I can just tell you.

20         You said you recalled the weather encountered on those days

21   because it was, in your words, "shitty."  Do you remember that

22   now?

23   A.    The s-word.

24   Q.    The s-word?

25   A.    Yes, "s," "shitty."

1   Q.   Do you remember that now, sir?

2   A.   I guess so, yeah.

3   Q.   And what do you remember about the weather now that I've

4   reminded you about your testimony about the weather?

5   A.   Yeah, I mean, it was blowing.  You know, whenever you have

6   wind into your face, or, you know, you're heading in a southerly

7   direction, or southeasterly, and you have southeast weather,

8   where the wind is coming from, it's a concern.

9   Q.   Okay.  So you're looking at the log sheet for October 23.

10  Can you remind me which entries you made, sir?

11  A.   It would be the 4 and 6, and the 1600.  That's the only

12  other one I see of mine.

13          MR JARRETT:  Okay.  So then go to the 24th, please,

14  Ms. Ivie, the next page.

15  Q.   (By Mr. Jarrett)  So what memorable weather do you see

16  noted there on the log sheet?

17  A.   35, 40 southeast.

18  Q.   35, 40 southeast, and that starts at 0400 or so?  No.

19  Sorry.  It starts at two o'clock; is that right?

20  A.   Yeah.

21  Q.   And you said that weather was blowing in your face?

22  A.   Uh-huh.

23  Q.   Sorry, sir.  Is that a "yes"?

24  A.   Oh.  Yes.  I'm sorry.

25  Q.   No, it's okay.  I do it all the time.

1    And in the seas you were encountering, were -- can you tell

2    me which seas notations you made there?

3    A.    At four and six, so it would be 10 to 12.

4    Q.    And you've been, sort of, estimating sea height for a long

5    time.  At this point, this is, you know, five or six years ago,

6    so 45 years on the water at that point, roughly?

7    A.    Yeah.

8    Q.    So are you pretty confident in those estimates that you

9    wrote down on the log sheet?

10   A.    Yes.

11   Q.    So you're pretty sure, then, that the vessel was

12   encountering seas on the nose that were ten feet or bigger; is

13   that right?

14   A.    Yeah, yeah -- yes.

15   Q.    All right.  Okay.

16         And you don't know because you never saw it.  You don't

17   know if those seas or bad weather would end any restrictions

18   that the surveyor attempted to impose, do you?  You don't know?

19   A.    No.  That was Steve's job.

20   Q.    All right.  So then -- and I don't mean to drag you back

21   into all this stuff about the capsize, but I'm just curious.

22         When the YFD started to list, you reported that to Captain

23   McGavock?

24   A.    Yes.

25   Q.    And got him up -- he was off watch at the time, but you got

1    him up --

2    A.   He was already up making a cup of coffee.

3    Q.   Okay.  So you'd just come on watch.  You told him the thing

4    is listing.  Did you report it to Western management?

5    A.   I did not.  That would have been Steve.

6    Q.   Okay.  Are you aware if Mr. McGavock reported it to Western

7    management?

8    A.   I don't recall that.

9    Q.   Okay.  All right.

10        And you weren't sitting there in the wheelhouse with him

11   throughout this whole chain of events, but do you know how many

12   times Captain McGavock was reporting to Western Management

13   the --

14   A.   No.

15   Q.   I'm sorry.  I just need to finish the question, and then

16   you can let me know.

17        Strike that.

18        Do you know how many times Captain McGavock reported the

19   changing in the dry dock's listing to Western management?

20   A.   No, I do not.

21        MR. JARRETT:  Thank you, sir.  Those are all the

22   questions I have for you.  Thank you for your time.

23        MR. GASPICH:  Very brief follow-up, Your Honor?

24        THE COURT:  Yes.

25                    REDIRECT EXAMINATION

1   BY MR. GASPICH:

2   Q.   Counsel just asked you about a surveyor, Bowditch Marine,

3   who did some towing recommendations or a survey of the tow in

4   this matter.

5        Do you know Captain Shaw?

6   A.   I do not.

7   Q.   Okay.  And I'm going to show you Exhibit A-4, the towing

8   recommendations, and this is the one that you have clarified you

9   did not see this aboard the vessel; is that correct?

10  A.   Yes.

11  Q.   All right.

12       And if you look at the bottom of the second page, there is

13  a date of January 7th, 2021.

14  A.   Yes.

15  Q.   So if this document was issued on January 7th of 2021, you

16  certainly would have seen it -- would not have seen it?

17  A.   No, I would not.

18  Q.   So luckily, that wasn't the day it was issued.  Counsel

19  represented early to the court that it was, actually, presented

20  with a tow survey that Captain Shaw had done of the tow.

21  A.   Oh.

22  Q.   So I'll show you Exhibit A-5, and could we go down to the

23  last page, please?  And Exhibit A-5 has a date of October 18,

24  2016, that it was issued.  Okay?

25       When did the tow leave Seattle?  Do you remember?

 1    A.    November?  Actually, I don't know the exact date.  I'd have

 2    to look at the logs.

 3    Q.    Okay.  Can we pull up the log?

 4    A.    Yeah, so it was October 25th.

 5    Q.    Wait.  Wait.

 6    A.    Oh, yeah, I see.

 7    Q.    Showing you the log page for October 17th, 2016, is that

 8    the day that you left?

 9    A.    Yes.

10    Q.    So if Captain Shaw issued his so-called survey and

11    so-called recommendations on the 18th, you couldn't have seen

12    it.

13    A.    Yeah, right.

14          MR. GASPICH:  That's all I have.  Thank you.

15          MR. JARRETT:  Can I -- it might be two questions, Your

16    Honor.

17          THE COURT:  You may.

18                         RECROSS-EXAMINATION

19    BY MR. JARRETT:

20    Q.    Mr. Cowgill, is there a radio or other means of

21    communicating with the Western office on the *Ocean Ranger*?

22    A.    There's a single side band.  I'm not sure.  Can you ask

23    that question again?

24    Q.    You bet.

25          After the *Ocean Ranger* pulls away from the dock and it's

1    still in Puget Sound, before it makes the turn to Flattery, is

2    it possible for anyone on the *Ocean Ranger* to talk to the

3    Western home office by any means of communication?

4    A.    Yes.

5    Q.    Does that happen occasionally?

6    A.    Yes.

7    Q.    So and even further out, after you turn at Flattery, do you

8    occasionally communicate with the home office by radio or other

9    means?

10   A.    Yes.

11   Q.    So it's possible for the surveyor's recommendations to have

12   been relayed by some means of communications to the *Ocean*

13   *Ranger*, isn't it?

14   A.    Yes.

15          MR. JARRETT:  Thank you.

16          MR. GASPICH:  Nothing further, Your Honor.

17          THE COURT:  Mr. Cowgill, thank you.  You may step

18   down, and you're free to go.

19          MR. SIMMS:  Western will call Fred Pickhardt.

20                    FRED PICKHARDT,
          having been first duly sworn, testified as follows:
21

22          THE CLERK:  Please state your full name for the

23   record, and spell your last name for the court reporter.

24          THE WITNESS:  Fred Pickhardt, and that's spelled

25   P-i-c-k-h-a-r-d-t.

1        THE COURT:  Mr. Pickhardt, I believe you've heard the

2    court's instructions to the other witnesses.

3        THE WITNESS:  Yes.

4        THE COURT:  Okay.  So don't speak over counsel's

5    questions.  I know it's hard because sometimes you're not quite

6    sure when they're finished, but give it that extra beat before

7    you answer.

8        THE WITNESS:  I'll try.

9        MR. SIMMS:  Your Honor, before we move into

10   Mr. Pickhardt's testimony, the parties have talked and agree

11   that Exhibit 10, which is the dry dock operating manual,

12   beginning with Vigor Bates No. 2884, is authentic and

13   admissible.

14       THE COURT:  Thank you.

15   Madam Clerk, 10 is admitted.

16                        (Exhibit 10 admitted.)

17       MR. SIMMS:  When we were going through the expert

18   reports and also reporting that each party agreed that the

19   experts were qualified, I skipped over Fred Pickhardt's report,

20   15, and so I want to make sure that is entered, too.

21       MR. JARRETT:  No objection.

22       THE COURT:  Thank you, counsel.  Madam Clerk, 15 will

23   be admitted.

24                        (Exhibit 15 admitted.)

25                        DIRECT EXAMINATION

1   BY MR. SIMMS:

2   Q.   Mr. Pickhardt, you have been here throughout the testimony

3   and heard a good bit of testimony about the weather and

4   available resources and things like that.  And since your report

5   is admitted and your qualifications at the end of the report are

6   detailed, I won't go into those, but is it fair to say you have

7   a good bit of experience as a meteorologist?

8   A.   Yes.

9   Q.   And, specifically, in ocean-related meteorology?

10  A.   Yes, I do.

11  Q.   All right.

12       Now, let's start with Ken Campbell's report, the expert on

13  the call related to weather on the Vigor side.  Have you

14  reviewed Mr. Campbell's report?

15  A.   I have.

16  Q.   And do you have any opinions to express, to a reasonable

17  degree of meteorological certainty, about Ken Campbell's report

18  in rebuttal.

19  A.   Well, I did read through the report, and the report was

20  based on a hindcast.  That means a forecast made after the fact

21  based on information that would have been available at the time.

22       In the report, it states that they used solely the GFS

23  computer model.  The GFS model is NOAA's main forecasting model

24  to forecast weather.  It's one of many models.  So it was

25  strictly done through a model and not an actual forecast that a

1  meteorologist would do.

2      Now, a meteorologist would look at the model, yes, and

3  maybe look at several models, look at input from observations,

4  look at tracking of storms, a number of items, and then make a

5  forecast based on a number of inputs, not just rely on one

6  model.

7  Q.   All right.

8      And in your experience, is the GFS model, used alone, the

9  most accurate model to use?

10 A.   In my experience, it's a good model, but it's probably not

11 the most accurate.  The European model tends to outperform it.

12 There are other models that are equivalent.  Japan has one,

13 Canada has one.  There's a number of them.  I don't remember all

14 of them.

15 Q.   So to obtain the most accurate forecast, would you rely

16 solely on the GFS model?

17      THE COURT:  Mr. Pickhardt, hang on a second.  Can I

18 have you push that mike back a little bit?  You're a good

19 speaker and you're loud enough, but you're blowing out my court

20 reporter's ears.

21      THE WITNESS:  Sorry about that.

22      THE COURT:  You may continue.

23 Q.   (By Mr. Simms)  To obtain an accurate forecast, would you

24 rely only on the GFS model?

25 A.   No.

1    Q.    And do you have any other observations about Mr. Campbell's

2    report concerning routing and predictability of weather along

3    the appointed route?

4    A.    Well, in the report that used the GFS model, at time the

5    vessel left, it indicated that weather would not be an issue

6    down around the 23rd, 24th off of California, and as it turns

7    out, it was an issue.

8    Q.    If, instead of Rich Courtney, Western had gotten Ken

9    Campbell, Vigor's chosen weather router, apparently, and gotten

10   the route, Ken Campbell's route would have been wrong for the

11   24th and 25th; is that what you're saying?

12   A.    From the hindcast that was offered, yes.

13   Q.    Okay.  And is there any other reason that that report was

14   accurate?

15   A.    Well, it was based -- I mean, when you're using a model,

16   the models tend to be accurate at the beginning.

17        So what a model does is -- NOAA takes input from all kinds

18   of observations -- satellite, ships at sea, airports, balloon

19   observations, radar -- they create an initial condition and feed

20   that into a computer, and then the computer calculates how the

21   air masses will change in steps.  It usually -- it can be

22   hourly, it can be three hourly, and they can run these things

23   out for two weeks.

24        Now, of course, if you're looking at three hours from the

25   initial, it's very, very accurate.  And as you go out 24, 48

1    hours, it's -- it's accurate.  And you go beyond that, and you

2    start getting uncertainties.  And you get out five or six days,

3    oftentimes it is significantly different than what actually

4    happens.

5    Q.    And so if Western had gone to Ken Campbell, even, say, on

6    the 17th, the day of departure, in your experience using what

7    Ken Campbell used, could Western have gotten a reliable report

8    about what weather they would experience October 25th, on the

9    17th, asking, Ken, what are we going to see on the 25th?

10   A.    Well, if he was actually asked to do it, real-time, he

11   might have done it in a different method, but he said that he

12   doesn't use any NOAA input, so relying on the hindcast that was

13   produced, it wouldn't have been accurate.

14   Q.    So you saw the discussion -- and it was brought up -- about

15   the Iowa State University record.  I'm going to pull that up,

16   which is 92, Vigor's file.

17         So what is this, in your professional experience?

18   A.    Well, this is discussions.  NOAA meteorologists will

19   discuss what's going on with the forecast.  They may talk about

20   what could go wrong.  They might talk about things like is the

21   models in agreement, are models not in agreement?  It's similar

22   to notes that you're leaving for your next shift.  It is not an

23   official forecast.

24   Q.    It's kind of like a chat room for meteorologists?

25   A.    Yeah.  It might be something akin to night orders from a

1   captain at sea, or the exchange between one watch officer coming

2   on watch and the previous watch officer's giving him the

3   situational awareness.  This is what's going on; be careful,

4   this might happen.  These are notes meant for a meteorologist.

5   Q.    In your professional opinion, are these the kind of notes

6   that are a source for predicting weather?

7   A.    No.

8   Q.    Why is that?

9   A.    It's not for the public.  This is a source for other

10  meteorologists coming on to see what's going on, to have a

11  continuation from one watch to another.  These are things that I

12  see, these things could go wrong, this is accurate.  You know,

13  it's giving a situational awareness to the next meteorologist.

14  It's not an official forecast at all.

15  Q.    It's more comparing opinions?

16  A.    Yes.

17  Q.    And it's not something that you would rely on to make a

18  forecast?

19  A.    No.

20  Q.    And so let's go what you would rely on in your professional

21  experience, and we've heard a lot about gale warnings and all

22  sorts of things that should have been picked up at the turn at

23  Cape Flattery.  So let's put ourselves at the -- coming out of

24  Puget Sound.  We're at Cape Flattery.  We are on the 18th, I

25  guess, late morning or so.

1      And did you, after hearing all that testimony, look back at

2  the actual NOAA forecasts --

3  A.    Yes.

4  Q.    -- to see what was going on?

5          MR. BOYAJIAN:  Objection, Your Honor.  I believe the

6  question was, After hearing testimony yesterday, have you

7  created more opinions that were not in your report?

8          MR. SIMMS:  Rebuttal.

9          THE COURT:  Rebutting?

10          MR. SIMMS:  Rebutting the testimony that was put out,

11  relying on what Ken Campbell said, that there was going to be

12  absolutely no bad weather.  Rebutting this introduced as a

13  reliable weather report supposedly showing the tug that they

14  knew absolutely there was going to be a gale-force warning.

15      And so Mr. Pickhardt, in response, seeing this, saying,

16  well, this isn't reliable.  I'm going to go back and I'm going

17  to rebut what they say is reliable by looking at the NOAA

18  forecast and then comparing it and telling you what I saw as a

19  professional meteorologist.

20          MR. BOYAJIAN:  Your Honor, if I may?  This can't

21  possibly be rebuttal to anything Ken Campbell said.  Ken

22  Campbell hasn't been in the courtroom once all week.

23          MR. SIMMS:  Your Honor, it's the purpose of these

24  experts being in here, to listen to the testimony of all the

25  experts -- all the witnesses, not just the experts, and to rebut

1    the conclusions that they are drawing.

2         We've had an assertion that this is a competent

3    meteorological record, and then Captain McGavock was

4    cross-examined on it, and he's looking at it, and he says, yes,

5    that seems to be what it says.

6         What we're going to hear from Mr. Pickhardt is, no, it's

7    not a competent meteorology record.  I look back now at the

8    record to rebut this, and I looked at the NOAA record, and it

9    doesn't say -- it's not what this says, and it's not what was

10   available in the NOAA record, which is what the tug was looking

11   at, to tell them at sea, making the turn.

12             MR. BOYAJIAN:  Your Honor, yesterday, Captain McGavock

13   testified that he had seen if not those similar forecasts, that

14   he was aware of a gale -- a potential gale offshore; that he

15   chose to make decisions to go offshore notwithstanding.

16        To the extent Mr. Pickhardt has opinions that he can use to

17   rebut Mr. Campbell's testimony, he can assist Mr. Simms in

18   preparing for cross-examination once we present Mr. Campbell's

19   first-person testimony in direct, but this is not a rebuttal of

20   any.

21             THE COURT:  I agree, counsel.  I think it's putting

22   the cart before the horse.  I think he's right.  The objection

23   is sustained.

24   Q.   (By Mr. Simms)  Let me ask it this way:  When you're

25   looking at forecasts, is it important to see what the timing of

1    the forecast is?

2    A.    Yes.

3    Q.    Okay.

4          And so you might have a forecast which is made at 1:00

5    a.m. -- well, let me -- how often do the NOAA forecasts issue?

6    A.    In most places, they do them every six hours.

7    Q.    And is it important to know the areas that it covers?  You

8    heard --

9    A.    Yes.

10   Q.    -- Captain McGavock's testimony, which is that there are

11   large -- my hearing, anyhow -- large area forecasts, and then

12   there are forecasts for specific areas; is that right?

13   A.    Correct.  NOAA produces what's known as a zone forecast,

14   both for land and for marine areas.  The zone may go out as much

15   as 60 miles off the coast, and it might be 60 to 100 miles north

16   to south.  So it is a rectangular box.  And when they make a

17   forecast, they're forecasting for anywhere in that area.  So

18   conditions may be similar but not exactly the same.  But, for

19   instance, if they forecast gale warnings within a zone, then

20   that whole zone gets the gale warning.

21   Q.    And you heard Captain McGavock's testimony.  Did he refer

22   to the specific time that he was reading the forecast about the

23   gale warnings?

24   A.    I don't recall.

25   Q.    Okay.  But would that be important to know?

1    A.    Yes.

2    Q.    And in relation to the time they left out of Cape Flattery,

3    would that be important?

4    A.    Yes.

5    Q.    So, for example, if there was a NOAA forecast during the

6    day of the 18th, but at 2:00 in the afternoon, that said this is

7    it.  Now, they make the turn, and then at 8:00 in the evening,

8    once they have committed themselves and headed down towards the

9    Columbia River, it reports a gale.  Would that be something that

10   could come up in the same day of forecast?

11   A.    Yes.

12   Q.    Okay.  All right.  And is that what you observed?

13   A.    Yes, it was.

14   Q.    Okay.

15         So what you observed was, looking at those forecasts, when

16   they made the turn, no gale warning, and then when they picked

17   up the forecast and made the turn, they had gale warning and

18   they were committed?

19   A.    Yeah, that's correct.  NOAA issued a gale warning for the

20   coastal waters from Cape Flattery, I believe, down to

21   Shoalwater, which is, I think, down the coast, and they issued

22   it around 9:00 p.m. Sunday night.

23   Q.    Okay.

24         And so when that report came from NOAA, did you see that

25   there was weather behind the tug; that is, where they had come

1   from?

2   A.   When they rounded Cape Flattery, there were no gale

3   warnings ahead of them at that time.  The gale warning came up

4   after they had made the turn, so probably 12 hours, roughly,

5   maybe 15 hours later.  They were in the zone already at that

6   point.

7        But the forecast wasn't for that time.  It was for the next

8   day, late afternoon and evening, so the 19th, late afternoon and

9   evening, was the timeframe for the gale warning for that zone.

10       And at that point, I believe from the navigation, that the

11  tow -- the tug and the dry dock had already or would be south of

12  that region before late afternoon on the 19th.

13  Q.   Okay.

14       Is there anything else that is important to know about --

15  in rebuttal to Ken Campbell's report?

16  A.   I'm not sure what you mean.  Could you rephrase?

17  Q.   Have you said everything else that you've observed about

18  Ken Campbell's report?

19  A.   I know there was no -- the only thing I would mention was,

20  he used a buoy that was down off the California coast.  The

21  vessel -- the tow had passed that, I believe, on the 24th, and

22  that was the closest buoy, and he combined the wind -- he had a

23  chart on there that had the wind and the gusts, and he combined

24  them or averaged them out, which is not something that would

25  normally be done.

1    Q.   All right.  Why?

2    A.   Well, normally, when you have sustained winds, what it

3    would mean is that the wind is blowing for a period of time and

4    it's averaging at this amount.  You may have fluctuations or

5    gusts.  So if fluctuations are more than nine or ten knots

6    between the lull in the peak of the wind, they'll start calling

7    those gusts, so they'll add those separately.

8        So the wind is averaging, let's say, 25 knots, there may be

9    gusts up to 30 knots.  One is a steady average one; the other is

10   a momentary fluctuation.

11   Q.   And you saw the tug logs.  That's an average.  Okay?  And

12   to you, as a professional meteorologist, what is that telling

13   you?

14   A.   So the logbook is showing the seamen's estimate of the wind

15   and the sea conditions, based on the visual observation of

16   waves.

17       And there's a comparison.  NOAA produces a book.  It's

18   photographs that shows you what the sea would look like for

19   these various Beaufort forces.  Beaufort force, say, 5, the sea

20   would look like this, and if it's Beaufort force 6, it would

21   look like this, and so on.  So you can compare what you see with

22   these photographs, and you can estimate the wind from that.

23   Q.   And so there is the forecast, but the most accurate

24   on-the-ground way to record weather is what you see; is that

25   correct?

1    A.    Correct.

2          Now, some ships are equipped with an anemometer that

3    measures the wind.  The issue with that is, you have to subtract

4    out the wind direction, the ship's direction and speed, because

5    it affects it.  If you're moving into the wind -- for instance,

6    if you're driving in a car and put your hand out, you feel a

7    strong wind, and that's created by the motion of the car.  So

8    you have to subtract that out before you can get the actual

9    wind.

10         Also, with the smaller vessels, the anemometer is up, and

11   as the boat is rocking, it's adding wind direction from the

12   rocking.  So often, I think, sailors or seamen will tend to look

13   at the visual picture and estimate the wind that way, instead of

14   trying to factor out all of those issues to get out a true wind.

15   Q.    And in your professional opinion as a meteorologist, is it

16   acceptable or reliable to only take a routing forecast?

17         Let me just put it this way.  Okay?

18         If the only thing that the tug *Ocean Ranger* did was to get

19   a routing forecast -- whether it was Rich Courtney or Ken

20   Campbell or anybody else -- the only thing they did was to get

21   that, and not look at anything else, like NOAA forecasts, would

22   that, in your professional opinion, be a way to reliably know

23   what's on the intended track?

24   A.    No.

25   Q.    Why's that?

1  A.    You wanted to have as much input as you can to make a

2  professional judgment.

3  Q.    And it's one factor that you might use?

4  A.    Yeah.  You want to look at it, but you want to look at

5  other sources.

6  Q.    Okay.

7        And Ken Campbell's report, in particular, he had ran -- you

8  saw -- an analysis of what he would have told about the intended

9  track on the 17th, and that turned out to be dead wrong; that

10 is, do you remember that he had said, If I had done a route

11 track, by the 24th and 25th, good weather.  Do you remember

12 that?

13 A.    Yeah.

14 Q.    And he was dead wrong.  Okay.

15       What did you observe the actual conditions to be on the

16 24th and 25th?

17 A.    They encountered winds that peaked between 25 and 35 knots.

18 So that would be strong -- between strong, over six, to the very

19 bottom part of a gale.

20 Q.    And what did you observe about the conditions north of that

21 area they were in on the 24th and 25th?

22 A.    The conditions were worse the further north you went.

23 Q.    So turning around was not an option?

24 A.    I'm not a towboat operator, but I would think that would be

25 a difficult thing to do.

1    Q.    But, on the other hand, if Ken Campbell was the one they

2    used to forecast, he gave a good-to-go forecast for everything

3    at least past the 19th.

4          MR. BOYAJIAN:  Your Honor, objection.  That is not

5    what Ken Campbell's report says, and Ken Campbell will be here

6    tomorrow to answer that question.

7          MR. SIMMS:  Okay.

8          THE COURT:  Sustained.

9          MR. SIMMS:  All right.  I am finished with my

10   questions.

11                      CROSS-EXAMINATION

12   BY MR. BOYAJIAN:

13   Q.    Mr. Pickhardt, did you review any of the deposition

14   testimony in this case?

15   A.    The only deposition I was able to watch was Ken Campbell's.

16   Q.    Okay.

17         So you issued a report before any of the fact depositions

18   for the vessel crew were taken in this case?

19   A.    I didn't see any of the other.

20   Q.    I know.  You issued your report before any of those were

21   taken?

22   A.    Yes.  I don't know when they were taken, but my report was

23   issued before the deposition I witnessed.

24   Q.    Okay.  I'm talking about the crew depositions.  Your report

25   came out before the depositions of any Western crew members.

1    A.    Okay.

2    Q.    Afterwards, after we took those depositions, did you review

3    those transcripts so that you can conform your report to

4    anything that they had to say about how they made weather

5    observations --

6    A.    No.

7    Q.    -- or about how they received weather forecasts?

8    A.    No.

9    Q.    About what weather information they relied on?

10   A.    No.

11   Q.    Okay.

12         What is a forensic weather expert?  What do you do?

13   A.    I normally review weather conditions that affected an

14   incident.  So it could be -- in the maritime industry, it could

15   be a collision, it could be a sinking, it could be an injury,

16   somebody is injured because of rough weather, I will write a

17   report and investigate what the actual conditions were at the

18   time of the incident.

19   Q.    Okay.

20         So also a report that looks at weather from hindsight?

21   A.    Yeah, I'm looking at historical records.

22   Q.    Okay.  Looking at records to determine what happened?

23   A.    Yes.

24   Q.    All right.  So hindsight?

25   A.    Yes.  But it's not a hindcast, it's not a forecast, it's an

1    analysis of actual conditions.

2    Q.   Okay.  And we'll ask Mr. Campbell tomorrow whether he would

3    call his a hindsight or a hindcast.  But both of you are looking

4    backwards at what happened in the past?

5    A.   I was looking backward at the actual conditions, and I

6    believe the report was giving a forecast based on conditions or

7    information that was available at the time.

8    Q.   Okay.  He'll be able to characterize that.

9         So you're one of two experts, then, that have issued an

10   opinion in this case that have to do with the weather; yourself

11   and Dr. Kriebel?

12        MR. SIMMS:  Objection, Your Honor.  That's not what

13   the Kriebel report says at all.  Dr. Kriebel will testify about

14   wave conditions.  Mr. Pickhardt has not talked about wave

15   conditions.  He's talked about weather conditions.  There's not

16   a duplication.

17        THE COURT:  All right.  Aside from the

18   characterization, do you have a question?

19        MR. BOYAJIAN:  I will move on, Your Honor.

20   Q.   (By Mr. Boyajian )  Did you see, before you prepared your

21   report, the two different sets of weather restrictions

22   applicable to the *Ocean Ranger* in this case?

23   A.   No.

24   Q.   The Bowditch recommendations, you've sat in trial and

25   you're now aware that they don't leave without a forecast less

1    than eight feet, 21 knots, don't go into seas greater than eight

2    to ten feet.  You've been here all week.  You've seen those now?

3    A.   I've seen them now, but I don't remember when I first saw

4    them.

5    Q.   But not before you wrote your report?

6    A.   No.

7    Q.   And have you seen the second set, as I'll call them, the

8    ones that Western put in their tow plan, an imperfect transfer

9    of Captain Shaw's recommendations, and that was 20 to 25 knots

10   and eight to ten feet, ideally?

11   A.   I haven't seen that.

12   Q.   You haven't seen that while you've been in the courtroom?

13   A.   Yeah, yeah, here I have.

14   Q.   Okay.  So those recommendations were less than 22 knots and

15   eight feet -- eight to ten, 20 to 25 knots, eight to ten.

16        What is a gale warning?

17        So you've seen these recommendations less than 22 knots,

18   less than eight feet, or don't leave; less than eight- to

19   ten-foot seas throughout the trip.  That's Captain Shaw.

20        Western's version, Jeff Slesinger's version that he copied

21   out of the towing recommendations that were provided to Western,

22   as he testified, 20 to 25 knots, eight to ten feet.  You've seen

23   those now?

24   A.   Yes.

25   Q.   Okay.

1       What is a gale warning?

2   A.   A gale warning is frequent gusts of at least 34 knots.

3   Q.   Okay.  So 50 percent higher than the 21-knot restriction

4   that Captain Shaw imposed on the boat?

5   A.   I haven't done the math, but, yes, it's certainly higher.

6   Q.   And what about storm warning?

7   A.   Storm warning would be for winds of 48 knots to about 63

8   knots.

9   Q.   Okay.  So when you say there were no gale warnings or storm

10  warnings available -- published when they rounded Cape

11  Flattery --

12  A.   Correct.

13  Q.   -- that doesn't actually relate very closely at all to the

14  restrictions imposed by Captain Shaw or the way they were

15  transferred into Western's tow plan.

16  A.   No, I reviewed the -- if there were any NOAA marine

17  warnings at the time.

18  Q.   Okay.

19  A.   And that would be gale or storm warnings.

20  Q.   Well, there are also small-craft advisories, right?

21  A.   Right, but those aren't warnings, they're advisories.

22  Q.   I understand.

23       In the Pacific Northwest -- small-craft advisories have a

24  regional definition, don't they?

25  A.   Yes, they do.

1    Q.    Do you know the definition in the Pacific Northwest?

2    A.    Well, generally speaking, for each region, I don't know

3    them all, but it can be anywhere between 20 knots and 33 knots.

4    Most regions use 25 knots as a minimum, some use 20.

5    Q.    Okay.

6          You've been in there this week.  Have you also heard that

7    the regional version can -- you can issue a small-craft advisory

8    for seas in access of ten feet?

9    A.    Yes.

10   Q.    So wouldn't a more pertinent thing to include in your

11   report be whether or not there had been small-craft advisories

12   issued, because that more closely relates to the restrictions

13   that play in this case?

14   A.    I wasn't asked to do that.

15   Q.    I understand.  You were asked a different question, which

16   was, were there warnings for wind conditions at least 50 percent

17   greater than Captain Shaw's recommendations, but I'm asking you

18   a different question.

19         Did you include anywhere in your report at all, or analyze,

20   whether there were warnings that had been issued that would have

21   been closely related to the restrictions imposed on the *Ocean*

22   *Ranger*?

23   A.    Yes, but only in the coast of California, north of San

24   Francisco --

25   Q.    Okay.  So --

1   A.    -- not for Cape Flattery.

2   Q.    So you were specifically not asked to address whether wind

3   conditions in excess of the restriction would have been

4   available -- forecast for those conditions would have been

5   available to the *Ocean Ranger* at Cape Flattery?

6   A.    Well, they would have been available.  I wasn't asked to

7   review that.

8   Q.    Okay.  So when your report says there were no gale warnings

9   or storm warnings available, it doesn't actually say there were

10  no forecasts that suggested there were conditions in excess of

11  the restrictions?

12  A.    Correct.

13  Q.    All right.

14        I'm going to talk about but not put up your report.  I'm

15  sure you're familiar with it.

16        Page 7, you say, For a moment on October 19th and 20th,

17  there was, quote, a brief period of fresh-to-strong winds.

18        When you're talking about that, are you talking about the

19  ten-hour period where the vessel's logs indicate there were

20  conditions in excess of Western's restrictions?

21  A.    It was a period of winds that were up to 4-6 at

22  approximately 25 knots.  That would have been above -- that

23  would be at the upper limit of those restrictions.

24  Q.    I just want to be clear.  As a lifelong sailor and former

25  yacht captain, I understand what a fresh breeze is, but I think

 1   it's a confusing term for those of us who haven't used it in the

 2   industry.  So I want to pull up the logs, please, for the

 3   afternoon of the 19th.

 4        What your report calls "fresh winds," what you're talking

 5   about here is the -- starting at 12:15, two, four, six, eight,

 6   ten -- at least ten hours of logged conditions exceeding the tow

 7   restrictions.

 8        When you use the word "fresh breeze," that's the scene

 9   you're talking about, right?

10   A.   Yes.  My report is based on my analysis, not on the

11   logbook.

12   Q.   I understand.

13        And this is also 16 hours -- if we scroll onto the next

14   page -- of consecutively logged conditions in excess of Captain

15   Shaw's restrictions.  But the way your report says it is, they

16   encountered a fresh breeze -- a brief period of fresh breeze?

17   A.   Fresh to strong --

18   Q.   Okay.

19   A.   -- strong being up to 27 knots.

20   Q.   Okay.  Okay.

21   A.   Fresh, meaning starting -- roughly 20 to 25 knots.

22   Q.   Okay.  You said up to 27 --

23   A.   That's the upper limit of strong.

24   Q.   I understand.

25   A.   What I analyzed was 25 knots.

1    Q.    Okay.   But we're talking about the same period of time that

2    the *Ocean Ranger* logged -- two, four, six, eight -- at least

3    eight hours with 30 and sometimes 35 knots.   Same period of

4    time?

5    A.    Approximately.

6    Q.    Okay.   Thanks.

7          And then you skip ahead -- right? -- just straight to the

8    23rd and 24th in your report?

9    A.    Yes.

10   Q.    And you said, on page 9, that it has, quote, been

11   determined -- in the passive voice -- that the tug encountered

12   20 to 25 knots of wind.

13         Could we go to the -- and scroll, if you would, please, to

14   the next page.

15         We're talking about now, when you say that, the same period

16   of time when the *Ocean Ranger* logged -- two, four, six, eight,

17   ten -- twelve hours in excess of 35?

18   A.    Yeah, approximately the same time, yeah.

19   Q.    Okay.   I just want to be clear, because you have different

20   numbers.

21         But you heard the testimony, right, from Captain McGavock

22   and both mates saying they're very careful and very experienced

23   and very trained about making their observations and that

24   they're confident about what they write in these logs?

25   A.    I heard that.

1    Q.    Okay.

2          And you're aware that, when Captain McGavock signs this, it

3    becomes a sworn statement and sworn record of the vessel?

4    A.    Yes.

5    Q.    So this is the best record of what, in real-time, they

6    observed, not what you created later from data?

7    A.    That's their estimate of the winds based on visual

8    observation of the waves.

9    Q.    Okay.

10         Page 10 in your report, if you remember it, you say that

11   you rely on National Weather Service and NOAA forecasting stuff

12   for your report, right?

13   A.    Yes.  I was reviewing the NOAA National Weather Service

14   marine coastal waters forecast.

15   Q.    Do you remember Captain McGavock's testimony yesterday,

16   when he said, Even though I saw warnings for gale force, I don't

17   want to use warnings.  That's a technical term.  So our forecast

18   that included the term gale-force winds, I sort of discount

19   that, because I think the National Weather Service and NOAA

20   exaggerate.

21         You don't think so, right, because that's what you rely on

22   when you create your report?

23   A.    Well, he meant -- from what I recall from the testimony, he

24   was talking about that his experience was that the NOAA forecast

25   may vary across a large area.  The specific area may be

1  different than the entire area.  So if there's a forecast of 30

2  knots in a zone, it might not be 30 knots everywhere in the

3  zone.  That's how I remember it.

4  Q.   You don't recall that he said he thought they exaggerate?

5  A.   Yes, I do remember him saying that, yes.

6  Q.   Okay.  Thanks.

7       And then so you talk about your conclusion of 25 to 35 knot

8  winds, even though the vessel logged significantly higher on

9  their own observations.

10      The other piece, on page 9, that you make, is you report

11 that the tow encountered significant wave heights of eight to

12 ten feet.  Tell us what a significant wave height is.

13 A.   A significant wave height is defined as the average of the

14 one-third highest wave.  So if you have a number of waves, you

15 take the highest third, and you take an average of that, and

16 that's the significant wave.  It's usually what the seamen would

17 see when they report waves.

18 Q.   Understood.

19      So when the seafarers were recording 10- to 12-foot waves,

20 they're logging a significant wave height of 10 to 12?

21 A.   Yes, I believe they were.

22 Q.   Okay.  Let's use your numbers, eight to ten feet.  Ten is a

23 nice one to go with.  It's a round number.

24      How tall are the largest waves in a ten-foot significant

25 sea?

1    A.    The maximum wave could be up to 20 feet, approximately

2    double the significant wave.  That would be the highest,

3    statistically.

4    Q.    What percentage of waves are over ten feet in a ten-foot

5    significance?

6    A.    That would be roughly about 14, 15 percent, something like

7    that.

8    Q.    Okay.  So three out of every 20, more than 10 percent.  One

9    out of -- more than one out of every ten waves would be over ten

10   feet?

11   A.    It could be, yes.

12   Q.    Okay.  So if a vessel had a ten-foot-wave-height

13   restriction -- right? -- said don't be out in seas over ten

14   feet, would a significant ten-foot sea contain at least ten or

15   fifteen percent of waves higher than ten feet?

16   A.    Yes.

17   Q.    Okay.  So when the vessel is logging eight to ten, one out

18   of every ten, maybe two out of every ten, but one, one and a

19   half are higher than ten feet?

20   A.    Yes.

21   Q.    Time of departure.  In your report, you say on the 16th and

22   17th, no gale and no storm warnings.

23         You've heard testimony all week that the critical time for

24   decision-making was on the 18th, right, when you leave the

25   sheltered waters of Puget Sound for the open ocean?

1    A.    Yes.

2    Q.    You didn't look at the forecasts for the 18 --

3    A.    Yes, I did.

4    Q.    -- when you were writing your report, did you?

5          Okay.  On page 10, you specifically refer to forecasts

6    available on the 16th and 17th.  Why don't you talk about the

7    forecasts available on the 18th?

8    A.    The forecast that I looked at was for what would be

9    available to the captain when they left Seattle, for rounding

10   the Cape and making south.  So that would be -- the forecast may

11   be issued on the 17th, but the forecast period would be for the

12   18th or 19th.

13   Q.    Understood.

14   A.    On the 18th, they would have already passed that area.

15   Q.    Captain McGavock testified yesterday that 5:00 p.m. was his

16   best estimation of when they rounded Flattery on the 18th, so

17   that's 1700 hours.

18         Were there forecasts available that had been issued on the

19   18th that were available before 5:00 p.m.?

20   A.    Yes.

21   Q.    Okay.  At 6:00 p.m., Captain McGavock is only one hour

22   south of Flattery.  He could have turned around in good weather,

23   right?  Were there forecasts available on the 18th that would

24   have been relevant to him?

25   A.    The forecasts were issued at approximately around 3:00 p.m.

1  and then updated at 9:00 p.m.

2  Q.    There are no forecasts issued by the National Weather

3  Service or NOAA prior to 3:00 p.m. in the afternoon?

4  A.    Prior to it, yes, every six hours.

5  Q.    Okay.

6  A.    They're issued approximately 3:00 p.m. and approximately

7  9:00 p.m.

8  Q.    Okay.  But ever six hours.  So, actually, on the 18th, if

9  Captain McGavock says he rounded at 5:00 p.m., 1700, he actually

10  had available to him at least three forecasts that day, right?

11  A.    Yeah, he had a forecast that was available through 3:00

12  p.m.

13  Q.    Okay.  Why doesn't your report on page 10 discuss any of

14  those?  It only discusses the forecasts available on 16th and

15  17th?

16  A.    I don't know.

17  Q.    Is it because you weren't asked about those, too?

18  A.    I was asked if there were NOAA marine warnings when the

19  vessel departed Cape Flattery --

20  Q.    Okay.

21  A.    -- which, if I recall, I thought it was earlier than 1700,

22  but we can check on that.

23  Q.    Okay.  Well, there's conflicting testimony.  Captain

24  McGavock has said 1700.  Some of his mates have said as early as

25  1400, 2:00 in the afternoon.  But it's the captain's boat, so

1  I'm going to go with the captain.

2       You were asked, specifically, were there gale warnings or

3  storm warnings on the 16th and 17th?  But both of those numbers

4  are far higher than the restrictions, and both of those dates

5  cut off at least a set of three, maybe four forecasts that would

6  have been available to Captain McGavock when he got to Flattery;

7  am I right?

8  A.    The last forecast that would have been able to him before

9  rounding Cape Flattery would have been about 3:00 p.m.

10 Q.    Right, and --

11 A.    There were ones before that.

12 Q.    Okay.  That your report doesn't address, because you stop

13 on the 17th, and then you jump forward until the 23rd; am I

14 right?

15 A.    I don't remember that, exactly what's in there, as far as

16 the timing.

17 Q.    Okay.  It's in the report.

18      When was the very first day that a storm on the 23rd or

19 24th would have been forecast or reasonably forecast?  Right?

20 Because there are -- when you're looking at forecasts out at

21 sea, sometimes they say, We're watching a system that is giving

22 us concern, but they haven't quite nailed it down yet.

23      What is the first date that the *Ocean Ranger* should have

24 been aware or could have been aware that they might encounter

25 tough conditions on the --

1   A.    Probably Saturday -- I forget what the date was.  I think

2   it was the -- I don't recall the date, but I remember it was on

3   Saturday.

4   Q.    Well, the *Ocean Ranger* left on Monday, the 17th.  They

5   round Flattery on Tuesday, the 18th.  They are in a storm the

6   night of -- Tuesday night into Wednesday.

7         Let me just grab the log.

8         Okay.  They leave on a Monday.  Let's scroll down and find

9   which day is Saturday, please.  You just said that Saturday

10  would be --

11  A.    I don't have my report in front of me, but as I recall, it

12  was Saturday.

13  Q.    Okay.  So Saturday, the 22nd, one day -- they had a one-day

14  warning?

15  A.    That was the first indication that winds were going to be

16  an issue.

17  Q.    Winds --

18  A.    Exceeding 25 knots.

19  Q.    Okay.  I thought you had said before that the question you

20  were asked was to answer when there were gale warnings.

21  A.    That was for when they departed.

22  Q.    Okay.  So you were asked a different set of questions for

23  the two different dates?

24  A.    Off the coast of California, when they were approaching, we

25  looked in detail at the NOAA forecast.

1    Q.    Okay.

2          Your conclusions, two of them, for this storm on the 23rd

3    and 24th -- you might have had more (inaudible) to me -- you

4    said the *Ocean Ranger* encountered winds of up to 35 knots.

5    That's your opinion notwithstanding the fact that you heard

6    testimony say we're very careful about what we write in our

7    logs, and the logs show winds in excess of 40 for a period of

8    ten or more hours?

9    A.    That is my opinion.

10   Q.    Okay.

11         And then you say, And they encountered a combined sea swell

12   state of 12-foot significant, and we talked about what

13   significant waves are.

14         What is the maximum wave height you would expect to

15   encounter in a 12-foot significant sea?

16   A.    About 24 feet.

17   Q.    Twenty-four feet.

18         You remember that the restrictions on this tow were ten

19   feet?

20   A.    Understood.  Yes.

21   Q.    Okay.

22         Last question I think I have:  Western's counsel was asking

23   you a question, Wouldn't it have been folly to only get a

24   weather forecast from Rich Courtney?  And I think you said,

25   Yeah, that would have been a mistake.

1    Tell me if I'm paraphrasing your answer correctly.

2    You want as much input as you can possibly get.

3  A.    Correct.

4  Q.    Okay.

5    So Captain McGavock testified he was looking at a couple

6  apps available on his phone.  He testifies that he was looking

7  at some NOAA forecasts but not the ones that the archive master

8  at Iowa State says are the NOAA forecasts, and they're not

9  anything that they kept a record of, because all of that has

10  been thrown away, including the stuff they say they downloaded

11  to their computer, which they must have physically deleted.  All

12  of that is gone.

13    Is there a reason that you wouldn't hire Rich Courtney if

14  you want to get as much input as you can get?

15  A.    That would be up to them.

16  Q.    Right.

17  A.    I would think you would want input, as much as you can, for

18  this type of a tow.  That might include a private meteorologist,

19  but not any particular one.

20  Q.    Okay.

21    What about if you promised to use, in writing, a particular

22  one?  Would it make sense to use that one?

23  A.    Sure, yes.  I don't remember or recall if they specifically

24  said that particular one, but if it did, yes.

25  Q.    Yeah, it did.  It said, "Western Towboat will be using Rich

1    Courtney of Maritime" --

2    A.    Yes.

3    Q.    -- whatever his company is -- "for weather information and

4    course guidance."

5          Do you do course guidance?  Do you do routing?

6    A.    Yes.

7    Q.    What is course guidance?

8    A.    So for ship routing, it is primarily for ocean passages,

9    not coastal runs.  So if you're going, say, from San Francisco

10   to Tokyo, you want to take the route that will minimize time,

11   but at the same time you want to avoid delays due to storms,

12   injury to the ship and to the crew, damage to the ship and

13   cargo.  So it's a combination of the most efficient route

14   without causing undue risk.

15         So you may give coordinates, like go to this point and then

16   this point and that point, to minimize adverse weather

17   conditions.

18   Q.    You heard Captain McGavock rattle off a list of names of

19   apps he was using on his phone.  Did any of them perform a

20   routing function?

21   A.    I'm not familiar with all of them.  Some offer some type of

22   a routing.  I've never used it or looked at it myself.

23   Q.    Okay.

24         What about the NOAA weather forecast that get broadcast

25   over VHF?  Do they provide routing information?

1  A.    No, they do not.

2           MR. BOYAJIAN:  Thanks.

3           THE COURT:  Redirect?

4                     REDIRECT EXAMINATION

5  BY MR. SIMMS:

6  Q.    We've heard a lot about the papers, things were written

7  down on and not kept, and the court had something to say about

8  that, too, in an earlier decision.

9           But let's say I wanted to go back -- what's a GRIB file, by

10  the way?

11  A.    A GRIB file is a computer file which contains geographical

12  information, combined with something else, like if you have a

13  weather map.  That could be saved as a GRIB file.

14  Q.    It's G-R-I-B?

15  A.    Correct.

16  Q.    Which stands for Gridded Information Binary Index.

17  A.    Correct, yes.

18  Q.    And if I went back to the GRIB files, as one source, I can

19  pull up the NOAA forecast for any particular time?

20  A.    It wouldn't be a NOAA forecast.  It would be a model

21  forecast, and, typically, it would be the GFS model.

22  Q.    Okay.

23           So this Iowa thing, not reliable, but I could go back and

24  get history for NOAA files, right?

25  A.    Yes.

1  Q.   I can find -- we talked about the three o'clock turning

2  Cape Flattery.  I can go back and I can get that forecast for

3  Cape Flattery, right?

4  A.   Correct.

5  Q.   And, in fact, to test this, you did that, right?

6  A.   Yes.

7  Q.   And you pulled them right up.  Where did you go to get

8  them?

9  A.   NOAA has the files.  You download it from NOAA itself.

10  Q.   You go right on the Internet, and you pull them up?

11  A.   Yes.  You have to know where to go.  It's a little

12  complicated, but, yes.

13         MR. BOYAJIAN:  Objection here.  We're talking about

14  these files.  We asked for these files.  Mr. Simms has

15  characterized them as easy to find.  We spent weeks looking for

16  them.  The best facsimile we could find was through the

17  archivist who issued a declaration supporting that these are

18  directly pulled from the NOAA archives.  He does it every day.

19     We asked Mr. Simms to produce these files that he kept

20  saying were so easy to fine.  He never did, Your Honor, until

21  the very last couple of days, before the end of trial

22  preparation, frankly, at which point we said, We've been asking

23  for a long time them for a long time (inaudible).  So I would

24  ask that we stop talking about how easy these are to find.  They

25  are not, and Western refused to produce them to us by repeated

1  requests.

2  Q.    (By Mr. Simms)  So these files that we're talking about,

3  they came right off the Internet, right?

4  A.    The GRIB files?

5  Q.    The NOAA historical records.

6  A.    Oh, yes.

7  Q.    And that's something --

8         THE COURT:  Mr. Simms, hang on.

9  So your objection is?

10        MR. BOYAJIAN:  My objection is that we stop talking

11  about these GRIB files that were requested and they were never

12  produced, and we could not find ourselves, despite an engine

13  search.

14        THE COURT:  All right.  So maybe you can come back and

15  recross the witness on his answers.  I don't really care much

16  about what Mr. Simms is saying.  I care about what the witness

17  is saying.

18  Q.    (By Mr. Simms)  So could a professional trained

19  meteorologist, like you did, get these records right off the

20  Internet?

21  A.    Yes.

22  Q.    And they're free, right?

23  A.    They are.

24  Q.    Okay.  So if I wrote them down, copied them, and then threw

25  it away, and if I did that accurately, would that be different

1    from what I would be just be able to pull for free from the

2    Internet?

3    A.    You can retrieve past NOAA forecasts from their site.

4    Q.    Okay.  All right.

5                         RECROSS-EXAMINATION

6    BY MR. BOYAJIAN:

7    Q.    You're aware that weather forecasting is a critical issue

8    in the case?

9    A.    Yes, I do.

10   Q.    And you were asked to answer certain questions that we've

11   already talked about aren't exactly tied to the restrictions and

12   the timelines at play in this case, right?

13   A.    Could you rephrase that?

14   Q.    Sure.

15         You were asked to look at gale-force and storm-force

16   warnings, both of which are well over, in terms of wind force,

17   the restrictions that were at play in this case?

18   A.    I was, yes.  The warnings, the gale storm warning was for

19   the time when they were at Cape Flattery.

20   Q.    Okay.  No, I'm sorry, not for the time at Cape Flattery.

21   A.    Up to Cape Flattery, yes.

22   Q.    Again, you said you were specifically asked to look at the

23   day they departed, not the day they approached Cape Flattery.

24   A.    Yes, so it was the 16th and the 17th.

25   Q.    Correct, and they didn't get to Cape Flattery until the

1    afternoon sometime on the 18th.

2    A.    Correct.

3    Q.    If these NOAA forecasts were so easy to pull, why don't any

4    of them appear in your report and analysis?

5    A.    I have extracts.  The forecasts are very long, so I

6    extracted portions of the forecasts into my report.

7    Q.    Okay.  In your report, when discussing what was available

8    to the *Ocean Ranger* on the 16th and 17th, you do not reference a

9    single NOAA forecast that would have been available to the *Ocean*

10   *Ranger*.

11   A.    Not in the report directly.

12   Q.    Okay.  Where -- how indirectly?

13   A.    I reviewed them, and I found no reference to gale or storm

14   force winds predicted when the vessel would be coming around

15   Cape Flattery.

16   Q.    Well, again --

17   A.    -- prior to them reaching it.

18   Q.    Okay.  So for the 16th and 17th?

19   A.    Yes.

20   Q.    Fully a day before.

21   A.    From what I remember, they left on the 17th.

22   Q.    Fair.

23        Do you recall, having reviewed all of those forecasts -- do

24   you recall, having reviewed those forecasts, that there were

25   forecasted winds in excess of 21 knots?

1   A.    Yes.

2   Q.    Do you recall that Captain Shaw's restriction was 21 knots

3   or less?

4   A.    Yes, I do.

5             MR. BOYAJIAN:  Okay.

6             MR. SIMMS:  No questions, Your Honor.

7             THE COURT:  Mr. Pickhardt, thank you.  You may step

8   down.

9        Counsel, we'll go ahead and take our break for 15 minutes.

10              (Court in recess 2:41 p.m. to 2:59 p.m.)

11             THE COURT:  Please come forward to be sworn.

12                         BOB SHREWSBURY,
             having been first duly sworn, testified as follows:
13

14             THE CLERK:  Please state your name for the record, and

15   spell your last name for the court reporter.

16             THE WITNESS:  Bob Shrewsbury, President of Western

17   Towboat.

18             THE CLERK:  And spell your last name, please.

19             THE WITNESS:  S-h-r-e-w-s-b-u-r-y, and I'm the Second.

20             THE COURT:  Mr. Shrewsbury, good afternoon.  You don't

21   need to get so close to the mike.  The court reporter has a

22   headset on, and it's connected to the mike.

23             THE WITNESS:  I wear hearing aids.  I was worried

24   about being close to a speaker.

25             THE COURT:  If you don't understand a question, just

1  say so, and we'll get them explain it further.  Hopefully that

2  will help.

3       Counsel, you may inquire.

4                    DIRECT EXAMINATION

5  BY MR. SIMMS:

6  Q.   Mr. Shrewsbury, you said you were the Second.

7       Tell us about Western Towboat and a bit of the history and

8  what Western Towboat does.

9  A.   Western Towboat, my dad started it in 1948, with one small,

10 wooden tugboat, and we've continued to grow over the years and

11 expand our services.  We started building our own steel tugs in

12 1982, and we still do that, build our own vessels.

13      And we started a freight company with a couple of partners

14 in '78, '79, and then we ended up selling that business to

15 Lynden Transport, who changed the name to Alaska Marine Lines,

16 and we've continued to grow along with Alaska Marine Lines.  We

17 service all of Southeast Alaska, and we twice weekly service by

18 barge, we serve Alaska Railroad once a week with barges, or more

19 if needed, and we serve all over Western Alaska, seasonally, as

20 well, and we do local work in Puget Sound, and harbor work, and

21 we take odd towing jobs all over, as far east as New Jersey, and

22 we've been to Guantanamo, we've been to Chile, Guam, Hawaii.  We

23 do a few oddball jobs like that as well.

24 Q.   And is Russ Shrewsbury your son?

25 A.   Yes, he is one of my sons.  His younger brother, Ross, is

1  also a captain and works for us, and my daughter manages our

2  office.  It's definitely a family business.

3  Q.   Tell the court about your personal experience.  We've

4  designated as you an expert in ocean towing.  Tell us about

5  that.  What experience do you have?

6  A.   I've never done anything else.  I started riding locally

7  with my dad, even when I was five years old.  I made my first

8  trip to Alaska when I was seven.  I graduated high school in

9  '71, and I went directly to running tugboats, and I did that,

10 ran tugboats till and even after my dad retired in '89.  I did a

11 lot of Alaska work and some coastwise work, but mainly Alaska

12 for me, and working with Alaska Marine Lines in the freight

13 business.

14 Q.   And do you still hold a master's license?

15 A.   No.  It expired a year and a half ago, I think.  It doesn't

16 mean I don't do some harbor work, but we won't tell anybody

17 that.  I'm almost 68 now, so...

18 Q.   Have you made any tows up and down the West Coast?

19 A.   Yes.  Yes.  I've been to San Diego and Los Angeles and Coos

20 Bay, Portland, San Francisco.  But it's been quite a while.  The

21 last time I was down the coast was around '91, or somewhere in

22 there.

23     I spent a lot of time working with Alaska Marine Lines and

24 the freight business.  That's our biggest customer and account,

25 and we work real closely with the owners of Lynden.

1    Q.    And so now you have the honor of being president.

2    A.    For a little while, still, maybe.

3    Q.    And all that goes with it.

4          What do you do on a day-to-day basis?

5    A.    Oversee our yard operations and the tugs.  I don't do the

6    dispatching, typically.  And I look over some of the bidding and

7    things like that for the different jobs that we do.  And, like I

8    say, I do a lot with Alaska Marine Lines and Lynden.  I work

9    directly with them because I've known them for so long, and the

10   relationships we have with all the managers and stuff.  So most

11   of my focus is with Alaska Marine Lines and maintaining our

12   construction site and what we do in our yard there.

13   Q.    And your son, Russ, is vice president?

14   A.    Yes, right.  He's dispatching and quoting most of these

15   kinds of jobs now, and he still fills in and runs tugs

16   occasionally, when he has to, in the harbor, and dealing with

17   all the customers, too.

18   Q.    Before -- let's go back before 2015 or, at least, before

19   the tow contract here in August 2016.  Let's go back before

20   that.

21         Had Western ever moved the YFD 70 around?

22   A.    Yes.  We moved it at the terminal, you know, just locally

23   there at the shipyard.  I'd done that a couple of times myself.

24   Q.    And so was Western somewhat familiar with the YFD 70?

25   A.    Yeah.  We knew the dock, yeah.

1    Q.    And had you ever moved it in different pieces?

2    A.    No, no.

3    Q.    It was always one piece?

4    A.    Always, yeah.  That's the way it's been since I worked in

5    the harbor there.

6    Q.    How long is that?

7    A.    A long time.

8    Q.    It's always been in one piece --

9    A.    As long as I've worked around it, Vigor and prior to that

10   when it was Todd Shipyard, yes.

11   Q.    And so we get into 2016, coming up into August, and do you

12   remember walking around the 70, talking with Dan Keen about

13   towing it?

14   A.    Yeah, we were asked about towing it.

15   Q.    All right.

16         And what did Dan ask, and what did you say?

17   A.    I said I felt we could do it.  I was concerned about it,

18   due to its age, because I've been around a lot of World War II

19   ex-military barges and things that are a little shaky and rusted

20   out.  We had one of them flipped up -- a small, Navy barge that

21   one of our customers owned turned upside down on us with a load

22   of gravel on it.

23         Yeah, we felt comfortable, if we could do it at the right

24   time of the year and in decent conditions.

25   Q.    So at that time, in August, you were talking with Dan about

1  a tow when?

2  A.    Late September was what we were all hoping for, prior to

3  getting too deep into the fall.

4  Q.    And so did Dan ask for a quote -- a tow quote?

5  A.    Yeah, I believe either Dan or Paul Torrey.  I don't know

6  who asked for it.  I know we sent it to Paul, I believe.

7  Q.    And I'll put up Western Exhibit 4, and this is the towage

8  agreement.  And is this Western's standard towage agreement?

9  A.    Yeah, that Bauer Monihan attorneys provide for us, yes.

10  Q.    So Western sent this to Vigor -- and let me go to the

11  bottom here.  And here's your -- that's your signature?

12  A.    Yes.

13  Q.    And Paul Torrey's.

14        And did Vigor make any changes to this agreement?

15  A.    Our attorney had pointed something out.  They did the

16  additional conditions.  We didn't do that.  There was --

17  Q.    Well, let's -- yeah, before we pass that.

18        So they did additional conditions.  "The tow is dependent

19  on favorable weather conditions.  In event that the weather

20  conditions do not allow the tow to commence by November 26th,

21  2016, either party may reschedule."

22        So did this require the tow to commence by October 7, 2016,

23  if there were favorable conditions.

24  A.    Yeah.

25  Q.    Okay.

1    And so if there are favorable conditions before November 7,

2  2016, your understanding was you got to go, right?

3  A.    Yeah, that's what people were thinking.

4        MR. HOWARD:  Objection; leading.

5        MR. SIMMS:  I'll be careful.

6        THE COURT:  Thank you.

7  Q.    (By Mr. Simms)  All right.  So it's August -- sorry --

8  October 4th, 2016, and you -- here's the contract.  It comes

9  back.  And I want to go down here, and I'll blow it up a little

10 bit.

11       Down at the bottom, this paragraph, "Customer."  Is that

12 Vigor, customer in the contract?

13 A.    Yes.

14 Q.    Okay.

15       And here it is, October 4, 2016, and the line is, "And it,"

16 Vigor, "has informed owner," Western, "of any special

17 circumstances or conditions applicable to the tow, which may

18 affect the performance of services under this agreement."

19       All right.  Did Vigor, Paul Torrey, anybody else, inform

20 Western of any special circumstances or conditions applicable to

21 the tow?

22 A.    No, no one did.

23 Q.    Okay.

24       And so would you consider the fact that the tow -- that

25 Vigor sold the dry dock for $10,000 to be a special

1    circumstance?

2    A.    To me, it would.  It seemed odd, yes.

3    Q.    And why did it seem odd?

4    A.    Well, I just never heard of anything being sold that cheap

5    before with that much tonnage.  When you look at the --

6    Q.    Are you aware that in the sale contract, the sale contract

7    was secret and confidential between Vigor and Amaya Curiel?

8              MR. HOWARD:  Objection; both leading and irrelevant.

9              THE COURT:  Sustained.

10             MR. SIMMS:  Okay.

11   Q.    (By Mr. Simms)  So $10,000, that was a special

12   circumstance?

13         Were you aware, at the time of the circumstance, that Vigor

14   intended to, before proposing this tow, transport the YFD 70 on

15   a heavy-lift ship in three pieces.  Were you aware of that?

16   A.    We were aware of that because we helped put another one of

17   their dry docks on a heavy-lift ship, and we went through

18   several meetings with them about how to do that and the pilots.

19   So, yes, we had heard that that's what they were hoping to do.

20   Q.    Were you aware, at the time of this contract, that the

21   original design of the 70 was for an open-ocean tow, for the two

22   sections at the end to be loaded on the middle?  Were you aware

23   of that?

24   A.    No, I was not.  I was aware these dry docks were built to

25   tow in the ocean, but not -- not -- I had not heard about ends

1  being removed.

2  Q.   Would you consider that to be a special circumstance,

3  knowing the original design?

4  A.   Yes, I would.

5  Q.   Okay.

6       And had you known, at this time, about that ultrasonic

7  survey that had been done on the 70 several years before?

8  A.   No, we did not.

9  Q.   Okay.  And would you consider that a special circumstance?

10  A.   Yeah, that would have been nice to know, due to the age of

11  that dry dock, yes.

12  Q.   All right.  And was it a special circumstance to know that

13  the dock, at least at that ultrasound survey, had some

14  significant deficits that, Dan you've heard testify -- needed to

15  be repaired?

16       MR. HOWARD:  Objection; both mischaracterizing and

17  leading.

18       THE COURT:  Sustained.

19  A.   Yes, I would --

20       THE COURT:  Mr. Shrewsbury, wait for the next

21  question.

22  Q.   (By Mr. Simms)  So would you consider it a special

23  circumstance to have known of the ultrasonic survey?

24  A.   Only if there were some issues in that that were dangerous

25  for towing in the ocean, yes.

1    Q.    Okay.  All right.

2          So the contract comes back around October 4, and then what

3    was your next involvement with the 70 tow after you got the

4    contract back from Vigor?

5    A.    Coordinating between Dan and Paul Torrey on the departure

6    times.  We emailed back and forth and talked a little bit about

7    our tug being available and when the dry dock could -- we were

8    hoping to move the dry dock very early in October, and -- and

9    then that's what we continued to discuss, that.  And then it got

10   pushed back a ways, so we weren't excited about that, but, with

11   the right weather, we were still hoping we could do it.

12   Q.    Did Vigor want you to move the dock out as soon as that

13   could be done?

14   A.    It sounded like we were okay if we hadn't left on the day

15   we did, but sooner was better for them, is what we were told.

16   Q.    Uh-huh.  But you had to leave by November 7, if favorable

17   weather?

18          MR. HOWARD:  Objection; leading; mischaracterizes.

19          THE COURT:  Sustained.

20          MR. SIMMS:  Okay.

21   Q.    (By Mr. Simms)  So did Jeff Slesinger have any role in the

22   preparation for departure with the tow?

23   A.    Yeah.  He provided a tow plan that -- Vigor asked us to

24   submit a tow plan with the Coast Guard so that we could get this

25   tow approved, because the vessel was not a classed vessel for

1  the American Bureau of Shipping or anything like that, so it has

2  to have a Coast Guard permit to be towed in the open ocean like

3  that.  So he was working with -- he provided that, and I believe

4  they got in contact with Mr. Shaw, and he talked with him about

5  the dry dock.  And I think he -- I don't remember if he went

6  down himself and looked at it personally, but I thought he did.

7  Q.   All right.

8       And at some point, Richard Shaw became involved.  Did you

9  have ever any discussions with Richard Shaw about the 70?

10 A.   No.  I never spoke to him.

11 Q.   Did you ever receive -- I'm putting up Exhibit -- this is

12 Vigor Exhibit 3.

13      Did you ever receive from Richard Shaw, or anybody else,

14 this draft survey?

15 A.   No, I was never sent that.

16 Q.   Okay.  All right.

17      And did you ever receive from Richard Shaw, or anybody

18 else, this final survey, October 18, 2016?

19 A.   No, I was never sent that, either.

20 Q.   Okay.

21      And in your professional experience, have you ever -- have

22 you ever received a trip-and-tow-suitability survey, ever seen

23 one?

24      Let me ask it this way:  Have you ever been involved with a

25 tow where there was a surveyor for the tow?

1  A.    Yes, yes, I have.

2  Q.    And in your experience, is it customary for the surveyor to

3  discuss his or her survey with the tow company before departure?

4  A.    Yes, yes.

5  Q.    Is the customary procedure to discuss the survey and to

6  have the master initial it?

7  A.    Yeah.  Typically, that's normal, yes.

8  Q.    And was that done here?

9  A.    No.

10  Q.    So -- okay.

11       So there is -- and is Russ working to prepare -- is Russ

12  working with Vigor at this point to --

13  A.    Well, Russ -- yes, he worked with Vigor on scheduling moves

14  and things like that.  Jeff Slesinger, in our office, I believe,

15  is the only person that had any contact with Mr. Shaw.

16  Q.    Okay.

17  A.    And that's kind of what his job is, too.

18  Q.    Okay.  So we are now walking ahead and we get into October,

19  and it's not quite -- why didn't the tow leave earlier than when

20  it did?

21  A.    Vigor was notified by the people in Ensenada that they had

22  a delay in finding a moorage spot in Ensenada for the dry dock,

23  so they wanted the arrival of the dry dock postponed, so that

24  pushed it out at least another week or so there, or more.

25  Q.    So we're coming up to the weekend of the 14th, 15th, 16th,

1    and Rich Courtney's name has come up a lot here, including in

2    the tow plan.  What do you remember about Rich Courtney's

3    involvement with the tow?

4    A.    Dan Kelly, in our office, had emailed him that we were

5    going to be doing this tow.  And then I had spoke to him, I

6    believe, a couple days before we sailed, about what he saw in

7    the forecast.  I was looking at the extended forecast and a

8    couple other things online, and I just wanted his opinion of

9    what he was seeing.  And then told him if anything changed,

10   that, you know, and we agreed that it looked okay at that time,

11   and if anything changed, we would contact him.

12   Q.    Did you tell Rich Courtney about a 15-foot restriction?

13   A.    That's what I knew at the time, yes.

14   Q.    And where did that come from?

15   A.    That was on our document that Jeff had provided, our voyage

16   plan that he submitted to the Coast Guard.

17   Q.    And that was, ideally, 15 feet?

18   A.    Fifteen feet, yeah, for swell conditions.

19   Q.    And did you speak with Rich Courtney?

20   A.    Yes, yes.

21   Q.    How many times?

22   A.    Just that one time.

23   Q.    Okay.

24   A.    I think.

25   Q.    And there are some emails about that.  Do those emails

1    accurately record the conversation?

2    A.    Yeah, yeah.

3    Q.    Okay.

4         So what did you understand from Rich Courtney

5    conversations, emails, about the departure date of the 17th?

6    A.    Yeah, he was looking ahead and giving me his outlook on the

7    next seven days, or as best as he could guess.  And for us, it

8    looked like it made the most sense to get going that day.  And

9    our thought was that if we got out in the straits and things

10   deteriorated in the forecast, that we could wait out there.  But

11   due to the way the forecast looked, it was -- it looked better

12   for us to go and deal with the end of that low-pressure thing,

13   because behind it, we had a good four or five days of good

14   weather, which would get us further south, out of Oregon and

15   Washington, down to where we expected better weather in

16   California.  So we didn't want to waste that opportunity that

17   was there.

18   Q.    Uh-huh.  Okay.

19        And so did the weather conditions on November 17th, that

20   Monday, permit Western to commence the tow?

21   A.    Yes.

22   Q.    So the tow commences, and we've heard about Cape Flattery

23   and weather and those sorts of things.  Why didn't Western --

24   you -- why didn't you have any more contact with Rich Courtney

25   about this tow after that conversation over the weekend?

1    A.    Because everything looked so good forecast-wise, and, yeah,

2    we ran the next, I think, five -- five days or six days, and

3    even then the forecasts still were favorable for us.

4    Q.    Were you looking at the weather?

5    A.    Oh, yeah.

6    Q.    So what were you looking at?

7    A.    I look at the NOAA forecasts.  I get it online, and the

8    Windy program, yeah.  And so -- because we were concerned,

9    definitely concerned about this dry dock.

10   Q.    Now, the NOAA forecast, looking at the Windy program, and

11   in your professional experience, is that what mariners consult

12   to determine weather?

13   A.    Yeah.  When we're traveling down the U.S. coast, yeah, we

14   trust NOAA for that.  You know, when we've done some trips out

15   our NOAA area, we've hired a private company -- we did some

16   container cranes on our barges from Los Angeles to Florida in

17   kind of a critical time of year, and we hired a special company

18   like what Rich Courtney does to watch weather for us.

19         But on the Washington, Oregon, and California coast, we're

20   pretty confident in the NOAA forecasting.

21   Q.    In your experience as both when you were sailing and as a

22   manager, are the NOAA forecasts reliable?

23   A.    Yeah -- yes.  Yeah, we live by them; I mean, we do.

24   Q.    Do you need an extra forecaster to fill you in on what the

25   forecasts are?

1    A.    It's nice in Alaska, the critical Gulf of Alaska.  We have

2    our rail barges that go every week.  We have kind of the --

3    found out that a 16-foot swell is about what the railcar

4    lashings cannot take.  So we try to be really critical of that.

5          So sometimes between two areas there, it's a little

6    confusing, and that's generally when we'll call Rich for an

7    opinion on what we should expect, and -- because it's not -- you

8    know, for us it's a 270-mile trip from inside Cape Spencer to

9    the next safe spot over there behind Cape Saint Elias.  So that

10   expert opinion really helps sometimes.  He's saved us a few

11   times from making the wrong decision.  We just like to verify

12   what we're thinking.

13   Q.    Did Rich have any particular geographical area that he was

14   most familiar with?

15   A.    Well, Alaska and the West Coast.  But Alaska is where he is

16   based out of, Yakutat.

17   Q.    Did you expect him to have specific expertise for the West

18   Coast of the U.S.?

19   A.    I did, yes.

20   Q.    So he was available.

21   A.    Yes.

22   Q.    And so the tug and tow go out, and now we're up to the

23   25th.

24         What do you remember of the first report you got -- well,

25   let me go before that.

1          Did you get any reports from the tug and tow about problems

2    with the tug and tow before the afternoon, around 2:00 or so?

3    A.    No.  Everybody was pretty happy with the way things were

4    going, and the tug...

5    Q.    Now, how did you communicate with the tug?

6    A.    With phone service, when we could.  I didn't talk to

7    them -- only once, I believe, but everything -- emails, so...

8    Q.    And so then in the afternoon of Tuesday, the 25th, did you

9    get -- were you the one who call about the list?

10   A.    Yes, I got the call.

11   Q.    Who called you from the tug?

12   A.    Captain Steve McGavock.

13   Q.    Okay.  What did he tell you?

14   A.    He said there was a slight list of maybe four degrees, and

15   just what everybody thought.  And we asked them if they could

16   send us some pictures that we could forward to Dan Keen.

17   Q.    Okay.  Yeah.

18         And so did you send those pictures to Dan Keen?

19   A.    Yeah.  I think we had -- one or two shots that we had, yes.

20   Q.    All right.  So now it's about the two -- two -- four

21   o'clock in the afternoon.  Did you speak with Dan Keen?

22   A.    I believe I did, yeah.  And I emailed Paul Torrey, too, as

23   well, and the exact -- who I talked to first.

24   Q.    Did you ask Dan or Paul to do anything?

25   A.    Well, yeah.  We were -- we wanted to know what Dan was

1  thinking when he saw the pictures, yeah.

2  Q.    Well, why did you ask Dan?

3  A.    Well, because he was the dockmaster and he's the most

4  familiar with the dock.  He'd been running the dock, and he knew

5  it better than anyone.

6  Q.    Okay.  Well, why didn't you just rely on Steve looking at

7  the dock himself?

8       In your experience as a professional mariner, when you're

9  looking at a tow, can you tell what's going on with the tow?  A

10  little bit?

11  A.    If it's a barge you know, yeah, you can tell, but we're not

12  familiar with the inside structure of the dry dock like that.

13  And I know Dan is totally familiar with it.  He has to know

14  exactly how to raise it, lower, and it which tanks or, you

15  know -- I don't know how things were connected or disconnected

16  inside or anything.  We wanted to know if it was still safe, or

17  if we needed to look for a place of safety, or what they

18  thought.

19  Q.    Okay.  And did you trust what Dan told you?

20  A.    Yes.

21  Q.    And what did Dan tell you?

22  A.    He said, from what he could tell, it looked like it was

23  probably okay.  But then I think we decided that it was best if

24  we could get it somewhere to get some people on it and try and

25  secure whatever was leaking.

1   Q.   Okay.  So we're going to get -- we're going to go back and

2   forth about this a lot, and you'll see, I'm sure, your

3   deposition transcript that said it was your sole decision to go

4   to San Francisco and to Monterey.  Was it?

5   A.   No, no.  I thought we discussed the options that we had

6   about going to San Francisco, and that was our first decision,

7   that if it was okay, that we could go in there.

8   Q.   Uh-huh.

9   A.   But the more I thought about it, and the age of the dry

10  dock, I got worried about San Francisco.  And then I told them

11  that I was.  I either called them or I emailed them and told

12  them that we needed to talk about another option.  And we also

13  talked to the Coast Guard about that we were having an issue and

14  what we were thinking, and then we changed our thinking to

15  Monterey.

16  Q.   Were you talking to the Coast Guard?

17  A.   I believe I did call them and started the conversation,

18  yes.

19  Q.   All right.

20       And then you gave them Paul Torrey's number?

21  A.   I believe that's how it worked, yeah.

22  Q.   Okay.

23       And at that point, when you called the Coast Guard, is

24  there anything that indicates to you that they had no idea where

25  you were?

1    A.    I don't remember.

2    Q.    Okay.

3          So just to your left there, there there's the chart.  And

4    what were your concerns about coming into San Francisco?

5    A.    I was just worried if anything was more serious on the dry

6    dock, and we couldn't get in there safely, that if I ever sunk

7    in that waterway, becoming as busy as it is, and there is a bar

8    there, which is shallow, and as high as the sides are on that

9    dry dock, that if it sunk there, it would be a national disaster

10   for the shipping industry, if it went down in the wrong place,

11   and that's why thought we needed to rethink that.

12   Q.    We've talked about San Francisco and Monterey.

13         Did you have any idea that Vigor was prepared to meet the

14   tug and tow at San Francisco with Global Diving?

15   A.    Yeah, we discussed that, but we also -- but after I went

16   back to them with my thoughts on San Francisco, I believe they

17   agreed to that, too, and everybody decided that we would not go

18   there.  We would look for a lee in Monterey Bay, if the Coast

19   Guard approved of that idea.  And we knew some people who could

20   get equipment out to the dry dock, if it was approved and the

21   weather allowed us to get in there and find a lee.

22   Q.    Was there ever any consideration to simply head off with

23   the tow into the deepest water possible and sink it?

24   A.    Well, later that night, yes.

25   Q.    But at this time?

1    A.    Not at that time, no.

2    Q.    Had Dan Keen told you that, more likely than not, it would

3    float at this time?

4    A.    Yeah.  He felt it was probably going to be okay from what

5    he saw there and from what he could tell in that photograph.

6    Q.    Did Western have any responsibility to try to come to the

7    assistance of the tow?

8    A.    Not in the sea conditions we had.  Because of the way the

9    dry dock is --

10   Q.    And I'm not talking about going around with a tug and

11   getting on it.  I'm talking about assistance from the standpoint

12   of saving the tow, if possible.  Was there any idea that that

13   was something Western was supposed to do?

14   A.    Yes, yes, I mean, that's why they hire us; to get it down

15   there safely, and if we can save it and if it's something simple

16   and it was just one or two compartments that had a fracture or

17   something that we could deal with, then, you know, maybe it

18   would be fine.

19   Q.    Was the plan to put on a patch or something like that?

20           MR. HOWARD:  Objection; leading.  I'm trying not to

21   object too often to leading.

22           THE COURT:  It is.  Sustained.  Rephrase.

23   Q.    (By Mr. Simms)  Were there any plans -- tell us of the

24   plans, if any, to assist the dock.

25   A.    They had Global Diving lined up, and I think the first plan

1   was just to see what the damage was.

2   Q.   And just to see, was that --

3   A.   Yeah.

4   Q.   When was that to take place?

5   A.   After daylight the next day, then if it was safe to come

6   in, then we would come in.

7   Q.   Uh-huh.  Okay.

8        So was the plan, on Tuesday evening, to have Vigor meet the

9   dock the next day to see what the damage was?

10  A.   Yeah.  We would keep in contact with them, and we would

11  continue to head down the coast so we were closer to Monterey

12  Bay, and then we could decide to come in.

13  Q.   All right.

14       And now, of course, there's the captain and the mates on

15  the tug, they can see this.  Why was it necessary for Vigor to

16  meet the tug and tow anywhere?

17  A.   Well, we just didn't know if it was going to continue to

18  get worse.

19  Q.   All right.  So Vigor wanted to meet.  Did Vigor want to

20  meet and see --

21  A.   Yeah.  Well, they wanted to save their dry dock.  They made

22  a deal to sell it and -- yeah.

23  Q.   Was Western trying to assist in saving the dry dock?

24  A.   Yes, yes, that was our goal, too.

25  Q.   Okay.  So we get into the evening.  What else do you

1  remember about that evening?

2  A.   Well, what happened was it got dark, and also the weather

3  conditions changed.  It got foggy, and our guys couldn't see the

4  tow.  Because we still had to have most of our tow wire out, so

5  we couldn't tell what was happening with the dry dock, and

6  that's what was making us nervous; that if all of a sudden it

7  filled up and started to sink and we couldn't tell, it could --

8  if the boat could not get back and release the brake or

9  something, if it sunk that fast, it would pull the boat

10  backwards, and we've got five people on there.  It was pretty

11  nerve racking for everybody not knowing what will happen with

12  that dry dock.

13  Q.   Uh-huh.

14       So we get into evening -- early morning, and how often were

15  you communicating with the tug?

16  A.   We told them if they saw anything, or when they could see,

17  let us know what it looked like, because if it changes for the

18  worse, then we need to make another plan.

19  Q.   All right.

20  A.   And that...

21  Q.   Now, so let's talk about the decision to head to deep

22  water.  All right?  Tell the court everything that went into the

23  decision.

24            MR. HOWARD:  Your Honor, I believe this is a topic the

25  court has said it already resolved and decided not relevant.

1  I'll object to the topic.

2          THE COURT:  There's still the issue of the contract

3  and either side abiding by the conditions of the contract.  If

4  that affects this in any way -- we're not going to get into

5  staying out the sanctuary?

6          MR. SIMMS:  No.

7          THE COURT:  Okay.  Overruled.

8          MR. HOWARD:  Thank you, Your Honor.

9  Q.   (By Mr. Simms)  So tell the court about that.

10 A.   I told the tug crew to call me when they can see the dry

11 dock, if anything gets worse.  And I got a call late that night,

12 and Steve said, yeah, it's taking on much more -- you could see

13 it now.  And I said, Well, head to as deep of water as you can,

14 get as far out there as you can.

15 Q.   And did you get an email from Dan Keen that says, "Agree.

16 Head to deep water"?  At 6:37 p.m., is that an email you got

17 from Dan?

18 A.   Yeah.

19 Q.   Okay.  And then this is Dan -- do you remember getting that

20 from Dan?

21 A.   Yeah, yeah, I believe that was sent to me as well.

22 Q.   Okay.

23          And then we -- 9:43, 10:00 p.m., looks like from you to

24 *Ocean Ranger*, and we heard John Cowgill saying he saw this.  So

25 is this you sending that to the *Ocean Ranger* at 10:00 p.m.?

1    See?

2    A.    I'm -- yeah, from home there.

3    Q.    Yeah, you're at home?

4    A.    Yeah.

5    Q.    And you forward Dan's message?

6    A.    Yeah.

7    Q.    With the diagram.  It's 10:00 p.m.  So that gets to the

8    tug.  And then here, 3:13 a.m.  When did you turn in that

9    evening?

10   A.    Yeah, I guess I must have sent it at that time, right, 3:00

11   in the morning?

12   Q.    The email is 3:13.  Whether or not you were awake to get

13   it, who knows.  But it was probably morning?

14   A.    Yeah.  I see, yes.

15   Q.    Okay.  So after you had this discussion with Steve about

16   heading to deep water, did you get any more reports from the

17   tug's view?

18   A.    I thought he called me, actually, when it did sink.  And I

19   don't think I sent Dan anything in the middle of the night.

20   Q.    Uh-huh.  Okay.  All right.

21         And throughout all of this, in your dealing with Dan,

22   emails and that sort of thing, did you ever get any indication

23   from Vigor that the dock was going to sink?

24   A.    No.

25   Q.    Did you ever get any indication from Vigor that they were

1   going to do anything else but see you in the morning?

2   A.    No, I don't think there was anything else that I was

3   expecting.

4         MR. SIMMS:  Okay.  No notes coming my direction, so

5   I'll turn you over to Vigor.

6         THE WITNESS:  Okay.

7                        CROSS-EXAMINATION

8   BY MR. HOWARD:

9   Q.    Good afternoon, Mr. Shrewsbury.  Can you hear me okay?

10  A.    Yes.

11  Q.    I understand you're hard of hearing --

12  A.    Yep.

13  Q.    -- so tell me any time if I speak too quickly or softly.

14  A.    Okay.

15  Q.    I'm Christopher Howard.  We have not met.  I may be asking

16  you questions, occasionally, from your deposition that

17  Mr. Boyajian, my partner to my left, took.  Do you recall him?

18  A.    Yes.

19  Q.    Starting at the beginning for this transaction, for the

20  contract, you wrote the contract for this case, correct?

21  A.    No.  I'm not an attorney.  I did not write the contract.

22  Q.    You took a form that you had your attorneys create, and you

23  put that into it?

24  A.    That was one of our standard contracts that they'd produced

25  that we've used with a couple other customers.

1  Q.   So clarify.  Did you actually send this contract, this

2  particular one with Vigor, off to your attorneys to draft, or

3  did you use your attorneys' form?

4  A.   No.  We used their form.

5  Q.   Were there attorneys involved in negotiating this contract

6  with Vigor, or just the parties?

7  A.   No, not that I remember.

8  Q.   And you were familiar with the YFD 70 from personally --

9  you personally had moved it around and moved boats in and out of

10  it?

11  A.   Yes.

12  Q.   You've known that dry dock for years, if not decades,

13  right?

14  A.   Well, for a while, yes.

15  Q.   And would it be accurate to say that the port is a small

16  place, a small neighborhood; you know what's going on there?

17  A.   Yeah.

18  Q.   So you've seen Vigor --

19  A.   Yeah.

20  Q.   -- do their work on it, fix it up, and maintain it?

21  A.   Yeah.

22  Q.   And you knew they kept it up and used it?

23  A.   I knew they used it, yes.

24  Q.   They used it for Navy ships for many years?

25  A.   Yes.

1  Q.   But this is the first time -- well, other than towing it in

2  the harbor, this is the first time Western had tried towing it

3  on a coastal or out in the ocean, correct?

4  A.   Yes.

5  Q.   Now, despite that, you didn't ask for a survey of the

6  vessel -- Western didn't ask for a survey, did it?

7  A.   No.  We were told they were doing one.

8  Q.   And while we're on the contract, we're on the topic of

9  special -- did you express, by the way, to Vigor that you had

10 concerns about the condition of the dry dock?

11 A.   Not -- I don't know that I spoke to anybody about that

12 personally.

13 Q.   Did you have concerns about the dry dock while you were

14 negotiating this?

15 A.   Yeah.

16 Q.   And you didn't ask for a survey, and you didn't --

17 A.   Well, no, I knew they were getting a survey.  I was told

18 they were getting a survey, and Jeff Slesinger knew surveyor, of

19 him, and I knew about it.

20 Q.   And that survey was important to Western, that it was being

21 done, right?

22 A.   Yes.

23 Q.   And the right person to get it at Western was Jeff

24 Slesinger?

25 A.   Yeah.

1  Q.    Is one of Jeff Slesinger's titles -- more than one job

2  title -- port captain for your company?

3  A.    Yes.

4  Q.    So the port captain is the guy in your company who would be

5  getting the survey, and then pass it along to whoever needed it

6  at Western, right?

7  A.    Typically, yes.

8  Q.    And you would expect Jeff Slesinger, once he gets it, to

9  incorporate the special considerations noted in that survey,

10  that report, into your tow plan, wouldn't you?

11  A.    Yeah.

12  Q.    And now when we're on the topic of special considerations,

13  you would expect the information contained in that survey and

14  the recommendations to be the type of special considerations

15  that Vigor would report to Western before undertaking this,

16  right?

17  A.    Say that again, please.

18  Q.    Yeah.  Okay.

19       There is a provision in the contract about special

20  considerations.

21  A.    Yes.

22  Q.    And, in fact, your special considerations, in your mind,

23  would relate to the condition of the dry dock, right?

24  A.    That would be --

25            MR. SIMMS:  Your Honor, I object.  This is

1  misconstruing the contract at the time of the contract.  It

2  says, "We have informed."  It's the point at which special

3  considerations are considered is at the time of the contract,

4  not what they decide to tell later.  So that has to be made

5  clear.

6          THE COURT:  The objection, if there is one, will be

7  overruled.  All I want to know is what the witness knew and

8  understood about that contract.

9      Next question, please.

10          MR. HOWARD:  Okay.  I don't know that that one was

11  answered.  Could I have the court reporter read it back, since

12  it was overruled?

13          THE COURT:  The question was:  "There is a provision

14  in the contract about special considerations.  And, in fact,

15  your special considerations, in your mind, would relate to the

16  condition of the dry dock, right?"

17  A.    That would be one factor.

18  Q.    (By Mr. Howard)  In fact, do you recall when Mr. Boyajian

19  took your deposition on St. Patrick's Day of this year, March

20  17th -- good of you to give up that day.  Do you recall that

21  day?

22  A.    Yes.

23  Q.    And were you under oath that day?

24  A.    I don't know.  Was I?

25  Q.    Well, I believe the court reporter swore you in that day.

1    A.    Okay.

2    Q.    Were you trying to give truthful answers that day?

3    A.    Yeah, yes, yes.

4    Q.    And I believe in front of you is a heavily highlighted copy

5    of page 25 of your deposition from that day.

6          And do you recall, regarding special consideration,

7    Mr. Boyajian asking you if there's something you need to know

8    about how to tow it to do it safely.  "Is that what this is

9    telling you?"  Question.

10         And you answered:  "Yes, partially.  And then there's some

11   condition of that dock that we need to know about, that it may

12   have leaks or something, that we wouldn't be able to see by

13   looking at it ourselves.  So I would assume" -- I'm just going

14   to read one more question and answer.

15         "Okay.  Would this include when they tell you about weather

16   restrictions, this dry dock can't be out in the seas greater

17   than ten feet, is that a special circumstance applicable to this

18   tow?"

19         And you said, "Yeah."

20         Was that correct?

21   A.    Yes.

22   Q.    And you still agree with that testimony you gave?

23   A.    Yes.

24   Q.    Okay.

25         So the restrictions contained in Captain Shaw's report

1  would be important type of special considerations, information

2  that you were expecting to receive under the contract; would

3  that be accurate for you?

4  A.   Yes, that would be some of it.

5  Q.   Were you expecting Vigor to give you a complete rundown of

6  all the maintenance they had done on the dry dock for the last

7  decades?

8  A.   No.

9  Q.   Okay.

10      Do you know what NAVSEA certification is?

11  A.   No.

12  Q.   Okay.

13      So do you know what standards that dry dock had been

14  maintained to over the years prior to its being towed?

15  A.   No.

16  Q.   Okay.  And would that not be your area anyway?

17  A.   Well, I was not familiar with those -- that.

18  Q.   I'm going to change topics because I want to get us done

19  and you out of here today.

20      Mr. Courtney --

21  A.   Yeah.

22  Q.   -- you called Mr. Courtney a few days before this left,

23  correct?

24  A.   Yes.

25  Q.   And, actually, let me do one more thing about the contract

1    relating to whether.

2         You understood, didn't you, that if you didn't get weather

3    you liked or felt comfortable with in October, this could be put

4    off till the spring, right?

5    A.   Yes, that was in the contract.

6    Q.   And you knew that?

7    A.   Yes.

8    Q.   You didn't have to leave in October?

9    A.   Well, we didn't have to, but we knew they wanted to get it

10   out of there.

11   Q.   And you wanted to get the job done?

12   A.   Yeah.  We were trying to help them, yes.

13   Q.   But if you were going to do it safely, you could do it

14   safely later, rather than have to leave in October, right?

15   A.   We possibly wouldn't have been able to do it in the spring.

16   Q.   Was that "would" or "wouldn't"?

17   A.   Would not have been able to, most likely.

18   Q.   Would it be put off further, then, until it was safe?

19        MR. SIMMS:  Objection, Your Honor.  It's misconstruing

20   the contract.  The contract language is very clear.  We've heard

21   the witness testify that the conditions allowed the tow to

22   commence before the deadline of November 6th, and the contract

23   language is very clear.  It's not to imply that this is an

24   option.  He 's not correct under the express terms of contract.

25        THE COURT:  Mr. Howard?

1    MR. HOWARD:  He's already testified that he knew he

2   had an option of putting this off if he was not comfortable with

3   the weather.  He's the one who drafted the contract, and I'm

4   asking him how far he thought he could be allowed to put it off

5   to get clear weather, under the contract.

6    THE COURT:  Mr. Shrewsbury, let me ask you -- I want

7   to clarify this as well.

8    The contract is drafted and it has a specific date, must

9   sail by this date.  If the weather was bad, and that date came

10   and went, then the contract wouldn't apply, correct?

11    THE WITNESS:  Correct.

12    THE COURT:  You would have no contract.  You would

13   have to start over again, right?

14    Mr. Howard, your next question.

15    MR. HOWARD:  Actually, I would like to follow up on

16   that.

17   Q.   (By Mr. Howard)  I've pulled up a portion of Exhibit 4.

18   This is part of the contract that you drafted; is that correct?

19   A.   No.  This is -- Vigor put this in.

20   Q.   But it was in the contract?

21   A.   Yes.  It was something they added.

22   Q.   And you knew about this provision?

23   A.   I guess, yeah.  I signed it, so I must have known about it,

24   yeah.

25   Q.   And under this provision, does it not say that either party

1  may reschedule the tow, at no cost, to a more favorable date in

2  2017?

3  A.   Yes.

4  Q.   Okay.  And you signed the contract with this language in

5  the contract?

6  A.   Yeah.

7  Q.   Okay.  So either party was free to say, Let's put this off

8  till next year?

9        MR. SIMMS:  Objection.  That's not what it says.

10  That's not what it says.  "In the event that the weather

11  conditions do not allow the tow to commence."  We have his

12  testimony that said the weather conditions allowed the tow to

13  commence.

14        THE COURT:  I understand, and I can read the contract,

15  and the court can interpret the contract for itself.

16     Mr. Howard, any other questions?

17        MR. HOWARD:  I believe his understanding is important,

18  and he's testified about that.  Thank you, Your Honor.

19  Q.   (By Mr. Howard)  Now, when it came to calling Mr. Courtney,

20  your recollection is you called him a couple of days before the

21  trip left; is that correct?

22  A.   Yes.

23  Q.   And do you recall what wind conditions and sea states you

24  were asking him about?

25  A.   I was asking him about the extended forecast after that

1    predicted small-craft advisory they had up.  What they thought

2    for -- what he could see for the future.

3    Q.    Okay.

4    A.    I trusted him to know way better than what I could look at

5    a weather map and tell.  I just wanted to know if he felt it was

6    going to be tell -- if we were going to get -- it was going to

7    be a slow tow, we knew, and we had weather restrictions, and I

8    wanted to make sure we had enough days to get far enough south

9    to get out of the northern part in October, because lows come

10   through.  We just had one happen a few days before when we were

11   originally thinking we were going to go, prior to the Mexicans

12   postponing it.  So we didn't want to be in one of those again.

13   Q.    And you know the weather is usually better in California in

14   October.

15   A.    Yes.

16   Q.    Would it be accurate paraphrasing of your memory that what

17   you understood from Mr. Courtney was there are a bunch of

18   low-pressure systems out there, and the first one was expected

19   to pass to the north, and you might be able to get out before

20   the other ones came in?

21   A.    Yeah.  He thought we had a pretty good stretch, and that

22   proved to be the case for us.  I mean, we almost made it to, you

23   know, the -- well, we made it into Northern California when we

24   got the worst weather.

25   Q.    Now, there's been some discussion about an email exchange

1    between you and Mr. Courtney.  Do you recall that?

2    A.    Yeah.

3    Q.    We have put up Exhibit A-66 --

4    A.    Yeah.

5    Q.    -- and the first question I have for you is:  Who is Dan

6    Kelley?

7    A.    He's our operations, slash, personnel manager.  He helps

8    crew the boats and hire employees and schedule the crews on the

9    tugs going where they go so they get the right people on the

10   right boats.

11   Q.    Now, when your port master goes on vacation -- as in when

12   Mr. Slesinger goes on vacation -- would Mr. Kelley fill in for

13   him?

14   A.    Not on everything, no.  We all do --

15   Q.    On this occasion -- sorry.  I did not mean to cut you off.

16   A.    We all fill in.

17   Q.    Who was filling in for Mr. Slesinger on this occasion when

18   he left on October 14th to go get an airplane early on the 15th?

19   A.    I think that was shared between Rich Christensen and

20   myself, I guess.

21   Q.    Did you direct that correspondence come to you that was

22   being sent to Mr. Slesinger?

23   A.    I just assumed Jeff would copy me on anything he got.

24   Q.    But I believe you already testified you never got Captain

25   Shaw's recommendations that were sent to Jeff, correct?

1    A.    Yes, I did not get that.

2    Q.    So I want to turn your attention to Exhibit 66, and in this

3    exchange, do you see that Mr. Kelley is asking for a 12-foot

4    head swell.  Do you know where he got that?

5    A.    I don't know.  I'm assuming that Jeff possibly called him

6    and talked to him, or -- and he misconstrued it or -- I don't

7    know where that all came from.  I'm assuming it came through

8    Jeff, for him to contact Rich to update him on what we were

9    doing.

10   Q.    And on the next page, please.  On the next page, do you get

11   involved and correct that number, that 12-foot number?

12   A.    Well, yeah, because I had 15.

13   Q.    Right.

14         Now, to be clear, this is October 12th that you're

15   saying -- you're using 15.

16   A.    Yeah.

17   Q.    Is 15-foot the limitation information you gave to the

18   weather person with whom you were consulting?

19   A.    Yeah.  I sent this to him because that's what I had on our

20   tow plan that the Coast Guard approved, and I had not -- nobody

21   had forwarded me Mr. Shaw's.

22   Q.    Okay.

23   A.    Yeah.

24   Q.    No one at Western had forwarded you Mr. Shaw's report?

25   A.    Nobody at all.  I never got a copy of it, that I'm aware

1    of.

2    Q.   Now, I think you indicated the Coast Guard approval was

3    necessary for the permit because of the nature of the tow,

4    correct?

5    A.   Yes.

6    Q.   But you don't expect the Coast Guard to do any separate

7    analysis of whether or not the weather is appropriate.  You're

8    not relying on them to do an analysis, are you?

9    A.   Well, we put it in our tow plan, so we expected them, if

10   they didn't think it was right, to correct that.

11   Q.   If they had the information that Western had regarding what

12   the surveyor had -- what Captain Shaw said, they might change

13   it, for example?

14   A.   Yeah --

15          MR. SIMMS:  Objection; calls for speculation.

16          THE COURT:  That will be sustained.

17   Q.   (By Mr. Howard)  I left up part of Exhibit 66, but the real

18   question I want to ask from Exhibit 66 is:  Did you ever contact

19   Mr. Courtney and say, What about a ten-foot sea?  I need to

20   change your projection based upon a ten-foot sea.

21   A.   No, I didn't, because I never talked to him again after

22   that -- later that week, two or three days later.  And I still

23   hadn't been -- I never knew the ten-foot thing until the dry

24   dock -- sometime after the dry dock passed.

25   Q.   Okay.  So whatever information you got from Mr. Courtney

1  was based upon him being asked to project weather for a 15-foot

2  sea; is that correct?

3  A.    Yeah, if -- yes, that would have been correct.

4  Q.    Now, were you in on the decision of whether or not to go or

5  not to go when they got to Cape Flattery?

6  A.    Yeah.  I believe I talked with Stephen out there on the

7  boat, and we agreed that it was good to go, and if we -- if --

8  if we found a change in the weather that wasn't acceptable, that

9  we still had a chance to turn around there.

10 Q.    Now, unfortunately, for some reason, you still had not seen

11 Captain Shaw's reports or recommendations at that point; is that

12 correct?

13 A.    I had not, no.

14 Q.    Okay.

15       But you would agree that if, at Cape Flattery, there were

16 forecasts that exceeded the recommendations, and you had known

17 that, you would have said, Don't go?

18 A.    I would have needed -- I would need to see the direction of

19 the weather.  If it was an offshore's easterly, southeast,

20 and -- you know, I wasn't worried about the wind speed as I was

21 the swell, and it would have depended what that forecast showed

22 for me to make a -- change the direction.

23       I was more worried about getting further down the coast

24 prior to anything else developing.

25 Q.    So you're saying it would have been a judgment call that

1  you and the captain would have made, even if you had forecasts

2  that exceeded the restrictions placed on the tow at Cape

3  Flattery?

4  A.    Yeah.  We were basing our numbers on the swell condition,

5  and, obviously, we considered the wind in that, the wind and the

6  direction, but to get five or ten knots of wind from the east,

7  more than 25 knots isn't going to make -- you know, we

8  understand that this is all about the swell and the swell in the

9  ocean affecting the strength of that dry dock, and that was the

10 critical part.

11 Q.    And you knew that at the time?

12 A.    Pardon me?

13 Q.    You knew that at the time.

14 A.    Yeah.  I mean, that's -- we have tows where the wind is

15 critical, where you're towing a container crane or something,

16 and the thing is 120 feet off the deck, if you get too high a

17 wind, it will blow you backwards.

18        But on this particular tow, we understood the swell

19 condition was the key to this safety.  And, unfortunately, I

20 didn't know it got changed to ten feet.  Originally -- when Jeff

21 Slesinger talked to Mr. Shaw, it was originally -- he agreed on

22 our tow plan, but I didn't know that they changed it.

23 Q.    And if Jeff Slesinger had informed you of that and

24 forwarded the recommendations, that might have changed some of

25 your thinking in this matter?

1   A.    It might have.  On the weather we were looking at there, I

2   doubt it would have, but --

3   Q.    And is there a period of time, after you pass Cape

4   Flattery, where you get a forecast of gale winds, you still have

5   time to turn around?

6   A.    Yes.

7   Q.    How far is that?

8   A.    It depends on how fast it's coming at you, how far down you

9   go.  For this tow, if we thought we were going to get over ten

10  feet and we were more than, you know, 80 miles south of there or

11  something, it probably wouldn't have made sense.

12  Q.    So if you had a 35-mile-an-hour wind projection within an

13  hour or two or three, or even five hours after passing Cape

14  Flattery, would you have said, Let's turn around?

15  A.    I would have to see the forecast.  I can't say that.

16  Q.    You would agree, wouldn't you, that you were concerned

17  about that, but it hit a storm within one day, and the tow was

18  fine, right?

19  A.    No, it didn't hit a storm.

20  Q.    It hit heavy seas that exceeded the restrictions within one

21  day.

22  A.    Yeah, they weren't gale-force winds.  They were small-craft

23  warnings, as I remember, and, you know, we had seas close to ten

24  feet, eight feet or whatever, but it was, obviously, okay.  The

25  dry dock never changed after that for days.

1  Q.    Now, when the list was first noticed, you were involved; is

2  that correct?

3  A.    Yes.

4  Q.    Now, I want to go through this without getting into issues

5  that relate to necessarily Western but the focus on what Vigor

6  did.

7      Your counsel asked a question that compounded the decision

8  for Monterey and San Francisco, and I want to break those up as

9  a non-compound question.

10     You engaged a number of people in the discussion about

11  possibly going to San Francisco to do repair work, right?

12  A.    Yeah.

13  Q.    But the decision to no-go San Francisco, this is too

14  dangerous, that was your decision, wasn't it?

15  A.    Yeah.

16  Q.    And you told Vigor afterwards?

17  A.    I called them and told them what I was thinking, as I

18  remember, why we should change this idea.

19  Q.    And it was a good idea to change it, wasn't it?

20  A.    It turned out it was, yes.

21  Q.    And like I say, that was your idea, you made the decision,

22  you take ownership for that, right?

23  A.    Yeah, I got it.

24  Q.    And you weren't basing that on anything Dan told you about

25  the condition of the dry dock, right?

1  A.   Well, I was -- no.  I was hoping Dan was right, but I was

2  planning for the worst.

3  Q.   Okay.

4       And did Dan ever get updated photos or further data beyond

5  the one or two photos you sent early on?

6  A.   None of us did because the fog set in.

7  Q.   So no one ever told Dan about the increasing list, as far

8  as you know?

9  A.   No, because nobody knew that.

10 Q.   Now, the decision, after leaving San Francisco, which was

11 your decision, the decision to head out to go to Monterey was

12 also your decision.  You weren't relying on Vigor telling you to

13 go to Monterey, were you?

14 A.   Well, we were -- I was also going by what the Coast Guard

15 had agreed.

16 Q.   Okay.

17      But I'm, actually, focusing not on Western's decision, but

18 Vigor wasn't involved in that decision, but they were informed

19 of the decision.  Would you agree with that?

20 A.   To?

21 Q.   To go to Monterey.  It's like, Meet us in Monterey, not San

22 Francisco.

23 A.   No, I thought we all agreed on that, that it made the most

24 sense.  I don't remember if it was myself or Russ, but we told

25 them of companies that could help us get people down there and

1    get to the tow, if we could arrive there.

2    Q.   Once again, I'm going to ask you to take a look at your

3    deposition.

4    A.   Okay.

5    Q.   A few months ago.

6    A.   Yeah.

7    Q.   At page 63 at line 3 -- actually, go back to page -- are

8    you able to go to page 62?  I'll have to ask the question on

9    page 62, if I may, because we may not have a pre-page 62.

10        You were asked:  "And what was that conversation, to the

11   best you can recall it, understanding it was five years ago?"

12        And your answer -- oh, sorry.  Actually, I have the wrong

13   one here.  Go to 68.

14        Starting at 67 -- at line 18 on 67, you were asked:  "Is

15   that one of the reasons that you decided it just makes no sense

16   to go to San Francisco?"

17        And you said, "Yes."

18        "Who else was in on that decision?"

19        And you said, "Nobody."

20        "Just you coming from the top, you thought it over and

21   decided" -- page 68, and you answered -- are we on 68 yet?

22   Ms. Ivie?

23             MS. IVIE:  No, we're not.

24             MR. HOWARD:  Okay.

25        And, Your Honor, I'm almost done.

 1          THE WITNESS:  Are you waiting for an answer?

 2          MR. HOWARD:  No, I've got the answer.  I just wanted

 3   to...

 4      Your Honor, may we approach and give him a copy of the

 5   deposition?  We're having trouble getting it on the screen.

 6          THE COURT:  That's fine.

 7   A.   From what I did see, yeah.

 8   Q.   (By Mr. Howard)  Okay.  Here's the answer:  "Yes, I called

 9   the tug, and I called Dan afterwards, and I said, 'We don't even

10   want to take a chance on that.'"

11      And then, "Okay."

12      "Then we started looking to options for telling some

13   companies that could help us in Monterey to come down to the

14   bay, if we needed to do that."

15      So you made those calls --

16   A.   Yes.

17   Q.   -- and you informed Vigor afterwards?

18   A.   Yes.

19   Q.   Okay.

20      And I don't want to go into the rest of it.  I just needed

21   to establish that portion of it.

22   A.   Yes.

23   Q.   You never discussed sanctuaries with Vigor, either, did

24   you?

25   A.   No, not at that time, no.

1  Q.   And that's not something you would expect them to know

2  about, is it?

3  A.   No.  None of us were looking at a chart at that time.

4       MR. HOWARD:  Okay.  Thank you.  I have no other

5  questions.

6       THE COURT:  Mr. Simms, anything further?

7       MR. SIMMS:  Yeah.  Let's just go right at the "looking

8  for options, telling some companies."

9                    REDIRECT EXAMINATION

10 BY MR. SIMMS:

11 Q.   "Looking for options and telling some companies."  Was it

12 you or Vigor who called Global Diving?

13 A.   It was not me.

14 Q.   Okay.  Was it Western or Vigor that called Global Diving?

15 A.   It was Vigor.

16 Q.   Was it Western or Vigor that called Greger Towing?

17 A.   It was not Western, no.

18 Q.   And so you had some ideas about options.  Was it Vigor that

19 then executed on putting those options in operation?

20 A.   Yes.

21 Q.   Did you -- to punctuate this a little bit, I'll risk being

22 facetious.

23      Did you make the airline reservations for Dan Keen to come

24 to San Francisco?

25 A.   No.

1    MR. SIMMS:  Okay.  No more questions.

2    THE COURT:  Mr. Shrewsbury, thank you.  You may step

3  down.  You're free to go.

4    Counsel, we're at the end of our day.  Who are you

5  expecting to call as witnesses?

6    MR. SIMMS:  We'll call Russ Shrewsbury, to start off

7  with.  Then I think we will go with Dr. Hudson by telephone.

8  Then we will go with Dr. Kriebel, and then we will go with

9  Captain Fox.  And, oh, I'm sorry.  In there somewhere is Mike

10  Naylor.

11    THE COURT:  All right.  You're quite aware of my

12  schedule.  My schedule is pretty jammed with criminal matters,

13  so I anticipate that will take probably the bulk of the day.

14    MR. SIMMS:  I've been losing bets on whether I can get

15  things done fast enough.  So I think that's right, Your Honor,

16  it will.

17    THE COURT:  So to help us in terms of scheduling, how

18  long would Vigor anticipate their witnesses will take?

19    MR. JARRETT:  Your Honor, at the risk of talking

20  without my partner's knowledge, we have mostly experts left to

21  testify.  And I think if we can negotiate the stipulation or

22  proffer that we've been talking to Mr. Simms about on another

23  matter, then I think a day.

24    I mean, now, I'm not speaking for Mr. Simms on

25  cross-examination, but a day, day and a half.  I think a day and

1    a half is probably what we should reserve.

2              THE COURT:  All right.

3         All right.  I'll see you at nine o'clock tomorrow morning.

4

5                   (Proceedings adjourned at 4:20 p.m.)

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 2nd day of August 2021.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter