UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE.

_____

WESTERN TOWBOAT COMPANY,          ) CASE NO. C20-00416-RSM
                                  )
                    Plaintiff,    ) Seattle, Washington
                                  )
v.                                ) July 1, 2021
                                  ) 9:00 a.m.
VIGOR MARINE, LLC,                )
                                  ) BENCH TRIAL
                    Defendant.    ) Vol. 4 of 5
                                  )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

  For the Plaintiff:      J. STEPHEN SIMMS
                          Simms Showers LLP
                          201 International Circle, Suite 230
                          Baltimore, MD 21030

                          ANTHONY J. GASPICH
                          Gaspich Law Office PLLC
                          8094 NE Barthrop Place
                          Bainbridge Island, WA 98110

  For the Defendant:      CHRISTOPHER H. HOWARD
                          DAVID R. BOYAJIAN
                          Schwabe Williamson & Wyatt
                          1420 Fifth Avenue, Suite 3400
                          Seattle, WA 98101

                          NOAH JARRETT
                          Schwabe Williamson & Wyatt
                          1211 SW Fifth Avenue, Suite 1900
                          Portland, OR 97204

                          ADAM MURRAY
                          Schwabe Williamson & Wyatt
                          700 Washington Street, Suite 701
                          Vancouver, WA 98660

EXAMINATION INDEX

| EXAMINATION OF | | PAGE |
|---|---|---|
| RUSSELL SHREWSBURY | DIRECT EXAMINATION<br>BY MR. SIMMS | 587 |
| | CROSS-EXAMINATION<br>BY MR. JARRETT | 637 |
| | REDIRECT EXAMINATION<br>BY MR. SIMMS | 664 |
| PATRICK HUDSON | DIRECT EXAMINATION<br>BY MR. SIMMS | 667 |
| | CROSS-EXAMINATION<br>BY MR. HOWARD | 695 |
| | REDIRECT EXAMINATION<br>BY MR. SIMMS | 715 |
| DAVID KRIEBEL | DIRECT EXAMINATION<br>BY MR. SIMMS | 719 |
| | CROSS-EXAMINATION<br>BY MR. BOYAJIAN | 727 |
| | REDIRECT EXAMINATION<br>BY MR. SIMMS | 744 |
| BRUCE FOX | N/A | 750 |
| MICHAEL NAYLOR | DIRECT EXAMINATION<br>BY MR. HOWARD | 760 |
| | CROSS-EXAMINATION<br>BY MR. SIMMS | 789 |
| | REDIRECT EXAMINATION<br>BY MR. HOWARD | 806 |

1          PROCEEDINGS

2     _____

3          THE COURT:  Counsel, call your next witness.

4          MR. SIMMS:  Your Honor, we will call Russ Shrewsbury,

5     who is in the restroom as we speak.

6          So the order of witnesses today will be Russ Shrewsbury,

7     then we'll hear from Dr. Patrick Hudson, and then we'll hear

8     from Bruce Fox, Captain Fox.

9          Will Mr. Naylor be here today?

10          MR. HOWARD:  He'll be here this afternoon.

11          MR. SIMMS:  Then we'll call Mr. Naylor this afternoon,

12     and then we'll call Dr. Kriebel.

13          THE COURT:  Mr. Shrewsbury, good morning.  If I could

14     have you step up before the clerk to be sworn to testify prior

15     to testifying.

16                    RUSSELL SHREWSBURY,
          having been first duly sworn, testified as follows:
17

18          THE CLERK:  Please state your name for the record, and

19     spell your name for the court reporter.

20          THE WITNESS:  It's Russell Shrewsbury,

21     S-h-r-e-w-s-b-u-r-y.

22          THE COURT:  You may inquire, counsel.

23                    DIRECT EXAMINATION

24     BY MR. SIMMS:

25     Q.   So Mr. Shrewsbury, tell us what you do at Western Towboat.

1  A.    I'm the vice president and captain.

2  Q.    And you're also Bob Shrewsbury's son?

3  A.    Yes.  Third generation mariner at Western Towboat.

4  Q.    How long have you worked with Western Towboat?

5  A.    Well, my mom was on the tug pregnant with me, so I guess 37

6  years.  But as a deckhand, I started as a full-share deckhand at

7  13, but going to Alaska is five.

8  Q.    Since five years old.

9        How many times as a deckhand, as a -- do you hold a

10  master's license?

11  A.    I do.  I have a 3rd Mate Unlimited and a Master of Towing,

12  which is, basically, good for all towing vessels.

13  Q.    Have you ever towed up and down the West Coast?

14  A.    I have.

15  Q.    How many times?

16  A.    Oh, probably ten.  I've been in the Panama Canal a couple

17  of times -- oh, probably more, like, 20, actually.

18  Q.    And did you go to school?

19  A.    I went to Cal Maritime.  I graduated in 2006.

20  Q.    What were some of the courses you took at Cal Maritime?

21  A.    I was transportation, like Stephen and Rich Shaw, so we had

22  stability, navigation, meteorology, bridge simulation; a whole

23  bunch of different things.

24  Q.    What was your degree from Cal Maritime?

25  A.    I was a bachelor of science in marine transportation, and I

1   almost minored in law.

2   Q.   All right.  Almost.

3        And so tell the court about the relationship between

4   Western Towboat and Vigor.

5   A.   We've been doing dry dock work around Seattle for Vigor

6   tows, various things, I'd say, for as long as I can remember,

7   probably 30-plus years, before Vigor was Todd Shipyard.  And we

8   performed a lot of the dry dockings at Todd when I was growing

9   up as a deckhand.

10       And I worked in the harbor for about ten years prior to

11  coming into the office as a master, and we exclusively do all of

12  their dry dock operations and tows from various places with

13  different types of things:  Navy caissons, ships, ferries,

14  barges in and out of the shipyard to different destinations

15  around Puget Sound and Portland; stuff like that.

16  Q.   When you were doing this work, how long have you yourself

17  been moving things around, first Todd, and then when Vigor took

18  over the Vigor shipyard?

19  A.   I would say -- let's see.  I started working on the

20  weekends in high school, so that would be 1998 and '99.

21  Q.   On your route from home to the office, does that take you

22  by Vigor Shipyard?

23  A.   I live just north of Seattle, so -- well, when I drive

24  to -- the time, I was working out of Harbor Island, so, yeah,

25  I'd drive by the shipyard on Aurora/99 when we had a viaduct.

1  Q.    During all that time, did you see the 70?

2  A.    Yeah.  When I was working the harbor, we'd sometimes

3  transit up and down the river past Vigor Shipyard maybe 20, 30

4  times a day.

5  Q.    And did you ever see the 70 taken apart into more than one

6  piece?

7  A.    I don't remember ever seeing that, no.

8  Q.    So have you always seen the 70 in one piece?

9  A.    Yes.

10  Q.    And you've been here since Monday, since we started trial.

11  You've heard all the testimony, and you were here for Dan Keen's

12  testimony about what Vigor hires Western to do and what it

13  doesn't.  Do you agree with that?

14  A.    No.

15  Q.    Please tell us why.

16  A.    I just quoted a job to tow the Pacific Collector from

17  Portland to Seattle -- what was that? -- six months ago.  So

18  Vigor does contract us to do outside towing.  Dan said they have

19  not since this incident, and that's false.

20  Q.    And did somebody at Vigor reach out and ask for that quote?

21  A.    Clint Krueger of Portland.

22  Q.    Okay.

23       And so what does Western continue to do now for Vigor?  Is

24  there a business relationship?

25  A.    There is, yeah.  Dan and I talk all the time.  This last

1  week we put a DDG in dry dock, an LCS Navy ship.  We do all the

2  Washington State ferries; caissons.  We moved both their old dry

3  docks, one from Everett to Seattle for dismantling/scrapping at

4  their shipyard.  We moved a concrete dry dock from Tacoma.  We

5  towed it up to Seattle for dismantling.  So we've moved a few

6  different oddball things for them.

7  Q.  Are there any Shrewsburys in your family that might be

8  coming into this business sometime?

9  A.  Yeah.  I've got two kids, a daughter and a son.

10 Q.  How old are they?

11 A.  Four and a half and two and a half.

12 Q.  So that will be a while.

13 A.  Yeah, and then I can retire.

14 Q.  Okay.

15     So do you consider Dan a friend?

16 A.  Absolutely, yeah.

17 Q.  How long have you known Dan?

18 A.  Since he started at Vigor.  I think he said 2013.  I guess

19 it is.  Time seems to fly now.

20 Q.  What do you understand Dan's responsibility to be at Vigor?

21 A.  Dan's in charge of all the docks and the moves we do.  So

22 when we talk with Dan, he's going to tell us, you know, how he

23 wants vessel in dry dock, when he wants it due to tide, and

24 he'll cancel dry dockings if the weather is bad or something

25 like that.  He's, basically, Vigor's liaison to Western Towboat.

1    He orders the tugs and directs what we need to do at the

2    shipyard for him.

3    Q.    Well, do you ever talk with Dan -- we all talk with each

4    other about the weather -- but do you ever talk to Dan about the

5    weather in connection with work that Western does?

6    A.    Oh, all the time.

7    Q.    Did that indicate to you that Dan is regularly monitoring

8    the weather?

9    A.    Yes, because he's canceled dry dockings before due to high

10   winds in the Sound or something like that.

11   Q.    And we'll get to the day of the departure, but I want to

12   still go back a little bit.

13        Before the contract -- and I'll put up the tow contract and

14   mark the date, October 4th.

15        Before October 4th, did you have any familiarity with the

16   70?

17   A.    Yes.

18   Q.    Okay.  What was that?  Why?

19   A.    We'd been moving it around the yard.  The Emerald Sea, I

20   was a tow master for Western Towboat, and Vigor had a couple

21   heavy-lift ships come in and take down the Emerald Sea down to

22   Mexico before all this happened.  So once the Emerald Sea left,

23   we were moving the 70 around in the shipyard there to a

24   different berth to get it ready for -- I don't even remember

25   why.  There was a week were, I remember, we were juggling dry

1    dock pieces all over the shipyard.

2    Q.    So were you involved in the discussion to use a heavy-lift

3    ship to transport the 70?

4    A.    I remember there being talk of it.  When we were doing the

5    Emerald Sea, there was talk that they may put it on a heavy-lift

6    ship, but it was just kind of, you know, in passing.

7    Q.    Were you aware of the proposal -- not just the heavy-lift

8    ship -- transporting the dock in three pieces aboard the

9    heavy-lift?

10   A.    No, I never heard that.

11   Q.    Well, did you have any understanding of how they were going

12   to do that without breaking it into three pieces?

13   A.    Well, the Emerald Sea was a large dock, and what they did

14   when they loaded it on the heavy-lift ship -- the ship is

15   square, if you will, and they canted it at a 45 on the deck,

16   because of the length.  So it was overhanging the sides of the

17   ship, and then it welded to the deck of the heavy-lift ship.  So

18   I assume that's how they would do it.

19   Q.    Did Western assist putting the Emerald Sea on the

20   heavy-lift ship?

21   A.    We did, yeah.

22   Q.    What -- in advance of signing this contract -- if any,

23   discussions did you have with Dan Keen, with Paul Torrey about

24   moving the dock, the 70, in one piece to Ensenada?

25   A.    I remember Dan asking if we'd be interested in giving him a

1   quote to tow it to Mexico, and I said, "Yeah, I think we can do

2   that."  At the time, I wasn't doing quotes, so I had mentioned

3   it to my dad, and he said he would work up the numbers for it.

4   Q.    Did Dan say anything about the capability, suitability of

5   the 70 being towed to Ensenada?

6   A.    The only thing that was mentioned was that he was working

7   on the -- when we decided that we were going to tow it, he had

8   someone do an engineering for the tow pads.  Vigor was going to

9   be in charge of rigging the tow gear, and they had an engineer

10  calculate everything.  And all we needed to provide was our tug

11  and then a shot of chain to marry in to their tow jewelry.

12  Q.    Okay.  So did you learn that Vigor would be installing new

13  tow connections before the contract, or after?

14  A.    I believe this was -- it would have been -- I don't

15  remember offhand.  I think it was after, most likely.

16  Q.    Okay.

17        And do you and Dan, in the course of your relationship --

18  do you still work with Dan at the Vigor?

19  A.    Yeah.  From time to time, I get to be on my floating

20  office.

21  Q.    Was it your habit to talk with him about the weather and

22  the weather expected in connection with that work?

23  A.    Yes.

24  Q.    Okay.

25        So you turned the contracting over to your dad, and we've

1  seen how we got here.

2      So after the contract was signed -- oh, before I go there:

3      So as you were transporting the 70 down around at the Vigor

4  yard or Todd Shipyard -- let's talk about Vigor yard in 2015.

5  Did you ever any see repairs being done on the 70?

6  A.    No.

7  Q.    What was going on with the 70 during, let's say, the year

8  before -- two years before?

9          MR. JARRETT:  Objection; no foundation for that for

10  witness's testimony about...

11          THE COURT:  Hang on.

12      The objection will be sustained.

13      Ask your next question.

14  Q.    (By Mr. Simms)  So let's go back a year before the tow.

15  All right?  Were you familiar with the 70?

16  A.    Yes.

17  Q.    Did you see it on a regular basis?

18  A.    Yes.

19  Q.    And so did you move it around before this tow we're going

20  to talk about?

21  A.    Many times.

22  Q.    And when you did that, when you saw it, did you ever see

23  anybody working on the 70 to make repairs, improvements?

24  A.    No.

25  Q.    Okay.  All right.

1    And did you ever get a call from Vigor -- did Western ever

2   get a call from Vigor saying, Hey, we'd like you to come over

3   here and help us move the dock so we can make some repairs?

4   A.   No.

5   Q.   All right.  So we've got the contract here, and between the

6   time of this contract and the time the tow departed, did you

7   ever come to Vigor Shipyard?

8   A.   Yes.

9   Q.   Okay.  This is between October 4th and the 17th.  Okay.

10   All right.

11       How regularly, if at all?

12   A.   I can't recall, but I would be -- I know I went there -- I

13   sailed the tow the day it left.  I was running the harbor tug of

14   ours.  And then -- I can't remember what day it was, but I know

15   shortly, like a month or -- I can't remember when, but the dock

16   almost blew off the dock there in a wind storm.  I remember

17   pushing on it.  I think it was that section.  I can't -- it was

18   early October.  That might have been before.

19   Q.   Okay.  Okay.

20       So -- and during that time, did you dee any repairs being

21   done on the 70?

22   A.   No.

23   Q.   So the contract comes in, and then tell the court what

24   happened after that.

25   A.   Remember talking with Rich Shaw.  He set up, I believe, him

1   and Jeff -- or him to meet Jeff to survey the Ocean Ranger to

2   make sure it was suitable for the tow.

3       And then Rich and I and Dan were all talking about we

4   were -- we were going back and forth about when everybody was

5   going to leave.  Rich -- I ended up getting the draft -- I can't

6   remember if Rich sent it to me or if Jeff did, but the survey --

7   Q.   Let me put up, the draft tow plan.

8       Was this the draft tow plan?

9   A.   Yes.

10  Q.   And it's hard to read the overlay here, so I'll go through

11  a few pages.

12      But did you get a draft that said, "Draft, do not

13  disseminate.  Not to be considered all inclusive"?

14  A.   I believe the one I'd received, yes.

15  Q.   "Do not disseminate.  Not to be considered all inclusive."

16  A.   Yes.  I remember I needed something, because I was going to

17  submit our tow plan, and this had to go with it to the United

18  States Coast Guard for Waterways Sector Puget Sound for the

19  voyage.

20  Q.   And I'll down to the bottom here.  There's a date, October

21  6, two days after the contract date.  Is this when you got the

22  draft survey from Rich Shaw?

23  A.   It would have been right around there when I sent it to the

24  Coast Guard, because, generally, when you send a plan to the

25  Coast Guard, if you want it done overnight, you're dreaming.  It

1    takes about week or two to get it approved.

2          MR. SIMMS:  And in the record already entered, Your

3    Honor, we have the tow plan, we have the Coast Guard approval,

4    and all that.

5          MR. JARRETT:  Your Honor, we don't have that in the

6    record.

7          MR. SIMMS:  We do.

8          MR. JARRETT:  The Coast Guard approval tow plan, Your

9    Honor --

10          MR. SIMMS:  Yes, we do.

11          MR. JARRETT:  But I only wanted to make that objection

12    for the record.  I don't mean to interfere with counsel's

13    direct.

14          THE COURT:  All right.

15   Q.   (By Mr. Simms)  So did you have any conversations with Rich

16   Shaw about this tow and the survey?

17   A.   I did.

18   Q.   So tell the court everything you remember, from the

19   earliest to the time of the tow's departure, of the

20   conversations you had with Rich Shaw about this draft survey.

21   A.   I've known Rich from our Cal Maritime alumni dinners and

22   everything, and he called me up and said, "Hey, I'm doing this

23   survey for this tow to Ensenada with the dry dock," and he goes,

24   "What tug are you going to use?"  And I said, "Oh, the *Ocean*

25   *Ranger*," and that when I set him up -- I said, "I'll get you

1    Jeff's number so you can come down to the yard and do your
2    survey," which is pretty standard.  This is, you know, before
3    the tow, you know, he has to approve the tug.  And he said -- we
4    were talking about weather, and I said, "Yeah" -- he mentioned,
5    he goes, "Well, 15 feet," and I said, "Yeah, okay, 15 feet," I
6    go, you know, "That's going to be what it's going to be."  We
7    were just kind of -- you know, we were interchanging stuff
8    quickly.  And he said, "Okay, well, we'll get the tug done."
9    And then I was waiting, and I said, "Well, when I get the
10   survey, I'll send it all to the Coast Guard, and we'll get our
11   tow plan submitted, we can get going with this thing."
12   Q.   Okay.  So that was the first conversation.  Was that a
13   conversation with Rick Shaw in person, over the phone?
14   A.   That would have been over the phone.
15   Q.   Okay.
16        And so was that the first part of October, after the
17   contract was signed?
18   A.   Yes.
19   Q.   Okay.
20        And so then did you have any more conversations with Rich
21   Shaw after this first conversation?
22   A.   There was the -- well, when we were all -- we had that
23   storm come up, and everybody was getting ready to go with this
24   dock.  And I remember we were all watching the weather.  We were
25   waiting to go with this thing, and then there was that storm.

1   And we'd all been talking -- Rich, Dan, my dad.

2       My dad was, kind of, more doing the weather side of things

3   for Western Towboat.  I was more of the liaison between Rich and

4   Dan because of my connection with both of them, day-to-day

5   working.

6       And we all kind of -- I said, "Hey" -- and we'd all been

7   watching the weather.  I said, "We're thinking we should all

8   leave on Monday, the 17th," and I called Rich, and he said yes,

9   and Dan said, "Okay, we'll all get going on the 17th.  It looks

10  good."

11      And so we -- this probably on a -- I think it was a

12  Saturday or a Sunday we decided that.  Then we got the crew up

13  and we got the tug crewed up in the morning, and we departed on

14  that Monday.

15  Q.   Did Rich ever talk with you about the recommendations in

16  the draft tow plan?

17  A.   No, other than he told me that he felt the tow was good to

18  go and everything looks good.  That's basically what he said.

19  He said, "This thing is Navy-built.  It's tough."

20  Q.   He said, "This thing is Navy-built.  It's tough."  Did he

21  tell you that?

22  A.   Something to that effect, I believe, yes.

23  Q.   Okay.  When did he tell you that?

24  A.   That would have been -- oh, after -- in that first phone

25  call.

1  Q.   And so how many conversations did you have with Rich Shaw

2  after the first phone call before the --

3  A.   Oh, there probably would have been a few in between.

4  Q.   More than five, less than five?

5  A.   I want to say that phone call was a few days after he

6  surveyed the *Ocean Ranger*, because he called to tell me how nice

7  of a boat it was.

8  Q.   Okay.  Okay.

9       And did you see him in person at any time?

10  A.   I think I saw him in the yard the day it was leaving

11  from -- or maybe showing up for the survey.  I can't remember,

12  to be honest.

13  Q.   Okay.

14       Now, let's focus on your conversations with Dan Keen after

15  this contract.  Tell us the earliest one, and let's run through

16  the time the tow left.

17  A.   I think I had just been talking to Dan.  From what I

18  remember, we would have been talking shipyard stuff, like moving

19  stuff around.  I remember Dan telling me that -- you know, they

20  had -- I said, "Well, how are we going to tow this thing?"  He

21  said, "Well, I've got the engineers, and we're going to have

22  these two pendant wires that run to some bits on the dock, and

23  the engineering has been done for the strength of all this, and

24  then we have the tow jewelry/surge chain put together."  And

25  then we were talking about how we were going to hook up the tow.

1    So the way the tow was hooked up is, Dan was going to crane

2    the pigtail, which is -- you have a tow bridle chain, then

3    there's kind of a long piece -- it looks like peace sign, right?

4    And then he craned that piece onto the tug, and I got onto our

5    tug, if I remember right, and helped hook up our chain to it.

6    And then we, basically, just pulled the tow off the dock with

7    the two tugs laterally, and off we went.

8    But most of the conversation was about tow prep.  Like, Dan

9    was getting an emergency towline, and he asked what size rope

10   and -- I can't remember if he was looking for a buoy or

11   something, maybe, for the trailing line, and I had to get him

12   one or something.  I can't remember offhand.

13   Q.   Did Vigor install new tow connections to the 70?

14   A.   Yes.  I believe he installed new pad eyes, and he sourced

15   all the rigging gear.

16   Q.   And did you send that configuration to the Coast Guard as

17   part of the tow plan approval?

18   A.   I did, because Dan had sent me the configuration that he

19   had.  So it was the tow plan, Rick Shaw's draft, which is on the

20   screen, and then there was the engineer's drawing of the towing

21   connection of the YFD 70, or whatever it was, the dry dock.

22   Q.   Did Dan design the new pad eyes, the connection?

23   A.   I don't know.  I'd assume.  He said an engineer did it.

24   Q.   So describe to the court where that was located on the 70.

25   A.   There was two pad eyes that were about 40 or 50 back on the

1    pontoon -- on the deck of the dry dock.  And then there was two

2    pennant wires that came out to chocks, close chocks on the

3    front, and then the chain went through the chocks and connected

4    to these pendant wires, if I remember correctly.

5    Q.    Were the pad eyes on what we now know is the center section

6    of the dock?

7    A.    Yeah.

8    Q.    So did that have the towing connection coming over what we

9    understand is the end section of the dock?

10   A.    That's correct.

11   Q.    Did you hear the testimony about the bolts that held the

12   end section on?

13   A.    I did.

14   Q.    If you had known that the only thing holding that end

15   section on were those bolts, would you have made the tow in that

16   configuration?

17   A.    No.

18   Q.    Why?

19          MR. JARRETT:  Objection, Your Honor; lack of

20   foundation and lack of expertise to make any judgment like that.

21          THE COURT:  Sustained.

22   Q.    (By Mr. Simms)  All right.  Let's go back.

23          Did you hear the testimony from Dan that there were 40 --

24   whatever the number of bolts were -- holding the end sections on

25   to the 70?

1    MR. JARRETT:  Objection, Your Honor; mischaracterizes

2    the testimony.  There wasn't 40 anything.

3         MR. SIMMS:  Bolts.

4         THE COURT:  It does mischaracterize the testimony.

5    Rephrase your question.

6         MR. SIMMS:  All right.

7    Q.   (By Mr. Simms)  Did you hear the testimony from Dan Keen

8    that bolts held on the end sections of the 70?

9    A.   Yes, I did.

10   Q.   All right.  What did you hear?

11   A.   I heard that it was bolted together on each of the wing

12   walls, and then there was something about it being hard to get

13   to the one bolt, there was 18 inches around it, or something

14   like that, and they were two- or four-inch bolts, or something

15   like that.

16   Q.   Okay.  So this is just from your experience.  So tell us

17   your experience again, your background, starting from Cal

18   Maritime, to your towing and all that, because I'm going to ask

19   you about your response to the bolts.

20        MR. JARRETT:  Is there a question?

21        MR. SIMMS:  There is.  We have a question about

22   whether he's qualified to respond on the question of the bolts.

23   Q.   (By Mr. Simms)  And so I want you to go into everything

24   that you think might help you know about bolts and towing.

25        MR. JARRETT:  Your Honor, object to the foundation and

1  the characterization of the testimony by both Mr. Simms and by

2  the witness.

3          THE COURT:  Counsel, the court has heard the

4  testimony.

5      Mr. Simms, I'm not quite sure where you're going with this.

6          MR. SIMMS:  Sure.  Where I'm going, Your Honor, is, we

7  have a design that connects to the center of the tow, and lops a

8  tow wire over a set of bolts so that when we have the connection

9  here and the end section here, we have a wire that's going like

10  this that would tend to bend and stress those bolts.  And it's

11  important to him to know that it's not a continuous section;

12  that, in fact, it's bolted.  Makes a big difference.

13          MR. JARRETT:  Your Honor, I object to this testimony

14  because, again, Mr. Shrewsbury is a towboat captain.  He is not

15  a marine engineer and has not reviewed the design of the vessel

16  beyond the testimony, which he described inaccurately already

17  this morning.  So there is no foundation for this testimony.

18          THE COURT:  The objection will be sustained.

19  Q.    (By Mr. Simms)  Have you, Mr. Shrewsbury, ever towed, or

20  has Western -- well, let's start with you.

21      Have you ever towed any vessel connected with bolts?

22  A.    Flexsi Floats.

23  Q.    What is a Flexsi Float?

24  A.    It is a series of pontoons that are sometimes held together

25  with, like, rods, or you can bolt them together.

1          And I also moved a few derrick barges that had pontoon

2     sections on the side that slide into, like, a notch, and then

3     they have a cover plate that's bolted down.

4     Q.    Is it important for you to know, when you are considering a

5     tow, whether the vessel -- dry dock is not a vessel -- whether

6     what you're towing is held together with bolts; is that

7     important for you to know?

8     A.    Yes.

9     Q.    Why?

10    A.    Its strength.

11    Q.    Go into that.

12          MR. JARRETT:  Objection, Your Honor.  Again, the

13    witness is not a marine engineer.  Bolts hold together many

14    things in the world, Your Honor, including many different types

15    of vessels.

16          THE COURT:  The objection will be overruled.  The

17    court can put whatever weight on his testimony it feels

18    appropriate.

19    Q.    (By Mr. Simms)  And if you had known that the 70 was bolted

20    together, would you have towed it?

21    A.    No.

22    Q.    Would you consider that a special circumstance?

23    A.    I do.  The reason -- if you want my reasoning for it, I'll

24    give it to you.

25          For instance, Manson Construction has a derrick barge

1    called the Derrick 24.  When they tow that barge out in the

2    ocean -- the Derrick 24 has pontoons on either side of it to

3    give it stability.  When they're making critical lifts, it gives

4    a little more buoyancy.

5         When the Derrick is being towed anywhere out in the ocean,

6    they take the pontoons off and stack them on the deck, and lash

7    them.

8    Q.   And if you had known that the original design of the 70 was

9    to have the tow done in three pieces, with the end sections

10   loaded on the center -- if you had known that and, instead, been

11   presented only with a one-piece tow, would you have made the

12   tow?

13   A.   No.

14   Q.   Why?

15   A.   Well, it's pretty simple.

16        When we're going to tow something in the ocean -- if this

17   phone is the barge, or the whatever, the stresses -- if you

18   twist, like, a piece of cardboard that's long and skinny, it's

19   easier to twist.  The shorter you get it, the more rigid it is,

20   the more stable and stronger.

21        So if you have something that's 70 years old, and you can

22   make it shorter and compact, with less longitudinal twisting --

23   from my ship structure and stuff I did at Cal Maritime -- it's

24   going to be stronger the shorter it is.  And that's why I

25   wouldn't.

1    Q.    Okay.

2          So when you were talking with Rich Shaw, did Rick Shaw

3    mention anything about a ten-foot wave restriction?

4    A.    No.

5    Q.    All right.

6          Now, if he had -- if he said, "Now, Russ, I want you to

7    know that this is really important.  You cannot take this thing

8    out on over ten feet -- maximum ten-foot waves, cannot take it

9    out," how would you respond, if you did respond?

10   A.    I would have told him that was not feasibly possible.

11   Q.    Would you have done the tow --

12   A.    No.

13   Q.    -- if that was a restriction?

14   A.    Yeah, we wouldn't have been able to do the tow.  It you

15   can't tow something in the ocean and expect only ten-foot seas.

16   Q.    Did Rich Shaw tell you there were restrictions on this tow?

17   A.    He did not.

18   Q.    Did he ever give you instructions, commands, orders about

19   how the tow must be done?

20   A.    No.

21   Q.    Did he ever talk about wind to you?

22   A.    No.

23   Q.    Wind recommendations or restrictions?

24   A.    No.

25   Q.    And to make clear, we've got the draft survey up.  Did

1  Western, before the tow departed, ever receive the final survey?

2  A.    I never saw it.  I never saw the final survey until these

3  proceedings.

4  Q.    Okay.  All right.  So lots of conversations with Rick Shaw.

5  Now we're going to talk about the conversations with Dan Keen.

6        Tell us the earliest conversation -- you did -- about the

7  tow connections.

8        What were other, if any, conversations you had with Dan

9  Keen before the tow departed?

10 A.    I mean, it just would have been the rigging and then when

11 we were going to go, looking at the weather and all that.

12 Q.    Were you talking to Dan Keen about the weather in

13 connection with the departure of the tow?

14 A.    I believe I would have, because we were all trying to

15 figure out when we were going to leave with the tow.

16 Q.    All right.

17       So let's talk about now what you use to know what the

18 weather is.  Okay?

19 Q.    Do you use your cell phone.

20 A.    I use my phone all the time.

21 Q.    Take it out, and let's see.  What do you do?  You've got it

22 right there.

23 A.    The first one I use is the Washington Marine Forecast,

24 which shows you by zone.  Like right now, if I want to look at

25 the coastal waters for Washington, I can look from Cape Flattery

1  to James Island, ten nautical miles out.  I can look from Cape

2  Flattery to Point Granville, 60 miles out, and I have all the

3  different forecasts.

4      I can look at WindyTY.  I have Marine Weather app.  I have

5  the NOAA weather buoys as a bookmark on my phone.  So we look at

6  all these different tools.

7  Q.  You talk about the Wash U.  Is that the NOAA forecast?

8  A.  It's the NOAA forecast that the University of Washington

9  puts out for all Washington State.

10  Q.  And does that forecast including Cape Flattery and south?

11  A.  Yeah, all the way to the Columbia River, and it gives you

12  bar conditions as well.

13  Q.  Okay.

14      When you were talking with Dan about the weather for tow

15  departure, do you have any idea what he was using?

16  A.  I would assume probably the NOAA forecast.  I know Dan has

17  a --

18      MR. JARRETT:  Objection, Your Honor; move to strike.

19  The witness's speculation is not relevant.

20      THE COURT:  That will be sustained.

21  Q.  (By Mr. Simms)  Okay.

22      So you were about to say that you know Dan has "a."  How

23  did you know that Dan has "a," and what do you understand that

24  he has?

25  A.  In the past, when we've done moves at Vigor Shipyard, he's

1   sent me emails with a wind forecast hour by hour with, like, a

2   bar graph.  I don't know what program it is, but -- and he would

3   say, "Hey, it doesn't look good for Thursday.  This is what the

4   wind is supposed to do, but after four o'clock it looks like

5   it's going to be doable."

6   Q.    All right.

7         So did you have conversations with Dan about the tow plan?

8   A.    I don't remember ever really having any conversation, other

9   than I believe I sent it to him.  He might have been linked in

10  when I sent it to the Coast Guard, because Vigor would have

11  wanted to know -- he was -- I didn't know Paul Torrey at the

12  time, but I believe I would have included Dan in that email,

13  just because he would tell Vigor that they're good to go.  He

14  would be the liaison, I guess, to his people, to know that, you

15  know, it was cleared by the Coast Guard.

16  Q.    Uh-huh.  Okay.

17        I'm looking for our emails.  Okay, here.  Let's look at 19.

18  I'll start at the bottom.  This is Exhibit 19.

19        Okay.  So October 7, and this is three days past the

20  contract; so October 4, contract; October 6, draft survey; and

21  this is October 7.  Who is Jeffrey Zappen?

22  A.    Jeffrey, at the time, he was the Sector Waterways Seattle

23  commander.  I think he was, kind of, the head guy of the

24  Waterways management there that, basically, approves or

25  disapproves tow plans, if I remember correct.

1  Q.   So down here, this is the 7th.

2       So did you email the tow plan to the Coast Guard?

3  A.   Yes, I would have.

4  Q.   Okay.  And was part of what you email to the Coast Guard

5  this chart, which showed the route for the tow?

6  A.   Yeah.

7  Q.   Okay.

8       So did the -- let's go up here.  And what's this, by the

9  way?  Oh, sorry.  That's a chart.  But up at the top, what's

10 that?

11 A.   What that is is your waypoints.  So on the chart below,

12 this is starting at Waypoint 1, which would be probably -- I

13 don't know, maybe Cape Flattery.  But that's each individual

14 coordinates of the waypoints.  And the course that you're going

15 to -- your next waypoint, that's your true course to that.  They

16 call that point-to-point navigation.  So you're just plopping

17 down points, and running like an Etch-a-Sketch to each one for

18 your route.

19 Q.   And does that show the Coast Guard the exact waypoints that

20 Western intended the tug and tow to follow?

21 A.   Yeah.  It's more general, because, you know, if you have

22 traffic or something, you'll be deviating from that a little

23 bit.  But it's showing them the general course that we're going

24 to be taking.

25 Q.   Okay.

1      And was that course through the Monterey Marine Sanctuary?

2   A.   I'd have to take a closer look.  I don't know.

3   Q.   Look at the chart right here.  You can't really see it.

4   A.   I think it's outside of it, if you plotted it.

5   Q.   So we have exact waypoints.  So let me go back to the

6   email, and so the attachment was the tow plan.

7        Did the Coast Guard ever see the amendment to the tow plan?

8   Did you ever send that to them?

9   A.   I don't know.  I might have.  I think I did.

10  Q.   Uh-huh.  Okay.

11  A.   For Jeff or something.  I...

12  Q.   All right.

13       So this is intended distance from shore.  He's asking you

14  to provide that.  And then you sent this.  You're planning on

15  staying 20 nautical miles offshore.

16  A.   The reason for that is -- I remember this -- because the

17  Coast Guard, they want to notify each sector when you're passing

18  through their zone.  If you're on an exemption -- you know,

19  like, you didn't have a load line.  So that way each port zone

20  knows what we're doing in it.  Even if we have a tow exemption,

21  they have to notify everybody on your way down the coast.

22  Q.   And your understanding is that's standard Coast Guard

23  practice?

24  A.   Yes.  You should see, like, a COPT, or captain of the port

25  or something.

1    Q.    Okay.  All right.

2          So you provide that, and then after you provided this to

3    Lieutenant Zappen, did the Coast Guard -- this is on the 7th --

4    confirm that it has no objections to the tow plan?

5    A.    Yeah.

6    Q.    Okay.

7          All right.  Now, after this, to the time the tow departed,

8    did you have any further conversation with the Coast Guard?

9    A.    I can't recall.  It may have been the amendment later on,

10   or something like that.

11   Q.    Did you have any discussions with Dan Keen about the tow

12   plan?

13   A.    Not offhand, I don't think.  It was more like a -- I think

14   I remember we -- talking about Western Towboat would supply the

15   lights, because we have those nice, magnetic solar ones and help

16   Vigor out with them.

17   Q.    And so let's go forward here.

18         We're at the 7th.  What other, if any, conversations did

19   you have with Dan Keen about the tow?

20   A.    I guess just making sure it was ready do go and everything

21   was squared away.

22   Q.    What did he tell you?  What did you tell him?

23   A.    I think I told him that, you know, we need to make sure

24   that all the connections are right and everything is sealed up.

25   And he had told me that Global had done all the work diving on

1   it and sealing all the cofferdams and everything up, and the

2   inlets and outlets.

3        So I said, "All right.  Go home."

4        You know, we were working with Rich and, supposedly,

5   everything was good to go.

6   Q.   Okay.

7        So then you get up to the time of departure, that weekend.

8   Was there a big storm that weekend?

9   A.   Yeah.  I remember talking to my dad.  I would have been

10  running boat, I'm sure, but I remember there being a storm and

11  that's why we were delayed and we couldn't go.

12  Q.   All right.

13       So were you talking with Dan over that weekend about the

14  time of departure?

15  A.   I'm sure I would have been, yeah.  When we saw that break

16  in the weather window, we all would have been talking about,

17  okay, it's go time.

18  Q.   And did Dan agree it's go time?

19  A.   Yeah.  Everybody agreed.

20  Q.   And you talked with Dan about that?

21  A.   And Rich.

22  Q.   And Rich Courtney?

23  A.   Shaw.

24  Q.   Rich Shaw.  Yeah.  Okay.

25       So now it's the 17th.  It's time to go.  And describe that

1    day.  Were you at the shipyard that morning?

2    A.    Yeah.  I was running the west track.

3    Q.    What exactly is that?  What exactly were you doing that

4    morning?

5    A.    I was there.  First, we got -- put all our harbor people on

6    the tow; start rigging all the lights; making sure the emergency

7    towline, everything is ready to go; checking everything.  And I

8    drove around the tow, and, you know, take a last look, make sure

9    we're not missing anything.

10        And then I pulled up next to the *Ocean Ranger*, if I

11   remember right.  I remember helping them hook up the tow with my

12   mate.  We tied alongside them as Dan had the shipyard crane

13   lower that chain down and help the crew make the connection and

14   everything, make sure everything was good to go.

15   Q.    Okay.

16        So were there any discussions, then, that morning about the

17   weather?

18   A.    No.  It was gray day, and everybody was happy, and we got

19   underway right around noon or something.

20   Q.    Okay.  Was Dan there near the site?

21   A.    Dan was on the pier, yeah.

22   Q.    Was Rich Shaw around?

23   A.    No.

24   Q.    And so we're going to finish up the conversation with Rich

25   Shaw for now.

1      Did Rich Shaw ever talk to you about the final survey?

2  A.   No.

3  Q.   Okay.

4      Now, I want you to put the court on the bridge of the tug.

5  Steve McGavock, he is connected.  We've seen the picture of the

6  YFD 70 going out.  What do you see?  If you're at the helm, what

7  do you see?

8  A.   You have all your controls for -- you have your radar

9  screens.  And then behind him, he's going to have one computer

10  for navigation, he's going to have a laptop that's connected to

11  the satellite Internet --

12  Q.   And when you say "behind him" -- I want to make sure

13  there's foundation.

14      Are you familiar with the bridge and configuration of the

15  *Ocean Ranger* on October 17, 2016?

16  A.   I am.

17  Q.   All right.

18      So when you say "behind," where behind?  Let's put it in

19  reference to the court.  Does the master sit in a chair, or does

20  the master stand?

21  A.   There is a chair on that boat in the middle, I believe.

22  The wheelhouse on that boat is kind of funky.  The front windows

23  are about here.  The back of the wheelhouse is about where your

24  wall is here.  So everything is close.  And you have two driving

25  stations.  You have one on the port, one on the starboard.  Then

1    in the center is a compass and an autopilot.  And then you turn

2    around, and behind you is your computer screen with the

3    electronic chart.  And then you have your chart table on that

4    boat.  It's on the port side.  And the computer screen is right

5    next to it.  And you have a laptop that we do the ship's

6    business, email.  We keep that separate, normally, from the

7    navigation computer so you don't get a virus or something if

8    you're using the Internet.

9        And then on that boat, it has a weather fax, and I think

10   that boat also has another chart plot -- I don't remember if it

11   has --

12   Q.   What's weather fax?  Is that like the thing in -- it's

13   terrible -- the -- the fishing boat that went under, the movie?

14   You know -- you see that?  What is a weather fax?

15   A.   A weather fax is a fax machine that will print out the NOAA

16   forecast and weather maps in black and white.

17       So you get a general area where you get -- it shows you the

18   high- and low-pressure systems; basically, all the weather maps.

19   And it comes through every six hours, I believe.

20   Q.   Uh-huh.  Okay.

21       So the computers, the navigation system, what does that

22   navigation system look like?  If you're, again, looking -- so

23   Judge Martinez would be looking over what shoulder to see the

24   navigation system?

25   A.   On that boat, it would be to the left.  It depends on where

1   you're standing.  If you're standing in the wheelhouse, it's

2   over your left shoulder.  And it's a real-time display of a

3   chart.  So when you zoom in, it changes the chart automatically

4   to a higher aspect.  And it will show you pinpoint where your

5   boat is, the heading line, how far you're going to go in ten

6   minutes, or however far the captain has it set, it will give you

7   what is called dead reckoning.

8        It will plot your position and move it along the chart as

9   the boat moves via GPS.  It has two different inputs.  It has an

10  input from the boat's GPS system, but the boat also has an

11  automatic identification system, AIS, which is a satellite GPS

12  that tracks the boat, as well.  So you have redundancy in inputs

13  into where the boat's location is.

14       Most of the guys use the charting program as the main

15  navigation.  The days of paper plotting have gone by the wayside

16  after 2010, something like that.

17       That boat may -- I can't remember if it had a Garmin GPS

18  chart plotter as well, like you would see on a sport fishing

19  boat or something.  I think it has one.  It's about the size of

20  a notebook.

21  Q.   So to the left of you, there is a chart that's up.  If

22  you're looking at the navigation system, would it look like that

23  chart, or something different?

24  A.   It would look just like that chart.  But the nice thing

25  about the plotting system is you can zoom in or out.  The boat

1    will stay where it is.  So if you're going into, say -- if I was

2    going to sail up the Duwamish River, I would zoom in on that

3    chart, and it would give me more information as far as depths.

4    But when it's a small aspect like that, you only get a depth

5    every so often, but the farther in you go, the more depths you

6    get.

7    Q.    And you've heard lots of testimony about marine

8    sanctuaries.  Do the charts that display show those blue lines

9    that designate the marine sanctuary?

10   A.    It should, yeah.

11   Q.    But does it?

12   A.    On a roster, yeah, it would.

13   Q.    Okay.  So we talked about the weather fax.

14        Now, would the tug master -- you're a tug master.  Do you

15   use your cell phone to get weather?

16   A.    Predominantly, yes.

17   Q.    And do you have an understanding of what Captain McGavock

18   was using as he departed Seattle?

19   A.    Well, he would have been using his phone.  When we go down

20   the coast, we have cell service pretty much all the way down the

21   coast of Washington.

22   Q.    So what do you understand he had on his phone?

23        MR. JARRETT:  Your Honor, we heard extensive testimony

24   from Captain McGavock about what he did, what he had, what he

25   used.  This witness's rehash of that testimony is not relevant

1    nor helpful.

2              THE COURT:  I agree.  Let's move on.

3              MR. SIMMS:  Okay.

4    Q.   (By Mr. Simms)  Now, you described what the tug has.  In

5    your experience, does the tug have more available to it or at

6    least as much as a weather forecaster would?

7    A.   Yes.

8    Q.   Now let's go to the office.  Okay?

9         Was your dad monitoring the weather conditions?

10             MR. JARRETT:  Objection, Your Honor; lack of

11   foundation.

12   Q.   (By Mr. Simms)  Do you have an understanding about whether

13   your dad was also monitoring the weather conditions from the

14   office?

15             MR. JARRETT:  Same objection, Your Honor.

16             THE COURT:  Counsel, his dad was on the stand.  We

17   have all that testimony in.

18             MR. SIMMS:  Okay.  All right.

19   Q.   (By Mr. Simms)  So it is time to depart.  Did anyone

20   express any concerns about the weather at the time of departure?

21   A.   No.

22   Q.   So let's go out the next day, the 18th.

23        Okay.  Were you getting reports from the tug?

24   A.   We sent a daily report.  I think on that trip we may have

25   been sending two.  It just depends.  Sometimes -- they're

1  usually on the sixes.  So 6:00 in the morning, 6:00 at night or

2  the 7s, 7 --

3  Q.   Who did you send that daily report to?

4  A.   I believe -- well, it would have been going to Dan and

5  Richard Shaw, and then it goes to a boilerplate email.  It's an

6  ETA.  You know, our company gets one email that gets spit out to

7  everybody at Western Towboat that receives those in the office.

8  And then I would have -- if I got the morning report and didn't

9  see the other people forwarded on it, I would have contacted the

10  tug and said, "Add this person," or just forwarded it to myself

11  to whoever needed it.

12  Q.   So the people receiving the report, did that include Dan

13  Keen?

14  A.   It would have, yes.

15  Q.   Did the report include a report of weather conditions?

16  A.   Our morning reports usually have a position, weather, ETA,

17  miles traveled.  Sometimes we have fuel in there, once in a

18  while.

19  Q.   Now, you mentioned a transponder.  What is the importance

20  of that?

21  A.   AIS is a tool that we use now.  Well, one, the Coast Guard

22  can track your location with it; two, we use it to identify

23  other ships.  So it was foggy or something like that, and I was

24  leaving the Puget Sound and there was a ship coming behind me

25  that I needed to get ahold of to make passing arrangements, it

1  will show me on that ship the chart in relation to my vessel,

2  and I can safely make arrangements with him.

3      It's a pretty handy tool because the computers now -- if

4  you're in a crossing situation, it will show you exactly where

5  you'll meet these people, how long it will be until you meet

6  them.  It's made what we do a lot safer.  And I get to track

7  where all our boats from the office to make sure they're going

8  in the right direction.

9  Q.   So this is a free, available program that shows where the

10 *Ocean Ranger* was on the 24th.  And I've got a -- I'm not

11 connecting to the satellite function, but there is a satellite

12 function that you can use.  Do you ever use this, the marine

13 traffic?

14 A.   Daily.

15      MR. JARRETT:  Objection, Your Honor.  This is

16 irrelevant, again.  And for the further reason, that the court

17 has already found -- I think where we're going here -- the

18 relevance to the sanctuary.  That portion of the case is already

19 decided.  Western's transit into the marine sanctuary has been

20 decided already.

21      MR. SIMMS:  That's not where I'm going.

22      THE COURT:  Where are we going?

23      MR. SIMMS:  I'm going to knowledge of the position of

24 the tug at the time of the encounter of weather that has been

25 claimed to be beyond the tow recommendations.

1    THE COURT:  All right.  Can we get there?

2    MR. SIMMS:  We're getting there, yes.

3  Q.   (By Mr. Simms)  So was Rich Shaw getting reports of where

4  the tug was and the weather conditions?

5  A.   He would have, yes.

6  Q.   Now, after the tug left, did you have any conversations,

7  before the report of the list, with Dan Keen about the tow?

8  A.   I may have, in passing, with Dan.  I can't remember.

9  Q.   Okay.  Dan didn't mention anything along the lines of,

10  "Hey, is there something wrong?  You guys are coming up to bad

11  weather."  Anything like that?

12  A.   No.

13  Q.   How about Rich Shaw?

14  A.   I think I remember Rich calling and going, "Hey, Cap, I see

15  them going," and me saying, "Yeah," and I say, "Everything is

16  good."

17  Q.   So this transponder showed that -- if somebody wanted to

18  see where the tug was, they could see?

19  A.   Yes.

20  Q.   Okay.

21    And did you ever get any calls from Rich or Dan, at any

22  time, saying, Hey, outside the weather recommendations, outside

23  your tow plan, there's a problem, too rough, you're going to

24  have a problem, anything like that?

25  A.   No.

1    Q.    Okay.  And let me blow that up.

2          Did you ever hear any calls like that to any -- hear about

3    any to Captain McGavock, to your dad, to Jeff Slesinger,

4    anything?

5    A.    I did not.

6    Q.    You didn't hear it?

7          Now, did you communicate with the tug, with Captain

8    McGavock, as the tug continued town towards Point Reyes?

9    A.    I did talk to Steve, like, a day or so out, because I was

10   curious how that thing was going to tow.  You know, it's pretty

11   big.  He said it was following great, and that was it.  Well, to

12   Point Reyes.  I think I just talked to him that first day.  Once

13   he was out in the ocean, we were watching him.  It looked like

14   he was making decent speed.

15   Q.    So you didn't hear of any problems?

16   A.    No.

17   Q.    And if there was a problem, would you hear of it?

18   A.    Yeah.  He'd call us.

19   Q.    Okay.  So now we're up to the 28th.  Okay.  And what was

20   the first -- well, let me just back up.

21         Did you hear that the tow had experienced a list?

22   A.    Yeah.  I believe my -- I can't remember if it was Steve or

23   my dad called me around 4:00.  I think it was my dad.

24   Q.    Okay.

25         And what, from that, did you understand, to start with,

1    about the list?

2    A.    I remember the first call was, "Well, we think" -- I

3    remember him saying, "Well, we think we've got a list.  We're

4    not sure."  And I believe my dad had told me -- he said, "Well,

5    we're going to watch it and give it a little bit, and then

6    they're going to call us back and let us know if that's what's

7    actually going on."

8    Q.    Okay.  Tell the court, then, what time of the day was this

9    that you first heard about the list?

10   A.    It was somewhere around four o'clock.  I think I was

11   Downtown.  I was just finishing the day or -- I think I was

12   driving or something.

13   Q.    All right.

14        So tell the court now the next conversation -- what, if

15   anything, did you do next after you heard that?

16   A.    Well, we were just kind of waiting to hear from the tug.

17   The initial was, "Yeah, we think we have a list," and then, "We

18   were going to watch it for an hour or two," because it was hard

19   for them to tell, going through the swells.  But then, "Well,

20   maybe we do have a little water in there or something," because,

21   you know, if it was just a slow leak of a hatch or something,

22   who knows.

23        And then I think it was 6:30 or something like that, and I

24   got the next call, and that was, "Yeah, there is a list, and

25   it's gotten a little bit worse."

1    Q.    Okay.  All right.  So who gave you that call?

2    A.    That would have been my dad.

3    Q.    All right.

4          And so then did you have any conversations after that with

5    Dan Keen?

6    A.    Yeah.  I called Dan.  I was at dinner, and I remember --

7    well, first, I think, I called Stephen, actually, myself, on the

8    sat phone.  I remember it was kind of crummy service, and I

9    remember talking to him.  Because I wanted to give Dan the

10   information as best I could, and Stephen said, "Yeah, I think

11   we're down by, like, three feet, or something like that."  Then

12   I remember calling Dan and saying, "Hey, we've got a little

13   issue going on here," and he said, "Yeah, I've been talking to

14   your dad," or something to that effect.  And then there was

15   this, kind of, back-and-forth between Dan and my dad and myself.

16   Q.    Okay.

17         Did you tell Steve McGavock anything during that call?

18   A.    I think at that time I told him that I was going to talk

19   with Dan and we'd try and figure out what we're going to do

20   here.

21   Q.    Now, where were you going to talk with Dan?

22   A.    Well, it's his dock.

23   Q.    Well, go into that.

24         Here's Captain McGavock.  You know, shouldn't he be able to

25   look at that tow and say, "Oh, my gosh, it's going to sink.  I

1  better get out of here"?

2        MR. JARRETT:  Objection, Your Honor.  This is leading,

3  and I think it gets into the subject matter that we've already

4  discussed is decided already.

5        MR. SIMMS:  It goes into, Your Honor, the expertise of

6  Dan Keen and why Western looked to Vigor for information about

7  the tow.

8        MR. JARRETT:  During the time when -- I'm sorry, Your

9  Honor.  I still object, because this is the time when the list

10  is already presented.  This is the time when decisions were made

11  about what to do about the list.  This is the time that the

12  court has already decided that Western was negligent, and that

13  negligence put the dry dock at the bottom of the sanctuary.

14        THE COURT:  Right.  But in terms of the dry dock

15  sinking is a different issue that's still up for play.

16     All right.  Let me have you rephrase your question.

17  Q.   (By Mr. Simms)  So you testified that you talked -- you

18  said, "Okay, Captain McGavock, I'm going to talk to Dan about

19  the tow."

20     Why would you talk to Dan about the tow?

21  A.   Because I know Dan, when it was at the shipyard, was

22  working with Global to seal all these inlets and outlets up.

23  Q.   Well, before that.  Okay?  We're taking about the first

24  step.

25     You called Captain McGavock, and you say, "Okay.  I'm going

1    to talk to Vigor about this." Okay? And why did you say, "I'm

2    going to talk to Vigor," as opposed to saying, "Well, you know,

3    Steve, you're the best guy on the ground. You can see it right

4    there. I don't need to talk to anybody else. You just keep an

5    eye on that thing and use your best judgment about whether it's

6    going to sink or not"?

7    A.    I called Dan because Dan prepped the dock and Dan knew the

8    dock. So if there was a condition happening with the dock, Dan

9    would be the best person to answer that question for Western

10   Towboat.

11   Q.    Did you read the deposition testimony of Vigor's expert,

12   Russ Johnson?

13   A.    Parts of it, yes.

14   Q.    And do you recall the part of the testimony of his

15   experience during the tow that he had from the West Coast to

16   Hawaii?

17   A.    Yes.

18   Q.    When he had a problem, do you recall what he said he did?

19   A.    Yeah. He called the guy that owned the barge, or the --

20   what was he? -- the engineer, or something like that, or the

21   architect of the barge.

22   Q.    And within your professional experience as a mariner, was

23   that the correct thing to do?

24   A.    Yes, because they're the person that knows the design of it

25   better than anybody.

1  Q.   All right.

2       And if you were Captain McGavock, at that point what would

3  you have done?

4  A.   I would want to know the same thing.  If we're going down

5  by the head, how far can this thing go?  What are the risks and

6  what are the limitations here?

7  Q.   Uh-huh.  Okay.

8       And so did you speak to Dan about that?

9  A.   Absolutely.

10 Q.   What did you tell Dan?  What did you ask Dan, if anything?

11 A.   Well, when we were talking about this.  I know we were all

12 worried about this thing -- what was going on with it.  But on

13 the other hand, we know -- we're talking to Dan to run these

14 numbers, and we're, like, "Well, what's the worst-case

15 scenario?"

16      And he sent back the email, that we've all seen, with the

17 list, and it said 48 feet, and thinking, Okay, the San Francisco

18 Bar, the entrance is 52 feet, so that's a risk right there for

19 Western Towboat.

20 Q.   All right.

21      And so once you saw the email from Dan Keen, what did that

22 tell you about the feasibility of coming in to meet Global in

23 San Francisco Bay, across the bar?

24 A.   I called my dad, and I told him it was -- personally, I

25 said, "I don't like the fact that, if worst-case scenario, this

1  thing goes to 48 feet, and you have a 52 over-keel clearance to

2  get into the San Francisco Bar -- I believe it's somewhere in

3  that neighborhood -- and you have a swell that's ten feet, it's

4  not safe, and it's not prudent seamanship.

5  Q.   Okay.

6       And was that the point at which there were conversations

7  about going to Monterey?

8  A.   Yeah.  You know, we were talking to Dan about that, and I'd

9  given him -- he'd asked me who I knew down there that could do

10 this and that, and I said, "Well, we've got" -- a family friend

11 of ours has a tug outfit there, Ron Greger, and I said, "Well,

12 you guys use Global.  I think they're up and down the West

13 Coast."

14      And we were all talking together about the best place to do

15 this.  You know, we figured that we'd wait for the morning, and

16 try and -- Dan told he was flying down there and he was going to

17 set up these resources, and we're going to, you know, see what

18 it looks like in the morning, and then make our plan.

19 Q.   Okay.

20      So at that point, we're talking about, what, 9:00, 9:30 in

21 the evening?

22 A.   It was, yeah.

23      And my dad had been talking to the tug, and they couldn't

24 see the tow.  It was foggy.

25 Q.   You've heard the testimony about the list and the list

1  increasing, and from the reports you were getting from the tug,

2  were you in conversation -- in communication with the tug?

3  A.    On and off, but I remember talking to Stephen, I believe,

4  like, when he got into that fog, or it was right around there,

5  and he was -- he was nervous because he couldn't see the tow.

6  Q.    Uh-huh.  All right.

7        And so did he report to you that he couldn't see how much

8  it was listing?

9  A.    I remember that was that effect.  It was, like, Let's pump

10  the brakes here and see what we've got in the morning.

11  Q.    Meaning what, "pump the brakes"?

12  A.    Well, we're going to keep going south towards Monterey,

13  down the coast, and then --

14  Q.    Why --

15  A.    -- we'll make a decision --

16  Q.    Why?

17  A.    So if the dry dock had stabilized, we would be close to

18  Monterey, where Vigor was organizing assets to be there.

19  Q.    Okay.

20        Now, at that point, did you have any understanding from

21  anybody -- let's take it from Dan.

22        Did you have any understanding from Dan that the tow

23  certainly was going to sink?

24  A.    No.

25  Q.    And why are you so certain about that?

1    A.    Because he said the worst-case scenario.  He thought it

2    would be all right.

3    Q.    All right.

4          And throughout the evening, are you continuing to talk with

5    Dan?

6    A.    I think the last conversation probably would have been

7    around -- if I had one, it would probably be 8:00 or 9:00, you

8    know, telling him the game plan or something.

9    Q.    Continuing to email him late into the night?

10   A.    Probably texting.

11   Q.    Texting?  Okay.

12         Okay.  At that point, you're texting back and forth.  Was

13   Vigor lining up, as you understood it, Global to come and meet

14   the tow?

15   A.    To my knowledge, yes.  I don't know if it was Paul or Dan

16   or whoever, but I know Dan was flying down and mobilizing

17   people.  We weren't asked to do any of that.

18   Q.    Okay.  Did anybody give Western the responsibility of

19   mobilizing people to meet the tow anywhere?

20   A.    No.  I just gave a phone number for Ron Greger.

21   Q.    And so to your understanding, did Vigor take on that

22   responsibility to line people up?

23   A.    Yes.

24   Q.    Okay.  Because Western didn't.

25   A.    No.

1    Q.    Okay.

2          Now, did Western have any responsibility to assist the tow

3    if it was in trouble?

4    A.    Sure --

5          MR. JARRETT:  Objection, Your Honor; calls for a legal

6    conclusion, as near as I can tell.

7          THE COURT:  Sustained.

8          MR. SIMMS:  Okay.

9    Q.    (By Mr. Simms)  Do you have any understanding of the

10   responsibilities of a tow company when they -- when you

11   encounter that a tow that is having problems?  Do you have any

12   understanding of that?

13         MR. JARRETT:  Objection, Your Honor; same objection.

14   Q.    (By Mr. Simms)  Based on your personal experience.

15         MR. JARRETT:  Same objection.

16         THE COURT:  It's calling for a legal conclusion,

17   counsel.  Sustained.

18         MR. SIMMS:  Okay.  All right.

19   Q.    (By Mr. Simms)  Well, let's talk about the tow contract,

20   then, the contract that Western entered into.

21         Is there a requirement in it to assist the tow if the tow

22   gets in trouble?

23   A.    I believe -- I don't know offhand, to be honest.

24   Q.    Okay.  Well, let's put it this way:  Why was the tow coming

25   in toward Monterey?

1  A.   Because we were trying to save this thing.  We were doing

2  the best for our customer to deliver a finished product.

3  Q.   Do you have an understanding of what a captain of the port

4  order is?

5  A.   Yes.

6  Q.   What is that?

7  A.   It's an order telling you you have to stay where you're at

8  or do a certain thing or you can't enter.  It can be for a

9  number of different things.

10 Q.   And do captains of the port order give permissions to do

11 things?

12 A.   Yes, they do.

13 Q.   Did Western have any role in obtaining a captain of the

14 port order in connection with the tow?

15 A.   I had none, no.

16 Q.   Okay.  Did anybody at Western have any role?

17 A.   To my knowledge, no.

18 Q.   All right.  Was that Vigor handling everything with the

19 Coast Guard?

20 A.   To my knowledge --

21       MR. JARRETT:  Objection; lack of foundation, and we're

22 getting into the transit into Monterey, which --

23       MR. SIMMS:  No --

24       MR. JARRETT:  -- we've already litigated --

25       MR. SIMMS:  -- we're getting into comparative

1    negligence, because it was Vigor that enabled this tow to come

2    into where it came in into.  It was the captain of the port

3    order that gave permission to that, with Vigor lining up the

4    salvage and the tow company and everything.

5              THE COURT:  All right.  The objection will be

6    overruled.

7         The last question was, "Did anybody have any role?"

8         The answer:  "To my knowledge, no."

9         Ask your next question.

10   Q.   (By Mr. Simms)  So -- and this is -- this -- this isn't

11   going to Your Honor's holding, but I'm going to ask about marine

12   sanctuaries.

13        Did you have any discussion with Dan Keen about marine

14   sanctuaries?

15   A.   No.

16   Q.   Okay.  And why not?

17   A.   At the time, I'm at home.  I didn't have a chart.  We're --

18   phone calls going back and forth, we were worried about the

19   crew, the tug, what we were going to do, what everybody was

20   going to do.  It wasn't on the radar, really.  We're not --

21   particularly, we're worried about losing the vessel and the

22   safety of our crew.  So safety of the crew is priority number

23   one for us, as owners, because, as a family business, that's

24   what we care about.

25   Q.   How late or early were you up on the evening of the 25th,

1   morning of the 26th?

2   A.   I wouldn't have slept that well.  I probably was up most of

3   the night thinking about it.  In fact, I think I remember

4   looking at my phone and seeing them go really slow on marine

5   traffic.

6   Q.   Okay.  So you were tracking.

7        So as you were up that night, did anybody say to you, This

8   is absolutely going to sink?

9   A.   No.

10  Q.   And what was your understanding about what was going to

11  happen in the morning?

12  A.   That we would assess the condition of the dock, and then

13  make the final decision to go in for repair.

14  Q.   That it would be above the water?

15  A.   Yes.

16  Q.   Okay.  So no idea that it would sink; no reason to warn

17  anybody about sinking in a marine sanctuary?

18  A.   Correct.

19           MR. SIMMS:  All right.  We'll turn you over to Vigor.

20           THE COURT:  Mr. Jarrett, if we can start

21  cross-examination for 15 minutes before our break?

22           MR. JARRETT:  I would love to, Your Honor.

23                        CROSS-EXAMINATION

24  BY MR. JARRETT:

25  Q.   Mr. Shrewsbury, good morning.

1      While I listened to your direct examination, things get

2   different, so I have some jumping around I need to do, and I

3   apologize in advance.  It's not meant to distract or confuse

4   you, so please understand if you don't understand the question.

5      So one of the things you said early on today was that the

6   folks at Western had submitted a proposal for the movement of

7   the Pacific Collector.  Did I get the name of the vessel right?

8   A.   Yes.

9   Q.   So you submitted a proposal for the Pacific Collector to

10  Vigor.  Did you-all get the contract?

11  A.   No.  They decided to do the repairs in Portland instead of

12  moving it to Seattle, like they had asked.

13  Q.   Fair enough.

14      So then you mentioned some other jobs that you have done

15  for Vigor.  And those jobs were all done in Puget Sound, right?

16  A.   Correct, except for -- I think this was before.  We towed

17  the United States Icebreaker *Polar Sea* from Vigor Seattle to

18  Portland yard, and then they took the shafts out of her, and we

19  towed her back up to Seattle after that.  I think that was in

20  2015, though.

21  Q.   Oh, so you towed a polar icebreaker before --

22  A.   I think it was before.

23  Q.   -- the tow of the YFD 70?

24  A.   And then we did, actually, do another tow, third-party tow.

25  We towed the stern section of the Alaska State ferry.  We loaded

1    it on a barge in Portland, and towed it to Ketchikan, Alaska, to

2    Vigor Shipyard.

3    Q.    When was that?

4    A.    Oh, probably three, four years ago.

5    Q.    Okay.  So after the YFD 70?

6    A.    Yeah.

7    Q.    Okay.  Thank you.

8         So then you talked about how you have conversations with

9    Dan Keen during a dry docking, just in general.  I think the

10   questions were phrased in general.  So we're not talking about

11   any specific job, but I think you said that you have

12   conversations with Dan Keen over the phone, over text, over

13   email, whatever, about conditions, about the job duration, about

14   wind and weather; is that right?

15   A.    Correct.

16   Q.    And so but -- but Dan's -- that's during the dry docking,

17   right?

18   A.    It's usually before.  The night before, if Dan doesn't like

19   the weather, if he looks at the forecast and it's supposed to

20   blow, we'll cancel.  Like the other week, we had the *USS Chosin*

21   that was supposed to come off dry dock, and -- it was, I think,

22   on Thursday -- it was a Thursday, or something -- and the

23   weather -- the wind was supposed to be blowing, and we ended

24   up -- or maybe it was a different boat -- but the weather

25   forecast wasn't adequate for what he wanted to do on the dock.

1    It was over parameters, per se.

2    Q.    With the dock -- the parameters of the dock?

3    A.    No.  It's for the evolution, too.  You know, you've got to

4    float the vessel, so you're transiting this thing in and out of

5    docks, so it's a safety-margin thing.

6    Q.    During the dry docking, Dan Keen is in charge of the

7    operation because it's his -- I'm holding up air quotes, for the

8    record -- it's his dry dock, right?

9    A.    I'm not sure I'd go -- sometimes there's a pilot on the

10   vessel, but once it gets into the dock, I don't know officially.

11   Q.    Okay.  Fair enough.  I don't, either.  That's why I asked.

12        Okay.  So you -- and I wanted to get this subject done

13   before we move into the relevant stuff.

14        During the -- after the list was reported -- you just

15   talked to Mr. Simms, at some length, about that evening of the

16   25th of October 2016.

17        After that list is reported, you had various conversations

18   with Dan Keen, right?

19   A.    Yes.

20   Q.    Did you talk to anybody else employed by a Vigor company

21   that night, during the listing and eventual sinking of the

22   YFD 70?

23   A.    I wouldn't have had their numbers, no.

24   Q.    Okay.  So Dan was your contact at Vigor?

25   A.    He was the liaison, yes, between Western Towboat and --

1    Q.    Gotcha.

2          Oh, sorry to interrupt.  Sorry to interrupt.

3          So when you're talking to Dan, you reported the initial --

4    well, you reported a list to him at 6:00 or so in the evening;

5    is that about right?

6    A.    I think we would have reported the initial phone call.  I

7    think I did, and told him we were going to be watching it and to

8    see what's going on.  I can't remember 100 percent on that.

9    Q.    All right.

10   A.    But I know as soon as we had an inkling of a list, I would

11   have talked to Dan.

12   Q.    Okay.  And you said to Dan, "The guys are pretty sure

13   there's a list, and we'll get back to you after we observe it

14   for an hour or two to make sure"?

15   A.    Correct.  It's hard -- as you saw in the testimony, it's

16   hard to tell when you're rolling around in the ocean there.

17   Q.    I believe me, you don't want me to do anything on a boat,

18   so I believe you.

19         So the crew on the vessel, or the mates on the vessel, we

20   heard their testimony about they observed the dry dock for a

21   while and confirmed, at least to themselves, that there was a

22   list on it at 2:30 or so in the afternoon on October 25.

23         Do you recall that?

24   A.    Somewhere in that timeframe, yeah.

25   Q.    So was that the point at which you called Dan to say,

1  "We've confirmed it.  There's a list"?

2  A.    I can't tell you the time, six years ago or whatever it is.

3  I don't know, but I know Dan was notified.

4  Q.    All right.

5        Okay.  So this case comes down to some details,

6  Mr. Shrewsbury.

7        So you informed Dan there might be a list, the guys are

8  going to check it out, and then you called him back an hour or

9  two later -- I'm not holding you to that timeframe -- an hour or

10 two later, you called him back and said, "Yep, there's a list

11 for sure"?

12 A.    That's correct.

13 Q.    Did you tell him an estimate of the degree or did you

14 quantify the list, in any respect, for Dan?

15 A.    At that point, I think we were thinking it was three feet.

16 Q.    A three-foot list?

17 A.    That was around 7:00 or whatever.

18 Q.    All right.  And then Dan eventually responded with that

19 email that we've seen, Exhibit 34 -- I don't need to look at it

20 right now -- that he -- well, the email speaks for itself, but

21 there is a diagram of a dry dock generated by a computer, and

22 some words from Dan over that.

23        Is that his response by email that you were talking about

24 during your direct testimony?

25 A.    There was one of them, yeah.

1    Q.    Okay.  So -- all right.

2          So you reported that there was a three-foot-or-so list on

3    the dry dock?

4    A.    I'm assuming -- yeah, I know there was -- there was talk of

5    numbers, because Dan wanted numbers to run models.

6    Q.    Sure.

7          At any point that evening, did you report to Dan that the

8    list had increased?

9    A.    I couldn't recall.

10   Q.    All right.  Good.  So we can move on to a different area of

11   testimony.

12         So, Mr. Shrewsbury, your company has one of the better

13   websites of marine operators that I've seen.  And I looked at it

14   a little bit this morning.

15         So Western holds itself out as an ocean-towing company?

16   A.    That's correct.

17   Q.    Yeah.

18         And part of the -- and so you're an ocean-towing company

19   expert, right?  That's what your company is, an expert

20   ocean-towing company?

21   A.    We like to think we are good at our jobs, yes.

22   Q.    Sure.

23         And you employ highly credentialed, excellent operators.

24   We talked to a bunch of people that work for you this week, and

25   I'm not trying to discount that expertise.

1    In Western's experience, there are some risks associated
2  with ocean towing, aren't there?
3  A.   There's a risk anytime you step on a vessel and perform a
4  task.
5  Q.   Yeah, but there are risks particular to ocean towing, don't
6  you think?
7  A.   Particular to ocean towing?  Sure.
8  Q.   So what are those, as far as you're concerned?
9  A.   Well, if you're, say, going from here to Hawaii, and you
10  have issues, you're a little bit farther away from land.
11  Q.   Okay.  And how might issues arise on an ocean tow?
12  A.   Well, I'd be worried if you had a fire on a vessel, a
13  mechanical breakdown, depending on equipment.  I mean, if you go
14  to Hawaii and you suck up a fishnet out in the middle of the
15  ocean and foul both propellers, that's an issue.
16  Q.   Sure.
17    Could weather also be an issue during a tow?
18  A.   Weather is always an issue, no matter where you are.
19  Q.   Right.
20    So you have some in-house expertise for trying to figure
21  out how to do the job safely in light of the potential weather
22  that you might encounter, right?
23  A.   Yes.  There's a lot of skilled people.
24  Q.   Good.  So we'll come back to that.
25    But as a company, you probably have some priorities for

1    your operation.  I know a lot of clients that I work for have

2    some, sort of, fundamental things that they try to do.

3         So what are the fundamental priorities for Western Towboat

4    Company?

5    A.   Doing the job well and correctly and safely.

6    Q.   There you go.  Okay.  So safety is, at least, a priority

7    for Western Towboat Company?

8    A.   I'd like to think it is a priority for every company.

9    Q.   Sure.  But for your company --

10   A.   Always.

11   Q.   -- it's a priority.

12   A.   Always.

13   Q.   It's probably your first priority when you talk to your

14   crews, right?

15   A.   Yes.

16   Q.   You want to make sure that the people are protected, that

17   the job is done safely, and that's -- I mean, I think lots of

18   the companies that I work for would say that's what they try to

19   do at the end of every day is to have everybody come back safely

20   when they get back from a voyage.

21   A.   Yeah.

22        We've been a company since 1948.  We've never had a

23   fatality on any of our vessels.  The other companies in Seattle

24   can't say the same.

25   Q.   Well, that's great, and, sincerely, I appreciate that.  I

1   represent a lot of towing companies, and they have -- everybody

2   has crews, everybody's crews are exposed to risks as they work

3   on boats, and to the extent your protect yours to the extent you

4   have no fatalities in the history of your operations, that's

5   wonderful.

6        So safety of the people is the most important thing.

7   Safety of equipment has got to be right up there, though, isn't

8   it, in your priorities?

9   A.   Yes.

10  Q.   And you don't just tow your own equipment at Western

11  Towboat Company, do you?

12  A.   We tow for many different people.

13  Q.   Sure.  And you tow equipment owned or operated by lots of

14  different people, right?

15  A.   Correct.

16  Q.   So safety of that equipment has to be one of your top

17  priorities when you're towing somebody else's equipment, right?

18  A.   Yes.

19  Q.   All right.

20       At the end of the day, Western Towboat Company is a

21  for-profit company, though, isn't it?

22  A.   Yes, it is.

23  Q.   So you want to make a little money, too.  After you protect

24  your people and your equipment and other people's people and

25  equipment, you want to make a little money at the end of the

1  day, right?

2  A.    Like every business, yes.

3  Q.    Well, like every for-profit business.  Sure.

4        So you recognize with me that you want to do jobs as safely

5  and as efficiently as possible while wasting as little money as

6  possible, right?

7  A.    Do you want to rephrase that?

8  Q.    Sure.

9        You want to maximize your return on investments, to the

10 extent you can do that, while recognizing the importance of the

11 safety of the people and the equipment in your operation.

12 A.    Not necessarily.

13 Q.    You don't want to maximize your return on investment?

14 A.    Depending on the situation.

15 Q.    What would make you want to make less money when you're

16 still protecting the people and equipment in your operation?

17 A.    Well, there's some times we get into jobs that are kind of

18 interesting and fun.  Like, we had a Wendy's on one of our

19 barges, and we got our tug and barge on the news.  We didn't

20 make a lot of money on that job, but it was a fun job.

21 Q.    Oh, I see.  Okay.

22       So I read your deposition, and I didn't see a lot of

23 discussion about trainings of your operators therein.

24       Do you have trainings for the operators of Western's

25 vessels?

1   A.   We do.

2   Q.   And those trainings, do they include things like -- well,

3   safety?

4   A.   Yeah.

5   Q.   Do they include things like voyage planning?

6   A.   Yeah.

7   Q.   So how many -- and are operators on a schedule of

8   trainings, or is it just kind of willy-nilly?

9   A.   We have our winter training every year, which is about a

10  two-week session.  We have a couple different ones that we cycle

11  all our crews through.

12       We have a weekly online-based training, and we also do it

13  for different people.  Like, now we have to do -- for mates, the

14  rules and regulations have changed over the years.  There's a --

15  it's called a TOAR, Towing Officers Assessment Record.  So the

16  port captain will take out mates and train them how to properly

17  do the required tasks in that.

18       And then every voyage you get on, you have mobile ops,

19  which there's drills and scenarios.  We also do internal audits,

20  external audits, drills with Transport Canada, audits with

21  Transport Canada because of our freight business.  So there's a

22  lot of different training that goes on.

23            MR. SIMMS:  Can we pause for a minute?  We have some

24  fact witnesses in the courtroom.  Can we ask them to leave,

25  please?

1          Are any of you fact witnesses?  No?  You're going to

2     testify today?

3               MR. JARRETT:  Not in our case.

4               MR. SIMMS:  All right.  Please go ahead.  I just -- go

5     ahead.

6               MR. JARRETT:  All right.

7               THE COURT:  I hope it didn't surprise you that there

8     are other people who might be interested in this.

9               MR. SIMMS:  I hope so.

10              MR. JARRETT:  I recognize one person in the pews, Rose

11     Olstrom, who is an associate in my law firm is here, but she

12     isn't going to testify.

13              THE COURT:  Welcome.

14          Counsel, let's go ahead and take our break.

15                   (Court in recess 10:32 to 10:52 a.m.)

16              THE COURT:  All right, Mr. Jarrett.  You may continue

17     your cross.

18     Q.   (By Mr. Jarrett)  You were telling us about the training

19     program that Western has for its operators.  And does Western

20     train watchstanders on how to maintain watch in the wheelhouse

21     of a tug?

22     A.   Typically -- well, that just depends.  Like, guys that come

23     from the academy now, to get a license, they get all that

24     training at, like, Cal Maritime or at the Pacific Maritime

25     Institute here in Seattle.

1  Q.   So Western doesn't provide additional training before

2  turning them loose on your boats?

3  A.   Oh, we do.  It's all part of your required Coast Guard

4  training.  To maintain your license, you have to go and take --

5  you know, do that, and then we also, with our in-house training,

6  we do that, yes.

7  Q.   And it's important for Western to know that its

8  watchstanders are competent and do the job correctly while

9  they're working, right?

10  A.   Correct.

11  Q.   And so are your watchstanders periodically evaluated for

12  the way they do the job?

13  A.   Yearly.

14  Q.   So the ones that we have heard from a lot in this case are

15  Captain McGavock, right?  Captain McGavock, he's been evaluated

16  yearly for the way he drives tug boats for you; is that right?

17  A.   In theory, yeah.

18  Q.   In theory?  Sometimes it doesn't happen?

19  A.   It should.  I mean, what we do is a yearly evaluation.

20  Your crew evaluates the captain, and then the crew evaluates the

21  crew, and it's confidentially turned into the office.

22  Q.   Sure.

23       So for Captain McGavock, for his evaluation in 2016, was

24  the sinking of YFD 70 a subject of that evaluation?

25  A.   It's purely a crew evaluation of his duties aboard the

1    vessel.  So the evaluations generally happen around -- well, it

2    would be -- I think it's in the spring.  I'm not 100 percent.

3    So it would be whatever crew he was on the vessel with at that

4    time, or his regular crew would evaluate him.  We try and get

5    the people.  If Stephen -- like, right now he is on a regular

6    run, as he mentioned, going to Whittier, his normal crew would

7    evaluate him, because they spent the most time with him.

8    Q.    Okay.  So did the crew mention the sinking of the YFD 70 in

9    their evaluations of him?

10   A.    That wouldn't have been part of our standard form.

11   Q.    So was Captain McGavock disciplined for any conduct

12   relating to the sinking YFD 70?

13   A.    No.

14   Q.    Was he issued any -- were there any plans put in place to

15   retrain him or to make better any of his practices following

16   that sinking?

17   A.    No.  He's a great captain.

18   Q.    Okay.

19         After this court's ruling that Captain McGavock and Western

20   were negligent, in some respect, with respect to the sinking of

21   the YFD 70 in the sanctuary, will Captain McGavock be retrained

22   on anything now?

23   A.    No.  We believe he wasn't negligent, as a company, and we

24   stand by our captain's decisions.

25   Q.    Okay.

1    I'm not seeing it, so I'm not sure that it was done, but

2    was there a Western Towboat investigation of the sinking of the

3    YFD 70?

4    A.   I believe so.  That would have been Jeff that did that.

5    Q.   I've seen some statements of the folks -- the men on the

6    boat at the time.  Was there a report of that investigation

7    written up anywhere?

8    A.   I can't speak to the matter of that.  I don't know.

9    Q.   Okay.  It didn't rise to you anyway, that investigation?

10   A.   At the time I was sailing, working on the tugs three or

11   four days a week, so I wouldn't have been in the office to know.

12   Q.   Fair enough.

13       So now to the other watchstanders on the vessel, and,

14   specifically, I'm asking -- maybe you don't even use that term.

15       So for Kyle Jacobson, has his -- he's not an employee

16   anymore.  Was Kyle Jacobson trained by Western in how to stand

17   watch in the wheelhouse of any Western tug?

18   A.   He attended Pacific Maritime Institute, so he would have

19   had that training for his license there, and then whatever our

20   winter training programs would have been.

21   Q.   So that's where he would be trained on how to take

22   observations regarding wind and weather the vessel was

23   encountering?

24   A.   I'm not 100 percent on the program there, so I couldn't

25   answer that.

1    Q.    Okay.

2          He did that while he stood watch in the wheelhouse of the

3    *Ocean Ranger* on this voyage, though; you're aware of that,

4    right?

5    A.    It's standard in our logbooks to estimate the weather.

6    Q.    Do you personally have any doubts or a lack of confidence

7    about Mr. Kyle Jacobson's ability to stand a watch on a tugboat?

8    A.    Standing watch?  No.

9    Q.    When he worked for you, he was a competent watchstander,

10   wasn't he?

11   A.    Yeah.  He did a nice job for us.

12   Q.    Good.  So you had confidence that his notations in a vessel

13   log were worthy of competence; is that right?

14   A.    I don't know.  I'm not going to make assumptions on just

15   writing things in a logbook.  I can't see what he sees, so I

16   can't make an assumption on that.

17   Q.    All right.  So you don't know if he wrote things down

18   competently or not on this voyage; is that what you're saying?

19   A.    I would assume he would.

20   Q.    Okay.  Have you seen anything during -- you sat through

21   this entire trial, to this moment.  Have you seen anything that

22   would make you doubt any of the notations that Kyle Jacobson

23   made in the *Ocean Ranger* log?

24   A.    Yeah.  When you look at the difference between Cowgill's

25   observations and his, there is a noticeable difference within a

1     short period of time.  So it's all estimation.  Some people,

2     like earlier in this trial, may perceive something as different.

3     Q.    What's the difference between Jacobson's notations and

4     Cowgill's, in your mind?

5     A.    I noticed on some of the -- or we went through it -- or

6     Dave was going through it, with respect to the sea heights and

7     wind, there was a different in speeds between watch-change.

8     Q.    Which one was higher and which one was lower?

9     A.    John was lower.

10    Q.    John was lower, and Kyle was higher?

11    A.    That's what I observed in the one log sheet there, yes.

12    Q.    So John -- we were talking at the break about

13    Mr. Cowgill's -- the fact that he worked an entire career

14    fishing in Alaska -- right? -- and then came down here and is

15    working 20 years on for Western, to date.  Is that your

16    understanding as well?

17    A.    Yep.

18    Q.    And you have confidence in Mr. Cowgill's abilities to stand

19    a watch and accurately observe the weather, do you?

20    A.    As long as he's wearing his glasses, yes.

21    Q.    I think he was wearing them yesterday.  So could we assume

22    he was wearing his glasses when he worked for you?

23    A.    I can assume.

24    Q.    Fair enough.

25          It's important to Western that the watchstanders are as

1    accurate and uniform as possible when they're writing in the

2    logs of a vessel, right?

3    A.    Sure, for pertinent information, yes.

4    Q.    Good.

5          When a captain needs help with weather forecasts during a

6    voyage, what is the captain supposed to do, according to Western

7    procedures?

8    A.    Well, he can always call the office, or he can call -- use

9    any means of help he wants.  It's master's discretion at Western

10   Towboat.

11   Q.    And we looked at the tow plan amendment a number of times

12   here, but that identifies Rich Courtney as a resource for help

13   for the captain during the voyage.

14         Do I need to bring it up, or do you recall that?

15   A.    Yeah.

16   Q.    You do recall that?

17   A.    Yes.

18   Q.    Okay.  Thanks.

19         Do you personally have confidence in Mr. Courtney's

20   abilities?

21   A.    I've never used him so I can't speak to that matter.

22   Q.    Sure.

23         During your deposition, you talked about him, and you said

24   that he has a degree in meteorology -- you acknowledged that he

25   has a degree in meteorology, but you also said you took a class

1    in meteorology at Cal Maritime.

2    A.    Correct, yeah.

3    Q.    So he's not standing on the deck of the vessel, so you have

4    more confidence in the observations of the person on the deck of

5    the vessel than you do in Rich Courtney?

6    A.    Yeah, real-time, yes.

7    Q.    Okay.

8          So in the end, I think it's -- well, it's my memory that

9    Captain McGavock testified that he did not consult Rich Courtney

10   at all on this voyage.  Is that your recollection also?

11   A.    Correct.

12   Q.    Did you did you talk to Rich Courtney about this voyage?

13   A.    I wouldn't have, no.

14   Q.    What do you mean you wouldn't have?

15   A.    I was wasn't in the office.  I was working on the boats

16   more.

17   Q.    Okay.

18         Oh -- more jumping around for you, sir.

19         From the website, I think I saw that Western builds its own

20   towboats in Western's own yard; is that correct?

21   A.    Correct, since 1980, I think it was, somewhere in that

22   neighborhood.

23   Q.    Okay.  Cool.

24         Do you have marine engineers on staff at Western Towboat?

25   A.    We use Jensen Maritime consultants.  We also use Glosten

1    here in Seattle.

2    Q.    So those are outside design professionals; is that right?

3    A.    Yeah.  And then we have, also, we use another guy, Mark

4    Siburg, with Argonaut Marine, who is an engineer, and he,

5    actually, is on site a lot as, kind of, a contractor to Western

6    Towboat.

7    Q.    You bet.

8          And my point is that you don't design vessels yourself;

9    that is, Western employees don't take pen to paper and draw what

10   the vessel should look like and where things attach and what

11   equipment goes where, do you?

12   A.    We do, actually.  My father designed all our tugs, and I

13   designed our newest one, the *Mariner*, and we work directly,

14   hand-in-hand, with the architects.

15   Q.    So do you use structural calculations?

16   A.    That's what the architect and engineers are for.

17   Q.    Mechanical calculations?

18   A.    I don't do that.

19   Q.    So, again, is that what the outside engineers and

20   architects are for?

21   A.    Vessels are built to class, most of the ones we've built,

22   so you have to have an outside source.  And then you also have

23   to have it verified by an outside engineering firm, like ABS,

24   RINA, DNV, something like that, before you can even build.

25   Q.    Because ABS, RINA, they know that Western is an expert

1   ocean-tower, or we assume they do, but they also know that

2   Western is not a marine engineer or a naval architect, correct?

3   A.     Incorrect.  They're classification societies.

4   Q.     Sure.

5   A.     So in order for the tug *Ocean Ranger* to go from Seattle,

6   out in the ocean, down to, say, Ensenada, you have to have a

7   certificate for an ocean voyage, a load line, and that's

8   issued -- like in the *Ocean Ranger*'s case -- by a classification

9   society, ABS, where all the designed is improvement.  It has to

10  use ABS-certified plate, and it has to be inspected regularly.

11  Q.     Okay.  So do you know how to accomplish that design

12  yourself, you, Russell Shrewsbury?

13  A.     We work with the engineers and architects and ABS to do

14  that.

15  Q.     Again, I'm asking for your personal knowledge, sir.

16  A.     No.  Sorry.  No.

17  Q.     Okay.  Thank you.

18         So you rely on engineers to help you do the job safely and

19  efficiently, right?

20  A.     When constructing a vessel, yes.

21  Q.     Okay.

22         So now let's talk a little bit about Rich Shaw.

23         So I'm unclear.  Have you ever seen the tow-plan amendment

24  that Jeff Slesinger put together?

25  A.     I believe I sent it to the Coast Guard.  I don't know

1    how -- remember how or when I got it.

2    Q.    How did -- if you know -- Mr. Slesinger come up with the

3    tow-plan amendment?  How did he make that document?

4    A.    I don't know.

5    Q.    You do recognize, though, that the sea-conditions part of

6    that tow-plan amendment is different than in the original tow

7    plan, don't you?

8    A.    I do, yeah, looking at it, yes.

9    Q.    What he did was he reduced the seas that he advised the

10   crew to ideally -- he reduced the recommendations from those in

11   the original tow plan significantly, didn't he?

12   A.    Looking at it afterwards, yeah.

13   Q.    Okay.

14       And do you know how or why he did that?

15   A.    I couldn't tell you, no.

16   Q.    So do you know if Mr. Slesinger got any survey or

17   recommendations from Richard Shaw?

18   A.    Personally, no, I don't.

19   Q.    Okay.

20       Do you know if you got any survey report or surveyor's

21   recommendations from Rich Shaw?

22   A.    To my recollection, it was just the draft that I received

23   that I sent to the Coast Guard.

24   Q.    So you never -- you don't think you got any follow-up

25   documents from that?

1  A.    I don't remember.  If I did, it would have been forwarding

2  on whatever it was, probably.  Generally, they don't tend to

3  change.

4  Q.    Well, you've seen in this case it did change, haven't you?

5  A.    Yes.

6  Q.    All right.  So let's talk about Richard Shaw.

7        Would you agree that he is an expert marine surveyor?

8  A.    Given his qualifications in the industry, I've only known

9  him as a good surveyor, yeah.

10  Q.    All right.  So you've seen him around Puget Sound during

11  surveys for other people; is that right?

12  A.    I haven't seen him around; only on the jobs we've done.

13  Q.    Okay.  Has he done surveys on other jobs that you've done?

14  A.    He did do another Vigor -- I can't remember what it was,

15  offhand.

16  Q.    Okay.

17        Did you hear conversations from the folks at Western

18  that -- did anyone say anything to the effect of, Who is this

19  Rich Shaw character?  We don't know this guy.  He doesn't know

20  what he's doing.

21  A.    No.  Jeff just knew of him.  That was all.

22  Q.    Was Jeff Slesinger, your port captain at the time, or

23  maybe -- strike that.  Was Jeff Slesinger your port captain at

24  the time?

25  A.    Director of safety training and port captain, yeah.

1   Q.   Sure.

2   A.   I mean, it's kind of an all-in-one title.

3   Q.   And he'd been with Western for 20 years or so at the time,

4   I think, right?

5   A.   I grew up going to Alaska with Jeff as captain when I was a

6   kid.

7   Q.   And how old are you now, sir?

8   A.   Unfortunately, 37.

9   Q.   Okay.  So that was, at least, depending on your definition

10  of "kid," it means when you were a teenager, so 20 years ago,

11  right?

12  A.   Yes.

13  Q.   All right.  Thank you.

14       I made another note here.  No, we'll skip that one.

15       So after the incident, the National Oceanic and Atmospheric

16  Administration contacted Western Towboat; is that right?

17  A.   I believe so.  I was not privy to that.

18  Q.   You did receive, at least, one piece of correspondence from

19  NOAA, didn't you?

20  A.   I believe my father did.  I didn't see it.

21  Q.   Okay.  Did Western ever respond to that piece of

22  correspondence from NOAA regarding the sinking of the YFD 70 in

23  the sanctuary?

24  A.   I don't remember.  I don't know.  We were under the advice

25  of an attorney at a different firm.  I do know that, and that's

1  all I know.

2  Q.    So --

3  A.    And this was back a few years, anyway.

4  Q.    You bet.

5        Do you remember when my partner, Dave Boyajian, took your

6  deposition?

7  A.    I think that was a day he won't forget, either.

8  Q.    So is that a "yes," sir?

9  A.    Yes.

10  Q.    And he asked you this question -- this is page 244, line

11  13.  He asked you:  "How early did you know that a government

12  federal agency might make a claim against the parties?"

13        And your answer was:  "Oh, there is a letter sent to us by

14  Rachel-somebody a year or two after, maybe."

15        Do you remember that?

16  A.    Yeah.  That was the letter my father received.

17  Q.    Okay.  And so do you remember what the letter was about?

18  A.    Honestly, I -- it was something to the effect of the boat

19  being in the sanctuary, I believe.  I don't really remember if I

20  read it or not.  I just remember my father and our other

21  attorneys talking about it.

22  Q.    So I don't want you to tell us -- well, I guess, I don't

23  care.  Nobody is objecting.  I'm not asking what the lawyers

24  told you, Mr. Shrewsbury, but was the letter about wanting

25  Western to be involved with the research-vessel opportunity to

1   go and, actually, locate the dry dock, as far as you know?

2   A.    I'm assuming.  I don't know.

3   Q.    So, again, when my partner, Dave Boyajian, took your

4   deposition -- page 244, line 21, the question is a bit strange,

5   but here's the question:

6        "Okay.  I don't have a copy of it" -- referring to

7   letter -- "it would be within" -- and then, I think, the way I

8   read the transcript, sir, is that you interrupted him to say,

9   "It was asking -- I remember seeing it.  It was asking about us

10  wanting to be involved with a research-vessel opportunity to go

11  and actually locate the dry dock, and that was it."

12  A.    Yeah.  To clarify that, there was an opportunity to be

13  involved in going to find it, or something to that effect.

14  Q.    Sure.  Did Western --

15  A.    Not -- not the name of the vessel.  It was an opportunity.

16  Q.    Oh, I see.

17  A.    It was something to that effect, is what -- what that

18  meant.

19  Q.    Okay.  I understand, and I think the record understands.

20  We'll see, I'm sure.

21       So this was an opportunity to be involved with the research

22  vessel.  Did Western take the government up on that opportunity?

23  A.    Under the advice of our attorney, I think, if I remember

24  correctly -- we're okay to say that, I'm assuming -- but they

25  told us not to do anything.

1    Q.    So did Western do anything?

2    A.    No, because we didn't contractually obligated to.

3                MR. JARRETT:  Okay.  I'm getting smirks and shakes of

4    the head, Mr. Shrewsbury, so I think I'm done with my

5    examination, sir.  Thank you for your patience.

6                THE COURT:  Thank you, counsel.

7          Counsel, anything further based on the cross?

8                MR. SIMMS:  Yes.

9                        REDIRECT EXAMINATION

10   BY MR. SIMMS:

11   Q.    So Mr. Jarrett asked about aftermaths of the sinking.  And

12   was anybody threatened -- was there any -- did anybody lose

13   their license as a result of the sinking?

14   A.    No.

15   Q.    Did the Coast Guard have any investigation of anybody's

16   license?

17   A.    Not that I'm aware of, no.

18   Q.    Was there any Coast Guard conclusion, that you're aware of,

19   of negligence or breach of safety protocols or anything in

20   connection with the sinking?

21   A.    To my knowledge, no, there was not.

22   Q.    Okay.  So -- all right.

23               MR. SIMMS:  Okay.  Done.  Thank you.

24               THE COURT:  Thank you.  You may step down.

25         Counsel, you may call your next witness.

1          MR. SIMMS:  We will call Dr. Hudson, and he is on the

2    phone.  So I think he knows that he needs to punch in the

3    asterisk, and he'll be able to speak.

4       Dr. Hudson, are you on with us?

5          THE WITNESS:  I am.  Can you hear me?

6          THE CLERK:  Yes, we can.

7          UNIDENTIFIED SPEAKER:  Boy, can we.

8          THE COURT:  Dr. Hudson, good morning.  Thank you for

9    joining us.  It's my understanding you are being called as a

10   witness by the plaintiff.  Of course, there will be an

11   opportunity, once that questioning is finished, for

12   cross-examination by the defense, and then we may go back and

13   forth once or twice.  Do you understand?

14         THE WITNESS:  Yes, Your Honor.

15         THE COURT:  All right.  We need to swear you in,

16   because your testimony will be sworn under oath, and our clerk

17   will handle that.  So please pay attention to the oath, and then

18   answer her question.

19                        PATRICK HUDSON,
               having been first duly sworn, testified as follows:
20

21         THE CLERK:  Please state your name for the record, and

22   spell it for the court reporter.

23         THE WITNESS:  Patrick Hudson, H-u-d-s-o-n.

24         THE COURT:  Counsel, it sounds like we might have a

25   little bit of trouble in terms of being able to listen to him.

 1   Let me instruct our court reporter to not hesitate at any point

 2   in time if you are not able to make out what is being said on

 3   the phone by the witness.

 4           MR. SIMMS:  Dr. Hudson, one thing that could help is

 5   if you're on a speaker, take that off.

 6           THE WITNESS:  I'm actually on a headset, but if that's

 7   not good, I can take off the headset.

 8           MR. SIMMS:  All right.  The headset ought to be pretty

 9   good.  We'll see how it goes.

10       And, Nancy, if you have a problem, please let us know.

11       All right.  Are we ready?

12           THE COURT:  You may inquire.

13           MR. SIMMS:  Before we do, is there any way we can tell

14   who else is on the telephone?

15           THE CLERK:  The hearing is open to the public, so we

16   don't, generally, have them identify themselves.

17           MR. SIMMS:  We do have a sequestration order, which

18   makes that kind of interesting.

19           THE CLERK:  Well, if any other witnesses --

20           MR. SIMMS:

21           THE CLERK:  -- potential witnesses are on the line,

22   we'd ask you to identify yourselves.

23           MR. SIMMS:  Is Mr. Naylor on the phone?

24           MR. HOWARD:  Mr. Naylor is a retained witness as well

25   as an expert witness.

1          MR. SIMMS:  I'm just interested if he's on the phone.

2          THE COURT:  There was no answer, counsel.

3          MR. SIMMS:  Okay.  All right.

4                         DIRECT EXAMINATION

5    BY MR. SIMMS:

6    Q.   Dr. Hudson, I have put up on the screen your report, which

7    has been entered into evidence.  And you were here in person the

8    other day and have you been listening in to the proceedings that

9    have gone on?

10   A.   Yes, I have.

11   Q.   Okay.  All right.

12        Now, would you briefly -- because it's in your report --

13   tell us something about your background, and, in particular,

14   have you ever had any responsibilities concerning dry docks?

15   A.   Well, I graduated from the U.S. Naval Academy with a degree

16   in naval architecture, and I spent 26 years in the Navy,

17   combined with the Naval Reserve (inaudible) so I had

18   about (inaudible) I graduated -- retired as a commander in the

19   Reserves.  My specialty was engineering duty officer.  And of my

20   26 years in the Navy, about ten and a half were on active duty.

21        In the latter part of my career, I was involved in mainly

22   ship repair and heavy-lift dry dock vessels.  I was the

23   executive officer of the Navy's heavy-lift dry docking unit, and

24   we trained and operated to, basically, observe the heavy lift of

25   Navy vessels in dry dock.

1   Q.   Okay.  And as part of those responsibilities with the Navy,

2   did you have any responsibilities relating to the tow of dry

3   docks?

4   A.   I had the responsibility with the heavy lift of dry docks.

5   We heavy-lifted the ASBM from Norfolk, Virginia, to Todd

6   Shipyard in Seattle.  So we were involved with the preparation

7   for the heavy lift and the on-load of the dry dock onto the

8   heavy-lift vessel.  My unit was involved with the offload as

9   well.

10  Q.   So what I'd asked is about your responsibilities with dry

11  dock and anything to do with the towing of dry docks, and what

12  was your answer?

13  A.   I was never directly involved with the towing of dry docks,

14  but I was involved with the heavy lifts of dry docks.  Our unit

15  heavy-lifted a similar dry dock, which had been the YFD 67, from

16  Norfolk, Virginia, when the Navy retired it and sold it to Todd

17  Shipyard in Seattle.  So we heavy-lifted that dry dock because

18  it was deemed not safe to tow to Seattle.

19  Q.   Okay.  And did your responsibilities involve assessing the

20  structural integrity of dry docks from a marine architecture

21  standpoint?

22  A.   Yes.  I was involved -- my unit and I were involved in

23  inspecting dry docks for NAVSEA certification.

24  Q.   Okay.

25  A.   We would go down and crawl through the tanks and inspect

1    the structure and inspect the thickness of the steel.

2    Q.    All right.  Now, would you briefly describe to the court

3    what your professional conclusions were in your report about the

4    YFD 70?  If you want to refer us to a page, we have the report

5    up on the screen.

6    A.    Well, just to summarize my findings first, the first was

7    that the dry dock should not have been towed in one piece.  It

8    was not the design and not the recommendations for the actual

9    requirements by the Navy.

10        When it was operated by the Navy, the dry dock had to be

11   separated into three parts.  And this wasn't for convenience;

12   this was for the important fact that the longitudinal bending

13   stress for the completely assembled dry dock would be too great

14   to handle waves, and not only the bending stress, but also the

15   connections between the three sections.

16   Q.    And make sure -- because there is a lot of long words here,

17   like "longitudinal bending stress," make sure you're speaking

18   slowly enough, because the court reporter is taking this down.

19   A.    I understand.  I'll try to be slower.

20   Q.    Okay.  Please continue.

21        MR. HOWARD:  Your Honor, to the extent that there has

22   been an agreement and an order entered that opinions are limited

23   to those expressed in the report, there was no opinion expressed

24   in this report regarding stresses on the connections between

25   sections, and we object to that as a new theory that was not

1    disclosed in discovery or the expert report.  I've, actually,

2    heard nothing about it until this morning, when they tried to

3    bring it up with their fact witness.

4              MR. SIMMS:  We will have a rebuttal.  The court has

5    said that there may be a rebuttal offered, and so we are going

6    to come to that.

7    Q.   (By Mr. Simms)  And, Dr. Hudson, would you tell the court,

8    briefly, a summary of the conclusions in your primary report

9    before we turn to rebuttal?

10             MR. HOWARD:  Objection.

11             THE COURT:  Before we go there, I'll note the

12   objection on the record.  The court is also concerned about any

13   testimony outside of the report.  But I'll let you put it on the

14   record, and then whether or not it's determined to be useful,

15   for the court's purposes, whether or not the court allows it, we

16   can make that ruling later.

17             MR. SIMMS:  I understand, Your Honor.

18             MR. HOWARD:  Thank you.

19             THE COURT:  All right.

20   Q.   (By Mr. Simms)  So you were summarizing the conclusions of

21   your report.  Let's just start with that.

22   A.   The one-piece tow.

23             As described in my report, the manual for the AFDM 14,

24   specifically stated -- and this is on page 12 of my report --

25   that the dock must be disassembled and both end sections off and

1    secured in the center section for towing.

2    Q.    Now, Dr. Hudson, you referred to the AFDM 14.  What, if

3    anything, does that have to do with the YFD 70?

4    A.    AFDM 14 was the later designation by the Navy of the

5    YFD 71.  There were three docks -- those were sister docks --

6    the 69, the 70, and the 71.

7    Q.    Okay.  Please continue with the summary of your report and

8    your conclusions.

9    A.    The tow-suitability survey by Captain Shaw did not either

10   address or quantify any construction and structural capacity of

11   the dry dock, due to the corrosion of the plating and

12   stiffeners.

13          In reviewing Captain Shaw's suitability survey, I noted

14   that there were no photographs in his survey or much description

15   of the ballast tanks.  There were no photographs of the ballast

16   tanks, and the description of the ballast tanks' description

17   was, basically, that they were good.

18          I did examine a total of 444 photographs that were provided

19   as part of Captain Shaw's production.  And I looked at all the

20   photographs, particularly the ones that showed the tanks, and

21   these photographs showed extreme corrosion, and corrosion which

22   would make me conclude that the structure was not in a good

23   condition.

24          At the time I wrote my report, we had no ultrasonic

25   thickness measurements available to us.

1    Q.    Okay.  Please continue with the conclusions of your report.

2    A.    So I stated that while a survey placed a limit on sea

3    state, there was no analysis in the survey that would support

4    why it was seas eight to ten feet.

5              THE COURT:  Dr. Hudson, please repeat your answer.

6    A.    While the survey placed an arbitrary limit on sea state --

7    in other words, the eight- to ten-foot limit -- there was no

8    analysis in the survey that supported that limit.  And there was

9    no consideration of the structural condition of the dry dock,

10   and so that while there's nothing that would support why that

11   would be eight to ten feet.  The dry dock was not designed to be

12   towed in the open ocean with the end sections attached, because

13   when you increase the length from just the center section to the

14   full 528 feet, the bending stresses in the dry dock are much

15   greater, and those increased bending stresses, combined with the

16   decreased structural capacity of the dock from apparent

17   corrosion, could cause or exacerbate flooding.

18   Q.    (By Mr. Simms)  Could exacerbate?  Could you say that

19   again?  Could exacerbate flooding?

20   A.    Could cause or exacerbate flooding.

21   Q.    All right.

22   A.    My other findings concluded that the design details of the

23   connection between the center section and the end section would

24   have included 16-inch-diameter pipes and 18-inch-diameter

25   flooding holes, and those holes had to be properly sealed to

1   ensure there was no flooding through those.

2       When the dock was designed, it was designed to be assembled

3   and then used, and when it was used, they needed flooding holes

4   between the center section and the end sections.

5       But the requirements for -- the Vigor requirements for

6   operation of the dock included specific requirements for sealing

7   these holes -- these flooding holes before towing; hence, in

8   towing, the center section would be separated from the end

9   sections.

10  Q.   Okay.  And I'm looking at page 14 of your report, the final

11  sentence there.  Would you tell the court what you meant by

12  "failure to follow accepted procedures for preparation of the

13  dry dock for open-ocean towing"?

14      What were the accepted procedures for preparation of the

15  dry dock for open-ocean towing?

16  A.   The accepted procedure for towing of this dry dock included

17  the Navy requirements for towing the dry dock; the design

18  drawings, which stated that the dry dock needed to be separated.

19  And, also, there was a report -- and I mentioned this on

20  page 12 -- in the planning for towing the YFD 69 from Portland

21  to Seattle, Mr. Hayes provided a report, from Heger Dry Dock,

22  that included the work-breakdown structure, and part of that

23  work-breakdown structure included separating the sections.

24  Q.   Okay.  And then in that last sentence, you have -- let me

25  go back down to page 14 -- "combined with inadequate structural

1    maintenance of the dry dock."  What do you mean by that?

2    A.    The high degree of corrosion that I observed in the

3    photographs that were produced by Bowditch surveys, which were

4    not included in Captain Shaw's survey report, showed excessive

5    corrosion in both the plating, the bulkheads, the frames, and

6    that degree of corrosion was what I consider inadequate

7    structural maintenance.

8    Q.    Did you include in your report some of those photographs

9    that you saw indicating heavy corrosion?

10   A.    I did.

11   Q.    Are those the ones at page 7?

12   A.    Page 7.  That's just an example of Ballast Tank 14.

13   Q.    Now, why did you focus on Ballast Tank 14?

14   A.    Well, I didn't specifically focus on just Ballast Tank 14,

15   except it is in the aft end section.  But that's just examples.

16   You know, in the 444 photographs there's, you know, a hundred

17   examples of corrosion.

18        The other thing I noted in his photographs is that he did

19   not have photographs of every single tank.

20   Q.    Which tanks --

21   A.    There were only --

22   Q.    -- were not included in the reports -- in Captain Shaw's

23   report?

24        Let me put it this way:  Were there tanks that you

25   considered to be important for the buoyancy of the 70 which did

1   not have photographs included in the report?

2   A.   Yes.  Ballast Tank 14, for example, is right in one of the

3   end sections.  And so it's right -- it's near the -- in fact, it

4   is -- includes the connection between the end section and the

5   center section.

6        And there were several other -- I'd have to go back and

7   tabulate which compartments did not have photographs, but there

8   were not photographs of every single compartment.

9   Q.   All right.  So this is a 60,000-foot view, but have you

10  summarized your report now?

11  A.   I have, yes.

12  Q.   Okay.  Now what I would like to turn to is your rebuttal

13  consideration.

14       Have you read and considered Vigor expert Michael Naylor's

15  report?

16  A.   Yes, I have.

17  Q.   Okay.  What, if any, observations do you have in rebuttal

18  about that report?

19            MR. HOWARD:  Your Honor, we object to the extent that

20  they submitted one rebuttal report in advance that was not for

21  this witness.  We received no rebuttal report.  They've had Mike

22  Naylor's report for months.  And they're now, during trial,

23  giving us opinions that we should have been provided in advance,

24  as they did for the one expert whom they listed as a rebuttal

25  expert.  We object to this as beyond the scope.

1    MR. SIMMS:  Your Honor, in your order in limine, you

2  allowed for three things:  You allowed for rebuttal reports; you

3  allowed for experts to sit in to the trial -- that is, Western's

4  experts -- to observe the testimony and comment on it; and you

5  allowed for them to give rebuttal testimony, and that was not

6  limited to testimony about a rebuttal report.

7    And I think -- I read it, re-read it, and that was,

8  clearly, what the court's order was.  That's why we brought the

9  experts here, that's why we had Dr. Hudson and all of the

10 experts here ready to testify and to respond to the points,

11 including engineering points, that have been introduced with

12 other -- with Vigor's experts.

13    THE COURT:  All right.  Counsel, the report -- again,

14 the objection will be noted.  It will be overruled at this time.

15    MR. SIMMS:  Okay.

16 Q.  (By Mr. Simms)  So, Dr. Hudson, would you offer your

17 rebuttal, starting with expert Naylor's report.  What are your

18 observations about his report?

19 A.  Well, the first one involves the condition of the YFD 70,

20 particularly compared to the condition of the YFD 69.

21    On page 6 of Mr. Naylor's report, he states, "In Heger's

22 opinion, it is possible that YFD 70 was in slightly worse

23 condition in comparison to YFD 69, as YFD 70 operated in

24 saltwater conditions; whereas, YFD 69 operated in freshwater."

25    For reference, Heger's analysis of YFD 69 conservatively

1    assumed 10 percent general corrosion, and this report assumes

2    the YFD 70, in general, is 15 percent corroded, with the

3    exception of the pontoon deck, which is more deteriorated.

4    Q.   And let me stop you.  I've just put up on the screen

5    Mr. Naylor's report, and were you reading from page 37?

6    A.   I was reading from page 6.

7    Q.   From page 6.  Okay.

8    A.   Above the subtitle of "longitudinal strength."

9    Q.   Okay.  I see it.  Okay.  This is almost at the bottom of

10   the paragraph.  Okay.  Please continue.

11   A.   So, Mr. Naylor, you know, a couple of paragraphs above,

12   speaks of the YFD 69 and the one-piece wet tow of the 69 from

13   Portland to Seattle.  And Heger Dry Dock, ultimately, reached

14   the conclusion the dock could be safely towed in sea states.  I

15   would note, they also reached this conclusion after first

16   stating that the dock had to be separated into three parts.

17        But the fact that -- you know, the assumption that the YFD

18   70 was only slightly worse than the 69 is in direct contrast

19   from the photographs produced from Bowditch, compared to the

20   photographs of the YFD 69.

21        It was interesting to note, in the Bowditch survey of the

22   YFD 69, that he included photographs of the tanks and specific

23   descriptions of a few of the tanks, and the photographs of the

24   tanks showed them to be in very good condition.  They had been

25   operating in freshwater.  They'd never been operating in

1   seawater.  You compare those photographs to the ones which were

2   not in his survey for YFD 70 that show the tanks in

3   exceptionally worse condition.

4   Q.    Do you have any further observations in rebuttal to

5   Mr. Naylor's report?

6   A.    I do.

7         Looking at his analysis of the longitudinal bending

8   strength of the dry dock in various configurations, he has

9   curves starting on page 12.

10  Q.    Okay.  I'm going to go to page 12.  Do you have that?  All

11  right.

12  A.    And Figure 7.

13  Q.    Okay.  So Figure 7, that is page 12.  Okay.  I have it up.

14  Please go ahead.

15  A.    So those colored curves are curves of bending moments.

16  Q.    What is a bending moment?

17  A.    So if you take a box or a piece of wood, and you bend it in

18  either end, you create -- if you bend it down, you create

19  tension on the top surface and compression on the bottom

20  surface.

21        So that is similar to when a ship experiences or a dry dock

22  experiences waves, which is sagging when the bow and stern are

23  supported on waves and the middle section is not, so the middle

24  section tends to sag, or hogging, where the crest of the wave is

25  at the mid-part of the ship, and the ends are not supported on

1    waves.

2         So because of this difference in buoyancy along the dry

3    dock, because of the waves, you get varying degrees of loading.

4    So this is not how the dry dock was intended to be operated,

5    fully assembled in sheltered water, where there are no waves.

6         So if we look at his curves of the bending moment, he has

7    dotted lines for ultimate strength and safe limit.

8    Q.   That's at the top?

9    A.   Safe limit at the top, and two for hogging and two for

10   sagging, and those dotted lines are based on his own

11   interpretation of what the condition of the dry dock was,

12   including his assumption of 15 percent corrosion.

13        And by 15 percent or 40 percent, whatever percentage when

14   you talk about corrosion, you look at the original thickness of

15   the steel and what steel is left after corrosion.

16        So he's assuming 15 percent corrosion in all the structure,

17   except for the pontoon deck, where you see 40 percent corrosion.

18   That percentage refers to what percentage of thickness of the

19   steel has been removed due to corrosion.

20        So if your steel was one-inch thick, after 71 years you

21   assume that you lose some of that steel due to corrosion, and 15

22   percent allowance means you only lost 15 percent of thickness to

23   corrosion, and 40 percent means you've lost 40 percent

24   thickness.

25        The point of comparison, the ultrasonic thickness gauging

1  of YFD 70, which was produced after my report, showed areas in

2  the pontoon deck that were nearly 70 percent corroded.

3      But going back to Figure 7, those color curves represent

4  different wave conditions, and he has the legend at the top of

5  Figure 7, showing what his estimate of the bending moment would

6  be in different wave conditions.

7  Q.   And we'll hear from Dr. Kriebel about wave conditions.

8  A.   So if you look at how he plotted those curves, he plotted

9  them directly above an elevation of the dry dock taken from a

10 CAD drawing, and you can see that those curves start at the

11 center section.  So they don't start at the end section.

12     So what Mr. Naylor analyzed was the longitudinal bending

13 stress, or bending strength, of just the center section, not the

14 completely assembled dry dock.

15 Q.   In looking at Figure 7, there is a drawing at the bottom,

16 which appears to be the dry dock, but the curves don't extend to

17 both ends of the dry dock.  Do you have any opinion or

18 observation about that?

19 A.   Yes.  That's exactly what I was referring to.  The curves

20 start -- if you go down from the ends of those curves, they seem

21 to start at Frame 1, which is the intersection between the end

22 sections and the center section.

23     If you look at that elevation on the bottom, you can see

24 that there's -- there's the interface between the end sections

25 and the center section.  It kind of looks like a Tetris piece.

1     But that is --

2  Q.    It looks like a what?

3  A.    Like -- we used to play Tetris.  You know, it's a --

4  Q.    Tetris.

5  A.    It is a multidirectional interface, both horizontal and

6  vertical.

7        So the center section fits over the end section, but the

8  center section starts at Frame 1, where his curves start.  His

9  curves don't extend the full length of the dry dock.  What that

10 means is his calculations were based on just the center section

11 longitudinal strength, which we already know, from the original

12 design, it was designed to handle waves.

13 Q.    Okay.

14 A.    And if you were to plot these curves going to both ends,

15 you'd have much higher bending moments in the center of the dry

16 dock.

17       But even in his curves, you can see that, for a significant

18 wave height of ten feet, wave lengths of 500 feet, which is less

19 than the length of the dry dock, they exceed the safe limits for

20 sagging.

21 Q.    Okay.  And so his assumption about 15 percent corroded,

22 what, if anything, would be a difference if the dock was 20

23 percent corroded?

24 A.    The dotted lines would move down, so the safe limit would

25 be lower.

1    Q.    The safe limit would be lower.  Okay.  How much would they

2    move down?

3    A.    Well, I would have to calculate what that would be.

4    Q.    But, in general, if the corrosion level is higher than 15

5    percent, then the safe limit would be less in terms of

6    structural integrity?

7    A.    Yes.  As a comparison mentioned in the report, the AFMD 14

8    Navy manual, which I referenced.  And I know you don't have a

9    copy of that in front of you, but they talk about the fact that

10   originally the dock was designed with a maximum bending moment

11   of 220,600 foot-long tons.

12         But in 1984, after they overhauled it, they reduced that,

13   due to corrosion that had taken place between 1945 and 1984, and

14   they then get to 178,000 foot-long tons.

15         So if you look at his curves, 178,000 foot-long tons is

16   somewhere between -- about halfway between 150 and 200.  So that

17   safe limit has moved down, just in 1984, and this is for the YFD

18   71, not the YFD 70, but it's, you know, the same basic -- you

19   know, with an increase of corrosion, you have an decrease in

20   allowable bending stress, and so your bending moment will

21   decrease.

22   Q.    And the 71, was that a dock kept in San Francisco?

23   A.    Yes.  That dock was operated by the Navy until, I believe,

24   1999.  And it was decaying -- it was sold to the Port of San

25   Francisco, and decaying, the Eureka.

1        And I mentioned in my report that they did a structural to

2    the belly of the Eureka and found that there was, in 2017, it

3    was unsafe for lifting operations.  And quoting the report, and

4    this is on page 8 of my report, they say, "As discussed" -- this

5    is quoting the dry dock Eureka report, "As discussed in this

6    report, a significant number of UT thickness readings," "UT"

7    being ultrasonic -- "UT thickness readings show a current steel

8    thickness of 25 percent to 50 percent of the original, due to

9    corrosion."

10       And those numbers are in line with the YFD 70 UT survey

11   that was completed in 2013.

12       And they go on to say, in their report, "The corroded deck

13   plate in its current condition has drastically reduced the

14   transitory strength of the dock."

15   Q.   All right.

16   A.   And going back to the statement that the YFD 70 was only

17   slightly worse than the YFD 69, it's not supported.

18   Q.   And just relating to this, you heard testimony that the

19   sale price of the 70 was $10,000, with many dollars in excess of

20   that to prepare it to tow, or whatever, or get it to tow.  Does

21   that tell you anything about the assumption, at all, about the

22   corrosion factor or, generally, the condition of the 70?

23            MR. HOWARD:  Objection; relevance and speculation.

24            THE COURT:  Sustained.

25            MR. SIMMS:  Okay.

1    Q.    (By Mr. Simms)  Did you come to understand, from listening

2    to testimony or otherwise, that the Vigor intention for the tow

3    was to scrap the 70?

4    A.    Yes.  From my analysis of the documents, the intention was

5    to scrap it.  They sold it for scrapping in Mexico.

6    Q.    Uh-huh.  Okay.

7          And did you hear testimony about the price that it was sold

8    for?

9    A.    Yes, I did.  $10,000.

10   Q.    And in your professional opinion, familiar with dry docks,

11   do you draw any observations about that and the condition of the

12   dock?

13               MR. HOWARD:  Same objection, Your Honor; relevance and

14   foundation.

15               THE COURT:  It's not relevant.

16         Mr. Simms, we're straight up at noon.  How much more do you

17   have for this witness?

18               MR. SIMMS:  Probably a half an hour.

19               THE COURT:  And then there's going to be

20   cross-examination?

21               MR. JARRETT:  There will be.

22               THE COURT:  Counsel, we'll go ahead and take our noon

23   break at this point in time.

24         But I just want to bring to your attention -- especially

25   Mr. Simms -- I need you to finish your case today, because we

1    are doing everything we can to try to move things around for

2    next week so that we can allow the defense their day and a half

3    or two days that they requested.  That's what we were able to

4    pull out.  Wednesday and Thursday of next week are the only two

5    days that we can possibly have.  If not, you're looking at

6    sometime probably well into September before we're able to get

7    back to this.

8        So you have three other witnesses today that you have

9    intended to put on.  You need to finish with this witness, so

10   you'll have until our close of business today to get that

11   testimony on.

12            MR. SIMMS:  Yeah.  And I need to talk to the court

13   about the timing of that for the next week, too.

14            THE COURT:  Those are the only two days I have

15   available.

16            MR. SIMMS:  Then we would have to move to September.

17            THE COURT:  Well, maybe it's a good time between the

18   parties to talk about this, during the lunch break.

19            MR. SIMMS:  Uh-huh.  I think we can finish today,

20   subject to the cross-examination.  So when Dr. Hudson comes back

21   on, we'll finish up with the rebuttal, and turn it over to

22   cross.

23            MR. HOWARD:  Your Honor, we had planned to do our

24   complete examination of Mr. Naylor, to make him not have to come

25   back.  If they take Mr. Naylor next, that would not leave much

1    time for the other two witnesses.  So if they get those other

2    two witnesses done first, we would probably be able to

3    finish out -- if they call Mr. Naylor next, it will impair his

4    ability to finish his case.

5              THE COURT:  I figured as much.  That's why I told him

6    he's got to be finished by the end of business today.

7              MR. HOWARD:  Thank you, Your Honor.

8              THE COURT:  All right.  We'll be at recess.

9              (Court in recess 12:00 p.m. to 1:16 p.m.)

10             THE COURT:  Do we have Dr. Hudson on the phone?

11             MR. HOWARD:  Your Honor, before we proceed, I'd like

12   to clarify something.

13        We have Mike Naylor, who is a retained expert for the

14   defense.  He was on the phone earlier, and he informed me he

15   could not figure out how to unmute his phone when the court

16   asked if anyone was listening in.  He was, and we were

17   proceeding while he was still trying to figure out how to unmute

18   his phone.

19             THE COURT:  That reminds me of the many times when

20   I've tried the same thing.

21        Thank you for bringing that to our attention, and Mr. Simms

22   is aware of that now.

23        Counsel, you may proceed.

24   Q.   (By Mr. Simms)  Dr. Hudson, we are back.

25        One part that didn't quite come through is your degree,

1   which is in naval architecture; is that correct?

2   A.   Yes.   It's a Bachelor of Science degree in naval

3   architecture.

4   Q.   And so we're looking at this exhibit from Mr. Naylor's

5   opinion, Figure 7.   You talked about a Tetris figure.   What did

6   you mean?

7   A.   Looking at that, I'm referring to the end piece has both a

8   vertical and a horizontal --

9   Q.   Make sure you speak slowly.

10         THE COURT:   Mr. Simms, if it helps, I understand

11   exactly what the expert is testifying to.   I can look at the

12   exhibit, at Figure 7, and I can see exactly what he means about

13   the Tetris pieces down below, the way they are connected and

14   where they connect on the chart.

15         MR. SIMMS:   All right.   We'll move ahead.   Thank you.

16   Q.   (By Mr. Simms)   So, Dr. Hudson, what is the next

17   observation that you have in rebuttal to Mr. Naylor's report?

18   A.   Well, it goes to, you know, he took some exceptions to my

19   report, and I just wanted to address those.

20         As far as the Eureka, I think we've discussed it

21   previously, but the Eureka was a YFD 71 and was similarly

22   maintained by the Navy until 1999.   It was in good shape.   And

23   then by about the same time, in 2013-2014, it was deemed not fit

24   because it had corroded so badly.

25         So the conditions of the two docks could vary dramatically,

1  depending on the maintenance programs.  So the docks had,

2  basically, the same maintenance program when they were owned by

3  the Navy.  And, certainly, after that, it's -- looking at the

4  photos from the Eureka report, they are very similar to the

5  photos in the Bowditch production that Captain Shaw did not

6  include in his report of the tanks.

7  Q.    And so are you saying that you would expect, based on your

8  professional opinion and familiarity with dry docks, that the 70

9  would be in the condition of the 71, the Eureka?

10        MR. HOWARD:  Objection, both leading and cumulative of

11  the report.

12        THE COURT:  Sustained.

13  Q.    (By Mr. Simms)  What are you saying when you're making this

14  observation about the Eureka?

15  A.    If you go back to my report, when I spoke about the Eureka.

16  Q.    Okay.  We're on that page, page 8.

17  A.    Page 8.

18        The two docks were built at the same time.  They had

19  similar maintenance periods, similar maintenance procedures when

20  they were owned by the Navy, and they were both in saltwater.

21        So my only comparison is that the Eureka is a better

22  comparison to the YFD 70 than the YFD 69.  YFD spent its entire

23  life in freshwater in Portland, until it was towed up to

24  Seattle.  So the fact that it was in much better shape,

25  structurally, below the deck is not a surprise, and given that a

1  10 percent allowance was given to the YFD 69 for corrosion, I

2  would suggest a much greater allowance be given for corrosion on

3  the YFD 70, considering the photographs and considering what we

4  later saw after my report.  The UT survey concluded in 2013 for

5  YFD 70, you had pontoon deck plating that was as much as 70

6  percent corroded.

7  Q.    And if the 71 Eureka and the 70 were not NAVSEA qualified

8  but the 69 was, would that tell you anything about the

9  comparison?

10  A.    Yes, in that I have completed surveys from NAVSEA

11  certification on floating dry docks, and I know that YFD 70

12  would never pass a NAVSEA certification in the condition I found

13  in the photographs in the Bowditch production.

14  Q.    Do you have any other observations in rebuttal to

15  Mr. Naylor's report?

16  A.    I do not.

17  Q.    You also listened to the testimony of Mr. Keen.  Do you

18  have any comments in rebuttal to that testimony?

19  A.    Well, the first comment is that Mr. Keen -- I don't have a

20  transcript, but I believe he referred to the fact that the YFD

21  70 could be split into three parts, as a matter of convenience,

22  in a fixed condition to allowed it to be towed anywhere, from

23  World War II.

24       Certainly, the fact that they required it to be towed in

25  just the center section with the front and stern sections on

1  top, not because of convenience, but because they realized that

2  the longitudinal bend strength of the fully assembled 528-foot

3  dry dock could not handle open-ocean waves.

4  Q.   Now, you heard that -- before we go past that, you heard

5  the testimony that this was not an open-ocean tow but, instead,

6  was a coastal tow.

7       In your experience, is -- first, was that a correct

8  statement that there is difference between an open-ocean tow and

9  this tow along the coast?

10  A.   No, it was not.  The California Coast gets deep very

11  quickly.  I grew up in Carmel, in Monterey.  I know the

12  California Coast.  I know the symmetry of the California Coast.

13  The water is very deep, and that is definitely open ocean all

14  the way down.

15  Q.   Do you have any other observations about Mr. Keen's

16  testimony?

17       MR. HOWARD:  Your Honor, Mr. Keen was here as a fact

18  witness.  I don't know that the expert rebuttal of a fact

19  witness is appropriate testimony.  We object to the scope.

20       THE COURT:  Mr. Simms?

21       MR. SIMMS:  That's why the experts are here, to

22  comment on the -- and, particularly, Mr. Keen is talking about

23  the engineering capabilities of the dock and also talked about

24  the repairs that were made and the supposed compliance to make

25  a -- due diligence of this dock.  And as an expert, Dr. Hudson

1  is prepared to testify in response to that statement that the

2  things that Vigor did were compliant with due diligence.

3          MR. HOWARD:  I don't believe he's been disclosed as a

4  due-diligence expert, and, certainly, where he grow up and the

5  depth of the California Coast is beyond the scope of what he was

6  disclosed for.  I think we're getting far afield, Your Honor.

7  That's why I'm objecting.

8          THE COURT:  I agree.  The objection is sustained.

9  Q.   (By Mr. Simms)  So when you looked -- you mentioned that

10  you looked at many photos that Mr. Shaw had taken, and you heard

11  the testimony that there had been repairs done.  Did you see,

12  based upon your experience, that repairs had been done to the

13  70, reflected in those photos?

14  A.   I looked at every one of the 444 photos that were included

15  in his production.  I could not find any evidence of, you know,

16  some of recent repairs in any of those credited areas that had

17  been mentioned in the UT report --

18  Q.   In the ultrasound --

19  A.   -- ultrasonic thickness.

20  Q.   If there had been repairs in that two-year period between

21  the ultrasonic report and the 2015 photos, what would you have

22  expected to see?

23  A.   I would have expected to see areas of brittle-looking steel

24  with welds, and I didn't see any of that.  I didn't see any

25  replacement of beams or stiffeners.  I, in fact, saw in one of

1  the photos, in Tank 4, looking up, it appears to be two holes in

2  the main deck where sunlight is coming through.

3  Q.   And you heard the testimony about what holds the dry dock

4  on:  Bolts.  Do you have any comments, from your professional

5  opinion, about that?

6  A.   I don't know when those bolts were last replaced.

7  According to the procedure that Mr. Naylor documented in 2013,

8  when he recommended that the dock be split into three parts, he

9  recommended that all the bolts be discarded and new bolts be

10  installed, which I would concur with, because after years of

11  corrosion, the bolts are going to be too difficult to remove,

12  and will probably have to be cut off.

13      Bolts corrode just as much as steel corrodes, and there are

14  no photographs in the Bowditch production by Dr. Shaw showing

15  the condition of those bolts, or even any photographs of the

16  interface between either the center and front section or the

17  center and stern section.

18  Q.   Okay.  And then --

19  A.   -- I don't have any --

20  Q.   I'm sorry.  I interrupted.

21  A.   I don't have any information as to what the condition of

22  those bolts are.  But unless they were recently replaced, I

23  would have an expectation that they would, you know, not be of a

24  condition that would support the same structural load as they

25  were when they were new or as for which they were was designed.

1  Q.   From a naval architecture perspective, is the bolting of

2  the end sections designed for a one-piece tow?

3  A.   It is not.  That built-in section was designed for use of

4  the dry dock in calm water for, essentially, vertical holds and

5  bending moments.  It's certainly not designed to take ocean

6  waves.

7       And while the Mr. Naylor's calls for the bending moments,

8  bending stress in the back, even though he only configured that

9  the center section, he did not mention what the effect on that

10 connection would have been.  And that would have -- if I was

11 going to recommend towing this dry dock is open ocean, I would

12 recommend the detailed engineering design and evaluation of that

13 connection to be sure that the bending moments would not cause

14 excessive tensile force in those bolts that might cause them to

15 separate, and cause one of the sections to separate from the

16 center section.

17 Q.   And you heard the testimony about the installation of pad

18 eyes for connection of the tow gear, and what was your

19 understanding from that testimony about the location of this pad

20 eye installation?

21      MR. HOWARD:  Your Honor, I renew our objection.  This

22 is a whole new theory, apparently, first introduced this

23 morning, beyond the scope of any issues in this case.

24      THE COURT:  The objection will be sustained.

25      MR. SIMMS:  All right.

1  Q.    (By Mr. Simms)  Did you have any observations, based on the

2  testimony of the naval architecture soundness, of the tow

3  configuration that Vigor presented to Western?

4          MR. HOWARD:  Same objection.  This is the same

5  question, just a different way to get at it.

6          THE COURT:  It is, counsel.  Let me have you move on.

7  Q.    (By Mr. Simms)  Do you have any other observations to offer

8  before we turn you over to Vigor?

9          MR. HOWARD:  I will object if it's just an invitation

10  to say the same thing.

11          THE COURT:  Let me have ask you a specific question,

12  if you have any, Mr. Simms.

13  Q.    (By Mr. Simms)  Do you have any concluding observations

14  about Mr. Naylor's report?

15  A.    Well, aside from what I've already mentioned, I do not

16  think he considered the actual condition of the YFD 70.  And I

17  think if you use the actual corrosion loss in the steel, the

18  assumptions he made would show that it was not capable of even

19  the ten-foot tow that he stated it was.

20          In addition to that, the calculations he has for the

21  longitudinal bending member only extended up to the ends of the

22  center section.  So it would have been much higher if he had

23  calculated it for the entire length of the dock.

24          MR. SIMMS:  All right.  We will turn you over to

25  Vigor.

1          MR. HOWARD:  Thank you.

2          THE COURT:  Cross-examination by Mr. Howard?

3          MR. HOWARD:  Thank you, Your Honor.

4                   CROSS-EXAMINATION

5   BY MR. HOWARD:

6   Q.   Good afternoon, Mr. Hudson.  Can you hear me?

7   A.   Yes, I can.

8   Q.   Okay.  My name is Christopher Howard.  I'm here on behalf

9   of Vigor.

10       Because a lot of this is responding to issues you brought

11  up today, I may skip around a bit.  Please ask me to slow down

12  or repeat if I skip too quickly.  Is that okay?

13  A.   Yes, it is.

14  Q.   Okay.

15       And I'm going to make a special effort to speak slowly.

16  That's for the court reporter.  Don't take that as anything

17  negative about you.

18  A.   Okay.

19  Q.   I want to deal with one of the most recent points, out of

20  order, and then I'll go to my outline.

21          MR. HOWARD:  Ms. Ivie, could you put up Figure 7 from

22  Mr. Naylor's report?

23  Q.   (By Mr. Howard)  Do you have Mr. Naylor's report in front

24  of you?

25  A.   Yes, I do.

1    Q.   Okay.  And we've just spent a considerable amount of time

2    on Figure 7.

3         First, I want to ask:  Did you do any calculations to check

4    the accuracy of the calculations Mr. Naylor did in Figure 7?

5    A.   No, I did not.

6    Q.   Okay.  Did you do any calculations to check the accuracy of

7    any of Mr. Naylor's calculations?

8    A.   No, I did not.

9    Q.   Did you do any calculations?

10   A.   I did calculations for stability and list of the dock, but

11   as far as bending moment, I did not do any calculations.

12   Q.   Now, your report did not show your math or your

13   calculations; is that correct?

14   A.   That's correct.

15   Q.   Okay.  So going back to high-school math, Mr. Naylor showed

16   his work so you could double-check it.  You did not, right?

17   A.   Which work are you referring to?

18   Q.   Mr. Naylor showed his calculations, and you made comments

19   about them; is that right?

20   A.   That's right.

21   Q.   Okay.

22        Now, Figure 7 is up here on the screen in the courtroom,

23   and would it be accurate to say that you assume, because the

24   various colored lines end at the point where a mark has just

25   been -- well, a mark has been made in the courtroom -- you're

1  assuming the calculations did not extend to the end simply

2  because the chart -- the graph did not extend to the end?

3  A.    No, I did not.

4  Q.    Okay.

5       So you believe that Mr. Naylor -- if Mr. Naylor comes up

6  and testifies to the court that, yes, his calculations included

7  the entire distance, but the chart doesn't have all of that

8  because it's just a flat line, you have evidence to the

9  contrary?

10 A.    The bending moment would not be zero at that point that is

11 shown close to zero.

12 Q.    That wasn't my question.

13       Did you check his math?

14 A.    I did not check his math.

15 Q.    So are you in a position to contradict Mr. Naylor when he

16 testifies to this court -- and I'll ask you to assume that he

17 will -- that he ran these numbers with the full distance of the

18 YFD 70, including the two end pieces?

19 A.    I'm sorry.  Is there a question there?

20 Q.    Yes.

21       Are you in a position to contradict that?  Can you point me

22 to some mathematics in this report to show that he based it upon

23 the shorter distance, that you assume, as opposed to the entire

24 distance that he will testify his math is based upon?

25 A.    I don't see any calculations in his report --

1    Q.    Okay.

2    A.    -- that show the actual length.

3    Q.    So I'm going to ask the question I tried to ask before, and

4    then I'll drop this.

5          So your assumption is that he did not include the entire

6    length because his chart does not go the entire length; is that

7    correct?

8    A.    My assumption is he did not include the entire length

9    because the bending moment is close to zero at the end of the

10   center section, which is what you would expect if you only look

11   at the center section.

12         If you look at the original bending moment curves -- in

13   fact, the bending moment curves that he provided in his 2013

14   report -- you'd see that it's not close to zero at the end of

15   the center section.

16   Q.    But you did not actually run the calculation to tell me

17   where that's wrong, other than your belief that it shouldn't be

18   close to zero?

19   A.    I did not run any calculations, no.

20   Q.    I'm going to change subjects, because I want to get this

21   done as quickly as possible.

22         Mr. Hudson, can you tell me the meaning of "forensic" in

23   your profession?

24   A.    In my profession, as a forensic engineer, it is the

25   scientific analysis of a failure of something that has happened

1    in the past.

2    Q.    And your work primarily related to litigation or the legal

3    field; is that correct?

4    A.    I've worked both in the legal field and in the insurance

5    field in the last five, ten years.

6    Q.    And how much of your work right now is forensic?

7    A.    All of my work right now is forensic.

8    Q.    Have you ever designed a dry dock?

9    A.    No, I have not.

10   Q.    And I believe you indicated -- I just want to clarify --

11   that you have not worked a dry dock up to be towed; is that

12   correct?

13   A.    I have not worked a dry dock up to be towed, no.

14   Q.    You mentioned you worked a dry dock up to be moved by

15   heavy-lift ship; is that correct?

16   A.    That is correct.

17   Q.    And you delivered that -- you were involved in that

18   yourself, correct?

19   A.    Yes.

20   Q.    It was a delivery to Todd Shipyard in Seattle?

21   A.    It was.

22   Q.    And you delivered --

23   A.    I worked on the on-loads.  I didn't work on delivery, but I

24   worked on the on-loads.

25   Q.    You said on-loads?  I needed to clarify that for the court

1    reporter.

2    A.    Yes, on-loads.  The dry dock was on-loaded in Norfolk and

3    carried via heavy-lift ship to Seattle --

4    Q.    And you -- sorry.  Go ahead.

5    A.    -- I did not work on the offload, and I was not present for

6    the offload.

7    Q.    So were you made aware that you delivered that dock in

8    damaged condition from the transport?

9    A.    I didn't deliver the dock.

10   Q.    You just coordinated the on-load of the dock?

11   A.    No.  We just observed it on behalf of the Navy.  The

12   on-load and offload and transport were completed by the

13   heavy-lift company.

14   Q.    Now --

15   A.    We were the observers from the Navy.

16   Q.    Changing subjects:  Captain Shaw was not hired as an expert

17   for litigation, was he?

18   A.    No, he was not.

19   Q.    And he was there in person to evaluate the condition of the

20   dry dock prior to tow, correct?

21   A.    He was.

22   Q.    And you disagree with his assessment?

23   A.    I do, based on his photographs that he didn't include in

24   his survey.

25   Q.    And you really cannot tell how much rust or corrosion is

1   present from a photograph, can you?

2   A.   You can make a qualitative assessment based on the amount

3   of scaling and the amount of loss of material and the fact that

4   in some areas I could see light penetrating through from above

5   from the sunlight.

6   Q.   Do you defer to Captain Shaw in any way for his on-scene

7   assessment of the condition of the dry dock?

8   A.   I don't understand your question.

9   Q.   Do you give any deference to Captain Shaw in terms of his

10  on-scene inspection of the dry dock, in terms of his evaluation

11  of the condition?

12  A.   I don't really have an opinion on everything he said.  I

13  just looked at the photographs that were in the survey, and

14  compared it to the photographs of the YFD 69, which he also

15  surveyed, and those photographs he included in the survey report

16  show that the tanks are in very good shape.

17       In fact, in support, when he summarized the condition of

18  the dock, he said the tanks on the YFD 70 were good, which is

19  also called the tanks in the YFD 69.  But looking at the

20  photographs of the two, there's no comparison.

21  Q.   Mr. Hudson, I don't think I asked you that, but I'll move

22  on to save time.  I'm going to broaden the question, and I would

23  like you to try to listen to it, and ask me if you aren't sure

24  you understand it.

25  A.   First, before you go on, it's "Dr. Hudson."

1    Q.    Okay.  Dr. Hudson."  I respect your schools.

2          Dr. Hudson, had you ever been on and inspected any of the

3    YFD 69, 70, or 71?

4    A.    No.

5    Q.    Have you ever seen any of them, even from a distance?

6    A.    Yes.

7    Q.    Which one?

8    A.    The YFD 71.

9    Q.    Okay.  But you did not inspect it?  You've not had that

10   chance?

11   A.    I have not.

12   Q.    Do you give any deference to the people who have inspected

13   it with respect to their knowledge of the condition of those

14   three vessels?

15          THE COURT:  Counsel, I'm not sure that that's a

16   question that he can answer.  I think he's given us his best

17   answer.

18          MR. HOWARD:  Okay.  I'll move on.

19          But what I want to, basically, get from this -- and I'll

20   say this in front of the witness -- whether he's trying to

21   substitute his judgment or gives any weight at all to their

22   judgment, if he's relying upon their inspection for his opinion.

23          If I may ask him that?

24          THE COURT:  Ask him that.

25   Q.    (By Mr. Howard)  Dr. Hudson, do you rely upon these people

1   who inspected these three vessels, at all, in forming your

2   opinions?

3   A.    I rely upon -- I have relied upon the reports.  But as far

4   as the three vessels, I've seen the YFD 69 at Vigor, the YFD 70

5   at Vigor, and the YFD 71, which is now the Eureka, in San

6   Francisco.

7   Q.    Dr. Hudson, you put pictures in your report of certain

8   structural members in Hold 7 -- Tank 14.  Do you recall that

9   portion of your report?

10  A.    I do.

11  Q.    What are those structural members?

12  A.    Those are frames, and you can see the bulkhead plating in

13  Figure 4.

14  Q.    The framing is important for the support of lifting a ship

15  out of the water; is that correct?

16  A.    The framing is important for the strength of the ship --

17  the strength of the dry dock.

18  Q.    You're saying that framing --

19  A.    If you don't have the framing, then you don't have

20  longitudinal strength.  That framing contributes to the overall

21  moment inertia at the cross-section of the dry dock.  If you

22  didn't have that framing, you just had the decks and the

23  bulkheads, the dry dock would likely collapse before it even hit

24  the water.  All that framing provides -- it's an important

25  structure, both the framing and the bulkheads framing.

1    Q.    In your report, you make reference to a seal that you say

2    may be corroded.  Do you recall that?

3    A.    To -- I'm sorry.  To a what?

4    Q.    A seal that may be corroded.

5    A.    I didn't say "corroded."  I said the mastic -- are you

6    talking about --

7    Q.    Yes, the mastic seal.

8    A.    What -- what -- show me in your report what you're

9    referring to, and I can better respond in that respect.

10   Q.    Okay.  I did not transpose the page number for that one.

11   I'll come back to it rather than distract right now.  It's a

12   specific page in your report that, before we finish, I'll come

13   back to.

14         I want to move now to the Eureka, the YFD 71.

15   A.    All right.

16   Q.    This is not a vessel that you have seen, correct?

17   A.    I have seen it.  I have not been aboard.

18   Q.    Were you involved in it in any way when you were in the

19   Navy or the Navy Reserve?

20   A.    Specifically the Eureka?

21   Q.    Yes.

22   A.    No, I was not, except that's when I saw it, when I was in

23   the Navy.

24   Q.    So the Navy sold it when they were done with it, correct,

25   or leased it out?

1    A.    They sold it, yes, they sold it.

2    Q.    And the Navy had it in San Diego, didn't they?

3    A.    They did.

4    Q.    And, in fact, do you know how the YFD 71 was transported

5    from San Diego to San Francisco?

6    A.    I do not.

7    Q.    Would it surprise you if it was wet-towed in one piece?

8              MR. SIMMS:  Objection, Your Honor.  There's no

9    evidence of that.

10             MR. HOWARD:  I will make an offer of proof that that

11   will be offered by Mr. Naylor.

12             MR. SIMMS:  It's not in Mr. Naylor's report.  It

13   shouldn't be offered.  The court was very clear that the

14   responses would be limited to the reports of the experts.

15             MR. HOWARD:  That's fact, not opinion, that we're

16   offering.

17             THE COURT:  The objection will be overruled.

18        Dr. Hudson, can you answer the question?

19             THE WITNESS:  Can you repeat the question, please?

20   Q.    (By Mr. Howard)  Would it surprise you to find out that the

21   YFD 71 was transported from San Diego to San Francisco in one

22   piece, wet-towed?

23   A.    It would surprise me, yes.

24   Q.    And it did make it to San Francisco, didn't it?

25   A.    Yes, it did.

1   Q.    NAVSEA certification.  First, you are not a NAVSEA

2   certifier, are you?

3   A.    I am not currently.  When I was in the Navy, I participated

4   in NAVSEA certification for the technical warrant holder for dry

5   docks at NAVSEA.

6   Q.    I would like to clarify.  If by saying you participated in

7   certifications, you were a licensed or certified certifier for

8   NAVSEA, were you?

9   A.    I don't know what a licensed certifier are.

10  Q.    Are there people who are in charge of determining if a dry

11  dock meets NAVSEA specifications?

12  A.    There's a team of engineers that survey the dry dock, and

13  they make recommendations to the technical warrant holder at

14  NAVSEA, who then certifies the dry dock.

15  Q.    And were you on the team determining if it was -- if it

16  would meet specifications or on the team trying to help a dry

17  dock meet specifications when you were in the Navy?

18  A.    I was inspecting the dry dock on behalf of NAVSEA for

19  certification.

20  Q.    Now, is NAVSEA certification fairly stringent?

21  A.    Yes.

22  Q.    In fact, you have to do maintenance and be structurally

23  sound to pass NAVSEA specification -- well, a dry dock has to

24  have had maintenance on it and be structurally sound to pass

25  NAVSEA certification, does it not?

1   A.   Yes.

2   Q.   And do you have an understanding -- I'm switching now to

3   the 70, the YFD 70 -- that it was NAVSEA's certified through

4   2013?

5   A.   That's what I've heard from testimony.

6   Q.   Do you understand that or accept that statement?

7   A.   I don't have any basis to accept it.  I just heard it from

8   the testimony.  I have not seen the inspection reports or the

9   certification report.

10  Q.   Do you have any evidence to the contrary?

11  A.   I do not.

12  Q.   And to be NAVSEA certified from your experience, a World

13  War II vintage vessel would have to have repairs, maintenance,

14  fixing of steel to pass NAVSEA certification 50, 60 years later,

15  correct?

16  A.   I know that it did not pass NAVSEA certification after the

17  2015 ultrasonic thickness survey.

18  Q.   That wasn't my question, Dr. Hudson.  Do you recall my

19  question?

20  A.   Why don't you repeat your question.

21  Q.   Okay.

22       In order to pass NAVSEA certification, to have been

23  certified through 2013, it would had to have had significant

24  maintenance, repair, and even replacement of steel; would you

25  agree?

1  A.    I don't know when it last actually passed NAVSEA

2  certification, but prior to being certified, it would have to

3  have had maintenance.

4  Q.    Significant maintenance, as in it would have to be very

5  good shape at that point, correct?

6  A.    No, I would say continuous maintenance, not so much

7  significant maintenance.  You don't have to have significant

8  maintenance if you've continually maintained it.

9  Q.    Okay.  So continuous maintenance also works, in your

10  opinion; is that correct?

11  A.    That's correct.

12  Q.    You have made references to the structural suitability

13  survey done on the Eureka, which is the YFD 71; do you recall

14  that?

15  A.    Yes.

16  Q.    Do you recall who did that structural suitability survey?

17  A.    Well, the report to which I was referring in my report was

18  the structural assessment report.

19  Q.    Do you recall who did that?

20  A.    Believe it was GHD Talon, but I would have to look at the

21  report to confirm that.

22  Q.    Do you know if Mr. Naylor, at Heger, has done surveys and

23  is personally aware of the condition of the 71?

24  A.    I would certainly not be surprised, but I would not know

25  that for a fact.

1    Q.    Why would you not be surprised?

2    A.    Because Mr. Naylor works for Heger Dry Dock, and Heger Dry

3    Dock is well respected.

4    Q.    All they do is dry docks, right?

5    A.    That's right.

6    Q.    And steel, when you do maintenance and repair to steel,

7    would you agree the color can change fairly quickly when a dry

8    dock is in use?

9    A.    Well, the color can change, but not relative to the

10   surrounding areas.

11         All steel corrodes in the same rate.  So if you have

12   freshly repaired steel next to unrepaired steel, you're always

13   going to see a difference.  The new steel is not going to

14   suddenly become the same color as the surrounding steel.

15         And it's not just the color.  It's the fact that the steel

16   was corroded badly and flaking away.  There were areas that

17   would have had to have been repaired.  In the photos shown by

18   Captain Shaw, there was no evidence, that I could see, of

19   repairs made.

20   Q.    Can you tell from a photo whether it's steel that is

21   flaking or paint that is flaking?

22   A.    Yes.

23   Q.    You can?

24   A.    I can.

25   Q.    Okay.

1      By the way, just to clarify:  Your opinion is that these

2   dry docks would never be safe to tow in one piece; is that

3   right?

4   A.   No.  I would say that the YFD 70 wouldn't be safe to tow in

5   one piece in open ocean.

6   Q.   So the 69 was safe to tow in one piece?

7   A.   I didn't do an evaluation on the 69.  I was reading the

8   survey.

9   Q.   So you don't know?

10   A.   I know the 69 was in much better shape, structurally, than

11   the 70 was.

12   Q.   What is mastic filler?

13   A.   It's a pliable sealant that was designed to be placed in

14   the interface between the center section and the end sections,

15   to seal those sections.

16   Q.   Do you have evidence that mastic filler on this case, on

17   the 70, was degraded?

18   A.   I do not.  I do have the breakdown structure that

19   Mr. Naylor developed for the YFD 69 in 2013, where he

20   recommended that all the mastic be replaced.

21   Q.   Now, while we're on the topic, Mr. Naylor prepared -- Heger

22   Dry Dock, with Mr. Naylor, prepared more than one report on the

23   YFD 69, did they not?

24   A.   They did.

25   Q.   And you've been referring to the suitability report when

1    you've been referring to the report, correct?

2    A.   Well, I've been referring to two reports.  The relocation

3    of the YFD 69 work-breakdown structure.

4    Q.   We'll have Mr. Naylor explain this in great detail, but the

5    work suitability study on the 69 is for putting it into use as a

6    dry dock, not for transporting it.  Would you agree?

7    A.   Well, the intent of the report was described with the

8    intent for Vigor to relocate YFD 69 from Portland to its current

9    berth in Seattle.

10   Q.   Do you recall my question?

11   A.   I don't know what suitability study you're referring to,

12   but this was not a suitability study.

13   Q.   We'll let Mr. Naylor will explain that.

14        Would you agree the Heger report evaluated and gave the

15   opportunity for multiple different options -- or at least two

16   different options -- for transporting the 69 from Portland to

17   Seattle, correct?

18   A.   The work-breakdown structure had two options; one was to

19   dock the end sections on the center section, and the other was

20   to dock the end sections on a separate barge.

21   Q.   You do not believe that the Heger report also evaluated the

22   engineering aspects of wet-towing it in one piece?

23   A.   Well, I know the investigation for the ability of the dry

24   dock to resist ocean-wave bending, which is a different report,

25   did have three cases.  Actually, it had four cases.

1    Q.    I couldn't hear what that last -- actually had what?

2    A.    The other report, I believe, that you're referring to, is

3    the wave-bending resistance report, and that report has four

4    cases, 1B, 1A, 2, and 3, that has towing it as a single unit, or

5    towing it as the center section and one unit, or towing it in

6    just the center section.

7    Q.    Right.

8          So Heger evaluated, did the engineering work, and prepared

9    the calculations and information, giving Vigor options on how to

10   tow this, including a single-piece wet-tow, correct?

11   A.    Correct.

12   Q.    And it, obviously, did survive that tow, correct?

13   A.    It did.

14   Q.    You have stated in your report that the 71 would be unsafe

15   in any sea state; is that correct?

16   A.    Yes.

17   Q.    Are you familiar with Seattle harbor?

18   A.    I have been there.

19   Q.    Are you familiar with what sea states are frequently

20   occurring in Seattle harbor?

21   A.    I wasn't talking about Seattle harbor.  If you look at my

22   report, including my findings -- let me get to the page -- page

23   14:  "YFD 70 dry dock was not suitable to be towed in the open

24   ocean in any sea state in the condition configuration in which

25   it was provided to Western for towing."

1   Q.   But you feel it would be safe to sustain the same sea

2   states in Seattle harbor?

3   A.   I wasn't evaluating Seattle harbor.

4   Q.   So you have no opinion?

5   A.   I have no opinion regarding Seattle harbor, no --

6   Q.   Similarly --

7   A.   -- I was talking about open-ocean towing.

8   Q.   Similarly --

9   A.   And by the way, I didn't say it was not safe to be towed.

10  I said it was not suitable to be towed.

11  Q.   Okay.

12       So if you had been asked ahead of time if this should be

13  wet-towed, you would have said no, based upon the information in

14  your report, correct?

15  A.   Yes.

16  Q.   And when a company like Vigor wants to determine if it's

17  safe to tow this, they go hire experts, like Captain Shaw and

18  Heger, to make that evaluation for them, correct?

19  A.   They may at some times.

20  Q.   I want to change subjects to the bolts.

21       Whatever opinions you gave, I want to understand that you

22  indicated you have no information about the bolts, correct?

23  A.   Correct.

24  Q.   So that would be speculation?

25  A.   That I have no information about the bolts?

1  Q.   You have no basis to give an opinion as to the condition of

2  the bolts, correct?

3  A.   I didn't give an opinion as to the condition of the bolts.

4  Q.   And that was based upon assumptions -- sorry.  Go ahead.

5  A.   I stated that if they had not been replaced, then the bolts

6  should have been examined for structural capacity, because bolts

7  corrode.

8       I did not see the bolts.  I don't believe Captain Shaw saw

9  the bolts, because there were not any photographs in his 444

10 photos that showed the bolts.

11 Q.   But the ultimate answer is, you do not know?

12 A.   I do not know what?

13 Q.   The condition of the bolts or whether or not Captain Shaw

14 saw the bolts.

15 A.   There's no evidence to show that Captain Shaw saw the

16 bolts, so I do not know.

17 Q.   You testified that Heger Dry Dock -- I believe your

18 testimony was -- recommended the 69 be towed in three pieces.

19 Do you recall that?

20 A.   I do.

21 Q.   Would you defer to Heger on what they believe they did or

22 did not recommend?

23 A.   I don't know what they believe they did or did not

24 recommend.  I can just read the report that says they

25 recommended towing it in three sections.

1   Q.   Now, you said you did some calculations, but would it be

2   fair to say there's no calculations shown in your report, right?

3   A.   Correct.

4   Q.   So we cannot double-check your work on your calculations,

5   right?

6   A.   My only calculations regarded the number of tanks that

7   would need to be filled, and that was in concurrence with

8   Mr. Naylor's report.

9   Q.   So you don't have any other calculations beyond the number

10  of tanks needed to flood -- you didn't do that in forming your

11  opinions, correct?

12  A.   Correct.

13          MR. HOWARD:  I have no more questions.  Thank you.

14          THE WITNESS:  Thank you.

15          THE COURT:  Any redirect for Dr. Hudson, based on

16  cross?

17                    REDIRECT EXAMINATION

18  BY MR. SIMMS:

19  Q.   Dr. Hudson, was the fundamental problem that you were asked

20  about with Captain Shaw's report -- with Captain Shaw's report

21  is that he was never informed of the design, that it was not

22  designed to be a one-piece tow?

23  A.   I don't know what he was informed of.

24  Q.   And you talked about the curve from the 2013 report not

25  showing bending moments at the end of zero.  Could you go more

1   into that?  What did you mean by that, the bending moments --

2   A.   The 2013 report, there are waves -- sorry -- bending curves

3   for the different cases they looked at.  And those bending

4   moments were non-zero at the end of the center section.  It was

5   zero at the ends of the dock, as you would expect.

6   Q.   And you got asked about this never-disclosed-before-now

7   notion that the 71 was towed in one piece, but let's put some

8   dates on that.

9        All right.  I sat down after that, and I went on the

10  Internet, and I pulled up a date done by -- do you know who --

11  have you ever heard of GHD Telamon Engineering?

12           MR. HOWARD:  Your Honor, I've never seen this document

13  before.  I have no idea what it --

14           MR. SIMMS:  I just pulled it up.  I've never heard

15  anything about a one-piece tow.

16  A.   That document was referenced in my report.

17  Q.   (By Mr. Simms)  Okay.

18  A.   That's the Eureka structural assessment report.

19  Q.   All right.  This is the --

20           THE COURT:  Hang on, Mr. Simms.

21       It was referenced in his report, Mr. Howard?

22           MR. HOWARD:  Okay.  I don't believe it was produced,

23  but I will accept the reference in the report.

24           THE COURT:  All right.

25  Q.   (By Mr. Simms)  Okay.

1    So I'm looking at a table, "Summary condition of ratings of

2    the YFD 71," and it doesn't say anything about a one-piece tow.

3    But let me tell you -- and if you have it handy, you can pull it

4    up, too.  This is at page 8.

5    A.   Yep, I'm looking at it.

6    Q.   "1995, all ballast and trim tanks sandblasted to white

7    metal and coated with long-lasting preservative."

8         Was the 70 coated with long-lasting preservative?

9    A.   I did not see any evidence of that.

10   Q.   All right.

11        And so then we have, after that, "Within two years, towed

12   to Suisun Reserve Fleet and mothballed."

13        Is the Suisun Reserve Fleet in San Francisco Bay?

14   A.   Yes.  The Suisun is up to the north end of San Francisco

15   Bay.

16   Q.   And then in 1999, it was sold to San Francisco -- towed to

17   San Francisco Dry Dock.  Is that in the San Francisco Bay?

18   A.   Yes.

19   Q.   So the tow within the San Francisco Bay, if it was in one

20   piece, was in the San Francisco Bay?  Okay.

21        And then 2000, "Excellent."  "Dry dock to be in excellent

22   and well maintained."  Was that the situation for the 70?

23   A.   No, it was not.

24   Q.   Okay.  And this is in 2000, and we're looking at the 70 in

25   2015.

1    And then when you look back at the AFDM 14, or the 71 --

2  and this was by, what, 2018, 2017? -- what condition was it in?

3  A.    Well, the 71 is the Eureka.

4  Q.    The Eureka, yeah.

5    And when you looked at it, in your report, what was its

6  condition?

7  A.    Yes.  That was -- that was 2017.  The condition was poor,

8  not certified, (inaudible) fractures at the underdeck,

9  stiffeners (inaudible) portions, 25 percent of corrosion.

10 Q.    So over the 17 years, from 2000 to 2017, the 71 had gone

11 from excellent condition to what kind of condition?

12 A.    Poor.

13 Q.    Was that because of, among other things, saltwater storage?

14    MR. HOWARD:  Objection; lack of foundation.  He has no

15 knowledge of what was done during that time.

16 Q.    (By Mr. Simms)  Would saltwater have --

17    THE COURT:  Hang on --

18 Q.    (By Mr. Simms) -- been --

19    THE COURT:  Mr. Simms, when there is an objection, you

20 have to wait until the court can make a ruling.

21    The objection will be sustained.

22    MR. SIMMS:  Okay.

23 Q.    (By Mr. Simms)  So with the 71 and the 70 kept in saltwater

24 and the 69 kept in freshwater, based on your professional

25 experience, which would you expect to be most corroded?

1   A.   The 70 and 71.

2   Q.   Okay.

3          MR. SIMMS:  Those are my questions.

4          MR. HOWARD:  Nothing further, Your Honor.

5          THE COURT:  Dr. Hudson, thank you very much.

6          THE WITNESS:  Thank you, Your Honor.

7          MR. SIMMS:  We'll call Dr. Kriebel.

8          THE COURT:  Come forward and raise your right hand to

9   be sworn.

10                      DAVID KRIEBEL,
           having been first duly sworn, testified as follows:
11

12          THE CLERK:  Please state your name for the record, and

13   spell your name for our court reporter.

14          THE WITNESS:  My name is David Kriebel, K-r-i-e-b-e-l.

15          THE COURT:  And you've heard the instructions to the

16   other witnesses, so the same apply to you.

17      You may inquire.

18                      DIRECT EXAMINATION

19   BY MR. SIMMS:

20   Q.   Dr. Kriebel, would you tell the court of your background

21   and experience in the field of ocean engineering?  And this is

22   in your report, so you can overview it.

23   A.   I suppose pertinent to this case, about 40 years of

24   experience working with ocean waves; a professor at the U.S.

25   Naval Academy for 34 years.  I ran a wave-and-towing tank there,

1   which simulated wave conditions for ship model testing.  I've

2   done computer modeling of waves and wind-generated waves.

3        I've been selected as the U.S. representative on

4   International Standards Organization, to write international

5   standards on waves and currents.  I've authored a number of Navy

6   guidance documents related to ship-generated waves.

7        I've been involved in tsunami investigations.  I was one of

8   the first U.S. representatives to go to Japan after the tsunami.

9        I've been appointed by the Secretary of Army on several

10  Corps of Engineers panels and dispute resolutions.

11       And I suppose I've been very heavily involved in codes and

12  standards with the American Society of Civil Engineers, writing

13  engineering design standards that would go into national

14  building codes.

15  Q.   Okay.  Now let's talk about your report.

16       Please tell the court an overview of the conclusions of

17  your report; not the expert rebuttal report, but the conclusions

18  of your report.

19            MR. BOYAJIAN:  Your Honor, if I may?  An objection to

20  this.

21       The report is already in evidence.  This is duplicative of

22  evidence that's already before the court, to the extent he's

23  just been asked to summarize things that you already have

24  already in the record, in writing, Your Honor.

25            THE COURT:  And it's kind of a waste of time, counsel.

1    The report is in evidence, and the court has the ability to read

2    it just as well.  Might it make more sense to utilize your time

3    to get to the very pertinent things you want to get to?

4              MR. SIMMS:  All right.

5    Q.   (By Mr. Simms)  And so your rebuttal report and your expert

6    report, just so we're clear, that is 7, and then your rebuttal

7    report, which we've agreed would go in, is 73 -- okay.  All

8    right -- and that is in evidence.

9         Now, you've had a chance to hear the evidence in court.  Do

10   you have any comments on that evidence?

11             MR. BOYAJIAN:  Your Honor, objection, again.

12        I believe you've, with respect to other proposed rebuttal

13   or fact witnesses, have already made rulings that experts are

14   not here to rebut fact testimony.

15        The scope of that question is so broad as to -- it's

16   unclear as to which -- whether or not it's touching on the

17   objections Your Honor has already sustained.

18             THE COURT:  It's impossible for the court to make a

19   ruling when you ask such an open-ended question.  I need you to

20   be specific.

21             MR. SIMMS:  All right.

22   Q.   (By Mr. Simms)  In your professional opinion as an ocean

23   engineer, was this dock suitable to be towed in one piece?

24   A.   Based on what I know about wave effects and the effects

25   that waves have on bending moments on vessels, I firmly believe

1    that towing it in one piece placed it in great jeopardy.

2        By towing it in one piece, towing the longer length, it

3    allowed for greater flexure, and that allows for greater bending

4    moments in waves of the same height, as compared to towing it in

5    the shorter configuration.

6        Stated maybe in reverse, by making it longer, the maximum

7    wave that it could tolerate is much smaller than was in the

8    original design.

9        And I think -- I learned earlier this week, listening to

10   Captain Shaw, that he was not provided with any analysis of the

11   effects of that extra length and that that was not something

12   that was considered, at least no technical calculations, at the

13   time.

14   Q.   When do you believe the damage occurred?

15   A.   Well, in my opinion, I believe it occurred later in the

16   trip, the 24th or 25th.  I believe Mr. Naylor and I are,

17   actually, relatively in agreement on that.

18       I think the empirical evidence suggests that it made the

19   first eight days of the voyage without any apparent damage to

20   the crew and that, by my estimate, the wave conditions were not

21   particularly severe during those first several days of the trip.

22   They were in excess of forecasts, but I don't believe that a

23   particularly dangerous point.

24       But there did reach a point -- on, I estimate, the 24th --

25   where the combination of conditions would have caused this

1   structure to face the potential for much greater bending flexure

2   and hogging and sagging than it had previously in the trip.

3   Q.    What was that combination of conditions?

4   A.    So for almost the entire trip, the vessel was in fairly

5   large swell coming out of the northwest.  And I noticed that

6   Captain Shaw, the other day, did not seem particularly concerned

7   about the large swell.  He made a comment about -- it was really

8   the seas, the shorter-period waves, that he was more concerned

9   with.

10       So these longer waves, you know, I think they would be kind

11  of rolling through at very long period, very long wave length,

12  much longer than the length of the vessel.  When that's the

13  case, the vessel can, kind of, ride over the waves without much

14  difficulty.

15       As I reviewed the conditions, somewhere on the 24th the

16  wind direction changed, the wind speed changed, and we had the

17  sea conditions starting to come in from the southwest.

18       The vessel was headed slightly to the southeast, but the

19  combination, at that particular point, the sea conditions

20  became, I think, a primary concern, at least -- I'm saying that

21  on my part, as an engineer -- and I think it's at that point

22  where we had the potential for the wave length of the waves to

23  match the 528-foot length of the vessel, and that's the

24  definition of a condition that will produce maximum bending

25  moments.

1      So I believe that that was most likely the point where

2  something was initiated in the voyage.

3  Q.   What was initiated?

4  A.   Well, I -- you know, I don't know for sure.  The likely

5  scenario would be a bending stress failure.  I think the

6  evidence that Mr. Naylor produced on bending moments that you

7  looked with Mr. Hudson certainly showed that, even in eight-foot

8  significant wave heights, the bending moments had reached the

9  limit, and in ten-foot wave heights, they had exceeded it.

10     So what that means is that the center of the vessel, the

11  steel in the keel, is going to be pulled apart in tension, the

12  top of the wing wall pushed together in compression, and that

13  would be under the sagging condition.

14     The hogging condition would be just the opposite.  The wing

15  walls are pulled apart; the keel is put in compression.

16     Mr. Naylor showed that it was weaker, had lower tolerance

17  on the sagging component.

18     So I think the most likely thing to happen was that the

19  bending moments and then the bending stresses reached a critical

20  level at that point.

21     I don't know exactly what transpired.  I don't think any of

22  us do.  But the likely thing is some sort of a separation

23  somewhere in the steel, at that point, which would allow water

24  ingress.

25  Q.   And you heard the testimony, and, of course, you've looked

1    at the configuration and seen the safety deck.

2        Where on the dry dock is the safety deck?

3    A.    Fairly high on the wing walls.  I believe I heard -- and

4    I'm not familiar with the dock -- but it's not all the way to

5    the top, but it's up fairly high on the wing walls.

6    Q.    From a wave-analysis standpoint, how could a wave, which is

7    down way below the safety deck, affect the integrity of the

8    safety deck?

9    A.    Well, it could do it through --

10            MR. BOYAJIAN:  Objection.  Dr. Kriebel just testified

11   he's not familiar with the dock.  Now he's being asked specific

12   questions about how the dock would be affected by a particular

13   wave form.

14            THE COURT:  Overruled.  I think it to goes whether --

15   the amount of reliability the court might place on the

16   testimony, but I'll let him answer that.

17            THE WITNESS:  Could you repeat the question again?

18            MR. SIMMS:  Yeah.

19   Q.    (By Mr. Simms)  So the waves are down here, and the safety

20   deck is up higher than the waves, normally, how would any wave

21   action affect the safety deck?

22   A.    I think Mr. Naylor's report is going to inform a lot of

23   that.  He has a diagram in his report of some of the buckling of

24   the steel that can occur up in the high levels of the side of

25   the hull.

1      So as the vessel is being flexed, in hogging and sagging,

2   again, at certain points the steel is being pulled, at other

3   points it's been compressed, and the compression has the

4   potential for buckling to occur, where, instead of a flat piece

5   of steel, it deforms.

6      So, obviously, that region is above the direct wave action;

7   in other words, it wouldn't have likely seen a wave,

8   potentially, at that point.  But it could certainly be affected

9   by this overall compression and tension, this cyclic loading

10  that's going on in the structure.

11  Q.   And what did you do that makes you confident that the

12  damage occurred on the 24th or so?

13  A.   Well, we know -- again, I think I said that I believe it's

14  most likely to have occurred then.

15     The conditions that I looked at ahead of that time, I

16  think, coupled with the empirical evidence of the crew

17  successfully making the voyage for the first eight days with no

18  issues, I think that indicates the conditions during that period

19  of time were not particularly severe or damaging.

20     And I say that, again, having looked at, sort of, the wave

21  directions and the wave lengths.  And, again, I believe the

22  vessel would have ridden out the swell fairly well.

23     And so I think it's really, as you get to the 24th and

24  then, potentially, on the 25th, that we have this change of

25  conditions that occurred.  I mentioned in my report that the

1  conditions at the time were in excess of anything that was

2  predicted.  So I think, at that particular time, conditions just

3  arose and became damaging.

4          MR. SIMMS:  All right.  I'll turn you over to Vigor.

5                  CROSS-EXAMINATION

6  BY MR. BOYAJIAN:

7  Q.   Dr. Kriebel, let me start with a few things that we just

8  talked about.

9      I believe you mentioned that you have a belief that the

10  length of dry dock contributed to its failure.  Did you do

11  calculations to establish that?

12  A.   Comparative calculations, yes.

13  Q.   And are those calculations included in your report?

14  A.   No, they're not.

15  Q.   Did you do calculations to conclude that the 24th and the

16  25th were the most likely time?

17  A.   Yes, I did.

18  Q.   And those are not included --

19  A.   They are.

20  Q.   Those calculations are?

21  A.   Yes.  Well, not the numerical calculations; the graphical

22  results, yes.

23  Q.   Okay.  But not the numbers.

24  A.   Not the numbers.

25  Q.   You just put them on a graph?

1  A.    Correct.

2  Q.    Because there'd been some confusion about a graph in

3  Mr. Naylor's report, and he'll testify as to the math that

4  underlies it.  You're saying there was none?

5  A.    There was math.

6  Q.    Okay.

7        Earlier conditions in the tow, prior to the 24th and the

8  25th -- and we'll talk about the wave conditions you cited, but

9  I just want to talk about things you said for now.

10 A.    Uh-huh.

11 Q.    The tow encountered significant wave heights over ten feet

12 earlier in the tow.  Do you recall that from the logbooks?

13 A.    Yes.

14 Q.    And from your own analysis?

15 A.    Yes.

16 Q.    Would stresses exerted during those times -- they would

17 still exert stresses on the dry dock, correct?

18 A.    They would exert some.  The magnitude would depend heavily

19 on the wave direction, the wave period, and the wave length.  So

20 even though the height might be high, I think, just as Captain

21 Shaw mentioned the other day, a longer-period swell would not

22 have nearly the effect as some much shorter period -- or,

23 actually, of period of waves that produced a wave length that

24 matched the length of the vessel.

25 Q.    Understood, but it would still exert forces?

1    A.    It would exert forces.

2    Q.    And if it did that for the periods like we've seen in these

3    logbooks, where there were 14 hour of waves in excess of the

4    restrictions, those could -- even if they didn't cause the dry

5    dock to take on water and sink, they certainly could weaken

6    structures within the dry dock, couldn't they?

7    A.    I think that's a potential, certainly.

8    Q.    Okay.

9          So when you said you agreed with Mr. Naylor when he

10   concludes that the most likely time was the 24th and 25th, did

11   you see the part of Mr. Naylor's report that says he also

12   believes that earlier periods of bad weather contributed to

13   weakening the dry dock, making it more susceptible to failure in

14   later conditions?

15   A.    I did not.  I'm sorry.  I did not see that.

16   Q.    Okay.

17         Would you agree that that is a reasonable proposition; that

18   early exposure to long periods of adverse weather, even if not

19   enough to break the dock, would weaken it and make it more

20   susceptible to later damage?

21   A.    I would only agree to that stipulated by what I said

22   earlier; that you're requiring the waves come out of a

23   particular direction with a particular wave period and wave

24   length for that to really happen, and I didn't see any evidence

25   of that.

Q.   Well, for it to happen, or would it affect the degree to

which it happens?

A.   Uh --

Q.   Is there any situation in which putting a 528-foot,

71-year-old dry dock into seas in excess of ten feet for periods

of 14 hours straight or more is good for the dock?

A.   I mean, if -- by your argument, I think anytime you put it

in waves, it's going to feel some flexure, regardless.

     So, no.  All I can say is, as I looked at the conditions --

and I think Mr. Naylor shows this.  For different wave periods,

the bending moments are not particularly severe.  It's only when

the wave periods produced the wave length that matches the

length of the vessel that things become very critical, and the

magnitude of these things, the bending moments become much

larger.

Q.   Understood.

     I'm a lifelong sailor and a captain.  I think you might be

the person best suited to answer a question I've had since I was

a kid.

     Can you please describe the difference between a maximum

wave restriction, ten foot, no bigger, and a significant wave of

ten foot?

A.   So in simple terms, significant wave height -- if I can

diverge for just a moment -- is kind of a universally used,

average type of wave estimate, and, as you heard earlier, it's

1   based on taking the top one-third of the waves -- so the most

2   severe 33 percent -- and averaging that.

3       So -- and it's universally used in NOAA forecasts, for

4   example.  So all the NOAA forecasts refer to significant wave

5   height.

6       The rule of thumb for maximum wave height, then, is up to

7   about twice that.  So if you asked yourself, in this random sea,

8   when the waves are moving randomly, and if you knew the

9   significant wave height was ten feet, there's a potential to get

10  waves up to 20 feet in that same sea state.  And that's, you

11  know, quite well known in oceanography and ocean engineering.

12  Q.  And what percentage of waves in a significant sea are

13  higher than -- say, you're in a ten-foot significant sea.  What

14  percentage of waves are higher than ten feet?

15  A.  So it goes back to something called the Rayleigh probable

16  distribution, which is universally accepted, I think, in our

17  discipline.

18      13.5 percent is the percentage of waves that are larger

19  than the significant wave height, theoretically.

20  Q.  Okay.  So if a surveyor, like Captain Shaw, recommends an

21  upper limit of ten foot, and that somehow gets transferred,

22  through someone like Jeff Slesinger, to a tow recommendation

23  that says ten feet that is then misrepresented as being

24  significant, you're saying 13 percent waves would be greater

25  than Captain Shaw's restriction?

1  A.    Well, I think, as I raised in my report, the survey was, in

2  my mind, very unclear about how waves are defined.  And I think

3  the -- as I did in my report, the eight to ten foot, I believe,

4  was a significant wave height.

5       And the reason I say is, significant wave height is what

6  mariners and trained observers tend to estimate visually, by

7  eye.  So it's become this universally used definition of waves

8  to describe a sea state, with all the randomness, and --

9  Q.    And I don't want to cut you off, but are you here as a

10 professional on the standard of care of towboat operation?

11 A.    No, I'm here as a wave expert.  I'm trying to explain

12 wave --

13 Q.    I do understand, but I want to make sure that we stay on

14 topic.

15 A.    Okay.

16 Q.    So while you, as a wave expert, use significant wave

17 heights, you're not an expert to say what is common in the

18 industry for what towboat operators and surveyors exchange with

19 numbers?

20 A.    I am not, except for the testimony I heard earlier this

21 week from the towboat operators that they use the NOAA charts to

22 look at wave conditions, those are significant wave heights.

23      So there's no way that an operator could use a maximum

24 limit, because they can't define it.  It's not what they're

25 going to do observe directly.  It's not what's going to be

1    forecast.

2         So I think all evidence, to me, points to the fact that

3    Captain Shaw intended that it was eight to ten foot significant

4    wave height.

5    Q.   But you were here for Captain Shaw's testimony.

6    A.   I was, uh-huh.

7    Q.   And he, very clearly, said -- if you recall -- that, in his

8    mind, it was a maximum.

9    A.   I did not hear that as I was listening to him and taking

10   notes.

11   Q.   Okay.  Well, the record will reflect that.

12        So am I to assume, then, that what you're saying is, when

13   Captain Shaw issued an eight to ten foot, what he really meant

14   was, "I know some waves will be 20, and that's fine"?

15   A.   I think that's what it would have said, yes, based on the

16   definition of "significant wave height."

17        To go the other way, if he intended an eight-foot maximum

18   wave, that means a significant wave height could have only been

19   four feet, and in the Chesapeake Bay we get that.  So I don't

20   think the vessel could ever have departed if he intended eight

21   feet as a maximum height.  I'm sorry, it's just a ridiculously

22   low number in terms of sea state.

23        So I'm just saying, in terms of waves, I don't think it's a

24   logical way to interpret what was written.

25   Q.   Sure, but he didn't write eight feet, did he?  He wrote

1  ten.

2  A.   Eight to ten, that range.

3  Q.   So eight wasn't a limit?

4  A.   Correct, it would be eight to ten.

5  Q.   Okay.

6       Did you review any testimony before you wrote this report?

7  A.   No.

8  Q.   Okay.

9       No testimony from any of the vessel crew members?

10 A.   No.  I read the Coast Guard report, so that had some very

11 brief statements in it, but I did not read any deposition

12 testimony.

13 Q.   Okay.

14      So when you speculated that there was possible confusion

15 about these numbers, you didn't bother to read testimony to find

16 out whether anyone said they were confused --

17 A.   I did not look at that, no.

18 Q.   Okay.

19      The YFD 71, you talk about it in here.  Are you a dry dock

20 specialist?

21 A.   I am not.

22 Q.   Okay.  Have you ever been on the YFD 71?

23 A.   I have not.

24 Q.   Have you ever seen it in person?

25 A.   I have not.

1  Q.   So anything in your report about the YFD 71 is based on

2  pure speculation, not on expertise?

3  A.   It would have been based on what I read in the Moffatt &

4  Nichol report.

5  Q.   In the Moffatt & Nichol report.  Are you a dry dock

6  engineer?

7  A.   I'm not.

8  Q.   Okay.  So does a dry dock engineer's report make you an

9  expert to opine on the relative condition of various dry docks?

10  A.   Only what I read in that report.

11  Q.   Okay.  Are you an expert on dry dock engineering?

12  A.   I am not.

13  Q.   Okay.

14       I'm trying to move quickly so we don't waste anyone's time.

15       If you had questions or concerns or you were unclear about

16  the way that the crew logged conditions -- because in your

17  report you talk about it's not clear to you how they made their

18  conditional assessments and entries -- wouldn't it have been

19  useful to you to read their depositions?

20  A.   I didn't even know they were deposed, so I didn't have that

21  option.

22  Q.   Okay.  So you speculated about confusion they might have

23  had without going back to source documents to see if you could

24  answer those questions.

25  A.   I speculated about what -- yeah, how I presumed they

1    understood and estimated winds and waves.

2    Q.    Your report also addresses forecasts for wave conditions,

3    and I quote, at or near the time of departure.

4    A.    Uh-huh.

5    Q.    What days did you look at?

6    A.    Mostly on the 17th, and I think -- yeah, probably late on

7    the 17th, at that point.

8    Q.    Okay.  You didn't look at the 18th?

9    A.    I didn't, specifically, that I can recall.

10   Q.    Okay.

11         So the day that they approached Flattery, and then sometime

12   in the late afternoon, made their decision to go onto the open

13   ocean, you didn't, actually, look at wave forecasts they would

14   have had available that day?

15   A.    No, not that particular day.

16   Q.    You do notice, though -- you do note -- you talk about buoy

17   data all along the coast, and your conclusion is that the tow

18   went, quote, in and out of recommended conditions --

19   A.    Uh-huh --

20   Q.    -- on several occasions?

21   A.    Yes.

22   Q.    Did you note that there were more buoys that the vessel

23   passed that showed waves in excess of ten feet than showed waves

24   below ten feet?

25   A.    I forget how I phrase it.  It I think I might have said

1   that, yes, in my one paragraph, but --

2   Q.    Forgetting how you phrased it --

3   A.    Yeah, but --

4   Q.    -- both of us forgetting --

5   A.    No, no, no --

6             THE COURT:  You can't talk over each other.  You have

7   to wait.

8        Counsel, let's take our break at this point in time.

9        I'm going to ask our wave expert one thing I've been

10  wanting to know for quite a while, and when we come back, you

11  can follow up, if you'd like.

12       I'm just interested in your opinion, as a wave expert on

13  the reasonableness of an eight- to ten-foot-wave height

14  requirement on a multi-day voyage from Seattle to Ensenada.

15            THE WITNESS:  Sir, I think my opinion would be -- and

16  I think as the survey suggested -- it's a recommendation, but I

17  cannot see how it can possibly be a requirement.

18       You certainly -- for a voyage that long, you're outside of

19  a predictive range, so the forecasts -- eventually, you're

20  beyond those.  We all know the sea states, the conditions are

21  going to do what they're going to do.

22       So I just don't see how it can be listed as a hard-and-fast

23  requirement, and I don't think it was listed that way.  I think

24  it was a recommendation, was the way I interpreted.

25            THE COURT:  All right.  We'll take our break.

1        (Court in recess 2:39 p.m. to 2:57 p.m.)

2        THE COURT:  Counsel, you may continue.

3   Q.   (By Mr. Boyajian)  Let's pick up where Judge Martinez just

4   finished.

5        So was it reasonable.

6        The *Ocean Ranger* needed -- depending on the testimony we

7   take this week -- five, six, or seven days to get from Cape

8   Flattery down to the San Francisco area.

9        You've heard that testimony?

10  A.   I don't recall that, specifically.  I think I calculated it

11  was eight days but --

12  Q.   Okay.  Let's go with eight.

13       So in order to make it from Flattery to San Francisco

14  within the restrictions -- and this is -- I'm not going to

15  quibble with whether those meant significant or they meant

16  maximum, but, either way -- what the Ocean Ranger needed was

17  relatively high confidence in eight days of wave conditions that

18  met the restrictions, whichever way they interpreted them.

19  A.   I think that's true.

20  Q.   Okay.

21       Your report, you don't address any forecasts beyond 96-hour

22  forecasts, right?

23  A.   That's right.

24  Q.   Those are four days?

25  A.   Yes.

1    Q.    So that only got them halfway there, on your numbers.

2    A.    Right.

3    Q.    Okay.

4          And you don't, at all, address the recommendations not to

5    leave Puget Sound without a forecast less than 4-6, right?

6    A.    No.  You know, I knew at the outset that there was a

7    weather expert, Mr. Pickhardt, working on, sort of, the wind

8    aspects, so, no, I didn't really focus on that.

9    Q.    Okay.

10         But there is an associated wave state with Beaufort scale

11   winds, right?

12   A.    There can be, yes.

13   Q.    And I agree that it's shorthand and it's tied to the wind

14   speed, but what is your understanding of the wave range within

15   Beaufort 4-6?

16   A.    That's, actually, a good question, because it, I think, can

17   differ, depending on what particular version of what chart --

18   sea-state table you look at.

19         But I think, as I recall, the one I looked at that, that

20   would be -- I'm sorry, I don't remember the exact number --

21   maybe below nine feet, I think was the number I remember.

22   Q.    Okay.  So that recommendation, then, was don't leave Cape

23   Flattery without a forecast of wave state less than nine feet.

24         You didn't address the wave forecast, though, for the 18th.

25   We already mentioned that, right?

1  A.   That's correct.

2  Q.   Did the wave forecasts available on the 17th indicate all

3  waves below nine feet?

4  A.   As I saw them, yes, within the zone where they would be,

5  based on my interpretation of the charts and the maps.

6  Q.   Okay.

7       You were present when we showed the archived NOAA

8  forecasted weather?  We're going to say they were the actual

9  forecasts that were shown, or they were the discussions between

10  NOAA meteorologists that they use to make their forecast.

11  A.   Yes.

12  Q.   You did see those?

13  A.   I did see those.

14  Q.   Do you recall that, at least in those discussions, NOAA's

15  meteorologists were predicting waves of ten feet or higher for

16  the coastal waters?

17  A.   I'm not sure I recall that, no.  I'm sorry.  I didn't focus

18  in on that.

19  Q.   The record will be.

20       But you recall that we looked at forecasts from the 16th,

21  17th, 18th, and 19th, right?

22  A.   Yes, uh-huh.

23  Q.   Okay.

24       Do you remember seeing the contract?  We've shown it.

25  A.   I've seen it several times.

1   Q.   I don't expect you to remember every clause, so I'm going

2   to put one up on the screen.

3        Okay.  These are the additional conditions.  They've been

4   discussed at some length.

5        And it says the tow was dependent on favorable weather

6   conditions.  When it says "favorable weather conditions," do you

7   read that as wind and sea conditions within the

8   recommendations of --

9            MR. SIMMS:  Objection, Your Honor.  This is -- he's

10  not here to interpret the contract.

11           MR. BOYAJIAN:  I'm asking about just the definition of

12  "favorable weather conditions" that we can proceed on.  He's a

13  weather and wave expert that you brought here and introduced.

14           THE COURT:  Objection overruled.

15  Q.   (By Mr. Boyajian)  And you see here that -- I want to focus

16  on -- right before the break, you gave Judge Martinez an answer

17  that you didn't think it was realistic that Western Towboat

18  could find a window of conditions eight days from Flattery to

19  San Francisco, where they would be able to stay within those

20  recommendations.

21  A.   That's correct.

22  Q.   Did I heard that correctly?

23  A.   Yes.

24  Q.   Okay.

25       Is that less likely in late October than it is, say, in the

1   middle of summer?

2   A.   Yes.  I've looked at, you know, the wave statistics up and

3   down the coast, and, yes, it's less likely in October than it

4   would be in, let's say, July or August.

5   Q.   Okay.

6        And you've heard testimony all week from Western's folks,

7   that they are relatively expert in understanding weather

8   patterns and understanding wave conditions, et cetera.

9        Would it seem reasonable that they would know that late

10  October is a difficult time to find eight days of conditions

11  less than ten feet?

12  A.   They're the ones that are out there frequently.  I don't

13  know what they would be thinking at the time.

14  Q.   Okay.

15       More likely that folks who spend their lives on the sea

16  than a guy who sits behind a desk in a shipyard doing drawings

17  would know about that?

18  A.   I don't really have an opinion on that.

19  Q.   Have you heard testimony from anyone at Western this week

20  that Western told Vigor, This is an unrealistic set of

21  restrictions and we can't possibly do this, especially in late

22  October?

23  A.   I don't believe I heard that, no.

24            MR. BOYAJIAN:  Okay.  Can we go back to that contract

25  clause?

1    Q.   (By Mr. Boyajian)  The second part:  "In the event that

2    conditions do not allow the tow to commence by November 7" -- so

3    we're talking about a tow that started October 17th, right?

4    Late October, until November 7th.  "After that, either party may

5    reschedule to more favorable dates in the next year."

6         Would it be more likely that the tow might have been able

7    to find eight days of favorable weather if they had waited till,

8    say, the next summer?

9    A.   I would say it's probable if they waited that long, yes.

10   Q.   And if they had the whole year of 2017, do you think they

11   could have found a suitable seven- or eight-day window to get

12   from Seattle -- from Cape Flattery down to San Francisco Bay

13   within the conditions that you saw in the recommendations?

14   A.   Yeah.  I think -- I think they would have to rely on the

15   statistics, because none of the forecasts go out eight days.  So

16   they're still hamstrung by the fact that -- at least in the wave

17   field, and I don't know in the weather field -- the wave

18   forecasts only go out 96 hours, or four days.

19        So I don't know what impact that has on the contract

20   language, but I don't think there's really any way that they

21   could have looked beyond four days at a time in terms of the

22   wave climate.

23   Q.   Okay.  Put it a different way, then:  Statically speaking,

24   were they more likely to find a favorable window had they waited

25   until the following June, July, August, than to try and do it in

1  the second half of October or the first week of November?

2  A.   Yes.

3         MR. BOYAJIAN:  Thank you.

4                    REDIRECT EXAMINATION

5  BY MR. SIMMS:

6  Q.   I have questions about your calculations.

7       Did you do calculations for your report?

8  A.   Yes, I did.

9  Q.   And how did you do those?  Did you do them in pencil and

10 computer?

11 A.   Many of them, initially, in pencil, and then converted them

12 over to computer.

13 Q.   And are there some calculations that you would be able to

14 show us that you did?

15 A.   Some rough rules of thumb that I used, yes.

16 Q.   All right.  What are those rules of thumb?

17 A.   Well, at the Naval Academy, we teach a course in naval

18 architecture to non-engineers, and one of the topics we cover is

19 hogging and sagging, wave bending moments on rectangular barges.

20      So it's not a difficult calculation to do, in a simple

21 sense.  It's not as accurate as a computer model would be, but

22 it gives you a functional relationship, I think, between the

23 different variables that cause the bending moment.

24 Q.   Could you do that calculation for us here?  We've got a

25 pad.

1   A.    Yeah.  I'm not sure I could go through the whole

2   calculation, but I know the result in the end.  It's easy

3   enough.

4           MR. SIMMS:  Your Honor, if you have any questions

5   about how that's done, Dr. Kriebel can show you.

6           THE COURT:  I don't.

7           MR. SIMMS:  All right.  Okay.

8   Q.    (By Mr. Simms)  So could you ever leave Seattle -- this is

9   from your experience as a wave expert, and looking at what

10  you've looked at -- and guarantee that you will never --

11  regardless of season, never have seas over ten feet?  We're not

12  talking about average, we're not talking about -- we're talking

13  about not a single wave, ever.

14  A.    Certainly not.  I mean, the NOAA wave buoys, most of them

15  have historical statistics available, which I looked at.  And

16  there's really not a month that goes by where they're not going

17  to find waves over -- and I'm going to say, roughly, four to

18  five meters.  So I think every single month of the year has some

19  chance of getting waves that big, which would be 13, 16 feet,

20  something like that.

21  Q.    Was the problem here -- and we've been talking about

22  restrictions.  Of course, there were none.  It was

23  recommendations and those sorts of things.  The testimony is

24  clear on that.

25          But was the problem here not wave height but wave length?

A.    It's a combination of the two.  The simple equation that I
was referring to says that, generally, bending moment and the
bending stresses and hogging and sagging are proportional to
wave height, but then to the vessel length or the ship length
squared.

So it turns out that, you know, they're -- we would say in
engineering -- linearly proportional to the height.  So if you
double the height, you double the bending stress.

On the other hand, if you factor in the length of the
vessel and make it longer, that relationship is squared, so it
goes up very quickly and increases bending moments very quickly.

Q.    Now Captain Shaw, apparently, had great confidence in his
report; that, you know, if you take this out -- interpreting it
as Vigor does -- that no absolute single wave higher than ten
feet, everything was going to be okay.  Okay?

Did you see any indication in your calculations that there
was any wave height that would have been suitable for this tow?
Is it ten feet, is it fifteen feet, is it eight feet?

MR. BOYAJIAN:  Objection, please.  Your Honor,
Dr. Kriebel has testified that he's not an expert in dry dock
engineering or dry docks, at all.  He's now being asked about a
question of would a dry dock be okay in a certain wave height.
That's a dry-dock question, not a wave question.

THE COURT:  The objection to the form of the question
will be sustained.

1    Q.    (By Mr. Simms)  Okay.  So let's say that -- knowing what

2    you know about waves and about the length of the dock and the

3    condition of the dock, would you feel that you could make --

4    from a naval engineering standpoint -- that you could make any

5    recommendation about a maximum wave height safe for towing?

6              MR. BOYAJIAN:  Your Honor, again, same objection.

7    That's a dry-dock question.

8              THE COURT:  Same ruling.

9              MR. SIMMS:  Okay.

10   Q.    (By Mr. Simms)  So you looked at Mr. Naylor's bending

11   moment limits.

12   A.    Yes.

13   Q.    Okay.  So looking at those bending moment limits and wave

14   height -- all right? -- applying those, does that tell you

15   anything about the safe -- if there is one -- height of waves

16   for this tow?

17             MR. BOYAJIAN:  Your Honor, we're changing the words

18   but we're still getting at the same fundamental question.

19        He's asking what would the wave height be in which this dry

20   dock could be safely towed.  That is, fundamentally, a dry-dock

21   question.

22             THE COURT:  Sustained.

23             MR. SIMMS:  Okay.

24   Q.    (By Mr. Simms)  So based on your experience as a naval

25   engineer, if Vigor had come to you saying, Dr. Kriebel, what

1    would you need to know, from your standpoint, to tell us that

2    the one-piece dry dock could be safely towed?  What would you

3    need -- and we need to know what the wave height should be.

4              MR. BOYAJIAN:  Your Honor, this is the same question.

5              THE COURT:  It is, Mr. Simms.  Let's move on.  Do you

6    have anything else?

7              MR. SIMMS:  All right.

8    Q.    (By Mr. Simms)  Well, do you feel like you would have any

9    qualification to answer that question?

10   A.    I do.

11   Q.    And why would you have the qualification to answer that

12   question?

13   A.    Because bending moments are a fundamental thing in

14   engineering, so it's something that every engineer has been

15   schooled on since sophomore year.

16   Q.    And you've taught about them in your fundamental class for

17   people like us who aren't --

18   A.    Engineer majors, political science majors.  I'm not sure

19   where you fall, but -- but, no.  I mean, that's a fundamental

20   thing that's not hard to do.  And I think, from my expertise,

21   there really is no ocean problem where you would not want to

22   investigate wave-height conditions, wave-period conditions,

23   wave-length conditions, and wave directions.  And I think all

24   those things are going to come into play if you're going to try

25   to calculate bending moments and try to make a recommendation on

1  bending of a dry dock, or anything.

2  Q.   And so for this dry dock, if I'm Vigor coming to you, I

3  don't want the bending moment to exceed a certain point, right?

4  A.   Uh-huh.

5  Q.   What point is that?

6          MR. BOYAJIAN:  Your Honor, objection, again.  This

7  time twice.

8      It is still a question about the dry dock, even if he says

9  he understands bending moments mathematically; second, and I

10  think more critically, none of these opinions are addressed.

11  There is no foundation for them in Dr. Kriebel's report.  His

12  report is about wave heights, and this is a dry-dock question.

13          MR. SIMMS:  We've been talking about wave height the

14  whole -- since Monday.

15          THE COURT:  No.  I understand.

16      Mr. Simms, I get the point, so there's no need to go

17  further down this road.  I know exactly what he's saying.  Some

18  of us did major in the sciences, even if we have a law degree.

19          MR. SIMMS:  Yeah, and some of us just had to stop at a

20  law degree.

21          THE WITNESS:  Sir, I have many former students that

22  went on to law as well.

23          MR. SIMMS:  All right.  Thank you, Dr. Kriebel.

24          THE COURT:  Anything further?

25          MR. BOYAJIAN:  No.  Thank you, Your Honor.

1          THE COURT:  You may step down.

2          MR. SIMMS:  Calling Dr. Fox.

3          THE COURT:  Captain, if I can have you make your way

4   up here to be sworn prior to testifying.

5                          BRUCE FOX,
          having been first duty sworn, testified as follows:
6

7          THE CLERK:  Please state your full name for the

8   record, and spell your name for the court reporter.

9          MR. JARRETT:  Your Honor, Vigor has to object to

10  Captain Fox testifying as an expert at all, because his

11  testimony will be entirely duplicative and redundant of

12  Western's previous three designated experts on prudent

13  seamanship, who have testified for a total of more than seven

14  hours of court time in this case.

15     Both Captain Fox, Captain Shrewsbury, Captain Shrewsbury,

16  and Captain McGavock were -- all of those folks were designated

17  as prudent-seamanship experts.  So this is just redundant

18  testimony, Your Honor.

19         THE COURT:  Mr. Simms, I am kind of curious.  What

20  would Captain Fox add -- and I have no doubt about his

21  qualifications -- that we haven't already gotten here?

22         MR. SIMMS:  Captain Fox will give a rebuttal to

23  Captain Johnson's report.

24         MR. JARRETT:  Your Honor, if I may?  Captain Johnson

25  has not yet testified.

 1          THE COURT:  He hasn't.  But what portion of the report

 2     would he rebut?

 3          MR. SIMMS:  He will rebut the portions about the power

 4     of the tug.  He will rebut the portions about the weather that

 5     the tug encountered and their assessment of the go-or-don't-go

 6     decision.  He will rebut the points about the decisions within

 7     the sanctuary.

 8          MR. JARRETT:  Well, Your Honor, particularly with

 9     respect to that last subject, I think that's totally irrelevant

10     to any issue currently before the court.

11        The other three or four subjects that Mr. Simms mentioned

12     were the subject of -- I don't know -- hours of testimony in

13     front of the court during trial.  And it doesn't do much to

14     develop the Western theory that those opinions by Western's

15     previous prudent-seamanship experts were correct by putting on

16     another prudent-seamanship expert.

17          MR. SIMMS:  Well, let's look at who we're talking

18     about here.

19          MR. JARRETT:  Your Honor, if we may have a ruling

20     before we proceed on to testimony from the expert, that would be

21     helpful, from my perspective.

22          THE COURT:  Mr. Simms, I don't see what Captain Fox

23     would add to what we already have that would not be cumulative.

24     Yes, I have not heard the other defense expert testify, but

25     maybe if that happens, it might become relevant at that point in

 1   time.

 2       I understand he's not local.  I think he lives in Maryland.

 3   There's no reason why we couldn't put him on the telephone, if

 4   that were the case.

 5              MR. SIMMS:  Captain Fox is local -- relatively local.

 6              THE COURT:  Okay.

 7              MR. SIMMS:  And I would just tell you, having -- the

 8   comments went to Captain Shrewsbury and Captain McGavock and --

 9   the two Captain Shrewsburys, and they were relating the facts --

10   those particular facts as they experienced them, in light of

11   their experience.

12       Captain Fox is here to testify, based on his experience,

13   looking at what they did from the standpoint of prudent

14   seamanship.

15              THE COURT:  Okay.  Then we can put that in the record

16   as your offer of proof.  But, as indicated, let's wait and see

17   what the other expert testifies to, and then if you feel it is

18   relevant, then we can bring it up at that point the time.

19       Do you have any other witnesses?

20              MR. SIMMS:  We don't, but I want to enter -- we gave

21   Ms. Cuaresma a list of exhibits, and there's just one that

22   should come in, which is -- that's not already in, which is 42,

23   sale agreement with Amaya Curiel.  Stipulated; authentic;

24   objection; relevance.

25       And so I think that we've been talking about this, through

1  a number of witnesses, the Amaya Curiel sale agreement, proposed

2  heavy lift.  We've entered the testimony of Roberto Curiel,

3  which refers to the agreement and confirms the agreement, that

4  there was an agreement, and so 42 should be entered into

5  evidence.

6       MR. JARRETT:  From our perspective, Your Honor,

7  Exhibit 42 does not establish the standard of care for shipping

8  the dry dock.

9     It says that Amaya Curiel originally contracted for it to

10  be shipped.  There was testimony about how that arrangement

11  changed.  And we can rehash that, but that doesn't seem to be

12  worth the court's time at the moment.

13      The document is just not relevant to any issue that the

14  court needs to decide, from our perspective.

15      THE COURT:  All right.  I see, by looking at the

16  pretrial order, that 42, the authenticity and admissibility are

17  both stipulated to.  It's just a relevance objection.  The court

18  will admit it at this point in time and determine whether or not

19  it's relevant when reaching its decision.

20      MR. JARRETT:  Thank you, Your Honor.

21      MR. SIMMS:  Okay.  So what Your Honor has told us is

22  now -- so we're now looking toward next week, Wednesday,

23  Thursday, and Vigor will put on its case.

24      So I think what I've heard is that if Western feels it

25  needs to put on rebuttal witnesses, then we can bring those

 1  back.  Is that what Your Honor is saying?

 2          THE COURT:  And you'd have to convince me that it's

 3  going to be absolute rebuttal, correct.

 4          MR. SIMMS:  Uh-huh, yes.

 5          THE COURT:  But we only have those two days --

 6          MR. SIMMS:  Understood.

 7          THE COURT:  -- so --

 8          MR. SIMMS:  Understood.

 9      And if we need to bring them back for rebuttal, then phone

10  would be workable for the out-of-town?

11          THE COURT:  If we have someone from out of town that

12  needs to be a rebuttal witness and you can convince me that that

13  rebuttal testimony is appropriate, then we can do it remotely,

14  just like we did with Dr. Hudson.

15          MR. SIMMS:  Okay.  All right.

16          MR. JARRETT:  Your Honor, if I might, can I just speak

17  to the phone witnesses, please?

18      The court found time for us, for which we're grateful.  We

19  need to figure out if we can bring our experts back.  We may

20  have folks that are not available to be here in person.  It

21  worked pretty well to have them by phone.  If that's necessary,

22  can we do that?

23          THE COURT:  Yes.

24          MR. JARRETT:  Okay.  Thank you.

25          THE COURT:  So long as we have a decent phone

 1   connection.  You saw what it was like today, with the headset

 2   and --

 3          MR JARRETT:  No headsets.

 4          THE COURT:  As I think we all learned from our Zoom

 5   phase, it is very easy to get interference from multiple sources

 6   and how difficult it is and almost impossible for our court

 7   reporters to follow.

 8          MR. SIMMS:  So for Captain Fox, even though he is

 9   local, if there is a limited amount of his testimony for

10   rebuttal, would phone work for him as well?

11          THE COURT:  I don't see why not.

12          MR. SIMMS:  Okay.

13          THE COURT:  So I'm assuming we're done for the day?

14          MR. HOWARD:  Your Honor, two things.  I haven't heard

15   the words "plaintiff rests," but has plaintiff rested?

16          MR. SIMMS:  Plaintiff needs to rest.

17          MR. HOWARD:  Your Honor, we would make a CR 52(c)

18   motion for judgment on partial findings.  We believe that's

19   appropriate.

20       We also know that you can tell me to, basically, submit it

21   in writing, or whatever you want us to do about it, but I

22   believe that the court has heard enough to already know that

23   the -- we'll only argue this right now as much as you want me

24   to, but I believe the court has heard enough to be able to

25   decide the contract case and to be able to decide in terms of

1   both the fault of Western in disregarding the suitability

2   survey, basically, not transmitting it from the port captain, to

3   whom it was appropriately given, to the rest of Western, and

4   proceeding south with weather information based upon wrong

5   numbers for recommendations.  And if they could not proceed

6   safely, according to the recommendations, they should have and

7   could have turned around.

8        There's sufficient evidence there to decide the contract

9   case, and that act of negligence, by itself, whether intentional

10  or not, is sufficient to decide the contract case.

11       The evidence is also clear that Vigor was not involved in

12  the decision to turn south at Monterey.  Bob Shrewsbury owned

13  that.  He owned those decisions.  I think I even used the word

14  "own," and he said, "Yes."

15       So we make that motion at this point.  I would urge the

16  judge to take it under advisement, if you want further briefing

17  from us on that or proposed partial findings of fact and

18  conclusions of law before we close off today.

19       And before I shut up completely, I want to point out we

20  have a witness here that we would call first, and we would not

21  mind starting.

22            THE COURT:  Would you want to call Mr. Naylor?

23            MR. HOWARD:  I would think it's a good use of our

24  time.

25            THE COURT:  If the defense is ready.

1        Are you ready, Mr. Simms?

2            MR. SIMMS:  Am I ready?  Sure.  He's here.  Let's do

3   it.

4        Is Your Honor deferring that motion?

5            THE COURT:  In fact, let me make the ruling for our

6   record.

7        I don't think I need to take it under advisement.  The

8   court, at this point in time, will deny the motion made by the

9   defense.

10        I think, given the testimony the court has, that there has

11   been sufficient evidence put on the record where the court could

12   decide the issues that are before it, and so, automatically, a

13   CR 52(c) motion, I think, is inappropriate at this point in

14   time.  It will be denied.

15            MR. HOWARD:  Thank you, Your Honor.

16            THE COURT:  All right.

17        Mr. Naylor, good afternoon.  Please raise your right hand

18   to be sworn.

19                    MICHAEL NAYLOR,
           having been first duly sworn, testified as follows:
20

21            MR. SIMMS:  Your Honor, just as we got at the

22   beginning of Dr. Kriebel's testimony, what the parties agreed to

23   is that they put the expert reports in the record, and the court

24   has held that Vigor is not permitted to have testimony exceed or

25   go beyond the expert report, and also that there would be no

 1   rebuttal that Vigor could be able to offer, and so there is no

 2   reason to hear this testimony.

 3          THE COURT:  Mr. Howard?

 4          MR. HOWARD:  Your Honor, Mr. Naylor -- who is also a

 5   fact witness who's been relied upon in terms of several

 6   witnesses have been relying upon Mr. Naylor -- I think should be

 7   given the opportunity to respond to other people's

 8   characterization of the work he did, both factually and as an

 9   expert.

10       His report seems to keep coming up in this case, and I

11   think he should be given a chance to explain other people's

12   constructions and misconstructions of it.

13          MR. SIMMS:  Your Honor, I think your ruling was very

14   clear.

15       And, in fact, Mr. Naylor, even though the court accepted

16   his report late, had, in his report, rebuttal of Dr. Hudson and

17   Dr. Kriebel.  And so we have that in evidence here, even with a

18   rebuttal that the court later said wouldn't be permitted, and

19   the court has held that that is the extent of the expert

20   testimony that would be allowed from Vigor, the Vigor reports,

21   not further rebuttal.

22          THE COURT:  Counsel, let me point out to both sides

23   that you both missed deadlines in terms of discovery, experts,

24   and things like that, and tried to strike the other side's.  I

25   remember going through all that.

 1          My concern, in this particular case, is that there is

 2     information that, I think, would be useful to the court in

 3     trying to decide the very few issues in front of me, not only

 4     the other side issues that have been addressed, but the ones

 5     that are in front of me.

 6          Today, the last day, has, actually, been illuminating in

 7     terms of what's been presented to the court, given what we've

 8     had up till now.

 9          Mr. Naylor is here.  Let's go ahead.  And, Mr. Howard, put

10     in whatever pertinent parts you believe.  Mr. Simms is correct,

11     his report is in the record.  If there's something specific,

12     let's see if we can get it done today.

13          MR. HOWARD:  Okay.  And, Your Honor, I'm going to do

14     this in an unusual order, because I wanted to deal with recency

15     first, so this might almost sound like a cross-examination.  Has

16     he been sworn?

17          THE CLERK:  He has been sworn.

18          MR. HOWARD:  Okay.  Thank you.

19          THE CLERK:  Please state your name for the record, and

20     spell your last name.

21          THE WITNESS:  Michael Naylor, N-a-y-l-o-r.

22          THE COURT:  Mr. Naylor, please listen carefully to the

23     questions.  Please don't speak over counsel; it's impossible for

24     our court reporter to transcribe.  If you don't understand

25     something, just say so.

1          You may inquire.

2                    DIRECT EXAMINATION

3     BY MR. HOWARD:

4     Q.     I'm going to ask one or two minutes of foundation questions

5     about your experience, Mr. Naylor.

6          In general, is your experience listed in your resumé, which

7     is part of your report?

8     A.     Yes.

9     Q.     Where are you employed?

10    A.     At Heger Dry Dock.

11    Q.     In what capacity?

12    A.     I'm principal engineer.

13    Q.     What type of engineer?

14    A.     Structural marine engineer.

15    Q.     Are you licensed as an engineer?

16    A.     In many states.

17    Q.     What does Heger do?

18    A.     We specialize in the design, inspection, certification of

19    mainly steel-floating dry docks, but we also deal with steel

20    caisson gates on grating docks and other docking calculations.

21    Q.     What's a steel caisson gate?

22    A.     It's the floating steel closure wall to a grating type of

23    dry dock.

24    Q.     Ground-based?

25    A.     In the ground, different than the dock we've been talking

1   about today.

2   Q.   Which is a floating dry dock?

3   A.   That's a floating dry dock typically made of steel.

4   Q.   And to clarify, do you understand you have a role in this

5   case both as an eyewitness of some things, but also have we

6   retained you as an expert?

7   A.   I do understand.

8   Q.   And are you paid for your time to be here?

9   A.   I am paid.

10  Q.   I want to move to part of your report that's been discussed

11  a few times today.  Do you see on the screen Figure 7 of your

12  report?

13  A.   Yes, I do.

14  Q.   Could you briefly explain to the court, in your words, what

15  this reflects and represents?

16  A.   Yes.

17       So this is a plot of the dry dock in a one-piece

18  configuration.  I recreated the condition of departure for the

19  dock from Seattle, and I put it through a computer model with a

20  series of different waves applied to it, wave conditions, and

21  this graph shows the waves that you'd expect in a sea state five

22  condition.

23       Now, wave lengths in a fully developed sea state five are

24  typically a little bit shorter than the dry dock, but I also

25  looked at waves that are the same length as the dry dock,

1    because that does produce the worst-case scenario.

2    Q.    Is that what the last witness was just discussing, in terms

3    of length of the wave?

4    A.    Yes.  Dr. Kriebel was accurately describing that when the

5    wave length equals the length of dry dock, that produces the

6    worst-case scenario for bending moments, you know, causing

7    flexure of the dock.  Waves that are shorter and longer than the

8    dark aren't nearly as critical in terms of longitudinal

9    strength.

10   Q.    Now, did you, using the computer, did you personally do the

11   math for what's reflected on this chart?

12   A.    Yes, I personally ran all the inputs into that computer

13   model.

14   Q.    What does this chart show?

15   A.    This chart is a chart of the bending moments at each

16   location along the dock for various different waves.  I also

17   looked at waves that would produce a sag, which that's causing

18   the center of the dock to deflect downwards, and I looked at

19   waves that would produce a hog.  So that's when waves are

20   located at the midpoint of the dock, the center point, and that

21   causes the ends to go down.

22   Q.    Now, you had heard another engineer today suggest that you

23   only calculated this based upon the center section, and did not

24   include the two end sections.  Do you recall that testimony?

25   A.    I do recall.

1    Q.    Is that accurate?

2    A.    That is inaccurate.  The testimony implied that I did not

3    look at the bending moments in the end sections.  And while they

4    are not zero, they are very near zero.  And you'll see that, in

5    my graph, I am showing bending moment across the bolted

6    connection, which is indicated by about, you know, Frame 5 or

7    Frame 55 on the X axis of the graph.

8    Q.    And at the bottom here, did you superimpose at the bottom?

9    A.    Yes, I superimposed the dock as I model it in the computer

10   program.

11   Q.    And that's what was referred to as the video-game-type

12   pieces?  I'm suddenly blocking on the video game, but the

13   video-game-type pieces earlier today?

14   A.    Yes.  These sections are all bolted together in one piece.

15   Q.    And just to be super clear on this, toward the end, on the

16   right side, even though your colors disappear, you ran the

17   numbers for that distance, also; is that correct?

18   A.    That is correct.  The dock is 528 feet long in the computer

19   model.

20   Q.    Does it make a difference that those ends are bolted on for

21   the purpose of these calculations?

22   A.    It does make a difference.  It does increases the bending

23   moment in the center section when those end sections are bolted

24   on to a center piece.

25   Q.    And that's what's reflected in this?

1    A.    That's reflected in all my calculations.

2    Q.    What about the fact that it's bolted?

3    A.    I did look at that.  I compared the bending moments that

4    were produced across the bolted connection, and I compared that

5    to the design drawings of the YFD 69, 70, 71, that have all been

6    discussed.  And especially for this sea state, number five, the

7    bending moments across the bolted connection are significantly

8    less than the bending moment you would expect to see when

9    lifting a designed vessel for this dock, which is about 14,000

10   or even as high as 17,000 tons.

11   Q.    I'm going to back off because I'm, actually, fairly new to

12   this, and I want to make sure that -- when you talk about

13   lifting, are we talking about something completely different

14   than towing?

15   A.    Yes.  The design drawings of the dock have graphics that

16   indicate the stresses you'd expected to see in the dock

17   structure when lifting a capacity vessel, and that information

18   is how I evaluated the strength of the bolt to see if it was

19   adequate for this wave state.

20   Q.    Did you have an understanding as to how recently this dry

21   dock had been in use before this time period?

22   A.    When I wrote my report, I relied on information that was

23   available to me, one of them being some conversations with Dan

24   Keen, who told me that the dock was in use in 2015 to lift a

25   tug, and the dock was NAVSEA certified until 2013.

1    Q.   Now, while we're clarifying some points regarding how the

2    other engineer reviewed your report, were you able to determine,

3    from that expert's report, any of his calculations?

4    A.   I could not see any calculations that were done in his

5    report to evaluate the strength of the dry dock in an oceangoing

6    condition.

7    Q.   Do you, as an engineer --

8         MR. SIMMS:  Your Honor, this is rebuttal, and the

9    court has ruled that there is no rebuttal.

10        MR. HOWARD:  Your Honor, Your Honor, I think this is

11   useful testimony, based upon clarifying attacks on his report

12   today.

13        MR. SIMMS:  Your Honor, Western disclosed its reports

14   on time.

15        And Your Honor said that Western had missed deadlines.  I,

16   respectfully, tell you that we did not miss any deadlines.  We

17   submitted the reports when we were supposed to, which triggered

18   the time for timely rebuttal reports to be submitted.  There

19   were not timely expert reports submitted by Vigor, and there

20   certainly is a well-missed deadline for rebuttal reports, so we

21   object to this testimony.  It's, actually, rebuttal on rebuttal.

22        MR. HOWARD:  Two rebuttals allowed in the rules, Your

23   Honor.

24        THE COURT:  Mr. Howard, I'll sustain the objection.

25        MR. HOWARD:  Thank you.

1  Q.   (By Mr. Howard)  I'm going to move back to my original

2  outline, which we haven't been following.

3       And I don't think we'll finish today, for which I

4  apologize, but I'm glad we get a chance to start.

5       Have you had a chance, in person, to inspect -- I'll just

6  shorten it to the number -- the 69?

7  A.   I do inspect and I currently certify the 69, personally.

8  Q.   You put that in the present tense.

9  A.   Yes.  You're talking the 69, before departure?

10  Q.   How long have you been inspecting and certifying the 69?

11  A.   My company has been inspecting it for quite some time now.

12  When it was at Portland, Oregon, we inspected it routinely and

13  certified the dock there.

14       We were involved in the relocation of 69 from Portland to

15  Seattle, and we continue to routinely inspect the dry dock and

16  certify it if its condition so warrants.

17  Q.   Now, you said your company.  In terms of the transfer from

18  Portland -- prior to the transfer from Portland to Seattle, were

19  you personally involved that?

20  A.   I was personally involved in the structural analysis, yes.

21  Q.   Could you explain what that means, you being personally

22  involved in the structural analysis?

23  A.   So we were asked to perform some loading conditions on the

24  dock before the -- in the same manner that I made the report for

25  the YFD 70.  I made a computer model of the YFD 69, and we

1   evaluated the strength in one-piece configuration.  We also

2   evaluated the strength with one end section removed, and both

3   end sections removed and stacked on the center section.

4   Q.   Now, there was testimony by another expert that Heger

5   recommended the end pieces be removed for tow.  Did Heger make

6   such a recommendation?

7   A.   Heger never recommended the end pieces be removed for tow.

8   Q.   What did Heger do?

9   A.   So there's been a lot of talk about the work specification,

10  which presented that as something to be done.  I believe that

11  precluded -- or was before we did our structural analysis of the

12  one-piece configuration, and we presented the options to Vigor,

13  and we didn't make any recommendations for which of the three

14  configurations we analyzed for the -- which configuration was to

15  be executed.  We just provided what we thought was the

16  appropriate sea state for that configuration.

17  Q.   And that was part of one of those two reports?

18  A.   Yes.  The analysis report is what I'm referring to, and a

19  lot of reference has been made to the work specification

20  document, which was more -- the tone of that document was more

21  to get the dock ready to be useful in Seattle, performing

22  things, like installing moorings on the dock, painting the dock,

23  things you'd need to be useful to lift a ship out of water in

24  Seattle.

25  Q.   So translating to lay people -- and I don't want to put

1    words in your mouth.  But translating to layperson's -- for

2    me -- terms, what was the purpose of the work specification

3    report referred to by the other expert?

4    A.    That document was all the things that we discussed with

5    Vigor on how to modify the existing dock to be useful at

6    Seattle.

7    Q.    As a dock?

8    A.    As a dock for lifting ships.

9    Q.    Did it have anything to do with towing?

10   A.    No.  There was sections that discuss towing, but the

11   document was more to highlight all the work that needed to be

12   done to modify the dock.

13   Q.    And was the second report, did it have anything to do with

14   towing?

15   A.    Yes.  It was all the structural analysis regarding tow.

16   Q.    And did Heger reach a conclusion regarding the 69 and the

17   structure of the 69, as to whether it was suitable to be towed

18   in one piece from Portland to Seattle?

19   A.    Yes.  Our report says that the dock was capable up to the

20   lower end of a sea state five.

21   Q.    Structurally, are you familiar with the specifications for

22   the 70?

23   A.    I'm not exactly -- the specifications?  What do you mean?

24   Q.    Structurally, do you have enough information to inform the

25   court as to whether there's any difference between the 69 and

1    the 70?

2    A.    It's my understanding that those two docks have the same

3    structural hull design.

4    Q.    Okay.  And since we'll make reference to the 71, how about

5    that one?

6    A.    That also is the same structural design in terms of the

7    hull.

8    Q.    When you say "structural design," does that include the

9    inside?

10   A.    The plating, the stiffeners, the transverse frames, the

11   length, the width, the end sections, that's all the same.

12   Q.    Now, you say you are still inspecting the 69?

13   A.    That's correct.

14   Q.    Why is that?

15   A.    When you're asked to certify it every year or every two

16   years, and we perform inspections of it, we crawl all the tanks,

17   we submerge the dock, or we watch Vigor submerge the dock and

18   operate all the mechanical systems, and if everything operates

19   to our satisfaction and we don't think there are any structural

20   issues with the hull, we'll issue a certificate of capacity for

21   what we believe is the maximum limit of a vessel to be docked on

22   the dock for ship repair.

23   Q.    Is Vigor required to do that to do use the dock?

24   A.    I believe their customers require that.

25   Q.    Do you have personal knowledge if the same procedure was

1    regularly done?  Was it done for all their dry docks, to your

2    knowledge?

3    A.    I know that we certify almost all of Vigor's dry docks.

4    Q.    Now, you personally never had the opportunity to certify

5    the 70; is that correct?

6    A.    Right.  As a company, we did not inspect or certify the 70.

7    Q.    Do you have information as to whether or not the 70 had

8    been certified?

9    A.    My understanding is that NAVSEA certified the dock.

10   Q.    And what is NAVSEA?

11   A.    NAVSEA is a government agency, and you need their

12   certification in order to dock a Navy warship on the dock.

13   Q.    And do you have an understanding as to whether the 70 was

14   used for Navy warships?

15   A.    I don't have an understanding for what Navy ships, vessels

16   were docked on it, but given that it had NAVSEA certification,

17   it was certainly capable of docking Navy vessels with whatever

18   restrictions NAVSEA placed on that certification.

19   Q.    Are all dry docks capable of being NAVSEA certified?

20   A.    No.

21   Q.    Why not?

22   A.    NAVSEA has very strict requirements for what the dock needs

23   to be capable of.  To meet NAVSEA certifications, you have to

24   produce binders of calculations justifying the capacity of the

25   dock and its capabilities.  You have to have binders of

1  procedures and maintenance programs for the dock.  You have to

2  have qualified people that maintain the dock and operate the

3  dock.

4      And you have to adhere to all those procedures and

5  maintenance requirements inside of that binder, which is

6  referred to as the facility certification report, and NAVSEA

7  will come and audit the facility every three years to make sure

8  things are tracking correctly.

9  Q.   Can a World War II vintage dry dock maintain NAVSEA

10 certification without significant, ongoing maintenance?

11 A.   In my opinion, no.

12 Q.   Now, before I move on to the 70 further, there's been

13 discussion about the 71.

14      What is the basis of any knowledge you have about the 71?

15 A.   I've inspected the 71 two or three times.

16 Q.   Why have you inspected it?

17 A.   We were asked -- similar to what we do for Vigor -- to come

18 down, inspect the structure, watch the dock operate it, and

19 certify it if we think the conditions so warrants.

20 Q.   Did you certify it?

21 A.   We certified it twice, I believe.

22 Q.   The third time?

23 A.   The third time, they had not done all the maintenance that

24 we requested they do in the timeframe that we requested it to be

25 done in, so we rejected.  Once we surveyed the dock and found

1    out it was in poor condition and the maintenance had not been

2    done, we refused to certify the dock.

3    Q.   I'm going to step aside and ask a foundation question I

4    meant to ask earlier.

5         You heard me ask the other engineer what "forensic" meant.

6    Do you know what "forensic" means?

7    A.   I do.

8    Q.   How many times have you testified as an expert?

9    A.   This is my first.

10   Q.   So how much of your work is forensic?

11   A.   None of it, until this point.

12   Q.   What do you do all the time?

13   A.   Mainly designing docks.  That really keeps us busy for most

14   of the year, as we like to have one big dock-design project, and

15   the filler work is really these inspections and these special

16   jobs for designing mooring systems for docks or docking plans

17   and helping support our clients in any way we can.

18   Q.   Now, I know that we're going to disrupt your plans,

19   possibly, to finish this, but what are you scheduled to do next

20   week?

21   A.   I'm supposed to be in Alabama inspecting a dry dock.

22   Q.   For certification?

23   A.   For certification.

24   Q.   I'd like to go to the 70, and I want to ask a term -- this

25   is for background knowledge for this Navy-built.

1    What is damage stability?

2  A.    So this is, actually, another reason why not all docks can

3  meet NAVSEA certification.  Docks that are in the NAVSEA

4  program, as one of the calculations you have to do, you have to

5  show that with your biggest, largest-capacity vessel on the

6  dock, that you can damage a certain number of tanks, and that's

7  not going to jeopardize the safety of that vessel in dock.

8    So you may damage four tanks and the dock is still going to

9  float, and it's still going to float with a certain attitude.

10  Q.    "Attitude," meaning?

11  A.    The rules are stated that you can't have a heel of more

12  than 15 degrees, you can't have a trim of more than 20 feet

13  along the length of the dock, and then there's this thing called

14  the margin line, which is defined as three inches below the top

15  deck, you can't submerge to that point.

16  Q.    Okay.  Unlike Mr. Boyajian, I'm not a mariner.  The judge

17  might be.  But what's heel and trim in this context?

18  A.    So trim is in the longitudinal forward and aft direction of

19  the dock.  Any difference between the forward and aft end is

20  called trim.

21    Heel is when the dock changes floating attitude in the

22  transverse direction perpendicular to that, where the port side

23  or the starboard side is lower in the water.

24  Q.    Now, while I'm still on -- I'm bouncing back and forth

25  because of things that were said today.

1        I want to ask you about Heger's manual.  A copy was shown

2   on the screen the other day.  Does Heger have a dry dock manual?

3   A.   We do.

4   Q.   What's its purpose?

5   A.   Its purpose is for training people who are, generally, new

6   to the industry or to the dry-docking practice.  The basic

7   concepts for dry docks -- the basic concepts you should know for

8   dry docks or docking ships.

9   Q.   Does Heger consider it an authoritative document?

10  A.   No.  It's a training aid.

11  Q.   Does it even address the type of dry dock we're dealing

12  with here?

13  A.   I don't believe so.

14  Q.   There has been repeated times where different types of

15  structures have been discussed, and this will go to an

16  assumption you made in your report, but I want you to explain

17  the significance of the different areas.

18       You assume 15 percent corrosion in certain areas and 40

19  percent in others.

20       Can you describe to the court, in your words, not only why

21  but the significance of the different areas and why that matters

22  for the calculations you did?

23  A.   Yeah.

24       So in our experience in dealing with a number of different

25  dry docks across the country that are of this age or -- and in a

1  condition that we saw in the photographs, that the pontoon deck

2  is the first structural element to go.

3        When you lift a ship out of the water and production --

4  ship repair -- is ongoing on that vessel, that's where all the

5  work is being done.

6        You have glass grit flying around and accumulating on the

7  deck.  You have vehicles driving over that glass grit, sanding

8  that pontoon deck down.  You have water sitting on the deck,

9  saltwater.  Every time you operate the dock, it captures

10  saltwater.  It sits there till it evaporates.

11        So it's not uncommon for a pontoon deck to only last 20

12  years until you need to replace it.  If you maintain it better

13  than that, it can last a little bit longer.  But for every dock

14  design we do, we assume the pontoon deck to be 25 percent

15  corrosion, and we recommend repairs be made at that point.

16        That's the element most susceptible to our design -- or to

17  a dry dock in use.  We assumed it was 40 percent in our report

18  because we believe that to be a conservative assumption based on

19  what we were seeing in the photographs.  Some of the data from

20  the 2013 UT report, it supports that.  And it wouldn't surprise

21  us if the pontoon deck was beyond its useful life when the YFD

22  70 was towed.

23        Now for all other elements of the dock, we've designed

24  docks with 10 to 15 percent general corrosion allowance, is what

25  we call it, where we -- you know, when we do our designs, we

1    already build in to the fact that that dock may be 10 or 15

2    percent corroded at some point in its life.  And, you know, in

3    our opinion 15 percent is kind of the upper end of a dock in

4    terms of corrosion amounts when it's nearing the end of its

5    useful life.

6         You're more likely to see corrosion, you know, on the

7    pontoon deck, but also in the wind/water strake, which is three

8    feet, plus or minus, above and below the pontoon deck.  That's

9    where all the waves are always crashing into the side of the

10   dock.  It's -- you know, the wind is blowing saltwater onto the

11   steel in that area of the dock, so that corrodes pretty quickly

12   as well.

13        But, in general, things that are important to longitudinal

14   strength, like the pontoon bottom and the top deck, you know,

15   the pontoon bottom is always submerged underwater, so it doesn't

16   oxidize.  The top deck is always dry, far away from the salt

17   spray, so those structural elements don't corrode as quickly.

18   Q.   Going back to the beginning of this, with the 40 percent

19   corroded area where the work is done, you used the term

20   "longitudinal strength."

21        What relevance does that area have to what you called

22   longitudinal strength for the dry dock?

23             MR. SIMMS:  Your Honor, this is in his report.  It's

24   repeating -- we weren't permitted to repeat parts of reports,

25   and neither should this be permitted.

1    MR. HOWARD:  Just trying to make sure things are

2    clarified after -- there have been a lot of contradictory

3    testimonies.  I'm trying not to ask too many things that are,

4    actually, directly in the report, but an explanatory -- a full

5    explanation here will be helpful to the court.

6         THE COURT:  All right.  You may answer.

7    A.   So when we do a -- it's called a section modulus

8    calculation through the cross-section of the dry dock.  We

9    develop what's called a neutral axis.

10        So Dr. Kriebel was explaining correctly that the top deck,

11   when the dock goes into sag, it goes into compression; when it

12   hogs and bends the other way, it goes into tension, and the

13   reciprocate of that is happening at the pontoon bottom.

14        Now the neutral axis is the zero stress point as the dock

15   goes into bending, where there's no stress and strain in the

16   dock, and that neutral access falls at the pontoon level for all

17   dry docks.

18   Q.   (By Mr. Howard)  And I wanted to ask a very specific

19   clarifying -- you've seen, obviously, the report from the other

20   engineer who testified earlier, and I just want to show you the

21   pictures he showed, in 17, to ask you the --

22        MR. SIMMS:  Same objection, Your Honor.  He had --

23        MR. HOWARD:  I haven't even finished my question.

24        MR. SIMMS:  -- the Hudson report.  His report was

25   after this one.  He's already submitted rebuttal in his report.

 1  The court said no rebuttal permitted.  This is rebuttal.  This

 2  is what he could have commented on had there been a rebuttal

 3  report timely submitted in response to our timely submitted

 4  expert report.

 5          MR. HOWARD:  Your Honor, I haven't finished my

 6  question.

 7          THE COURT:  Please.

 8          MR. HOWARD:  And I believe the point of my question is

 9  to let this witness explain to you what this structure relates

10  to.  Because the pictures are not necessarily self-evident, and

11  he can tell you what part of the structures these are.  That's

12  the whole point of my question.

13          THE WITNESS:  So explain --

14          MR. HOWARD:  I haven't heard a ruling yet, actually,

15  so don't talk until he's ruled.

16          THE COURT:  You may respond.  Go ahead.

17          MR. HOWARD:  Okay.  Thank you.

18  A.   So by this picture is the transverse frames and the

19  transverse bulkhead in the dock.  In the second picture, that's

20  the transverse bulkhead.  It's a watertight boundary between

21  tanks.  The first picture, Figure 3 there, is more depicting the

22  transverse frames of the dock.  And, you know, while they need

23  to be there for the dock to not fall in on itself, they don't

24  contribute to the longitudinal strength of the dock.  They're

25  vital when lifting a ship out of the water.  That contributes to

1    all the transverse strength in the dock.

2         And I do agree that there's some corrosion occurring on

3    these members, but you can't tell, by looking at the picture,

4    how much corrosion there is there.

5    Q.   (By Mr. Howard)  Why not?

6    A.   If I could, I could charge you a lot of money.

7         The Navy requires everyone that's in the NAVSEA

8    certification program to UT their structures every five, every

9    ten years to determine how much thickness there is there,

10   because you can't tell from looking at it.

11        Steel expands to be 16 times its original size when it

12   scales off.  So when something looks bad, it doesn't necessarily

13   mean that it is bad.

14   Q.   There's been discussion here about the Navy Tow Manual.

15   This is not specifically in your report.

16        Is the Navy Tow Manual something you rely upon in your

17   practice?

18   A.   We don't rely upon it very often.

19   Q.   Why not?

20   A.   It's my understanding that the Navy Tow Manual is for

21   Navy-owned vessels, and we don't deal with Navy-owned vessels

22   very often.

23   Q.   In your time of practice, have you seen other three-piece

24   docks be towed as one piece?

25   A.   I haven't personally seen them being towed in one piece,

1  but I --

2          MR. SIMMS:  Objection; hearsay.

3          THE COURT:  The objection will be sustained.

4  Q.  (By Mr. Howard)  Are you familiar, from your practice and

5  investigation as a dry dock engineer, with the transport of

6  other dry docks?

7  A.  I am.

8  Q.  Is that part of your practice and information that you rely

9  upon as an expert in this field?

10 A.  Yes.

11 Q.  Are you, from that, aware of other three-piece dry docks

12 being towed?

13         MR. SIMMS:  Objection; hearsay.

14         THE COURT:  Overruled.

15 You can answer.

16 A.  Yes, other three-piece dry docks have been towed in one

17 piece.

18 Q.  (By Mr. Howard)  Does that include the 71?

19         MR. SIMMS:  Basis of his knowledge.

20         THE COURT:  Overruled.

21         MR. SIMMS:  Other than what someone told him.

22         THE COURT:  How do you know this?

23         THE WITNESS:  I know it from working with people in

24 the industry.

25         MR. SIMMS:  Hearsay.

1          THE COURT:  Overruled.

2      You may answer.

3  A.   I know, from working with people in the industry, that the

4  YFD 71 was towed in one piece from San Diego to San Francisco.

5  Q.   (By Mr. Howard)  Are there docks that you're familiar with

6  on the East Coast that were towed -- three-piece docks towed in

7  one piece?

8  A.   Yes.

9  Q.   Have you ever heard in the industry, in the time you've

10  been practicing the last how many years?

11  A.   Ten years.

12  Q.   In the last ten years, have you heard of a three-piece dock

13  being towed with the outside pieces being put on the center

14  piece?

15  A.   So our docks are three-piece and designed like that, in

16  some instances, when the docks get up to 800, 900 feet long, but

17  like the Harris-type docks, the World-War-II-type docks, I don't

18  know any of them towing them with the midsections stacked on the

19  mid-body.

20  Q.   You've used the term "Harris-type dock."  Can you explain

21  what a Harris-type dock is?

22  A.   Harris is the name of the engineer that designed these

23  docks for the Navy.  This was, kind of, his signature, if you

24  will, to have a self-docking-type dock with smaller end sections

25  that can be docked on the center section, and, actually, the end

1  sections could be submerged below the center section and lift up

2  the center section out of the water for maintenance reasons.  So

3  there's a high number of these type of docks built in that era,

4  and it's coined as the Harris-type dock.

5  Q.    Are many still in use?

6  A.    There's a few of them, yes.

7  Q.    Including, obviously, the 69.

8  A.    Yep, the 69 is one of them.

9  Q.    Your opinion on how this failed is in your report; is that

10  correct?

11  A.    Yes, I did form an opinion.

12  Q.    And you've gotten to hear some testimony today.  Has

13  anything changed, in your opinion, about how this failed as

14  described in your report?

15  A.    Nothing's changed.

16  Q.    With respect to the earlier storms, do those play a role in

17  the failure?

18  A.    It's potential that they could have played a role.

19          MR. SIMMS:  Objection.  It's not in his report.

20          MR. HOWARD:  Your Honor, the specific issue was raised

21  by counsel in asking other witnesses, and I'm giving him a

22  chance to clarify, based upon questions counsel has raised.

23          MR. SIMMS:  It's rebuttal, and he had a chance to put

24  this rebuttal in his report after -- it was late, and

25  Dr. Kriebel said when it happened, and there was an opportunity

1   to make a comment about whether there was damage before.  This

2   is rebuttal on rebuttal.

3              THE COURT:  Sustained, Mr. Howard.

4   Q.   (By Mr. Howard)  Could a tree have taken this out?

5   A.   In my opinion, it would be unlikely.

6   Q.   Why?

7   A.   The dock had inherent damage stability designed into it, so

8   it would take a serious number of tanks to submerge it, and it

9   wouldn't sink unless the upper portions of the wing wall were

10  also damaged.

11  Q.   Were the Bowditch restrictions -- Captain Shaw's

12  restrictions that you've reviewed appropriate for --

13             MR. SIMMS:  Objection.  This is also in his report.

14             MR. HOWARD:  It's a foundation question for the

15  follow-up question to clarify -- I think the judge's question

16  asked about whether or not this could be safely towed.

17             THE COURT:  Mr. Howard, how much more do you have for

18  this particular witness?

19             MR. HOWARD:  Your Honor, trying to avoid duplicating

20  anything that's actually in the report, I probably have about

21  ten minutes.  If you want, I will stop now and give him some

22  cross with the right to recall him next week for anything we

23  don't cover.

24             MR. SIMMS:  I'd rather they finish.

25             MR. HOWARD:  I'm trying hard to cut portions out of my

1   outline that are covered in the report.  That's why I stop

2   occasionally and skip something.

3           THE COURT:  All right.

4           MR. HOWARD:  I'm also trying to give him a chance --

5   I'm sorry, Your Honor.

6           THE COURT:  I was going say, he's supposed to be in

7   Alabama to do his job.  I like the fact that this is the first

8   time he's testified, so he's getting some experience here, and

9   that's something positive for him.  I would like to be able to

10  get him to Alabama to do that.

11      Mr. Simms, how much cross would you have?

12          MR. SIMMS:  Twenty minutes.

13          THE COURT:  All right.

14      Mr. Howard, why don't we move right to the most pertinent

15  part.

16          MR. HOWARD:  Okay.

17  Q.   (By Mr. Howard)  Would damage be cumulative between storms,

18  in your opinion?

19  A.   Yes.  Damage in one storm and damage in another storm, the

20  damage would still exist.

21  Q.   If the Bowditch restrictions had been followed, could this

22  have safely made it to Ensenada?

23  A.   In my opinion, yes.

24  Q.   Dynamic versus static.  There's only been a little bit of

25  discussion, but I want to give you a chance to explain to the

1  judge the difference between those analyses that you, as an

2  engineer, perform --

3          MR. HOWARD:  This isn't an opinion, Your Honor.  This

4  is background for analysis of the testimony you're hearing.

5  A.   A description of static versus dynamic?

6  Q.   (By Mr. Howard)  What you're doing when you're calculating

7  these things, dynamic versus static forces.

8  A.   My analysis is strictly static, which means that I assume

9  everything to be at rest at a snapshot in time when I do my

10  stress analysis.

11  Q.   And in layperson's terms, you look at the analysis when the

12  wave is in midpoint, for example --

13  A.   Yeah.

14  Q.   -- or at end; that's what you mean by "static"?

15  A.   That's correct, for the moment in time where the wave

16  crests are at the end or at the center of the dock, is how I do

17  my analysis.

18  Q.   The term "slamming," which is hitting the dry dock in

19  front, are you familiar with that term?

20  A.   I am.

21  Q.   Is that a dynamic or a static force?

22  A.   That's, in my opinion, a dynamic force of acceleration of a

23  mass, being the water, into the front edge of the dry dock.

24  Q.   Was that something you calculated or considered in your

25  report?

1    A.    It's not.  Dynamics is a little bit outside of my area of

2    expertise.

3    Q.    Would slamming help for the condition --

4          MR. SIMMS:  Objection.  He said that he has no

5    expertise in this, it's not involved in what he analyzed.

6    There's no indication there is qualification to respond to that

7    question.

8          MR. HOWARD:  Actually, I'll ask a different

9    foundational question.

10         THE COURT:  Thank you.

11         MR. HOWARD:  I'll withdraw that one.

12   Q.    (By Mr. Howard)  Why do people not ask you for

13   dynamic-force analysis?

14   A.    We've been asked, but we say that -- we defer them to other

15   experts in the industry who are more well suited to perform

16   dynamic-type analysis.  It's pretty specialized.

17   Q.    And that's an area that can also cause damage, but it's an

18   area you don't calculate?

19         MR. SIMMS:  Objection.  No qualification that he

20   says -- it's outside of his expertise.  Objection to the

21   question will it also cause damage.

22         THE COURT:  The objection will be sustained.

23   Q.    (By Mr. Howard)  So that's just something that, whether it

24   has an impact or not, it's outside of the area you're opining

25   for the cause here?

1    A.    Correct.

2    Q.    Your corrosion assumptions have been attacked in this case.

3    You saw the photographs that the other engineers saw.  Do you

4    believe your assumptions are accurate?

5    A.    I do.

6    Q.    Why?

7    A.    For starters, 15 percent is an average.  There's places in

8    the dock that are better and worse than 15 percent, I'm sure.

9    15 percent, you know, is not a greater number, in terms of dry

10   docks, but it does indicate that the dock was corroded.

11        But the strength -- if you have one spot in the dry dock

12   that's 25 percent and one spot that's 5 percent, that stress

13   through that area is going to distribute, and the structure has

14   reserve capacity.  So 15 percent, as an average, it's not saying

15   the dock is in good condition, and that's what I believe it to

16   be in, looking at the photographs.

17        The most critical components to longitudinal strength of a

18   pontoon bottom and the top deck, you have, primarily, the top

19   deck, and looking at the photographs, you know, that area of

20   dock was probably not corroded at all, or well below 15 percent,

21   as an average.

22        So I think 15 percent is a good number.

23        There's also been a lot of attack on, you know, this only

24   being 5 percent more corroded than YFD 69.  We knew 69 was in

25   very good condition.  We inspected it.  Our thought was, at the

1   time when we did the calculation, is that it's probably zero to

2   5 percent corroded, but we used 10 percent to be extra

3   conservative.

4        So when you compare my conservative assumption for

5   calculations on the 69 to the actual condition of the 69,

6   that's, kind of, apples to oranges.

7   Q.   How about 71?  We've heard an expert testify that the 70

8   should be likened to the 71.  You've seen the 71.  Are they

9   comparable?

10  A.   The 71 is in significantly worse condition than 69 --

11  Q.   -- the 70?

12  A.   Yes, the 71 is much worse condition than the 69.  When I

13  inspected it, stiffeners were disconnecting from the side shell

14  of the dock.  There were holes in the pontoon dock.  Many of

15  them, hundreds.  There were holes in the side shell of the dock.

16  In that wing wall line, which I talked about, it had high

17  susceptibility to corrosion.

18       It's not in good condition, you know, currently, especially

19  when they did -- when GHD did their analysis of that dock, and

20  when GHD did their analysis of the dock, I read their reports.

21  I don't think they inspected the dock.  They relied a lot on our

22  photographs and our inspection reports to produce their own

23  analysis.

24  Q.   In your opinion, was the 71 safe to go to sea under any

25  conditions?

1    A.    In what year?

2    Q.    When you inspected it last.

3    A.    When I inspected it last, as a company we decided to not

4    certify the dock for lifting ships.  At the time, our opinion

5    would be it not safe for ocean tow, either, even in a

6    three-piece configuration.

7    Q.    So was the 70 appropriately compared to the 71 for safety

8    to go to sea?

9    A.    In my opinion, no.

10   Q.    Was the 70 safe to go to sea with appropriate restrictions?

11   A.    Based on what I've seen, yes.

12         MR. HOWARD:  Thank you.

13                        CROSS-EXAMINATION

14   BY MR. SIMMS:

15   Q.    So you said that Heger never did an inspection of the 70,

16   correct?

17   A.    That's correct.

18   Q.    But that's not right, isn't it?  Didn't Heger do a dry dock

19   gauging survey September 2013?

20   A.    We did not.

21   Q.    Okay.

22         And you'd never seen that ultrasonic gauging survey, have

23   you?

24   A.    I have seen that.

25   Q.    You have seen it?

1    A.    Yes.

2    Q.    When did you see it?

3    A.    Vigor asked our opinion of it right after it was done, and

4    we said the pontoon deck was shot.

5    Q.    Okay.

6          And why did Vigor ask your opinion of the survey?

7    A.    You'd have to ask Vigor their intentions.

8    Q.    Okay.

9          And so since that survey, did Vigor ever approach you

10   asking for engineering assistance with upgrading or fixing the

11   things the survey showed?

12   A.    No, they did not.

13   Q.    Okay.

14         Now, you say you went in to Captain Shaw's report, and you

15   noticed that -- at the critical areas, you could see pictures

16   that gave you confidence that they were in great shape, right?

17   A.    Define your question of which areas were in great shape.

18   Q.    Well, there were certain areas that were important to be

19   intact for longitudinal bending, right?

20   A.    That's correct.

21   Q.    You testified about that?

22   A.    Yes.

23   Q.    Okay.  And when you looked at the pictures in Captain

24   Shaw's report, were there pictures in there that showed those

25   areas?

1    A.    Yes.

2    Q.    Those critical areas?  All right.

3          But you've told us that when you look at pictures, you

4    can't really tell what the situation of the steel is, can you?

5    A.    You cannot tell how much corrosion there is, no.

6    Q.    Exactly.  And so you'd want to look back at the ultrasonic

7    survey, right?

8    A.    Ideally, yes.

9    Q.    Ideally, yes, but did you do that?

10   A.    For the 69, we did not look at a UT survey.

11   Q.    Did you do it for the 70?

12   A.    There's none available before it left.

13   Q.    There was none available.  Well, here it is.  It's right

14   here.  You told me that Heger -- that Vigor asked you to look at

15   the ultrasonic survey, and you did, didn't you?

16   A.    I did.

17   Q.    But for the purpose of your report, you never went back to

18   the ultrasonic survey, which is reliable about the thickness of

19   steel, to see whether you could believe your eyes, basically?

20   A.    I didn't feel confident using it as a basis of my report

21   because it was three years prior to the departure of the dock --

22   Q.    Okay --

23   A.    -- and I didn't know which areas of the dock could have

24   been maintained --

25   Q.    Understood --

1    A.    -- and usually those reports are done to fix the dock, if

2    areas come up as corroded.

3         In general, looking at other portions of the UT survey,

4    which did not capture elements that are critical to the strength

5    of the dock, it was more viewed towards those transverse frames

6    and the pontoon deck that are critical for lifting a ship.  It

7    didn't have the information that would be needed for doing

8    longitudinal strength calcs.  But the other areas of the dock,

9    that report highlights things that are 18 percent corroded, and

10   there's very few areas of dock, besides the pontoon deck, that

11   reached that threshold.

12   Q.    Okay.  So it didn't -- so now you're remembering that

13   ultrasonic survey didn't have the information needed to do the

14   calculations for your report, right?  Is that what you're

15   saying?

16   A.    I think "now you're remembering" is a mischaracterization

17   of what I just said.

18        I said I knew about it.  That report supports, in my

19   opinion, my assumption made for the calculation.

20   Q.    Okay.  But the report didn't have -- in your memory -- an

21   assessment of the critical parts of the 70 that you need to be

22   confident that those critical parts would support the

23   longitudinal forces, right?

24   A.    That's correct.

25   Q.    Okay.  And the way to be certain about that -- and that's

1  important to know -- for Vigor to know before the tow left out,

2  right?

3  A.   It's --

4  Q.   -- that those elements were in sufficient shape to support

5  longitudinal bending.  Wasn't that important?

6  A.   A UT survey would justify my assumptions, or any

7  assumptions that were done for calculations at the time.

8  Q.   If it was done.

9  A.   Yes.

10  Q.   But it wasn't.

11      Okay.  Now, before the tow, Dan Keen approached you and

12  asked for a drawing, right?

13  A.   That's correct.

14  Q.   And he drew up where the pad eyes were going to go.  It was

15  in red pen, I remember seeing, right?

16  A.   That's correct.

17  Q.   And he just asked you to put this into a plan and send it

18  back?

19  A.   Yep.

20  Q.   He didn't ask Heger to do any engineering calculations for

21  the suitability of this particular configuration, right?

22  A.   That's correct.

23  Q.   Didn't ask any engineering calculations of the suitability

24  of a one-piece tow of a 70-year-old, corroded dry dock in poor

25  condition, and quoting the surveyor, right?

1    A.    Yes.

2          MR. HOWARD:  Objection; mischaracterizing, Your Honor.

3          THE COURT:  Sustained.

4    Q.    (By Mr. Simms)  Now, you see this drawing for a one-piece

5    tow of the 70, that you knew was not in the shape of the 69, but

6    you didn't say anything, right?

7    A.    They asked for a CAD sketch of the redline drawing, so

8    that's all we did.

9    Q.    And you sent it back, and that was it?

10   A.    We had notes in our drawings indicating that no engineering

11   analysis was done, and that had to be signed off on by a marine

12   warranty surveyor, so we accurately pointed out in our drawing

13   that we did not do engineering analysis.

14   Q.    Okay.

15         And so as Richard Shaw walked through, crawled through the

16   70 and he looked at things, looked at pictures -- before I go

17   back -- so you looked at a lot of pictures of the -- well, let

18   me go back before that.

19         You didn't look at any pictures of the 70, other than those

20   in Shaw's report, right?

21   A.    For doing what activity?

22   Q.    In Shaw's -- Shaw went through, and his assistant, and he

23   took pictures and he put them in his report, right?

24   A.    Yeah.  I saw all those pictures.

25   Q.    Those were the only pictures you looked at, right?

1   A.    That's correct.

2   Q.    The only ones in Shaw's report.

3   A.    Yeah, the 500 photographs or so?

4   Q.    You didn't look at all 500?

5   A.    Of course I did.

6   Q.    Okay.  In any of those, you didn't see any evidence of

7   recent repairs, did you?

8   A.    I did.

9   Q.    You did?

10  A.    Yeah.  There were repairs made above the sally port.  I

11  remember seeing those.  Other areas of the dock, I can't talk

12  about, but that one, in particular, stuck out to me because of

13  the fresh paint.

14  Q.    Okay.  But you didn't see any repairs in the critical areas

15  for longitudinal bending?

16  A.    The dry dock, which I consider to be the most critical for

17  longitudinal strength of the dock, the interior area of safety

18  deck had its original paint still intact, which, to me,

19  indicates no corrosion.  The top deck looked in pretty good

20  shape, to me, in those photographs.  I didn't see any signs of

21  corrosion.  I do agree that there were signs of corrosion inside

22  the ballast tanks, and there were not very good pictures,

23  specifically, of the pontoon bottom to reach any conclusion as

24  to what shape that would be in.

25  Q.    And let's talk about the safety deck.  If the safety deck

1   holds, the 70 floats, right?

2   A.   If all the other ballast tanks are floated?

3   Q.   Yes.

4   A.   Yes, it floats.

5   Q.   Okay.  So if you were Dan Keen -- okay? -- and somebody

6   asked you, Will this float?  What would you tell them?

7   A.   I need more context than that.

8   Q.   Okay.  You'd tell them, If the safety decks are intact,

9   you're in good shape, right?

10          MR. HOWARD:  Objection.  I think this is lacking

11  foundation and calling for speculation as phrased.  It might be

12  relevant, but there is inadequate foundation.

13          THE COURT:  There is.  Sustained.

14  Q.   (By Mr. Simms)  You testified that the 70 will float if the

15  safety decks remained intact, right?

16  A.   I said it will float if all the ballast tanks are flooded.

17  Q.   If all of the ballast tanks are flooded and the only thing

18  remaining is the safety deck tanks, it will float, right?

19  A.   That's correct.

20  Q.   Okay.

21      So put yourself in the position of Dan Keen, who got asked

22  on the night before the sinking, he said Western said, Would you

23  run the numbers on the GHS program, and tell me whether it would

24  float?  Okay.  I want you to put yourself there.  Okay?

25      Should Dan have said, Yeah, it'll float as long as the

1  safety deck is intact?

2         MR. HOWARD:  Objection; relevance, Your Honor.  That

3  wasn't a question asked of him.  That wasn't a statement made.

4  I think we're off on pure speculation now.

5         THE COURT:  The objection is sustained.

6         MR. SIMMS:  Okay.  All right.

7  Q.   (By Mr. Simms)  So do you use the GHS program?

8  A.   I do.

9  Q.   All right.  And for the purpose of your analysis, did you

10  use the GHS program?

11  A.   For doing this analysis?

12  Q.   Yes.

13  A.   Yes, I did.

14  Q.   Okay.

15        And did you run the numbers that showed you why the dock

16  sank on the GHS program?

17  A.   Yes.  I did a flooding analysis of, in theory, what it

18  would take to sink the dock.

19  Q.   Okay.  And did your flooding analysis show that there was a

20  certain set of characteristics that would sink the dock?

21  A.   Yes.

22  Q.   Okay.  And it was possible for you to do, right?

23  A.   Yes.

24  Q.   Okay.  And what were those characteristics?

25  A.   I found that, in my assumptions, if you -- I was trying to

1    recreate the condition the crew observed, which was a port list

2    and a bow-down trim, which was, you know, difficult to create.

3    You had to damage about 75 percent of the ballast tanks in the

4    dock.  Even then, I found that to produce a 17-degree

5    heel-to-port and a slight bow-down trim.  But that alone would

6    not sink the dock.  You had to damage, in my rough estimation,

7    maybe four to five of the safety compartments on the dock to get

8    it to go down and sink.

9    Q.   Okay.

10        And when you did that analysis -- all right? -- what would

11   the dock have to look like before it sank?

12   A.   It doesn't necessarily have to look like anything.  I mean,

13   I'm assuming you're asking from a vantage point of a very long

14   distance --

15   Q.   Yes.

16   A.   -- and you may not notice damage at that distance,

17   especially in the fog, which many people have testified to.

18   Q.   Okay.

19   A.   If you look up close, you could see tears and buckles, you

20   know, in the upper portions of the wing wall.  Those are the

21   areas most likely to have damage.

22   Q.   Okay.

23        So the men on the tug could be looking at the dock and

24   think it seems to be just fine, right?

25   A.   In terms of --

1  Q.   In term of it floating.

2  A.   I mean, based on it floating, yes.

3  Q.   Okay.  So to find out whether it was going to sink, they

4  need to get reliable information from Dan sitting behind the

5  program, right?

6        MR. HOWARD:  Objection, Your Honor; lack of

7  foundation; speculation.

8        THE COURT:  Sustained.

9        MR. SIMMS:  Uh-huh.  Okay.

10 Q.   (By Mr. Simms)  But you were able to duplicate what

11 conditions would cause the dock to sink, right, on the program?

12 A.   You have to keep in mind it's a static analysis where that

13 dock -- it solves for equilibrium with programs.  So I damage

14 those tanks, and those tanks flood, you know, it doesn't have a

15 time stamp to it.  They're assumed to be flooded, and it tells

16 you what condition the dock is in.

17      If a tank is partially flooding over time, you can't put

18 that information into the program.

19 Q.   Uh-huh.  Okay.

20      And so did you run a scenario showing that the safety deck

21 had failed?

22 A.   As part of what I thought, my analysis of what it would

23 take to sink the dock, I ran a number of cases without the

24 safety deck flooded, and it wasn't until I flooded the safety

25 deck that the dock went down and sank.

1    Q.    Uh-huh.  Okay.

2          All right.  The 69, let's talk about the sequence of things

3    with the 69.  So there was what you call -- I think you called

4    it a work order first?

5    A.    Yes.  It's a work-breakdown, work specification.

6    Q.    And there was a bunch of work done on the 69, correct?

7    A.    That's correct.

8    Q.    Okay.  So it was, basically, bringing it back to new

9    condition, wasn't it?

10   A.    I wouldn't say new.  They did a few things to the dock,

11   like paint the bottom structure, but they didn't paint the

12   entire dock.  They installed moorings, they installed stairways,

13   that sort of thing.

14   Q.    To this day, 69 is NAVSEA certified, right?

15   A.    No, that's not correct.

16   Q.    Okay.  The last time it was NAVSEA certified was?

17   A.    I don't know the answer to that.

18   Q.    Okay.  At the time it came out of Portland, was it NAVSEA

19   certified?

20   A.    It was not.

21   Q.    Okay.  And since then, you haven't been involved in any

22   NAVSEA certification of the 69?

23   A.    In my time at Heger, we have never been involved with the

24   NAVSEA certification.  I don't know when Vigor decided to let

25   that lapse --

1    Q.    Okay.

2    A.    -- but I assume it was NAVSEA certified at some point.

3    Q.    Okay.

4          So you didn't get reported -- you didn't get asked to do

5    the analysis of a one-piece tow until after all that work had

6    been done on the 69, did you?

7    A.    So by actual work, I don't know when the timeline was.  We

8    produced a work specification, which is, essentially,

9    instructions of everything that needs to be done.  Vigor had us

10   produce that package to maybe get pricing for what it would take

11   to bring this dock up into a shape where it would be usable in

12   Seattle.  So that's the first step, preparing the specification,

13   shopping it around, getting pricing.

14         And then you execute the work.  They, actually, ended up

15   dry docking it in their own dry dock in Portland, which we

16   designed; did all the work, and then towed it to Seattle.  And I

17   don't know how much time transpired between all those events.

18   Q.    Okay.  So all that work was done in that specification,

19   then Rich Shaw gets asked to survey the one-piece tow, right?

20   A.    Uh-huh.

21   Q.    And the one-piece tow was done in May?

22   A.    Yeah, of 2015.

23   Q.    And that was the time you did your analysis for a one-piece

24   tow, right?  It was May?

25   A.    I don't know the timeline, but I thought we did the report

1  in '13 or so.

2  Q.    Uh-huh, uh-huh.

3  A.    It took a lot of time to fix the dry dock up and get it

4  into a condition where they, you know, could use it in Seattle,

5  and transport it and to have it fit into the mooring system at

6  Seattle.  The dry dock we designed, which is, you know, an

7  80,000-ton dry dock, that didn't arrive until October 2014, I

8  think.

9  Q.    Uh-huh.  Uh-huh.  Okay.

10       And what's the sequence there?  The 69 replaced the 70,

11  right?

12  A.    In Seattle, that's correct.

13  Q.    Right.

14       And so there was, in your memory, about two years' worth of

15  work on the 69 before it got moved, one piece, to Seattle?

16  A.    It wasn't two years' worth of work; it was two years' worth

17  of planning.

18  Q.    Two years' worth of planning.  Okay.

19       And those other docks you said were moved one piece, you

20  didn't have any idea what condition they were in when they were

21  moved?

22  A.    No.

23  Q.    Well, the 71 was in excellent condition, wasn't it, when it

24  was moved one-piece?

25  A.    I assume it was in good condition.  It was NAVSEA

1   certified.

2   Q.   But you don't know, one way or the other, if those other

3   docks moved in one piece, whether they were in excellent

4   condition, good condition, any condition?

5   A.   We weren't physically -- I, personally, wasn't actively

6   involved in those jobs, and I don't believe Heger, as a company,

7   was.  I assume they were in good condition.

8   Q.   Uh-huh.  Okay.

9        We talked about the 70 and that Heger has

10  never inspected -- talked about the 69.  Heger's never inspected

11  the 70.  The 71, you did inspect.

12       Okay.

13       So corrosion.  Okay?  Now, you gave an average in your

14  report of 15 percent, but let's look at the critical members --

15  okay? -- the longitudinal support.

16       There could have been some of those more corroded than 15

17  percent, right?

18  A.   Yes.  I said that in my report as well.

19  Q.   Okay.  All right.  And the only way you'd know whether

20  there's more corrosion than 15 percent is an ultrasound survey,

21  right?

22  A.   Yes, definitively, yes.

23  Q.   All right.

24       And so you don't really have any basis for confidence in

25  this ten-foot-minimum sea -- whatever, recommendation, it's been

1    called a limitation.  You don't have any basis for confidence in
2    that because you never measured the critical elements
3    ultrasonically, do you?
4    A.    My bases is my experience and, you know, the 50 or 60
5    surveys I've done on dry docks, and what I've seen in dry docks
6    of this age, and I don't believe my assumptions to be wrong; if
7    anything, conservative, especially in the upper portions of the
8    wing wall.
9    Q.    But you didn't -- you were relying on a survey that turn
10   only on a visual inspection?
11   A.    Yes.
12   Q.    Okay.
13   A.    I assume a visual inspection by a qualified individual
14   would highlight problem areas of the dock, if there were any
15   found.
16   Q.    But he couldn't see how much wastage there was, with
17   reliability, right?
18   A.    No one can see if there is wastage.  People can see if
19   there's scaling occurring.  You know, that's one of the jobs
20   of -- you know, myself, as a qualified inspector, is to identify
21   areas, with high levels of skill, and recommend those areas be
22   further examined with UTs to see how much wastage there is
23   there.
24   Q.    So Vigor went to the trouble of commissioning a survey or
25   an assessment -- two assessments for the move of the 69, in calm

1  weather, from a short distance, from Portland to Seattle, but

2  they never went through the trouble of asking for such an

3  assessment for a one-piece tow all the way from Seattle to

4  Ensenada, right?

5           MR. HOWARD:  Objection; foundation, scope, and

6  relevance.  He's not here as a dry-dock-operator expert.

7           THE COURT:  That's great argument, Mr. Simms, but

8  sustained.

9           MR. SIMMS:  Okay.

10 Q.   (By Mr. Simms)  And so what I need to ask you is, all

11 right, you're assessing professional behavior.  Here, Vigor

12 commissions you -- okay -- to do a very detailed and lots of

13 calculations, a survey to show whether it's safe to move the 69

14 a short distance.  All right?  But Vigor does none of that for

15 the 70.  Is that, in your viewpoint, professional and

16 responsible?

17          MR. HOWARD:  Same objection, Your Honor.

18          THE COURT:  Sustained.

19     Mr. Simms, I've given you more than your 20 minutes.  Do

20 you have any other questions?

21          MR. SIMMS:  Okay.  I think we're concluded, Your

22 Honor.

23          THE COURT:  Mr. Naylor, thank you.  You may step down.

24          MR. HOWARD:  Your Honor, I do have two questions, if I

25 may?

1          THE COURT:  All right.

2          MR. HOWARD:  And I really will keep it to two

3     questions.

4                    REDIRECT EXAMINATION

5     BY MR. HOWARD:

6     Q.   A background question before I ask the question.

7          It's forensic versus real life.

8          Are the marine warranty surveyors being hired for forensic

9     purposes --

10         MR. SIMMS:  Beyond the scope of cross, Your Honor.

11         THE COURT:  Sustained.

12    Q.   (By Mr. Howard)  You were asked about -- well, you relied

13    upon a marine warranty surveyor in your opinions in this case;

14    is that correct?

15    A.   That's correct.

16    Q.   Why?

17    A.   They're usually, in our opinion, the authority for

18    determining if something is seaworthy or not.

19    Q.   Why is that?

20    A.   You know, that's -- essentially, their job is to sign off

21    on suitability of tow, towing arrangements, you know, things

22    that need to be done to prepare a vessel, like a dry dock, for

23    an open-ocean tow.

24    Q.   And in terms of your attempting to recreate what happened

25    in this case -- what you were asked about a moment ago -- was

1    that based upon being told there was a three- or four-foot list?

2    A.    Sorry.  Repeat your question.

3    Q.    When you were trying to recreate what happened in your

4    modeling, was that trying to recreate its sinking, or was that

5    trying to recreate a three- or four-foot list?

6    A.    Yes, it was trying to recreate the list and the trim

7    towards the bow end of the dock.

8    Q.    Were you recreating a three- or four-foot list, or a more

9    severe list?

10   A.    Well, I first started by seeing how much damage it would

11   take to create a three- or four-foot list, and then I expanded

12   my analysis to see how much damage it would take to actually

13   sink the dock.

14   Q.    Structurally, 69, 70 were the same?

15   A.    Yes, they are the same.

16   Q.    But comparing the 70 to 71 is not a pure comparison --

17              MR. SIMMS:  Your Honor, this is beyond the scope --

18              MR. HOWARD:  He asked about the 71.

19              MR. SIMMS:  -- of the cross.

20              THE COURT:  Counsel, that's Question No. 8.

21              MR. HOWARD:  Okay.  Thank you.

22              THE COURT:  Mr. Naylor, thank you.  Safe travels.

23         Laurie, do we still have an open mike?

24              THE CLERK:  We do.

25              THE COURT:  Okay.  Shut it down, please, and, Nancy,

1    let's go off the record.

2                    (Discussion held off the record.)

3            THE COURT:  We'll see you Wednesday at nine o'clock,

4    unless we hear from you otherwise.

5                    (Proceedings adjourned at 4:42 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Nancy L. Bauer, CCR, RPR, Court Reporter for
the United States District Court in the Western District of
Washington at Seattle, do hereby certify that I was present in
court during the foregoing matter and reported said proceedings
stenographically.

        I further certify that thereafter, I have caused
said stenographic notes to be transcribed under my direction and
that the foregoing pages are a true and accurate transcription
to the best of my ability.



        Dated this 5th day of August 2021.


                        /S/  Nancy L. Bauer

                        Nancy L. Bauer, CCR, RPR
                        Official Court Reporter