UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE.

_____

WESTERN TOWBOAT COMPANY,          ) CASE NO. C20-00416-RSM
                                  )
                    Plaintiff,    ) Seattle, Washington
                                  )
v.                                ) July 7, 2021
                                  ) 9:00 a.m.
VIGOR MARINE, LLC,                )
                                  ) BENCH TRIAL
                    Defendant.    ) Vol. 5 of 5
                                  )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

  For the Plaintiff:      J. STEPHEN SIMMS
                          Simms Showers LLP
                          201 International Circle, Suite 230
                          Baltimore, MD 21030

                          ANTHONY J. GASPICH
                          Gaspich Law Office PLLC
                          8094 NE Barthrop Place
                          Bainbridge Island, WA 98110

  For the Defendant:      CHRISTOPHER H. HOWARD
                          DAVID R. BOYAJIAN
                          Schwabe Williamson & Wyatt
                          1420 Fifth Avenue, Suite 3400
                          Seattle, WA 98101

                          NOAH JARRETT
                          Schwabe Williamson & Wyatt
                          1211 SW Fifth Avenue, Suite 1900
                          Portland, OR 97204

                          ADAM MURRAY
                          Schwabe Williamson & Wyatt
                          700 Washington Street, Suite 701
                          Vancouver, WA 98660

EXAMINATION INDEX

| EXAMINATION OF | | PAGE |
|---|---|---|
| TOM GILMOUR | DIRECT EXAMINATION<br>BY MR. JARRETT | 815 |
| | CROSS-EXAMINATION<br>BY MR. SIMMS | 824 |
| | REDIRECT EXAMINATION<br>BY MR. JARRETT | 836 |
| RUSSELL JOHNSON | DIRECT EXAMINATION<br>BY MR. JARRETT | 839 |
| | CROSS-EXAMINATION<br>BY MR. SIMMS | 849 |
| DAWN CARTRIGHT | DIRECT EXAMINATION<br>BY MR. HOWARD | 874 |
| | CROSS-EXAMINATION<br>BY MR. SIMMS | 878 |
| | REDIRECT EXAMINATION<br>BY MR. HOWARD | 883 |
| KEN CAMPBELL | DIRECT EXAMINATION<br>BY MR. BOYAJIAN | 885 |
| | CROSS-EXAMINATION<br>BY MR. SIMMS | 897 |
| | REDIRECT EXAMINATION<br>BY MR. BOYAJIAN | 899 |

1                       PROCEEDINGS

2       _____

3          THE COURT:  Good morning.  Please be seated.  Welcome

4  to the 14th floor.  Moving on up a floor.

5       I want to thank Judge Pechman for graciously allowing us to

6  use her courtroom.  I don't know if Ms. Williams has explained

7  to you that Judge Jones has a month-long criminal trial going

8  on, and they needed to use my courtroom, not only for jury

9  selection, but just in case not everyone was fully vaccinated,

10 they need to be able to social distance them instead of all

11 being in a jury room.

12      We have a witness on the telephone; is that correct?

13          MR. BOYAJIAN:  We do, Your Honor, but can I address

14 our preliminary matter first?

15          THE COURT:  All right.

16          MR. BOYAJIAN:  It is our intention to try and rest

17 today.  We have four witnesses.  They were here last week, but

18 now they are -- Captain Russ Johnson is here, but other than

19 that, they appearing by telephone today.  We intend two on in

20 the morning and two on in the afternoon.

21      We have a fifth witness, and Mr. Howard raised this on the

22 first day of trial, and that's Greg Challenger.

23      The court issued an order on a motion in limine excluding

24 his testimony as being veiled expert testimony.  Mr. Howard

25 raised it, but the court didn't address or give us an answer.

1   So Mr. Challenger is going to be here today and be available.

2       Vigor hired Mr. Challenger in December 2016 as a consultant

3   on how to respond to letters we were receiving from NOAA.  He

4   has been intimately involved with first-hand personal knowledge

5   on every decision we have made.  The research vessels we hired

6   and his own people from Polaris Applied Science attended a

7   boardable research vessel with NOAA scientists.

8       So he has personal, firsthand knowledge about the facts in

9   the case.  Mr. Simms knows this because Mr. Simms took his fact

10  deposition separate from expert testimony.

11      We would ask whether we would be able to put on

12  Mr. Challenger, very carefully sticking to his fact knowledge,

13  today, if time allows.

14          THE COURT:  All right.  Let me give you an answer

15  right after the noon hour.

16          MR. BOYAJIAN:  Sure, Your Honor.

17      The only reason I might -- he will be here in person, and

18  we have two witnesses scheduled this morning.  There may be

19  dead-air time, if we get through these witnesses before the

20  lunch hour.  But I'm only telling you that for information

21  purposes.  Of course, whenever your decision is ready, that's

22  when we'll hear it.

23          THE COURT:  All right.

24          MR. SIMMS:  Your Honor, as to the timing, Your Honor

25  has ordered in limine that the experts of Vigor are limited to

1    their reports.  Their reports are in the record.

2        And so as we did last time, since the reports are in the

3    record, no direct testimony is needed from -- or should be

4    allowed from the Vigor experts, and it should move straight to

5    cross.

6              THE COURT:  Mr. Jarrett?

7              MR. JARRETT:  As I recall, that's not what we did with

8    the witnesses who testified for Western.  Both the retained

9    experts and the non-retained experts, who testified at length

10   last week, started with direct testimony, and we'd like to

11   follow the same procedure today.

12             THE COURT:  And we will.  Again, the court is allowing

13   greater flexibility with a bench trial, so we're allowing some

14   of it in.  But, as indicated, we do have the reports in the

15   record.  If I could just have you focus on what is probably the

16   most important, from your perspective, put on the record now.

17             MR. JARRETT:  Understood, Your Honor, and we certainly

18   will do so.

19             THE COURT:  All right.

20             MR. JARRETT:  We expect -- as Mr. Boyajian said, we'll

21   be done today, depending on the extent of cross-examination, but

22   we fully expect to be done expeditiously.

23             THE COURT:  All right.

24        So who is your first witness?

25             MR. JARRETT:  Rear Admiral Tom Gilmour, who is

1   appearing by telephone.

2          THE COURT:  Admiral Gilmour, are you on the line?

3          THE WITNESS:  Yes, sir, I am.

4          THE COURT:  Good morning.  This is Judge Martinez.  If

5   I could swear you in before we get started with the questioning.

6                           TOM GILMOUR,
         having been first duly sworn, testified as follows:

7

8          THE COURT:  You will now be questioned, first, by the

9   defense side, who called you, and it will be Mr. Jarrett

10  questioning, and then that will be followed by cross-examination

11  by counsel for Western Towboat.

12      Mr. Jarrett, you may proceed.

13          MR. JARRETT:  Thank you, Your Honor.

14                       DIRECT EXAMINATION

15  BY MR. JARRETT:

16  Q.   Good morning, Rear Admiral Gilmour.

17  A.   Good morning.

18  Q.   So you heard a discussion just before you were sworn.

19  We're not going to have you read every word from your report,

20  sir, but I would like for you to -- well, first, can you tell us

21  who you are and what experience and expertise you bring to your

22  testimony today?

23  A.   Yes.  I will try to speak slowly and distinctly.

24      I had my file sent earlier.  I would just like to elaborate

25  on that.

1          My academic experience is four years at the Academy, where

2    I earned a Bachelor of Science in mathematics and physics.  In

3    addition, the Coast Guard sent me to the University of Michigan

4    for two years.  I received a Master's of Science in engineering

5    and naval architecture engineering (inaudible) also mechanical

6    engineering.

7    Q.    Rear Admiral Gilmour, if I could interrupt you for a

8    second.  Sometimes your phone is garbled, and it cuts out.  So

9    the part that I think was garbled most recently is -- the Coast

10   Guard sent you where, sir?  Can you start there again?

11   A.    I'm sorry.  I'll just start over from the beginning.

12   Q.    All right.

13   A.    I had it on speakerphone, and now it is not on

14   speakerphone.

15   Q.    Thank you, sir.

16   A.    Is that better?

17   Q.    Yes.  That is better.  Thank you.

18   A.    Okay.

19         My academic experience was four years at the Coast Guard

20   Academy, where I received a B.S. in mathematics and physics, and

21   later the Coast Guard sent me to graduate school for two years,

22   where I got a master's in naval architecture, marine

23   engineering, and mechanical engineering.

24         I spent 34 years on active duty from insignia to admiral.

25   Twenty-seven of those years were in commercial-vessel safety.

1          My last three years as a flag officer, I ran the

2    commercial-vessel safety program for the Coast Guard as the

3    chief of marine safety security and environmental protection.

4          I was also appointed by the State Department to represent

5    and lead the U.S. delegation at the International Maritime

6    Organization in London, developing international safety

7    standards.

8          In my three years as a captain, I was also deputy of marine

9    safety and I ran the vessel inspection, licensing, and

10   investigation programs for the Coast Guard.

11         During these years, amongst other things, I spent six years

12   in a partnership with the American Waterways Operators, which is

13   a national organization for towboat operators.  Together we

14   tracked tug and barge safety, we developed voluntary safety

15   management system for towboat operators, which later turned into

16   regulations that are now in subchapter M for towboats.

17         During my career, I spent ten years as a commercial-vessel

18   inspector, two years in vessel investigations and one year in

19   Merchant Marine licensing.

20         I worked for three years as a Captain.  I was Captain of

21   the port in New York, which is the largest port -- and in charge

22   of the Port New York, which is the largest port in the U.S. for

23   vessel arrivals.

24         I also spent three years as the alternate captain of the

25   port and executive officer at Marine Safety Office in San

1   Francisco Bay.

2        I had six years in commercial-vessel design review of

3   structures and stability, and for seven years I was an IMO

4   delegate for the Coast Guard, developing international

5   standards.

6        Upon retirement from the Coast Guard, I worked for the

7   American Bureau of Shipping, which is the only U.S.

8   classification society for merchant vessels.  I was, for five

9   years, the vice president of the American division, which

10  covered North and South America.  I was in charge of steward

11  aid, inspections, engineering design review of vessel plans to

12  the American Bureau of Shipping standards, and I had over 1,500

13  surveyors and 500 engineers working for me.

14       The American Bureau of Shipping verified vessel design and

15  operations for insurance purposes, and also represented many

16  sovereign nations, including the United States.

17       As a maritime consultant, the last few years I have worked

18  for a shipping building company VT Falter in Mississippi for two

19  years on a design team to develop standards for an offshore

20  Coast Guard patrol cutter.

21       I've done a passenger vessel safety stability analysis for

22  an operator in Portland, and I have been on retainer for Alaska

23  Tanker Company, working on safety management systems, their

24  ballast water management systems.

25       I've done survey on the vessel, and numerous shipwrights.

1    So I think that concludes what I have done.

2              (Technical troubleshooting takes place.)

3              THE COURT:  I'm very sorry.  Judge Pechman's

4    courtroom, I forgot, has poltergeist.  It always has when it

5    comes to technical stuff.  We did not have this problem in my

6    courtroom.  That's all I've got to say.

7         All right.  You may continue.

8              MR. JARRETT:  Thank you, Your Honor.

9    Q.   (By Mr. Jarrett)  Rear Admiral Gilmour, the ghosts are

10   busted and we're ready to continue.  Are you still there?

11   A.   I'm still here.

12   Q.   Great.

13        So you told us about your background.  Did we ask you to

14   review the materials listed in your report, sir?

15   A.   To form my report, you gave me a number -- actually, about

16   40 exhibits, and I wrote my report from those exhibits you gave

17   to me.

18   Q.   Sure.  And you had the depositions of Russell Shrewsbury,

19   Bob Shrewsbury, and Stephen McGavock, right?

20   A.   I did.

21   Q.   Great.

22        And is your testimony today based on your review of those

23   materials?

24   A.   Yes, it is.

25   Q.   All right.

1          So just to get started here, what was the central question?

2     What you were you asked to review?  What was the question you

3     were asked to answer?

4     A.   Well, basically, as I said at the beginning of my report, I

5     looked at this as an investigation to determine not only the

6     cause of the casualty but what may have contributed to the

7     casualty.

8          I looked at all of the plans involved, all of the email

9     exchanges, but my focus was really on the people that were

10    operating the vessel and the written procedures that led up to

11    the vessel leaving and proceeding down until it was lost off San

12    Francisco Bay.

13    Q.   All right.  So did you reach any conclusions as to whether

14    proper towing plans were written?

15    A.   I did.

16    Q.   And what's your conclusion in that regard, Rear Admiral

17    Gilmour?

18    A.   Well, let me go -- my conclusion was that the two plans

19    written by Western Towing did not contain some key

20    recommendations made by Bowditch Marine in their survey.

21    Q.   Go ahead, please.

22    A.   I can read sections, if you want me to.

23         But Bowditch gave a number of recommendations, one of them

24    being -- and I'm going through my testimony here.  If you go to

25    page 3, Bowditch made a recommendation, in a letter that they

1    sent, that the master of the tug should avoid heavy head or beam

2    seas greater than eight to ten feet.  Note that the word "shall"

3    was used here, meaning it was not optional.

4          Paragraph 7 of the recommendation is also important in that

5    the master of the tug is not to proceed from any safe port or

6    sheltered waters during the voyage without first determining

7    that reasonable weather conditions less than 4-6 are predicted

8    along his intended track.

9    Q.    Rear Admiral Gilmour, if I can interrupt you.

10          You've only written one report for this case; is that

11   right?

12   A.    That's correct.

13   Q.    And that report is in evidence, and I didn't intend -- I

14   didn't ask you a very good question, sir, but I didn't intend

15   for you to read from the report --

16   A.    Okay.

17   Q.    -- the court can do that as well.

18          I think --

19   A.    Well, I can sum that up quickly for you.

20   Q.    Okay.  A summary would be great, sir.

21   A.    Okay.

22          In Western's tow plan, both their original tow plan and

23   their amendments to the tow plan, did not include, in my view,

24   key paragraphs from the Bowditch report, which were developed by

25   naval architects and engineers.  It did not have that

1    information in their final tow plan amendments.

2        In fact, the Western tow plan amendment to the original tow

3    plan, which allowed 15-foot seas, said, "Ideally, no more than

4    eight- to ten-foot seas or 20- to 25-knot winds."

5        So in my view, I think if the master of the vessel had had

6    the Bowditch information, he may have altered the route that he

7    took, or he may have not gone at all.

8    Q.   Thank you, sir.

9        Is it your opinion that the tow-plan amendment should have

10   incorporated the towing recommendations from Bowditch?

11   A.   Yes.  I think both the paragraph of sea limitations and the

12   paragraph of the recommendations of getting weather along the

13   track not to exceed those limits was left out of the tow-plan

14   amendments written by Western.  And I think it was critical

15   information, developed from the very people who had done

16   engineering analysis on the dry dock and it being towed.

17   Q.   Okay.  And on -- let's see -- that is page 5 of your

18   report, the middle paragraph concludes, "Had the recommendations

19   in paragraphs 6 and 7 had been strictly followed, this casualty

20   might have been avoided."

21       Can you expand on that?  Tell us what you mean by that

22   sentence, sir.

23   A.   Well, I used the word "might" because we never know what

24   will happen if things were changed.  But I don't think --

25   earlier in that paragraph, the eight- to ten-foot sea

1    requirements were exceeded in a number of days.  They were in

2    weather that exceeded the recommendations.  So if they had

3    followed those, they may not have been there, or they may have

4    altered their route or slowed their speed.

5    Q.    To avoid the weather?

6    A.    To avoid the weather, yes.

7    Q.    Is there any further explanation you want to add for any of

8    the conclusions you reached in your report?  Keep in mind, sir,

9    that I'm only referring to the opinions referenced in your

10   report, not opinions you have reached otherwise.

11   A.    Yeah.  The only other conclusion that I made of note, that

12   I think the master of the vessel, as the vessel was sinking off

13   of San Francisco Bay as he headed south, was just inside the

14   sanctuary, the Monterey Bay Sanctuary, and if he had known

15   exactly where he was, he should have been outside of the

16   sanctuary.

17        I think the sanctuary should have been avoided at all

18   costs, but there was a lot going on that night --

19   Q.    Thank you.

20   A.    -- indeed.

21   Q.    All right.  I interrupted you, Rear Admiral Gilmour,

22   because those issues are not in front of the court for this

23   trial anymore.

24   A.    Oh, okay.

25   Q.    Those are the questions I have for you, sir.  So there will

1   be some cross-examination by counsel for Western, so hang on.

2           THE WITNESS:  Okay.

3                         CROSS-EXAMINATION

4   BY MR. SIMMS:

5   Q.   Good morning, Admiral Gilmour.  This is Steve Simms.  We

6   had a chance to Zoom together with the *Eagle* in the background,

7   the Coast Guard flagship.

8   A.   Yes, sir.

9   Q.   Yes, sir.

10          You have your report in front of your, correct?

11  A.   Uh-huh.

12  Q.   Okay.  Do you have anything else in front of you?  Any

13  notes or anything like that?

14  A.   I've got a whole lot of things in front of me.

15  Q.   Do you have a copy of the transcript of your deposition?

16  A.   I do not.

17  Q.   Did you receive a copy of the transcript of your

18  deposition?

19  A.   I did not.

20  Q.   All right.

21          So your report assumed that the Coast Guard had not

22  approved the tow plan; is that correct?

23  A.   That is correct.

24          The Coast Guard where?

25  Q.   The -- yes.  The Coast Guard where?  Coast Guard Seattle.

1   A.    Okay.  All right.

2         Yes, that is my assumption.

3   Q.    Yes, but your assumption was wrong, because the Coast Guard

4   did approve the dead-ship tow plan, correct?

5   A.    Perhaps verbally.  I don't know that information.  I don't

6   know if they had a written approval.

7   Q.    That was in the Coast Guard investigation report that you

8   reviewed during your deposition, wasn't it, confirming that the

9   Coast Guard approved the plan?

10  A.    It said that Seattle had --

11        THE COURT:  Admiral, hang on one second.  This is

12  Judge Martinez.  Is there an objection?

13        MR. JARRETT:  Is there a page he can reference so he

14  can look at and see -- is he being impeached with this

15  deposition testimony?  I don't know the basis --

16        MR. SIMMS:  I'm asking the question --

17        THE COURT:  Hang on, Mr. Simms.

18   Admiral Gilmour, you do not have a copy of your deposition

19  in front of you?

20        THE WITNESS:  I do not.

21        THE COURT:  Then the way we will do this is as

22  follows:

23   Mr. Simms will indicate the page number and line number, if

24  there's going to be a question that connects to the deposition

25  so that defense counsel are also looking at the same exact

1   thing.  And I'm sorry you don't have one, because that would

2   probably make it a little easier for you.

3       So let me have Mr. Simms indicate if he, in fact, going to

4   use the deposition for impeachment.  Mr. Simms?

5   Q.   (By Mr. Simms)  First I want to ask, Captain, did you see

6   the Coast Guard Information Exchange report summarizing the

7   information?

8   A.   I'm not sure what you're referring to.

9   Q.   Okay.  All right.

10      This is at transcript page 30, line -- we'll go back to --

11  gosh, there's a lot of stuff that gets into this, but we'll go

12  back to page 29.  My question, at line 2:  "And Exhibit 2, and

13  you are -- you are familiar with this, right?  The Coast Guard's

14  Maritime Information Exchange, which is online?  This is what

15  I've marked as Exhibit 2 and this is -- this is a summary --

16  this is familiar to you, this format and this -- this source,

17  right?"

18      Your answer --

19  A.   Are you referring to the 160-some page investigation report

20  from San Francisco?

21  Q.   I'll refer to that, too, because that is -- and you saw

22  that report, didn't you?

23  A.   Yes.

24  Q.   All right.  So there is a summary on the publicly available

25  Coast Guard Information Exchange of that investigation report,

1  correct?

2  A.    There is.

3  Q.    All right.  And both the summary and the report say that

4  the Coast Guard approved the dead ship tow, correct?

5  A.    Yes.

6  Q.    All right.  Your report assumed that the Coast Guard had

7  not approved the dead ship tow.

8  A.    I guess what I would say is, I saw -- at that point in my

9  testimony, I saw no written approval from the Coast Guard in

10  Seattle of the tow report, or the tow -- yes, of the tow report.

11     But I did note that the Coast Guard had verbally approved

12  the tow to go.  But I had seen no written plan, at that point,

13  when I wrote my summary.

14  Q.    Yes.

15  A.    Since then, I have seen an email exchange, from the Coast

16  Guard in Seattle, with a number of people, and know that they

17  did receive the Bowditch report that said eight- to ten-foot

18  seas, a restriction.  The Coast Guard did receive that report.

19     And I don't know what they base their approval on.  My

20  assumption was that they based their approval on the fact that

21  they knew Western Towing, and they knew that Bowditch was a

22  reputable marine surveyor.  And, in fact, they got the plan as

23  the vessel was leaving.

24     So the only thing that the Coast Guard in Seattle saw was

25  the Bowditch report that had the eight- to ten-foot sea

1   requirement in it.

2   Q.   Okay.

3   A.   And also the weather reporting.

4        And I can refer to the things that I saw when I was up in

5   Seattle, waiting for testimony.

6   Q.   Uh-huh.  Okay.  All right.  Well, the record will show that

7   that assumption is not correct.

8   A.   Which assumption?

9   Q.   Your assumption that all the Coast Guard saw was Bowditch's

10  report and something about the weather.

11  A.   Yes.  I had not seen the actual email exchange with the

12  Seattle Coast Guard until this past week, either on Monday or

13  Tuesday, when I was up in Seattle waiting to testify.

14  Q.   Okay.  All right.  So --

15  A.   I did not have that information when I wrote my report.

16  Q.   Okay.  Let's move on to another of your assumptions.

17       You assume that a structural analysis was done of the YFD

18  70 as part of the Bowditch report; is that correct?

19  A.   No, that is not correct.

20  Q.   Okay.  All right.

21       Well, a structural analysis should be done, shouldn't it,

22  before a tow such as this one?

23  A.   I think some sort of structural analysis probably should be

24  done.

25       But I do know that the underwriter for the tow and that

1  Mr. Shaw from Bowditch had an email exchange.  They were -- they

2  questioned the 15-foot seas that were in the original tow plan,

3  and then came up with their recommendations later.  Exactly what

4  they did, I do not know.  I just -- I gleaned that information

5  from an email exchange.

6  Q.    Okay.  All right.

7        And so your belief was that was a structural analysis?

8  A.    I'm assuming they considered the structure of the dry dock

9  when they changed it from 15-foot seas to eight- to ten-foot

10  seas, yes.

11  Q.    Now, is that a sufficient structural analysis for a tow

12  such as this one?

13        MR. JARRETT:  Objection, Your Honor.  There is no

14  foundation for that question.  Rear Admiral Gilmour just stated

15  he saw what he saw.  He did not see the basis of the analysis.

16        THE COURT:  The objection will be sustained.

17  Q.    (By Mr. Simms)  Is a wasting analysis important for a tow

18  such as this one?

19        MR. JARRETT:  Objection, Your Honor.  That's beyond

20  the scope of Rear Admiral Gilmour's report.  He did not touch on

21  a wasting analysis, whatever counsel means to refer to by that

22  question.

23        MR. SIMMS:  He did.  He 's talking about a structural

24  analysis that he saw.  He says that Bowditch's report was the

25  be-all and end-all of this tow.  I want to know whether it was

1  or not.

2        THE COURT:  All right.  I'll give you a little bit of

3  latitude.  Overruled.

4  Q.   (By Mr. Simms)  Was a wastage analysis an important part of

5  concluding -- Bowditch -- that the vessel was seaworthy?

6  A.   I would assume that Mr. Shaw, from Bowditch, when he did

7  the survey of the vessel, looked at all structural members,

8  including any wastage, and he should have so noted.

9  Q.   All right.  And so just to go back to that question.

10       Was it an important thing to do for Bowditch to determine

11  wastage of the YFD 70?

12  A.   Wastage would be part of the survey, as well as damage to

13  any internal structures.  You know, there's a number of things a

14  surveyor would look at, but wastage would be -- if there was

15  severe wastage somewhere, it would be considered in whatever he

16  did.

17  Q.   Okay.  But you can't determine wastage just visually, can

18  you?

19       MR. JARRETT:  Objection, Your Honor.  Rear Admiral

20  Gilmour is not presented as a wastage-analysis expert, not at

21  all.

22       THE COURT:  Sustained.

23       Next question, Mr. Simms.

24  Q.   (By Mr. Simms)  So the Western tow plan, it was not any

25  less detailed than plans you're familiar with, correct?

1    A.    I'm sorry.  Would you repeat that question again?

2    Q.    Are most of the tow plans you've reviewed of the detail of

3    Western's tow plan?

4    A.    Of Western's tow plan?

5    Q.    Correct.

6    A.    I'm -- I'm -- could you ask the question in a different

7    way?  I'm not sure what you're after.

8    Q.    Have you reviewed tow plans before?

9    A.    I have.

10   Q.    All right.  Was Western's plan of the same detail of most

11   of the plans you reviewed?

12         MR. JARRETT:  Objection, Your Honor.  The question is

13   ambiguous in that there are several plans in evidence.

14         THE COURT:  Sustained.

15   Q.    (By Mr. Simms)  Okay.  Let's look at the first plan.

16         Was that plan of the detail of most plans you've reviewed,

17   the first plan, the unamended one?

18   A.    The unamended Western tow plan?

19   Q.    Yes.

20   A.    Is that what you're asking me to comment on?

21   Q.    Yes.

22   A.    Okay.

23         In my statement, I said the original plan -- which I assume

24   is the one you want me to talk to -- which I assume was produced

25   by Western Towing -- gave no wind restrictions or -- and a

1    restriction of 15-foot seas.  It also gave a speed of five to

2    six knots, which seemed a little excessive to me.

3        My assumption was that this plan was taken from a more

4    standard tow as a placeholder; for a later plan to be developed

5    after the dry dock was surveyed and completed.

6    Q.   Just to stop you there, do you have any basis for that

7    assumption that it was a placeholder?

8    A.   Yes.  Because it had no detail as to the tow itself.  So

9    that's what I made my assumption on.

10   Q.   Okay.  Let's go to your transcript, page 7, and then we'll

11   continue onto 9.

12       I ask, at 7, line 20:  "Were the tow plans that you

13   reviewed plans for dead ship tows?"

14       Twenty-two:  Answer:  Some.  I have done dead ship tows

15   before, yes."

16       Twenty-four, on page 7:  "Okay.  And let's focus on dead

17   ship tows.

18       "Have you ever reviewed a tow plan for a dead ship tow that

19   contained the detail that -- that your opinion says Western

20   should have submitted?"

21       Your answer, line 4, page 8:  "Well, you're making me

22   recall things from a long time ago.  Actually, I think Western's

23   tow plan was a fairly standard tow plan, and so, yes, certainly

24   the detail of that, of sea heights, winds, actual local areas

25   they were going to report from, communications, the fact that

1   they had pollution-response equipment, et cetera, et cetera, so,

2   yes, I would say most of the plans I reviewed were of the detail

3   of Western plans.

4        "And I would add, too, that I have investigated a number of

5   collisions of towboats, going way back, where tow plans were in

6   question and much of the information in the tow plan was in

7   question.  So I guess I'm speaking now of just the ones that I

8   approved."

9        Then my question at line 20, page 8:  "And so we will -- we

10  will move to the investigations you were involved in.  Have

11  you -- have you -- have you seen a tow plan as part of those

12  investigations that contain the detail that your opinion says

13  Western should have contained?"

14       Page 9, your answer at line 1:  "As I said, most tow plans

15  I have looked at are with a similar detail of Western's tow

16  plan."

17       Your testimony there was correct, wasn't it?

18  A.   Well, I -- obviously, that's what I said.  And I guess I

19  would like to elaborate a little bit.

20       The original Western tow plan, I'm assuming, came from the

21  tows they make up and down the coast of standard tows of large

22  or shipshape vessels, and it had all of the information that I

23  said in my deposition in it.

24       But in this case, this was a very nonstandard tow.  So I

25  would expect more detail of the tow itself, such that was

1   contained in Bowditch's notes, or the Bowditch letter that I

2   referred to in my report.  This was not in any way a standard

3   tow, and most of the tow plans I have looked at were standard

4   tows.

5   Q.   Okay.  All right.

6        So your report also assumes that Western had in hand the

7   final Bowditch report and recommendations, correct?

8   A.   It did.

9   Q.   And that was in hand before the departure of the tow,

10  correct?

11  A.   I wouldn't -- I don't know exactly when and where the

12  Bowditch plan was given to Western Towboat, but because the

13  Western tow plan amendment had the term "ideally no more than

14  eight- to ten-foot seas and 20- to 25-knots of wind," I assume

15  that came from the Bowditch report.  That's the only mention of

16  eight- to ten-foot seas, which was only contained in the

17  Bowditch report.

18       So my assumption was, when Western Towing made the tow-plan

19  amendments for the YFD 70, they had seen the Bowditch report.

20  Q.   Okay.  And is that the final report?  That's your

21  assumption?

22  A.   I'm not sure what you're referring to in "the final

23  report."

24  Q.   Well, a report that was the final Bowditch report.  That's

25  what you had in mind, wasn't it?

1   A.   Yeah, but those eight- to ten-foot seas and the weather

2   tracking of the proposed way down to San Francisco was contained

3   in numerous places, three or four references had the same two

4   paragraphs in it, and more in both the Bowditch report, three or

5   four exhibits, and the report that was sent to the Seattle Coast

6   Guard, which I assumed they based their approval on, also had

7   the same two paragraphs in the survey report that went from Dan

8   Keen to the Coast Guard in Seattle.  So it wasn't just in one

9   report that the restrictions occurred.

10  Q.   Okay.

11       And you have never had any involvement before this case

12  with a YFD class dry dock, have you?

13  A.   No, I have not.

14  Q.   And you have found, though, that the *Navy Towing Manual* is

15  a reliable source?

16  A.   I would not comment on that, but if the Navy has a tow

17  plan, I'm sure some thought went into it.

18  Q.   Uh-huh.  Okay.

19       All right.  This is your transcript at 25, line 9.  My

20  question:  "Is that -- is the *Navy Tow Plan* a reliable source to

21  determine standards for towing dead ship tows?"

22       Your answer, line 12:  "I -- I would think it would be a

23  resource, and hopefully, if the Navy is using it, it is a

24  reliable source, yes."

25       Is that correct testimony?

1    A.    Yeah, absolutely.

2    Q.    All right.

3          So you talked about altered weight and speed.  I think that

4    went to the awareness in the marine sanctuary.

5              MR. SIMMS:  And so I'd ask the court not to consider

6    that testimony, or, otherwise, I'll cross-examine.

7          He was talking about the rate of the speed of the tug not

8    altered.

9              THE COURT:  No, we don't need any testimony about

10   that.

11             MR. SIMMS:  All right.  Got it.

12         All right.  Thank you, Admiral.

13         And the phone sounds great.

14             THE COURT:  There may be additional questioning from

15   Mr. Jarrett.

16             MR. JARRETT:  Briefly, Your Honor.  Thank you.

17                       REDIRECT EXAMINATION

18   BY MR. JARRETT:

19   Q.    Rear Admiral Gilmour, Mr. Simms asked you about Coast Guard

20   approval for the tow to leave Seattle, and you testified that

21   you assumed the Coast Guard had, at least, verbally approved

22   that departure.  Do you remember that?

23   A.    Yes.

24   Q.    Do you quibble with the Coast Guard's approval of this tow,

25   Rear Admiral Gilmour?  Do you think that was wrong?

1    A.    You know, based on what they had, I think the Coast Guard

2    did the right thing in that they ensured that there was a

3    reputable towing company that was insured, had the proper

4    pollution prevention, et cetera, et cetera.  And when they saw

5    that they had a reputable surveyor, they probably felt pretty

6    good about it.  And, indeed, in the email exchange that I saw

7    when I was up in Seattle, the Coast Guard did ask for a survey

8    report, which was given to them as the vessel was leaving.

9         So I think they were probably satisfied with what they had.

10   I don't think they did a detailed review, however, of the survey

11   report.

12   Q.    Thank you, sir.

13        And just, finally, in all your time with the Coast Guard,

14   and since, even, have you come to view Coast Guard approval as a

15   substitute or an excuse for the exercise of reasonable

16   seamanship?

17   A.    I'll just -- I'll say this:  Coast Guard and federal

18   requirements are minimal requirements.  The safety management of

19   the company, in my view, the good companies go well beyond any

20   Coast Guard requirements.

21        So the Coast Guard probably approves a whole bunch of

22   things that maybe they should, in hindsight, take a better look

23   at.

24        But, again, Coast Guard requirements are minimum

25   requirements for safety.

1     MR. JARRETT:  Thank you, Rear Admiral Gilmour.  I

2  don't have anything further for you.  Mr. Simms may have

3  questions.

4     MR. SIMMS:  Thank you, Admiral.  No questions from me,

5  and thank you for your testimony.

6     THE COURT:  All right.  Thank you.

7     THE WITNESS:  You're welcome.

8     THE COURT:  Your next witness, counsel?

9     MR. JARRETT:  Vigor calls Captain Russ Johnson, Your

10  Honor.

11     THE COURT:  Captain, good morning.  If I could have

12  you work your way up before our clerk to be sworn prior to

13  testifying, sir.

14                    RUSSELL JOHNSON,
             having been first duly sworn, testified as follows:

15

16     MR. SIMMS:  Your Honor, before we start, I think we're

17  moving along.  If the Vigor side can get its witnesses in here,

18  we can use the time well.

19     THE COURT:  Okay.

20     MR. JARRETT:  Thanks for that, counsel.

21    Our witnesses are not available until after the lunch

22  break, as Mr. Boyajian referenced, unless Greg Challenger

23  testifies.

24     THE CLERK:  Please state your name for the record, and

25  spell your last name for the court reporter.

1      THE WITNESS:  Robert Russell Johnson, J-o-h-n-s-o-n.

2      THE COURT:  Captain, I think you may have heard the

3   admonitions I gave other witnesses.  I'm not sure if I saw you

4   in the courtroom or not previously.

5      THE WITNESS:  Not before today.  This is my first day

6   here.

7      THE COURT:  All right.  Listen carefully to counsel's

8   questions, don't speak over them, and if you don't understand

9   them, just say so, and we'll get them to rephrase.

10      You may inquire.

11                     DIRECT EXAMINATION

12   BY MR. JARRETT:

13   Q.   Captain Johnson, we're going to -- your report -- you've

14   only written one report in this case; is that right?

15   A.   That's correct.

16   Q.   That report is in evidence as well, so, by all means, feel

17   free to refer to your copy of your report, but we really do not

18   need to read any of the language from it.  We're not reading it,

19   verbatim, into the record.  Do you understand?

20   A.   Understood.

21   Q.   Great.

22      So can you summarize, a thumbnail sketch, of your

23   background and experience, and what gives you the basis for your

24   knowledge of ocean towing on the West Coast?

25   A.   Well, I started my career in 1966.  I followed my father

1   over to Vietnam.  He was a captain of a tugboat and working for

2   a company in Vietnam, an American company that towed supplies

3   for the military.

4        I, unfortunately, had just dropped out of college at

5   Seattle University, up the street here, and I was a little

6   wayward.

7        I went over there in '66, and I was there until, I think it

8   was late 1970, so almost four years, four years, something like

9   that.

10        I was fortunate enough to get my first captains job over

11   there when I was still not yet 21 years old.  Just circumstances

12   of the war at the time.

13        I came back in 1970, and I received my First Master's

14   license in 1971.  It was 1,000-ton Master's license, ocean

15   freight and towing, and that's the license that I have today.

16        I believe I was probably -- I was told I was the youngest

17   captain to receive 1,000-ton Master's license at that time.

18        I worked on the West Coast for a number of years for Alaska

19   Tug & Barge, also known as AT&B, which was later bought out by

20   Crowley Maritime, a very large -- one -- at the time, one of the

21   largest towboat companies in the world, and I was a captain for

22   them for a number of years.

23        In 1983, I was asked by Crowley management to come into the

24   office as a port captain.  And in 1984, I was transferred to San

25   Francisco as the operations manager for San Francisco and for

1    outside operations on the West Coast.

2        In 1990, I was transferred back up to Seattle and promoted

3    to marine operations manager for the West Coast and Alaska for

4    Crowley Maritime, where I was responsible for over 100 tugs and

5    barges in the Crowley system, for not only their safe operation,

6    but their routes and their route plannings.

7        I left Crowley in 1994 to go back to sea, and I operated up

8    and down the West Coast for a company called Dunlap Towing

9    Company.  The West Coast and Alaska were my routes, as well as

10   Hawaii and return.

11       And at some time later, in 2000, I was asked to come ashore

12   by Dunlap, to a shoreside post, helping to manage marine

13   operations, as well as the safety manager for the company.

14       At Dunlap, I was responsible for -- integrated the

15   international safety management system that the company now

16   operates on and was necessary to operate over 200 miles

17   offshore.

18       And I continued that career with Dunlap until -- I guess it

19   was 2010, when I retired.

20       Since then, I have been active in my expert witness

21   business and a marine consultant in various projects.

22   Q.  Thank you, Captain Johnson.

23       During your experience with Crowley and/or Dunlap, did you

24   have experience managing the fleet; that is, conferring with the

25   company about contracts that it was undertaking, managing the

1  company's vessels, dispatching various vessels to various

2  contracts, that kind of thing?

3  A.    Yes.  At Crowley, I approved all tows, and I approved the

4  contracts that the guys that were doing the contracts and the

5  company were arranging at the time, and assigned the proper tugs

6  and barges to the project.

7        And at Dunlap Towing Company, I was very active in doing

8  the contracting.  I'd bid the tows, bid the jobs, and contracted

9  with the carriers -- I'm sorry -- the shippers.

10 Q.    Sure.

11       Did we ask you to review documents and depositions for

12 purposes of reaching opinions in this case, Captain Johnson?

13 A.    Yes, you did.

14 Q.    Those are listed in your report; is that right?

15 A.    That's correct.

16       MR. JARRETT:  Just for the record, for our reference

17 later, Captain Johnson's report is marked as Exhibit A-35.

18 Q.    (By Mr. Jarrett)  So moving into the opinions in that

19 report, Captain Johnson, again, I don't think that we need to --

20 well, I know we don't need to go through the report

21 line-by-line, but there are a couple of your opinions that could

22 bear some further explanation.

23       So do you have your report in front of you, sir, your copy

24 of it?

25 A.    Yes, I do.

1  Q.   So keeping in mind -- if you are going to read anything,

2  you need to keep in mind that it is being transcribed, so you

3  need to read at a conversational pace and not an out-loud

4  reading pace.  Do you follow me?

5       All right.  So, Captain Johnson, referring to the opinion

6  section of your report, which starts at the top of page 9, do

7  you see it there, sir?

8  A.   Yes, I am.

9  Q.   All right.  So your sentence is that the lump sum towage

10 contract for the YFD 70 for a voyage on the West Coast during

11 mid October was risky.

12      Can you tell us what you mean by that sentence, sir?

13 A.   Well, there is a number of factors to consider when I say

14 "risky."  First of all, it was the nature of the tow, which was

15 not an oceangoing barge; it was a dry dock, and a 70-year-old

16 dry dock, to boot.  So, obviously, special care would have to be

17 considered for towing it down the coast at that time.

18      Secondly, the restrictions that were put on the tow by the

19 surveyor of eight- to ten-foot seas and 20- to 25-knot winds is

20 pretty confining, in the aspect that the month of October could

21 more than likely have stronger winds and heavier seas on the way

22 down the coast of the United States at that particular time of

23 the year.

24      October is notoriously unpredictable, and even into

25 November, so that's -- that's why I say it's a little bit risky.

1          And the other part of that is that it is a lump-sum tow,

2     meaning that the company was being paid a fixed amount of money

3     regardless of how long the tow took to go down the coast.  And

4     in my position as a manager, I'm thinking, well, you know, I

5     likely might exceed the amount that I'm receiving for that bid,

6     because of weather conditions, holding up for weather in the

7     Strait of Juan de Fuca, or slowing down to a couple of knots, or

8     one knot or zero knots, to avoid weather.

9          So if you add all those up, it was a risky tow.  And it's

10    probably a tow that I personally would not have authorized or

11    booked at that particular time.

12          You can -- I believe they had the ability to -- with Vigor,

13    and Vigor agreed that they could tow it any time they wanted to.

14    They didn't have to necessarily leave in October.  If they would

15    have left in May or June of the following year, they would

16    likely have a good weather window to operate on, much more

17    likely than in October.  So that's probably what I would have

18    decided to do.

19    Q.    All right.  So would it have been more prudent to wait

20    until spring to undertake this tow, Captain Johnson?

21    A.    I believe so, yes.

22    Q.    So conversely, was it prudent to undertake this voyage in

23    mid to late October?

24    A.    As an operations manager, I don't believe it was prudent to

25    take it on at that time.

1    Q.    Okay.

2          Some terms that you used are not necessarily familiar to

3    me.  You said that this tow would proceed outside.  What does

4    "outside" mean in your parlance, Captain Johnson?

5    A.    I'm sorry.  Say that again.

6    Q.    Yeah.

7          So you said when you get outside, you encounter weather.

8    Outside of -- go ahead.  Outside of Puget Sound, is that what

9    you meant?

10   A.    I would be referring to shorthand for going into the ocean.

11   It's a 124 miles from Seattle to Cape Flattery, where you have

12   relatively calm seas and relatively calm winds.  And once you

13   get past Cape Flattery, then you're into the open ocean for

14   8,000 miles across the Pacific.  That's what I mean by

15   "outside" --

16   Q.    Okay.

17   A.    -- outside Cape Flattery in the open ocean, Pacific Ocean.

18   Q.    Okay.  Great.

19         Opinion No. 3 in your report, on page 9, you -- the

20   conclusion is Captain McGavock and Western Towboat management

21   were in the most important --  sorry.  I'll start again.

22   A.    Are you saying No. 3?

23   Q.    Yes.  I'm just reading the conclusion so we're on the same

24   page.

25         Starting again.

1      "Captain McGavock and Western Towboat management were in

2  violation of the most important basic tenets of the

3  tow-suitability survey."

4      Can you explain that for us, sir?  What are those most

5  important basic tenets, and how were they violated, in your

6  opinion?

7  A.   I'm sorry, but my opinions aren't tracking with yours.

8  My No. 3 starts out, "The trip tow recommendations from the

9  surveyor stated that the master of the *Ocean Ranger* is not to

10 proceed."

11 Q.   That's the one, Captain.  I was reading from the last

12 sentence of that paragraph.

13 A.   Okay.  I gotcha.  Okay.

14     "Captain McGavock and Western Towboat management were in

15 violation of the most important basic tenets of the

16 tow-suitability survey."

17     Well, yeah, they -- they were not in -- they were -- two

18 days out from leaving Cape Flattery, they were already into

19 winds that were in excess of the recommended parameters of the

20 surveyor.

21     And I believe that Bob Shrewsbury had information

22 indicating that they would be going into a weather system a

23 couple of days out that likely would exceed the parameters of

24 the surveyor.  They did, indeed, encounter that weather a couple

25 of days out, and they did take some pretty heavy weather, which

1   was not on the recommendations of the surveyor.

2   Q.   Thank you, Captain Johnson.

3        Do you have any opinions as to the reasonableness with

4   which Captain McGavock conducted the tow down the coast, the

5   speed that he maintained and the vessel's engines, the way that

6   he maneuvered, anything like that to avoid weather?  Did you

7   reach any opinions in that regard, sir?

8   A.   I believe that there were a couple of -- maybe numerous

9   different times where, I believe, that he was towing too hard

10  for the conditions that they were encountering at the time.

11       There was mostly southeast, southerly, and southwesterly

12  winds, which they were taking right on the bow of the dry dock,

13  and there was a lot of slamming going on.  And remembering that

14  this is a blunt-nosed instrument of a craft, and they're taking

15  these seas directly, slamming into that craft.

16       And just from my experience, towing at 3, 4, 5 knots into

17  eight- to ten-foot seas, even a regular cargo barge can cause

18  significant damage.  With a tow of this type, I think it was

19  certainly not advisable, and they should have been slowing down.

20  I believe that that was a big issue in the damage to the dry

21  dock.

22  Q.   Thank you, sir.

23       And was that contrary to any recommendations from the

24  tow-suitability surveyor?

25  A.   Well, absolutely.  It was eight- to ten-foot seas, and they

1  shouldn't have been in it in the first place.

2  Q.   So those recommendations from the tow-suitability surveyor,

3  should those be viewed as requirements for the tow, in your

4  view, Captain Johnson?

5  A.   I believe that they can be reviewed -- I mean, understood

6  as requirements for the tow.  But I just don't think it's

7  reasonably attainable to have those restrictions in that time of

8  year and accepting to take that tow down the coast.

9  Q.   Okay.

10      As the manager of any of the entities that you've worked

11  for, or as the skipper of any towboat that you've operated, do

12  you rely on the customer to tell you what the weather conditions

13  are and what the forecasts and what waves, seas, and winds

14  you're going to encounter?

15  A.   Certainly not.  No, we have our own methods of checking the

16  weather, and we do not rely on the customer to dictate to us

17  what the weather is going to be or provide us any information.

18  Q.   Sure.  And I think I know the answer to this, but who has

19  the final say as to whether a towboat will depart or whether a

20  towboat will continue into the conditions it's encountering?

21          MR. SIMMS:  Can we have a reference in the report to

22  that?

23          MR. JARRETT:  That's fair.  I'll strike that question.

24  I'll withdraw it.

25  Q.   (By Mr. Jarrett)  Captain Johnson, is there any of the

1  opinions in your report that you think -- you think require

2  further explanation to us this morning?

3  A.   I don't think so, but I'll be glad to provide them, if

4  necessary.

5          MR. JARRETT:  Thank you, sir.  Mr. Simms will likely

6  have some questions for you.

7                       CROSS-EXAMINATION

8  BY MR. SIMMS:

9  Q.   Was this an open-ocean tow?

10 A.   I would consider it an open-ocean tow, yes.

11 Q.   So let's talk about your experience with open-ocean tows.

12 You had an experience with a barge going from Oregon to Hawaii

13 that had some trouble, right?

14 A.   Yes.  I believe you're referring to a tow that I was

15 questioned about in my deposition.

16 Q.   Yes, that one.

17 A.   Technically, it was from Seattle to Hawaii.

18 Q.   Seattle to Hawaii.  And the tow experienced heavy weather

19 around the Oregon Coast?

20 A.   Yeah, about 80 to 100 miles off the Oregon Coast.

21 Q.   And that was weather that you hadn't foreseen?

22 A.   That was -- I really don't recall.  It was so long, long

23 time ago, 35 years ago.

24 Q.   And tell the court what happened with the tow.

25 A.   Well, it certainly wasn't anticipated to be this rough.  It

1  turned out to probably be the worst weather that I've ever

2  encountered in my career.  We had up to 100 mile-an-hour winds

3  and 40-foot seas.

4       We were slowed down to, actually, no way through the water,

5  and at times going backwards during a 24- to 36-hour period of

6  time.  And after the storm moved through, we continued our trip

7  to Hawaii.

8  Q.    And there was a problem with the barge, right?

9  A.    Yes, there was a problem with the barge.

10  Q.    Well, what happened?

11  A.    A couple days later, we noticed that there was a slight

12  list on the barge.  And we didn't know the reason for it at the

13  time.  But, at any rate, we continued on, and it got worse at

14  some point, and we took a substantial list, 30-, 35-degree list.

15  And it was a container barge, and we were dumping numerous

16  containers over the side on our way to Hawaii.  We ended up

17  going into Honolulu with 80 percent of our cargo gone.

18  Q.    During that tow, did you talk with a marine architect?

19  A.    I did not personally.

20  Q.    Did somebody at your office talk with a marine architect

21  about the listing?

22       MR. JARRETT:  Objection, Your Honor.  This is well

23  outside the confines of Captain Johnson's report and his direct

24  testimony.

25       THE COURT:  Sustained.

1           MR. SIMMS:  Okay.

2    Q.   (By Mr. Simms)  So back in your report -- this is paragraph

3    12 -- you talk about Captain McGavock says in his statement

4    that, at some point, because of rapidly deteriorating condition

5    of the dry dock, it became apparent that the tow would not make

6    it.

7           Okay.  So that's at paragraph 12?

8           If you had been Captain McGavock, would you have consulted,

9    either through your office or directly, with the marine

10   architect familiar with the tow?

11          MR. JARRETT:  Objection, Your Honor.  This testimony

12   has already been found by the court to be outside of the issues

13   we're considering this week during trial.  It's been decided on

14   summary judgment.

15          MR. SIMMS:  It is not.  It goes directly to

16   contributory negligence, to comparative negligence, absolutely

17   directly.

18          THE COURT:  Overruled.  You may answer.

19          THE WITNESS:  Would you repeat the question?

20   Q.   (By Mr. Simms)  Sure.

21          If you were in Captain McGavock's position, would you have

22   consulted, directly or through the marine architect, about this

23   situation of the tow, the makeup of the tow, its capabilities?

24   A.   I would have certainly been, you know, consulting with

25   operations management at my company, yes.

1    Q.    Okay.  Is that what you did with your tow across to Hawaii?

2    A.    Yes.

3    Q.    And without doing that, you never would know whether the

4    tow would sink or not, right?

5    A.    Well, they -- you know, I'm presuming that the office,

6    through whatever consultation that they're having, has access to

7    information that I might not have.

8          Although we do try to provide our captains with all of the

9    detail of the tows, as much as we can, we might not have all of

10   the calculations necessary to figure out if a barge is going to

11   flip over or if it's not going to flip over.

12   Q.    And when this barge flipped over, that was an emergency

13   situation, wasn't it, the YFD 70?

14         MR. JARRETT:  Objection, Your Honor.  Emergency

15   situation is not defined in the question or otherwise, and that

16   is not relevant to this case, either.

17         THE COURT:  The objection to the form will be

18   sustained.

19         MR. SIMMS:  Okay.

20   Q.    (By Mr. Simms)  You talked about, in your direct testimony,

21   the flipping over of the tow here, the 70.  Was that an

22   emergency situation?

23         MR. JARRETT:  Again, Your Honor, objection.  That's

24   beyond the scope of his direct testimony.  We did not talk about

25   that at all.

1          THE COURT:  That's sustained.

2   Q.   (By Mr. Simms)  So in your experience -- Captain McGavock

3   has this tow, he sees the listing -- would you have been able to

4   know for certain, by viewing the tow -- and let's look at --

5   let's talk about the tow you've experienced -- could you, by

6   observing your tow, know for certain that it was going to sink?

7          MR. JARRETT:  Objection, Your Honor.  The hypothetical

8   that Mr. Simms proposed is neither complete nor unambiguous.

9          THE COURT:  And there is no way for him to answer that

10  particular question with the information that he had.

11     Sustained.

12          MR. SIMMS:  Okay.  All right.

13  Q.   (By Mr. Simms)  I want to talk about your experience.  You

14  were going across the Pacific with a tow that was listing.  All

15  right?  And you're looking back at the tow.  Okay?

16     Could you, by looking at that tow -- just looking at it --

17  on your own determine -- tell that it was going to sink?

18          MR. JARRETT:  Objection, Your Honor, this is, again,

19  not --

20          THE COURT:  Yes.  Mr. Simms, we need to move on to a

21  different area.  The question did not make sense.  There's no

22  way he can answer it, given the information that he had.  It's

23  great argument, though.

24          MR. SIMMS:  I'm trying to get to his experience.  He

25  has a comment here about rapidly deteriorating condition, that

1   it became apparent that the tow would not make it, and we've

2   already heard his testimony that he connected back to the office

3   and talked with a marine architect.

4           THE COURT:  No, I understand that's in his report.

5   That's a great argument you can make to the court, but there's

6   no way anybody can look at this and decide, oh, yeah, it's

7   sinking, it's not sinking.  We already have that in from

8   Mr. Keen, from his testimony.

9           MR. SIMMS:  This is one thing we haven't done all this

10  time.  We have never seen a picture of the 90.  So we're going

11  to see a picture of it.

12  Q.   (By Mr. Simms)  So while I'm putting this up, what do you

13  know of the *Ocean Ranger*; its horsepower, its capabilities, that

14  sort of thing?

15  A.   I believe it's one of their class of tugs that they've been

16  building for quite some time.  I have not been aboard it myself.

17  I believe I've seen the specs on it before.  But other than

18  that, I've not been aboard it.

19  Q.   Okay.  All right.

20       Here it is.  Okay.

21       So you were, in your report, talking about the maximum R PM

22  of the *Ranger*.

23          MR. JARRETT:  Your Honor, the document that's being

24  displayed to the court is not an exhibit.  It's not in anything

25  that we sent to Captain Johnson for review.

1      MR. SIMMS:  This is rebuttal.

2      MR. JARRETT:  I don't understand --

3      THE COURT:  All right.  I don't have a question in

4  front of me.  What are you going to ask him about this document?

5  Q.   (By Mr. Simms)  So, in your opinion, paragraph 3, you said

6  that the *Ocean Ranger* towed at a near maximum power at 1430

7  RPMs.

8  A.   I'm sorry.  Which?

9  Q.   Paragraph 3 of your report, at page 9.

10  A.   Okay.

11  Q.   Okay.  All right.

12      And so we've got horsepower RPM here of 4,200 and 1,600.

13  Does that change your opinion about maximum power, at or near

14  maximum power?

15  A.   No, it does not.

16      MR. JARRETT:  Objection, Your Honor.  This document is

17  not an exhibit nor is it identified for the record.

18      MR. SIMMS:  It's rebuttal, and it is --

19      THE COURT:  Hang on, Mr. Simms.  I understand, and the

20  captain has testified that he's seen the specs but has not been

21  on the vessel.

22      This is not in evidence at this point in time, but I'll let

23  you ask him questions about his knowledge of the specifications.

24  Q.   (By Mr. Simms)  Did you have this knowledge of these

25  specifications of the *Ocean Ranger* when you made your report?

1    A.    Yes, I've seen these specifications.

2    Q.    Okay.

3          So you testified that towing into eight- to ten-foot seas

4    will cause damage, right?

5    A.    Can cause damage.

6    Q.    Can.  And towing in three- to five-foot seas can cause

7    damage, right?

8    A.    Depends on what type of tow.  Are you talking about the dry

9    dock?

10   Q.    A tow with a perpendicular bound.

11         MR. JARRETT:  Again, Your Honor, this is outside the

12   scope of Captain Johnson's report and his testimony.  We weren't

13   talking about three- to five-foot seas in any context in this

14   case.

15         THE COURT:  Sustained.

16         MR. SIMMS:  Okay.  All right.

17   Q.    (By Mr. Simms) So in paragraph 5, you say, "Due to the

18   configuration of this tow, it is my opinion that the tug had too

19   much power for the conditions and may have directly contributed

20   to the damage to the dry dock and to its sinking," and that was

21   because Western was towing into head seas, correct?

22   A.    Yes, at probably full RPMs, yes.

23   Q.    Okay.  And so towing into three- to five-foot head seas, as

24   opposed to 10- to 12-foot head seas, that can also cause damage,

25   right?

1    MR. JARRETT:  Again, Your Honor, I hesitate to be so

2  obstreperous, but this was not within the scope of Captain

3  Johnson's report or his direct testimony.

4    THE COURT:  Sustained.

5  Q.    (By Mr. Simms)  So you've been up and down the West Coast

6  in smooth conditions and in rough conditions, correct?

7  A.    Yes, I have.

8  Q.    Okay.  And that was for the purpose of towing.

9    In smooth conditions, what is the quickest trip from

10  Seattle to Ensenada?

11    MR. JARRETT:  Objection, Your Honor.  Objection

12  because there are so many variables left out of that

13  hypothetical, it is not answerable.

14    Objection, Your Honor.

15    THE COURT:  Sustained.

16    MR. SIMMS:  Okay.

17  Q.    (By Mr. Simms)  Let's add some variables in there.

18    First, smooth conditions; that is, no wave higher than 10

19  feet.  Okay?  No wave higher than 10 feet.  Is that, in your

20  experience, a possible condition along the West Coast from

21  Seattle to Mexico?

22    I want to make sure I have a reasonable --

23  A.    Absolutely smooth conditions?

24  Q.    Absolutely, no wave ever higher than 10 feet.

25  A.    Not likely.

1   Q.   Okay.  But let's -- so what would a smooth condition be?

2   A.   Probably your aforementioned three to five feet.  It sounds

3   like a really smooth trip down the coast to me.

4   Q.   Three to five feet?

5   A.   At the right time of the year.

6   Q.   And wind, what would a smooth wind condition be that would

7   go along with that three to five feet?

8   A.   Ten to 12 knots.

9   Q.   Okay.

10       So assume the best conditions, the three to five feet, the

11  10 to 12 knots.  No head seas, that would be another best

12  condition, right?

13  A.   Correct.

14  Q.   Okay.  Assume those three things.  Okay?

15       Now, what is the quickest you could make from Seattle to

16  Ensenada, safely, with 528-foot tow?

17            MR. JARRETT:  Again, Your Honor, objection.  There are

18  lots of variables missing from this hypothetical.

19            THE COURT:  Sustained.

20  Q.   (By Mr. Simms)  What other variables would you need to know

21  to be able to answer the question?

22            MR. JARRETT:  Objection, Your Honor.  This is outside

23  the scope of his report and his direct testimony.

24            MR. SIMMS:  It is -- Your Honor, it is directly --

25            THE COURT:  I know, Mr. Simms, but it's impossible for

1   him to answer questions like this.  There are too many

2   variables; given this dry dock, given the configuration of it,

3   all of those things.  We know what happened, but it's impossible

4   to say what would happen.

5              MR. SIMMS:  Okay.

6   Q.   (By Mr. Simms)  So your opinion is that Western rushed down

7   as fast as it could to -- maybe even faster -- to try to get

8   this tow done in the shortest period of time; is that what

9   you're saying?

10             MR. JARRETT:  Objection, Your Honor.  The word

11  "rushed" does not appear in his report, so we object to the

12  mischaracterization of his testimony.

13             THE COURT:  Let me have you rephrase.

14             MR. SIMMS:  Okay.  All right.  Here, let's read

15  through the report.

16  Q.   (By Mr. Simms)  "They had incentive to push through bad

17  weather and make the best possible speed because it was a

18  fixed-price tow."  That's at paragraph 1.  Is that a fair

19  summary of that paragraph 1?

20  A.   I believe you read that correct.  They had the incentive to

21  push through bad weather and make the best possible speed,

22  obviously, because the quicker they get down there, the more

23  money the company makes.

24  Q.   Uh-huh.  Okay.  Right.

25        Now, is it your opinion that -- that -- or is your

1  assumption that the number of days of the tow was a -- that

2  there was no -- there were no extra days built into the bid for

3  the tow?

4  　　　　MR. JARRETT:  Objection, Your Honor.  That is not

5  within the wording of his report or in the scope of his direct

6  testimony.

7  　　　　THE COURT:  Do you understand the question?

8  　　　　THE WITNESS:  I think I do.  Let me kind of paraphrase

9  it.

10  　　　　THE COURT:  Let me overrule the objection.

11  A.  Are you asking me if there was any extra days built into it

12  somehow?

13  Q.  (By Mr. Simms)  Yes.

14  A.  In what form?  I'm not familiar with that kind of contract.

15  Q.  Sure.  In the bid, the contract would have extra days to

16  account for potential bad weather.

17  　　　　Do you assume that there are no extra days to account for

18  potential bad weather included in Western's bid?

19  A.  I don't know whether there was or not, but I'm unfamiliar

20  with that contract term.  It's nothing that I've worked under

21  before.

22  Q.  Okay.  Did you, at the time of your report, know that the

23  original recommendation for the tow in the Navy plan was to have

24  the open-ocean tow of the 70 towed in three pieces, with the

25  center piece -- with the two end pieces loaded on the center?

1  Did you know about that?

2  A.    I did not.

3  Q.    Did you know that the tow did not have a -- let me back up.

4        Do you consider the *Navy Tow Manual* a reliable source to

5  determine standards for towing?

6             MR. JARRETT:  Objection, Your Honor.  That manual is

7  not addressed in Captain Johnson's report, nor in his direct

8  testimony.

9             THE COURT:  I don't think there's enough foundation at

10  this point in time, counsel.

11             MR. SIMMS:  Okay.

12  Q.    (By Mr. Simms)  Are you familiar with proper standards for

13  tows?

14  A.    Yes, I believe I am.

15  Q.    Okay.  And do you believe that the *Navy Tow Manual* is

16  reliable source to determine standards for towing?

17             MR. JARRETT:  Again, Your Honor, this is outside the

18  scope of Captain Johnson's report and his direct testimony.

19             THE COURT:  Aside from being outside, potentially, the

20  scope, we don't even know if he is familiar with the *Navy Tow

21  Manual* for dry docks.

22             MR. SIMMS:  Uh-huh.  Okay.

23  Q.    (By Mr. Simms)  All right.  This is page 26 of your

24  transcript, and question, line 21:

25             "QUESTION:  Do you have or do you ever use the *Navy*

1    *Tow Manual* as a reference for determining tow, towing

2    standards, and requirements?

3    "ANSWER:  No.

4    "QUESTION:  Is it a reliable source to use to

5    determine standards for towing?

6    "MR. JARRETT:  Objection to form.

7    "THE WITNESS:  Yeah, I -- yeah, I believe it's a

8    reliable source."

9    MR. JARRETT:  The objection to form, Your Honor, was

10   lack of foundation, because Captain Johnson said, on page 26,

11   that he's not familiar with the *Navy Towing Manual*.

12   THE COURT:  That will be sustained.

13   Q.   (By Mr. Simms)  And then was the YFD 70 tow a dead ship

14   tow?

15   A.   It was a dead dry dock tow.  I wouldn't consider it a ship.

16   Q.   A dry dock is not a ship.  Yes.

17   In your experience, would it have been a good idea to have

18   a flood alarm on the tow?

19   A.   It certainly wouldn't have been a bad idea.

20   Q.   Okay.

21   Was it surprising to you -- did you know whether the dry

22   dock had pumps on it?

23   A.   I didn't know whether it did or did not.

24   Q.   Uh-huh.  Would it be surprising to you to know that there

25   were no pumps on the dry dock?

1    A.    It would not be surprising.

2    Q.    Okay.  Your transcript at 29, my question, line 6:  "Yeah,

3    well, if I told you that the pumps were all removed before this

4    tow, would that surprise you?"

5          Your answer:  "I can't say that.  Well, you mean the pumps

6    that flood and de-flood the dry dock?"

7          My question:  "Yes."

8          And your answer, 13:  "Well, I guess it's a little

9    surprising, yeah.  I mean, I don't know why.  I guess they were

10   worth some money, and they didn't want to, as part of the

11   contract, sell it."

12         Is that your testimony?

13   A.    That's what I said, yes.

14   Q.    All right.

15         Prior to the tow, would it have been valuable for the

16   surveyor to have -- this is talking about Bowditch -- a wasting

17   analysis in hand?

18         MR. JARRETT:  Objection, Your Honor.  This is beyond

19   the scope of his report and of his direct testimony.

20         THE COURT:  Sustained.

21   Q.    (By Mr. Simms)  Okay.  There is an opinion, the third

22   paragraph, recommendations from the surveyor, and should a

23   wasting analysis have been a part of the recommendations?

24         MR. JARRETT:  Objection.  We're beyond the scope of

25   his direct and of his opinion.

1      THE COURT:  We are, Mr. Simms.

2   Q.   (By Mr. Simms)  We're at paragraph 3 of your -- page 9.

3      MR. JARRETT:  I'm sorry, Your Honor.  I didn't track

4   the question that referred to paragraph 3 of page 9.

5      THE COURT:  There is no question yet.

6      MR. JARRETT:  Thank you.

7      MR. SIMMS:  There is a question.

8   Q.   (By Mr. Simms)  The question is:  Should the trip and tow

9   recommendations from the surveyor have included a wasting

10  analysis?

11      MR. JARRETT:  Your Honor, same objection.

12      THE COURT:  Sustained.

13  Q.   (By Mr. Simms)  Are you familiar with Captain Fox.  Do you

14  know him?

15  A.   Yes, I do.

16  Q.   Okay.  And you trained him, didn't you?

17  A.   He served a lot with me on the various tugs I was captain

18  of, and I believe I did have some input into his training, yes.

19  Q.   And what's your opinion of his ability and experience?

20      MR. JARRETT:  Your Honor, Captain Fox -- objection.

21  This is beyond the scope of Captain Johnson's report and

22  testimony.  He did not review Captain Fox's report, either.

23      THE COURT:  Sustained.

24      MR. SIMMS:  Let me see if there are any more questions

25  here.

1       All right.  Thank you.

2              THE WITNESS:  Thank you.

3              THE COURT:  Any redirect?

4              MR. JARRETT:  No.  Thank you, Your Honor.  Thank you,

5     Captain Johnson.

6              THE COURT:  Captain, thank you.  You may step down.

7     Vietnam between '66 and '70 must have been an interesting place.

8              THE WITNESS:  It was very interesting.  Mekong River

9     was particularly interesting.

10             THE COURT:  Good luck in your retirement, sir.

11             MR. BOYAJIAN:  Your Honor, Mr. Keen has been with us

12    all last week.  He had cleared all last week, but he has to

13    operate dry dock today, and he will have to leave shortly after

14    eleven o'clock this morning.

15             THE COURT:  All right.  That's perfectly fine.

16         Other than Mr. Challenger, are there any other witnesses on

17    behalf of the defense?

18             MR. BOYAJIAN:  We have two other witnesses, Your

19    Honor.  Both of them are available this afternoon.  They were

20    available last week, Your Honor, but were unable to clear their

21    whole day today.

22             THE COURT:  Right.

23         Mr. Simms, at this point in time, do you plan on calling

24    any other witnesses?

25             MR. SIMMS:  We don't, Your Honor.

1        THE COURT:  Okay.  All right.

2     Counsel, I remember, in the ruling on the motions in

3  limine, looking at the objection, I believe, by Western about

4  why Mr. Challenger should not be allowed to testify.  But what I

5  want to do is go back and review that, and review the arguments

6  made by both sides.  Obviously, the court can change its mind on

7  motions in limine.  I tend not to, just to let you know, but let

8  me go back and take a look at it.

9     Give me, maybe, 15 minutes or so.  We'll go ahead and take

10  a break at this point in time.  I can make a ruling, and then we

11  can wait and see, as soon as your witnesses might be available

12  this afternoon.

13        MR. BOYAJIAN:  Mr. Challenger is at the courthouse.

14  He's not on the 14th floor.  He's downstairs.  But other than

15  that, our witnesses will be available from 1300 on -- 1:00 on.

16        MR. SIMMS:  Your Honor, as long as we're looking at

17  legal issues here, going through the exhibits -- and this was

18  Vigor, I think, 94 and 95 -- one thing that has jumped out is

19  that most of the payments for the damages, or whatever it is

20  that Vigor will claim, were made by insurance carriers; that is,

21  they've already been made.  And there's a waiver of subrogation

22  in the tow contract, and also in the insurance policies.

23     And so, at least, for the amount that was paid, which seems

24  to be most, if not all, of it, there is not a real party in

25  interest which is claiming the money.  In other words, Vigor has

1   already been made whole for all of this, and so any testimony by

2   Mr. Challenger or Ms. Cartwright is not relevant.

3        As a matter of fact, Vigor does not have the right to raise

4   that claim because, first, they're already paid, and second,

5   because the insurance carrier, which is the real party in

6   interest, has waived subrogation.

7                THE COURT:  All right.

8                MR. HOWARD:  Your Honor, I'm prepared to respond.

9                THE COURT:  Yes.

10               MR. HOWARD:  Your Honor, there's two separate issues

11  in this case.  It a contract case where Mr. Simms' issue

12  probably should have been brought up earlier and briefed as

13  opposed to the last day of presentation.

14       But we're bringing up issues where maritime law clearly

15  establishes the collateral source rule would make this argument

16  irrelevant for the marine negligence aspect of this case.

17       The exhibits that have already been stipulated to -- I

18  believe they are 93 and 94, as opposed to 94 and 95 -- do,

19  indeed, show the payments that made.  In fact, the amount of the

20  payments are already in evidence.

21       The collateral source rule deals with his objection now

22  with respect to Vigor being made whole for those payments made

23  by it and on its behalf, as the documents will show, primarily

24  through our firm's trust account.

25       That, however, to be more explicit on the example, you'll

1   notice Vigor is not bringing a claim for the loss of the dry

2   dock itself.  That's one to which the provisions he's arguing

3   would apply.  That's part of the contract claim.

4       We bring this damage as part of the marine negligence

5   claim, which Your Honor has ruled on, and, for that, the

6   collateral source rule of maritime law governs.

7               THE COURT:  All right.

8               MR. SIMMS:  Your Honor, the payments were made under

9   the very same insurance policies that have the waiver of

10  subrogation.  There was no way that those payments came in but

11  for those contracts with the waiver of subrogation clause.

12              THE COURT:  Counsel, if it becomes a real issue for

13  the court, we may have to have some additional briefing on that.

14  But, like I said, let me go back and review it, in all fairness

15  to the parties and to Mr. Challenger, and then I'll let you

16  know.

17      If we're not going to have him testify, then we'll come

18  back in session at one o'clock, when their witnesses are ready.

19              MR. JARRETT:  Thank you, Your Honor.

20              THE COURT:  All right.  We'll be at recess.

21              (Court in recess 10:45 a.m. to 11:08 a.m.)

22              THE COURT:  Mr. Simms, where we left off right before

23  the break, in terms of argument that you were making, counsel,

24  isn't this really what you asked the court to look at in summary

25  judgment, at the very beginning of the case?  Maybe I need you

1  to elaborate a little bit more on what argument, exactly, you're

2  making.

3          MR. SIMMS:  No.  It's Rule 7.  Every claim brought by

4  the real party in interest.  Vigor is not the real party in

5  interest for most, if not all, of the amounts it's claiming.

6      We've got, in the Schwabe firm's client trust account

7  ledger, there's $354,028.64, which is received from insurers and

8  then paid back out to Vigor.  And so Vigor is made whole for all

9  of that money, and the insurers have waived subrogation.

10     So if this were a car accident -- if I was the plaintiff

11 hurt in a car accident and my medical insurer paid for my

12 medical, and then I went out and I got a recovery, I would be

13 subrogated to that or have to pay back the insurer.

14     Here, though, there is no subrogation.

15         THE COURT:  I fully understand that, counsel, but why

16 is argument being made now after five days of trial?  Why

17 couldn't we have made this argument at the very beginning and

18 ruled that there was no injury?  Then wouldn't we have had all

19 the testimony that we did.

20         MR. SIMMS:  Well, because I -- two things:  First, in

21 this -- I was sitting here and listening to all this, and I said

22 to Mr. Howard, "Isn't there a subrogation problem here because

23 of waiver and everything was paid?"  And I have raised this

24 twice -- three times now since then, and no response.

25     And I saw this and I saw Greg Challenger's -- we've been

1  through this.  And then I looked back at this exhibit, and there

2  it is.  And if there is two cents left that's not reimbursed to

3  Vigor, then we're still in the question of damages, but we're

4  still -- we're tossing over two cents rather than -- well, the

5  trial brief says $415,441.67, but the interrogatories say that

6  there is -- the damages were $397,476.67, Vigor's interrogatory

7  answers that we have marked as Exhibit 41.  So there's a $17,000

8  difference there.

9          The expense invoices in 93 total that $397-.  But the point

10 is, they have to show that the damages are being brought by the

11 real party in interest.  They're being sought by the real party

12 in interest.  They can't show that.

13         The collateral source rule is quite different than what

14 we're hearing here.  Collateral source rule is -- let's say I'm

15 a plaintiff, and I come in and say I've been badly hurt, and the

16 other side comes in and says -- Oh, and I want a million

17 dollars.  And the other side comes in and says, Well, it's not

18 so bad, because you got $999,000 reimbursed by your medical

19 insurer, so you really weren't hurt that badly.

20         The collateral source rule says uh-uh, you don't look at

21 that, you don't subtract from the million-dollar claim.

22         That's not what this is.  This is just, I paid out money, I

23 want back money.  We're not talking about a right to a double

24 recovery here.  We're not talking about recovery.

25         What's going to happen is -- is Vigor pursuing the rights

1   of these insurance companies here, or is it going to just keep

2   the money?  Well, it can't because it's waived subrogation.

3        These payments came through these policies that were

4   procured under the towage contract.  And I've got copies of the

5   policies, if the court wants to see them.  Every single insurer

6   that's named here -- Berkley, AXA XL Specialty, Starr Marine --

7   are part of this insurance that Vigor obtained required by the

8   tow contract.  So they've got -- the insurers have been paid the

9   money.

10       If they want to come and get the money, the insurers have

11  to get the money, under Rule 7, because they're the real parties

12  in interest.

13            THE COURT:  Mr. Howard?

14            MR. HOWARD:  Your Honor, this is a situation where

15  we're seeking maritime negligence damages and where collateral

16  source rule is well established under federal maritime law -- I

17  can cite cases, if you want, or submit them later, which, I

18  think, is more efficient -- that the collateral source rule

19  applies.

20       We agree that this argument of Mr. Simms would apply to a

21  claim we have not brought for the loss of the tow.

22       That contract case, we agreed it applies there.  It does

23  not apply to the maritime negligence case where the damages have

24  been paid by or on behalf of Vigor.  That's what should be

25  admissible.

1    The case law authority, which I will send a supplemental

2    brief to Your Honor as to why it is collateral source rule and

3    should be allowed in.  The issue of insurance does come in here.

4    We don't hide it in Exhibits 93 and 94, because insurance was

5    required under the contract, and so we complied to the contract

6    in that regard.  But this is an issue that should have been in

7    the trial brief and could be addressed in supplemental briefing,

8    and should not prevent the taking of the evidence today, Your

9    Honor.

10         THE COURT:  Counsel, I hate to have the parties spend

11   even more money on this, but I -- the main thing we always want

12   to do is, we want to get it right.  We don't want you leaving

13   from here with issues that could have been resolved and should

14   have been resolved.  And I certainly, like I said, don't want to

15   impose more costs on the parties, but I think it's an issue that

16   we will definitely need additional briefing on.

17        I'm just upset about the timeliness of it, at this point in

18   time.  It doesn't make any sense, counsel.  We could have

19   shortened this entire thing if the court had ruled a certain

20   way, based on the argument that you're making today.  But we're

21   almost at the very end.  I'll let you go ahead and finish.

22        And, like I said, we'll have additional briefing on that.

23   At this point, the court hasn't made any ruling yet as to

24   whether contributory negligence, on behalf of Vigor, and what

25   that means in terms of any potential damages that might or might

 1  not come into play.  I know it's all hypothetical, but, like I

 2  said, we want to get it right.

 3       In all the years I've been a judge -- going on 32 years

 4  now -- I have always not enjoyed making procedural rulings that

 5  overcome the call on the merits.  I've always believed that the

 6  parties deserve the right to have their case determined on the

 7  merits and not just procedure.  But I am concerned about the

 8  timeliness of this entire thing at this point, too.

 9       All right.  I know your other witnesses will be here at one

10  o'clock.

11       There remains one other issue, and that is the testimony of

12  Greg Challenger.  I had a chance to review the motions in limine

13  and the court's ruling on it, and, at this point in time, I'm

14  not convinced that the testimony of Mr. Challenger is relevant

15  or necessary at all, in terms of the findings the court has

16  already made.  So that finding will not be disturbed.

17       So, Mr. Boyajian, who are the two witnesses this afternoon?

18       MR. BOYAJIAN:  This afternoon, Your Honor, we have

19  Mr. Ken Campbell, he's a weather expert, and we have Dawn

20  Cartwright from Vigor.

21       THE COURT:  All right.  Then 1300 it is.

22       MR. HOWARD:  Ms. Cartwright will be on the phone at

23  1300, Your Honor.

24       THE COURT:  Thank you.  We'll be at recess.

25       (Court in recess 11:17 a.m. to 1:02 p.m.)

1          THE COURT:  You may call your next witness.

2          MR. HOWARD:  We call Dawn Cartwright.

3          THE COURT:  Good afternoon.  Ms. Cartwright, are you

4    on the phone?

5          THE WITNESS:  Yes.

6          THE COURT:  This is Judge Martinez.  You've been

7    called as a witness in this particular matter, and, thankfully,

8    we could get you in by telephone, so I'll swear you in.

9                        DAWN CARTRIGHT,
          having been first duly sworn, testified as follows:
10

11          THE COURT:  Please, wait until counsel's question is

12   complete before you answer.  If you don't understand something,

13   don't hesitate to say so, and we'll get counsel to clarify for

14   you.  Okay?

15          THE WITNESS:  Understood.  Thank you.

16          THE COURT:  All right.  You may inquire.

17                      DIRECT EXAMINATION

18   BY MR. HOWARD:

19   Q.   As a preliminary matter, Ms. Cartwright, we've been having

20   trouble with phones that are on speakerphone.  You may, for the

21   court reporter's benefit, disable speakerphone on your end.

22   A.   Okay.  I've done so.

23   Q.   Would you state your name, please?

24   A.   Dawn Cartwright.

25   Q.   What is your profession?

1    A.    I'm the vice president of human resources and risk

2    management for Vigor.

3    Q.    And how long have you worked for Vigor?

4    A.    About nine years.

5    Q.    What does your job entail at Vigor?

6    A.    On the risk management side, primarily insurance placement,

7    claims management, and loss control.

8    Q.    In that capacity, have you been involved with the work

9    related to working with NOAA regarding the loss of this dry

10   dock?

11   A.    Yes, I have.

12   Q.    And, specifically -- Exhibits 93 and 94, you have copies of

13   those with you; is that correct?

14   A.    I do, yes.

15   Q.    Those have already been admitted, and I'll come back to

16   those at the end of your testimony.

17        But you're familiar with the expenses that have been paid

18   by or on behalf of Vigor related to cooperating with NOAA; is

19   that correct?

20   A.    Yes.  They have been reviewed by the risk management

21   department and either paid by Vigor or directed to be paid by

22   Vigor.

23   Q.    What I want to get to about that is -- because I know

24   Mr. Simms will have questions -- why did Vigor pay these bills?

25   A.    I would say there were probably four, kind of, major

1   reasons.  One was NOAA reached out to us, you know, relatively

2   soon after this event occurred, and we view them as, basically,

3   like law enforcement for the ocean, and so just as we would,

4   kind of, cooperate with any law enforcement, that was the

5   primary reason.

6        Secondary, you know, we hadn't had something like this

7   happen in our history, so we immediately tapped experts at

8   Schwabe and our insurers, and, generally, understood from the

9   advice of people that had been through this before, that it was

10  best for us to cooperate; that it was going to be cost

11  effective, it's going to be -- you know, we were going to be

12  seen as partners and at the table as opposed to adversaries.

13       As we went along the way, I think we learned that it was

14  going to be less expensive.  Some of the things that they wanted

15  to do, they were going to do regardless of whether we cooperated

16  or not, and we could probably get those things done more cost

17  effectively for Vigor and others, and probably faster than NOAA

18  would have done it.

19       And then, I think, kind of underlying that, that was just

20  our general company culture, and one of our values is

21  responsibility; that we act on what we know is right.  And

22  whether we were responsible for what happened or not, we

23  certainly felt a sense of responsibility.

24  Q.   Thank you.  I'd like to follow up on a just a couple of

25  points.

1      When you talk about being cost effective, did you track

2   whether this ended up being less expensive than what NOAA told

3   you it was going to cost?

4   A.    Yeah.  Originally, when we had, kind of, a range given by

5   NOAA to Vigor, it was -- and this was specifically around the

6   ROV exploration for the dry dock -- they had indicated that it

7   would be somewhere between $450,000 and $600,000.  And, I think,

8   by the material (inaudible) on this case, you know, we've come

9   in at a little over $400,000.  So I think definitely it would

10  have been less expensive than what they led us to believe if

11  they did it.

12  Q.    Did you -- Vigor -- get any other benefits by cooperating

13  with NOAA?

14  A.    Yeah.  I mean, we generally feel like we have a good

15  rapport with them -- right? -- so I think as we continue

16  conversations with them, we hope that will be helpful to us.

17      We have a seat at the table.  So we're the ones that

18  organized the ROV.  We had people on the ROV that had our

19  interests at heart and were able to actually see what was down

20  on the floor of the ocean where the dry dock landed and the

21  conditions in which it was sitting in.  So I think we had some

22  intelligence that we might not have otherwise had that could be

23  helpful to us.

24      Those are probably the primary reasons.

25  Q.    Do you have an understanding as to whether or not Vigor

1    would have been able to have someone on the ROV without

2    following the path you followed?

3    A.    I don't know.  I don't recall whether we ever spoke to them

4    about that or they indicated one way another whether that would

5    be possible.

6    Q.    Now, you've reviewed Exhibits 93 and 94.  Do these include

7    checks actually made by Vigor and paid by Vigor?

8    A.    Yes.  They're payments made directly by Vigor, and then

9    payments made at Vigor's -- by our insurers at Vigor's

10   direction.  And this was largely due to a deductible that we had

11   on the policy that had to be, you know, met before insurance

12   would be responsive to the loss.

13   Q.    And did your department approve all of these expenses?

14   A.    Yes.  Whether Vigor paid them or the insurers paid them,

15   they all came through us and were reviewed for reasonableness

16   and accuracy.

17          MR. HOWARD:  Thank you.  I have no other questions.

18   Mr. Simms may have some.

19          THE COURT:  Mr. Simms?

20                       CROSS-EXAMINATION

21   BY MR. SIMMS:

22   Q.    Ms. Cartwright, this is Steve Simms.  I'm Western's

23   lawyers.

24          What was the amount of deductible you referred to?

25   A.    $100,000.

1   Q.   Okay.

2   Q.   Has that deductible been met?

3   A.   Yes, through payment of these invoices and legal fees, et

4   cetera.

5   Q.   Okay.  So some of the $100,000 was to pay legal fees?

6   A.   Yes.  I mean, we have a deductible for any costs that are

7   incurred on the claims.

8   Q.   Well, let me knock this down.

9        How much of the deductible was to pay legal fees?

10            MR. HOWARD:  Your Honor, object as to relevance of

11   this inquiry.

12            MR. SIMMS:  Absolutely relevant, because we're trying

13   to figure out --

14            THE COURT:  All right.  Overruled.

15   Q.   (By Mr. Simms)  How much of the deductible was to pay legal

16   fees?

17   A.   I don't know.

18   Q.   How much of the deductible was to pay costs of -- I'll call

19   them "ROV costs."

20   A.   I don't recall the split between the initial fees and what

21   was part of the deductible; whether it was for legal fees or the

22   ROV cost or the consultant fee with Polaris.

23   Q.   Okay.  So in Exhibit V-93, adding up everything, we get

24   $397,476.67, but in the trial brief that Vigor put in, the

25   figure is $415,441.67.

1        What explains the difference of $17,965?

2   A.    I don't have an immediate answer for that.

3   Q.    Okay.  So the support Vigor has for its claim is -- is the

4   claim $397,476.67?

5   A.    My recollection of the figure is a little over $415,000.

6   Q.    Okay.  All right.  But you don't know what makes up the

7   $17,000 difference.  All right.

8        So, then, in A-94, the very last page is the Schwabe firm

9   client trust account ledger showing amounts received from

10  insurers, $354,028.64.  And my question is:  If you go off the

11  397 figure, what -- is there $43,448.03 not reimbursed, or was

12  it reimbursed?

13  A.    We met our deductible, which was $100,000, and after that,

14  our insurance has been paying for the cost associated with the

15  claim.  Some of those payments were made directly to the Schwabe

16  account because we met our deductible.

17  Q.    Okay.  But you can't say today what amount of the

18  deductible was legal expense, what amount was anything else,

19  right?

20  A.    That's correct.

21  Q.    And am I right, the legal expense now -- and this was in

22  the interrogatory responses -- it's running over a half million

23  dollars for --

24  A.    Again, once Vigor met its deductible, I don't know what

25  they've been running.

1    Q.   Okay.  So that's -- that was all paid by insurers.  Okay.

2         All right.  So are you saying that all the bills came in to

3    you to approve?

4    A.   Yes.  All the bills that make up the $415,000 came through

5    Vigor to review and approve.

6    Q.   Okay.  Because the only bills we have is $397,000.  They

7    are bills -- so Polaris, $45,496.53.  Did you review and approve

8    all those bills that initially went to the Schwabe firm?

9    A.   Right.  So Polaris's and Eclipse's, correct.

10   Q.   So the Polaris bills, those initially went to the Schwabe

11   firm, correct?

12   A.   Yes, I think so.

13   Q.   And before they were paid, did you review those?

14   A.   That's correct.

15   Q.   You did?  Did you review them?

16   A.   Yes, I reviewed them.

17   Q.   All right.

18        And so the Eclipse bill, $351,980.14, again, that bill went

19   for the Schwabe firm first.  Did you review that bill before it

20   was paid?

21   A.   (Inaudible.)

22   Q.   Is that a "yes"?

23   A.   (Inaudible.)

24        THE COURT:  Ms. Cartwright, our court reporter is

25   having difficulty following your testimony.  Can you speak up?

1  A.   Correct.  I said "yes" to the Polaris review of the bills

2  and "yes" to Eclipse review of the bills.

3           THE COURT:  That's perfect.  Thank you.

4  Q.   (By Mr. Simms)  And so -- well, exactly how much benefit,

5  then, has Vigor gotten from this figure, whether paid for by the

6  insurers or not?  Exactly how much?

7  A.   I'm not sure I understand that question.  What do you mean?

8  Q.   So NOAA hasn't assessed any penalties, right?

9  A.   Correct.

10 Q.   And so you can't say today that even a dollar that you

11 spent has had any benefit, can you?

12          MR. HOWARD:  Objection; asking for a legal conclusion

13 and beyond the scope of what's left in the case.

14          THE COURT:  It is.  Sustained.

15          MR. SIMMS:  Okay.

16 Q.   (By Mr. Simms)  Well, so you said you hoped that this

17 advance would be helpful to Vigor.  Do you have anything beyond

18 that hope that it's been helpful?

19          MR. HOWARD:  Objection.  Same objection.

20          THE COURT:  Sustained, Mr. Simms.

21          MR. SIMMS:  Okay.  All right.  No other questions.

22          MR. HOWARD:  I have one clarifying question, Your

23 Honor.

24          THE COURT:  All right.  You can ask it from there,

25 Mr. Howard.  It might be easier for you.

1     MR. HOWARD:  Did you see my knee just went out?

2                    REDIRECT EXAMINATION

3   BY MR. HOWARD:

4   Q.   Ms. Cartwright, I have two different number, $397- and

5   $415-.  I have a background question for that.

6        Have you continued to approve and direct to be paid bills

7   for Polaris?

8   A.   Yes.  I think we're still continuing to see relevant bills

9   in this case.

10  Q.   And what is your understanding of the number that has been

11  paid by or on behalf of Vigor for Polaris and Eclipse?

12  A.   A little over $415,000.

13                MR. HOWARD:  Thank you.  No other questions.

14                MR. SIMMS:  All right.  We'll object to the

15  introduction of any evidence of anything over -- first, the

16  objection that we raised earlier, real party in interest, but

17  also in the interrogatory answers, which are 41.

18                THE COURT:  Mr. Simms, hang on.

19        Can we release Ms. Cartwright?

20                MR. SIMMS:  Yes.

21                THE COURT:  All right.  Ms. Cartwright, thank you very

22  much.  That's all the questioning, and we thank you very much.

23                MR. HOWARD:  Thank you, Your Honor.

24                MR. SIMMS:  So, Your Honor, in the interrogatory

25  answers, which are Exhibit 41, the figure given is that

1    $397,476.67 number, there was a responsibility to seasonably

2    amend the responses to the interrogatories.

3         There's also no evidence of any -- any -- anything -- no

4    expense invoices or anything like that, so there can't be a

5    figure larger than $397,476.67 that's involved here.

6             THE COURT:  All right.  I understand your objection.

7    It's noted for the record.

8         An accounting of this will wait for the end of the trial

9    itself, and we'll see exactly what claims are being made by

10   Vigor.

11        All right.  You may call your next witness.

12            MR. BOYAJIAN:  Yes.  He's just texted me that he's

13   dialing in now, Your Honor.

14        Mr. Campbell, you'll have to hit star six to let us know

15   you're there.  If you're not, I'm talking to dead air.  It's

16   just like being at home.

17            THE COURT:  Over the last 16 months, I've been

18   speaking to dead air, too.

19            MR. BOYAJIAN:  Your Honor, with the pandemic and being

20   at home with my wife and kids, I have, too.

21            THE WITNESS:  This is Ken Campbell.

22            MR. BOYAJIAN:  Your accent is unmistakable.  I knew

23   who it was immediately.  The judge will swear you in.

24            THE COURT:  Mr. Campbell, good afternoon.  Can you

25   hear me?

1      THE WITNESS:  Yes, I hear you fine.  Good afternoon.

2      THE COURT:  Okay.  I know you're on the phone.  If you

3  could take it off speaker, if there is any speaker function on

4  it, it makes it easier for us, and our court reporter as well.

5      Keep your voice up.  We're in a large courtroom.  It's

6  coming through the speakers, but it will help us as well.

7      THE WITNESS:  I'm off speaker.

8      THE COURT:  All right.  You've been called as a

9  witness, and I'm sure both sides will have questions for you.

10  Raise your right hand, and I'll swear you in.

11      THE WITNESS:  My hand is raised.

12                          KEN CAMPBELL,
        having been first duly sworn, testified as follows:
13

14      THE COURT:  Mr. Boyajian, you may inquire.

15      MR. BOYAJIAN:  Thank you, Your Honor.

16                      DIRECT EXAMINATION

17  BY MR. BOYAJIAN:

18  Q.    What do you do for a living?

19  A.    I currently am retired, but for the previous 41 years I was

20  a weather forecaster.  For the last 26 years, I owned a company

21  called Commanders Weather Corporation, which specialized in

22  weather forecasts for sailing.

23  Q.    Okay.  Is that forecasting and routing?

24  A.    Yes.  The company -- about 40 percent of the revenues was

25  generated from races, and those races could be split into short

1  inshore races and distant races, such as the Transpac race from

2  Long Beach to Honolulu.  60 percent of the business was weather

3  routing for specific clients all around the world.

4  Q.   Is there any fundamental difference between the routing you

5  do at Commanders, which is to help a sailboat, that tells you

6  what are their weather parameters to get safely from one spot to

7  another, and what you would have done if asked by Western

8  Towboat, in this case, to help forecasting and routing for a dry

9  dock tow from Seattle to Ensenada?

10 A.   Sure.  Not all of our routing is just sailboats.  We also

11 do motor yachts.

12     What I would have done with Western Tow is that, in the

13 initial call, I would want to find out all the parameters -- sea

14 state, weather conditions, whether there were any time

15 constraints.  Another thing that I would do is I would get all

16 the communications information, and then I'd give them a brief

17 overview of some of the weather problems that they may encounter

18 during that time of year and any potential options that they may

19 have.  For example, for stopping at one location or not being

20 able to stop.  So that would be the introduction.

21     Then I would make a suggestion to them.  About three days

22 before their first departure date, we would start looking for a

23 weather window.

24     And what I do when I look for a weather window is I give

25 them the weather options, but I don't tell them whether to go.

1  It's more of a discussion; the positives and negatives leaving

2  on certain days.

3       Once we establish the day that it would be best for them to

4  leave, then I would produce a weather forecast, and our

5  weather-routing forecasts go out as far as eight days.  We don't

6  feel comfortable going beyond eight days, but eight days is a

7  very standard pre-to-departure weather-routing forecast.

8       That forecast is then specific to their boat.  We take the

9  counter of six of that tow, and we figure out where they're

10  going to be along that route at that particular time, and then

11  do a specific wind and sea state forecast for them at that

12  particular time, for eight days, all the way down to the

13  completion of the trip.  That's on the departure day.

14       If the weather conditions look fine, we may not suggest an

15  update the next day, but in that forecast we'll make a

16  suggestion of when we think the next update should be done.

17       We ask the client, every single day, to please send in a

18  position report, status report, how they're doing.  Then we

19  would check their progress versus the weather that day.  If we

20  see something that they need to know about, we will contact

21  them, at no charge, and make a suggestion that they should get

22  an update --

23            MR. SIMMS:  Your Honor --

24  A.    -- if all is well, we will not contact --

25            MR. SIMMS:  -- this is not in the report.  None of it

1  is in the report.

2          MR. BOYAJIAN:  Your Honor, Mr. Campbell's report

3  discusses what it is to be a weather router, his experience as a

4  weather router, and he's giving a background on what a weather

5  router does.  I haven't ask a specific question about this case

6  yet.

7          THE COURT:  That's where I thought we were, just

8  getting background information.

9          MR. SIMMS:  All right.

10          THE COURT:  All right.  Next question.

11  Q.    (By Mr. Boyajian)  Mr. Campbell, you have seen, in this

12  case, the tow plan and tow-plan amendment, correct?

13  A.    I didn't quite catch the question.  Could you repeat it?

14  Q.    You've seen the tow plan and the tow-plan amendment that

15  were prepared by Western in this case, haven't you?

16  A.    Could you give me something more specific?  Because I've

17  seen all the plans, but there is a lot of them, and they were

18  contradictory, so --

19  Q.    Sure.

20  A.    -- could you say specifically which one?

21  Q.    Yes.

22          I have something on the screen here in the courtroom that

23  you don't have the benefit of.

24          In the tow-plan amendment prepared by Western, there is a

25  section titled "weather routing," and then it says --

1          MR. SIMMS:  Your Honor, this is not in the report.

2    There is no disclosure that it was something -- he refers to the

3    tow plan.  Okay.  Go ahead.

4          MR. BOYAJIAN:  And I haven't asked a question yet.

5    Q.    (By Mr. Boyasian)  It says, "Weather routing.  Western

6    Towboat will be using Rich Courtney of Maritime Weather Service

7    for weather information and course guidance."

8          There is a few things there I want to pull apart.

9          Is what you've described just a moment ago generally what

10   the industry considers, quote, weather routing?

11   A.    That's a tough question.  Because the industry is

12   relatively small, we're probably one of the larger companies

13   that does this type of weather routing for sailboats and motor

14   yachts.  What we do, I'm certain of.  What everybody else does,

15   I'm not certain.

16   Q.    Okay.  Let me ask it this way, Mr. Campbell:  Is what

17   you've described earlier what you consider to be reasonable

18   weather routing?

19   A.    Absolutely.  That's the way that I want all my employees to

20   do it, and, yes, absolutely.

21   Q.    And then it also says that Mr. Courtney will provide

22   weather information and course guidance.

23         Could you tell us what you understand weather information

24   and course guidance from a weather router to be?

25   A.    Certainly.

1          What we try to do is, when somebody comes to us for a

2     project, the most important thing is completing a project

3     safely.  And sometimes it requires us to slow a boat down or

4     speed them up to make sure that you handle the weather properly.

5     And sometimes you've got to take a slightly different route than

6     the shortest route.

7          So that's what weather routing is; to help a client utilize

8     the weather that they have to successfully complete a project.

9     Q.   Do you need to be in ongoing contact with the client to

10    provide reasonable weather routing?

11    A.   That is certainly preferred.

12         When I first started the business, communications at sea

13    was difficult.  In the present time, and certainly the last

14    several years, communications at sea is quite easy and quite

15    common.  And that is the preferred client that we'd like to deal

16    with, somebody that we can get in touch with in case something

17    changes.

18    Q.   Okay.  Let me turn now to a little bit of the specifics in

19    this case.

20         Is it important to you that, when a potential client

21    contacts you, they give you an accurate assessment of what their

22    weather restrictions will be?

23              MR. SIMMS:  Objection.  Not in the report.  Not in the

24    report.  That's an opinion that's not in the report.

25              MR. BOYAJIAN:  Your Honor, a weather router provides

1    forecasting subject to restrictions.  I'm just asking

2    Mr. Campbell if it's important to know what those restrictions

3    are.

4              THE COURT:  Exactly.  Objection overruled.

5    A.   I can answer that question.

6    Q.   (By Mr. Boyasian)  Please do.

7    A.   Absolutely.

8         Each client is different.  Each client is going to have

9    different restrictions, and we've got to have an honest

10   assessment from the client in what they're trying to do;

11   otherwise, we may not route them the correct way.

12   Q.   Okay.

13        For example, if a client tells you, We have a sea height

14   restriction of 15 feet, but the actual restriction should be 10,

15   can you provide them with an accurate weather window or routing

16   forecast?

17   A.   What I would do is I'd ask them to clarify that difference.

18   Because there is going to be difference.  Fifteen feet and ten

19   feet is a huge difference.

20        So we'd have to get a clarification, because the routing

21   would be different -- actually, very different.

22   Q.   Let's turn now to the specifics of this case.

23        You're familiar with the dry dock YFD 70 and the fact that

24   they left Puget Sound, crossed Puget Sound for a day, and then

25   turned south at Cape Flattery in the early afternoon sometime of

1  October 18th, 2016.

2      Have we set the stage?  We're in the same place?

3  A.   Yes.

4  Q.   Did the *Ocean Ranger* have a favorable forecast of

5  conditions less than 4-6 when they turned south at Cape Flattery

6  on October 18th, 2016?

7  A.   Well, in fact, the forecast for October 19th, the second

8  day at sea, were for conditions at 25 to 35 knots, which exceeds

9  4-6.  And the seas were forecast to be up as high as 10 to 12

10  feet, which also exceeds 4-6.  The forecast for those conditions

11  were to last up to a day.

12  Q.   Okay.  So is that answer, no, they did not have a forecast

13  that fit within the restrictions as you understand them

14  applicable to the tow of the YFD 70?

15  A.   That's correct.

16  Q.   Had you been hired as their weather router, what would you

17  have told Western Towboat as they approached Flattery with the

18  intention of turning south on the afternoon of the 18th?

19          MR. SIMMS:  Continued objection.  Not in the report.

20          MR. BOYAJIAN:  Your Honor, Mr. Campbell's report is

21  nothing but what forecasts he would have provided.

22          THE COURT:  Overruled.

23          MR. SIMMS:  Different.

24          THE COURT:  Mr. Campbell, you may answer.

25  A.   Yes.

1       We don't make the decisions on whether people go or not go.

2  We provide advice.

3       What we would have done is we would have forecast those

4  conditions.  If they told us they were going to continue on, the

5  request would have been made by me or another forecaster to

6  please stay in close contact with us and let us know how they're

7  making out, because if the conditions exceed what the limits

8  are, it would raise a serious level of concern with us.  And my

9  feeling is, I would want to hear from them frequently to make

10 sure that everything was going well with them.

11 Q.   Okay.

12      The storm that came up on the 24th and 25th, you were not

13 present in the courtroom last week, but there's been testimony

14 that it was the worst weather of the trip.  Would you agree with

15 that?

16 A.   That's correct.

17 Q.   How could the *Ocean Ranger* had known about this storm that

18 was going to materialize on the 24th and 25th?

19      MR. SIMMS:  Can we see in the report where there is a

20 reference to this?

21      MR. BOYAJIAN:  The forecast within the report.  The

22 forecaster broken down by forecasts that would have received on

23 various dates.  He was asked about the storm, both in the

24 deposition that you took and as the subject of this expert

25 report.  So asking him, as a forecaster, on what day would the

1    forecast had been available, I think is within the scope of his

2    expert testimony, as covered in the report and in your

3    deposition.

4              MR. SIMMS:  It's not in here.

5              THE COURT:  If there is an objection, it's overruled.

6         Mr. Campbell, you may respond.

7    A.   Thank you.

8         The October 20th -- and if I may elaborate a little bit?

9    The only data that we archive in our office is the GFS GRIB

10   files, which is the U.S. Global Forecast model.  So when I was

11   first contacted, I accessed that data, and the first time that

12   that storm system showed up on the weather models was on October

13   20th.

14        Now, subsequent to that, the attorneys have sent over to me

15   some intergovernmental forecast discussions, and those

16   discussions discuss all the various weather models that those

17   government forecasters have, and they started seeing a problem

18   on some of the other weather models, showing up as early as the

19   19th.  But the data that I had, the earliest I saw it was the

20   20th.

21   Q.   Thank you.

22        Finally, switching to the last topic that I'd like to

23   discuss with you.

24        The weather restrictions in this case -- and I'm -- there

25   are slight differences between which document you look at -- but

1    roughly eight- to ten-foot seas and less than 25 knots of wind.

2         How many days in favorable weather did you calculate the

3    *Ocean Ranger* needed to get from Cape Flattery to San Francisco?

4    A.   If there were no weather problems whatsoever, it was going

5    to be a five- to six-day trip, but as soon as they run into bad

6    weather, the boat is going to slow down, and as it turns out, it

7    ended up being an eight-day trip.

8    Q.   There's been a considerable amount of testimony, that you

9    also didn't sit through, that Western Towboat's personnel are

10   somewhat expert at reading weather maps and predicting weather

11   systems.

12        For someone with that background, would it have been

13   reasonable for them to think that they would have a five-, six-,

14   or seven-day weather window that complied with the restrictions

15   in this case in the second half of October?

16        MR. SIMMS:  Objection; not in the report.  That's an

17   opinion of an expert that is not in his report.

18        THE COURT:  Mr. Simms, that's fine.  Your objection

19   will be noted.

20        The court can read the report.  It is a bench trial.  If

21   it's not in the report and the court feels it is not relevant at

22   that point in time, the court can disregard it.

23        MR. SIMMS:  Thank you.

24        THE COURT:  Mr. Campbell, you may respond.

25   A.   Yes.

1      At that time of the year, it would be very difficult to

2   find a six- to eight-day favorable weather window.  Just from my

3   experience of doing this for -- in excess of 25 years, it's not

4   the favorable time of year to do it.

5      And, personally, that's one of my bugaboos with routing

6   clients.  They want to go at unfavorable times of year, and it

7   makes my job more difficult.

8   Q.   (By Mr. Boyasian)  Mr. Campbell, is there a favorable time

9   of year in which it would have been likely for them to find a

10  five- to eight-day window to leave Seattle with conditions that

11  did not exceed restrictions in the tow plan?

12           MR. SIMMS:  Same objection.

13           THE COURT:  Mr. Simms, I'll give you a continuing

14  objection to all of this.  All right?

15           MR. SIMMS:  Yes, sir.

16           THE COURT:  You may respond, Mr. Campbell.

17  A.   Certainly, there is a favorable time of the year.  I'm

18  going to answer it, and then I'll give you an example, if I may?

19      The best time of the year to do it is certainly June, July,

20  and August, and the weather pattern can be favorable, quite

21  favorable, in May.  September can also be favorable.

22      Now, what I did is, I contacted my office yesterday because

23  I wanted to get a feeling for how many clients we have that

24  we're routing right now on the West Coast of the U.S. and where

25  they are located.

1          So effective July 6th of this year, we had nine clients

2   located between Oregon and Alaska.

3          I then asked them to go back to 28 days prior to COVID,

4   because certain places still closed, and find out where we had

5   clients at that time on the West Coast U.S. on July 6th.

6          We had 11 clients, and they were all located between Oregon

7   and Washington -- Oregon and Alaska.  I'm sorry.

8          I then asked, on October 26th, 2018, how many clients do we

9   have on the West Coast U.S.?  We had seven clients on October

10  26th, 2018.  Only one of them was north of Santa Barbara,

11  California.  That client was in Seattle, had received three

12  weather window advisories from us prior to October 26th.  They

13  were considering canceling their trip until the next spring.

14         That is very typical for the type of problems we have in

15  the Pacific Northwest at that time of the year.

16         So the best time to do it, in my opinion, is June, July,

17  and August.  May and September will work, at times, as well.

18            MR. BOYAJIAN:  Thank you, Mr. Campbell.  I expect that

19  Western's counsel will have questions for you, and I may have

20  some follow-up after, but I'm passing you over.

21         Thank you.

22            THE WITNESS:  You're welcome.

23                     CROSS-EXAMINATION

24  BY MR. SIMMS:

25  Q.   Mr. Campbell, this is Steve Simms.  We got to see each

1    other in person, not long ago, on Zoom.

2        Now, in your report, you talked about towing the Russian

3    submarine.  That's the only tug-and-tow project you have ever

4    had, right?

5    A.   That's the only towboat tow project we've had.  Quite

6    frequently, the motor yachts and some of the larger sailboats,

7    they'll tow tenders or smaller boats behind them, and when they

8    do that, there are restrictions for winds and sea state.

9        So the only major tow with a towboat was the Russian

10   submarine.

11   Q.   And you don't, in your work, use NOAA forecasts, right?

12   A.   No, we do not use NOAA forecasts because they are

13   generalized forecasts.  Ours are site specific, client specific.

14   Q.   And this intergovernmental report, you talked about it, the

15   copy that came from the University of Iowa, that's not something

16   relevant to what you do, either, is it?

17   A.   No, generally, I don't look at that.

18       When there's a major weather event, something very

19   important, or when there's conflict between the weather models,

20   I may look at the intergovernmental discussion.  I think

21   probably the last one I ever looked at was for Hurricane Sandy.

22   Q.   And you don't really know what sort of weather reporting a

23   tug crew typically looks at, do you?

24   A.   Personally?  No, I don't.

25           MR. SIMMS:  All right.  Thank you.

1          THE COURT:  Any redirect?

2          MR. BOYAJIAN:  Just one question, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. BOYAJIAN:

5    Q.   When you are routing yachts, is it that you are given a set

6    of weather conditions that they don't want to exceed and a route

7    that they would like to get to, and you look for a weather

8    window?

9    A.   That's correct.

10   Q.   Would there will be any reason at all that you would answer

11   a question differently if you saw the weather restrictions in

12   this case apply to a dry dock and a route that a towboat wanted

13   to get to at a given speed?

14   A.   No.  The way I handle projects, I would handle this one

15   exactly the same way.

16          MR. BOYAJIAN:  Okay.  Thank you very much,

17   Mr. Campbell.

18          THE COURT:  Mr. Campbell, thank you.  That will

19   conclude your testimony.

20          THE WITNESS:  Thank you.  Have a good day.

21          THE COURT:  Counsel, does that conclude the witnesses,

22   on behalf of Vigor?

23          MR. BOYAJIAN:  It does, Your Honor.

24          THE COURT:  Okay.

25       Any other witnesses in rebuttal by Western?

1          MR. SIMMS:  No, Your Honor.

2          THE COURT:  Both sides are resting?

3          MR. SIMMS:  Yes, Your Honor.

4          MR. BOYAJIAN:  Yes, Your Honor.

5          THE COURT:  All right.

6     Counsel, typically what the court does on bench trials,

7 like this, is we deal with any legal issues.

8     We have a legal issue outstanding that was raised earlier

9 today by Mr. Simms, and the court would definitely benefit by

10 briefing from both sides.

11     Once we take care of that, the next issue would be proposed

12 findings of fact and conclusions of law, and my typical practice

13 is then to have you submit those at a future time.  The court

14 can consider them, and then get you back together again, and

15 allow you some time for closing argument.

16     I understand, Mr. Simms, you're from Baltimore.

17          MR. SIMMS:  Yes, Your Honor.

18          THE COURT:  And I'd hate to have you fly back out here

19 again.  What we could do is -- we had, basically, figured we had

20 tomorrow -- at least tomorrow morning -- available for you.

21 What we could do is allow you to do a brief closing argument

22 tomorrow morning, give you some time today, rest up for a couple

23 of hours, and maybe formulate that and keep it -- put it

24 together in your mind a little bit better.  We can do closing

25 arguments in the morning, and then we can submit the briefing

1    and the proposed findings of fact and conclusions of law, and

2    you wouldn't have to return.

3            MR. SIMMS:  I would prefer to return.  Tomorrow is my

4    anniversary.

5            THE COURT:  Smart man.

6            MR. SIMMS:  I think, Your Honor, with some clarity,

7    including on the legal issues, I think closing argument might be

8    a little bit better.

9            THE COURT:  Yes, and that was my concern as well.  I

10   just didn't want you to have to do another trip out here.

11       When can we get the briefing done in terms of supplemental

12   briefing?

13           MR. SIMMS:  Could we have two weeks?

14           THE COURT:  Yeah, that would be fine.

15           MR. SIMMS:  So that would be the 23rd.

16           MR. BOYAJIAN:  Your Honor, if I may ask, is that for

17   Western to submit initial briefing, and we would have a chance

18   to respond?

19           THE COURT:  Correct.  And remember now, I start

20   probably a month-long trial on the 19th, so I'm going to be tied

21   up every day for a while.

22       But, no, that would be fine.  If you submitted your opening

23   brief on the 23rd; from Vigor's perspective, how long would you

24   need to respond?

25           MR. BOYAJIAN:  We'd like two, Your Honor.

1          THE COURT:  Okay.

2          THE CLERK:  That's August 6th.

3          THE COURT:  And then, Mr. Simms, if you'd like, not

4     that there would be any need, but if you'd like, maybe a short

5     reply to their response.

6          MR. SIMMS:  What would work?  The 13th or the 20th?

7     Either is fine.

8          THE CLERK:  Typically, it is just a week for a

9     response.  That will be the 13th.

10          MR. BOYAJIAN:  Your Honor, do you have any page limits

11     in mind?  You've seen a lot of --

12          THE COURT:  Yes, we definitely have that.  Follow the

13     same page limits as we have before, in terms of -- I mean, what

14     gives me -- what's the most valuable thing for me is if you can

15     point me to case law once you're making your factual argument.

16     That's the best on point.  It doesn't have to be very long.  I'm

17     not expecting lots and lots of pages on this.  In fact, you get

18     extra credit for having fewer pages.

19          So then here's what I propose:  Once we get that, the court

20     can make a ruling on the legal issue, and then that might help

21     you in formulating your proposed findings of fact and

22     conclusions of law.  So we'll wait; the court will make a

23     ruling; get that to you.  Once that's done, we'll ask for

24     findings of fact and conclusions of law, and then we'll schedule

25     closing argument sometime in August.

```
 1          MR. HOWARD:  Your Honor, this is a minor point.  If we
 2   get to September, I'll be in a Pierce County trial, so I would
 3   only have Fridays to be able to join you, although I'm sure I'll
 4   have Fridays open.
 5          THE COURT:  We'll try to get all this done as soon as
 6   we possibly can.
 7       Mr. Jarrett?
 8          MR. JARRETT:  Thank you, Your Honor.
 9       So at some point in this case, we had talked about doing
10   written closing.  I thought that that comment had originated
11   with Your Honor.  But if the court prefers to hear verbal
12   closings, that is, live closings, we could certainly do that,
13   but we had thought about that, and we were planning to do
14   written closing.  Whatever works best for the court is fine by
15   us.
16          THE COURT:  We can do it by Zoom.  I like oral
17   closings simply because I never know what questions I want to
18   ask until I hear the argument, and that prevents me from asking
19   the questions.  But we can do it by Zoom so Mr. Simms doesn't
20   have to come back out.
21          MR. SIMMS:  That's fine with us, Your Honor.
22          THE COURT:  Or we can have Mr. Gaspich do closing.
23          MR. GASPICH:  August 29th, I'm on a plane to Italy,
24   and I'll be gone for three weeks.  So if it's scheduled beyond
25   that, Mr. Simms will not have local counsel.
```

1           THE COURT:  Thank you for bringing that to my

2     attention.

3           MR. GASPICH:  I could Zoom in, but my strong

4     preference would be not to.

5           THE COURT:  That would be a little tough.  It's, like,

6     a 12-hour time-zone change.

7           MR. GASPICH:  I was worried about my wife.

8           MR. HOWARD:  I'd submit Mr. Simms might prefer being

9     here than in Baltimore in August.

10          THE COURT:  Exactly.

11       All right.  Gentlemen, thank you.  It's been very

12    interesting.

13       If, by any chance, now that all the evidence is in, you

14    resolve this, let us know as quickly as possible.  If you don't

15    need us to finish all this for you, it would be one less thing

16    off my desk.

17       So have a good rest of the day, and we'll be seeing you in

18    the future.

19                  (Proceedings adjourned at 1:56 p.m.)

20

21

22

23

24

25

C E R T I F I C A T E


        I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

        I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


        Dated this 5th day of 2021.


                        /S/  Nancy L. Bauer

                        Nancy L. Bauer, CCR, RPR
                        Official Court Reporter