```
1              UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

   _____
3                                )
     WESTERN TOWBOAT COMPANY,     ) C20-0416-RSM
4                                 )
                     Plaintiff,   ) March 22, 2024
5      v.                         ) 11:00 a.m.
                                  )
6      VIGOR MARINE, LLC,         ) Motions
                                  ) (Via Zoom)
7                     Defendant.  )
   _____
8
                VERBATIM REPORT OF PROCEEDINGS
9         BEFORE THE HONORABLE RICARDO S. MARTINEZ
              CHIEF UNITED STATES DISTRICT JUDGE
10 _____

11

12                  A P P E A R A N C E S

13

14  For the Plaintiff:       J. STEPHEN SIMMS
                             Simms Showers LLP
15                           201 International Circle
                             Suite 230
16                           Baltimore, MD 21030

17

18  For the Defendant:       DAVID R. BOYAJIAN
                             Schwabe Williamson & Wyatt
19                           1420 Fifth Avenue, Suite 3400
                             Seattle, WA 98101
20

21

22

23

24     Proceedings stenographically reported and transcript
25         produced with computer-aided technology
```

MARCH 22, 2024 - MORNING SESSION

* * * * * *

THE DEPUTY CLERK:  Please come to attention.  The United States District Court for the Western District of Washington is now in session, the Honorable Judge Ricardo S. Martinez presiding.

THE COURT:  Ms. Staples, good morning.  Can you hear me?

THE DEPUTY CLERK:  Yes, sir, I can hear you.

THE COURT:  I think I heard you earlier doing a sound check with everybody else, including our court reporter.

THE DEPUTY CLERK:  Yes, sir.

THE COURT:  All right.  You may call our case.

THE DEPUTY CLERK:  This is the matter of Western Towboat versus Vigor Marine, Cause Number C20-416, assigned to this Court.

Counsel, please make your appearances for the record.

MR. SIMMS:  Your Honor, Steve Simms for Western Towboat, and with us on the line is J.D. Stahl, who is our local counsel, and my colleague, Gary Murphy.

THE COURT:  I guess it's "good afternoon" for you, Mr. Simms.  It's "good morning" still over here.

MR. SIMMS:  Your Honor, it's actually "good morning." I'm in the San Francisco Bay visiting with our new grandson and daughter-in-law, on, when I'm not arguing, childcare

 1    duty.

 2            THE COURT:  Congratulations.

 3            MR. BOYAJIAN:  Congratulations, Steve.

 4      Dave Boyajian for Vigor.  My partner, Molly Henry, is also

 5    on the line listening in.

 6            THE COURT:  Mr. Boyajian, Ms. Henry, thank you.  Will

 7    you be arguing or presenting on behalf of Vigor?

 8            MR. BOYAJIAN:  I will, Your Honor.

 9            THE COURT:  Okay.  Counsel, I've had a chance to

10    review all of the materials submitted by the parties.  You're

11    quite aware we have -- the issue the Court is focused on has

12    to do with the appropriate amount of attorneys' fees and

13    costs in this very interesting case.  I'm quite familiar with

14    the case.  In fact, I went back and re-read some of the

15    materials on this trial that we had some time ago.

16      So here's what I need:  We have different categories that

17    we really need to discuss and talk about whether they apply

18    or don't apply and how they do that.  I think the easiest way

19    for me to do this is simply to ask you a series of questions.

20    I've got several things written down here in terms of

21    questions and different categories that might help me.

22      And since we're on this Zoom platform, this is maybe a

23    little easier than if people were in the actual courtroom.

24    No need to be at the podium, and I'm just going to bounce

25    back and forth between the two parties here, and that would

1    help me in reaching my decision on this particular case.

2        So let's first talk about no award here because insurance

3    paid.  And let me just start out by -- Mr. Simms, maybe I'll

4    start with you.  If you had both got insurance separately

5    without the involvement of the other side, would this even be

6    an issue in terms of the attorneys' fees here?

7              MR. SIMMS:  Well, that was that *Grays Harbor* case

8    that the Vigor side cited, and that's what makes the

9    difference here, which is that the insurance was the inherent

10   part of the consideration of the contract and waiver of

11   subrogation.  And that's what the Court looked at in your

12   decision, which is at Docket 108, at page 10, and concluded

13   that there was nothing to be reimbursed or paid or damages or

14   whatever to Vigor that they never paid, and it didn't.

15       And as a matter of fact, we know that because the Vigor

16   claims person, in-house, when she testified, she said, "Yeah,

17   this is how we got to the $100,000.  We paid out up to the

18   deductible, attorneys' fees mostly."  She didn't know --

19   Carter what's-her-name didn't know exactly how much it was,

20   but after that, the insurers took over entirely.  And so

21   that's the distinction with *Grays Harbor*, because in *Grays*

22   *Harbor,* it wasn't part of the consideration.  Either side had

23   their own insurance.  Not the same issue.

24       And the Ninth Circuit, in our opinion -- we went up, and

25   here we are back -- looked at that and said, yeah, this is

1  not a collateral-source issue.  This is a consideration

2  issue, and there's not a single bit of proof that the

3  insurers -- anybody but the insurers paid anything else but

4  the $100,000, and Vigor has already gotten the attorneys'

5  fees that it laid out as part of the $40,000 that Western has

6  paid.

7          THE COURT:  All right.  Before I turn to your

8  opponent here, let me ask you another question on that.

9  Wasn't my ruling originally limited only to damages?

10         MR. SIMMS:  That was the only thing that was before

11  you, but the ruling carries directly over to the question of

12  who gets the money.  Let's -- you know, it's probably more of

13  a -- just a question that will never be answered, but who's

14  paying for everybody on the Vigor side to be here?  I'll

15  betcha it's not Vigor.  It will be the insurers that pay, and

16  it has been the insurers that paid, just as they paid NOAA or

17  anybody else.  And so that is why Your Honor's decision at

18  Docket 108, page 10, carries over to here.  It's the same

19  thing.

20      You can't -- to put it another way, let's say that the

21  Court said, "Yes, Vigor, you get $1,572,457.03," which is the

22  claim.  It comes back to Vigor.  That's double recovery or at

23  least -- yeah, it's a double recovery, whether it's part of

24  the $40,000 or it's part of the over $100,000 that was paid,

25  because they've already been -- that money already has been

1   paid.  It wasn't something that Vigor paid.

2          THE COURT:  All right.  Final question for you,

3   again, before I allow your opponent to respond:  Why include

4   the provision for attorneys' fees in your agreement if that

5   was meant to be covered or set off by insurance?  Why add

6   that?

7          MR. SIMMS:  Well, it was.  First, it's not -- we're

8   not -- from this standpoint, from who paid and who,

9   therefore, can recover, that's not a focus of the tow

10  contract, okay?  It's simply a fact.  It's simply a fact that

11  Vigor never paid the insured the attorneys' fees over and

12  above $100,000, including in the $40,000.

13      But the insurance contract does say -- sorry, the tow

14  contract, under Clause 8 -- that basically everybody's

15  responsible for their own stuff, and that was, again, part of

16  Your Honor's decision, that you take care of your own stuff.

17      Now, if this had been, you know, just all about a standard

18  contract dispute, which it was after Your Honor held that

19  there wasn't standing at the time to go forward with the NOAA

20  stuff, then we wouldn't have a million-five claim.  We

21  wouldn't have anything like this, and maybe Vigor wouldn't

22  have presented it to the insured's company and maybe they

23  would have paid out their own attorneys' fees above the

24  deductible, but they didn't.

25          THE COURT:  All right.  Mr. Boyajian.

1          MR. BOYAJIAN:  There's a lot here, Your Honor.  Let

2     me start with one critical piece.  Your ruling on collateral

3     source didn't discuss fees.  It didn't discuss law on fees.

4     It was a damages question.  That is entirely separate from a

5     right-to-attorneys'-fees question.

6          You raise a good point, I think, a particularly good

7     point.  Well, before I get there, let me just say this:  This

8     argument feels belated.  This is an entitlement-to-fees

9     argument.  This is Mr. Simms arguing and Western arguing that

10    Vigor is not entitled to recover fees because insurance paid

11    it.  We've already had that motion, Your Honor, and you've

12    already ruled on it.  You said Vigor is entitled to collect

13    its reasonable fees and costs.  If this argument was to be

14    made, it should have been made then.  This is another example

15    of waiting until decisions have been made and then Western

16    saying, "Oh, shucks, I forgot to point out something about

17    the contract."

18         Now, turning to the merits of this argument, you're

19    exactly right.  If we adopt this position, Clause 15 in the

20    tow contract is meaningless.  And let's remember whose tow

21    contract it is.  This is Western Towboat's standing tow

22    contract.  We didn't modify it; we just signed it.  This is

23    what they called for.  We want you to procure this insurance,

24    and that insurance does cover, in certain types of lawsuits,

25    for claims, environmental claims maybe, attorneys' fees.

1    Western Towboat is intimately familiar with what a P&I

2    policy covers, and it covers defense costs of tort claims.

3    So, in Clause 8, Western Towboat says the parties have to

4    have P&I.  Separately and later, in Clause 15, Western

5    Towboat's contract form says, if we get in a fight, the

6    winning party gets their fees and costs.  If Clause 8 is

7    meant to preclude any party from having to pay their fees and

8    costs because they buy the type of insurance that covers

9    legal fees, why include Clause 15, which is explicit and

10   clear and can only otherwise be read as meaningless in the

11   face of Clause 8.

12       Now, when we get to the cases supporting this, Western

13   doesn't cite a single case supporting this proposition.  Not

14   one.  Not one case that says, if a contract says you have to

15   have insurance, and insurance pays the fees, you don't get to

16   recover.

17       *Grays Harbor* and *Blakely Island*, both of which we cited,

18   specifically say there is no merit under Washington law to

19   the argument that Western Towboat is making here, and again,

20   it's too late.  This is an entitlement-to-fees question, and

21   it should have been an argument raised in the prior motion

22   where Your Honor ruled that Vigor won and Vigor is entitled

23   to recover reasonable costs and fees.

24       What we are here to do is talk about lodestar calculation.

25   That's the method Washington courts use.  It's a reasonable

1   hourly rate -- and Western doesn't challenge our rates --

2   multiplied by the reasonable number of hours expended in

3   light of the controversy before the Court.

4       And no matter how many times Western, in its briefing and

5   in their declarations, try and say this is a $187,000 tow

6   claim on a contract, we were there.  You were there.  That's

7   not what this case was about.  There was a

8   hundred-million-dollar tail wagging this dog up until six

9   days before trial when Your Honor issued a summary judgment

10  ruling, and that ruling was appealable all the way through

11  and past the conclusion of trial, so that issue was never

12  taken off the table.

13      So what we need to talk about, Judge, since you've already

14  ruled we're entitled to collect, is -- our fees are

15  reasonable -- how many hours were reasonable to defend a

16  nine-figure lawsuit?

17          THE COURT:  All right.  Let me follow up on that.

18  Obviously, the attorneys' fees that are being requested here

19  are almost 1.5 million compared to the $40,000 in damages

20  awarded at trial because we had such limited issues by the

21  time we got there.  That is pretty disproportional.

22          MR. BOYAJIAN:  I don't disagree, Your Honor, if we

23  look at that and pretend that's what this case was about.

24  But let's think about it this way:  You have a $100 million

25  claim, and a party successfully defends it and takes nothing,

 1    right?  They get zero dollars, but they've won.  Are they not

 2    entitled to collect fees to defend that $100 million lawsuit

 3    because they took nothing?  I don't see a case anywhere that

 4    says that.

 5        What lodestar says, instead, Judge, is that you look at

 6    what were the issues, what was the complexity of the issues,

 7    what was the potential damages at stake or implicated by the

 8    case, and what was the benefit to the client?  It's not the

 9    fact that they recovered $40,000.  It's the fact that they

10    didn't get pinned with sole liability to the federal

11    government, which the federal government was saying, at the

12    time of trial, was $108 million.

13        Now, the reason that we were in trial at that time is

14    because Western wanted to.  If you remember, Judge, and you

15    said you've gone back and looked -- I'm sure you do -- Vigor

16    didn't want this fight, right?  Vigor invited Western

17    repeatedly to work cooperatively with Vigor and with NOAA to

18    resolve federal government liability.

19        At that point, we would have had a $187,000 tow claim,

20    right, because Vigor wouldn't have incurred costs cooperating

21    with NOAA.  The parties cooperatively would have handled that

22    $187,000 tow claim between the two entities that still work

23    together.  Western Towboat still pushes drydocks around for

24    Vigor.  We would have worked that out.  We wouldn't have been

25    here.  We tried to get them to cooperate, and then we tried

1    unsuccessfully -- or, no, successfully, to get a tolling

2    agreement in place so that we could resolve $100 million

3    worth of liability with NOAA before we had to fight about

4    $187,000.

5         Judge, we never would have seen the inside of your

6    courtroom on a $187,000 tow dispute.  I can assure you that.

7    I resolve those all the time.

8         Then, even during trial, right, we tried to negotiate a

9    tolling agreement at the close of discovery to avoid

10   incurring these kind of fees until NOAA could take that step

11   there, that tail wagging the dog off the table, and when we

12   couldn't negotiate one, Judge, we moved for one.  We asked

13   for a stay, and Western opposed it vigorously, and you said,

14   Judge, on Western's opposition, they're the plaintiffs, they

15   have a right to go forward.

16        Vigor never wanted to have this fight over $100 million.

17   We wanted to put that issue to bed, and then, two entities

18   that had worked together for years and still work together

19   now would have figured out what to do with $187,000 in tow

20   hire.  That's not what we got.  It's not what we litigated,

21   so we're not talking about a $40,000 case.  Judge, we're

22   talking about a dec action for potentially $100 million that

23   was live at trial.  You disposed of it six days before, and

24   the reconsideration period ran all the way through trial, as

25   did the appeal period.

1        THE COURT:  All right.  One short follow-up:  In my

2    time at federal court, we've had all kinds of very large

3    cases.  Yeah, I understand that NOAA had liability and NMSA

4    issues, but wasn't having seven attorneys on the case,

5    basically, a bit of overstaffing?

6        MR. BOYAJIAN:  No, Your Honor, I don't think so at

7    all.  So what we're talking about when we say seven attorneys

8    is four different associates who worked on a case that's been

9    on my desk since 2016.  Three of those attorneys are no

10   longer even with our firm, right?

11       So, then, what we're really talking about is myself and

12   Noah Jarrett, two maritime practitioners, who worked on this

13   case primarily for the duration.  We worked the case up.

14   Primarily, I did.  He offered support.  We worked as a team,

15   because it was an important case.

16       As we got toward trial and realized NOAA liability was

17   still on the table -- in the negotiations I was having with

18   NOAA, they were, in real time, quoting your interim judgments

19   throughout this case and quoting positions the parties were

20   taking.  They were using that to support "We think you ought

21   to pay this much, because it seems like the litigation is

22   going this way."  So this was very real and alive.

23       So as we realized we were not going to resolve NOAA

24   liability and we were going to go to trial, we brought in

25   Mr. Howard.  Noah Jarrett and myself are maritime lawyers.

1   We're good at what we do, I like to think.  I hope you agree.

2   Mr. Howard had a 30-plus-year trial career with a

3   hundred-plus trials.  He has something that lawyers, frankly,

4   in this area don't get.  We don't try cases like that.

5   Maritime lawyers do not.  And so we waited and waited, hoping

6   we could resolve this case, and when it became abundantly

7   clear that we were going to go try a case with maybe a

8   $100 million on the line, we brought in trial counsel.

9        Now, Western has pointed out, why didn't we use Seattle

10  lawyers instead of Portland lawyers?  Well, Western's lawyer

11  is in Baltimore, and Noah Jarrett and I are in Portland, but

12  when we needed a trial lawyer, we sure found one who lived in

13  Seattle and has experience in Seattle and in Washington

14  federal courts.  That was Mr. Howard.

15       Ms. Henry was brought in because, when Mr. Simms and

16  Western moved to exclude our expert witnesses, I couldn't

17  argue that motion.  It would have been improper and presented

18  a conflict for me to argue a motion implicating my own work,

19  so Ms. Henry was brought in.  She's also a maritime lawyer.

20  So those are the lawyers we brought in, what they did, and

21  why.

22       But at trial, as you'll recall, we had myself and

23  Mr. Jarrett, as maritime practitioners, and we had Mr. Howard

24  as an expert trial counsel, and we had a brand new associate,

25  Mr. Murray, who was helping us do on-the-fly research.  I do

1  not think that's overstaffing, Your Honor, for a case of this

2  magnitude.

3          THE COURT:  Mr. Simms, I don't need you to basically

4  go over everything you submitted in your memo, but anything

5  you'd like to say in response to counsel?

6          MR. SIMMS:  Well, I've got the tow contract right

7  here, and here is Clause 15, and it says, first, the

8  "substantially prevailing party" -- and I want to make clear,

9  there's been no waiver of argument here, we have never given

10  up on this argument, and the contract says what it says, and

11  we've never given up on the question of the direct

12  applicability of Your Honor's decision about collateral

13  source.

14      Interestingly enough, reading the Ninth Circuit opinion,

15  the Ninth Circuit says, yeah, you're right, Judge Martinez

16  was right about that, not awarding anything over damages.

17  We're not talking about collateral source.  We're talking

18  about, basically, who paid and who was responsible for

19  paying.

20      But here's Clause 15.  It says, "with the substantially

21  prevailing party," 40 percent isn't substantial compared to

22  60 percent, but anyhow, the next part, "to recover its" --

23  and I circled that here -- "its reasonable legal fees and

24  costs."  This was not "its" cost.  We've never seen a bit of

25  evidence that Vigor paid anything over $100,000.  We've never

1   seen a bill to Vigor.  All that there was was a printout of

2   time.  What happened to those bills?  I betcha if we saw the

3   real bills -- and it's not a question of privilege now.

4   We're all done with the case.  If we saw the real bills and

5   where they went and the money that came back in, it would be

6   from the insurers.  Vigor never paid its reasonable -- and

7   there's the other word -- "reasonable" fees and costs.

8       This is making us pay the money for K&L Gates to dig out

9   of the problem with the experts a reasonable cost when,

10  really, what was going on was whether Vigor should change

11  counsel.  That's not a reasonable cost.

12      And Jeff (sic) Howard, fabulous lawyer, but there was this

13  business about, oh, they've got him written off because it

14  was pro bono.  Well, the Supreme Court is very clear that you

15  can only charge fees and award fees that were paid.  So

16  there's two problems with that:  First, Jeff's fees weren't

17  paid, says Vigor; second, Vigor didn't pay the fees.  It was

18  the insurers.

19      And the *Grays Harbor* case, real different.  It was a

20  public utilities case.  It was under a Washington statute,

21  but the interesting thing that *Grays Harbor* cites is this

22  *Roats* case, R-O-A-T-S, a landlord/tenant situation where the

23  insurance was not independent, and at the end of the day,

24  there was no attorneys' fees that had to be paid under that.

25  So that's the big difference there.

1     But nothing was waived here.  We don't waive any of these

2     arguments, and particularly Your Honor's decision about

3     you've got to pay them to get them, and that didn't happen,

4     except as a part of the $40,000 that Western already has

5     paid, which was the 40 percent out of the hundred, most of

6     which, apparently, was attorneys' fees to exhaust the

7     deductible.

8           MR. BOYAJIAN:  Your Honor, if I may on one or two of

9     those points?

10          THE COURT:  Yes.

11          MR. BOYAJIAN:  If I can remember how to pick them

12    apart from the rest.  Insurance, whether insurance paid,

13    again -- oh, I'm sorry, there's three points I can think of.

14     Whether insurance paid, Your Honor, again, you've already

15    hit on the critical pieces.  Why would there be a fees clause

16    if the insurance clause was there expecting everyone to pay?

17    More importantly, have you ever gotten in a car accident,

18    Your Honor?  My wife did recently, and my insurance premiums

19    went through the roof, right?  So the idea that Vigor pays

20    nothing -- no insurance companies -- as Western Towboat is

21    well aware, because they've had lawsuits under their

22    policies, insurance companies come back and get it one way or

23    another, right?  And so the clause would make no sense if the

24    insurance was supposed to pick it up, and under law, if

25    insurance picks it up, there's no fees to recover.  The

1   clause would be meaningless.  It wouldn't even be in

2   Western's form.

3       But, regardless, it doesn't matter who paid it.  It is

4   Vigor's fees.  Vigor was the defendant.  The fact that they

5   had insurance that may have covered it doesn't change the

6   fact that it was paid out, and at the end of the day,

7   insurance companies get their pound of flesh.  The only

8   question is:  Should Vigor have to pay it in increased

9   premiums, or should Western, by reimbursing the insurers,

10  take that off Vigor's loss record?

11      Now, to the idea that fees not billed to a client are not

12  recoverable, that's absolutely not what Washington law says.

13  Washington law has several cases in which fees not billed to

14  a client are recoverable and not only in the pro bono

15  representation context.

16      The lodestar method is simply hours times the rate,

17  reasonable number of hours, given the controversy.  We know

18  what the controversy really was in this case, so were the

19  hours reasonable?  It doesn't say you then have to check to

20  see who paid them, you then have to say -- it doesn't say you

21  then have to see whether Vigor wrote some of them off.  It

22  simply says were the hours incurred, and the way the courts

23  judge that is by looking at contemporaneous billing records.

24      Finally, the K&L Gates fee.  Happy to talk about that one,

25  because I have to own it and still do.  This isn't about

1    Schwabe's recoverable fees.  It's about Vigor's, right?

2    Schwabe -- I may have made an error.  The Court forgave it or

3    overlooked it, whatever way it went, but at the end of the

4    day, we're not talking about what Schwabe's fees were, we're

5    talking about Vigor.  Vigor was in a position where they were

6    at risk of having their experts excluded at trial.  If that

7    had happened, my firm would have had no choice but to

8    withdraw from representation based on a conflict, right?  We

9    would have had to back out.

10       Trial was fast approaching on a case we had been working

11   for years.  K&L Gates had to step in to start getting up to

12   speed in case that came to pass.  It didn't come to pass, and

13   so K&L Gates hard-stopped, and Vigor was happy to continue

14   with our representation, which they appreciated.  But Vigor

15   should not be penalized because there was a risk that their

16   chosen counsel would have to step aside based on a

17   non-waivable conflict.

18       We're not talking here about what Schwabe's fees were.

19   We're here talking about the fees that Vigor reasonably

20   incurred in a bare-knuckle piece of litigation that Western

21   started, notwithstanding the fact that we had a tolling

22   agreement and that Western kept pressing forward at all

23   possible speed, notwithstanding the fact we could have waited

24   until a $100 million risk was off the table.  Western

25   wouldn't wait, so Vigor had to defend itself.

1        And at the end of the day, Vigor made choices that let it

2   win, right?  We can pull back and keep talking about

3   Mr. Simms' displeasure with your ruling on who the

4   substantially-prevailing party was, but that's in the books,

5   as is your ruling that we are entitled to our reasonable

6   costs and fees -- that my client is, not my firm.

7        And so all of these fees are recoverable.  The question

8   before the Court is simply lodestar.  Our rates haven't been

9   questioned by anyone credible.  Mr. Klein certainly isn't.

10  He didn't even review the pleadings.  He was advised this was

11  a $187,000 contract case.  I agree, if that was the case,

12  these fees would be unreasonable, but it wasn't the case, and

13  we all know that.

14           THE COURT:  All right.  Let me follow up on some of

15  that.  And maybe these are a bit more minor issues, but I

16  like to work my way through everything.

17       Western argues that Vigor failed to segregate fees,

18  including fees related to the NOAA and appeal preparation.

19  Your response was that, yes, Vigor has already removed it

20  from the charges.

21           MR. BOYAJIAN:  Yeah.

22           THE COURT:  However, in looking through the fees,

23  there's at least $27,000 and change in fees listed that were

24  related to the NOAA claim after it was removed by the Court.

25  And then, on the listings in one of your exhibits -- I think

1   it was A2 -- they are not attributed to a specific attorney

2   or person.  That makes it kind of impossible to tell me who

3   billed the time.

4       And then your motion says that Exhibit A2 reflects time

5   for which Schwabe did not charge Vigor, so are the fees in A2

6   being claimed here?

7            MR. BOYAJIAN:  No, Your Honor, those are fees we did

8   not charge Vigor, I believe.  If that's what it says in our

9   motion, then that's what it is.

10      As to claims about entries that have the word "NOAA" in

11  them, I took out $190,000 plus that are the fees incurred in

12  negotiating with NOAA, but not every single entry that has

13  the acronym "NOAA" in it was devoted to negotiating a

14  resolution with NOAA.  Some of those entries, Your Honor, the

15  ones that are left, had to do with trying to deal with how to

16  defend the issue that was raised that was that Vigor ought to

17  be on the hook for all of NOAA fees.

18      Just because the word "NOAA" is in an entry doesn't mean

19  that it is work directed at resolving the claims by NOAA.  I

20  have segregated those.  I could produce those separately if

21  Your Honor would like those, but just because an entry says

22  the word "NOAA" -- and if you look at them, several of them

23  say, "Call to NOAA," "Research regarding how to sever NOAA's

24  claim with Western," "Research regarding X-Y-Z."  They are

25  very minimal bits, looking at the big picture, of what

1    Western was trying to lay at Vigor's feet, which was

2    $100 million in NOAA liability.

3        This is -- you know, it is the control-F version of

4    reviewing the bills.  Look for the acronym "NOAA," and if it

5    shows up, that ought to be excluded?  No, Your Honor.  I did

6    a careful analysis of what work is reflected in each entry.

7    I removed $190,000 in fees for that work.

8            THE COURT:  All right.  Let's talk about Schwabe a

9    little bit, and then I'll have Mr. Simms respond to all of

10   this.  Schwabe, basically, in what they call -- they call it

11   a "billing judgment," they wrote off charges.  And so

12   Western's argument, of course, is that, you know, you were

13   not actually charged those fees by Schwabe.  Your response

14   is, well, yes, but that time was actually incurred in getting

15   a successful result and that Western, therefore, should not

16   get the benefit or the windfall benefit of those courtesy

17   write-offs.

18       You know, why should these write-offs be charged to

19   Western?

20           MR. BOYAJIAN:  Sure, Your Honor.  So Washington

21   courts allow recovery of documented fees not billed to a

22   client, period.  There are plenty of cases out there.  We

23   cite more than a few.

24       Lodestar is based on hours expended, not hours billed to a

25   client.  Chris Howard's time is accurately reported.  It

1   reflects real value, which is the measure under lodestar.  So

2   we waited as long as -- what I want to get to, the point is,

3   is that your question about windfall, right, Schwabe ate

4   these fees.  For whatever reason, we did.  We could take a

5   case pro bono to trial and still recover our fees.

6       In fact, Your Honor, as the head of our firm's pro bono

7   committee, I take cases with no fees to trial, and I am

8   routinely awarded my fees if and when I win on a case where I

9   don't bill a single penny to a client, right?  We wrote these

10  down.  At the end of the day, those are costs that the

11  Schwabe law firm ate.

12      But why?  We did it because we were in a bare-knuckle

13  fight that cost 1.6 million -- or $1.5-plus million that

14  Western picked, and now Western says, "We don't think we

15  should have to pay any of it, but at the very least, we

16  shouldn't have to pay something that Vigor didn't bill -- or

17  Vigor didn't get billed for."  Why?  It's what it took to win

18  the lawsuit.

19      Lodestar doesn't talk about dismissing that, and there are

20  plenty of cases under Washington law where folks don't bill a

21  penny to their client, but they still get to recover their

22  fees, the idea being this:  If we let Western off the hook on

23  this, what is it that they get?  They get to pick a fight,

24  lose the fight, but then not have to pay the costs.  Schwabe

25  eats it instead.  Why?  The fee provision is clear.  It is

1  about a party's fees, and under the lodestar calculus, it

2  doesn't say "billed to clients," it says "realized value,"

3  hours times time fairly recorded.

4       THE COURT:  Mr. Simms, once again, I don't need you

5  to restate everything you put down in your memo, but anything

6  you'd like to say in response?

7       MR. SIMMS:  Yes, sir.  The claimant isn't Schwabe

8  here.  It's Vigor.  Vigor never paid those fees.  It was

9  never billed those fees.  The Supreme Court is just awfully

10  clear about this, that there is -- we're not talking about

11  fee-shifting statutes.  What we're talking about is the

12  contractual maritime law standard here and -- but just a

13  basic, basic claim, which is, if you're not billed for them,

14  you don't get them.  I think Your Honor is -- yes.

15     We keep hearing about billing to Vigor, that sort of

16  thing, and our discovery motion also is out there.  We

17  haven't talked about that specifically, but Western asked for

18  all the stuff, but what are the bills actually sent?  What

19  are the payments actually made?  Because you can only get

20  paid attorneys' fees for what you paid or what you're

21  responsible to pay, and that was never produced, never

22  produced.  Asked for prior to -- way early in the case and

23  never produced.

24     So if Your Honor is going to be inclined to go past your

25  ruling that we talked about, there needs to be that

1    production.  There needs to be that evidentiary hearing to

2    show that Vigor was actually billed this, that they actually

3    paid it, that the underwriters actually paid it.

4        What if we weren't -- even if Vigor can double recover the

5    attorneys' fees that the underwriters paid -- and by the way,

6    we're not -- we're not being asked to pay higher insurance

7    premiums.  We're being asked to pay attorneys' fees.  Okay,

8    fine.  Are the attorneys -- are the premiums going to go down

9    if Vigor gets the money back?  Is Vigor going to send the

10   money back to the insurers?  We don't know.

11       But, at any rate, what if we were to see that these went

12   out to the underwriters and the underwriters came back, as

13   good underwriters often do, and say, "Well, you know, that

14   was a little bit high.  Nah, you can't have that.  That

15   expert spent too much time on it," so here's something that

16   was never paid that was -- by the people paying, so we've got

17   to have discovery on this stuff that we've asked for and that

18   wasn't responded to.

19            THE COURT:  All right.  Counsel, one final small area

20   that I want to get to, and that has to do with the expert

21   witness fees paid to Heger Dry Dock.  I think about $24,000

22   was paid by Vigor.

23       And then, Mr. Boyajian mentioned the fees paid by Vigor to

24   K&L Gates.  Since the tow agreement includes a provision

25   stating, "Any costs not covered by insurance will be

1    allocated by degree of fault," shouldn't that apply in this

2    particular case to those amounts being asked, Mr. Boyajian?

3          MR. BOYAJIAN:  No, Your Honor, because that comes in

4    the section talking about allocation of risk and loss, right?

5    That is separate from a clause further down the form, to

6    Clause 15 -- what, we move seven clauses later -- that talks

7    about costs and fees of litigation.  It's not a capital-C

8    cost that's a defined term somewhere in this contract.

9        In Clause 8, they're talking about costs arising out of

10   accidents, arising out of insured losses or losses that

11   should be insured or aren't.  When we get down to Clause 15,

12   we're talking about something entirely different.  We're

13   talking about costs related to disputes and litigation

14   between the parties.  It's not a capital-C defined term.

15   We're talking about two different things.

16       And I want to talk for a minute, too, about "double

17   recovery," which is a term that's been bandied about.

18   No one's looking for double recovery here.  Vigor collected

19   $40,000 out of $415,000 it paid trying to cooperate with the

20   Oceanographic Administration, for a net wealth of, what, 375,

21   365?  And now we're talking about, if they get fees, they get

22   a double recovery.  No, sir.  What they get is paid back for

23   what it cost to defend a fight they never wanted to have, a

24   fight they tried to avoid at every turn.

25       Western chose bare-knuckle litigation at a time when the

1   risk was highest, and now they don't want to pay for what it

2   costs to defend that fight.  It's nonsense.  The fact of the

3   matter is, yes, you know, I'm not here to give testimony, but

4   this recovery would flow back to the insurers, because they

5   are the ones that did pay most of these fees beyond the

6   deductible.  It doesn't say in the tow contract you don't get

7   your fees if insurance paid them, and it doesn't say that in

8   the case law that Western cited either, Your Honor.  So the

9   reality is, Vigor and its insurers, its underwriters, are

10  trying to get back what it cost to win the fight that Western

11  picked.

12          THE COURT:  Any final comments, Mr. Simms?

13          MR. SIMMS:  Well, okay, what we've established is

14  that underwriters paid everything over $100,000.  What we

15  don't know, but suspect, according to Ms. Cartwright's

16  testimony, is that much, if not all, of the $100,000, less

17  60 percent, the Court awarded those attorneys' fees.

18      What we also know is that the NOAA issue was what Your

19  Honor dropped out on the initial summary judgment as not

20  ripe, okay?  The NOAA issue may have been one of the gorillas

21  in the back of the case, but the front of the case was

22  $187,000 that Western was entitled to, not -- loss or no

23  loss, according to the towage contract, and interestingly

24  enough, it is Vigor which has paid NOAA on its damages, and

25  that's in the record.  Western still contests that it is

1    liable for any NOAA damages, but that's -- this was Western's

2    entitlement to $187,000, loss or no loss, that Western was

3    entitled to receive and that Vigor refused to pay.

4         So, if the Court's inclined to award anything, there has

5    to be discovery on the question of who paid, but I guess what

6    we've heard is nothing was paid, except up to $100,000 the

7    Court already awarded to Vigor, less $60,000, and Western has

8    paid that.

9              MR. BOYAJIAN:  Your Honor, if I may very quickly in

10   response to a few of those points?  Your Honor's prior ruling

11   is on damages, not fees.  It's not the same ruling.  It

12   didn't discuss -- we didn't brief cases dealing with fees.

13   It had nothing to do with that question, as the question was

14   not before the Court, so let's not pretend that question is

15   put to bed.  It may be on your mind, Your Honor, but it is

16   not put to bed.

17        And as to this point about discovery, there's not a single

18   case Western cites where this type of discovery is allowed,

19   not one, not from any single jurisdiction anywhere in the

20   country.  Western cites cases about discovery related to

21   perjury, false statements, and bad faith.  None of those are

22   about the quantum of fees, not a single one.

23        But what I will say all those cases do say is that, when

24   there's discovery on these issues, it's reciprocal.  We have

25   produced our contemporaneous billing records and accounting

1  of costs.  We haven't seen Western's.  And if we are going to

2  talk about what is reasonable in this litigation, we would

3  need to see that to compare, and not just Mr. Simms', because

4  Western had different counsel prior to Mr. Simms' engagement.

5  Going all the way back to 2017, where I start the clock, that

6  was a letter from Western's prior counsel with a tender and

7  demand that we defend and indemnify.  That's why I start at

8  February 13, 2017.

9      So, to the extent this Court is inclined to allow

10  discovery, which there is no support for that idea, but to

11  that extent, it ought to be reciprocal, because the

12  reasonableness of fees certainly ought to be viewed in

13  context.

14          MR. SIMMS:  Your Honor, the --

15          THE COURT:  That's okay.  I don't need any further

16  argument.  You answered the questions that I had about this,

17  and like I said, I'm quite familiar with the case.  This is

18  an interesting argument from both sides because of, again,

19  what happened with all the NOAA specter and the NMSA specter

20  looming over all of this before we actually got to our

21  much-shortened trial.

22      So I will take your oral arguments into account and go

23  back and review some of the materials, sit down with my

24  clerk, and hopefully, we'll be able to get you an order here

25  fairly quickly.

```
 1          MR. BOYAJIAN:  Your Honor, if I may, one point that
 2   is not argument?
 3          THE COURT:  Yes.
 4          MR. BOYAJIAN:  We'd like to concede three costs.  In
 5   preparing for this motion, I carefully reviewed Mr. Simms'
 6   comments on our billing record, and there's three things that
 7   I would like to concede.  We'd be happy to file an amended
 8   fee petition to reflect those deductions if it would help the
 9   Court, but it's just three, and I suspect, with the court
10   reporter's record, we can take care of it.
11          One is, Mr. Howard charged a single dinner during trial.
12   He was preparing a witness, and he included that on the cost.
13   That is $121.72.
14          I stayed at the Washington Athletic Club on February 16th,
15   '23.  That was to come attend the appellate argument.  That
16   inadvertently got included here.  It's $204.77.  That is more
17   properly tacked to costs for appeal and shouldn't have been
18   included here.
19          And third, Your Honor, $5,050 for fees that we wrote down
20   for preparing the notice of appeal documents.  Those are
21   documents that get filed in your court, in the trial court,
22   Your Honor, but Mr. Simms raises the point that they are more
23   appropriately billed toward appellate fees, and I think he's
24   correct.
25          So we want to concede those three, and I want to make sure
```

1  the record reflects that.  I know you said you were done.

2  This is not argument; this is concession.

3          THE COURT:  Mr. Boyajian, thank you for that

4  clarification.  I think it makes the record clear.

5      And just for your edification, the Court had already cut

6  every single one of those three.

7      Mr. Simms, enjoy your grandchild, enjoy San Francisco,

8  even though the weather may not be the best right now.

9      And, Mr. Boyajian, hope that you're doing well on the

10  Portland side.

11      And I'm glad we could do this by Zoom, even though many of

12  my colleagues don't like doing it.  Some of my more

13  experienced colleagues that have been around for a bit longer

14  than me like to be in the courtroom, but not having to

15  travel, you know, that distance and stay in a hotel,

16  et cetera, for basically an hour-long argument I think makes

17  sense for something like this.  Hope you're all doing well.

18      Madam Clerk, we will be at recess.  Thank you.

19          MR. BOYAJIAN:  Thank you, Your Honor.

20          MR. SIMMS:  Thank you, Your Honor.

21          THE DEPUTY CLERK:  Thank you.

22                      (Adjourned.)

23

24

25

1

2                    C E R T I F I C A T E

3

4

5       I, Sheri L. Schelbert, RMR, CRR, do certify that the

6    foregoing is a correct transcript, to the best of my ability,

7    from the record of proceedings in the above-entitled matter.

8

9

10   */s/ Sheri Schelbert*

11   Sheri Schelbert

12

13

14

15

16

17

18

19

20

21

22

23

24

25